IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BRENNAN M. GILMORE,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER E. JONES, et al.,<br><br>Defendants. | Case No. 3:18-cv-00017 (GEC) |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**
**AND MOTION FOR ATTORNEY FEES PURSUANT TO THE**
**TEXAS CITIZENS PARTICIPATION ACT OR THE VIRGINIA ANTI-SLAPP ACT**

Thomas E. Albro
Evan D. Mayo
Trembly & Smith, PLLC
105-109 E. High Street
Charlottesville, VA 22902
Telephone: (434) 977-4455
Facsimile: (434) 979-1221
tom.albro@tremblaysmith.com
evan.mayo@tremblaysmith.com

Elizabeth A. Scully
Mark I. Bailen
Andrew M. Grossman
Richard B. Raile
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
escully@bakerlaw.com

Eric J. Taube
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, TX 78701
Telephone: (512) 685-6401
eric.taube@wallerlaw.com

Robb S. Harvey
Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-5380
robb.harvey@wallerlaw.com

*Counsel for Defendants Alexander E. Jones,*
*Infowars, LLC, Free Speech Systems, LLC and*
*Lee Ann McAdoo a/k/a Lee Ann Fleissner*

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background ................................................................................................................ 4

Standard of Review .................................................................................................... 7

Argument .................................................................................................................... 8

    I.    The Court Lacks Personal Jurisdiction Over the Free Speech Defendants ........... 8

        A.    The Court Lacks General Jurisdiction ....................................................... 8

        B.    The Court Lacks Specific Jurisdiction ....................................................... 9

    II.    Gilmore's Defamation Claims Are Meritless and Should Be Dismissed for Failure To State a Claim Upon Which Relief May Granted ............................................ 10

        A.    The Challenged Statements Lack Defamatory Meaning ......................... 11

            1.  The Challenged Statements Are Not Defamatory on Their Face ......... 11

            2.  The Challenged Statements Do Not Assert by Implication That Gilmore Is Party to Some Kind of Criminal Conspiracy ........................................ 13

        B.    The Challenged Statements Are Not Materially False............................. 15

        C.    The Challenged Statements Are Commentary, Not Verifiable Fact.......... 16

        D.    Gilmore Does Not Plausibly Allege Actual Malice ................................. 19

            1.  The First Amendment Requires Gilmore, a Limited Purpose Public Figure, To Plausibly Allege Actual Malice ............................................... 19

            2.  Gilmore Does Not Plausibly Allege Actual Malice or Any Other Degree of Intent ........................................................................................ 19

    III.    Plaintiff's "Emotional Distress" Claim Must Also Be Dismissed ........................ 22

    IV.    The Court Should Award the Free Speech Defendants Their Costs and Attorneys' Fees in Responding to a Suit Brought To Harrass Them ...................................... 23

Conclusion .............................................................................................................. 25

Case 3:18-cv-00017-GEC   Document 16   Filed 04/10/18   Page 2 of 29   Pageid#: 276

## INTRODUCTION

This lawsuit is an assault on the First Amendment. Plaintiff Brennan Gilmore has sued to "stop" the journalism of Alex Jones and his news publication Infowars. That's what he wrote in a *Washington Post* article titled "Alex Jones is a menace to society. I'm suing him."[1] Gilmore is a Democratic Party apparatchik and activist who disagrees with the views and opinions expressed by Jones and published by Infowars. His Complaint gratuitously swipes at Jones and Infowars for pages, amounting to a list of gripes and misrepresentations of events that have nothing to do with Gilmore or his legal claims. For what it's worth, Gilmore has also stated that he disagrees with the *New York Times* and does not regard it as being engaged in "responsible journalism."[2] He has a right to his opinions, idiosyncratic as they may be. But he has no right to enlist a federal court to silence others because he disapproves their perspective, because he considers them to be on the other side—the wrong side!—of a public controversy. That is censorship, and our Constitution forbids it.

Gilmore complains about the public debate surrounding the August 2017 protests in Charlottesville that resulted in the injuries of protestors and a death—an event that Gilmore captured on his phone and then parlayed into extensive media exposure to express his views on the matter and to thrust himself to forefront of this public controversy. However biting some of the Charlottesville-related commentary may have been, it was not remotely libelous. Rather than exercise his right to address the speech he challenges in the marketplace of ideas, Gilmore has chosen to go to court to silence Jones and others, to launch a media blitz to publicize the lawsuit and to smear Jones, and to harass and burden the defendants with frivolous litigation.

What Gilmore fails to appreciate is that the First Amendment protects the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and

---

[1] Brennan Gilmore, *Alex Jones is a menace to society. I'm suing him.*, Wash. Post, March 14, 2018, available at https://www.washingtonpost.com/news/posteverything/wp/2018/03/14/alex-jones-is-a-menace-to-society-im-suing-him/.

[2] Brennan Gilmore, Twitter (Nov. 25, 2017), https://twitter.com/brennanmgilmore/status/934617931312443393.

1

wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The law empowers citizen-journalists like Jones and publications like Infowars to dig beneath the narratives of the mainstream media, to raise questions, to hold government and public officials and figures to account, and to add to the glorious din of public debate that is the hallmark of a free society. Whether one agrees with the content of the speech or not, Gilmore, like other public officials and figures, must endure speech he would prefer to suppress.

Gilmore's claims against Alex Jones, Lee Ann McAdoo, Infowars, LLC, and Free Speech Systems, LLC (collectively, the "Free Speech Defendants") must be dismissed. Gilmore challenges two statements, one by another defendant, Lee Stranahan, from an interview with Ms. McAdoo included in an Infowars news report, and a second from a video commentary by Jones. Both comment on Gilmore's prominence in the public debate on the protests in Charlottesville. The two statements, Gilmore alleges, assert by implication that Gilmore is enmeshed in some kind of shadowy government conspiracy to kill the protestor and stage a coup to overthrow President Trump. Gilmore's allegation is baseless, and that is only one of at least six separate grounds requiring dismissal of his defamation claims.

*First*, Gilmore fails to identify any words or language that could conceivably bear a defamatory connotation. Unable to base a claim on what was actually said, he extrapolates wildly from the two statements he challenges, concocting a conspiracy theory and then trying to put it in the mouths of the Free Speech Defendants. The law, quite sensibly, allows no such thing.

*Second*, Gilmore is unable to plausibly allege that the statements he challenges are materially false. That is, of course, a prerequisite to liability.

*Third*, the speech that Gilmore challenges is opinion, not assertion of fact. To be certain, the opinions expressed are based upon facts underlying them, but those facts are not defamatory and not in dispute. What Jones and Stranahan offered was their take on the news of the day, bringing to light possible connections and angles that might otherwise go overlooked. Jones and Stranahan may interpret the facts differently than the government, the mainstream media, and

Gilmore, but the Constitution provides them and others the right to do so.

