# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

BRENNAN M. GILMORE,

     Plaintiff

     v.

ALEXANDER JONES, et al.,

     Defendants

CASE NO.: 3:18-cv-00017-MFU

BRIEF IN SUPPORT OF THE JOINT MOTION TO DISMISS AND MOTION FOR ATTORNEY FEES AND COSTS OF DEFENDANTS HOFT, CREIGHTON, STRANAHAN, WILBURN, HICKFORD AND WORDS-N-IDEAS, LLC

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ v

Introduction and Summary of Argument ................................................................ 1

Facts ....................................................................................................................... 2

I.  This Court Lacks Subject Matter Jurisdiction ............................................. 7

    A.  There Is Not Actual Diversity of Citizenship between the Plaintiff and Mr. Stranahan ........................................................................................... 8

    B.  The Plaintiff Has Failed to Allege That the Amount in Controversy Exceeds $75,000 Because He Inappropriately Included Harms by Third Parties ............. 13

        1.  The Plaintiff Has Inappropriately Attempted to Include Harm Caused by the Wrongful Actions of Third Parties in His Calculation of Damages from the Alleged Defamation ........................................................................... 13

        2.  The Plaintiff Has Inappropriately Attempted to Include Harm Caused by the Wrongful Actions of Third Parties in His Calculation of Damages from the Alleged Intentional Infliction of Emotional Distress ................................. 17

II.  This Court Cannot Exercise Personal Jurisdiction over Mr. Hoft, Mr. Wilburn, Mr. Creighton, Ms. Hickford or WNI in the Instant Case ......................................... 22

    A.  Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford or WNI Have Not Engaged in Any Conduct That Meets the Requirements of Virginia's Long-Arm Statute ........................................................................................................ 22

    B.  The Plaintiff's Proposed Assertion of Jurisdiction Would Violate the Due Process Clause of the Fourteenth Amendment ............................................... 24

        1.  This Court Cannot Exercise Specific Personal Jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford or WNI Under *Young v. New Haven Advocate* ........................................................................................ 25

        2.  This Court Cannot Exercise General Personal Jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford or WNI Under *Collier v. Land & Sea Rest. Co.* ............................................................................................ 26

III.  The First Amended Complaint Fails to State a Claim upon Which Relief Can Be Granted ........................................................................................................... 27

A.     Defendants Hoft, Wilburn, Hickford and WNI Are Immune, in Whole or in Part, Under Section 230 of the Communications Decency Act ............................... 28

B.     The Plaintiff Has Failed to State a Claim for Defamation ............................... 33

        1.     The First Amended Complaint Fails to Properly Allege That the Undersigned Defendants Have Made Any Actionable, False Statements (Or Implications) of Fact with Respect to the Plaintiff ............................... 34

               (i)     The First Amended Complaint Fails to Properly Allege That Mr. Wilburn Has Made Any False Statements of Fact in His August 19, 2017 Article ............................... 36

               (ii)    The Plaintiff Fails to Properly Allege That Mr. Creighton Made a False Statement of Fact in His August 13, 2017 Article ............... 41

               (iii)   The Plaintiff Fails to Properly Allege That Mr. Creighton Made a False Statement of Fact in His August 13, 2017 Video ............... 48

               (iv)    The Plaintiff Fails to Properly Allege That Mr. Hoft Made a False Statement of Fact in His August 14, 2017 Article ....................... 50

               (v)     The Plaintiff Fails to Properly Allege That Mr. Stranahan Made a False Statement of Fact in His August 15, 2017 Interview with Ms. McAdoo ............................... 56

        2.     The First Amended Complaint Fails to Properly Allege Malice ............... 61

               (i)     The Plaintiff Is a Limited-Purpose Public Figure ....................... 61

               (ii)    The Plaintiff's Allegations of Malice Are Implausible in Light of *Iqbal* and *Twombly* ............................... 64

                       (a)     The Plaintiff Fails to Plausibly Allege Malice with Respect to Mr. Creighton ............................... 66

                       (b)     The Plaintiff Fails to Plausibly Allege Malice with Respect to Mr. Hoft ............................... 70

                       (c)     The Plaintiff Fails to Plausibly Allege Malice with Respect to Mr. Stranahan ............................... 74

                       (d)     The Plaintiff Fails to Plausibly Allege Malice with Respect to Mr. Wilburn ............................... 77

3. The First Amended Complaint Fails to Properly Allege Negligence ......... 78

4. The First Amended Complaint Fails to Properly Plead Damages Arising from Defamation ........................................... 78

   (a) None of the Statements by the Undersigned Defendants Could Constitute Defamation per se ........................................... 78

   (b) The First Amended Complaint Fails to Properly Allege Special Damages Caused by the Undersigned Defendants ................. 81

C. The First Amended Complaint Has Failed to State a Claim for Intentional Infliction of Emotional Distress ........................................... 87

   1. Once Again, the First Amended Complaint Fails to Properly Plead That the Undersigned Defendants Made a False Statement of Fact with Constitutional Malice ........................................... 87

   2. The First Amended Complaint Improperly Attempts to Blame the Undersigned Defendants for the Distress Caused by Third Parties ....... 89

   3. The First Amended Complaint Fails to Properly Plead Outrageous or Intolerable Conduct ........................................... 89

IV. The Undersigned Defendants Should Be Granted Immunity and Attorney's Fees and Costs under VA. CODE § 8.01-223.2 ........................................... 92

Conclusion ........................................... 94

iv

# TABLE OF AUTHORITIES

## CASES

*Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982) ............................................................ 7 and 17

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002) ............ 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................. 17, 28, 40, 64-65 and 84-86

*Avepoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496 (W.D. Va. 2013) ................... 34

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................. 28, 64-66, 69, 71, 75 and 82

*Bennett v. OmniSOURCE Corp.*, No. 7:14CV00309 (W.D. Va. Nov. 4, 2015) ............... 23

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) ................................. 35

*Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006) ............................... 40 and 51

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634 (E.D. Va. 2015) .... 32

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .............................. 13, 18-19, 80, 89 and 94

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390 (4th Cir. 2003) ......... 26-27

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993) ... 34-35, 46-47, 52, 55-57 and 58-59

*Chitty v. Liberty Univ.*, No. 6:13CV00043 (W.D. Va. July 25, 2013) ........................... 85

*Chisom v. Roemer*, 501 U.S. 380 (1991) ................................................................. 10

*Coles v. Carilion Clinic*, 894 F. Supp. 2d 783 (W.D. Va. 2012) .............................. 90-91

*Collier v. Land & Sea Rest. Co.*, No. 7:13-cv-00104 (W.D. Va. Oct. 15, 2014) ............. 26

*City of Greenwood, Mississippi v. Peacock*, 384 U.S. 808 (1966) ............................... 1

*Cutaia v. Radius Eng'g Int'l, Inc.*, No. 5:11cv00077 at *11 (W.D. Va. Feb. 16, 2012) ........... 47

*Diamos v. Specialized Loan Servicing LLC*, No. 13-cv-04997 NC (N.D. Cal. July 7, 2014) ..... 18

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) ........................................................... 43

*Elitharp-Martin v. Pulaski Cnty. Sch. Bd.*, 62 F. Supp. 3d 515 (W.D. Va. 2014) ............ 27

v

*Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862 (W.D. Va. 2016) ........... 29, 61, 64, 66 and 68

*Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666 (4th Cir. 1982) ................................. 62

*Fleming v. Moore*, 221 Va. 884 (1981) .............................................. 13 and 81

*Foretich v. Capital Cities/ABC*, 37 F.3d 1541 (4th Cir. 1994) ............................ 61-62

*Freeman Holdings of Ariz., LLC v. Doe*, No. CV-11-01877-PHX-NVW (D. Ariz. Jan. 18, 2013) ..

................................................................................................... 15

*Gazette, Inc. v. Harris*, 229 Va. 1 (1985) ................................... 14, 34 and 78

*Gertz v. Robert Welch*, 418 U.S. 323 (1974) ........................................... 61

*Goad v. Goad,* No. 5:10CV00139 (W.D. Va. Jan. 5, 2011) ............................... 7

*Griffin v. Dir. of Vatterott*, No. 4:17-CV-2632 DDN (E.D. Mo. Oct. 27, 2017) .............. 18

*Gypsum Storage Dev. LLC v. W. Reed Edgel & Assocs. Inc.*, No. 10-cv-02760-MSK (D. Colo. Nov. 15, 2010) .................................................................. 18

*Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24 (2006) ......................... 87 and 91

*Hayes v. Shelby Cnty. Tr.*, 971 F. Supp. 2d 717 (W.D. Tenn. 2013) ....................... 18

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................. 25

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) ............................... 88

*Int'l Shoe v. Washington*, 326 U.S. 310 (1945) ...................................... 25

*Jackson v. Fletcher*, No. 7:09CV00408 (W.D. Va. Jan. 18, 2011) ....................... 87

*Johnson v. Advance America*, 549 F.3d 932 (4th Cir. 2008) ............................. 9

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ....................... 77

*Krantz v. Air Line Pilots Ass'n, Intern.*, 245 Va. 202 (1993) ......................... 22

*Law v. Autozone Stores, Inc.*, 2009 WL 4349165 (W.D. Va. Nov. 25, 2009) ............... 91

*Levy v. Ryan Seacrest Prods.*, No. 2:13-cv-0070 (E.D. Cal., Jan. 29, 2013) ............. 18

vi

*M. Rosenberg & Sons v. Craft*, 182 Va. 512 (1944) ............................................ 14-15, 81 and 85

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ...................................... 46

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, 674 F.3d 369 (4th Cir. 2012) ................. 65

*McCauley v. Hospira, Inc.*, No. 11-CV-108 (M.D.N.C. 2011) ...................................... 28

*McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (Cal. App. 2 Dist. 1988) ......................... 19

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ............................... 34, 41, 51 and 53

*Mims v. Kemp*, 516 F.2d 21 (4th Cir.1975) ...................................................... 8

*Moldea v. New York Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994) *rev'd on reh'g*, 22 F.3d 310 (D.C. Cir. 1994) ............................................................................. 35 and 77

*Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56 (4th Cir. 1993) .................................... 23

*Naz, LLC v. Philips Healthcare*, No. 17-2882 (E.D. La. July 26, 2017) ......................... 18

*Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ... 28-29 and 33

*New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290 (4th Cir. 2005) .......... 23

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................... 61 and 64

*Nichols v. G.G. Searle & Co.*, 991 F.2d 1195 (4th Cir. 1993) ................................... 22

*Nowell v. Kumer*, No. 7:15cv00461 (W.D. Va. Nov. 17, 2015) .................................... 85

*Oved v. Weiner*, No. 17-CV-1348 (DRH)(GRB) (E.D.N.Y. Dec. 21, 2017) ........................... 18

*Peterson v. Paddy*, No. 3:16-cv-00026, 2017 U.S. Dist. LEXIS 94074 (W.D. Va. June 19, 2017) ............................................................................. 9-10 and 12

*Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006) .............................. 27

*Processing Research, Inc. v. Larson*, 686 F. Supp. 119 (E.D. Va. 1988) ........................ 23

*Reynolds v. Pionear, LLC,* No. 3:15cv209 (E.D. Va. March, 25, 2016) ........................... 46

*Russo v. White*, 241 Va. 23, 400 S.E.2d 160 (1991) ........................................... 91

vii

*Salahuddin v. Cuomo*, 861 F.2d 40 (2nd Cir. 1988) ............................................ 85

*Saleh v. Florida*, No. 3:17-cv-1465-J-34PDB (M.D. Fla. Jan. 5, 2018) ................. 18

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012) ................. 65

*Solomon v. Capital One Bank USA*, No.: GJH-14-03638 (D. Md. Dec. 19, 2014) ......... 51 and 82

*SuperValu. Inc. v. Johnson*, 666 S.E.2d 335 (Va. 2008) ............................... 87

*Tatoian v. Andrews*, 100 F. Supp. 3d 549 (W.D. Va. 2015) ............................ 25

*Terminiello v. Chicago*, 337 U.S. 1 (1949) ............................................ 80

*Time, Inc. v. Hill*, 385 U. S. 374 (1967) ............................................. 88

*Tinsley v. Streich*, 143 F. Supp. 3d 450 (W.D. Va. 2015) ............................. 8

*U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337 (4th Cir. 2009) ....................... 8

*U.S. v. Koon*, 34 F.3d 1416 (9th Cir.1994) ........................................... 42

*Webb v. Baxter Healthcare Corp.*, 57 F.3d 1067, 1995 WL 352485 (4th Cir. 1995) ......... 91

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999) ....................................... 61

*West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) ........................... 44

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) ................. 18-19

*Young v. New Haven Advocate,* 315 F.3d 256 (4th Cir. 2002) ......................... 25-26

*Virginia v. Black*, 538 U.S. 343 (2003) ............................................. 84

## FEDERAL AND STATE CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U.S. Const. Art. III, § 3, ¶ 1 ....................................................... 80

U.S. CONST. Amend. I, cls. 3 ......................................................... 1

U.S. CONST. Amend. I, cls. 4 ......................................................... 1

15 U.S.C. § 1 ....................................................................... 66

28 U.S.C. § 1331 ............................................................................................................... 7

28 U.S.C. § 1332 ..................................................................................................... 7, 8 and 22

42 U.S.C. § 1981 ............................................................................................................... 90

42 U.S.C. §§ 2000e, et seq. ............................................................................................... 90

47 U.S.C. § 230 .................................................................................................... 28-33 and 72

VA. CODE § 8.01-223.2 ............................................................................................ 1-2, 92 and 95

VA. CODE § 8.01-328.1 ......................................................................................................... 22-24

Va. Code § 58.1-400 ............................................................................................................ 12

Fed. R. Civ. P. 8 .................................................................................................................. 28

Fed. R. Civ. P. 10 ................................................................................................................. 3

Fed. R. Civ. P. 11 ............................................................................................................... 94

Fed. R. Civ. P. 12 .......................................................................................................... passim

## ARTICLES AND BOOKS

*9/11 Attacks*, HISTORY.COM, https://www.history.com/topics/9-11-attacks (last visited May 5, 2018) ............................................................................................................ 43

Associated Press, *Kevin Spacey faces new harassment allegations*, THE BOSTON GLOBE, Nov. 3, 2017, https://www.bostonglobe.com/arts/television/2017/11/02/kevin-spacey-faces-new-harassment-allegations/E2DrhxlAIGRzNbkeJQ5RVL/story.html (last visited May 2, 2018) ..... 38

Aaron Blake, *AP says Justice Department secretly obtained its phone records*, WASHINGTON POST, May 13, 2013, https://www.washingtonpost.com/news/post-politics/wp/2013/05/13/ap-says-justice-department-secretly-obtained-its-phone-records/?utm_term=.e38f6b29ad45 (last visited May 2, 2018) ............................................................................................................... 37

Debbie Clason, *Top Universities for Deaf Students*, HEALTHY HEARING, Sept. 15, 2016, https://www.healthyhearing.com/report/52682-Top-universities-for-deaf-students (last viewed May 3, 2018) .......................................................................................................... 58

James E. Cobb, *One of American History's Worst Laws Was Passed 165 Years Ago*, TIME, Sept. 18, 2015, http://time.com/4039140/fugitive-slace-act-165/ [sic] (last visited May 3, 2018) ...... 43

ix

Kaitlan Collins and Jeff Zeleny, *Trump furious over leak of warning to not congratulate Putin*, CNN, March 22, 2018, https://www.cnn.com/2018/03/21/politics/donald-trump-vladimir-putin-congratulations/index.html (last visited May 2, 2018) ⸻ 38

*Coup d'état*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/coup%20d'%C3%A (last visited April 8, 2018) ⸻ 79

THE DARK KNIGHT RISES (Warner Bros. Pictures 2012) ⸻ 42

THE DECLARATION OF INDEPENDENCE ⸻ 80

*Disgruntle*, MERIAM-WEBSTER, https://www.merriam-webster.com/dictionary/disgruntle (last visited May 6, 2018) ⸻ 46

Baxter Dmitry, *Police: Charlottesville Was 'Inside Job' To Ignite Race War*, YOURNEWSWIRE, https://yournewswire.com/charlottesville-inside-job/amp/ (last visited May 8, 2018) ⸻ 31 and 36

Sir. Arthur Conan Doyle, THE MEMOIRS OF SHERLOCK HOLMES (1894) available at http://etc.usf.edu/lit2go/40/the-memoirs-of-sherlock-holmes/573/adventure-1-silver-blaze/ (last visited May 7, 2018) ⸻ 46

*Ex-senator and Vietnam POW who blinked "torture" in Morse code dies*, CBS News, March 28, 2014, https://www.cbsnews.com/news/jeremiah-denton-ex-senator-and-vietnam-pow-who-blinked-torture-in-morse-code-dies-at-89/ (last viewed May 3, 2018) ⸻ 57

GUARDIANS OF THE GALAXY, VOL. 2 (Marvel Studios 2017) ⸻ 58

Abraham Lincoln, *"House Divided" Speech*, PBS, http://www.pbs.org/wgbh/aia/part4/4h2934t.html (last visited May 3, 2018) ⸻ 43

*Involved*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involved (last visited April 8, 2018) ⸻ 55

Erin McCann, *Who is Registered to Vote in Two States? Some in Trump's Inner Circle*, NEW YORK TIMES, Jan. 27, 2017, https://www.nytimes.com/2017/01/27/us/politics/trump-cabinet-family-voter-registration.html (last visited April 29, 2018) ⸻ 11

George Orwell, 1984 at 15 (1949) ⸻ 44

*Shill*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/shill (last visited April 8, 2018) ⸻ 50

*What is a SLAPP?*, PUBLIC PARTICIPATION PROJECT, https://anti-slapp.org/what-is-a-slapp/ (last visited April 12, 2018) ⸻ 92

x

## INTRODUCTION AND SUMMARY OF ARGUMENT

Fundamentally, this case is about the Plaintiff's desire to blame journalists for the independent, immoral, and often illegal conduct of third parties. Although the First Amended Complaint (ECF No. 29) (hereinafter the "FAC") alleges a few instances of harm allegedly caused by the Defendants' own actions, those allegations are perfunctory, conclusory, self-contradictory, chronically vague, speculative, often implausible, and lifeless. However, the FAC truly comes alive when discussing the myriad ways third parties who are not defendants in this case have allegedly harmed the Plaintiff and his family—without alleging facts that would allow this Court to believe that any Defendant is responsible for such misconduct. In doing so, the Plaintiff has attempted to undermine the fundamental civil right[1] of Freedom of Expression.

Fortunately for the cause of civil rights, this case will fail. Defendants Jim Hoft, Lee Stranahan, R. Scott Creighton, Derrick Wilburn, Michele Hickford, and Word-N-Ideas, LLC (hereinafter the "Undersigned Defendants") now come before this Court seeking dismissal of the case based on lack of jurisdiction and failure to state a claim, as well as dismissal and attorney fees and costs based on VA. CODE § 8.01-223.2.

First, this Court lacks jurisdiction over this subject matter, and lacks personal jurisdiction over nearly all of the Undersigned Defendants. With respect to subject matter jurisdiction, actual diversity of citizenship is not present. Further, when alleging that the claims in this case exceed $75,000, the Plaintiff inappropriately included harms caused by third parties without asserting any valid theory within the bounds of the First Amendment, U.S. CONST. Amend. I, cls. 3 and 4, that would make the Undersigned Defendants liable for the actions of those third parties, another reason

---

[1] *City of Greenwood, Mississippi v. Peacock*, 384 U.S. 808, 825 (1966) ("The First Amendment is a great charter of American freedom, and the precious rights of personal liberty it protects are undoubtedly comprehended in the concept of 'civil rights'").

to find that subject matter jurisdiction is not present. Additionally, this Court lacks personal jurisdiction over Mr. Hoft, Mr. Wilburn, Mr. Creighton, Ms. Hickford, and Words-N-Ideas, LLC (hereinafter "WNI") because writing on the Internet to a general audience is not sufficient to subject a person to jurisdiction in every state in which that writing might be accessed.

Second, the Plaintiff has failed to state a claim for which relief can be granted. With respect to both defamation and intentional infliction of emotional distress ("IIED"), many of the statements were not actually published by the Undersigned Defendants under 47 U.S.C. § 230. With respect to defamation, the Plaintiff fails to properly allege a single false statement of fact, the Plaintiff fails to properly allege malice or negligence, and the Plaintiff fails to allege damages. Likewise, the Plaintiff's IIED claim fails as well: The Plaintiff fails to properly allege the Undersigned Defendants made false statements with constitutional malice, the Plaintiff inappropriately blames the Undersigned Defendants for the wrongful actions of third parties, and the Plaintiff fails to properly allege outrageous or intolerable conduct.

Third, VA. CODE § 8.01-223.2 provides a unique immunity from defamation suits and, under this statute, this Court should grant attorney fees and costs to the Undersigned Defendants.

For all of these reasons, and in order to protect Freedom of Expression, this Court should dismiss the instant case for lack of subject matter jurisdiction; for lack of personal jurisdiction in relation to Mr. Hoft, Mr. Wilburn, Mr. Creighton, Ms. Hickford, or WNI; for failure to state a claim for which relief can be granted; and pursuant to the immunity granted under VA. CODE § 8.01-223.2. Further, this Court should grant the Undersigned Defendants attorney fees and costs.

## FACTS

Unless otherwise noted, the following facts are alleged to be true in the FAC and will be treated as true for purposes of this brief.

2

According to the FAC, the Plaintiff is a resident of Virginia, presently on long-term unpaid leave from the United States State Department where he is employed as a Foreign Service Officer. FAC ¶ 13. He served as chief of staff to Tom Perriello's campaign to be Governor of Virginia. *Id.* Mr. Perriello's campaign received a donation from George Soros. *Id.* at ¶ 106. The Plaintiff also serves as Vice President for Operations of Wize Solutions, LLC, an information technology company. *Id.* at ¶ 13.

Defendant Hoft is a resident of Missouri and owner of a website called THE GATEWAY PUNDIT, located at http://www.thegatewaypundit.com/. *Id.* at ¶ 20. Defendant Stranahan is domiciled in Virginia. See Exhibit A, ¶¶ 1-4. [2] For employment, Mr. Stranahan primarily engages in a number of journalistic activities. FAC ¶ 17. Defendant Creighton is a resident of Florida and runs the website AMERICANEVERYMAN located at https://americaneveryman.com/. *Id.* at ¶ 19. He also had a YouTube account where a video that is a subject of this suit was uploaded, but that account has since been terminated. *Id.* Defendant Hickford is the President of Defendant WNI, Exhibit E ¶ 2, and she is editor-in-chief of the *Allen B. West* website, *id.* at ¶ 23. WNI is an "inactive Florida limited liability company and the purported owner of the *Allen B. West* website." *Id.* at ¶ 24. Ms. Hickford is a resident of Florida. *Id.* at ¶ 23. Finally, Defendant Wilburn is a resident of Colorado. *Id.* at ¶ 22. The FAC alleges that he is a supporter of the pro-white racist alt-right movement, *id*. at p. 2.[3] He is an African American. Exhibit E ¶ 5.

Prior to the events relevant to this case, the Charlottesville City Council decided to remove a statue honoring Confederate General Robert E. Lee and to change the name of the park in which the statue resided from "Lee Park" to "Emancipation Park." *Id.* at ¶ 25. On August 12, 2017, a

---

[2] This declaration is signed electronically as is the other declarations attached to this brief. A copy with an ordinary signature is available if this Court believes it is necessary to examine it.