*Fourth*, Gilmore alleges no facts concerning the necessary element of the Free Speech Defendants' intent, simply parroting the bare elements of the "actual malice" standard. Not only does this failure require dismissal, but it raises serious questions about why Gilmore would come to this Court lacking any facts to support what is the central element of a defamation claim.

*Fifth*, the Free Speech Defendants are immune under the Texas Citizens Participation Act or, in the alternative, Virginia's anti-SLAPP statute, which protect speech on matters of public concern against abusive and harassing lawsuits exactly like this one.[3]

*Sixth*, Gilmore identifies no applicable contacts that the Free Speech Defendants have with Virginia and so has provided no basis for the Court's exercise of personal jurisdiction over them. This too requires dismissal—of all claims.[4]

In addition to dismissing this action, the Court should award the Free Speech Defendants their fees and costs under the fee-shifting provisions of the Texas Citizens Participation Act or Virginia's anti-SLAPP statute. The circumstances of this suit demonstrate that it lacks any merit, was brought solely to harass and burden the Defendants, and ultimately amounts to a publicity stunt, not a good-faith legal action to address real claims of the plaintiff. A fee and cost award would properly address Gilmore's abuse of this Court's authority and legal process, partially re-imburse the Free Speech Defendants for the unjust injury they have suffered, further the purposes of the Texas Citizens Participation Act (and the Virginia anti-SLAPP statute), and deter future abuses.

---

[3]There are also a number of grounds to dismiss Gilmore's claim for intentional infliction of emotional distress, including that he alleges no outrageous conduct, comes nowhere near alleging the kind of serious injury that is required, and has once again failed to make any plausible allegation of actual malice as the First Amendment requires. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53 (1988) (holding that claim for intentional infliction of emotional distress must meet same heightened standards as defamation when based on same publication).

[4]The Court may also lack subject-matter jurisdiction due what appears to be to the lack of complete diversity with respect to other of the Defendants.

## BACKGROUND

Defendant Alex Jones is a journalist, commentator, filmmaker, and host of a radio show syndicated on over 160 stations across the United States. The central focus of his work over the past 20 years has been the abuse of power by governments, by officials, by corporations, and by the connected. He strives to promote a culture of liberty, transparency, and freedom that empowers all persons, not just the elite class. Jones is the publisher of Infowars, a leading news website, and operates Infowars, LLC and Free Speech Systems, LLC. Compl. ¶¶ 13–15, 50. Defendant Lee Ann McAdoo, an independent contractor, is a reporter for Infowars. *Id*. ¶ 17. They are referred to, collectively, as the "Free Speech Defendants."

According to the Complaint, Plaintiff Brennan Gilmore is principally known for his Twitter account. *See, e.g.*, Compl. ¶¶ 28–31. Gilmore says he is a Foreign Service Officer in the U.S. State Department, albeit on "long-term unpaid leave" from that position for unspecified reasons. *Id*. ¶ 12. He is active in Democratic Party politics and has unspecified "connections to Democratic politicians." *Id*. and Introduction.

On August 12, 2017, Gilmore attended a protest held in Charlottesville, Virginia. Compl. ¶ 22. During the protest, he witnessed, and video-recorded on his mobile phone, a Dodge Challenger drive into a crowd of protestors, killing one and injuring many. *Id*. ¶¶ 26–27. The driver was later identified as James Alex Fields, a "neo-Nazi sympathizer" who had intended to participate in a "Unite the Right" rally that police canceled shortly before it was to begin. *Id*. ¶¶ 25–26. Gilmore posted his video on Twitter, along with a message: "Video of car hitting anti-racist protestors. Let there be no confusion: this was deliberate terrorism. My prayers with victims. Stay home." *Id*. ¶ 29. Posting the video, he insinuates, was necessary to rebut suggestions that the incident may have been an accident. *Id*. ¶ 28. Gilmore's post went viral, *id*. ¶ 29 (indicating nearly 90,000 "retweets" and over 100,000 "likes"), he conducted numerous interviews with media about the incident, and he appeared on television not only to "relay[] his account" of the event but also to use the media attention to emphasize the "seriousness" of the incident and to condemn "the hate-filled display and violence" he had seen in Charlottesville. *Id*. ¶¶ 30–31. The protests

4

were a major news story. *Id*.

For several days after the incident, the Internet buzzed with stories asserting that Democrats, the mainstream media, and "deep state" government employees who oppose President Donald Trump were involved in an effort to put a political, anti-Trump spin on the Charlottesville protests. *E.g.*, Compl. ¶¶ 32–39. For example, a blog post by Defendant Jim Hoft focused on the facts that many mainstream media stories featured Gilmore, that he happened to be at the protests recording video, that he was identified by the *New York Times* as a "U.S. State Department foreign service officer," that he had also been chief of staff for the campaign of a "liberal" Democratic politician, and that a billionaire donor to liberal causes, George Soros, had made a massive contribution to that campaign. Compl. Ex. E. Hoft concluded that the media who interviewed Gilmore knew who he was and that his reliably liberal comments in the media indicated that "the Deep State is working with the liberal media to shape narrative and fool the American people." *Id*. Hoft's view was that it was not a coincidence that "[t]he random Charlottesville observer who was interviewed by MSNBC and liberal outlets turns out to be a deep state shill with links to George Soros." *Id*.

Among many other outlets, Infowars was also on the beat. Its reporter, Lee Ann McAdoo, conducted a video interview with investigative reporter Lee Stranahan and published it under the title "Bombshell Connection Between Charlottesville, Soros, CIA." Compl. ¶¶ 41–42, Ex. F. Stranahan shared the view that there was an effort to put a liberal spin on the Charlottesville protests for the purpose of "smearing Trump and his supporters" and even perhaps replacing him in power. *Id*. ¶ 152. Stranahan also thought that it might not be a coincidence that the most prominent commentator on the protests was a State Department officer, worked for a Democratic politician, and espoused reliably liberal views in the media and on his Twitter account:

> STRANAHAN: If you go to Brennan Gilmore's page, his Twitter page, you'll see he has a picture of the young woman who was murdered, and you know what is says? "Martyr." Literally, it says "martyr." You can't be more explicit than this. So here's what I'm saying. I'm not a conspiracy theorist, I'm a fact-based journalist. The facts are enough. However, the Democrats have investigated Trump for a lot less. For a lot less. They have called for investigations, and secret meetings,

they have convened the FBI. When you have this many things going on, I think someone really needs to investigate. *Again, I don't like to jump to conclusions. I'd like to ask some questions about who this kid was, where he came from, what do we know—get it all out in the open. But I'll also point out that we can't count on the media to do this.*

STRANAHAN: Yeah, if you scroll…keep scrolling…this is the guy, Brennan Gilmore, and if you scroll down, keep going, it's not too far, you'll see the photo of the young woman…this is abs [sic]…when I saw this, uh, I was shocked…by the way, his bio, if you look at this guy's bio, it says he's with the State Department, and the fact that he called her a 'martyr'…. I don't know, but this is clearly, the way she's being used is she's a martyr to the cause….