[3] Contrary to Fed. R. Civ. P. 10(b), the Plaintiff has not numbered every paragraph in the FAC.

number of people came to protest those decisions, and others came as counter-protesters to support the City Council's decisions. *Id.* at ¶¶ 25-27. The Plaintiff counted himself among those counter-protesters. *Id.* at ¶ 27. At some point, there was rioting related to these protests, although the Plaintiff alleges that he did not participate in any violence. *Id.* at ¶ 28. That afternoon, James Fields drove a car into a group of counter-protesters, injuring 36 persons and killing one, Heather Heyer. *Id.* at ¶ 29. That incident occurred very close to where the Plaintiff was standing, and because he was already filming the counter-protesters with his smartphone, the Plaintiff was able to capture much of the incident on video. *Id.* at ¶ 30.

The Plaintiff chose to share this video on social media through his Twitter account, in part to correct media accounts suggesting it might not have been a deliberate attack. *Id.* at ¶ 31. The Plaintiff also "spoke with multiple television news networks and other news media on August 12 and 13, 2017," *id.* at ¶ 34, and did at least one interview on August 14, 2017, *id.* at ¶ 158.

On August 13, 2017, Mr. Creighton published an article on AMERICANEVERYMAN called "Charlottesville Attack, Brennan Gilmore and… the STOP KONY 2012 Pysop? [sic] What?"[4] On the same day, Mr. Creighton uploaded a video to YouTube entitled "Charlottesville Attack—Brennan Gilmore: Witness or Accessory?" Mr. Creighton was in Florida when he published these works, and he did not target them in any sense toward the Commonwealth of Virginia. Exhibit B ¶ 2. Further, he does not regularly do business in Virginia, solicit business in Virginia, engage in any persistent course of conduct in Virginia, or derive any revenue from goods used or consumed or services rendered, in this Commonwealth. *Id.* at ¶ 3.

---

[4] The Plaintiff claims that Mr. Creighton published his story on two other websites. FAC ¶ 37. In fact, he only published the story on his AMERICANEVERYMAN site. Exhibit B ¶ 2. Apparently unknown persons took Mr. Creighton's material, in blatant violation of his rights as a copyright holder, and placed it on their sites. *Id.* However, nothing in this brief turns on this nuance.

On August 14, 2017, Mr. Hoft wrote and, to the extent that it contains original material, published a piece called "*Random Man at Protests Interviewed by MSNBC, Ny Times Is Deep State Shill Linked to George Soros." Id.* at ¶ 38. Mr. Hoft was in Missouri at the time of publication, and he did not target that publication in any sense toward the Commonwealth of Virginia. Exhibit C ¶ 2. Further, he does not regularly do business in Virginia, solicit business in Virginia, engage in any persistent course of conduct in Virginia, or derive any revenue from goods used or consumed or services rendered, in this Commonwealth. *Id.* at ¶ 3.

On August 15, 2017, a video was published in which Ms. McAdoo interviewed Mr. Stranahan. FAC ¶ 83.

Finally, on August 19, 2017, Mr. Wilburn wrote and, to the extent that it contains original material, published an article entitled "BOMBSHELL: New Evidence Suggests Charlottesville Was a Complete SET-UP." Mr. Wilburn was in Colorado at the time of publication. Exhibit E ¶ 2. Ms. Hickford was in Florida when Mr. Wilburn published it. Exhibit D ¶ 3. Mr. Wilburn, Ms. Hickford, and WNI did not target that article in any sense toward the Commonwealth of Virginia. Exhibit D ¶ 3 and Exhibit E ¶ 2. Further, Mr. Wilburn, Ms. Hickford, and WNI does not regularly do business in Virginia, solicit business in Virginia, engage in any persistent course of conduct in Virginia, or derive any revenue from goods used or consumed or services rendered, in this Commonwealth. Exhibit D ¶ 4 and Exhibit E ¶ 3. The Allen B. West website did not even have a donation button. Exhibit D ¶ 4 and Exhibit E ¶ 3.

The contents of the articles and videos will be detailed in the discussion of whether the Plaintiff has properly alleged that the Undersigned Defendants made a false statement of fact. *Infra* 34-61.

Additionally, the Plaintiff alleges that third parties engaged in a large range of immoral,

5

harassing, and threatening behavior directed toward the Plaintiff and his family following the publication of all of the Defendants' statements. FAC at ¶¶ 150-163. However, there is no instance in which the Plaintiff alleges that the Undersigned Defendants advocated that any person engage in any violence or unlawful activity with the intent to imminently produce such conduct or where the Plaintiff alleges that they made such statements at a time when such advocacy was likely to imminently produce or incite violence or unlawful behavior. Indeed, the FAC never alleges that Undersigned Defendants advocated that anyone do anything at all, let alone anything illegal or violent.

Furthermore, the Plaintiff claims that prior to the publication all of the Defendants' "attacks," the Plaintiff had a reputation for patriotism and honor, and all of the Defendants had done irreparable damage to that reputation. *Id.* at ¶ 178. Depending on what part of the FAC one is reading, the Plaintiff also claims that he has "lost" friends because of all of the Defendants' defamation, *id.* at ¶ 6, that friends and others have been merely "deterred" from associating with him, *id.* at ¶¶ 50, 71, 92, 113 and 134, or that he merely fears such losses, *id.* at ¶ 185. The Plaintiff also claims that at least one potential romantic partner cut off communications because of unspecified "statements" by all eleven Defendants. *Id.*

The Plaintiff also claims professional damage. At one point the FAC claims that the Plaintiff has suffered "professional damage in Virginia, including reputational harm, the loss of business opportunities in Virginia, [and] irreparable damage to his career as a Foreign Service Officer[.]" *Id.* at ¶ 6. Later in the FAC, however, the Plaintiff alleges that instead he has faced skepticism and questioning by others. *Id.* at ¶ 187. Further, some potential business partners reviewed derogatory materials created by all eleven Defendants and at some point afterward decided not to pursue business relationships. *Id.* at ¶ 187. The Plaintiff complains that all eleven

6

Defendants' alleged defamation might in the future require him to remove himself from client-facing work, *id.* and he fears that someday in the future he might lose his job at the State Department, *id.* at ¶ 189. The Plaintiff has also claimed emotional harm as the result of the defamation, including a stress-related eye injury. See, *e.g.*, *id.* at 181.

Based on these alleged facts, the Plaintiff sued the Undersigned Defendants and five other Defendants for defamation and IIED under Virginia law. The Plaintiff asserts no claims based on federal law. He also claims that the damages he has suffered from each Defendant's alleged defamation exceeds $75,000, *id.* at ¶¶ 215, 224, 232, 240, 257, and 282, and the damages he has suffered from each Defendant's alleged IIED also exceeds $75,000, *id.* at ¶ 293. In both cases, those calculations include the alleged harm caused by third parties not named in this suit. *Id.* at ¶¶ 220, 228, 236, 244, 273, 287, 289-292.

# I.
## THIS COURT LACKS SUBJECT MATTER JURISDICTION

As this Court stated in *Goad v. Goad,* No. 5:10CV00139, at *3 (W.D. Va. Jan. 5, 2011):

> Federal courts are courts of limited jurisdiction. "They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Generally, a case can be originally filed in a federal district court if there is federal question jurisdiction under 28 U.S.C. § 1331 or diversity of citizenship jurisdiction under 28 U.S.C. § 1332.

Further, "It is to be presumed that a cause lies outside this limited jurisdiction..., and the burden of establishing the contrary rests upon the party asserting jurisdiction," *Kokkonen*, 511 U.S. at 377 (internal citation omitted). As stated in *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982):

> There are two critically different ways in which to present a motion to dismiss for lack of subject matter jurisdiction. First, it may be contended that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based. In that event, all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration. Second, it may be contended that the jurisdictional allegations of the complaint were not true. A trial court may then go

7

beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations. This was the subject matter jurisdictional attack made in the case sub judice.

In judging this evidentiary attack, the trial court necessarily assumes a different role than in a proceeding to resolve a 12(b)(1) motion based on contentions that the complaint was jurisdictionally deficient on its face. The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction. A trial court may consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment. See *Mims v. Kemp*, 516 F.2d 21 (4th Cir.1975). Unlike the procedure in a 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction.

(Footnote omitted). In the instant case there is no allegation that a federal question is involved. That leaves diversity of citizenship as the only possible basis of subject matter jurisdiction. Under 28 U.S.C. § 1332, it is the Plaintiff's burden to show 1) complete diversity between the parties and 2) that the amount in controversy exceeds $75,000. The Plaintiff has failed on both counts. There is not complete diversity in fact, and the Plaintiff has failed to allege a sufficient amount in controversy because the FAC inappropriately included damages caused by third parties for which the Undersigned Defendants are not responsible as a matter of law. For both of these reasons, this Court should dismiss this case for lack of subject matter jurisdiction.

A.    **There Is Not Actual Diversity of Citizenship between the Plaintiff and Mr. Stranahan.**

First, the Undersigned Defendants present an evidence-based attack on the Plaintiff's assertion of diversity jurisdiction. As noted by this Court in *Tinsley v. Streich*, 143 F. Supp. 3d 450, 455 (W.D. Va. 2015), "Diversity jurisdiction under § 1332 requires complete diversity among parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant." Furthermore, "When, as here, a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009).

8

The Undersigned Defendants present such an evidence-based challenge to the claim of diversity. The only evidence before this Court in regards to diversity is found in Exhibit A, a declaration by Mr. Stranahan. In it, Mr. Stranahan asserts facts that show that he is domiciled in Virginia but used to live in Texas. He states that he has rented and lived at a residence in Arlington, Virginia, since March 2017. Exhibit A ¶ 2. He states that while he does not have a job in Virginia, like many Northern Virginians, he works nearby in Washington, D.C. *Id.* He states that he has no home to return to in Texas and has no family there. *Id.* at ¶ 3. He also states that, contrary to the allegations in the *id.* at ¶ 17, he does not have a Texas driver's license—in fact, he has no driver's license at all, because he is legally blind, *Id.* at ¶ 4. He states that he has told his employer that he was a Virginian for tax purposes. *Id.* at ¶ 2. Further, he states that he has not voted in Texas since 2012. Finally, he states that his intent is to live in Virginia. *Id.* at ¶ 2. Given that "Domicile requires physical presence, coupled with an intent to make the State a home," *Johnson v. Advance America*, 549 F.3d 932, 937 n. 2 (4th Cir. 2008), plainly Mr. Stranahan is domiciled in Virginia. Given that the FAC alleges that the Plaintiff is also domiciled in Virginia, *id.* at ¶ 13, there plainly is no diversity of citizenship in this case.

On the other hand, FAC ¶ 17 alleges truthfully that Mr. Stranahan has not been purged from the voter rolls in Texas. Exhibit A ¶ 3. Based on that and the false allegation that this legally blind man has a Texas driver's license, the Plaintiff alleges that Mr. Stranahan is domiciled in Texas. See "Reply to Defendants Hoft and Stranahan's Joint Opposition to Motion to Set Briefing Schedule for Resolution of Motions to Dismiss by Plaintiff Brennan Gilmore," (ECF No. 34), p. 2, n. 1. In that previous filing, the Plaintiff cited *Peterson v. Paddy*, No. 3:16-cv-00026, 2017 U.S. Dist. LEXIS 94074, at *8 (W.D. Va. June 19, 2017)) for the proposition that a bare statement of intent by the individual is given very little weight because it is "self-serving." Further, the Plaintiff

9

asserted that *Peterson* held that registration to vote created a presumption of citizenship in a particular state and, even if it did not, this fact carried a great deal of weight.

However, the facts in that case are distinguishable. In *Peterson*, Mr. Paddy wished to be seen as a Virginian for venue purposes but this Court found that he was domiciled in Georgia. To reach that conclusion, this Court ignored Paddy's self-serving claim that he intended to live in Virginia again, and instead relied on the following facts: 1) he resided in Georgia, 2) he intended to remain there for several years, 2) his payroll records showed a Georgian address, 3) Georgia taxes were withheld from his paychecks at his request, and 4) he was registered to vote in Georgia. Specifically, in reference to voting, Paddy had registered to vote in Georgia on January 20, 2016, while the case had been filed on April 12, 2016, just under three months later.

By comparison, Mr. Stranahan was registered to vote in Texas in 2012, approximately six *years* before this action was commenced and has not voted there since 2012. Exhibit A at ¶ 3. In equating these two cases, the Plaintiff is confusing an act of commission with an act of omission. There is no question as a matter of logic that if you register to vote for the first time in a state, you are telling its government that you are affirmatively joining its political community, which suggests you think of this state as your new home. That initial registration is an act of commission, and it is reasonable to think that after three months, Mr. Paddy still intended to make Georgia his home.

On the other hand, Mr. Stranahan remaining on Texas' voter rolls six years after he first registered and six years after he had stopped voting in Texas is an act of *omission*, rather than *commission*. It is a *failure* to do something, to remove himself from the voter rolls rather than affirmatively doing something, that the Plaintiff hangs his hat on. It is, in essence, a "dog that did not bark" argument. See, *e.g. Chisom v. Roemer*, 501 U.S. 380, 396 n. 23 (1991) (declining to

apply a dog that did not bark argument). The metaphor comes from the Sherlock Holmes story "Silver Blaze"[5] in which a prize horse was stolen and its trainer is murdered. One key to unraveling the puzzle was the fact that the dog guarding the stables did not bark. Holmes knew that the dog barked aggressively at strangers. Therefore, Holmes reasoned the thief and murderer was not a stranger to the dog—an important link in Holmes' chain of logic. By that logic, then, an act of omission can be significant under the right circumstances. A dog failing to bark is significant if and only if you would expect the dog to bark under certain circumstances; in that case, a failure to bark would suggest those circumstances are not present. Likewise, the Plaintiff seems to think that Mr. Stranahan's failure to remove himself from the voter rolls in Texas is significant because they apparently believe that one would expect a person to do that when they move to a new state and do not intend to come back. But that assumption—that when people move from one state to another with the intent to make the new state their home, they typically actively remove themselves from the voter rolls in the previous state—is unproven. Attached to this brief are Exhibits G-N, representing eight people who moved from state-to-state—indeed, most have lived in multiple states—each time intending to make the new state their home, but never taking affirmative steps to remove themselves from the voter rolls in the previous states.[6] As Erin McCann of the NEW YORK TIMES wrote:[7] "Have you ever moved to a new state? And did you call up the people in

---

[5] Sir. Arthur Conan Doyle, THE MEMOIRS OF SHERLOCK HOLMES (1894) available at http://etc.usf.edu/lit2go/40/the-memoirs-of-sherlock-holmes/573/adventure-1-silver-blaze/ (last visited May 7, 2018).

[6] The only exception to this rule is when one of the declarants was affirmatively asked by local state officials whether he had moved away. Exhibit O ¶ 7. In other words, that person only thought to remove himself from registration when prompted, not on his own.

[7] Erin McCann, *Who is Registered to Vote in Two States? Some in Trump's Inner Circle*, NEW YORK TIMES, Jan. 27, 2017, https://www.nytimes.com/2017/01/27/us/politics/trump-cabinet-family-voter-registration.html (last visited April 29, 2018).

11

charge of voting in your old state to tell them to go ahead and take you off their list? Probably not." The same article goes on to observe that when the President asked on Twitter for a "major investigation into VOTER FRAUD, including those registered to vote in two states," news organizations then uncovered that many in the administration at the time were also registered to vote in two states. This might amount to anecdotal evidence, but it shows that this Court cannot simply assume that when a person moves to a new state intending to make that state his or her home, that he or she will actively remove him or herself from the old state's voter registration rolls (without being affirmatively prompted to do so). Mr. Stranahan's failure to remove himself from Texas' voter rolls does not show intent: It shows inertia.[8]

Further, the logic of *Peterson* supports Mr. Stranahan's assertion of domicile in another way. As a matter of logic and the law of *Peterson*, Mr. Stranahan's bare, self-serving assertion that he intends to live in Virginia is properly discounted. Obviously, a self-serving statement is less likely to be truthful. However, logic equally suggests the converse: A statement against interest is more likely to be truthful. Applied here, Mr. Stranahan's statement to his employer that he was a Virginian for tax purposes should be given considerable weight in this particular case because it was in his financial interest to claim to be a Texan. It is in Mr. Stranahan's interest to claim he is a Texan for tax purposes, because an examination of the Texas Code reveals that *Texas has no income tax*, unlike Virginia.[9] Mr. Stranahan's decision to declare himself a Virginian for tax purposes is likely to cost him hundreds, if not thousands, of dollars, and that decision was made before this suit was filed against him. It is highly persuasive evidence that when he came to

---

[8] To the extent that the caselaw suggests maintaining registration by inertia years after one has initially registered is highly probative on the question of domicile, that caselaw does not match up with human behavior and should be overturned.

[9] See, *e.g.* VA. CODE § 58.1-400.

12

Virginia, he intended to stay and make it his home.

Combining that with the fact that every other factor (beside his latent voter registration) shows that Mr. Stranahan is domiciled in Virginia, this Court should find that complete diversity of citizenship is absent. For this reason alone, this Court can dismiss the entire case, for all Defendants, for lack of subject matter jurisdiction.

**B.    The Plaintiff Has Failed to Allege That the Amount in Controversy Exceeds $75,000 Because He Inappropriately Included Harms by Third Parties.**

The fundamental problem with respect to the amount in controversy requirement is that the Plaintiff inappropriately tries to include harms caused by third parties for which the Undersigned Defendants are not responsible as a matter of law. With respect to defamation, Virginia does not allow the wrongful actions of third parties to be included in the calculation of damages at all. With respect to IIED, the Undersigned Defendants cannot be held responsible for incitement of third parties unless that alleged incitement meets the test in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and the Plaintiff has failed to properly allege that the Undersigned Defendants committed such incitement. Therefore, the Plaintiff has failed to properly allege the jurisdictional minimum and this case should be dismissed for lack of subject matter jurisdiction.

      1.    <u>The Plaintiff Has Inappropriately Attempted to Include Harm Caused by the Wrongful Actions of Third Parties in His Calculation of Damages from the Alleged Defamation.</u>

The Plaintiff alleges that all of the harms suffered by him due to the Undersigned Defendants' alleged defamation amount to more than $75,000 for each of the Undersigned Defendants. The Plaintiff's allegation of damages includes the wrongful acts of third parties, but such a calculation is forbidden by Virginia law.

First, as a preliminary matter, a claim for defamation per se would be insufficient to meet the jurisdictional minimum. In *Fleming v. Moore*, 221 Va. 884, 889 (1981), the Virginia Supreme

13

Court laid out the difference between defamation per quod and defamation per se:

> Unlike most states, Virginia makes no distinction between actions for libel and those for slander.... We have held that actions for libel are treated as actions for slander, and that the common-law rules of slander are applicable, so that alleged defamatory language is actionable according to the following principles:
>
> At common-law defamatory words which are actionable per se are:
>
>> (1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished. (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society. (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. (4) Those which prejudice such person in his or her profession or trade. All other defamatory words which, though not in themselves actionable, occasion a person special damages are actionable.

The same opinion went on to state that the determination of whether the statement is potential defamation per se or defamation per quod is a matter of law to be determined by the court, *id.*, and if the words do not constitute potential defamation per se, then special damages must be shown, *id.* at 889-890. The concept of special damages is explained well in *M. Rosenberg & Sons v. Craft*, 182 Va. 512, 520-21 (1944) (overruled on other grounds by *Gazette, Inc. v. Harris*, 229 Va. 1 (1985)) as follows:

> "Special damages are such as in fact have actually occurred as the result or consequences of the injury complained of, and not implied by law. They are either superadded to general damages arising from the act injurious in itself, as where some particular loss arises from the uttering of slanderous words actionable in themselves; or are such as arise from an act indifferent and not actionable in itself, but injurious only in its consequences, as where words become actionable only by reason of special damage ensuing.
>
> "Special damages must always be the legal and natural consequence arising from the defamation itself, *and not a mere wrongful act of a third person*. Whenever special damages are claimed, in order to prevent a surprise on the defendant, which might otherwise ensue at the trial, the law requires the plaintiff to state the particular damage which he has sustained, or he will not be permitted to give evidence of it

14

at the trial." Newell on SLANDER AND LIBEL, 4 ed., sec. 556, p. 603.

(Emphasis added). Thus, if we assume the Plaintiff has properly alleged defamation per se (and he did not, *infra* 78-81), there is a presumption of damages. *Id.* However, that represents a presumption that one is entitled to *some* money, not necessarily to over $75,000. Thus, an allegation of defamation per se alone is not sufficient to meet the jurisdictional minimum. See, *e.g.*, *Freeman Holdings of Ariz., LLC v. Doe*, No. CV-11-01877-PHX-NVW, at *5 (D. Ariz. Jan. 18, 2013) (holding that a defamation per se claim is insufficient to meet the jurisdictional minimum, in part because such a rule would require "this Court [to] accept jurisdiction in every Arizona defamation per se case with diverse parties"). Therefore, to reach the jurisdictional minimum, the Plaintiff has to properly allege special damages that can be "superadded" to the presumed damages, in order to reach the jurisdictional minimum, and he has failed to do so.

The Plaintiff cannot meet this burden primarily because in his calculation of damages he includes harms caused by the wrongful conduct of third parties. As stated in *Craft*, special damages cannot include the "mere wrongful act of a third person." 182 Va. at 521. Therefore, the Plaintiff cannot recover, as a matter of law, any damages from the Undersigned Defendants for any harm caused by third persons who allegedly committed wrongful acts against the Plaintiff with respect to defamation.

Therefore, when considering whether or not the Plaintiff has alleged the jurisdictional minimum with respect to defamation, this Court cannot consider damages caused by alleged incitement—because the Plaintiff cannot recover such damages as a matter of law. Yet, the FAC makes it clear that the Plaintiff's calculation of harm with respect to defamation always includes the wrongful conduct of third parties. For instance, FAC ¶¶ 220 and 228, found in Counts II-IV and V, are word-for-word identical to each other, each stating that:

15

> Defendant Creighton's false and defamatory statements were designed to injure [the Plaintiff's] reputation, subject [the Plaintiff] to contempt and disgrace, and incite harassment and threats directed at [the Plaintiff]; indeed, Defendant Creighton's statements had their intended effect.

In Count VI, FAC ¶ 236 also reads identically, except that Mr. Hoft's name is substituted for Mr. Creighton's. In Count VII, FAC ¶ 244 also reads identically, but this time Mr. Stranahan and several other Defendants are substituted for Mr. Creighton, while in Count IX, FAC ¶ 273 makes the same accusation word-for-word against all Defendants simultaneously. In each case, this allegation of harm is only a few paragraphs before an allegation that the damages exceed $75,000. *Id.* at ¶¶224, 232, 240, 257, and 282. Bluntly, it is clear that these paragraphs were cut-and-pasted. Thus, each of these repeated paragraphs demonstrates that when the Plaintiff claims that he suffered more than $75,000 in damages (*id.* at ¶¶ 224, 232, 240 and 257), he is including in that calculation harm caused by third parties who are not defendants in this case.