STRANAHAN: And let me point out what's happening. They, uh, they win no matter what they do. Are they trying to get a coup? I think clearly they are. But if they can't get a coup, they'll settle for impeachment. And if they can't get impeachment, they'll settle for smearing Trump and his supporters so much that they'll be able to elect another elitists. Does that make sense?

MCADOO: Absolutely.

Compl. ¶¶ 41, 152. As Stranahan spoke, McAdoo scrolled through Gilmore's Twitter profile, which consisted almost entirely of "tweets" touting Gilmore's media hits and invective against President Donald Trump.[5]

Count 7 of Gilmore's Complaint alleges that these remarks, but for the italicized portion above omitted from the Complaint's transcription, are "defamatory per se because they impute to Mr. Gilmore the commission of some criminal offense involving moral turpitude—in this instance, that Mr. Gilmore planned or participated in James Alex Fields, Jr.'s car attack in Charlottesville on August 12, 2017, which killed one person and injured many others, as part of a conspiracy to stage a 'coup' and overthrow a sitting president." Compl. ¶ 157.

While the story might not have received much play in the mainstream media, it continued to make waves online. Compl. ¶¶ 43–44. Naturally, Alex Jones weighed in several times with commentary, including a video published on Infowars.com and YouTube on or about August 20, 2017. *Id*. ¶¶ 44–45, Ex. G. Like others, Jones also thought it was unusual that a State Department

---

[5]The full video is available at https://www.youtube.com/watch?v=L58T2dl997A (Last visited April 6, 2018); Compl. ¶ 42 n.34.

officer was on the scene in Charlottesville recording video, was so ubiquitous in the news coverage of the protests, and was so consistent in using his media appearances to spout anti-Trump "talking points":

> I did research, and I confirmed it all. They had known CIA and State Department officials in Charlottesville, first tweeting, first being on MSNBC, CNN, NBC. The mayor is involved. Everybody has a cut-out—*of the major players. Some of the useless…I guess they're "useful idiots" to use Lenin's term. I see them as useless idiots. The white supremacists involved, some of those are real….*

> They got State Department and high-level CIA. One guy is paid 320,000 a year on the payroll of Soros. He doesn't just get money from Soros, he personally is paid 320 a year, and then he is there—CIA…State Department—and he is on the news. And when people pointed out who he was, they took his name of the State Department website and stuff, but Google has all the shots of it. I mean it's like whoa, whoa—CIA? Your senior guys? Like you're so stupid—on TV, "oh I saw 'em run over, I saw the racists, I saw the white supremacists attack, *oh I'm the guy being interviewed first, putting out the talking points: this is the downfall of Trump, this is the beginning, it shows he, and it's all…."* He worked for Podesta too, John Podesta. I'll give you his name and stuff, we're gonna play a video of him on the news. *They had him first on every newscast, just here he is, bring him up, "I'm just a witness, [garbled], ha ha yeah ha ha yeah.*"

*Id.* ¶¶ 46, 169–71.[6] Count 8 of the Complaint alleges that these remarks, but for the italicized portions omitted from the Complaint's transcription, are defamatory per se on the same basis as the last ones. *Id.* ¶ 176.

The Complaint includes two additional counts relevant here. Count 1 is a general defamation claim, against all Defendants, that is not based on any additional allegations and does not seek additional liability against the Free Speech Defendants beyond Counts 7 and 8. Compl. ¶¶ 107–14. And Count 10 is a claim for intentional infliction of emotional distress against all Defendants. *Id.* ¶¶ 194–98.

### STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*,

---

[6]The full video is available at https://www.youtube.com/watch?v=52C5-GplKxg. Compl. ¶ 45 n.40.

550 U.S. 544, 555, (2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

## ARGUMENT

## I. The Court Lacks Personal Jurisdiction Over the Free Speech Defendants

As a threshold matter, Gilmore identifies no contacts the Free Speech Defendants themselves established with Virginia, so the Court lacks personal jurisdiction over them. Gilmore's burden is to make a *prima facie* showing in support of jurisdiction, *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016), and "conclusory allegations" that do not satisfy the *Iqbal/Twombly* standard are insufficient. *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 775 F. Supp. 2d 790, 799 (D. Md. 2011); *Synergics Energy Servs., LLC v. Algonquin Power Fund (Am.), Inc.*, 2014 WL 2812230, at *16 (D. Md. June 20, 2014). Whether Gilmore has carried that burden is a question of law for the Court. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Although the Complaint references both general and specific jurisdiction, it plausibly alleges no facts to support either.

### A. The Court Lacks General Jurisdiction

Gilmore's complaint fails to allege "continuous" operations in a Virginia "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993) (quotation marks omitted). The conclusory allegation that, "[u]pon information and belief, Defendants regularly do and/or solicit business in the Commonwealth, engage in other persistent

courses of conduct, or derive substantial revenue from goods used or consumed or services rendered in the Commonwealth," Compl. ¶ 7, does not satisfy minimum pleading requirements.[7]

Likewise, the allegation that "Defendants solicit donations on their websites or blogs" and that some "traffic to these websites" involves "individuals in the Commonwealth of Virginia," *id.* ¶ 8, is also vague, conclusory, and insufficient to establish jurisdiction. Indeed, even extensive physical advertising in a state is insufficient to trigger general jurisdiction. *Ratliff v. Cooper Labs., Inc.*, 444 F.2d 745, 748 (4th Cir. 1971); *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993); *Burleson v. Toback*, 391 F. Supp. 2d 401, 407 n.6 (M.D.N.C. 2005). Ultimately, that allegation amounts to nothing more than an assertion that "individuals in the Commonwealth of Virginia" have access to the Defendants' websites, Compl. ¶ 8, and "[s]omething more would have to be demonstrated" to establish general jurisdiction. *See ALS Scan, Inc. v. Digital Serv. Consultants*, 293 F.3d 707, 712 (4th Cir. 2002).

## B. The Court Lacks Specific Jurisdiction

As with general jurisdiction, specific jurisdiction does not exist where the defendant "simply places information on the Internet." *ALS Scan, Inc.*, 293 F.3d at 714. Instead, the defendant must "direct[] electronic activity into the State" with "the manifested intent of engaging in business or other interactions within the State." *Id.*; *see also Young v. New Haven Advocate*, 315 F.3d 256, 261–62 (4th Cir. 2002).