However, because the Plaintiff chose to lump his damages caused by the wrongful acts of third parties who are not named as defendants in with the harms that he alleged to have been caused by the Undersigned Defendants, this Court cannot determine whether the FAC meets the jurisdictional minimum without those claims based on third-party misconduct. In other words, because the Plaintiff failed to allege that the Undersigned Defendants met the jurisdictional minimum without improperly including harm caused by the wrongful conduct of third parties, there is no way for this Court to know if the Plaintiff *can* plead the jurisdictional minimum without that improper calculation of damages. Therefore, the Plaintiff has failed to allege, with respect to the Undersigned Defendants, that the amount in controversy meets the statutory minimum. For that reason, the claim of defamation cannot support subject matter jurisdiction because there is no proper allegation that this claim meets the jurisdictional minimum.

16

<u>The Plaintiff Has Inappropriately Attempted to Include Harm Caused by the Wrongful Actions of Third Parties in His Calculation of Damages from the Alleged Intentional Infliction of Emotional Distress.</u>

Similarly, the Plaintiff has failed to allege that the amount in controversy exceeds $75,000 with respect to IIED, because the Plaintiff always makes it clear that part of what is allegedly causing this distress is the conduct of third parties who are not named as defendants in this suit without alleging any facts that would support any valid theory that would make the Undersigned Defendants responsible for the actions of those third parties.

The Plaintiff's theory is that the Undersigned Defendants incited this conduct. *Id.* at ¶¶ 5, 153, 164, 167, 177, 209, 220, 228, 236, 244, and 273. Even if one assumes arguendo that in an IIED case (or, for that matter, in a defamation case) that a person can be held liable for the misconduct of third parties if that defendant incites that misconduct, the FAC never makes any proper allegation of incitement.

First, although the FAC repeatedly uses variations of the word "incite," the Plaintiff's use of that term is purely conclusory. *Id.* at ¶¶ 5, 153, 164, 167, 177, 209, 220, 228, 236, 244, and 273. As noted above, *supra* 7-8, when subject matter jurisdiction is challenged based on the sufficiency of the allegations, as this brief does regarding the amount in controversy, the analysis is treated identically to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Adams,* 697 F.2d at 1219 ("all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration"). This includes the guidance in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) that conclusory allegations must be disregarded:

> the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.... In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption

17

of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.

(Internal citations omitted). [10] Applied here, the claim that the Undersigned Defendants incited any of the deplorable conduct committed by third parties is simply a conclusion and not entitled to any presumption of truth. Instead, the FAC must allege facts that, if true, would amount to incitement.

The test for incitement was established in *Brandenburg v. Ohio*, 395 U.S. at 447, in which the Supreme Court said that

the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

The instant FAC fails every part of this test, and one need look no further than the fact that the FAC never alleges that the Undersigned Defendants advocated any violence or lawless action.

The same conclusion was reached in *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002). In *Wilson,* a thirteen-year-old boy died when he was stabbed to death by a friend, identified only as "Yancy S." Andrea Wilson, the late child's mother, argued that Yancy S. was driven to stab her son by the famously violent video game *Mortal Kombat*, published by Midway and sued Midway under a number of theories that included IIED. The *Wilson* court noted significant doubts as to whether the tort of IIED would even lie under such facts as a matter of

---

[10] Other district courts have repeatedly held that a complaint must go beyond conclusory allegations to establish diversity jurisdiction. See, *e.g. Hayes v. Shelby Cnty. Tr.*, 971 F. Supp. 2d 717, 726 (W.D. Tenn. 2013), *Griffin v. Dir. of Vatterott*, No. 4:17-CV-2632 DDN, at * 3 (E.D. Mo. Oct. 27, 2017), *Naz, LLC v. Philips Healthcare*, No. 17-2882, at * 16 (E.D. La. July 26, 2017), *Diamos v. Specialized Loan Servicing LLC*, No. 13-cv-04997 NC, at * 4 (N.D. Cal. July 7, 2014), *Oved v. Weiner*, No. 17-CV-1348 (DRH)(GRB), at *10 (E.D.N.Y. Dec. 21, 2017), *Gypsum Storage Dev. LLC v. W. Reed Edgel & Assocs. Inc.*, No. 10-cv-02760-MSK, at *2 (D. Colo. Nov. 15, 2010), *Levy v. Ryan Seacrest Prods.*, No. 2:13-cv-0070, at *6 (E.D. Cal., Jan. 29, 2013), and *Saleh v. Florida*, No. 3:17-cv-1465-J-34PDB, at *11 (M.D. Fla. Jan. 5, 2018).

18

common-law but settled the matter by looking instead to the First Amendment. The *Wilson* court brushed aside a claim that the plaintiff only needed to allege that Midway "knew or should have known that its conduct would bring about harm," 198 F. Supp. 2d at 182, and instead held that Midway could not be held responsible for distress caused by the misconduct of a third party (Yancey S.) unless Midway's expression met the *Brandenburg* test, 395 U.S. at 447. As in the instant case, Midway's expression did not meet that standard.

Indeed, any other approach would inappropriately chill speech. The danger was most articulately explained in *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (Cal. App. 2 Dist. 1988). In that case, musician John "Ozzy" Osbourne and his music publisher were sued for allegedly causing a nineteen-year-old man to commit suicide through Mr. Osborne's music. Brushing aside that assertion, the *McCollum* court wrote that:

> it is simply not acceptable to a free and democratic society to impose a duty upon performing artists to limit and restrict their creativity in order to avoid the dissemination of ideas in artistic speech which may adversely affect emotionally troubled individuals. Such a burden would quickly have the effect of reducing and limiting artistic expression to only the broadest standard of taste and acceptance and the lowest level of offense, provocation and controversy. No case has ever gone so far. We find no basis in law or public policy for doing so here.

202 Cal. App. 3d at 1005-6 (footnote omitted). As dangerous as such liability would be to performing artists, it would be even more dangerous to impose such liability on journalists or news organizations such as the Undersigned Defendants. According to the Plaintiff's theory, the Undersigned Defendants cannot criticize other people or engage in negative reporting about them because, even though they do not advocate violence or illegal conduct, third parties might decide on their own to be violent or to break the law. In short, the Plaintiff believes that under the First Amendment all speakers must limit their expression "to only the broadest standard of taste and acceptance and the lowest level of offense, provocation and controversy." *Id.* The *McCollum* court

19

refused to adopt such a repressive rule, and this Court should do the same.

Applied here, the only form of emotional distress alleged by the Plaintiff that the Undersigned Defendants might be liable for is that which flows directly from the upset caused by the Plaintiff's personal reading of their writing. However, the Plaintiff makes no effort to separate that harm from the harm caused by third parties for which the Undersigned Defendants are not, as a matter of law, responsible. For instance, the allegations of harm in FAC ¶ 287 are laced with such claims:

> Defendants knew or should have known that their publications about [the Plaintiff] would cause him to be the *subject of harassment and threats and thereby cause severe emotional distress*.

(Emphasis added). Thus, the emotional distress complained of was not caused by the publications themselves but by the improperly pled incitement of third parties to engage in harassment and threats. Similarly, FAC ¶ 289-292 states that

> Defendants' publication of baseless false allegations have caused [the Plaintiff] extensive personal suffering *in the wake of the slew of threats and harassment that has been directed at him*; depression, anxiety, sleeplessness, inability to concentrate, irritability. It has also caused irreparable damage to his professional reputation as a diplomat in the State Department and his ability to conduct business in his current employment, including loss of income.

> [The Plaintiff] lives in a state of constant fear and anxiety after reading Defendants' false and defamatory statements about him all over the Internet *and due to the death threats that Defendants' armies of followers have launched at him* after taking Defendants' defamatory statements as assertions of fact. This high level of stress has manifested itself both physically and psychologically.

> [The Plaintiff] has developed a medical condition called Central Serous Chorioretinopathy, which causes loss of vision in [the Plaintiff's] right eye. This visual impairment seriously impedes his ability to conduct business, let alone carry out day-to-day activities.

> [The Plaintiff] also suffers from depression, the symptoms of which have been exacerbated by the consistently high levels of stress caused the [sic] reputational harm caused by Defendants' false and defamatory statements, *as well as by the threats and harassment directed at [the Plaintiff]*, and have impaired his ability to

20

conduct both work and social activities.

(Emphasis added). In each case, the alleged emotional distress is caused in part by the "threats and harassment," *id.* at ¶ 287, that the Plaintiff blames on the Undersigned Defendants. Indeed, common sense about human nature would suggest that the Plaintiff would be more upset by the conduct allegedly committed by third parties than any alleged defamatory comments by the Undersigned Defendants. In FAC ¶¶ 150-163, the Plaintiff makes fairly detailed allegations of the deplorable and often illegal harassment he and his family faced at the hands of third parties, and the Plaintiff may very well have causes of action against those third parties. To the extent that conduct was criminal or tortious, the Undersigned Defendants hope that those third parties—if they are guilty of the conduct described—face justice in either criminal or civil court.

However, given that the Plaintiff has not properly alleged incitement against the Undersigned Defendants, they cannot be held responsible for that conduct as a matter of law. Yet, when calculating damages, the FAC improperly includes harms caused by third persons that the Undersigned Defendants are not responsible for. Therefore, this Court has no idea whether the amount in controversy exceeds $75,000 with respect to IIED if those improperly included harms are not included. Given that the Plaintiff has also failed to allege the jurisdictional minimum with respect to Defamation, the Plaintiff has failed to allege a sufficient amount in controversy in the case as a whole.

In summary, the Plaintiff has failed to show subject matter exists for two reasons. First, the evidence shows that Mr. Stranahan is domiciled in Virginia and therefore, there is not complete diversity. Second, the Plaintiff has failed to plead the jurisdictional minimum because he has improperly included harms caused by third parties not named as defendants in this suit in order to exceed the $75,000 threshold. For both of these reasons, or either by itself, this Court lacks subject

21

matter jurisdiction and should dismiss this case under Fed. R. Civ. P. 12(b)(1).

## II.
## THIS COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER MR. HOFT, MR. CREIGHTON, MS. HICKFORD OR WNI IN THE INSTANT CASE

Given that this is alleged to be a diversity of citizenship case under 28 U.S.C. § 1332, the question of whether this Court can exercise personal jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, or WNI is determined by the same standards that would apply in any Virginia state court. Therefore, Virginia state law controls so long as it is consistent with the Federal Constitution. "[A] federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of jurisdiction is consistent with constitutional due process." *Nichols v. G.G. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993) (internal quotation marks omitted). In this instance the Plaintiff has failed to allege conduct by Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford or WNI that either meets the requirements of (1) Virginia's Long-Arm Statute or (2) the Due Process Clause of the Fourteenth Amendment. For those reasons alone, this Court should dismiss this case with respect to Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and WNI under Fed. R. Civ. P. 12(b)(2).

A.     **Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford or WNI Have Not Engaged in Any Conduct That Meets the Requirements of Virginia's Long-Arm Statute.**

First, although it is correct to say that "the function of [Virginia's] long-arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in Virginia, to the extent permissible under the Due Process Clause" of the Fourteenth Amendment, *Krantz v. Air Line Pilots Ass'n, Intern.*, 245 Va. 202, 205 (1993), it is incorrect to say that this Court can simply pretend that Virginia's Long-Arm Statute (VA. CODE § 8.01-328.1) does not exist. Even in *Krantz* where jurisdiction was found to lie, the Virginia Supreme Court first determined whether or not

22

the conduct at issue met the language of the statute and then determined whether such an assertion of jurisdiction would comport with due process.

Further, as this Court stated in *Bennett v. OmniSOURCE Corp.*, No. 7:14CV00309, at *3-4 (W.D. Va. Nov. 4, 2015):

> When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff ultimately bears the burden of proving the existence of jurisdiction over the defendant by a preponderance of the evidence. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). When, as here, the court decides such motion without an evidentiary hearing, "the plaintiff need prove only a prima facie case of personal jurisdiction." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). In deciding whether the plaintiff has made the requisite showing, the court must draw all reasonable inferences arising from the evidence, and resolve all factual disputes, in the plaintiff's favor. *Id.*

With respect to Virginia's Long-Arm Statute, FAC ¶ 4 appears to rest the current assertion of jurisdiction on VA. CODE § 8.01-328.1(A)(1) and (4), which states in relevant part that:

> A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:...
>
> 1. Transacting any business in this Commonwealth; [or]...
>
> 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth;

As an initial matter, § 8.01-328.1(A)(1) simply does not apply. In *Processing Research, Inc. v. Larson*, 686 F. Supp. 119, 121 (E.D. Va. 1988), the court stated that it was a "settled principle" that "a single act may constitute transaction of business under Virginia's Long Arm [Statute], *provided the action arose from that one transaction*," (emphasis added). However, the Plaintiff is not alleging a cause of action arising from any business Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, or WNI might have transacted in the Commonwealth, but rather based on words that were published, by the Plaintiff's own admission, "outside the Commonwealth." FAC ¶ 5.

23

There is nothing alleged in relation to writing those words that suggest that they constitute a "transaction" within the meaning of § 8.01-328.1(A)(1), and even if it were, it was not carried out in the Commonwealth.

Meanwhile, FAC ¶ 5 attempts to invoke § 8.01-328.1(A)(4) by stating that "Defendants injured Plaintiff... in the Commonwealth of Virginia by their conduct outside of the Commonwealth" and by stating in paragraph 6 that "Upon information and belief, Defendants regularly do and/or solicit business in the Commonwealth, engage in other persistent courses of conduct, or derive substantial revenue from goods used or consumed or services rendered in the Commonwealth," closely echoing the language found in subsection (A)(4). However, the Declarations submitted by Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and WNI indicate that they 1) made the allegedly defamatory publications in Missouri, Colorado and Florida, 2) do not do or solicit business in Virginia, 3) have not engaged in any persistent course of conduct in Virginia, 4) have not derived any revenue from goods used or consumed in Virginia, or 5) have not derived any revenue from any services performed in the Commonwealth. Exhibit B ¶ 3, Exhibit C ¶ 3, Exhibit D ¶ 4 and Exhibit E ¶ 3. Therefore, their conduct does not trigger any part of the Virginia long-arm statute, and for this reason alone, Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and WNI should be dismissed from the case.

**B.      The Plaintiff's Proposed Assertion of Jurisdiction Would Violate the Due Process Clause of the Fourteenth Amendment.**

Even if Virginia's Long-Arm Statute was satisfied that is only half of the analysis. The second question is whether the assertion of jurisdiction would be permitted under the Due Process Clause of the Fourteenth Amendment. This, in turn, is a two-part analysis:

> Two types of personal jurisdiction satisfy constitutional due process. Both require a nonresident defendant to have "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and

24

substantial justice." *Int'l Shoe v. Washington*, 326 U.S. 310, 316... (1945) (internal quotation marks omitted). First, a court may exercise general jurisdiction over a nonresident defendant who has "continuous and systematic" contacts with the forum state. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414... (1984)). Second, a court may assert specific jurisdiction based on the nonresident defendant's "conduct connected to the suit." [*ALS Scan,* 293 F.3d] at 711.

*Tatoian v. Andrews*, 100 F. Supp. 3d 549, 553 (W.D. Va. 2015). Neither general nor specific jurisdiction can be exercised in this case.

    1.    This Court Cannot Exercise Specific Personal Jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford or WNI Under *Young v. New Haven Advocate*.

The leading case in this circuit on the question of specific personal jurisdiction in the Internet age is *Young v. New Haven Advocate,* 315 F.3d 256 (4th Cir. 2002), and that case presents facts similar to the instant case in nearly every relevant respect. That case involved two Connecticut newspapers (and members of their respective staffs) and their associated websites which published articles allegedly defamatory of a Virginia prison warden. Mr. Young attempted to argue that Virginia could exercise personal jurisdiction over those defendants as follows:

(1) the [defendants], knowing that [the plaintiff] was a Virginia resident, intentionally discussed and defamed him in their [newspaper] articles, (2) the newspapers posted the articles on their websites, which were accessible in Virginia, and (3) the primary effects of the defamatory statements on [the plaintiff's] reputation were felt in Virginia.

*Id.* at 261-62. However, the *Young* court found this to be insufficient because there is no allegation that there was an intent to target a Virginia audience:

As we recognized in *ALS Scan*, "a person's act of placing information on the Internet" is not sufficient by itself to "subject[] that person to personal jurisdiction in each State in which the information is accessed." [293 F.3d] at 712. Otherwise, a "person placing information on the Internet would be subject to personal jurisdiction in every State," and the traditional due process principles governing a State's jurisdiction over persons outside of its borders would be subverted. *Id.*

25

*Id.* at 263. By the *Young* standard, there is nothing before this Court allowing it to determine that the publications of Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, or WNI cited in the FAC were meant specifically for a Virginia audience instead of a national or even a global audience. Therefore, under *Young*, this Court cannot assert specific personal jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, or WNI.

2. This Court Cannot Exercise General Personal Jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford or WNI Under *Collier v. Land & Sea Rest. Co.*

Turning to the question of general personal jurisdiction, the Plaintiff fares little better. First, with respect to Messrs. Hoft and Creighton, their declarations establish that in addition to their writing directed to the world at large, their sites allows donations to come from anywhere in the world. Exhibit B ¶ 3, Exhibit C ¶ 3. If one likens donations to sales, then this resembles the facts in *Collier v. Land & Sea Rest. Co.*, No. 7:13-cv-00104 (W.D. Va. Oct. 15, 2014). In that case, the plaintiff attempted to assert general jurisdiction, in part, based on the fact that one defendant, Norm Bloom and Son, LLC, ran a website that allowed Virginians to purchase their products online and that Virginians did purchase those products on their website. This Court brushed that argument aside as follows:

> Sales through a website alone are insufficient to confer general jurisdiction if that website is focused generally on customers located throughout the United States and does not focus on or target customers in the forum state. See *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 401 (4th Cir. 2003). Based on the information provided to the court, the website here falls within that category. That is, it allows customers located anywhere to purchase Norm Bloom's products through the website, but does not focus specifically on Virginia as a target market.

*Id.* at *6. Accordingly, the *Collier* court found that general jurisdiction did not lie in Virginia. Indeed, an examination of *Carefirst* verifies the correctness of this conclusion. In that case, the Fourth Circuit found that an interactive website that might be accessed in Maryland was not

26

sufficient to confer jurisdiction in Maryland:

> when CPC set up its generally accessible, semi-interactive Internet website, it did not thereby direct electronic activity into Maryland with the manifest intent of engaging in business or other interactions within that state in particular.... Consequently, the website fails to furnish a Maryland contact adequate to support personal jurisdiction over CPC in the Maryland courts.

334 F.3d at 401. Applied here, the Creighton and Hoft Declarations establish that any solicitation of donations does not target Virginia, but instead targets the world as a whole. Therefore, those donations along with the writings would not allow this Court to exercise general personal jurisdiction over Messrs. Hoft and Creighton.

With respect to Mr. Wilburn, Ms. Hickford, and WNI the argument for general personal jurisdiction is even weaker because the relevant website does not accept donations at all. Exhibit B ¶ 3, Exhibit D ¶ 4 and Exhibit E ¶ 3. In other words, for those Defendants, there is no basis for asserting general jurisdiction over them.

Therefore, this Court cannot exercise general or specific jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, or WNI, justifying dismissal of all claims against them under Fed. R. Civ. P. 12(b)(2).

## III.
## THE FIRST AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Even if this Court had jurisdiction, the Plaintiff has failed to state a claim for which relief can be granted against the Undersigned Defendants, justifying dismissal under Fed. R. Civ. P. 12(b)(6). As this Court stated in *Elitharp-Martin v. Pulaski Cnty. Sch. Bd.*, 62 F. Supp. 3d 515 (W.D. Va. 2014):

> A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). When considering a motion to dismiss, the court must accept the well-pled facts in the complaint as true and make all reasonable inferences in the plaintiff's favor. *Bell Atl. Corp. v.*

27

*Twombly*, 550 U.S. 544, 570... (2007).

Further, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim" as "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79. This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. Additionally, on a motion to dismiss "a court may apply common sense and reject fantastic allegations." *McCauley v. Hospira, Inc.*, No. 11-CV-108, at *4 (M.D.N.C. 2011).

In *Iqbal,* the Supreme Court wrote that "We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." 556 U.S. at 681. It might be useful to this Court to do the same, actually taking a copy of the FAC, crossing out every allegation that is not entitled to a presumption of truth and then seeing if there is anything left that would support any claim for relief. In the instant case, the Plaintiff has failed to make sufficient non-conclusory allegations that, if true, would allow this Court to find that the Undersigned Defendants had committed either defamation or IIED.

A.    **Defendants Hoft, Wilburn, Hickford and WNI Are Immune, in Whole or in Part, under Section 230 of the Communications Decency Act.**

Many of the statements at issue in this case are immune from suit under 47 U.S.C. § 230(c)(1), more colloquially known as Section 230 of the Communications Decency Act. In *Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009), the Fourth Circuit explained the purpose of this law:

> Recognizing that the Internet provided a valuable and increasingly utilized source

28

of information for citizens, Congress carved out a sphere of immunity from state lawsuits for providers of interactive computer services to preserve the "vibrant and competitive free market" of ideas on the Internet. 47 U.S.C. § 230(b)(2); see also *Zeran*, 129 F.3d at 330. The CDA bars the institution of a "cause of action" or imposition of "liability" under "any State or local law that is inconsistent" with the terms of § 230. 47 U.S.C. § 230(e)(3). As relevant here, § 230 prohibits a "provider or user of an interactive computer service" from being held responsible "as the publisher or speaker of any information provided by another information content provider."

As this section will show, the "big picture" with respect to this provision is that the only person who publishes content on the Internet is the person who creates the content. As stated in *Nemet Chevrolet*, "To further the policies underlying the CDA, courts have generally accorded § 230 immunity a broad scope." *Id.* at 254.

Subsection 230(c)(1) states that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." The effect of this provision is to shield those persons from liability arising from publication or speaking—defamation being the most obvious example, see, *e.g.*, *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 879 (W.D. Va. 2016) (noting that publication is an element of defamation), but also including IIED. This is demonstrated by § 230(e)(3), which states that "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

To define those terms, this Court can look to other parts of the statute. For instance, § 230(f)(2) provides that

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

29

Meanwhile, § 230(f)(3) states that "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."

So, for instance, all of the Defendants are obviously "user[s] of an interactive computer service"—namely, their respective Internet service providers—given that this case arises from their alleged misuse of the Internet. Thus Ms. Hickford is a "user," and Mr. Wilburn was another "information content provider" within the language of § 230(c)(1)'s admonition that "No provider or *user* of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Accordingly, § 230(c)(1) prevents a finding that Ms. Hickford is the publisher of any of Mr. Wilburn's writings unless it can be shown that she "is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3). The same can be said for WNI—without any allegation that WNI participated in the creation of Mr. Wilburn's content, WNI is not its publisher.

However, there is no allegation that Ms. Hickford or WNI shared in the creation of Mr. Wilburn's words. Another theory allowing for responsibility for the creation of content would be that WNI or Ms. Hickford was Mr. Wilburn's employer. While FAC ¶ 278 does allege that "At the time the false and defamatory statements were made, Defendant Wilburn was an employee and/or agent of Defendants West, Hickford, and/or Words-N-Ideas" this is simply a conclusory allegation, presenting without any facts that would lead this Court to conclude that Mr. Wilburn was Ms. Hickford's or WNI's employee or agent. Therefore, the Plaintiff has failed to allege that Ms. Hickford or WNI is "responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service" as required

30

by § 230(f)(3). As such with respect to the allegedly defamatory publication by Mr. Wilburn, Mr. Wilburn stands as another "information content provider" with respect to Ms. Hickford and WNI, and, therefore, they did not publish the allegedly defamatory article. Mr. Wilburn is its only publisher.