The conclusory allegation that "Defendants' defamatory statements were directed at and received by individuals and businesses in Virginia," Compl. ¶ 6, fails to show that "the defendant

---

[7] *See, e.g.*, *Barnett v. Surefire Med., Inc.*, 2017 WL 4279497, at *2 (D. Md. Sept. 25, 2017) (rejecting similar allegation); *Intercarrier Commc'ns LLC v. WhatsApp Inc.*, 2013 WL 5230631, at *1, 3 (E.D. Va. Sept. 13, 2013); *JPB Installers, LLC v. Dancker, Sellew & Douglas, Inc.*, 2017 WL 2881142, at *5 (M.D.N.C. July 6, 2017); *Carbone v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 4158354, at *7 (D. Md. Aug. 5, 2016); *Cleveland v. Accumarine & Transp., LP*, 2011 WL 939011, at *2 (D.S.C. Mar. 16, 2011); *see also Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 618–19 (E.D. Va. 2009); *Essex Ins. Co. v. Miles*, 2010 WL 5069871, at *2–3 (E.D. Pa. Dec. 3, 2010) ("[R]eliance…on information and belief cannot transform legal conclusions into plausible factual allegations.").

himself" directed anything at "the forum State itself." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). The Fourth Circuit addressed this kind of defect in *Young*, where Connecticut newspaper websites made allegedly defamatory statements about a Virginia resident that were accessible in Virginia by its residents. 315 F.3d at 263. That showing was insufficient because "the fact that the newspapers' websites could be accessed anywhere, including Virginia, does not by itself demonstrate that the newspapers were intentionally directing their website content to a Virginia audience." *Id.*

It is likewise insufficient to allege that the "the Defendants" spoke about "an event that took place in Virginia, which was of particular importance to local Virginians," Compl. ¶ 9, because speaking about persons and events in Virginia is not action "intentionally directing their website content to a Virginia audience." *Id.* at 263–64; *see also Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 401 (4th Cir. 2003); *Russell v. Krowne*, 2009 WL 10685441, at *5 (D. Md. June 19, 2009). As Gilmore alleges, the Charlottesville protests acquired *national* attention, Compl. ¶¶ 30–31, 41–50, Exs. A–C, and that *national* audience, not a Virginia-specific audience, was the target of the Free Speech Defendants' videos in their *national* publication. *See Young*, 315 F.3d at 263; *FireClean, LLC v. Tuohy*, 2016 WL 3952093, *6–7 (E.D. Va. July 21, 2016) (rejecting jurisdiction where defendant targeted "opinions to the nationwide marketplace of consumers," rather than a Virginia-specific audience). Gilmore's summary and conclusory allegations, even if true, are insufficient as a matter of law to establish jurisdiction over any of the Free Speech Defendants.

## II. Gilmore's Defamation Claims Are Meritless and Should Be Dismissed for Failure To State a Claim Upon Which Relief May Granted

Under Texas law, the elements for libel are (1) publication of (2) a defamatory statement with (3) the requisite intent. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).[8]

---

[8]Texas law applies. For tort actions such as defamation, "Virginia applies the doctrine of lex loci delicti, meaning the law of the place of the wrong governs all matters related to the basis of the right of action." *Dreher v. Budget Rent–A–Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006). The alleged wrongs—the publication of the challenged statements—took place in Texas, *see* Compl.

**A.      The Challenged Statements Lack Defamatory Meaning**

"A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury." *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 426 (Tex. App. 1997), writ denied (June 5, 1998); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). "A statement may be false, abusive, unpleasant, and objectionable to the plaintiff without being defamatory." *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 511 n.6 (Tex. App. 2008). Whether a statement is "reasonably capable of a defamatory meaning" is "a question of law to be decided by the trial court." *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987); *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 138 (Va. 1998). A statement may have defamatory meaning directly (e.g., "John is a leper.") or by implication (e.g., "John has been sent to the leper colony."). *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 591–92 (Va. 1954). As Gilmore alleges both types, each is addressed in turn.

**1.      The Challenged Statements Are Not Defamatory on Their Face**

The "plain and natural meaning" of the challenged statements, disposes of any claim that they directly defame Gilmore. *Carwile*, 82 S.E.2d at 591–92; *see also Overstreet v. Underwood*, 300 S.W.3d 905, 910 (Tex. App. 2009).

McAdoo interviewed Stranahan, and Stranahan's comments speak for themselves (and neither were stated by the Free Speech Defendants nor are libelous). The only statements in the interview directly concerning Gilmore are that he has a "Twitter page," wrote on Twitter that the woman killed at the Charlottesville protest was a "martyr," and identified himself as being with

---

¶¶ 13–17, making that the place of the wrong. *See Kylin Network (Beijing) Movie & Culture Media Co. Ltd v. Fidlow*, 2017 WL 2385343, at *3 n.2 (E.D. Va. June 1, 2017) (noting issue is unsettled and expressing "skepticism" toward argument that Virginia law applied in similar circumstances). The Free Speech Defendants alternatively cite decisions applying Virginia law, which is materially identical on the issues discussed. To be actionable, (1) a statement must contain a "provably false factual connotation," (2) must be "of or concerning" the plaintiff, and (3) must "tend[] to harm the reputation [the plaintiff]," that is, it must have a defamatory meaning. *WJLA–TV v. Levin*, 564 S.E.2d 383 (2002); *Gazette, Inc. v. Harris*, 325 S.E.2d 713 (1985); *Chapin*, 993 F.2d at 1092. Of course, the First Amendment limits equally the reach of Texas and Virginia defamation law.

the State Department. Compl. ¶ 142. In addition to being true, which Gilmore concedes, *id*. ¶¶ 12, 28, these things bear no conceivable defamatory meaning.

The same is true of the Jones commentary. To begin with, Jones's statement that "[t]hey had known CIA and State Department officials in Charlottesville, first tweeting, first being on MSNBC, CNN, NBC" is, as Gilmore concedes, literally true, in that he was a State Department Official, was in Charlottesville, and discussed the events there on Twitter and on television. Compl. ¶¶ 12, 28–31. None of these things are defamatory, as they could not conceivably injure Gilmore's reputation. And even Gilmore does not contend that the statement that "[e]verybody is a cut-out" has any literal defamatory meaning, alleging instead that the defamatory sting comes from the implication that he is party to "an alleged CIA/State Department conspiracy to incite violence in Charlottesville." *Id*. ¶ 169. In any instance, it is not apparent what *literal* meaning "cut-out" even has in this context or that the "cut-out" statement even concerns Gilmore, given that Jones qualifies that it is limited to "the major players" and that even some of them are merely "useful idiots."