However, Mr. Wilburn is not the publisher of every word that appeared in his allegedly defamatory article. For instance, his article states the following:

The story is being told on YᴏᴜʀNᴇᴡsWɪʀᴇ.com and other sources:

> "A Charlottesville police officer has come forward to express his anger at being told to "stand down" by the city mayor during violent clashes between protestors. He also claims the protests, which pitched "white supremacists" against members of Antifa, were "set up" to further the agenda of the elites.
>
> "We [Charlottesville police] were ordered to bring the rival groups together. As soon as they were in contact with each other, we were told to stand down. It was outrageous. We weren't allowed to arrest anyone without asking the mayor first. We weren't even allowed to stop the driver as he sped away."
>
> "The event was being set up as far back as at least May and it went like clockwork."
>
> Michael Signer, the mayor of Charlottesville, ordered police to stand down during the most chaotic and destructive period of the protests—despite police protests against the orders.
>
> "We wanted to do our job and keep the peace. But these mother******s in charge really want to destroy America."

FAC Exhibit H, p. 3. The phrase "YᴏᴜʀNᴇᴡsWɪʀᴇ.com" in that Exhibit is hyperlinked to https://yournewswire.com/charlottesville-inside-job/amp/.[11] On the face of the article, then, these are not Mr. Wilburn's words, but instead the words of an unidentified third person, and this is

---

[11] Baxter Dmitry, *Police: Charlottesville Was 'Inside Job' To Ignite Race War*, YᴏᴜʀNᴇᴡsWɪʀᴇ, https://yournewswire.com/charlottesville-inside-job/amp/ (last visited May 8, 2018).

31

admitted in FAC ¶ 126, in which the Plaintiff alleges that Mr. Wilburn's article "cites and republishes the alleged statement of an anonymous Charlottesville police officer."

In that context, then, the author of the YOURNEWSWIRE article that Mr. Wilburn quotes from is another "information content provider." There is no allegation that Mr. Wilburn is "responsible, in whole or in part, for the creation or development" of that information within the meaning of § 230(f)(3). Therefore, with respect to that passage, Mr. Wilburn is a "user of an interactive computer service" and that passage Mr. Wilburn quoted "is information provided by another information content provider"—*i.e.* the author of this YOURNEWSWIRE piece. Accordingly, Mr. Wilburn is not the publisher of those quotes from YOURNEWSWIRE: If those statements are truly defamatory, the Plaintiff will have to pursue the actual author for damages, not Mr. Wilburn (or Ms. Hickford or WNI).

Mr. Wilburn quotes from that article extensively in FAC Exhibit H, and it is fair to say that the majority of his piece is simply presenting long quotes from that YOURNEWSWIRE piece in italics, and thus, to the extent that Mr. Wilburn is quoting other articles on the Internet, § 230(c)(1) immunizes him from liability.

The same can be said for Jim Hoft's allegedly defamatory article. For instance, FAC ¶ 65 makes the following claim:

> [Mr.] Hoft... republishes statements from a disreputable Reddit[12] thread that falsely assert that [the Plaintiff] and/or the State Department removed references to [the Plaintiff's] State Department work in an attempt to cover up their alleged involvement in the Charlottesville rioting. This is false.

However, just as with Mr. Wilburn, to the extent that the FAC relies on Mr. Hoft quoting another "information content provider," Mr. Hoft is shielded from liability by § 230(c)(1).

---

[12] Reddit is a website on the Internet. See, *e.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 676 n. 30 (E.D. Va. 2015).

32

*Nemet Chevrolet* made it clear what the effect of § 230(c)(1) was as follows:

> Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. As we have often explained in the qualified immunity context, immunity is an *immunity from suit* rather than a mere defense to liability and it is effectively lost if a case is erroneously permitted to go to trial.

591 F.3d at 254 (internal quotation marks and citations omitted). Accordingly, *Nemet Chevrolet* affirmed a dismissal based on this immunity, and partial dismissal is appropriate here, as well. With respect to Ms. Hickford and WNI, this justifies dismissal of the entire case—they are not the publishers of any of Mr. Wilburn's words, and therefore, not responsible for any alleged defamation or IIED Mr. Wilburn allegedly committed. Further, to the extent that the Plaintiff bases liability on Mr. Wilburn's quotation of other information content providers, this case should be dismissed. Likewise, Mr. Hoft is not responsible for the accuracy or inaccuracy of any statement created by another information content provider that he quotes in the article, and to the extent that the FAC does rely on such statements, this case should be dismissed.

**B.     The Plaintiff Has Failed to State a Claim for Defamation.**

To the extent that the Undersigned Defendants are the legal publishers of the allegedly defamatory statements, the FAC fails to plead defamation for three reasons. First, the FAC repeatedly fails to properly plead that the Undersigned Defendants made a false statement of fact. Second, the Plaintiff fails to properly plead malice or negligence. Finally, the FAC fails to properly plead damages. For all of these reasons, the FAC fails to state a claim for which relief can be granted, and to the extent that Counts I-VII and IX apply to the Undersigned Defendants, those Counts should be dismissed.

33

1. <u>The Plaintiff Fails to Properly Allege That the Undersigned Defendants Have Made Any Actionable, False Statements (Or Implications) of Fact with Respect to the Plaintiff.</u>

In *Avepoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 506 (W.D. Va. 2013), this Court laid out what must be pled in order to support a claim for defamation:

> To state a claim for defamation under Virginia law, the plaintiffs must show that the defendants (1) published (2) an actionable statement with (3) the requisite intent… To be actionable, the statement must be not only false, but also defamatory, that is, it must tend so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

(Internal citations, quotation marks and footnotes omitted). It is the Plaintiff's burden to plead falsity, *Harris*, 229 Va. at 15 (1985), and a technically false statement can be defended on the substantial truth doctrine. Under Virginia law, "where the alleged defamatory 'sting' arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). Further, as a matter of logic, the statement can only be defamatory if the Plaintiff properly pleads that the statement is "of and concerning" the Plaintiff. *Avepoint*, 981 F. Supp. 2d at 508.

Meanwhile, pure expressions of opinion cannot be defamatory. *Id.* at 506. One particular brand of opinions that are protected, are best described as "conclusions based on disclosed facts." As stated in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 27 n. 3 (1990):

> The Restatement (Second) of Torts § 566, Comment c (1977) … explains that a statement that "I think C must be an alcoholic" is potentially libelous because a jury might find that it implies the speaker knew undisclosed facts to justify the statement. In contrast, it finds that the following statement could not be found to imply any defamatory facts:
>
>> "A writes to B about his neighbor C: `He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.'"

34

> Yet even though clear disclosure of a comment's factual predicate precludes a finding that the comment implies other defamatory facts, this does not signify that a statement, preceded by only a partial factual predicate or none at all, necessarily implies other facts. The operative question remains whether reasonable readers would have actually interpreted the statement as implying defamatory facts.

The logic of this doctrine is plain. As explained by the D.C. Circuit: "Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." *Moldea v. New York Times Co.*, 15 F.3d 1137, 1144-45 (D.C. Cir. 1994) *rev'd in on other grounds on reh'g*, 22 F.3d 310 (D.C. Cir. 1994); see also *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998) (quoting this passage favorably).

Finally, while it is possible to draw a defamatory meaning not from a person's literal words but by implication, alleging defamation by implication is not a license to engage in wild flights of fancy:

> A defamatory implication must be present in the plain and natural meaning of the words used.... Moreover, because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.

*Chapin,* 993 F.2d at 1092-93 (internal citations omitted). With these principles in mind, we turn to each publication in order to show that the Plaintiff never properly alleges that any of the Undersigned Defendants made an actionable, false statement of fact (by words or by implication) of and concerning the Plaintiff. For this reason alone, the Plaintiff has failed to state a claim for defamation against them.

35

The Plaintiff Fails to Properly Allege that Mr. Wilburn has Made any False
         Statements of Fact in His August 19, 2017 Article.

As noted above, one of the most basic requirements of pleading defamation is to actually

allege that the defendant made a false statement of fact. However, when it comes to Mr. Wilburn,

the Plaintiff has failed this very basic requirement for one simple reason: Mr. Wilburn was simply

accurately quoting other sources, and Mr. Wilburn specifically warns readers that he does not

know that these other sources are correct.

For instance, FAC ¶ 126 states that the following is allegedly a false statement of fact:

> If you think that is suspicious, wait until you learn about the other actors in this
> enormous set-up event. [The Plaintiff] was the first man "on the scene" and was the
> author of the first viral tweet about Charlottesville. He was later interviewed by
> MSNBC. He was presented as an accidental witness. But who is he really? [The
> Plaintiff] worked in Africa as a State Department foreign officer under Hillary
> Clinton. The New York Times mentioned this "coincidence"—and then later
> deleted it. [The Plaintiff] was also involved with the Kony hoax in 2012, and he is
> currently Chief of Staff for Tom Perriello, who is running for Governor of Virginia
> and received $380k from George Soros. So the first man on the scene, whose tweet
> went viral, and who was later interviewed on mainstream news as a witness, just
> happened to be a State Department insider with a long history of involvement in
> psy-ops? If you think this isn't fishy, how about this—since the Charlottesville
> protests and his appearance in the media, his information was suddenly removed
> from State Department websites."

First, the only alleged falsehood in that passage alleged by the Plaintiff is that "information [about

the Plaintiff] was suddenly removed from State Department websites"—which is an allegation

against the State Department, and not of and concerning the Plaintiff. Secondly, the FAC fails to

note that this entire passage is presented as a quotation of another source. On page 2 of FAC

Exhibit H (ECF No. 29-8), Mr. Wilburn's writes that "The story is being told on

YOURNEWSWIRE.com and other sources[,]" with the phrase "YOURNEWSWIRE.com" containing a

hyperlink to a separate article on a different website.[13] The Wilburn piece goes on to quote

---

[13] This is apparent if this Court reviews the PDF copy of FAC Exhibit H. If one places a cursor

36

extensively from this YOURNEWSWIRE article, the quoted passages appearing in *italics*. Therefore, the only fact being asserted by Mr. Wilburn with respect to that block-quoted passage is that YOURNEWSWIRE has an article on its site containing those words, and the FAC never asserts that this fact—the fact that YOURNEWSWIRE is saying this—is untrue.

This is no different in principle from what a reporter might say today about this case and accusations against the Plaintiff. The WASHINGTON POST, reporting on this very lawsuit might accurately say the following about this suit in relation to Mr. Hoft: "In paragraph 64, the amended complaint alleges that Mr. Hoft defamed the Plaintiff in part by calling him a 'Deep State shill.'" The WASHINGTON POST is not required to determine whether or not the Plaintiff is actually a "Deep State shill" in order for that sentence to be true. Sometimes the fact someone said something is a valid subject of reporting, whether the person's statement is true or false. For instance, if the President called the leader of North Korea "mentally retarded," the fact that it was said is something the news media can validly report, without independently verifying Kim Jong-un's IQ. Likewise, Mr. Wilburn did not have to verify that YOURNEWSWIRE's allegations are true in order to report that YOURNEWSWIRE made those allegations.

Indeed, such conduct is not uncommon in news reporting. For instance, the WASHINGTON POST once ran a headline that read "AP says Justice Department secretly obtained its phone records."[14] The article goes on to quote extensively from the Associated Press ("AP") without stating that any facts were independently verified by the WASHINGTON POST. The WASHINGTON POST, in turn was cited by CNN as follows: "The Washington Post first reported Tuesday that

over the term "YOURNEWSWIRE" a hyperlink is indicated.

[14] Aaron Blake, *AP says Justice Department secretly obtained its phone records*, WASHINGTON POST, May 13, 2013, https://www.washingtonpost.com/news/post-politics/wp/2013/05/13/ap-says-justice-department-secretly-obtained-its-phone-records/?utm_term=.e38f6b29ad45 (last visited May 2, 2018).

37

Trump congratulated Putin despite warnings from multiple national security advisers and briefing materials that said 'DO NOT CONGRATULATE.'"[15] CNN's reporting in turn has been cited by the AP and the BOSTON GLOBE that begins as follows: "NEW YORK (AP)—CNN is reporting that eight current or former 'House of Cards' workers claim that Kevin Spacey made the production a 'toxic' workplace and one ex-employee alleges the actor sexually assaulted him."[16] The Undersigned Defendants could produce thousands of examples, and none of these articles cited in this paragraph alleges that the reports by those other publications were true. They simply state the fact that other sources reported something, just like Mr. Wilburn did in his article.

Furthermore, Mr. Wilburn did something those institutional media outlets did not: He specifically warned the reader that he did not know whether the cited reports were true. Over and over, Mr. Wilburn makes statements such as "This revelation is huge and *if true* may implicate Mayor Signer and possibly other city officials in the death of a citizen," FAC Exhibit H, p. 3 (emphasis added), or "We need to clarify that these are early accounts and as yet unverified, but if true this is very, very serious stuff," *id.* at p. 6. The Plaintiff attempts to hold those statements against Mr. Wilburn, claiming that they show actual malice, *e.g.*, FAC ¶ 136, but in fact, they show that any reasonable reader would understand that Mr. Wilburn did not make any factual statement in that article except the following: That YOURNEWSWIRE has an article that uses the words he cited. Mr. Wilburn did not allege that those words are true; he only alleged that they were said—a fact the FAC does not dispute. Indeed, one wonders why the Plaintiff is suing Mr. Wilburn (as

---

[15] Kaitlan Collins and Jeff Zeleny, *Trump furious over leak of warning to not congratulate Putin*, CNN, March 22, 2018, https://www.cnn.com/2018/03/21/politics/donald-trump-vladimir-putin-congratulations/index.html (last visited May 2, 2018).

[16] Associated Press, *Kevin Spacey faces new harassment allegations*, THE BOSTON GLOBE, Nov. 3, 2017, https://www.bostonglobe.com/arts/television/2017/11/02/kevin-spacey-faces-new-harassment-allegations/E2DrhxlAIGRzNbkeJQ5RVL/story.html (last visited May 2, 2018).

38

well as Ms. Hickford and WNI) and not the author of that YOURNEWSWIRE piece.

This pattern of faulty logic is repeated throughout paragraphs 125-144 of the FAC, the Plaintiff claiming that Mr. Wilburn defamed him, when he only accurately quoted YOURNEWSWIRE. For instance, FAC ¶ 130 alleges that Mr. Wilburn characterized the Plaintiff's "presence during Fields' attack as 'fishy' and 'suspicious,' and that he falsely stated that [the Plaintiff's] information was 'suddenly' removed from State Department websites." However, Mr. Wilburn did not use the words "fishy," or "suspicious" or allege that the State Department had removed anything from its website, suddenly or otherwise. Those statements came from the YOURNEWSWIRE article.

Further, while Mr. Wilburn uses the term "deep state" as alleged in FAC ¶ 127, this is not a statement of fact that one exists. Rather, he is stating his opinion that if the reporting of YOURNEWSWIRE is correct, it would provide evidence of its existance. That is obvious when one places Mr. Wilburn's words in context: "We need to clarify that these are early accounts and as yet unverified, but if true this is very, very serious stuff. It points directly to the reality of the 'deep state[.]'" In context, all Mr. Wilburn is saying is if the story he quoted was accurate, it would provide evidence that the "Deep State" exists. That is a conclusion based on disclosed *hypothetical* facts which is a form of protected opinion. *Supra* 34-36.

Finally, FAC ¶ 131 states that

By citing the anonymous "testimony" of an alleged Charlottesville police officer, Defendants West, Wilburn, Hickford, and Words-N-Ideas reasonably indicate to readers that other undisclosed defamatory facts exist that would justify the conclusion that [the Plaintiff] was involved in orchestrating the violence in Charlottesville, such as this police officer's firsthand observation of [the Plaintiff] in Charlottesville. Furthermore, by republishing the alleged "testimony" of a police officer, Defendants West, Wilburn, Hickford, and Words-N-Ideas indicate to their audience that this source has been verified and the veracity of his or her "testimony" independently checked. Neither is true.

39

There are several deficiencies in that paragraph. First, there is no instance in FAC Exhibit H in which the term "testimony" is used—so the implication that Mr. Wilburn called it "testimony" is simply false. Second, Mr. Wilburn did not see that statement as being of and concerning the Plaintiff, and his plain language makes that clear. He wrote "This revelation is huge and if true may implicate Mayor Signer and possibly other *city officials* in the death of a citizen," FAC Exhibit H, p. 3 (emphasis added). The Plaintiff is not alleged to be the mayor of Charlottesville or a city official.

Third, the conclusory claim in FAC ¶ 112 that "Defendants West, Wilburn, Hickford, and Words-N-Ideas indicate to their audience that this source has been verified and the veracity of his or her 'testimony' independently checked" cannot be squared with the FAC Exhibit H. Its language specifically states that Mr. Wilburn did not know if the report he was citing is accurate. Therefore, this conclusory allegation by the Plaintiff should be disregarded because 1) conclusory allegations are not to be considered in light of *Iqbal*, 556 U.S. at 680, and 2) because it is contradicted by the Plaintiff's own exhibit, see *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006) (holding that courts can disregard allegations that "contradict matters properly subject to judicial notice or by exhibit").

In summary, the FAC fails to allege that Mr. Wilburn—and, by extension, Ms. Hickford and WNI—committed defamation because the Plaintiff failed to allege that they made a false statement of fact. An examination of FAC Exhibit H reveals that the only fact that Mr. Wilburn alleges to be true is that YOURNEWSWIRE has an article that contains the words that he attributed to them. The Plaintiff has not alleged that this is an untrue fact. Mr. Wilburn did not allege that the words he was quoting were true, and indeed took a step that the WASHINGTON POST, CNN, the ASSOCIATED PRESS and the BOSTON GLOBE did not: He warned the readers that he did not know

40

himself whether it was true. Therefore, the FAC stumbles over the most basic requirement in

defamation: Alleging that Mr. Wilburn (and Ms. Hickford and WNI) made a false statement of

fact about the Plaintiff.

(ii)    The Plaintiff Fails to Properly Allege That Mr. Creighton Made a False
Statement of Fact in His August 13, 2017 Article.

As noted above, conclusions based on disclosed facts are a form of protected opinion that

cannot, as a matter of law, be defamatory. *Milkovich,* 497 U.S. at 27 n. 3. Despite this black letter

law, the FAC repeatedly attempts to argue that conclusions from stated facts are defamatory when,

in fact, they are opinions protected by the First Amendment.

This is most clear in regard to Defendant Creighton's allegedly defamatory article quoted

in FAC ¶ 38. Just before the quote, the article states that

> In this article, Defendant Creighton notes [the Plaintiff's] experience as a Foreign
> Service Officer in the Central African Republic and his work as chief of staff to
> Tom Perriello. On the basis of these true facts, along with [the Plaintiff's] statement
> of belief that the attack was an act of terrorism, Defendant Creighton falsely states
> that [the Plaintiff] cannot have been a mere bystander who happened to record the
> attack.

*Id.* In other words, the FAC is not alleging that Mr. Creighton's *facts* are wrong. It is alleging that

his *conclusion* is wrong. Indeed, the FAC incredibly faults Mr. Creighton for not believing in

coincidence. For instance, FAC ¶ 40 states that "By stating that he is not into coincidence theories,

Mr. Creighton explicitly disclaims the conclusion that his statements about [the Plaintiff] are

hyperbole or opinion." Likewise, FAC ¶ 60 states that

> Creighton ran this story despite entertaining serious doubts about the veracity of his
> claims, which he demonstrated, at minimum, by directly disavowing the simplest
> (and the factually accurate) explanation: that [the Plaintiff's] witnessing of Fields'
> attack was a tragic and traumatizing coincidence, and that [the Plaintiff's]
> employment with the State Department had absolutely nothing to do with his
> presence in Charlottesville that day.

This Court is surely aware that two people can view the same event, see the same evidence, or

41

know the same facts, and draw two wildly different conclusions. For instance, every "hung" jury this Court has confronted in criminal cases represents a situation where people viewing the same evidence have drawn different conclusions. What leads two people to draw two different conclusions often depends on their world-views, which in turn is often shaped by their very specific life experiences. Two people might view the same video—for instance, the video of the beating of Rodney King[17]—and draw different conclusions about it based on their beliefs about how the world works. For instance, a person who believes that the police often single out members of racial minority groups for unlawful brutality might be inclined to conclude from that video Mr. King had been subjected to such unlawful brutality. Another person might strongly believe that most police officers genuinely want to serve and protect the community and conclude that the officer's use of force was lawful, based on that worldview. Much of the reason why people draw different conclusions based on the same facts or evidence is based on one's opinion of how the world works. Such differing views are quintessentially opinions.

Mr. Creighton is less inclined to believe in coincidences then perhaps most Americans. This is not an altogether unrespectable viewpoint. In the movie THE DARK KNIGHT RISES,[18] Commissioner Gordon—an avatar of rational and prudent policework—tells a young recruit: "You're a detective now, son. You're not allowed to believe in coincidence anymore." Even Abraham Lincoln, considered by most to be one of our wisest Presidents, saw a conspiracy where others might see a mere coincidence. In the years prior to the Civil War, there was a strain of abolitionist and anti-slavery thought that held that there was a conspiracy to spread slavery all over

---

[17] See, *e.g.*, *U.S. v. Koon*, 34 F.3d 1416, 1424-26 (9th Cir.1994) (describing the incident).
[18] THE DARK KNIGHT RISES (Warner Bros. Pictures 2012).

42

America known as the "Slave Power Conspiracy."[19] In his "House Divided" speech,[20] Lincoln invoked this conspiracy theory when he discussed the Nebraska Bill (which, championed by *Stephen* Douglas, allowed territories to choose whether to allow slavery), certain actions by President *Franklin* Pierce, *Dred Scott v. Sandford*, 60 U.S. 393 (1857) (which was authored by *Roger* Taney), and actions by President *James* Buchanan as being all coordinated as follows:

> We cannot absolutely know that all these exact adaptations are the result of preconcert. But when we see a lot of framed timbers, different portions of which we know have been gotten out at different times and places and by different workmen—*Stephen, Franklin, Roger,* and *James*, for instance—and when we see these timbers joined together and see they exactly make the frame of a house or a mill, all the tenons and mortises exactly fitting, and all the lengths and proportions of the different pieces exactly adapted to their respective places, and not a piece too many or too few, not omitting even scaffolding, or, if a single piece be lacking, we see the place in the frame exactly fitted and prepared yet to bring such piece in -- in such a case, we find it impossible not to believe that *Stephen* and *Franklin* and *Roger* and *James* all understood one another from the beginning, and all worked upon a common plan or draft drawn up before the first blow was struck.

(Emphasis added).