Likewise, the most that Jones's subsequent statements might be understood to directly say about Gilmore is that he works for the CIA or State Department, that he has received money from George Soros, that he has worked for John Podesta, and that he delivered consistent anti-Trump talking points in his many television interviews instituted as a consequence of Gilmore's insinuating himself and his political views into the media coverage. Compl. ¶¶ 170–71. Again, none of these things are defamatory, because none of them would "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin*, 993 F.2d at 1092 (quotation marks omitted). Even taken together and when considering the publications as a whole, the statements do not convey a sufficient defamatory meaning to be actionable. *See Delta Air Lines*, 949 S.W.2d at 426.

### 2. The Challenged Statements Do Not Assert by Implication That Gilmore Is Party to Some Kind of Criminal Conspiracy

Equally preposterous is Gilmore's contention that the challenged statements assert by implication that he is involved in a criminal conspiracy of some kind. When a plaintiff alleges defamation by implication, "the alleged implication must be reasonably drawn from the words actually used." *Webb v. Virginian-Pilot Media Companies, LLC*, 752 S.E.2d 808, 811 (Va. 2014). Where "the statement cannot properly be construed as ambiguous nor in the ordinary and proper meaning convey a defamatory interpretation, such meaning cannot be enlarged by claims of innuendo." *Overstreet v. Underwood*, 300 S.W.3d 905, 910 (Tex. App. 2009); *ABC, Inc. v. Shanks*, 1 S.W.3d 230, 237 (Tex. App. 1999) (same); *Webb*, 752 S.E.2d at 811 ("The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but *it can not introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain*.") (emphasis added and quotation marks omitted). Moreover, "because the Constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author also intends or endorses the inference." *Chapin*, 993 F.2d at 1093.

As for the Stranahan interview, the challenged statement says absolutely nothing about what Gilmore alleges it implies, which is that he "planned or participated in James Alex Fields, Jr.'s car attack in Charlottesville on August 12, 2017, which killed one person and injured many others, as part of a conspiracy to stage a 'coup' and overthrow a sitting president." Compl. ¶ 157. Stranahan obviously considered it a suspicious or odd fact that a State Department official was putting what he viewed as a hard anti-Trump spin on the events in Charlottesville. But conspiring to murder a protestor? Stranahan says nothing of the sort. And so Gilmore simply invents layers upon layers of unstated contentions: that Gilmore is "part of a conspiracy," that this conspiracy's objective is to overthrow President Trump through an unlawful coup, that this conspiracy sought

to carry out that objective by killing a protestor, and that Gilmore was somehow, in some un-stated fashion, involved in these crimes. This is exactly the kind of attempt to "introduce new matter" and "make that certain which is in fact uncertain" that is forbidden. *Webb*, 752 S.E.2d at 811; *Overstreet*, 300 S.W.3d at 910; *CACI Premier Tech. Inc. v. Rhodes*, 536 F.3d 280, 303 (4th Cir. 2008) (no implication claim where talk radio host named military contractor in an "open-ended list of potential targets for investigation [for torture and murder] without assigning blame to any particular contractor"). The insinuation of improper or illegal activities here is even more attenuated than in *Webb* and other precedent: Stranahan's comments do not state or imply that Gilmore took any action other than posting on Twitter with a perceived anti-Trump spin.

That deficiency is also fatal to Gilmore's alternative allegation, which is that Stranahan's commentary actually asserted by implication that Gilmore is a participant "in a conspiracy to ex-ploit Heather Heyer's death to stage a coup resulting in the removal of Donald Trump as Presi-dent." Compl. ¶ 153. Moreover, even if the unidentified group referred to solely as "they" is taken to reference Gilmore, which is not at all apparent from the context, what follows—that the same "they" "[a]re trying to get a coup" and that they will "settle for impeachment" or will "set-tle for smearing Trump and his supporters so much that they'll be able to elect another elitist"—makes clear the statement is ordinary hyperbolic political invective, not a literal accusation that someone is plotting a putsch. *Id.* ¶ 152. This is the kind of "hyperbolic characterization" that any listener would recognize as "exaggerated rhetoric intended to spark the debate." *CACI*, 536 F.3d at 301 (so finding with respect to talk radio host's statements that military contractor "torture[s] people" and is staffed with "hired killers"); *see also Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex. App. 1988), writ denied (June 21, 1989).

Infowars is talk radio, a "medium…in which hyperbole and diatribe reign as the preferred tools of discourse. Such expression, though not infrequently caustic and offensive, nevertheless enjoys robust First Amendment protection." *CACI,* 536 F.3d at 304 (Duncan, J., concurring). Further, anyone watching the Infowars videos on YouTube (or on Infowars.com) would see that Jones and his team use a documentary style with little editing, revisions, or cuts. This raw, uncut

style of journalism sets the audience's expectation about the nature of the reporting and the editing polish that go into a given segment.

Gilmore's claim regarding Jones's commentary fails for the same reasons. Gilmore alleges that Jones asserted by implication that he is "involved in an alleged government conspiracy to incite violence in Charlottesville" and that he "planned or participated in James Alex Fields, Jr.'s car attack in Charlottesville on August 12, 2017." Compl. ¶¶ 169, 171, 176. The problem is that Jones no more accuses Gilmore of these things than of participating in a conspiracy to fake the moon landing or to facilitate a takeover of the government by space aliens. The only action that Jones said Gilmore took was going on TV to parrot anti-Trump "talking points." Compl. ¶¶ 169–71. The rest is Gilmore's own invention, created to prop up his implausible legal claims. And, Jones having said nothing about inciting violence or any murder plot, it is impossible to find that Jones "intends or endorses" Gilmore's conspiracy theories. *Chapin*, 993 F.2d at 1093.

## B. The Challenged Statements Are Not Materially False

A "plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." *Chapin*, 993 F.2d at 1092. If the gist or "sting" of a statement is substantially true, "minor inaccuracies will not give rise to a defamation claim." *AIDS Counseling & Testing Centers v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990). And, under the First Amendment, a statement "is not considered false" and thus actionable "unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (quotation marks omitted); *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990). In light of these rules, Gilmore has failed to make plausible allegations of material falsity with respect to each of the actual challenged statements.

As to the Stranahan interview, Gilmore actually does not allege that any of the assertions in the lengthy transcript excerpt he challenges are false. Instead, he simply asserts in conclusory fashion that all those "statements are false…as an assertion of fact." Compl. ¶ 152. This is the kind of conclusory statement, unsupported by factual allegation, that fails to support a plausible claim. *Iqbal*, 556 U.S. at 679. Gilmore does, however, insist that it would be false to state that he

15

was involved in some kind of government conspiracy to kill a protestor and overthrow the government, but that is neither what Stranahan said nor the natural meaning or implication of Stranahan's words and so cannot render those words false.