Nearly every American is capable of deciding that a series of events are too much of a coincidence to allow for an innocent or accidental explanation. For instance, on the morning of September 11, 2001, it seems safe to say that when news of the first plane striking the World Trade Center broke, most people thought it was simply an accident, even though the sky was clear and World Trade Center had been attacked before. *9/11 Attacks*, HISTORY.COM, https://www.history.com/topics/9-11-attacks (last visited May 5, 2018). Yet, when the second plane struck, most rational people concluded that this was almost certainly a deliberate attack—it was too much of a coincidence not to be. *Id.* (stating that after the second plane struck "It

---

[19] James E. Cobb, *One of American History's Worst Laws Was Passed 165 Years Ago*, TIME, Sept. 18, 2015, http://time.com/4039140/fugitive-slace-act-165/ [sic] (last visited May 3, 2018).

[20] Abraham Lincoln, *"House Divided" Speech*, PBS, http://www.pbs.org/wgbh/aia/part4/4h2934t.html (last visited May 3, 2018).

43

immediately became clear that America was under attack.") Indeed, the Plaintiff in this case did not believe it was "just" an accident when Fields' car ran into those protesters. FAC ¶ 31. Instead, the Plaintiff decided it was clearly a deliberate attack—and with good cause. *Id.* It is reasonable to say that almost every rational person has a threshold they reach where events become too "coincidental" to allow for an innocent or accidental explanation. What separates Mr. Creighton from other people is that he has a lower threshold he has to reach before he decides coincidental events are not "just" a coincidence.

However, whether this Court agrees with Creighton's worldview or not, there is no question that his skepticism of coincidence is a *point of view*, and he has an absolute right to express it. As the Supreme Court stated in *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943):

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

Yet the Plaintiff would have this Court impose on Mr. Creighton the worst kind of orthodoxy. The Plaintiff would have this Court tell Mr. Creighton that his way of thinking is wrong, a "thoughtcrime," George Orwell, 1984 at 15 (1949), and subject to a defamation suit if he should put such unorthodox modes of thinking into words. As much as the Plaintiff claims that the failure to believe in coincidence transforms Mr. Creighton's conclusions based on disclosed facts into a statement of fact, that is not true. Mr. Creighton's reduced willingness to believe in coincidence is an opinion that informs the conclusions that Mr. Creighton is allowed to state as a matter of First Amendment law.

The same faulty logic plagues FAC ¶ 39 where it states that "Creighton emphasizes certain words, by capitalizing or lengthening with additional vowels, to falsely convey to his readers that

44

the circumstances overwhelmingly prove that [the Plaintiff's] presence during the attack was not coincidence." The problem in this analysis is that, even if the Plaintiff's interpretation of his remarks were correct, Mr. Creighton is only urging his readers to draw a conclusion which the Plaintiff admits is based on disclosed facts. Thus, Mr. Creighton is expressing an opinion. Likewise, FAC ¶ 41's allegation that Mr. Creighton refers to the Plaintiff as a "convenient witness," is nothing more than a repetition of the opinion Mr. Creighton previously expressed that these coincidental occurrences are not just coincidences. Similarly, the claim in FAC ¶¶ 44-45 that the responses of his readers somehow prove that they understood his opinions to be statements of fact is misplaced. Agreement by a third party with what is as a matter of law a protected opinion, does not magically transform the statement into an actionable statement of fact: It is at best evidence that people agreed with Mr. Creighton's opinion.

However, somewhat contradictorily, in FAC ¶ 43 the Plaintiff claims that there are undisclosed facts after all. After claiming in FAC ¶ 42 that Mr. Creighton incorrectly identified the Plaintiff as a *former* State Department employee, FAC ¶ 43 states the following:

> While Creighton discloses some of the facts upon which he bases his false and defamatory conclusion that [the Plaintiff] had foreknowledge of Fields' terrorist attack, Creighton's assertion reasonably indicates to his readers that Creighton knows of the existence of other undisclosed defamatory facts that justify his conclusion. For instance, Creighton does not disclose the underlying facts upon which he bases his assertion that "[c]learly the State Department has a lot of disgruntled former employees" and the false implication that [the Plaintiff] is one of them. A reasonable reader would interpret this to mean that Creighton has personal knowledge of [the Plaintiff's] employment status or his state of mind, when in reality Creighton possesses no such knowledge.

There are several problems with the assertion of false and potentially defamatory meaning in that passage.

First, the alleged inaccuracy in FAC ¶ 42—that the Plaintiff is a *former* State Department employee—is not actionable under the substantial truth doctrine expressed in cases such as

45

*Chapin*. As stated in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991): "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified," (internal quotation marks omitted). Here, the Plaintiff admits that 1) he is on long-term leave from the State Department, 2) that the leave is unpaid, and 3) the purpose of the leave is to "pursue other employment and educational opportunities." FAC ¶ 13. Those facts add up to the same "sting:" he once worked for the State Department for pay, now he is not, and he is now looking for work elsewhere. The difference between that and being a "former employee" might matter in terms of paperwork or benefits, but not in the sting or gist of the allegation.

Second, it is not clear that the statement that "the State Department has a lot of disgruntled former employees" is of and concerning the Plaintiff.

Third, the claim that he does not disclose the source of his claim that the State Department has a lot of disgruntled employees is false. Mr. Creighton does disclose the source. He writes in his article, see, *e.g.*, FAC Exhibit A, p. 4,[21] that the "State Department... is wholly disgusted with BOTH Trump and Tillerson for firing a number of 7th floor entrenched State Department career 'soft power' activists"—an allegation the Plaintiff does not deny. Those former employees would be likely to be "disgruntled."

Fourth, even if Mr. Creighton did allege that the Plaintiff was disgruntled, this statement would itself be an opinion. According to Webster's dictionary, the term "disgruntle" means "to make ill-humored or discontented—usually used as a participial adjective."[22] Courts have ruled again and again, that his kind of subjective language is simply an opinion that cannot be actionable as a matter of law. For instance, in *Reynolds v. Pionear, LLC,* No. 3:15cv209 at *9-10 (E.D. Va.

---

[21] The same words are used on FAC Exhibit B, p. 4, and on FAC Exhibit C, p. 4.

[22] *Disgruntle*, MERIAM-WEBSTER, https://www.merriam-webster.com/dictionary/disgruntle (last visited May 6, 2018).

46

March, 25, 2016), the Eastern District of Virginia explained that terms like "unfavorable," "very bad," "inappropriate" or "improper" cannot typically be actionable as follows:

> In isolation, a characterization of Reynolds's employment as "unfavorable" constitutes an expression of opinion that wholly rests on Pionear's perspective as to what "unfavorable" means. See *Trump Va. Acquisitions LLC*, 2012 WL 1898616, at *5 ("In general, statements of unsatisfactory job performance do not rise to the level of defamation."); see also *Marroquin*, 2009 WL 1529455, at *9 (finding, on summary judgment, that the terms "very bad," "inappropriate," and "improper" constitute opinions that cannot be proven false). Surely, the word "unfavorable" is an ambiguous term, the meaning of which hinges on what the speaker subjectively believes constitutes, in this context, favorable employment. Likewise, when unaccompanied by context, Pionear's second statement—"that [Reynolds] had engaged in 'inappropriate conduct' with a co-worker"—reflects an opinion that entirely depends on Pionear's viewpoint. (Compl. ¶ 12.) What is "inappropriate" to one speaker may differ completely if analyzed from the viewpoint of another. See *Marroquin*, 2009 WL 1529455, at *9; see also *Chaves*, 335 S.E.2d at 101 ("A corporal might seem inexperienced to a sergeant, but not to a private."). Thus, in a vacuum, the first two statements are not "provably false facts or factual connotation[s]." *Chapin*, 993 F.2d at 1093.

Likewise, this Court said in *Cutaia v. Radius Eng'g Int'l, Inc.*, No. 5:11cv00077 at *11 (W.D. Va. Feb. 16, 2012) (allegations that are "are wholly dependent on [the speaker's] viewpoint and not subject to objective verification" are non-actionable opinions) are not actionable as defamation. Applied here, how would this Court go about determining whether the Plaintiff is disgruntled? To some people, the most terrible turns of fate will not dampen their spirits, while others are miserable when facing the slightest difficulty. Whether a person is disgruntled or not is dependent on one's point of view, and there is no objective way for this Court to determine whether one is disgruntled. Therefore, a claim of disgruntlement is a non-actionable opinion.

Therefore, with respect to Mr. Creighton's August 13, 2017 article, the FAC has failed to identify any false statement of fact, but instead attempts to penalize Mr. Creighton for expressing opinions the Plaintiff does not approve of. For this reason, to the extent that Counts I-IV alleges that Mr. Creighton committed defamation, it fails to state a claim upon which relief can be granted.

47

(iii) The Plaintiff Fails to Properly Allege That Mr. Creighton Made a False Statement of Fact in His August 13, 2017 Video.

Count V concerns itself with a "companion video" produced by Mr. Creighton where he discussed many of the same topics as the article in the last section. FAC ¶ 46 alleges that in the video Mr. Creighton "repeats and expands upon the allegations contained in the article he published on his website" but does not specify which allegations are repeated, nor does the FAC allege that any of them are untrue. FAC ¶ 46 goes on to quote from a passage in Mr. Creighton's video as follows:

> CREIGHTON: He just happened to be there, at the specific place, where he could film the whole thing, from beginning, middle, to end. He just happened to have his camera running, he just happened for some reason to record this car driving for five seconds, before it did anything out of the ordinary, and just happened to have just the right message, just the right establishment message for CNN...

> He has ties to special operations, special forces, CIA, State Department, Hillary Clinton, and Tom Perriello, who has a long career of doing this kind of thing. People will call me a conspiracy theorist because what I am suggesting here is that someone had foreknowledge, that this event was going to happen... This man has every reason to want to see the support, the base for Donald Trump again mischaracterized as Nazis. He has every reason to do that....

> This guy just happens to be on that f—king corner with his camera rolling, watching that car drive by for five seconds, and he's former State Department, and close to Tom Perriello, who is also former State Department obviously, he's got a f—king ax to grind, that's one hell of a g——n coincidence, and you got to be a special kind of stupid to buy that.

(Ellipses in original and curse words censored). In attempting to claim that this paragraph contains a false statement of fact, FAC ¶ 47 states that

> [Mr.] Creighton again falsely asserts that [the Plaintiff] was aware of and part of Fields' plan to plow his car into the protesters. [Mr.] Creighton even directly states that he is suggesting that [the Plaintiff] had "foreknowledge[]" that this event was going to happen."

First, the FAC has failed to properly allege that the statement that "someone had foreknowledge" was of and concerning the Plaintiff. The Plaintiff is evidently convinced that "someone" refers to

48

the Plaintiff, but the FAC does not provide sufficient allegations to allow the Court to determine whether this conclusory allegation is true.

Second, to the extent that the passage can be seen as implying foreknowledge, that would be a conclusion based on stated facts. The FAC does not allege that any other statement in that passage is false. In the end, the Plaintiff seems to believe that Mr. Creighton is required to believe in coincidences. However, Mr. Creighton's skepticism of coincidence is an opinion, and he has a constitutional right to express it.

Perhaps sensing that this Court would be inclined to see this as simply an opinion based on disclosed facts, FAC ¶ 49 states that

> Again, while Creighton discloses some of the facts upon which he bases his false and defamatory conclusion that [the Plaintiff] had foreknowledge of Fields' terrorist attack, the nature of Creighton's conclusion reasonably indicates to his viewers that Creighton knows of the existence of other undisclosed defamatory facts that would justify the conclusion he reaches, such as personal knowledge of [the Plaintiff's] state of mind.

However, there is no instance where Mr. Creighton claims to know the Plaintiff's state of mind. For instance, in the second paragraph of the quoted passage it states that "*This man* has every reason to want to see the support, the base for Donald Trump again mischaracterized as Nazis. He has every reason to do that." However, this passage is surrounded by ellipses, so that this Court has no way of figuring out whether "this man" refers to the Plaintiff. Meanwhile, in the third paragraph it states that the Plaintiff is "former State Department, and close to Tom Perriello, who is also former State Department obviously, he's got a f—king ax to grind." However, it is clear in that context that Tom Perriello is the one alleged have an "ax to grind" by the basic rules of grammar. Specifically, when Mr. Creighton uses the pronoun "he" in "*he's* got a f—king ax to grind" the last male named in that sentence was Mr. Perriello. As such, the Plaintiff cannot claim that Mr. Creighton implied he had undisclosed information based on allegedly claiming "personal

49

knowledge of [the Plaintiff's] state of mind" because the FAC fails to properly allege facts to support this conclusory allegation.

Finally, FAC ¶ 50 asserts that in the video Mr. Creighton "clearly and directly states that [the Plaintiff] was a party to a planned psy-op that killed and injured human beings in Charlottesville." However, the term "psy-op" never appears in any of the passages quoted from the video. Accordingly, the Plaintiff has failed to properly allege that Mr. Creighton made a false statement of fact with respect to that allegation.

Therefore, like with the article published by Mr. Creighton on August 13, 2018, the FAC fails to allege that Mr. Creighton makes a false statement of fact in the video he published on the same day. Instead, once again, the Plaintiff seeks to penalize Mr. Creighton for expressing an opinion protected by the First Amendment. For this reason, to the extent that Counts I and V alleges a cause of action against Mr. Creighton, it fails to state a claim upon which relief can be granted and should be dismissed.

### (iv) The Plaintiff Fails to Properly Allege That Mr. Hoft Made a False Statement of Fact in His August 14, 2017 Article.

Count VI concerns itself primarily with an article that Mr. Hoft wrote and published at THE GATEWAY PUNDIT, entitled "Random Man at Protests Interviewed by MSNBC, NY Times is Deep State Shill Linked to George Soros."

First, FAC ¶ 64 alleges that Mr. Hoft committed defamation by calling the Plaintiff a "deep state shill." Putting aside the fact that it is not certain that any of those terms have a defamatory meaning,[23] the language of that quoted passage indicates that this is another conclusion drawn

---

[23] According to Webster's dictionary, one of the definitions of "shill" is "to act as spokesman or promoter." *Shill*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/shill (last visited April 8, 2018). Therefore, accusing a person of being a Deep State shill is not obviously defamatory.

50

from the facts presented in the article as a whole. Specifically, the term "shill" is only used twice—in the headline and in a sub-headline: "The random Charlottesville observer who was interviewed by MSNBC and liberal outlets turns out to be a deep state shill." By the use of the phrase "turns out" in the sub-headline, he is indicating to any reasonable reader that the evidence supporting that conclusion will be presented in the article. As such, it is a conclusion based on disclosed facts and, therefore, protected opinion under *Milkovich*.

In FAC ¶ 65, the Plaintiff claims that

Hoft states and republishes statements from a disreputable Reddit thread that falsely assert that [the Plaintiff] and/or the State Department removed references to [the Plaintiff's] State Department work in an attempt to cover up their alleged involvement in the Charlottesville rioting. This is false[.]

This allegation is insufficient for several reasons.

First, that passage contradicts the text of the article itself,[24] FAC Exhibit E, p.5, where first it says that "[the Plaintiff] was involved in Kony 2012" and then says after posting a hypertext link that "The State Department later removed any reference of [the Plaintiff]." In context, that means that the State Department removed the references after 2012. That is wholly consistent with the Plaintiff's allegation later in FAC ¶ 65 that the Plaintiff's "information regarding his previous post as Deputy Chief of Mission at the U.S. Embassy in the Central African Republic was removed when the Embassy rebuilt its website to reflect current staff information, after [the Plaintiff] left the Embassy." The only fact missing from the Plaintiff's statement in FAC ¶ 65 is when the change occurred, but that is supplied in FAC ¶ 108, when the Plaintiff alleges that he left the Embassy in

---

[24] This Court can disregard allegations in the FAC that contradict the exhibits attached to it, *Manchin*, 471 F.3d at 529 (4th Cir. 2006) (holding that courts can disregard allegations that "contradict matters properly subject to judicial notice or by exhibit") or allegations that contradict other parts of the FAC, *Solomon v. Capital One Bank USA*, No.: GJH-14-03638 at *6 (D. Md. Dec. 19, 2014) ("The Court is therefore not required to construe this contradictory allegation in the light most favorable to Plaintiff").

51

2013. Thus, as a matter of logic, the information was removed, at soonest, sometime in 2013. Therefore, according to the FAC, Mr. Hoft's statement is literally correct: The State Department did remove his information after 2012.

What the Plaintiff really seems to object to, instead, is the thoughtcrime that the Plaintiff attributes to Mr. Hoft—a conclusion that Mr. Hoft does not state, but the Plaintiff imagines is implied by the bare text. Further, in this case the implication the Plaintiff is alleging is truly bizarre. Here is the Plaintiff's denial: "[the information] was not removed in an attempt to cover up [the Plaintiff's] presence in Charlottesville." That is, the Plaintiff is alleging that Mr. Hoft believes that the State Department is attempting to deny that the Plaintiff was in Charlottesville at all. That bizarre argument attributed to Mr. Hoft is nowhere to be found in Mr. Hoft's piece, as quoted in FAC Exhibit E.

The same passage in FAC ¶ 65 also claims that the website deletions were "certainly not [committed] to cover up an alleged role orchestrating the rioting and violence there." However, that is a denial of a fact Mr. Hoft did not allege.

A similar flight of fancy occurs in FAC ¶ 66:

> Hoft also implies that the New York Times removed a reference to [the Plaintiff] from their article to hide [the Plaintiff's] relationship to the State Department, at the request of [the Plaintiff] and/or the State Department. This is false: [the Plaintiff] did not, and to his knowledge, the State Department did not, request the removal of the reference to [the Plaintiff] and his employment history.

However, *Chapin,* 993 F.2d at 1092-93, cautions that an allegation of defamation by implication is not a license to engage in wild flights of fancy. All Mr. Hoft says is that at one point the NEW YORK TIMES report on the car attack mentioned the Plaintiff's relationship to the State Department, and then at another point on the same day the NEW YORK TIMES removed that information, FAC Exhibit E, pp. 3-4—a statement that the Plaintiff admits is literally true, FAC ¶ 66. It says nothing

about why that statement was removed.

Furthermore, in evaluating statements by implication this Court has to be careful not run afoul of *Milkovich*. If *Milkovich* stands for the principle that a *stated* conclusion based on disclosed facts cannot be defamatory, certainly an *unstated* conclusion based on disclosed facts also cannot be defamatory. For instance, there is little question that if Mr. Hoft wrote that "The NEW YORK TIMES has removed any reference to the Plaintiff's service in the State Department and therefore, I conclude from that fact that either the Plaintiff or the State Department persuaded the TIMES to remove that passage" that this would be a non-actionable stated conclusion based on disclosed facts. However, it would be absurd if Mr. Hoft could be liable to a defamation claim because he reached the same conclusion, because it was *unstated*. Clearly unstated conclusions based on disclosed facts cannot be a basis of liability in defamation.

Furthermore, the Plaintiff does not properly allege that alleged unstated implication is false. The supposedly defamatory implication is that the information was removed "at the request of [the Plaintiff] and/or the State Department." *Id.* at ¶ 66. However, the Plaintiff does not fully deny that allegation: "[the Plaintiff] did not, and to his knowledge, the State Department did not, request the removal of the reference to [the Plaintiff] and his employment history." *Id.* That is a sufficient denial with respect to the Plaintiff, but not with respect to the State Department. Saying something did not happen *to the best of one's knowledge* is not the same as saying it did not happen. Nor are there any allegations that would establish that if the State Department did such a thing, that the Plaintiff would know it. Indeed, as a matter of logic, since the Plaintiff's is on long-term unpaid leave from the State Department, he would seem to be the employee least likely to have that knowledge.

As if those flights of fancy were not enough, the Plaintiff names three more statements

FAC ¶ 67 uses as trampolines to bounce into wild new alleged implications: 1) "[t]he media knows exactly who he is yet played it off like a casual observer," 2) "it looks like the State Department was involved in Charlottesville and is trying to cover it up," and 3), according to the Plaintiff, "by describing [the Plaintiff's] presence at and later description of the events in Charlottesville as proving how 'the Deep State is working with the liberal media to shape narrative and fool the American people,'"—with only the passage "the Deep State is working with the liberal media to shape narrative and fool the American people," being an actual quote from Mr. Hoft. From these passages, the Plaintiff claims that Mr. Hoft is making the following alleged implications:

> 1) that the State Department organized the Charlottesville rioting and/or attack; 2) that [the Plaintiff] participated in the State Department's planning of the Charlottesville riots and/or attack; 3) that the State Department conspired to conceal these facts by removing information about [the Plaintiff] from a number of internet sources; 4) that media outlets were involved in the conspiracy because they knew [the Plaintiff] was a State Department employee; 5) that the media characterized [the Plaintiff] as a casual observer because they were working in concert with [the Plaintiff], the State Department, and other government agencies to cover up their involvement in the conspiracy; and 6) that all of these conspirators worked together to deceive the public about what happened in Charlottesville that day.

*Id.* In all bluntness, the FAC seems to be engaged in precisely the kind of wild speculation only tangentially related to the facts that the Plaintiff accuses the Defendants of engaging in.

As an initial matter, the claim that "The media knows exactly who [the Plaintiff] is yet played it off like a casual observer," appears to be true in regards to the NEW YORK TIMES (and the Plaintiff does not allege it is false). As FAC ¶ 66 admits, the TIMES disclosed the Plaintiff's connection to the State Department and later deleted the reference. The result (intentional or not) of that deletion is that the reader would probably assume the Plaintiff was not a government employee, but rather a "casual observer," or a regular guy on the street. Further that sentence is followed by the claim that "This is how the Deep State is working with the liberal media to shape narrative and fool the American people." FAC Exhibit E, p. 8. Thus, in the latter sentence, the

54

phrase "This is how" refers to the allegations in the prior sentence, and therefore, that latter sentence is expressing another opinion based as disclosed facts.

Additionally, the claim that "it looks like the State Department was involved in Charlottesville and is trying to cover it up" is not actionable. Even a claim that the State Department was definitely involved in Charlottesville rioting is true. There was rioting in the general area: As stated in paragraph 25, "pockets of each side engaged in physical altercations." Further, the term "involved" does not necessarily imply any guilty involvement, such as by incitement or actually engaging in violence. According to Webster's dictionary being "involved" can merely include "having a part in something" or being "included in something," with Webster giving the example of saying "She was involved in a lawsuit."[25] Taking that use of the word as an example, one can be involved in a lawsuit as a plaintiff, defendant, attorney, judge, juror or witness. Only some of those roles are even voluntary, let alone blameworthy. Moreover, the use of the phrase "it looks like" is both an indicator that this is another opinion based on disclosed facts and a caution to the reader that this conclusion is not certain. In that case, it is not an opinion based on disclosed facts, so much as an uncertain opinion based on such facts. In short, the Plaintiff has not properly alleged that these are false statements of fact.

Instead, the Plaintiff argues that they lead to implications that are false. However, none of those implications are found in the plain or natural meaning of the words used, nor does the piece affirmatively suggest that Mr. Hoft intended or endorsed that inference, as required by *Chapin*. Further, even if this Court found that these flights of fancy were the unstated conclusions Mr. Hoft intended based on disclosed facts, then they would be protected opinion.

---

[25] *Involved*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involved (last visited April 8, 2018).

55

Finally, FAC ¶ 79 states that Mr. Hoft

> has published claims that State Department employees have "worked together to overthrow other governments" and thus "it was inevitable they would use the gun on [the U.S. government]."[45] These statements are clearly intended for his audience to make the inference that [the Plaintiff] was one of these State Department employees allegedly attempting to plan such a coup.