As to Jones's commentary, Gilmore fails to identify any material falsehoods. He alleges that it is false to contend that he works for the CIA, that he is compensated by the financier and liberal icon George Soros, and that he has ever worked for John Podesta. Compl. ¶¶ 169–71. Gilmore disputes those contentions, but not in a way that would make them *materially* false, because there is no defamatory sting associated with any of them. As for Jones's statement that "[e]verybody is a cut-out," if it is assumed even to apply to Gilmore, it at most indicates that Jones disapproves his advocacy, which Gilmore does not dispute and touts as a badge of honor. These are not materially false statements of fact.

### C.     The Challenged Statements Are Commentary, Not Verifiable Fact

Gilmore's claims also fail because they seek to suppress commentary on the news that consists of opinion and hyperbole, not verifiable fact. The First Amendment "provides protection for statements that cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co*., 497 U.S. 2, 20 (1990) (quotation marks omitted). Thus, "a pure expression of opinion is protected because it fails to assert an actual fact. Rhetorical hyperbole, in contrast, might appear to make an assertion, but a reasonable reader or listener would not construe that assertion seriously." *Schnare v. Ziessow*, 104 Fed. App'x 847, 851 (4th Cir. 2004); *see also CACI*, 536 F.3d at 293 (similar). Whether a statement asserts a provably false fact is a question of law for the Court. *CACI*, 536 F.3d at 293–94. In undertaking that inquiry, the Court must consider "the context and general tenor of the article," including the use of "loose, figurative or hyperbolic language which would negate the impression that the speaker was stating fact." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (quotation marks omitted).

Stranahan's interview expresses his opinion about the efforts to spin the events in Charlottesville. He discloses the underlying facts—Gilmore posted his video to Twitter, labeled the young woman hit by the car a "martyr," and works for the State Department—and they are not

(as discussed above) disputed. The rest is nothing more than Stranahan's take on the facts, and "no reasonable reader would consider [that] anything but the opinion of the author drawn from the circumstances related." *Chapin*, 993 F.3d at 1093 (holding opinion based on disclosed fact non-actionable). That conclusion is only reinforced by the context. Viewers would expect an interview to be more free-flowing and opinionated and less precise in its use of language than an article or book. That is especially the case for an interview conducted by Infowars, a website where "readers expect to find spirited critiques" of the media's coverage of current events, among other things. *Moldea v. New York Times Co.*, 22 F.3d 310, 311 (D.C. Cir. 1994) (discussing book-review context); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 625 (D.C. Cir. 2001) (statement that politician suffered "paranoia" was non-actionable given "well-understood context" of magazine commentary). And that conclusion is further reinforced by Stranahan's use of hyperbole in quipping that President Trump's opponents are seeking a "coup" before discussing more realistic objectives, such as "impeachment," "smearing Trump," and voting him out of office. The use of such loose, hyperbolic language has a long history in U.S. politics and has consistently been held to be protected opinion; indeed, throwing around the word "coup" is rather tame, so far as political discourse goes.[9]

---

[9]*Compare, e.g., Williams v. Town of Greenburgh*, 535 F.3d 71, 77 (2d Cir. 2008) ("Junior Mussolini"); *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 567, 569 n.6 (1999) (plaintiff's project proposal was a "veritable Brooklyn Bridge of misrepresentations"); *Dunn v. Ganett N.Y. Newspapers, Inc*., 833 F.32d 446, 454 (3d Cir. 1987) (Hitler and Castro); *Koch v. Goldway*, 817 F.2d 507–510 (9th Cir. 1987) (comparison to Nazi war criminal); *Buckley v. Littell*, 539 F.2d 882, 893–94 (2d Cir. 1976) ("'fascist,' 'fellow traveler' and 'radical right'"); *Yeager v. Local Union 20*, 453 N.E.2d 666, 667, 669 (Ohio 1983) (description of plaintiff as a "Little Hitler," as operating "a Nazi concentration camp," and as using "Gestapo" tactics).

Of course, Gilmore knows that people use words this way because he does, too. According to his Twitter feed, *see* Brennan Gilmore, Twitter, https://twitter.com/brennanmgilmore, President Trump is the "leader of [U.S.] white supremacists" (Feb. 15, 2018). Virginia Republicans, meanwhile, are guilty of "[c]riminal negligence" (Dec. 7, 2017). And those charges are tame compared to his routine use of language accusing Dominion Energy, with which he is strangely obsessed, of serious crimes. For example, in January he reported, "Corporate public utilities are literally stealing your money and drafting the laws that allow them to do so" (Jan. 23, 2018). That's "literally," not figuratively or metaphorically. Lest there be any doubt about who's doing the "stealing," he followed up three days later with a report that "Dominion Energy is stealing your

The same holds true for Jones's commentary. Jones saw the same government official (supposedly on leave) pop up in all the news reports and news broadcasts as a witness to the events in Charlottesville and deliver the same anti-Trump "talking points" every time. Compl. ¶ 46. That aroused his suspicion, which he expressed off-the-cuff in the passionate, hyperbolic style that is characteristic of his radio show and videos. Any viewer would recognize that as his opinion, because that is what they know to expect from Alex Jones: providing a different take on the news of the day by connecting reported facts in unexpected and illuminating ways.

The Fourth Circuit's decision in *CACI* is apposite to the circumstances of this case. The defendant was the host of a political talk show, known for being "shrill, screeching" and "hectoring, cocksure" and for her "colorful" commentary. 536 F.3d at 284. She devoted several weeks of her show to extended rants about abuses perpetrated by military contractors in Iraq, contending that they engaged in "murder," "torture," and other illegal and immoral conduct. *Id*. at 288–92 (quoting challenged statements). One of the contractors sued for defamation. The Court held that statements that the contractor's employees were "killers," that they "torture[d] people" and engaged in other unlawful conduct, and that they "fought on the side of [a] government that was literally chopping off young boys' hands because they didn't want to kill them" were not actionable under the First Amendment. *Id*. at 300–302. All of those comments, and arguably worse, were protected hyperbole and exaggeration. *Id*.

The statements in *CACI*, like those challenged here, are precisely the kind of "'imaginative expression' [and] 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation" and enjoys *complete* First Amendment protection. *Milkovich*, 497 U.S. at 20. That protection is what allows breathing space for citizens to criticize public officials and the powerful, to put

---

money ($400 million in just two years of unrefunded overcharges) and using it to buy off legislators so that it can steal more" (Jan. 26, 2018). More recently, he has leveled the serious accusation that there is "staggering legalized corruption in Virginia politics, led by @DomEnergyVA [i.e., Dominion Energy]" (Feb. 8, 2018). There are many more examples, but there is no need to belabor the point. No one would take this kind of invective as anything other than Gilmore spouting off, and not as an accusation of literal criminal conduct.

forward their own views of events, and to disagree with the government's take on the facts, free from fear of punishment. It completely immunizes the commentary challenged here from liability.