However, the Plaintiff does not allege sufficient factual material to allow this Court to determine whether those statements were of and concerning the Plaintiff. Indeed, the article it was taken from, attached as Exhibit F, does nothing more than present quotes from an interview of Presidential Historian Doug Weald by newscaster Lou Dobbs. It is Mr. Weald who makes the quoted statements, not Mr. Hoft. Further, it should not surprise this Court that it contains no mention of the Plaintiff, given that the article was published about two months before the Fields car attack that made the Plaintiff famous. In short, there seems to be no factual basis to support the Plaintiff's assertion that these quotes—made by Mr. Weald—were of and concerning the Plaintiff.

In summary, the Plaintiff has failed to properly plead that Mr. Hoft has made a false statement of fact. Therefore, to the extent that Counts I and VI apply to Mr. Hoft, this case should be dismissed.

<u>(v)</u>    <u>The Plaintiff Fails to Properly Allege That Mr. Stranahan Made a False Statement of Fact in His August 15, 2017 Interview with Ms. McAdoo.</u>

Count VII concerns itself primarily with an interview of Mr. Stranahan by Ms. McAdoo conducted on August 15, 2017. This Count is against Mr. Stranahan and several Defendants who are not a party to this brief: Ms. McAdoo, Mr. Jones, InfoWars, LLC, and Free Speech Systems, LLC. Although the Undersigned Defendants agree that the Plaintiff has failed to make out a claim for defamation against any Defendant, this brief will focus on Mr. Stranahan's defense.

As this Court has already seen, much of the FAC focuses not so much on the literal words but the Plaintiff's fanciful interpretations of what is implied from those words. In doing so, the

Plaintiff gave lip service to *Chapin*, but as a practical matter ignores what the Fourth Circuit said in that case. As stated before:

> A defamatory implication must be present in the plain and natural meaning of the words used.... Moreover, because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.

993 F.2d at 1092-93. The Plaintiff repeatedly uses phrases like "the plain and natural meaning" or makes conclusory allegations that each Defendant affirmatively intended or endorsed the inference, but chronically uses the Undersigned Defendants' expression as a springboard to launch into implausible flights of fancy untethered to any reasonable reading of their expression.

The most ridiculous example of this is found in FAC ¶ 84, in which the Plaintiff assigns great meaning to his description of Mr. Stranahan's and Ms. McAdoo's body language, claiming that at one point in the interview Mr. Stranahan "looks knowingly at the camera, eyebrows raised, arm raised, [and Ms. McAdoo] nods comprehendingly, laughs." From these cryptic descriptions, the Plaintiff weaves a fanciful (and bluntly, implausible) description of what is implied:

> *Stranahan and McAdoo's body language falsely convey* to the audience that [the Plaintiff's] tribute to a woman who died in the traumatizing attack that he and other bystanders witnessed indicates that he was actually a knowing participant in a Soros-sponsored conspiracy to stage violence and create a martyr—Heather Heyer—for their cause.

(Emphasis added). That is, according to the Plaintiff, the meaning of their body language amounts to that long, detailed and sophisticated message. The Plaintiff is not saying that Lee Stranahan blinked in Morse Code like Virginian hero Jeremiah Denton did to communicate that he was being tortured as a prisoner of war in Vietnam.[26] He is simply claiming that somehow those movements

---

[26] *Ex-senator and Vietnam POW who blinked "torture" in Morse code dies*, CBS News, March 28, 2014, https://www.cbsnews.com/news/jeremiah-denton-ex-senator-and-vietnam-pow-who-

57

communicated that ludicrous level of detail.

In facing such an absurd reading of body language, one is reminded of a running gag in GUARDIANS OF THE GALAXY, VOL. 2 (Marvel Studios 2017). In that movie, one character, Groot, can only say "I am Groot." His friends then read from his tone of voice and body language ludicrously specific meanings to that phrase. So, for instance, at one point, "I am Groot" is translated by his friend Rocket as follows: "He says, 'Welcome to the frickin' Guardians of the Galaxy.' Only he didn't use 'frickin'.'" A moment later, Rocket even admonishes Groot for using foul language—even though he had literally only said "I am Groot." But what is played as an absurd joke in those movies, the Plaintiff wants this Court to take seriously. One is tempted to inquire, what part of Mr. Stranahan's sequence of expressions described George Soros, for example? The raising of the eyebrows? If Mr. Stranahan had raised only one eyebrow, would that have been a reference to Dwayne "The Rock" Johnson, instead? One ordinarily does not expect body language in the greater D.C. area to be so specifically expressive outside of Gallaudet University.[27]

What this mockery is supposed to convey is that the Plaintiff's attempt to translate Mr. Stranahan's (and Ms. McAdoo's) expressions into this fanciful, extremely specific and extremely detailed implication spectacularly fails the *Chapin* requirement that the alleged implication be drawn from the plain and natural meaning of the expression. While no other example of the Plaintiff's flights of fancy are quite so ridiculous, the proffered implications are never grounded in the plain and natural meanings of the expression alleged.

---

blinked-torture-in-morse-code-dies-at-89/ (last viewed May 3, 2018).

[27] Debbie Clason, *Top Universities for Deaf Students*, HEALTHY HEARING, Sept. 15, 2016, https://www.healthyhearing.com/report/52682-Top-universities-for-deaf-students (last viewed May 3, 2018).

For instance, in an earlier part of FAC ¶ 84, the Plaintiff asserts that it is defamatory for Mr. Stranahan merely to suggest that the media should investigate the Plaintiff. This is what FAC ¶ 84 alleges that Mr. Stranahan actually says:

> If you go to [the Plaintiff's] page, his Twitter page, you'll see he has a picture of the young woman who was murdered, and you know what is says? "Martyr."... Literally it says "martyr." You can't be more explicit than this. So here's what I'm saying. I'm not a conspiracy theorist, I'm a fact-based journalist. The facts are enough. However, the Democrats have investigated Trump for a lot less. For a lot less. They have called for investigations, and secret meetings, they have convened the FBI. When you have this many things going on, I think someone really needs to investigate. Again, I don't like to jump to conclusions, I'd like to ask some questions about who this kid was, where he came from, what do we know, get it all out in the open, but I'll also point out that we can't count on the media to do this.

Contrary to what the FAC claims, Mr. Stranahan is not saying that the Plaintiff did anything wrong, only that someone—possibly in the news media—should explore whether anything untoward has occurred. That is the plain and natural meaning of those words, but the Plaintiff instead engages in another flight of fancy where he claims that this passage "reasonably indicates to his audience that he knows of the existence of additional undisclosed defamatory facts that justify his false conclusions about [the Plaintiff] and his association with Soros-funded coup efforts." *Id.* at ¶ 84. However, such an interpretation is not the plain and natural meaning of Mr. Stranahan's words, nor do his words affirmatively suggest that Mr. Stranahan endorsed that inference, as required by *Chapin*. If Mr. Stranahan was certain that a crime had been committed, for instance, he would have said so, or perhaps he would have demanded that the Plaintiff be arrested or charged with a crime. The plain and natural meaning of a call for an investigation (by journalists, no less) is a confession that one is not certain anyone has done anything wrong but believes there is enough evidence to be suspicious. That belief, in turn, is nothing more than an opinion.

Further, Mr. Stranahan's opinion was based on disclosed facts. When Mr. Stranahan said "the Democrats have investigated Trump for a lot less," the plain and natural interpretation is that

59

he believed the facts he had just cited justified an investigation—at least, by the measuring stick of when Democrats have investigated the President. This Court may not agree with that opinion, but it is Mr. Stranahan's right to hold that opinion and to express it freely.

Meanwhile, the next alleged statements by Mr. Stranahan are not clearly of and concerning the Plaintiff. From FAC ¶ 85:

> And let me point out what's happening. They, uh, they win no matter what they do. Are they trying to get a coup? I think clearly they are. But if they can't get a coup, they'll settle for impeachment. And if they can't get impeachment, they'll settle for smearing Trump and his supporters so much that they'll be able to elect another elitists.

The Plaintiff claims that this passage implies a long string of allegedly defamatory inferences, but there is nothing in that quote to indicate who "they" are. The Plaintiff alleges in a conclusory fashion that he is among the people Mr. Stranahan is speaking of, but such conclusory allegations are to be disregarded.

The only other semi-specific allegations against Mr. Stranahan appear in FAC ¶ 86 where the Plaintiff claims that both Mr. Stranahan and Ms. McAdoo assert that the Plaintiff "was directly involved in a latent civil war by participating in 'Soros-funded' events to lay 'the foundation for a violent coup to take out Trump' and 'achieve regime change.'" However, the FAC does not allege sufficient facts to support the claim that the quoted phrases by either Mr. Stranahan or Ms. McAdoo ("Soros-funded," "the foundation for a violent coup to take out Trump" or "achieve regime change") were actually of and concerning the Plaintiff.

In summary, the Plaintiff repeatedly fails to properly allege that Mr. Stranahan made a false statement of fact (or implication of fact by his words or by his and Ms. McAdoo's body language) that was of and concerning the Plaintiff. Accordingly, to the extent that Counts I and VII is asserted against Mr. Stranahan, it should be dismissed, just as this brief has demonstrated that similar

60

failures justify dismissal of the other Undersigned Defendants.

>    2.    The First Amended Complaint Fails to Properly Allege Malice.

Even if the FAC properly alleged that the Undersigned Defendants made false statements (or implications) of fact, the Plaintiff has failed to properly plead the correct state of mind: Constitutional malice. Going solely by the allegations in the FAC and without converting this into a motion for summary judgment, this Court should determine that the Plaintiff is a limited-purpose public figure, triggering the requirement that he plead constitutional malice. However, although the Plaintiff has made conclusory allegations of malice, the FAC fails to allege facts that could lead this Court to believe that such malice exists. For this reason, this Court should dismiss all Counts related to defamation for failure to state a claim.

>    (i)    The Plaintiff Is a Limited-Purpose Public Figure.

This Court laid out the doctrine and legal significance of limited-purpose public figures in *Eramo*, 209 F. Supp. 3d at 869 (W.D. Va. 2016) so thoroughly it is worth quoting extensively:

> If Eramo was a... limited-purpose public figure at the time of publication, as part of her defamation case, she must prove by clear and convincing evidence that defendants acted with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254... (1964); *Gertz v. Robert Welch*, 418 U.S. 323... (1974). The issue of whether Eramo was a ... limited-purpose public figure is a question of law to be resolved by the court. *Wells v. Liddy*, 186 F.3d 505, 531 (4th Cir. 1999). The court starts with a presumption that Eramo was a private individual at the time of publication, subject to defendants' burden of proving that plaintiff was a ... limited-purpose public figure. *Foretich v. Capital Cities/ABC*, 37 F.3d 1541, 1553 (4th Cir. 1994).

> A limited-purpose public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 361.... Importantly, these individuals are subject to the actual malice standard for two reasons: (1) because of "their ability to resort to the `self-help' remedy of rebuttal" as these individuals "usually enjoy significantly greater access [to the media] than private individuals"; and (2) because they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood." *Foretich*, 37 F.3d at 1552. To determine whether a plaintiff is a private person or a limited-purpose public figure in relation to a particular public controversy, defendants must prove the following:

61

"(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation."

*Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982); *Foretich*, 37 F.3d at 1553 (noting defendant's burden of proof). The second and third factors are often combined and are the heart of the inquiry: "whether the plaintiff had voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome." *Foretich*, 37 F.3d at 1553.

Often, it is difficult to show that a person is a limited-purpose public figure without presenting evidence and therefore, it is often impossible as a practical matter for a court to determine whether or not a person is a limited-purpose public figure in resolving a motion to dismiss. However, this case represents a rare instance where the allegations found in the FAC are sufficient to allow this Court to determine that the Plaintiff is in fact a limited-purpose public figure. Accordingly, this brief will address each prong of the test in turn.

First, the Plaintiff clearly "had access to channels of effective communication" at the time he was allegedly defamed. This entire controversy started when the Plaintiff filmed James Fields' horrible act of driving a car into a group of people and the Plaintiff posted the video on Twitter. FAC ¶¶ 30 and 32. According to the image accompanying FAC ¶ 32, that tweet was widely shared. The image shows that it has been retweeted over 80,000 times and liked by more than 100,000 people. In addition to that very effective direct access to the public through social media, the Plaintiff "spoke with multiple television news networks and other news media" with respect to that incident, including but not limited to the NEW YORK TIMES, on August 12 and 13, 2017. FAC ¶¶ 33-34. The Plaintiff also complains about being "aggressively questioned" "after concluding a brief television interview" on August 14, 2017. *Id.* at ¶ 158. The allegedly defamatory material

62

addressed in this brief appeared on August 13-19, 2017. Plainly, the Plaintiff "had access to channels of effective communication" at the time the Undersigned Defendants allegedly defamed the Plaintiff, meeting the first prong of the test to determine if the Plaintiff was a limited-purpose public figure.

The second prong of the test is pretty straightforward: It asks whether the Plaintiff "voluntarily assumed a role of special prominence in the public controversy." In FAC ¶¶ 31-72, the Plaintiff discusses how he filmed the incident, how he agonized over whether to go public, and how and why he decided ultimately to publish his footage of the incident. There is no question that he assumed a role of prominence in the controversy and did so voluntarily.

The third prong of the test asks if the Plaintiff "sought to influence the resolution or outcome of the controversy." This is obviously the case. In terms of the question of whether a crime was committed, the Plaintiff was publishing video evidence that is very likely to be key in the criminal case against Fields—it might make the difference between Mr. Fields going free or being convicted. Further, the Plaintiff makes it clear that the video was published in order to influence public perception about the incident. In FAC ¶ 31, the Plaintiff explains why he shared the video:

> He felt it necessary to share the video on his Twitter account after hearing from family and friends that media outlets were suggesting the incident was something other than a deliberate attack. [The Plaintiff] realized his recording unequivocally showed that the attack was a deliberate attempt to injure and kill peaceful counter-protesters—not an accident or act of self-defense. [The Plaintiff] also feared that an already violent day in Charlottesville could get worse, and he felt it was his duty to help convince the public to stay off the streets until safety was reestablished.

Further, the tweet accompanying the video states "Let there be no confusion: this was deliberate terrorism." *Id.* at ¶ 32. Clearly, the Plaintiff attempted to influence how the public perceived this incident and thereby "sought to influence the resolution or outcome of the controversy." He sought

to convince others with that evidence that the incident was a deliberate act of terrorism, meeting the third prong of the test to determine if he is a limited-purpose public figure.

The fourth prong of the test asks if "the controversy existed prior to the publication of the [allegedly] defamatory statement." According to FAC ¶ 146, the controversy regarding "using a car as a weapon against protesters" existed for months prior to the incident the Plaintiff witnessed. The FAC states that the incident occurred on August 12, *id.* at ¶¶ 28-29, and the tweet in which he shared the video was date stamped on the same day, *id.* at ¶ 32. The alleged defamation was published from August 13-19, 2017. Thus, the fourth prong is satisfied.

Finally, it goes without saying that the Plaintiff "retained public-figure status at the time of the alleged defamation." As noted above, the Plaintiff was still being interviewed by the media on the same day that Mr. Hoft published his allegedly defamatory material, and it is ridiculous to think he lost his public figure status by August 19, 2017, when Mr. Wilburn published his allegedly defamatory material.

With all five prongs of the *Eramo* test satisfied, this Court can determine—on the basis of the allegations in the FAC alone—that the Plaintiff is a limited-purpose public figure. That not only requires the Plaintiff to allege that the Undersigned Defendants acted with constitutional malice with respect to the defamation claims, but as will be shown later, *infra* 87-89, it must be alleged with respect to the IIED claims as well. The Plaintiff has failed to properly allege such malice.

        (ii)      The Plaintiff's Allegations of Malice Are Implausible in Light of *Iqbal* and *Twombly*.

Because the Plaintiff is a public figure, defamation cannot lie unless malice is alleged, which was defined in *New York Times Co. v. Sullivan*, 376 U.S. at 280, as making a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." This

requires more than merely conclusory allegations. For instance, in *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, 674 F.3d 369, 377-78 (4th Cir. 2012), the Fourth Circuit found that the Appellant was a public figure, and then rejected allegations of malice as follows:

> Applying the *Iqbal* standard to this case, we find that the Appellants have not stated a claim. To begin with, Appellants' assertion that Appellees' statements "were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity" is entirely insufficient. This kind of conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected.

The same point was made more memorably by the First Circuit in *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012):

> We turn our attention, then, back to whether Schatz's allegations plausibly support an actual-malice claim. His complaint used actual-malice buzzwords, contending that the RSLC had "knowledge" that its statements were "false" or had "serious doubts" about their truth and a "reckless disregard" for whether they were false. But these are merely legal conclusions, which must be backed by well-pled facts.

In the instant case, the Plaintiff offers little more than "actual-malice buzzwords." The FAC alleges in many paragraphs that the Undersigned Defendants' allegations "were made with knowledge of their falsehood or reckless disregard for the truth or falsity of their allegations," FAC ¶¶ 222, 230, 238, 246, and 275, or slight variations on that phrase, *id.* at ¶ 149, and alleges many times that Defendants acted with malice by using the word "malice," *id.* at ¶¶ 222, 230, 238, 246, and 275. However, those allegations of malice are "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

Perhaps stung by the previous brief supporting the motion to dismiss filed by Messrs. Hoft and Stranahan (ECF No. 26), the FAC adds a number of slightly more specific allegations of malice, but they are 1) chronically conclusory and 2) fail to properly allege any facts that would plausibly support the conclusion that any party acted with malice.

The plausibility standard required in modern pleading is best understood by examining

65

*Twombly* in detail. In *Twombly*, the Supreme Court was confronted with an allegation of an illegal agreement in violation of 15 U.S.C. § 1, which requires a conspiracy or agreement in restraint of trade. The Supreme Court found that the respondents had failed to properly plead such an agreement as follows:

> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

550 U.S. at 556. Applying similar logic here, the Plaintiff must allege a set of facts that suggests that discovery will reveal evidence of malice or else his claim is not plausible. However, the Plaintiff repeatedly fails to plausibly show that any of the Undersigned Defendants possessed constitutional malice.

(a)  The Plaintiff Fails to Plausibly Allege Malice with Respect to Mr. Creighton.

In *Eramo*, this Court observed that "Actual malice requires at a minimum that the statements were made with reckless disregard for the truth. Reckless disregard means that defendants must have 'entertained serious doubts as to the truth of [their] publication.'" 209 F. Supp. 3d at 971 (internal citations omitted), although this can be shown by circumstantial evidence. With respect to Mr. Creighton, the FAC focuses on four allegations: 1) that he failed to appropriately investigate, 2) that Mr. Creighton has ill-will or a desire to injure the Plaintiff, 3) that the Mr. Creighton had a pre-conceived narrative, and 4) harbored actual doubts about the veracity of his reporting. However, the Plaintiff does not properly allege any facts supporting those conclusions: They are typically nothing more than more detailed conclusions than in their original complaint (ECF No. 1)—new, more detailed actual malice buzzwords.

66

First, the FAC repeatedly claims Mr. Creighton failed to investigate. For instance, FAC ¶ 51 alleges that:

> At no point prior to or after publishing his article or video did Creighton investigate the outrageous and improbable factual allegations included in his story. He conducted no research beyond identifying a few disparate facts from [the Plaintiff's] biography and references to similar conspiracies.

This, however, is a conclusion, and therefore, must be disregarded. The FAC attempts to fill in additional "facts" but they never successfully cross the line into plausibility.

For instance, the Plaintiff alleges in FAC ¶ 52 that

> [Mr.] Creighton did not reach out to [the Plaintiff] to confirm the story's statements or conclusions. Nor did [Mr.] Creighton reach out to any of the other individuals or organizations named in his article for comment or confirmation of even the most basic facts it included.

With respect to whether Mr. Creighton reached out to the Plaintiff, the Plaintiff would presumably know whether or not Mr. Creighton did so, and therefore that allegation is plausible. However, it is not plausible for the Plaintiff to allege that Mr. Creighton did not reach out to anyone else, because the Plaintiff does not allege any facts that would support that conclusion. Indeed, one is tempted to ask how the Plaintiff could possibly pretend to know this? Is the FAC alleging, for instance, that the Plaintiff asked every person at the State Department whether Mr. Creighton had contacted him or her, and that if he had, that he or she would tell the Plaintiff if Mr. Creighton had contacted them? As it stands now, the claim that Mr. Creighton didn't contact all the subjects in his story is not a plausible allegation that would "raise a reasonable expectation that discovery will reveal" such evidence. Bluntly, it looks like a guess.

Further, with regard to the claim that Mr. Creighton did not seek comment from the Plaintiff, one is tempted to ask what good it would have done. The Plaintiff's central complaint against Mr. Creighton is that he stated his conclusion that the Plaintiff did not record the car attack

67

by accident. Putting aside that this is protected opinion, what good would it have done to contact the Plaintiff? Suppose Mr. Creighton called and asked the Plaintiff to comment: Presumably, the Plaintiff would have claimed that capturing the attack was just luck, but so what if he had? Perhaps there would have been one line in the article saying the Plaintiff disagreed with Mr. Creighton's conclusion, but little else would have changed.

The same can be said for the allegation in FAC ¶ 54 that Mr. Creighton did not have the facts independently checked. The Plaintiff does not disclose any facts that would show this to be true, and one is tempted to ask how the Plaintiff can pretend to know this? Without any allegation explaining how the Plaintiff knows this to be true, the claim is simply implausible.

The Plaintiff also claims that Mr. Creighton showed malice by refusing to update or correct the information in his article but does not allege that any event occurred that would justify a correction.

Next, the Plaintiff attempts in FAC ¶ 57 to allege that Mr. Creighton has ill-will against people he believed had participated in "psy-ops." According to the Plaintiff, Mr. Creighton allegedly decided that the Plaintiff was "a member of a 'psy-op' in his previous employment and in Charlottesville," by allegedly participating or having foreknowledge of the attack. *Id.* In turn, that belief led to ill-will and a desire to injure the Plaintiff. This tracks language in *Eramo*, discussing how ill-will or intent to harm is some evidence of malice, 209 F. Supp. 3d at 874, but misconceives its import. The issue is not whether a defendant in a defamation case has ill-will or hopes to see consequences after determining that a person has done something wrong, but whether that person had ill-will or a desire to harm *before* making that determination. To give a simple example, imagine that a reporter disliked war criminals, and she hoped to see them punished when they are discovered—like most Americans. However, if that reporter wrote an allegedly

68

defamatory article presenting evidence that a community leader was actually a notorious Serbian war criminal hiding under an alias, the reporter's dislike of war criminals would not provide any insight into how she gathered her evidence and made her determination that he was a war criminal. The Plaintiff's logic is circular: Mr. Creighton allegedly determined that the Plaintiff was a member of an alleged psy-op because he bears ill-will or has a desire to injure people who are members of psy-ops. Further, the allegation that Mr. Creighton bears ill-will or has a desire to harm people who participate in psy-ops is purely conclusory, claiming that a number of prior episodes show this to be the case without alleging sufficient factual matter to make it plausible in light of *Twombly*.