### D. Gilmore Does Not Plausibly Allege Actual Malice

Having enthusiastically thrust himself into public debate, it is Gilmore's burden to make plausible allegations of actual malice. Yet Gilmore is unable to satisfy his burden, instead only formulaically reciting the legal elements of his claims. That requires dismissal.

#### 1. The First Amendment Requires Gilmore, a Limited Purpose Public Figure, To Plausibly Allege Actual Malice

The actual malice standard applies because Gilmore is, at a minimum, a limited-purpose public figure.[10] When "an individual voluntarily injects himself or is drawn into a particular public controversy, he "thereby becomes a public figure for a limited range of issues" and so must prove actual malice. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Gilmore satisfies each of the relevant five factors: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation." *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994). This inquiry is a question of law for the Court. *Id*. at 1551.

First, Gilmore has extensive "access to channels of effective communication." Through his Twitter account, he can reach hundreds of thousands or even millions of readers. *See, e.g.*, Compl. ¶ 29. He receives "media requests from national, local, and international outlets," including the *New York Times*, and has appeared on "multiple television news networks and other news media." *Id*. ¶¶ 30–31. Indeed, it would not be surprising if the Court first learned of this lawsuit through the media (a result that Gilmore clearly intended and desired), given that it was covered

---

[10]Gilmore arguably is also a public official, as he acknowledges that he is a State Department official, albeit on an unpaid leave of absence.

by the *Washington Post* (which also published an op-ed by Gilmore), *Washington Examiner*, *Washington Times*, Reuters, Associated Press, and numerous other publications, many of which published direct quotes from Gilmore. Just the channels identified in the complaint exceed those held sufficient in *Hatfield v. The New York Times Co.*, 532 F.3d 312, 322 (4th Cir. 2008).

Second and third, Gilmore concedes that he voluntarily assumed a role in a public controversy—the meaning of the events in Charlottesville—and concedes that he sought to influence the outcome of that controversy. Compl. ¶ 28 (alleging that Gilmore posted the video to disprove that "the incident was something other than a deliberate attack"); *id*. ¶ 31 (alleging that Gilmore "spoke with multiple television news networks and other news media" so that he could "convey the seriousness and certainty of what he had seen and condemn the hate-filled display and violence at the 'Unite the Right' rally").

Fourth, Gilmore specifically alleges that the controversy over the meaning of the events in Charlottesville existed before the publication of Stranahan's interview and Jones's commentary. Compl. ¶¶ 28, 31–40.

Fifth, the publications occurred within days of the events in Charlottesville, while the controversy over them still raged, such that Gilmore, as a witness to those events and continuing commentator on them, remained a public figure. Compl. ¶¶ 28–31, 51–53.

Accordingly, Gilmore is at least a limited purpose public figure with respect to the events at issue here.[11]

---

[11]Under Virginia's anti-SLAPP statute:

> A person shall be immune from civil liability for…a claim of defamation based solely on statements (i) regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party…. The immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.

Va. Code § 8.01-223.2(A). Because Gilmore's defamation claims against the Free Speech Defendants concern matters of public concern subject to First Amendment protection, and were communicated to a third party, they are immune. To overcome that immunity, Gilmore must prove that those statements were "made with actual or constructive knowledge that they are false

## 2. Gilmore Does Not Plausibly Allege Actual Malice or Any Other Degree of Intent

Gilmore's ultimate burden is to "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 511 n. 30 (1984). The Fourth Circuit addressed the application of the *Iqbal/Twombly* "plausibility" pleading standard to actual malice in *Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369 (4th Cir. 2012). It rejected as "entirely insufficient" an allegation "that [defendants] statements 'were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity.'" *Id.* at 378. It explained that such a "conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected." *Id.*[12]

That rule is dispositive here. The entirety of Gilmore's allegations regarding the knowledge or subjective doubt of the Free Speech Defendants are as follows:

> 112. [All] Defendants acted with actual malice. Their defamatory statements about Mr. Gilmore's background and role in the Charlottesville protest and attack were made with knowledge of their falsehood or reckless disregard for their truth or falsity.

> 156. Defendants Jones, InfoWars, Free Speech Systems, Stranahan, and McAdoo acted with actual malice. Their defamatory statements about Mr. Gilmore's background and role in the Charlottesville protest and attack were made with knowledge of their falsehood or reckless disregard for their truth or falsity. At a minimum, Defendants Jones, InfoWars, Free Speech Systems, Stranahan, and McAdoo's statements were negligent.

> 174. Defendants Jones, InfoWars, and Free Speech Systems acted with actual malice. Their defamatory statements about Mr. Gilmore's background and role in

---

or with reckless disregard for whether they are false," a common formulation of the actual malice standard. *See, e.g.*, *CACI*, 536 F.3d at 293.

[12]*See also Schatz v. Republican State Leadership Committee*, 669 F.3d 50 (1st Cir. 2012) (affirming dismissal where complaint only used "actual malice buzzwords.); *Hanks v. Wavy Broad., LLC*, 2012 WL 405065, at *13 (E.D. Va. Feb. 8, 2012) ("Merely pleading the standard for actual malice in the Complaint without more is insufficient to state a claim.").

the Charlottesville protest and attack were made with knowledge of their false-
hood or reckless disregard for their truth or falsity.

Paragraph 112 is part of Count I, Paragraph 156 is part of Count VII, and Paragraph 174 is part
of Count VIII. All are conclusory allegations of the kind held insufficient in *Mayfield*. Indeed,
the complete absence of any non-conclusory allegations regarding the Free Speech Defendants'
intent means that Gilmore's claims would also fail under a lesser intent standard.

To say the least, Gilmore's inability to identify any facts supporting a central element of
his claims before filing this suit and launching a publicity blitz in support of it seriously calls into
question his and his attorneys' good faith in bringing this action. By all indications, they are at-
tempting to use the Court to deliver a political message, not to prosecute any colorable claim.

### III. Plaintiff's "Emotional Distress" Claim Must Also Be Dismissed

Gilmore's claim of intentional infliction of emotional distress ("IIED") is frivolous. To
sustain an IIED claim, the plaintiff must plausibly allege four elements: that "the wrongdoer's
conduct is intentional or reckless; the conduct is outrageous and intolerable; the alleged wrongful
conduct and emotional distress are causally connected; and, the distress is severe." *Russo v.
White*, 400 S.E.2d 160, 162 (1991); *see also Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735,
740 (Tex. 2003). IIED claims are disfavored. *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006).
Gilmore's claim fails for four independent reasons.

*First*, like the defamation claims, it is unsupported by a plausible allegation of actual mal-
ice, as the First Amendment requires. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).