Nor does the FAC provide allegations with sufficient specificity and plausibility with respect to the claim that Mr. Creighton had a pre-conceived narrative before reporting on the Plaintiff. The only semi-specific allegation is that "Creighton had previously posted an article and accompanying video describing the counter-protesters in Charlottesville as 'the Soros-backed side of this destabilization event,'" quoting Mr. Creighton. However, this allegation is conclusory, and in any case, such a claim, if true, amounts to evidence that he had engaged in prior reporting on the issue, not that he came into this story with planned narrative and that he would ignore countervailing facts in the pursuit of this narrative. For instance, a reporter might report on evidence that Harvey Weinstein committed sexual assault of a woman and two months later report on evidence that he did the same to a second woman. The fact that the reporter did a previous story on a similar subject does not show a pre-conceived narrative in that hypothetical, and the same logic applies in Mr. Creighton's case.

Finally, the Plaintiff attempts to show malice by asserting that Mr. Creighton reached the wrong conclusion by a "wrong" method of thought. Specifically, in FAC ¶ 60, the Plaintiff

69

alleges—in a passage cut-and-pasted with respect to all Defendants, *id.* at ¶¶ 82, 100, and 144—the following:

> Creighton ran this story despite entertaining serious doubts about the veracity of his claims, which he demonstrated, at minimum, by directly disavowing the simplest (and the factually accurate) explanation: that [the Plaintiff's] witnessing of Fields' attack was a tragic and traumatizing coincidence, and that [the Plaintiff's] employment with the State Department had absolutely nothing to do with his presence in Charlottesville that day.

As stated previously, Mr. Creighton is less prone to believe in coincidence than perhaps most Americans. *Supra* 42-44. This Court may not subscribe to that viewpoint, but it is a viewpoint that Mr. Creighton is entitled to. Furthermore, holding a disapproved-of viewpoint is not evidence that he subjectively entertained serious doubts as to the truthfulness of his reporting.

In summary, the Plaintiff has failed to show by non-conclusory and plausible allegations that Mr. Creighton had the constitutional malice needed to support a claim of defamation. Therefore, to the extent that Counts I-V allege that Mr. Creighton committed defamation, those Counts should be dismissed.

> (b)   The Plaintiff fails to Plausibly Allege Malice with Respect to Mr. Hoft.

As with Mr. Creighton, the Plaintiff attempts to show constitutional malice with respect to Mr. Hoft by making four general kinds of allegations: 1) that he failed to appropriately investigate, 2) that Mr. Hoft has ill-will or a desire to injure the Plaintiff, 3) that Mr. Hoft had a pre-conceived narrative, and 4) he harbored actual doubts about the veracity of his reporting. However, the Plaintiff does not properly allege any facts plausibly supporting those conclusions: He only presents more detailed conclusions.

First, FAC ¶ 72 alleges again, that "At no point prior to or after publishing his article did Hoft investigate the outrageous, improbable, and false factual allegations included in his story."

70

This is the same allegation alleged against Mr. Creighton in the first sentence of FAC ¶ 51. It is a conclusory allegation, and therefore, it must be disregarded.

FAC ¶ 73 also plausibly accuses Mr. Hoft of failing to ask the Plaintiff for comment as FAC ¶ 52 did for Mr. Creighton. Further, in FAC ¶ 76, the Plaintiff implausibly claims to know that Mr. Hoft did not reach out to "any of the other individuals or organizations named in his article," much in the way FAC ¶ 52 said of Mr. Creighton. As with Mr. Creighton, this allegation is implausible because the Plaintiff does not explain how he could possibly know if Mr. Hoft did ask those other persons or organizations anything. *Twombly* requires that for an allegation to be plausible, it must "raise a reasonable expectation that discovery will reveal evidence" supporting the claim. 550 U.S. at 556. The Plaintiff's bare bones, cookie-cutter allegation fails to raise such an expectation and is therefore implausible. With respect to the claim that Mr. Hoft did not seek comment from the Plaintiff, the FAC does not explain what good it would have done: What allegation did Mr. Hoft make that the Plaintiff could demonstrate to be false?

Next, FAC ¶ 74 tries to shore up the claim that Mr. Hoft failed to investigate by claiming that Mr. Hoft "did not identify any reputable human sources in his article with actual knowledge of the events described." However, every logical person knows that absence of evidence is not absence of evidence. Mr. Hoft is under no obligation to share his sources with his readers, and therefore, a failure to identify human sources does not show any evidence that he did not have reputable sources.

FAC ¶ 74 also alleges that Mr. Hoft "had reason to doubt the veracity of the anonymous, disreputable Reddit forum he cites." While that passage alleges the conclusion that the Reddit forum is disreputable, the Plaintiff alleges no facts that would lead this Court to conclude that the forum—and every author in it—cannot be trusted. In FAC ¶ 77 the Plaintiff alleges that Mr. Hoft

71

republished screenshots from that forum, but under 47 U.S.C. § 230(c)(1) he is not the publisher of those statements. *Supra* 28-33.

Additionally, FAC ¶ 74 alleges that Mr. Hoft did not have a third-party fact-check his writing, just as FAC ¶ 54 alleged that Mr. Creighton did not, and the claim is implausible here for the same reason. Without specific allegations as to how the Plaintiff could possibly know whether Mr. Hoft had a third-party fact-check his article, the allegation that he did not do so does not raise a reasonable expectation that discovery will produce evidence supporting this allegation, and therefore, the allegation is implausible.

Meanwhile, in FAC ¶ 75, the Plaintiff alleges a failure to update or correct his piece, but there is no allegation of any event that would justify such a change. Accordingly, the Plaintiff failed to properly allege a failure to investigate.

Next, FAC ¶ 79 alleges that Mr. Hoft has ill-will or a desire to injure the Plaintiff because Mr. Hoft allegedly has an animus toward the Deep State. This allegation is similar to the claim in FAC ¶ 57 that Mr. Creighton does not like those who have engaged in "psy-ops" and it fails for the same reason. The Plaintiff's logic is equally circular: Mr. Hoft allegedly determined that the Plaintiff was a shill for the Deep State because he bears ill-will or has a desire to injure people who are shills for the Deep State. In any case, the allegation of animus toward the Deep State is conclusory.

Additionally, FAC ¶ 79 alleges that Mr. Hoft was following a pre-conceived narrative, but fails once again to make plausible, non-conclusory allegations that support the claim. The Plaintiff makes a conclusory allegation that Mr. Hoft "has previously authored articles and published videos similarly claiming that the 'Deep State' is attempting to plan a coup to oust President Trump," but such allegations must be disregarded. Likewise, the Plaintiff claimed that Mr. Hoft

72

has published claims that State Department employees have "worked together to overthrow other governments" and thus "it was inevitable they would use the gun on [the U.S. government]."[45] These statements are clearly intended for his audience to make the inference that [the Plaintiff] was one of these State Department employees allegedly attempting to plan such a coup.

*Id.* at ¶ 79. However, as shown *supra* 56, that article simply quoted an interview in which a third party made those claims. Furthermore, the Plaintiff has failed to make sufficient allegations to show that any statement in that article was of and concerning the Plaintiff, and the claim is rendered implausible when one sees that it was published two months before the Plaintiff became famous following the August 12, 2017 automobile attack.

Meanwhile, FAC ¶¶ 81-82 attempts to show Mr. Hoft actually harbored doubts in the veracity of his reporting by stating the following:

Defendant Hoft did this despite entertaining the serious doubts about the veracity of his claims that would naturally arise from relying on screenshots posted to an anonymous, disreputable forum such as Reddit for the factual basis of his article.

Defendant Hoft ran this story despite entertaining serious doubts about the veracity of his claims, which he demonstrated, at minimum, by directly disavowing the simplest (and the factually accurate) explanation: that [the Plaintiff's] witnessing of Fields' attack was a tragic and traumatic coincidence and that [the Plaintiff's] employment with the State Department had absolutely nothing to do with his presence in Charlottesville that day.

Regarding Reddit, as noted above, the Plaintiff has failed to properly and plausibly allege that the Reddit forum is disreputable. Even if it is, the Plaintiff has also failed to properly and plausibly allege that Mr. Hoft knew it to be so.

Finally, with regard to the claim in FAC ¶ 81 that Mr. Hoft "directly disavow[ed]" that the Plaintiff's presence and recording of the Fields' attack was anything but a coincidence, if Mr. Hoft had done such a thing, then like Mr. Creighton, he would be expressing an opinion he was entitled to, and such "thoughtcrime" would not constitute evidence that Mr. Hoft actually entertained doubts about the veracity of his reporting. However, Mr. Hoft said no such thing. The Plaintiff

73

quotes no instance where Mr. Hoft said that the Plaintiff was anything but a coincidental bystander.

Thus, as with Mr. Creighton, the Plaintiff has failed to make plausible, non-conclusory allegations that Mr. Hoft's alleged statements of fact were made with actual malice. Therefore, to the extent that Counts I and VI are alleged against Mr. Hoft, the case should be dismissed for failure to state a claim.

(c)     <u>The Plaintiff fails to Plausibly Allege Malice with Respect to Mr. Stranahan.</u>

The Plaintiff continues his prior patterns of failure when we turn to the allegations that Mr. Stranahan had malice. Once again, the Plaintiff posits in nearly cookie-cutter fashion the same types of allegations to support the claim of constitutional malice: 1) that Mr. Stranahan failed to appropriately investigate, 2) that he has ill-will or a desire to injure the Plaintiff, 3) that Mr. Stranahan had a pre-conceived narrative, and 4) he harbored actual doubts about the veracity of his reporting. These allegations fail for similar reasons.

Once again, the Plaintiff makes conclusory allegations of a failure to investigate, this time in FAC ¶ 93, but such conclusory allegations are to be disregarded.

Once again, the Plaintiff asserts that no one—not Mr. Stranahan or any of the "Free Speech Defendants"[28] reached out to him for comment, this time in FAC ¶ 93. While that claim is plausible in the sense that the Plaintiff surely would know if they did, the claim that this represents a failure to investigate is not plausible because the Plaintiff does not explain how such a contact would do any good.

Once again, the Plaintiff purports to know about the behavior of others (without explaining how he can pretend to know this) by alleging that

At no point did Defendants Stranahan, McAdoo, Jones, or anyone from InfoWars

---

[28] Referring to Free Speech Systems, LLC, InfoWars, LLC, Mr. Jones, and Ms. McAdoo.

74

> or Free Speech Systems... reach out to any of the other individuals or organizations [besides the Plaintiff] named in the article and video for comment or confirmation of even the most basic facts they allege.

As with Messrs. Hoft and Creighton, this allegation fails to "raise a reasonable expectation that discovery will reveal evidence" supporting the claim as required by *Twombly*, 550 U.S. at 556, and therefore, this is not a plausible allegation.

As with Mr. Hoft, FAC ¶ 95 alleges that Mr. Stranahan "did not identify any human sources in the... video for [his] information regarding [the Plaintiff] other than from [the Plaintiff's] Twitter page or media appearances," and as with Mr. Hoft, the Plaintiff apparently believes that this is evidence that Mr. Stranahan had no sources. However, basic logic dictates that "absence of evidence is not evidence of absence." In this case, the failure to identify a human source beside the Plaintiff does not imply that Mr. Stranahan had no such source.

By rote, the FAC ¶ 95 alleges that there were no updates or corrections to this piece, without alleging that Mr. Stranahan received information justifying such action. The same paragraph also alleges that there was no independent fact-check, but as with Messrs. Hoft or Stranahan, the allegation is implausible in light of *Twombly* because the Plaintiff does not allege any facts that would explain how the Plaintiff could possibly pretend to know this.

Next, the FAC tries once again to allege that a Defendant harbors ill-will toward the Plaintiff or a desire to harm the Plaintiff, but this time Mr. Stranahan is alleged to bear animus toward George Soros, Soros-funded regime changers, or the "Deep State." *Id.* at ¶ 97. However, the Plaintiff never makes any proper allegation that Mr. Stranahan alleged that the Plaintiff was part of a "Deep State" or connected to Soros at all—including any connection to any Soros-funded regime changers. This, along with the false accusation that Mr. Hoft claimed that the Plaintiff's filming of the Fields' attack was something other than a coincidence, suggests that perhaps the

75

Plaintiff is having trouble keeping the Defendants straight. In any case, even if the Plaintiff had properly alleged that Mr. Stranahan had alleged either that the Plaintiff was connected to the George Soros or was part of a "Deep State," the allegation of animus is conclusory, and must be disregarded.

That is followed by another repetition of a prior failure when FAC ¶¶ 98-99 alleges that Mr. Stranahan had a pre-conceived narrative he applied to the Plaintiff. As with Mr. Creighton, there are conclusory allegations that Mr. Stranahan had engaged in prior reporting on events in Charlottesville that allegedly showed bias. Their conclusory nature is reason enough to disregard them, but even if the allegations were true, they do not support the allegation that Mr. Stranahan came into this story with a pre-conceived narrative or that he ignored countervailing facts in its pursuit. So, once again, the Plaintiff's talking point fails.

Finally, more cookie-cutter language appears in FAC ¶ 100 alleging that

Defendants did this despite entertaining serious doubts about the veracity of their claims, which they demonstrated, at minimum, by directly disavowing the simplest (and the factually accurate) explanation: that [the Plaintiff's] witnessing of Fields' attack was a tragic and traumatizing coincidence, and that [the Plaintiff's] employment with the State Department had absolutely nothing to do with his presence in Charlottesville that day.

The lazy, cookie-cutter nature of the allegation is evidenced by the fact that the FAC is not clear 1) which Defendants it discusses or 2) what the phrase "did this" refers to. To the extent that the FAC might allege that Mr. Stranahan suggested the Plaintiff's being present at the Fields car attack and recording it was anything but a coincidence, the Plaintiff never makes a proper allegation that Mr. Stranahan actually said so. Indeed, that allegation appears to be primarily based on a ludicrously detailed message gleaned from Mr. Stranahan and Ms. McAdoo's non-verbal body language. That interpretation is not the plain and natural interpretation of their body language and, therefore, can be safely disregarded under *Chapin*.

76

As with Messrs. Creighton and Hoft, the Plaintiff has failed to properly and plausibly allege malice with respect to Mr. Stranahan. Therefore, to the extent that Counts I and VII are asserted against Mr. Stranahan, they should be dismissed.

(d)    <u>The Plaintiff fails to Plausibly Allege Malice with Respect to Mr. Wilburn.</u>

Although the Plaintiff makes similar allegations against Mr. Wilburn alleging malice, the position Mr. Wilburn finds himself is a bit different than that of Messrs. Hoft, Stranahan, and Creighton. As demonstrated *supra* 36-41, the only *fact* Mr. Wilburn actually asserted is that an article on YOURNEWSWIRE made the statements that he attributed to that website. In short, Mr. Wilburn only quoted someone else's article, and there is no allegation that he misquoted that article in the slightest. Thus Mr. Wilburn's article is much like many other articles in more mainstream publications that simply report that other news sources have reported something to be true.

Further, Mr. Wilburn repeatedly cautioned the reader that he had not verified the claims made in that article. The FAC tries to claim this proves malice, but in fact, it proves just the opposite. It shows he did not rely on their claims and took a step that mainstream news sources such as CNN and the WASHINGTON POST never seem to do: He specifically warned readers that he had not personally verified the allegations, so they could evaluate what was said in light of that fact. *Moldea v. New York Times Co.*, 15 F.3d at 1144-45 ("because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation"). Such behavior displays the very opposite of malice.

So, with respect to the Undersigned Defendants, the Plaintiff was required to show malice and failed to do so. For this reason alone, to the extent that Counts I-VII and IX are asserted against the Undersigned Defendants, they should be dismissed.

77

3.    The First Amended Complaint Fails to Properly Allege Negligence.

Even if this Court could not find at this time that the Plaintiff is a public figure, the Plaintiff

still has not properly pled the state of mind needed to allege defamation. In *Harris*, 229 Va. at 15,

the Virginia Supreme Court has adopted a negligence standard when private individuals sue for

defamation:

> We hold, therefore, that in an action brought by a private individual to recover
> actual, compensatory damages for a defamatory publication, the plaintiff may
> recover upon proof by a preponderance of the evidence that the publication was
> false, and that the defendant either knew it to be false, or believing it to be true,
> lacked reasonable grounds for such belief, or acted negligently in failing to
> ascertain the facts on which the publication was based.

As with the issue of constitutional malice, the FAC never makes plausible, non-conclusory

allegations to support a claim of negligence. For this reason, the defamation claims against the

Undersigned Defendants should be dismissed.

4.    The First Amended Complaint Fails to Properly Plead Damages Arising from
       Defamation.

Even if the Plaintiff had properly pled the Undersigned Defendants made statements of fact

and not opinions and even if the Plaintiff had properly and plausibly pled the correct state of mind,

the FAC does not properly allege damages caused by such alleged defamation. As noted above,

*supra* 13-17, the Plaintiff must plead that the Undersigned Defendants committed defamation per

se, leading to a presumption of damages, or the Plaintiff must plead special damages. Applied here,

the Plaintiff has attempted to plead defamation per se but fails, and the Plaintiff equally fails to

properly plead special damages.

(a)    None of the Statements by the Undersigned Defendants Could Constitute
        Defamation per se.

The FAC only asserts that the Undersigned Defendants committed defamation per se in

three ways.

78

First, FAC alleges in paragraphs 214, 223, 231, 239, 248, 276, that the Undersigned Defendants stated or implied that the Plaintiff "participated in or planned James Alex Fields, Jr.'s car attack in Charlottesville on August 12, 2017." However, none of the Undersigned Defendants made a statement of fact alleging that to be the case. Mr. Creighton gave his opinion, based on disclosed facts, that it was not a coincidence that the Plaintiff was there and recorded the video.[29] The piece Mr. Wilburn quoted merely said the situation seemed to be fishy, and Mr. Wilburn stated he could not verify its accuracy. Meanwhile, the Plaintiff did not make any proper allegation that Messrs. Hoft or Stranahan said or implied even that much.

Second, with respect to Mr. Stranahan, the Plaintiff adds the allegation that Mr. Stranahan claimed that this attack was "part of a conspiracy to stage a 'coup' and overthrow a sitting president."[30] FAC ¶ 248. As noted in the last paragraph, there is no plausible, non-conclusory allegation that Mr. Stranahan accused the Plaintiff of planning or participating in that attack. Further, to the extent that Mr. Stranahan mentioned the possibility of a coup being sought, the Plaintiff failed to make non-conclusory allegations that those statements were of and concerning the Plaintiff.[31] *Supra* 60.

---

[29] Further, it is worth noting that the accusation that the Plaintiff was not there by accident is not the same as alleging that the person participated in or planned the car attack or even that he had foreknowledge. One could believe that the Plaintiff's presence was not a coincidence, but that the Plaintiff nonetheless behaved innocently, unknowingly following the advice of a third party to attend and film the protests, where that third party did help plan and/or participate in the attack—or at least knew what was going to happen.

[30] At this point the FAC cites a statute, 18 U.S.C. § 361, that does not appear to exist.

[31] Further, an actual "coup" is not inherently a criminal act. Webster's dictionary defines a *coup d'état* as follows: "a sudden decisive exercise of force in politics; *especially* : the violent overthrow or alteration of an existing government by a small group a military *coup d'état* of the dictator." *Coup d'état*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/coup%20d'%C3%A9t (last visited April 8, 2018). There is nothing in that definition that automatically makes that application of force unlawful or even immoral. For instance, if a future president is impeached

79

Finally, the Plaintiff alleges that Mr. Creighton also committed defamation per se in FAC ¶ 223 by claiming that Mr. Creighton "falsely suggests that [the Plaintiff] is part of a larger plot to commit treason against the United States by attempting to destabilize and/or delegitimize the federal government." There are no plausible, non-conclusory allegations that Mr. Creighton alleged any such thing by words or implication, but even if he had, that is not treason. Treason is defined in the Constitution as follows: "Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." U.S. Const. Art. III, § 3, ¶ 1. Destabilizing or delegitimizing the government not only is not automatically treason, but depending on the methods used, might be protected by the First Amendment.[32]

---

and the Senate votes to remove him or her, that ex-president might refuse to physically leave the White House. In that situation, federal agents—the Secret Service, one supposes—might be tasked with forcibly removing that ex-president. Such an act would be a "a sudden decisive exercise of force in politics" and, thus, a "coup," but it would not be illegal or immoral.

[32] For instance, "destabilizing" government by peaceable speech is not only protected under the First Amendment, but the Amendment's "high purpose" might be served by such speech, as explained in *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949):

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute..., is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.... There is no room under our Constitution for a more restrictive view.

(Internal citations omitted). Even advocacy of violence, where that advocacy that does not amount to incitement, is protected under *Brandenburg*. Indeed, one of America's founding documents, THE DECLARATION OF INDEPENDENCE, is itself a call to violent revolution. *Id.* at ¶ 2.

80

For all of these reasons, the Plaintiff has failed to properly allege any defamation per se (pretending he had alleged any defamation at all) and, therefore, he must allege special damages.

      (b)     <u>The First Amended Complaint Fails to Properly Allege Special Damages Caused by the Undersigned Defendants.</u>

As stated in *Fleming*, 221 Va. at 890, a plaintiff needs to either show that the defendant committed defamation per se or that the plaintiff suffered special damages. Having failed to show defamation per se, by process of elimination the Plaintiff must allege special damages. However, the Plaintiff fails to properly allege such damages.

It is useful to review what *Craft* said about special damages:

"Special damages are such as in fact have actually occurred as the result or consequences of the injury complained of, and not implied by law....

"Special damages must always be the legal and natural consequence arising from the defamation itself, and not a mere wrongful act of a third person. Whenever special damages are claimed, in order to prevent a surprise on the defendant, which might otherwise ensue at the trial, the law requires the plaintiff to state the particular damage which he has sustained, or he will not be permitted to give evidence of it at the trial." Newell on SLANDER AND LIBEL, 4 ed., sec. 556, p. 603.

182 Va. 512, 520-21 (1944). The alleged harm suffered by the Plaintiff doesn't meet this standard.

For instance, it has already been noted that one of the chief calculations of harm asserted by the Plaintiff stems from the deplorable and often illegal conduct by third parties. As stated with respect to the amount in controversy, *supra* 13-17, such calculations are categorically excluded from damages in defamation cases. See *Craft*, 182 Va. at 520-21 ("Special damages must always be the legal and natural consequence arising from the defamation itself, and *not a mere wrongful act of a third person*") (emphasis added).

Meanwhile, the Plaintiff claims that he has lost friends or might lose friends because of all eleven Defendants' allegedly defamatory statements, depending on what part of the FAC one is reading. For instance, FAC ¶ 6 alleges in a conclusory fashion that because of all of the

81

Defendants' alleged defamation the Plaintiff "has experienced... the loss of friendships with individuals in Virginia." FAC ¶ 50 alleges in a conclusory fashion that statements by Creighton "have also deterred friends, acquaintances, and members of the community from associating with [the Plaintiff]," and repeats the same conclusory allegation in reference to Messrs. Hoft, Stranahan, and Wilburn in FAC ¶¶ 71, 92, and 134, respectively. However, in FAC ¶ 185, the Plaintiff claims that all of the

> Defendants' frequent and incendiary publications about [the Plaintiff] have even polluted a simple Google search for his name. As a result, [the Plaintiff] risks losing potential friends or romantic interests if an acquaintance finds any one of Defendants' defamatory articles.