*Second*, Gilmore fails to allege "outrageous and intolerable conduct." Such conduct must
be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."
*Russo*, 400 S.E.2d at 162. But Gilmore alleges only that the Free Speech Defendants defamed
him in two publications, and even those claims don't hold up. This is precisely the kind of "friv-
olous suit[]" where "mere hurt feelings are involved" and dismissal is therefore required. *Harris*,
624 S.E.2d at 204 (quotation marks omitted).

*Third*, Gilmore's bare allegations of "emotional stress" and "fear," Compl. ¶ 89, are neither plausible—the complaint suggests that he affirmatively sought out and relishes his role as a public figure—nor adequately severe. Such an "alleged effect on the plaintiff's sensitivities is not the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 28 (dismissing where plaintiff "alleged that she was nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work").

*Fourth*, "to maintain a claim for intentional infliction of emotional distress," Gilmore "was required to allege facts independent of [his] defamation claim," *Draker v. Schreiber*, 271 S.W.3d 318, 323 (Tex. App. 2008), but the two claims involve the same underlying allegations.

## IV.  The Court Should Award the Free Speech Defendants Their Costs and Attorneys' Fees in Responding to a Suit Brought To Harass Them

The Free Speech Defendants are entitled to dismissal and a cost and fee award under the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code § 27.001 et *seq*. The Act requires dismissal when "a legal action is based on…a party's exercise of the right of free speech" unless the plaintiff "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id*. §§ 27.003(a), 27.005(c). Because Texas law applies here, *supra* 11 n.7, Gilmore's claims arise from the Free Speech Defendants' "communication made in connection with a matter of public concern," *id*. § 27.001(3), and those claims are (as shown above) legally defective, the Act requires dismissal. And that, in turn, entitles the Free Speech Defendants to an award of costs and fees, as well as "sanctions…sufficient to deter the party who brought the legal action from bringing similar actions." *Id*. § 27.009.

Likewise, Virginia's anti-SLAPP statute provides that "[a]ny person who has a suit against him dismissed pursuant to the immunity provided by this section may be awarded reasonable attorney fees and costs." Va. Code § 8.01-223.2(B). The circumstances of this suit indicate that it is a SLAPP—a Strategic Lawsuit Against Public Participation—brought with no possibility of success to harass and burden the Defendants. The purpose of the statute is to protect

SLAPP targets from suffering the consequences of abusive litigation, and so a cost and fee award here would achieve that purpose.

An award of fees is warranted here to prevent Gilmore, a SLAPP perpetrator, from abusing the Court's authority over legal process to impose unjustifiable burdens on parties for the purpose of chilling their advocacy. In addition to that overarching concern, five considerations are also relevant to this request.

*First*, the Complaint is deficient on its face, failing even to allege a necessary element of Gilmore's claims. Its defamation claims are premised on wild-eyed extrapolations from fairly typical news and political commentary, and it asserts a claim for intentional infliction of emotional distress that is an insult to those who suffer the kind of actual, serious injuries for which the law permits compensation. Far from being distressed, Gilmore revels in his role as an anti-Jones crusader, judging by his writings, his revelry on Twitter, the invocations in the Complaint itself and media statements.

*Second*, the Complaint gratuitously swipes at Jones and InfoWars for pages, amounting to a list of gripes and misrepresentations regarding events that have nothing to do with Gilmore, Charlottesville, or any topic of this suit. Compl. ¶¶ 74–83. These statements represent nothing more than an attempt by Gilmore to provide a political message by invoking allegations that are immaterial to the statement of alleged claims. If Gilmore disagrees with Jones and Infowars, he has the right to express his grievances, but a court pleading is not the proper vehicle to do so. The inclusion of these extraneous and irrelevant allegations underlines that the Complaint is nothing more than a publicity vehicle for Gilmore and his advocacy.

*Third*, the Complaint has no good-faith basis, in particular, to name McAdoo as a Defendant. It alleges no conduct on her part for which it seeks to impose liability, and Gilmore could have no basis to assert actual malice (or any degree of culpability) against a person who was merely interviewing someone else who made the statement he challenges. Having baselessly dragged her into a lawsuit, Gilmore proceeds to gratuitously malign McAdoo by identifying her as a "reporter" in scare quotes. Compl. ¶ 17.

24

*Fourth*, the Court should not overlook that Gilmore and his attorneys launched this lawsuit with a publicity blitz, taking every opportunity to insult Jones across every major outlet in the mainstream media. Gilmore is using this Court for a publicity stunt against a political opponent.

*Fifth*, a cost and fee award is required to avoid further abuses. Gilmore is represented by Georgetown Law's Civil Rights Clinic, and so likely incurred no cost in bringing suit—to the contrary, he benefitted through widespread publicity. Even if this suit is dismissed in short order, he still comes out on top, having gained public notice for himself and imposed costs on his targets. That is a terrible incentive and will only encourage future SLAPP perpetrators.

For all these reasons, Gilmore should be required to compensate the Free Speech Defendants for having haled them into court without any legitimate basis to do so, only a desire to criticize and harass them for their protected speech. At a minimum, the Court should order Gilmore to show cause why a cost and fee award is not warranted in these circumstances.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice and find that the Free Speech Defendants are entitled to an award of their costs and attorney fees.

TREMBLAY & SMITH, PLLC

Thomas E. Albro (VSB #12812)
Evan D. Mayo (VSB #89383)
105-109 E. High Street
Charlottesville, VA 22902
Telephone:  (434) 977-4455
Facsimile:  (434) 979-1221
tom.albro@tremblaysmith.com
evan.mayo@tremblaysmith.com

*Co-Counsel for Defendants Alexander E. Jones, Infowars, LLC, Free Speech Systems, LLC and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

BAKER HOSTETLER LLP

/s/ Elizabeth A. Scully
Elizabeth A. Scully (VSB #65920)
Mark I. Bailen (*Pro Hac Vice* forthcoming)
Andrew M. Grossman (*Pro Hac Vice* forth-coming)
Richard B. Raile (VSB #84340)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5304
Telephone:  (202) 861-1500
Facsimile:  (202) 861-1783
escully@bakerlaw.com
mbailen@bakerlaw.com
agrossman@bakerlaw.com
rraile@bakerlaw.com

*Counsel for Defendants Alexander E. Jones, Infowars, LLC, Free Speech Systems, LLC and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

WALLER LANSDEN DORTCH & DAVIS, LLP

Eric J. Taube
100 Congress Avenue, Suite 1800
Austin, TX 78701
Telephone: (512) 685-6401
eric.taube@wallerlaw.com

Robb S. Harvey
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
robb.harvey@wallerlaw.com

*Of Counsel for Defendants Alexander E. Jones, Infowars, LLC, Free Speech Systems, LLC and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Elizabeth A. Scully
Elizabeth A. Scully (VSB #65920)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5304
Telephone:  (202) 861-1500
Facsimile:  (202) 861-1783
escully@bakerlaw.com