So, the Plaintiff goes from a definite loss of friendship in FAC ¶ 6, to deterrence in FAC ¶¶ 50, 71, 92, and 134, to merely the risk of such a thing occurring in FAC ¶ 185. See *Solomon,* No.: GJH-14-03638 at *6 (D. Md. Dec. 19, 2014) ("The Court is therefore not required to construe this contradictory allegation in the light most favorable to Plaintiff"). Even if the allegations were not contradictory, they are hopelessly conclusory. Further these allegations fail to meet *Twombly's* plausibility requirement that the allegations must "raise a reasonable expectation that discovery will reveal" such evidence. Who specifically stopped being the Plaintiff's friend? Why does the Plaintiff believe he lost friends of the allegedly defamatory statements of the Defendants? Which specific statements motivated whom to disassociate?

The same can be said with respect to romantic engagements. In FAC ¶ 185, the Plaintiff alleges that "At least one potential romantic partner cut off contact with [the Plaintiff] because of Defendants' statements." Thus, the Plaintiff is claiming that this unknown person read statements by every single one of the Defendants and every single one of them is why that person decided not to become a romantic partner. In any case, the statement is implausible and hopelessly conclusory—for instance, it does not state *how* their statements caused this unknown person to cut

82

off contact.

Indeed, that passage does not even allege that this interference with romantic expectation was caused by *defamatory* statements, only by "statements"—which by *expressio unius*, suggests they are true. Certainly, the plain and natural meaning of this conclusory allegation allows for the possibility that the "statements" that drove this unknown person away might have been truthful. To give but one example, this person might have decided that he or she does not want to get into a romantic relationship with someone who saw such a horrific event as the car attack, because he or she does not want to deal with the emotional baggage that this brings—a horrible viewpoint, but there are people in the world who hold it. Or perhaps that person learned through the Defendants that the Plaintiff worked for the State Department in Africa, and that unknown person is convinced that State Department policy in Africa is hopelessly neocolonial, leading that person to dislike every person who served in such a role. The Undersigned Defendants don't posit these possibilities in any attempt to claim that they are true but only to demonstrate that there are many possibilities where learning true facts about the Plaintiff's life might lead this unknown potential romantic partner to dissociate from the Plaintiff.

Meanwhile, Plaintiff's allegations of professional harm are also contradictory. For instance, in FAC ¶ 6, the Plaintiff alleges that he has experienced "professional damage in Virginia, including reputational harm, the loss of business opportunities in Virginia, [and] irreparable damage to his career as a Foreign Service Officer[.]" However, in FAC ¶¶ 187-89, the Plaintiff tells a different story. There, he states he will not be able to continue in his present role in Wize Solutions in FAC ¶ 187, but he does not state that role has ended. Indeed, there is no clear explanation why he could not continue in his role or what his "present role" involves. He complains of "severe skepticism" but does not allege actual harm resulting from it.

83

Continuing with alleged professional harm, the Plaintiff also claims that he "has been consistently questioned by professional contacts about the derogatory information published on [all eleven of the] Defendants' websites, and other potential clients and partners have decided not to pursue business relationships with Wize after reviewing said information." *Id.* The Plaintiff does not allege that these events were the result of *defamatory* information—only *derogatory* information. Further, the Plaintiff does not allege any harm flowing from the questioning. Finally, by alleging that people or partners decided not to pursue business relationships with Wise after reviewing that information, the Plaintiff appears to be engaging in the *post hoc ergo propter hoc* fallacy—assuming that because one event occurred after another event that the earlier event caused the later event. For instance, those business opportunities were also allegedly lost by the Plaintiff after the last presidential election, after Neil Armstrong walked on the Moon, after the sacking of Rome, and after someone invented the wheel. Just because one event occurs before another does not mean the one *caused* the other.

Still focusing on professional harm, FAC ¶ 188 states that

it will be exceedingly difficult for him to serve as a diplomat to another nation, as foreign officials will certainly research his background and find the shocking and threatening information published by Defendants, including allegations that he is not actually a diplomat, but a covert CIA agent.

There is no particular allegation that any Defendant actually threatened the Plaintiff. Rather, it is probably just another example of the Plaintiff pretending he properly has alleged incitement of threats. Certainly, if the Plaintiff means that all eleven Defendants threatened him, that would be another conclusory allegation. See *Virginia v. Black*, 538 U.S. 343, 359 (2003) (describing the elements of a "true threat"). Further, the claim that the allegedly defamatory statements would make life difficult for the Plaintiff is vague and conclusory. *Iqbal* made it clear that conclusory allegations are insufficient, 556 U.S. at 679, and this Court has made it clear that vague allegations

84

are equally insufficient. *Nowell v. Kumer*, No. 7:15cv00461, at *2 (W.D. Va. Nov. 17, 2015) ("Nowell's allegations in his complaint are far too vague to state a cognizable federal claim against any defendant") and *Chitty v. Liberty Univ.*, No. 6:13CV00043, at *3 n. 3 (W.D. Va. July 25, 2013) (stating that a complaint can be dismissed for vagueness, quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2nd Cir. 1988)). The only claim in that paragraph that is not utterly vague is the claim that the allegation that he was a CIA agent might expose him to risk,[33] but the Plaintiff never alleged that the Undersigned Defendants made such an accusation. The Plaintiff also fears that the allegation that he is part of the "Deep State" might motivate his dismissal from the State Department at some unknown point in the future. *Id.* at ¶ 189. None of these allegations—each one conclusory and implausible—add up to an actual loss of business caused by the wrongful conduct of the Undersigned Defendants, in direct contradiction of the allegations in FAC ¶ 6. Accordingly, this Court can disregard these allegations merely because they are contradictory, as well as conclusory and implausible.

Finally, the Plaintiff claims repeatedly that he has suffered emotional harm as the result of the alleged defamation. That claim is defective because nearly every allegation is directed against every single Defendant, as an undifferentiated group, without specifying which alleged statement caused that harm, rendering the allegation conclusory and implausible. For instance, the Plaintiff alleges that he has suffered a stress-related eye injury in FAC ¶ 181 and claims it is "direct result of the stress he endures due to Defendants' false and defamatory publications, their ongoing press offensive against him, and the threats and harassment those publications have inspired." Of course, *Craft* prevents the Plaintiff from claiming defamation damages based on the wrongdoing of third

---

[33] It is odd of the Plaintiff to assert that the allegation that one works for the CIA is defamatory, given how many Americans honorably and proudly (though perhaps not openly) serve that federal agency.

parties, and the "ongoing press offensive against him" is not even alleged to be defamatory, but with respect to the claim that "Defendants' false and defamatory publications" are causing this harm, one is tempted to ask: Which ones? Which Defendants? Which allegedly defamatory publications? If the Plaintiff is attempting to claim that all the alleged defamation by all eleven of the Defendants caused this, that would fail the *Iqbal/Twombly* plausibility requirement.

The only time the allegation of emotional harm is at all specific—though still conclusory—is in FAC ¶ 180 in which the Plaintiff says that he has suffered emotional harm because of all of the "Defendants' deliberate campaign to falsely portray him as a 'CIA asset' and a 'Deep State shill' (among other similar characterizations) engaged in a criminal conspiracy against the United States." However, the Plaintiff never properly alleged that any of the Undersigned Defendants claimed that the Plaintiff was a CIA asset, nor did the Plaintiff properly allege that any of them had accused him of engaging in a criminal conspiracy against the United States. Finally, with respect to the allegation that he was a "Deep State shill," Mr. Hoft is the only one of the Undersigned Defendants to make that allegation—in a non-actionable opinion based on stated facts. *Supra* 50-51.

In summary, the FAC fails to state a claim for defamation against the Undersigned Defendants for three reasons. First, the Plaintiff repeatedly failed to make a non-conclusory, plausible allegation that the Undersigned Defendants made a false statement of fact and not protected opinion. Second, the Plaintiff fails to properly allege constitutional malice or negligence. Finally, the Plaintiff fails to properly allege any defamation per se or to allege special damages in order to support a claim for defamation per quod. For all of these reasons, this Court should dismiss Counts I-VII and IX insofar as they apply to the Undersigned Defendants, for failure to state a claim upon which relief can be granted.

**C.** **The First Amended Complaint Has Failed to State a Claim for Intentional Infliction of Emotional Distress.**

As noted by this Court in *Jackson v. Fletcher*, No. 7:09CV00408, at *20 (W.D. Va. Jan. 18, 2011), claims for IIED

> are not favored in Virginia. See *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006). The Supreme Court of Virginia has held that a plaintiff cannot recover on a claim of intentional infliction of emotional distress unless he can show by clear and convincing evidence that "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *SuperValu. Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008).

Further, an additional requirement is present when the plaintiff is a public figure: In that case, a plaintiff must allege that the defendant made a false statement of fact *with constitutional malice*. In the instant case, the FAC fails to plead such a false statement of fact with malice, repeatedly fails to plead a causal connection between the Undersigned Defendants' conduct and the emotional distress, and also fails to plead sufficiently outrageous or intolerable conduct. For all of these reasons, this Court should find that the Plaintiff has failed to state a claim for IIED against the Undersigned Defendants and to the extent that Count X applies to the Undersigned Defendants, it should be dismissed.

1.  Once Again, the First Amended Complaint Fails to Properly Plead That the Undersigned Defendants Made a False Statement of Fact with Constitutional Malice.

Previously, this brief noted that the Plaintiff is a limited-purpose public figure and, therefore, had to meet the malice standard with respect to defamation. *Supra* 61-64. Further, this brief noted that the FAC fails to properly plead that the Undersigned Defendants 1) made a false statement of fact, *supra* 34-61, 2) with constitutional malice, failing to provide plausible, non-conclusory allegations that that would lead this Court to conclude that either element was present,

*supra* 64-78.

Such a failure to plead either a false statement of fact or constitutional malice not only justifies dismissal of the defamation claim but also the claim for IIED. This rule was established in *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). In that case, *Hustler* ran a piece which imagined a fictional interview with televangelist Jerry Falwell, in which the preacher recalls a fictional sexual encounter with his mother, with a disclaimer reading "ad parody—not to be taken seriously." *Id.* at 48. Falwell sued the magazine and other defendants in part for IIED, arguing that even though the piece did not even pretend to be true, it nonetheless intentionally inflicted emotional distress on him.

However, the Supreme Court made it clear that the constitutional malice standard did apply under those circumstances as follows:

> We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication *contains a false statement of fact which was made with "actual malice," i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a "blind application" of the *New York Times* standard, see *Time, Inc. v. Hill*, 385 U. S. 374, 390 (1967), it reflects our considered judgment that such a standard is necessary to give adequate "breathing space" to the freedoms protected by the First Amendment.

*Id.* at 56 (emphasis added). Therefore, because the Plaintiff is a limited-purpose public figure, he is required to plead that there was a false statement of fact (which the FAC repeatedly fails to do, *supra* 34-61) and malice with respect to his claim of emotional distress (which the FAC also failed to do, *supra* 64-78). Indeed, the *Hustler Magazine* standard doesn't allow for mere implications to be actionable. The Plaintiff's failure to properly plead both elements, therefore, is fatal to both the defamation and IIED claims, justifying dismissal of both causes of action.

88

2.    The First Amended Complaint Improperly Attempts to Blame the Undersigned
      Defendants for the Distress Caused by Third Parties.

It is useful to take the elements somewhat out of order and look at the question of whether "there was a causal connection between the [alleged] wrongdoer's conduct and the resulting emotional distress" first because this will help limit the discussion of what conduct is relevant in this case.

As noted earlier, FAC ¶¶ 150-163 alleges a great deal of deplorable and possibly criminal conduct by third parties and, if true, the Plaintiff deserves sympathy. However, the Plaintiff has inappropriately attempted to blame the Undersigned Defendants for the conduct of those third parties without alleging facts that would make them liable. As noted above, *supra* 17-22, the Plaintiff does make conclusory allegations that the Undersigned Defendants committed incitement without properly alleging that their words met the constitutional test for incitement set down in *Brandenburg*, 395 U.S. at 447. The Plaintiff has not even alleged the bare minimum under *Brandenburg*: The Plaintiff never alleges that the Undersigned Defendants advocated violence or unlawful behavior.

Accordingly, to the extent that the claim of IIED is based on the conduct of third parties, those claims should be dismissed because the FAC fails to allege an appropriate causal connection between the Undersigned Defendants' alleged conduct and the distress that was allegedly felt.

3.    The First Amended Complaint Fails to Properly Plead Outrageous or Intolerable
      Conduct.

The second element of IIED is the requirement that the conduct of the defendant be "outrageous or intolerable." The Plaintiff plainly tries to meet this standard by bundling in the conduct of the Undersigned Defendants with those of third parties not named as defendants in this suit. As demonstrated in the previous section, the Undersigned Defendants are not responsible for

89

that deplorable conduct by third parties as a matter of law. Therefore, when all of that third-party conduct is stripped away, the allegedly outrageous and intolerable behavior amounts to nothing more than the Undersigned Defendants making allegedly defamatory statements about the Plaintiff. This is not outrageous or intolerable as a matter of law.

For instance, in *Coles v. Carilion Clinic*, 894 F. Supp. 2d 783 (W.D. Va. 2012), this Court was faced with a more outrageous and intolerable series of events. In that case, Vernell Coles, a black man, alleged that his employer maintained an incredibly hostile work environment as follows (with apologies for the language):

> In the complaint, Coles asserts that Carilion maintained a racially hostile work environment and harassed and treated him differently than his nonblack coworkers based on his race. (Docket No. 1 at ¶ 10.) More specifically, Coles alleges that he was frequently referred to by fellow employees as a "nigger" and a drug dealer, subjected to the display of shackles and a noose in the workplace, subjected to references to the Ku Klux Klan and the lynching of a black man, subjected to similar racially derogatory remarks concerning the current President of the United States, denied promotions, and instructed to perform degrading work assignments. (*Id.* at ¶ 11.) Despite Carilion's policy providing that the company would promote from within its ranks before hiring outside workers, Coles alleges that one manager informed him that he would never advance because he was a "worthless nigger." (*Id.*) Another manager stated that Coles obtained his job only "because of the NAACP," that he was a "lazy nigger," and that the manager desired to terminate Coles but "could not figure out how to do it." (*Id.*) Coles further alleges that one worker claimed to be a member of the Ku Klux Klan and reportedly displayed a Klan belt buckle at work. (*Id.*) Based on these factual allegations, Coles advances two causes of action in his complaint: first, a claim for race discrimination and retaliation, pursuant to 42 U.S.C. § 1981 (§ 1981) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. (Title VII); and, second, a claim for intentional infliction of emotional distress (IIED), pursuant to Virginia law.

*Id.* at 786-87. Yet, this Court did not find that this abuse was sufficiently outrageous or intolerable to support IIED as follows:

> Pursuant to the second element of an IIED claim, a plaintiff must prove that the conduct giving rise to the claim was outrageous and intolerable. To satisfy this element, Coles relies on the allegations in the amended complaint surrounding the use of racially abusive language and symbols and Carilion's persistence in refusing to promote him while electing to promote white males instead. An IIED claim under

90

Virginia law "requires extreme or outrageous conduct intended to cause and in fact causing severe emotional distress. `Extreme' means just that—only the most execrable conduct can give rise to the tort." *Webb v. Baxter Healthcare Corp.*, 57 F.3d 1067, 1995 WL 352485, at *5 (4th Cir.1995) (per curiam) (unpublished table decision). Furthermore, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Russo [v. White*, 241 Va. 23, 400 S.E.2d 160, 162 (1991)]. While the alleged conduct in the instant case "*may* violate contemporary standards of appropriate behavior in the workplace, [the court] cannot label it an atrocity or `utterly intolerable in a civilized society.'" *Webb*, 1995 WL 352485, at *6 (emphasis in original) (concluding that the plaintiff's allegations that she was repeatedly ridiculed based on her gender, religion, and disability were insufficient to state a claim for IIED under Virginia law); see also *Law v. Autozone Stores, Inc.*, No. 4:09CV00017, 2009 WL 4349165, at *3 (W.D. Va. Nov. 25, 2009) (stating that, generally, "verbal abuse and use of insensitive language will not meet the bill for outrageous and intolerable conduct for purposes of an IIED claim based on Virginia law"); *Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24, 34 (2006) (stating that "[i]nsensitive and demeaning conduct does not equate to outrageous behavior as set by our caselaw"). For this reason, the court will grant Carilion's Rule 12(b)(6) motion with respect to the plaintiff's IIED claim.

*Id.* at 796-97. While some subjectivity is involved in the definition of words such as "outrageous" or "intolerable," it seems safe to say that the abuse Mr. Coles allegedly faced was far more severe than the defamation the Undersigned Defendants allegedly engaged in. The behavior Mr. Coles described was in-person, defamatory, racially bigoted, and threatening. By comparison, the Undersigned Defendants, at most, allegedly defamed the Plaintiff on the Internet—something the Plaintiff could have safely ignored if he wished. If Mr. Coles did not allege sufficiently outrageous or intolerable conduct, then this Plaintiff certainly has not alleged such conduct either. This provides an additional reason to dismiss any claim for IIED against the Undersigned Defendants.

In summary, the Plaintiff has failed to properly plead a claim for IIED for three reasons. First, as a public figure, the Plaintiff is required to plead that the Undersigned Defendants made a false statement of fact with malice and failed to do so. Second, the Plaintiff inappropriately attempts to blame the Undersigned Defendants for distress caused by third parties. Finally, to the

extent that the Plaintiff alleges any distress caused by the Undersigned Defendants, their alleged defamation cannot, as a matter of law, satisfy the requirement that the conduct be extreme and outrageous. Accordingly, for all of these reasons, to the extent that Count X applies to the Undersigned Defendants, it should be dismissed for failure to state a claim.

**IV.**
**THE UNDERSIGNED DEFENDANTS SHOULD BE GRANTED IMMUNITY AND ATTORNEY'S FEES AND COSTS UNDER VA. CODE § 8.01-223.2**

States have increasingly recognized the growing problem of abusive lawsuits designed to punish people for engaging in protected expression. These are known as "SLAPP" suits, a concept explained concisely by the Public Participation Project[34] as follows:

> SLAPPs are Strategic Lawsuits Against Public Participation. These damaging suits chill free speech and healthy debate by targeting those who communicate with their government or speak out on issues of public interest.

> SLAPPs are used to silence and harass critics by forcing them to spend money to defend these baseless suits. SLAPP filers don't go to court to seek justice. Rather, SLAPPS are intended to intimidate those who disagree with them or their activities by draining the target's financial resources.

> SLAPPs are effective because even a meritless lawsuit can take years and many thousands of dollars to defend. To end or prevent a SLAPP, those who speak out on issues of public interest frequently agree to muzzle themselves, apologize, or "correct" statements.

Va. Code § 8.01-223.2 provides courts with tools to partially address this problem. The current statute reads in relevant part that

> A. A person shall be immune from civil liability for... a claim of defamation based solely on statements... regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party.... The immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.

---

[34] *What is a SLAPP?*, Public Participation Project, https://anti-slapp.org/what-is-a-slapp/ (last visited April 12, 2018).

92

B.    Any person who has a suit against him dismissed pursuant to the immunity provided by this section may be awarded reasonable attorney fees and costs.

Although there is no caselaw on the current version of the statute, the language is plain enough.

First, the plain language of the statute requires that there be a claim of defamation. That is true on the face of the FAC.

Second, the speech at issue is plainly regarding a matter of public concern. Whether one sees this as part of the larger debate about whether Lee's statue should remain, or just sees this as a question how one should perceive the actions of James Fields, either is plainly an issue of public concern.

Third, there is no question the statements are protected under the First Amendment, given that this brief has demonstrated that the objected-to statements were never shown to be false statements (or implications) of fact (and not opinion). *Supra* 34-61. Further, even if this Court pretended that they were allegedly false statements of fact, the Plaintiff had failed to properly plead malice or negligence, *supra* 64-78, and, therefore, the alleged statements remain protected.

Fourth, there is no question that the statements were communicated to a third party.

Finally, the Plaintiff has failed to properly plead actual or constructive knowledge that the alleged statements are false or were made with reckless disregard for whether they are false. *Supra* 64-78.

Accordingly, the statutory immunity would apply. Subsection B, meanwhile, gives this Court the discretion to award attorney fees and costs.

That discretion should be exercised in this case. The utter frivolousness of this lawsuit suggests that it is a classic SLAPP suit, not filed in order to win but filed simply to harass the Undersigned Defendants and impose legal costs upon them. The evidence of that intent to harass

93

will be outlined in more detail in an anticipated motion for sanctions under Fed. R. Civ. P. 11(c). Accordingly, this Court should use its discretion and grant not only dismissal but also attorney fees and costs to be determined at a later date.

## CONCLUSION

In the end, this is a lawsuit that should not have been filed. It would appear on its face to be a suit designed to punish expression protected by the First Amendment. The Plaintiff wishes to hale the Undersigned Defendants into a court that lacks subject matter jurisdiction. The Plaintiff wishes to force Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and WNI to endure the expense of defending themselves in a court far from home, in a court which lacks personal jurisdiction over them. The Plaintiff wants to hold people legally responsible for the statements they did not publish. The Plaintiff wishes to declare to be tortious expression that does not contain false statements of fact. The Plaintiff wishes to put the Undersigned Defendants on trial for defamation without properly alleging malice, negligence, or special damages. The Plaintiff wishes to assert IIED without properly alleging that a false statement was made with malice, or extreme and outrageous behavior that actually caused the alleged distress.

Most of all, the Plaintiff wishes to hold the Undersigned Defendants responsible for the wrongful acts of third parties. The Plaintiff does so either in ignorance of the Supreme Court's holding in *Brandenburg* or with a desire to erode this landmark decision in First Amendment law. In doing so, the Plaintiff would declare that the Undersigned Defendants are no longer free to criticize or report negative facts about others, because a member of their audience might independently decide to engage in misconduct.

In short, the Plaintiff wants the Undersigned Defendants to shut up.

Fortunately, for those who believe the civil right of Freedom of Expression, the Plaintiff

94

has failed to show that jurisdiction is present and has failed to state a claim for which relief can be granted. Furthermore, Virginia law grants immunity to their expression. Therefore, this case should be dismissed under Fed. R. Civ. P. 12(b)(1), (2) and (6), and under VA. CODE § 8.01-223.2.

Wednesday, May 9, 2018                     Respectfully submitted,


                                    *s/ Aaron J. Walker*
                                    Aaron J. Walker, Esq.
                                    *Attorney for Defendants Hoft, Stranahan, Creighton,*
                                    *Wilburn, Hickford and WNI*
                                    Va. Bar# 48882
                                    7537 Remington Road
                                    Manassas, Virginia 20109
                                    (703) 216-0455
                                    AaronJW72@gmail.com

**List of Exhibits:**

Exhibit A: Declaration of Lee Stranahan

Exhibit B: Declaration of R. Scott Creighton

Exhibit C: Declaration of James Hoft

Exhibit D: Declaration of Michele Hickford

Exhibit E: Declaration of Derrick Wilburn

Exhibit F: THE GATEWAY PUNDIT Article

Exhibit G: Declaration of Eric Johnson

Exhibit H: Declaration of Sarah Palmer

Exhibit I: Declaration of William J. J. Hoge III

Exhibit J: Declaration of Dustyn Hughes

Exhibit K: Declaration of Amy Lidster

Exhibit L: Declaration of George Howell

Exhibit M: Declaration of Andrew Stanbarger

Exhibit N: Declaration of Paul McKay