IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

BRENNAN M. GILMORE,

       Plaintiff,

     v.

ALEXANDER E. JONES, et al.,

       Defendants.

Case No. 3:18-cv-00017-NKM

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
AND MOTION FOR ATTORNEY FEES PURSUANT TO THE
TEXAS CITIZENS PARTICIPATION ACT OR THE VIRGINIA ANTI-SLAPP ACT**

Thomas E. Albro
Evan D. Mayo
Tremblay & Smith, PLLC
105-109 E. High Street
Charlottesville, VA 22902
Telephone: (434) 977-4455
Facsimile: (434) 979-1221
tom.albro@tremblaysmith.com
evan.mayo@tremblaysmith.com

Elizabeth A. Scully
Mark I. Bailen
Andrew M. Grossman
Richard B. Raile
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
escully@bakerlaw.com

Eric J. Taube
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, TX 78701
Telephone: (512) 685-6401
eric.taube@wallerlaw.com

Robb S. Harvey
Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-5380
robb.harvey@wallerlaw.com

*Counsel for Defendants Alexander E. Jones,
Infowars, LLC, Free Speech Systems, LLC and
Lee Ann McAdoo a/k/a Lee Ann Fleissner*

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................ 1

**BACKGROUND** ................................................................................................ 2

**ARGUMENT** ................................................................................................... 7

    **I.**    The Court Lacks Personal Jurisdiction Over the Free Speech Defendants ............ 7

        **A.**    The Court Lacks General Jurisdiction Over the Free Speech Defendants ................................................................................ 7

        **B.**    The Court Lacks Specific Jurisdiction Over the Free Speech Defendants ................................................................................ 8

    **II.**    Texas Law Governs Gilmore's Claims Against the Free Speech Defendants ...... 10

    **III.**    Gilmore's Defamation Claims Are Meritless and Should Be Dismissed for Failure To State a Claim Upon Which Relief May Granted ............................... 10

        **A.**    The Challenged Statements Lack Defamatory Meaning ......................... 10

        **B.**    The Challenged Statements Are Not Materially False ............................. 15

        **C.**    The Challenged Statements Are Protected Commentary on the Facts, Not Statements of Verifiable Fact ............................................................ 16

        **D.**    Gilmore Does Not Plausibly Allege Actual Malice .................................. 18

    **IV.**    Plaintiff's "Emotional Distress" Claim Should Also Be Dismissed ................... 23

    **V.**    The Court Should Award the Free Speech Defendants Their Costs and Attorneys' Fees in Responding to this SLAPP Suit Brought To Harass Them ................................................................................................. 24

**CONCLUSION** ............................................................................................... 25

i

# INTRODUCTION

Plaintiff Brennan Gilmore has no legal or factual basis for his libel suit against Alex Jones, Lee Ann McAdoo, Infowars, LLC, and Free Speech Systems, LLC (collectively, the "Free Speech Defendants"), only the admitted desire to exclude from the marketplace of ideas political views that he considers "hateful." His Amended Complaint fails to address the critical and fatal deficiencies in his Original Complaint.

Gilmore challenges two video segments from Jones's Infowars website commenting on Gilmore's seemingly ubiquitous presence in the news media following the August 2017 protests in Charlottesville and his leftist, anti-Trump spin on those events. Both expressed doubts that it was a coincidence that the most prominent media commentator on the protests was a government employee who worked for a Democratic Party politician and espoused reliably liberal views. The premise of Gilmore's legal claims is that this mundane commentary on the political bias of the media was actually a dog whistle to (in Gilmore's insulting words) Infowars' "gullible…throngs of followers" communicating that Gilmore is enmeshed in a convoluted government conspiracy to murder a protestor and stage a coup to overthrow President Trump. In fact, the very publications Gilmore challenges acknowledge that a white supremacist was responsible for the protestor's death, contradicting Gilmore's central claim in this case. Gilmore brought this suit to silence a viewpoint that he regards as illegitimate and intolerable, not to redress actual injury.

Gilmore's claims against the Free Speech Defendants should be dismissed for at least five reasons. *First*, Gilmore identifies no applicable contacts that the Free Speech Defendants have with Virginia and so provides no basis for the Court's exercise of personal jurisdiction over them. *Second*, Gilmore fails to identify any words or language that could conceivably bear a defamatory connotation. Unable to base a claim on the words actually used, he extrapolates wildly from the two statements he challenges, concocting a conspiracy theory and then trying to retroactively attribute it to the Free Speech Defendants. *Third*, Gilmore is unable to plausibly allege that the statements he challenges are materially false. *Fourth*, the speech that Gilmore challenges is

1

opinion, not statements of fact. To be certain, the opinions expressed are based upon facts under-lying them, but those facts are not defamatory and not in dispute. Jones and Infowars may inter-pret facts differently than the government, the mainstream media, and Gilmore, but the First Amendment guarantees them and others the right to do so. *Fifth*, Gilmore's allegations of actual malice ignore contradictory statements in the very publications he challenges that make clear a white supremacist was responsible for killing the protestor, thereby precluding any finding of lia-bility.

In addition to dismissing this action, the Court should award the Free Speech Defendants their fees and costs under the fee-shifting provisions of the Texas Citizens Participation Act (Texas "Anti-SLAPP Act") or Virginia's anti-SLAPP[1] statute. Gilmore's suit lacks any merit, was brought solely to harass and burden the Defendants, and ultimately amounts to a publicity stunt, not a good-faith legal action to address real claims of the plaintiff. A fee and cost award would properly address Gilmore's abuse of this Court's authority and legal process, partially re-imburse the Free Speech Defendants for the unjust injury they have suffered, further the purposes of the Texas and Virginia anti-SLAPP statutes, and deter future abuses.

## **BACKGROUND**

Defendant Alex Jones is a journalist, commentator, filmmaker, and host of a radio show syndicated by over 160 stations across the United States. The central focus of his work over the past 20 years has been the abuse of power by governments, by officials, by corporations, and by the connected. He strives to promote a culture of liberty, transparency, and freedom that empow-ers all persons, not just the elite class. Jones is the publisher of Infowars, a leading news website, and operates Infowars, LLC, and Free Speech Systems, LLC. Compl. ¶¶ 14–16.[2] Defendant Lee Ann McAdoo, an independent contractor, is a reporter for Infowars. *Id*. ¶ 18.

---

[1] "SLAPP" is short for "strategic lawsuit against public participation," referring to abusive litiga-tion that is intended to censor, intimidate, and silence speakers through the burden, expense, and uncertainty of litigation.

[2] Except where noted, all references to the "Complaint" are to the Amended Complaint, ECF No. 29.

Plaintiff Brennan Gilmore is an avid Twitter user, *see, e.g.*, Compl. ¶¶ 31–33, and Foreign Service Officer in the U.S. State Department on "long-term unpaid leave" from that position, *id*. ¶ 13. He is active in Democratic Party politics, has unspecified "connections to Democratic politicians," participates in public protests, and has frequently appeared in local, national, and international media. *Id*. ¶¶ 31–35, 27, Introduction.

On August 12, 2017, Gilmore attended a protest held in Charlottesville, Virginia. Compl. ¶ 27. During the protest, he witnessed, and video-recorded on his mobile phone, a Dodge Challenger drive into a crowd of protestors, killing one. *Id*. ¶¶ 29–30. The driver was later identified as James Alex Fields, a "neo-Nazi sympathizer" who had intended to participate in a "Unite the Right" rally that police canceled shortly before it was to begin. *Id*. ¶¶ 28–29. Gilmore posted his video on Twitter, along with a message: "Video of car hitting anti-racist protestors. Let there be no confusion: this was deliberate terrorism. My prayers with victims. Stay home." *Id*. ¶ 32. Posting the video, he believed, was necessary to rebut suggestions that the incident may have been an accident. *Id*. ¶ 31. Gilmore's post went viral, *id*. ¶ 32 (indicating nearly 90,000 "retweets" and over 100,000 "likes"), he conducted numerous interviews with media about the incident, and (as conceded in his Original Complaint) he appeared repeatedly on television not only to "relay[] his account" of the event, but also to use the media attention to emphasize the "seriousness" of the incident and to condemn "the hate-filled display and violence" he had seen in Charlottesville. *Id*. ¶¶ 33–35; Orig. Compl. ECF No. 1, ¶ 31.[3]

For several days after the incident, the Internet buzzed with stories asserting that Democrats, the mainstream media, and "deep state" government employees who oppose President Trump were involved in an effort to put a political, anti-Trump spin on the Charlottesville protests. *E.g.*, Compl. ¶ 63. For example, a blog post by Defendant Jim Hoft focused on the facts that many mainstream media stories featured Gilmore, that he happened to be at the protests recording video, that he was identified by the *New York Times* as a "U.S. State Department foreign

---

[3] The Court may take judicial notice of allegations made by the Plaintiff in prior pleadings. *See* 5c Fed. Prac. & P. § 1364 n.40 & surrounding text.

service officer," that he had also been chief of staff for the campaign of a "liberal" Democratic politician, and that a billionaire donor to liberal and Democratic Party causes, George Soros, had made a massive contribution to that campaign. Compl. Ex. E. Hoft concluded that the media who interviewed Gilmore knew who he was and that his reliably liberal comments in the media indicated that "the Deep State is working with the liberal media to shape narrative and fool the American people." *Id*. Hoft's view was that it was not a coincidence that "[t]he random Charlottesville observer who was interviewed by MSNBC and liberal outlets turns out to be a deep state shill with links to George Soros." *Id*.

Infowars was also on the story. Its reporter, Lee Ann McAdoo, conducted a video interview with RT Network investigative reporter Lee Stranahan and published it under the title "Bombshell Connection Between Charlottesville, Soros, CIA." Compl. ¶¶ 17, 83–84, Ex. F. Recalling a documentary he had recently viewed about the spinning of protests in the Ukraine to discredit that country's government, Stranahan opined that there was an effort to put a liberal spin on the Charlottesville protests for the purpose of "smearing Trump and his supporters" and even perhaps replacing him in power. *Id*. ¶ 84. Stranahan thought that it might not be a coincidence that the most prominent commentator on the protests worked for the State Department, worked for a Democratic Party politician, and espoused reliably liberal views in the media and on his Twitter account:

> STRANAHAN: If you go to Brennan Gilmore's page, his Twitter page, you'll see he has a picture of the young woman who was murdered, and you know what is says? "Martyr." Literally, it says "martyr." You can't be more explicit than this. So here's what I'm saying. I'm not a conspiracy theorist, I'm a fact-based journalist. The facts are enough. However, the Democrats have investigated Trump for a lot less. For a lot less. They have called for investigations, and secret meetings, they have convened the FBI. When you have this many things going on, I think someone really needs to investigate. Again, I don't like to jump to conclusions. I'd like to ask some questions about who this kid was, where he came from, what do we know—get it all out in the open. But I'll also point out that we can't count on the media to do this.

> STRANAHAN: Yeah, if you scroll…keep scrolling…this is the guy, Brennan Gilmore, and if you scroll down, keep going, it's not too far, you'll see the photo of

the young woman…this is abs [sic]…when I saw this, uh, I was shocked…by the way, his bio, if you look at this guy's bio, it says he's with the State Department, and the fact that he called her a 'martyr'…. I don't know, but this is clearly, the way she's being used is she's a martyr to the cause….

STRANAHAN: And let me point out what's happening. They, uh, they win no matter what they do. Are they trying to get a coup? I think clearly they are. But if they can't get a coup, they'll settle for impeachment. And if they can't get impeachment, they'll settle for smearing Trump and his supporters so much that they'll be able to elect another elitists. Does that make sense?

MCADOO: Absolutely.

Compl. ¶ 84. As Stranahan spoke, McAdoo scrolled through Gilmore's Twitter profile, which consisted almost entirely of "tweets" touting Gilmore's media hits and invective against President Donald Trump.[4]

According to Gilmore, Stranahan's words "falsely imply that Mr. Gilmore is a criminal conspirator and a party to treason and murder." Compl. ¶ 92. In particular, Count 7 of his Complaint alleges that these comments are "defamatory per se because they impute to Mr. Gilmore the commission of some criminal offense involving moral turpitude—in this instance, that Mr. Gilmore planned or participated in James Alex Fields, Jr.'s car attack in Charlottesville on August 12, 2017, which killed one person and injured many others, as part of a conspiracy to stage a 'coup' and overthrow a sitting president." Compl. ¶ 248.

While the story might not have received much play in the mainstream media, it continued to make waves online. *E.g.*, Compl. ¶¶ 125–44. Alex Jones weighed in with a video published on Infowars.com and YouTube on or about August 20, 2017. *Id*. ¶¶ 102–05, Ex. G. Like others, Jones also thought it was unusual that a State Department officer was so ubiquitous in the news coverage of the protests and was so consistent in using his media appearances to spout anti-Trump "talking points":

I did research, and I confirmed it all. They had known CIA and State Department

---

[4] The full video is available at https://www.youtube.com/watch?v=L58T2dl997A; Compl. ¶ 87. The Court may take notice of the complete publication because it is "integral to and explicitly relied on in the complaint and because the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

officials in Charlottesville, first tweeting, first being on MSNBC, CNN, NBC. The mayor is involved. Everybody is a cut-out—of the major players. Some of the useless…I guess they're "useful idiots" to use Lenin's term. I see them as useless idiots. The white supremacists involved, some of those are real….

They got State Department and high-level CIA. One guy is paid 320,000 a year on the payroll of Soros. He doesn't just get money from Soros, he personally is paid 320 a year, and then he is there—CIA…State Department—and he is on the news. And when people pointed out who he was, they took his name off the State Department website and stuff, but Google has all the shots of it. I mean it's like whoa, whoa—CIA? Your senior guys? Like you're so stupid—on TV, "oh I saw 'em run over, I saw the racists, I saw the white supremacists attack, oh I'm the guy being interviewed first, putting out the talking points: this is the downfall of Trump, this is the beginning…." He worked for Podesta too, John Podesta. I'll give you his name and stuff, we're gonna play a video of him on the news. They had him first on every newscast, just here he is, bring him up, "I'm just a witness, [garbled], ha ha yeah ha ha yeah."

*Id.* ¶¶ 104.[5]

After an advertisement, the video plays a narration of an article by reporter Baxter Dmitry of Yournewswire.com.[6] The article reports comments by a Charlottesville police officer that police were instructed not to intervene with protestors, preventing them from keeping the peace—an account confirmed by reporters on the scene. Dmitri's article notes that Charlottesville Mayor Michael Signer has "ties to Barack Obama and John Podesta"—Signer worked for Podesta on President-Elect Barack Obama's State Department Transition Team—and that the witness interviewed by MSNBC and other outlets, Gilmore, "worked in Africa as a State Department foreign officer under Hillary Clinton" and "is currently Chief of Staff for Tom Perriello, who is running for Governor of Virginia and received $380k from George Soros." Dmitri's article asks whether it is a coincidence that Gilmore is a "State Department insider with a long history of involvement in psy-ops" and states that "his information was suddenly removed from State Department websites." Compl. ¶ 105.

_____

[5] The full video is available at https://www.youtube.com/watch?v=52C5-GplKxg. Compl. ¶ 102.

[6] The narration is a verbatim recitation of Dmitri's article, which links to additional supporting sources. Baxter Dmitry, Police: Charlottesville Was 'Inside Job' To Ignite Race War, https://yournewswire.com/charlottesville-inside-job/. Likewise, the Court may take notice of this publication. *Phillips*, 190 F.3d at 618.

According to Gilmore, Jones's words false imply "that Mr. Gilmore participated in a State Department/CIA operation to stage the violence and Fields' car attack in Charlottesville" and "falsely brand Mr. Gilmore as a party to a criminal conspiracy and murder." Compl. ¶¶ 109, 113. Count 8 of the Complaint alleges that these remarks are defamatory per se because "they falsely impute to Mr. Gilmore the commission of a criminal offense involving moral turpitude— in this instance that Mr. Gilmore, as a CIA operative, planned or participated in" the car attack in Charlottesville on August 12, 2017. *Id*. ¶ 264. Two additional counts are relevant here. Count 1 is a general defamation claim, against all Defendants, that does not seek additional liability against the Free Speech Defendants beyond Counts 7 and 8. Compl. ¶¶ 204–15. Count 10 is a claim for intentional infliction of emotional distress against all Defendants. *Id*. ¶¶ 283–93.

## ARGUMENT[7]

**I.     The Court Lacks Personal Jurisdiction Over the Free Speech Defendants**

It is Gilmore's burden to make a *prima facie* showing in support of jurisdiction, *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016), and "conclusory allegations" that do not satisfy the *Iqbal/Twombly* standard are insufficient. *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 775 F. Supp. 2d 790, 799 (D. Md. 2011). Whether Gilmore has carried that burden is a question of law for the Court. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

**A.     The Court Lacks General Jurisdiction Over the Free Speech Defendants**

The Complaint fails to allege conduct in Virginia "so 'continuous and systematic' as to render [the Free Speech Defendants] essentially at home in the forum." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). "For an individual, the paradigm forum for

---

[7] To survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678.

the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home"—that is, the "domicile, place of incorporation, and principal place of business." *Id.* at 924. In *Daimler AG v. Bauman*, the Supreme Court held that even "a substantial, continuous, and systemic course of business" is not sufficient to render a business "at home" in a forum state. 571 U.S. 117, 138 (2014); *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199–1200 (4th Cir. 1993) (no general jurisdiction despite a foreign-state defendant's numerous contacts with the forum state, including employing forum-state residents, and holding meetings annually and earning millions annually in revenues in the forum state).

Gilmore alleges that the Free Speech Defendants are foreign to Virginia, all residing in Texas but for McAdoo, who resides in Florida, and carrying on their business in Texas. Compl. ¶¶ 14–16, 18; *see also* Declarations of Alexander Jones ¶¶ 2–9, Lee Ann McAdoo ¶¶ 3–9; Tim Fruge ¶¶ 3–12. Accordingly, his vague and conclusory allegations that *all* of the Defendants—including individuals like Jones and McAdoo who are not themselves businesses—conduct website advertising in Virginia, attract some unknown amount of Internet traffic from Virginia, and might earn revenue from selling products from Virginia residents do not suffice to render the Free Speech Defendants "at home" in Virginia and so do not support general jurisdiction over them. *See ALS Scan, Inc. v. Digital Serv. Consultants*, 293 F.3d 707, 712 (4th Cir. 2002) (declining "to recognize that a State may obtain general jurisdiction over out-of-state persons who regularly and systematically transmit electronic signals into the State via the Internet").

### B. The Court Lacks Specific Jurisdiction Over the Free Speech Defendants

Specific jurisdiction also does not exist where the defendant "simply places information on the Internet." *ALS Scan, Inc.*, 293 F.3d at 714. Instead, the defendant must "direct[] electronic activity into the State" with "the manifested intent of engaging in business or other interactions within the State." *Id.* Like this case, *Young v. New Haven Advocate* involved defamation claims against foreign-state news outlets that reported on Virginia events and residents in news articles accessible via the Internet here and allegedly causing reputational injury in the Commonwealth.

8

315 F.3d 256, 261–62 (4th Cir. 2002). Just as here, the plaintiff argued that the district court had specific jurisdiction over the defendants because "(1) the [defendants], knowing that Young was a Virginia resident, intentionally discussed and defamed him in their articles, (2) the [defendants] posted the articles on their websites, which were accessible in Virginia, and (3) the primary effects of the defamatory statements on [the plaintiff's] reputation were felt in Virginia." *Id*.; *compare* Compl. ¶¶ 4–6. The Fourth Circuit disagreed, because the challenged articles did not "manifest an intent to target and focus on Virginia readers." 315 F.3d at 263. In particular, they did not "contain[] advertisements aimed at a Virginia audience." *Id*. at 263–64. On that basis, it reversed the district court's finding of specific jurisdiction. *Id*.

Gilmore's jurisdictional allegations are indistinguishable from those in *Young*. He alleges that the events that were the subject of the challenged statements took place in Virginia, Compl. ¶ 4, that the Free Speech Defendants knew he was a Virginia resident, *id*. at ¶ 5, and that his reputation was injured in Virginia, *id*. at ¶ 6, but *Young* instructs that those precise allegations are insufficient to support specific jurisdiction. Moreover, as in *Young*, none of the website pages that Gilmore "placed in the record," 315 F.3d at 263, contain advertisements for Virginia businesses or services. *See* Compl., Exs. F, G; *see also* Fruge Decl. ¶ 12 (Infowars does not target advertising to a Virginia audience). Although Gilmore asserts (at ¶ 5) that the Free Speech Defendants' statements concerned matters of particular interest to a Virginia audience, elsewhere his complaint acknowledges that the Charlottesville protests were a story of national and even international interest. Compl. ¶¶ 33–34. Infowars, as Gilmore alleges, is not itself aimed at a Virginia audience but is "among the most popular websites in the United States" Compl. ¶ 123, and its challenged publications "were addressed to a nationwide audience…and had no special appeal for Virginia readers," such that their subject matter does not support specific jurisdiction. *FireClean, LLC v. Tuohy*, 2016 WL 3952093, *7 (E.D. Va. July 21, 2016) (rejecting jurisdiction where Internet publication with national audience allegedly defamed Virginia-resident business).

In sum, Gilmore has failed to carry his burden of demonstrating that this Court may assume power over the out-of-state Free Speech Defendants.

## II.      Texas Law Governs Gilmore's Claims Against the Free Speech Defendants

For tort actions such as defamation, "Virginia applies the doctrine of lex loci delicti, meaning the law of the place of the wrong governs all matters related to the basis of the right of action." *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006). Defamation and intentional infliction of emotional distress are torts and the "word 'tort' has a settled meaning in Virginia," referring to "a wrongful act" or "the violation of some duty owing to the plaintiff." *Buchanan v. Doe*, 431 SE 2d 289, 291–92 (Va. 1993) (quoting *Glisson v. Loxley*, 235 Va. 62, 67, 366 S.E.2d 68, 71 (1988)) (quotation marks omitted). And for torts, "Virginia clearly selects the law of the place where the wrongful act occurred, even when that place differs from the place where the effects of injury are felt." *Milton v. IIT Research Institute*, 138 F.3d 519, 522 (4th Cir. 1998). Here, the alleged wrongful acts or violations of duty were the publications of the challenged statements, which took place in Texas, *see* Compl. ¶¶ 14–16, making that the place of the wrong. *See Kylin Network (Beijing) Movie & Culture Media Co. Ltd v. Fidlow*, 2017 WL 2385343, at *3 n.2 (E.D. Va. June 1, 2017) (expressing "skepticism" toward argument that Virginia law applied in similar circumstances). Accordingly, Texas law governs.[8]

## III.     Gilmore's Defamation Claims Are Meritless and Should Be Dismissed for Failure To State a Claim Upon Which Relief May Granted

Under Texas law, the elements for libel are (1) publication of (2) a defamatory statement with (3) the requisite intent. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).[9]

### A.      The Challenged Statements Lack Defamatory Meaning

"A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury." *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 426 (Tex. App. 1997), *writ denied* (June 5, 1998). "A statement may be false,

---

[8] Decisions applying Virginia law, which is, in general, materially identical on these issues, are alternatively cited herein. The First Amendment limits equally the reach of Texas and Virginia law.

[9] To be actionable under Virginia law, (1) a statement must contain a "provably false factual connotation," (2) must be "of or concerning" the plaintiff, and (3) must "tend[] to harm the reputation [the plaintiff]," that is, it must have a defamatory meaning. *WJLA–TV v. Levin*, 564 S.E.2d 383 (2002); *Gazette, Inc. v. Harris*, 325 S.E.2d 713 (1985); *Chapin*, 993 F.2d at 1092.

abusive, unpleasant, and objectionable [to the plaintiff] without being defamatory." *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 511 n.6 (Tex. App. 2008). Whether a statement is "reasonably capable of a defamatory meaning" is "a question of law to be decided by the trial court." *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987). A statement may have defamatory meaning directly (e.g., "John is a leper.") or by implication (e.g., "John has been sent to the leper colony."). *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 591–92 (Va. 1954). As Gilmore alleges both types of defamation, each is addressed in turn.

### 1.  The Challenged Statements Are Not Defamatory on Their Face

The "plain and natural meaning" of the challenged statements disposes of any claim that they directly defame Gilmore. *Carwile*, 82 S.E.2d at 591–92; *see also Overstreet v. Underwood*, 300 S.W.3d 905, 910 (Tex. App. 2009).

McAdoo interviewed Stranahan, and Stranahan's comments speak for themselves. The only statements in the interview directly concerning Gilmore are that he has a "Twitter page," wrote on Twitter that the woman killed at the Charlottesville protest was a "martyr," and identified himself as being with the State Department. Compl. ¶ 84. In addition to being true, which Gilmore concedes, *id*. ¶¶ 13, 32, these things bear no conceivable defamatory meaning.

The same is true of the Jones commentary. To begin with, Jones's statement that "[t]hey had known CIA and State Department officials in Charlottesville, first tweeting, first being on MSNBC, CNN, NBC" is, as Gilmore concedes, literally true, in that he was a State Department official, was in Charlottesville, and discussed the events there on Twitter and on television. Compl. ¶¶ 13, 32–35. Even if these statements were false, they could not be defamatory as they could not conceivably injure Gilmore's reputation. Gilmore contends—citing Wikipedia—that the statement that "[e]verybody is a cut-out" amounts to an assertion "that Mr. Gilmore was involved in [a] treasonous act of espionage and deceit," Compl. ¶¶ 104 n.62, 110. But the Wikipedia definition—"a mutually trusted intermediary, method or channel of communication that facilitates the exchange of information"— does not fit Jones' statement or support Gilmore's heavy-

handed interpretation of that statement as an accusation of treason. Indeed, it is not apparent what *literal* meaning "cut-out" even has in this context or that the "cut-out" statement even concerns Gilmore, given that Jones qualifies that it is limited to "the major players."

Likewise, the most that Jones's subsequent statements might be understood to directly say about Gilmore is that he works for the CIA or State Department, that he has received money from George Soros, that he has worked for John Podesta, and that he delivered consistent anti-Trump talking points in his many television interviews instituted as a consequence of Gilmore's insinuating himself and his political views into the media coverage. Compl. ¶ 104. It is not apparent that these all concern Gilmore; the Podesta statement, for example, references Charlottesville's mayor. But, in any instance, none of these things are defamatory as to Gilmore, because none of them would "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (quotation marks omitted). Even taken together and when considering the publications as a whole, the statements do not convey a defamatory meaning. *See Delta Air Lines*, 949 S.W.2d at 426.

### 2. The Challenged Statements Do Not Assert by Implication That Gilmore Is Party to Some Kind of Criminal Conspiracy

Gilmore also contends that the statements assert by implication that he is involved in a criminal conspiracy of some kind. When a plaintiff alleges defamation by implication, the court must make "'a single objective inquiry: whether the [publication] can be reasonably understood as stating' the meaning the plaintiff proposes." *The Dallas Morning News, Inc. v. Tatum*, Slip. Op. at 20, No. 16-0090 (Tex. May 11, 2018). Where "the statement cannot properly be construed as ambiguous nor in the ordinary and proper meaning convey a defamatory interpretation, such meaning cannot be enlarged by claims of innuendo." *Overstreet*, 300 S.W.3d at 910; *Webb v. Virginian-Pilot Media Companies, LLC*, 752 S.E.2d 808, 811 (Va. 2014) ("The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but *it can not introduce new matter, nor extend the meaning of the words used, or make that certain*

*which is in fact uncertain*." (emphasis added and quotation marks omitted)). Moreover, "because the [C]onstitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author also intends or endorses the inference." *Chapin*, 993 F.2d at 1093 (footnote omitted).

As for the Stranahan interview, the challenged statement says absolutely nothing about what Gilmore alleges it implies, which is that he "planned or participated in James Alex Fields, Jr.'s car attack in Charlottesville on August 12, 2017, which killed one person and injured many others, as part of a conspiracy to stage a 'coup' and overthrow a sitting president." Compl. ¶ 248. Stranahan says nothing of the sort. Gilmore's interpretation of Stranahan's statements is exactly the kind of attempt to "introduce new matter" and "make that certain which is in fact uncertain" which is forbidden. *Webb*, 752 S.E.2d at 811; *see also Overstreet*, 300 S.W.3d at 910; *CACI Premier Tech. Inc. v. Rhodes*, 536 F.3d 280, 303 (4th Cir. 2008) (no implication claim where talk radio host named military contractor in an "open-ended list of potential targets for investigation [for torture and murder] without assigning blame to any particular contractor"). Stranahan's comments do not state or imply that Gilmore took any action other than posting on Twitter with a perceived anti-Trump spin.

Moreover, the language on which Gilmore fixates—"They, uh, they win no matter what they do. Are they trying to get a coup? I think clearly they are."—does not even concern him, as required. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) (defamatory statement must be "concerning the plaintiff"). The "they" at issue is expressly identified earlier in the interview by Stranahan as the people behind the "Occupy," "Black Lives Matter," and "Antifa" (or "Anti-Fascist") movements, which Stranahan describes collectively as the "Peace and Justice Movement." Compl. ¶ 87 n.48 (citing and linking to complete publication). Gilmore, however, is not a member of that movement—he describes himself as simply a "concerned resident," Compl.

¶ 27—and Stranahan does not identify him as a member of that movement. In any event, Strana-han allows that most members of that movement are mere "dupes" who have "no idea" about the movement's purposes and means. Compl. ¶ 87 n.48.[10]

Moreover, even if the group referred to as "they" in Stranahan's commentary is taken to reference Gilmore, what follows—that the same "they" "[a]re trying to get a coup" and that they will "settle for impeachment" or will "settle for smearing Trump and his supporters so much that they'll be able to elect another elitist"—makes clear the statement is hyperbolic political invec-tive, not a literal accusation that someone is plotting a putsch. Compl. ¶ 84. The statement is the kind of "hyperbolic characterization" that any listener would recognize as "exaggerated rhetoric intended to spark the debate." *CACI*, 536 F.3d at 301 (so finding with respect to talk radio host's statements that military contractor "torture[s] people" and is staffed with "hired killers").

The claim regarding Jones's commentary fails for the same reasons. Gilmore alleges that Jones asserted by implication that he "participated in a State Department/CIA operation to stage the violence and Fields' car attack in Charlottesville" and so is "a party to a criminal conspiracy and murder." Compl. ¶¶ 109, 113. The problem is that Jones no more accuses Gilmore of these things than of participating in a conspiracy to fake the moon landing or to facilitate a takeover of the government by space aliens. The only action that Jones said Gilmore took was going on TV to parrot anti-Trump "talking points." Compl. ¶ 104. The rest of the alleged defamatory connotation is Gilmore's own invention, created to prop up his implausible legal claims. Jones

_____

[10] Gilmore's claim against McAdoo is baffling, given that the extent of her communicative con-duct challenged by Gilmore is that she (in his characterization) "nods comprehendingly, laughs," in response to Stranahan and later responded "Absolutely" when Stranahan asked her whether she understood his remarks. Compl. ¶ 84. Preposterously, Gilmore alleges that these "discourse markers"—words and actions that facilitate the flow of a conversation like an interview without having any semantic content—"falsely convey to the audience that Mr. Gilmore's tribute to a woman who died in the traumatizing attack that he and other bystanders witnessed indicates that he was actually a knowing participant in a Soros-sponsored conspiracy to stage violence and cre-ate a martyr—Heather Heyer—for their cause." Compl. ¶ 84. In reality, McAdoo's challenged communicative conduct had no semantic content and certainly did not indicate that she "intends or endorses" a conspiracy theory that Stranahan never even espoused. *Chapin*, 993 F.2d at 1093.

14

said nothing about inciting violence or any murder plot, and so it is impossible to find that Jones "intends or endorses" Gilmore's conspiracy theories. *Chapin*, 993 F.2d at 1093.

## B.     The Challenged Statements Are Not Materially False

Gilmore has failed to make plausible allegations of material falsity with respect to each of the actual challenged statements. A "plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." *Chapin*, 993 F.2d at 1092. If the gist or "sting" of a statement is substantially true, "minor inaccuracies will not give rise to a defamation claim." *AIDS Counseling & Testing Centers v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990). And, under the First Amendment, a statement "is not considered false" and thus actionable "unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991).

As to the Stranahan interview, Gilmore does not allege that any of the assertions in the lengthy transcript excerpt he challenges are false. Instead, he simply insists that it would be false to state that he was involved in some kind of government conspiracy to kill a protestor and overthrow the government, *e.g.*, Compl. ¶¶ 84–86, but that is neither what Stranahan said nor the natural meaning or implication of Stranahan's words. As to Jones's commentary, Gilmore is unable to identify any *material* falsehoods. He alleges that it is false to contend that he works for the CIA, that he has worked in the "individual offices of President Obama and Secretary Clinton," that he is compensated by George Soros, and that he has ever worked for John Podesta.[11] Compl. ¶¶ 106–07. Gilmore disputes those contentions, but not in a way that would make them *materially* false, because there is no defamatory sting associated with any of them. If the statement that "[e]verybody is a cut-out," even applies to Gilmore, at most it indicates that Jones disapproves his advocacy, which Gilmore does not dispute and touts as a badge of honor. These are not materially false statements of fact.

---

[11] Jones's commentary did not state or imply all of these things—for example, Jones said nothing about Gilmore working in President Obama's or Secretary Clinton's "individual office."

**C.      The Challenged Statements Are Protected Commentary on the Facts, Not Statements of Verifiable Fact**

Gilmore's claims also fail because they seek to suppress commentary on the news that consists of opinion phrased in hyperbolic language, not verifiable fact. The First Amendment "provides protection for statements that cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co.*, 497 U.S. 2, 20 (1990) (quotation marks omitted). Thus, "a pure expression of opinion is protected because it fails to assert an actual fact. Rhetorical hyperbole, in contrast, might appear to make an assertion, but a reasonable reader or listener would not construe that assertion seriously." *Schnare v. Ziessow*, 104 F. App'x 847, 851 (4th Cir. 2004); *see also CACI*, 536 F.3d at 293 (similar). Whether a statement asserts a provably false fact is a question of law for the Court. *CACI*, 536 F.3d at 293–94. The Court must consider "the context and general tenor of the article," including the use of "loose, figurative or hyperbolic language which would negate the impression that the speaker was stating fact." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (quotation marks omitted).

Stranahan's interview expresses his opinion about the efforts to spin the events in Charlottesville. He discloses the underlying facts—Gilmore posted his video to Twitter, labeled the young woman hit by the car a "martyr," and works for the State Department—and they are not disputed. The rest is nothing more than Stranahan's take on the facts, and "no reasonable reader would consider [that] anything but the opinion of the author drawn from the circumstances related." *Chapin*, 993 F.2d at 1093 (holding opinion based on disclosed fact non-actionable).

That conclusion is only reinforced by the context. Infowars is the freewheeling Internet offshoot of Alex Jones's show on talk radio, itself a "medium…in which hyperbole and diatribe reign as the preferred tools of discourse. Such expression, though not infrequently caustic and offensive, nevertheless enjoys robust First Amendment protection." *CACI,* 536 F.3d at 304 (Duncan, J., concurring). Viewers of Infowars videos would see that, just like in talk radio, Jones and his team use a documentary style with little editing and few revisions or cuts. This raw, uncut style sets the audience's expectation about the nature of the reporting and the editing polish that

16

go into a given segment, informing them that what's offered is fresh, unvarnished, and often off-the-cuff commentary on the news of the day. Viewers would also expect an interview or monologue to be more free-flowing and opinionated and less precise in its use of language than an article or book. That is especially the case for an interview or monologue on Infowars, a website where "readers expect to find spirited critiques" of the media's coverage of current events, among other things. *Moldea v. New York Times Co.*, 22 F.3d 310, 311 (D.C. Cir. 1994) (discussing book-review context); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 625 (D.C. Cir. 2001) (statement that politician suffered "paranoia" was non-actionable given "well-understood context" of magazine commentary). The conclusion is further reinforced by the use of hyperbole in the quip that President Trump's opponents are seeking a "coup" (along with their more realistic objectives, such as "impeachment," "smearing Trump," and voting him out of office). Such loose, hyperbolic language has a long history in U.S. politics and has consistently been held to be protected opinion; indeed, the word "coup" is rather tame. [12]

The same holds true for Jones's commentary. Jones saw the same government official pop up in all the news reports and news broadcasts as a witness to the events in Charlottesville and deliver the same anti-Trump "talking points" every time. Compl. ¶ 104. That aroused his suspicion, which he expressed off-the-cuff in the passionate, hyperbolic, over-the-top style that is characteristic of his radio show and videos. Any viewer would recognize that as his opinion, because that is what they know to expect from Alex Jones: providing a different take on the news of the day by connecting reported facts in unexpected and illuminating ways. Jones's colorful

---

[12] *Compare, e.g.*, *Williams v. Town of Greenburgh*, 535 F.3d 71, 77 (2d Cir. 2008) ("Junior Mussolini"); *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 567, 569 n.6 (1999) (project proposal was a "veritable Brooklyn Bridge of misrepresentations"); *Dunn v. Ganett N.Y. Newspapers, Inc*., 833 F.32d 446, 454 (3d Cir. 1987) (Hitler and Castro); *Koch v. Goldway*, 817 F.2d 507–10 (9th Cir. 1987) (comparison to Nazi war criminal); *Buckley v. Littell*, 539 F.2d 882, 893–94 (2d Cir. 1976) ("'fascist,' 'fellow traveler' and 'radical right'"); *Yeager v. Local Union 20*, 453 N.E.2d 666, 667, 669 (Ohio 1983) (a "Little Hitler" operating "a Nazi concentration camp" using "Gestapo" tactics).

language drives the point home: "cut out," "useful idiots," "useless idiots," "whoa, whoa," etc.[13]

### D. Gilmore Does Not Plausibly Allege Actual Malice

Having enthusiastically thrust himself into public debate, it is Gilmore's burden to make plausible allegations of actual malice. He is unable to do so.

### 1. Gilmore Is At Least A Limited Purpose Public Figure

The actual malice standard applies because Gilmore is, at a minimum, a limited-purpose public figure. When "an individual voluntarily injects himself or is drawn into a particular public controversy," he "thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Gilmore satisfies each of the relevant five factors: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation." *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994). This inquiry is a question of law for the Court. *Id.* at 1551.[14]

First, Gilmore has extensive "access to channels of effective communication." Through his Twitter account, he can reach hundreds of thousands or even millions of readers. *See, e.g.,*

---

[13] Of course, Gilmore knows that people use words this way because he does too. According to Gilmore's Twitter feed, for example, President Trump is the "leader of [U.S.] white supremacists" and Virginia Republicans are guilty of "[c]riminal negligence." Those charges are tame compared to his accusations against Dominion Energy, with which he is strangely obsessed, of serious crimes. In January he reported, "Corporate public utilities are literally stealing your money and drafting the laws that allow them to do so." That's "literally," not figuratively or metaphorically. Lest there be any doubt about who's doing the "stealing," he followed up three days later with a report that "Dominion Energy is stealing your money ($400 million in just two years of unrefunded overcharges) and using it to buy off legislators so that it can steal more." More recently, he has leveled the serious accusation that there is "staggering legalized corruption in Virginia politics, led by @DomEnergyVA [i.e., Dominion Energy]." No one would take this kind of invective as anything other than Gilmore spouting off, and not as an accusation of literal criminal conduct. https://twitter.com/brennanmgilmore.

[14] Gilmore is also a public official, as he acknowledges. Compl. ¶ 13.

Compl. ¶ 32. He receives "media requests from national, local, and international outlets," including the *New York Times*, and has appeared on "multiple television news networks and other news media." *Id*. ¶¶ 33–34. Indeed, Gilmore launched this lawsuit with a massive media blitz, including coverage in the *Washington Post* (which also published an op-ed by Gilmore). Just the media channels identified in the Complaint (at ¶¶ 33–35) exceed those held sufficient in *Hatfield v. The New York Times Co.*, 532 F.3d 312, 322 (4th Cir. 2008).

Second and third, Gilmore concedes that he voluntarily assumed a role in a public controversy—the meaning of the events in Charlottesville—and that he sought to influence the outcome of that controversy. Compl. ¶ 31 (Gilmore posted video to disprove that "the incident was something other than a deliberate attack");; Orig. Compl. ¶ 31 (Gilmore "spoke with multiple television news networks and other news media" so that he could "convey the seriousness and certainty of what he had seen and condemn the hate-filled display and violence at the 'Unite the Right' rally"). Fourth, Gilmore specifically alleges that the controversy over the meaning of the events in Charlottesville existed before the publication of Stranahan's interview and Jones's commentary. Compl. ¶¶ 34–82. Fifth, the publications occurred within days of the events in Charlottesville, while the controversy over them still raged, such that Gilmore, as a witness to those events and continuing commentator on them, remained a public figure. *Id*. Accordingly, Gilmore is at least a limited purpose public figure.[15]

### 2. Gilmore Does Not Plausibly Allege Actual Malice or Any Other Degree of Intent

Gilmore's ultimate burden is to "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of the United States, Inc.*, 466

---

[15] In addition, should Virginia law apply, Virginia's anti-SLAPP statute also requires Gilmore to demonstrate actual malice. *See* Va. Code § 8.01-223.2(A). Because Gilmore's defamation claims against the Free Speech Defendants concern matters of public concern subject to First Amendment protection, they are immune. To overcome that immunity, Gilmore must prove that those statements were "made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false," a burden he cannot meet. *See* Section III.D.2

U.S. 485, 511 n.30 (1984). Under *Iqbal* and *Twombly*, first, allegations must be more than conclusory or else they will be disregarded. *Twombly*, 550 U.S. at 557. Second, allegations must be sufficient "to raise a right to relief above the speculative level," *id*. at 555, including sufficient facts to state a claim that is "plausible on its face," *id*. at 570. This requires that the plaintiff do more than "plead[] facts that are merely consistent with a defendant's liability"; the facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In assessing plausibility, the Fourth Circuit has explained that factual allegations must be disregarded when they do not identify a sufficient "factual basis" and are instead "'naked assertion[s] devoid of further factual enhancement.'" *McCleary-Evans v. Maryland Dep't of Transp*., *State Highway Admin.*, 780 F.3d 582, 585–86 (4th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).

Certain of Gilmore's allegations concerning the Free Speech Defendants' intent are plainly conclusory, merely reciting the elements of the actual malice standard. *See* Compl. ¶¶ 210, 246, 263 (reciting actual malice standard); *see also* ¶¶ 96, 118 (stating that the Free Speech Defendants "deliberately distorted the facts and their context"). These allegations must therefore be disregarded. *See Mayfield v. National Ass'n for Stock Car Auto Racing, Inc*., 674 F.3d 369, 378 (4th Cir. 2012) (rejecting as "entirely insufficient" an allegation "that [defendants] statements 'were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity'").[16]

The remainder of Gilmore's allegations are the kind of "naked assertions devoid of further factual enhancement" that cannot support the plausibility of Gilmore's assertion that the Free Speech Defendants subjectively knew or entertained serious doubt as to the truth of the

---

[16] *See also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56–57 (1st Cir. 2012) (affirming dismissal where complaint only used "actual-malice buzzwords"); *Hanks v. Wavy Broad., LLC*, 2012 WL 405065, at *13 (E.D. Va. Feb. 8, 2012) ("Merely pleading the standard for actual malice in the Complaint without more is insufficient to state a claim.").

challenged statements. First, Gilmore's allegations that the Free Speech Defendants failed to investigate the factual bases of their statements is both conclusory and rebutted by the materials cited in Gilmore's Complaint. *See* Compl. ¶¶ 93–96; 114–18. Although Gilmore would know if he did not speak with the Free Speech Defendants, he has no factual basis to allege that they did not "investigate" and "conducted no research" (¶¶ 93, 114), did not "reach out…to other individuals…for comment" (¶¶ 94, 115), and did not identify other sources or fact-check (¶¶ 95, 117). Those allegations are purely conclusory and lack any factual basis. Moreover, these allegations are contradicted by the challenged publications themselves. For example, Stranahan cites a wealth of primary and secondary sources concerning the subjects of his interview, and Jones (as described above) included in his commentary an entire article by Baxter Dmitri that, in turn, relies upon, links to, and quotes a variety of primary and secondary sources. The publications themselves indicate that Stranahan and Jones did consult various sources that then formed the factual backdrop for their commentary. Regardless, "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish [actual malice]." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

Second, Gilmore's allegations (at ¶¶ 95, 117) that the Free Speech Defendants did not "update or correct any information about Mr. Gilmore" does not support a showing of actual malice because it is unaccompanied by any factual allegation that the Free Speech Defendants were ever prompted to reconsider their statements, such as by a request for correction. Third, Gilmore's allegations (¶¶ 98–99, 120–21) that the Free Speech Defendants were motivated to defame him to support a "preexisting narrative" and to avoid "admit[ting] that the Charlottesville attack was the act of a white supremacist" likewise amount to naked factual assertions and are, in any instance, contradicted by the challenged publications themselves and other materials of which the Court may take notice. For example, Stranahan stated that there were "white nationalists in Charlottesville" and spoke of "the white supremacists who were in Charlottesville." McAdoo stated that what happened in Charlottesville was that "the white terrorists mowed down some people" and specifically stated that the events in Charlottesville involved "all these racist

white nationalists." Alex Jones made clear, "I'm not saying that white supremacists don't exist. I'm saying they were there." These statements are significant because they contradict the defamatory implication alleged by Gilmore and therefore preclude any finding of actual malice. *Klayman v. City Pages*, 650 F. App'x 744, 751 (11th Cir. 2016) ("Evidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice.").

Gilmore's inflammatory assertion that Jones and Infowars are unwilling to admit that the Charlottesville attack was carried out by a white supremacist, out of some fealty to white supremacy, is refuted by Infowars' coverage in the days following the protests. Infowars described Heather Heyer as "a woman mowed down by a white supremacist who struck her with a vehicle"; described her as "a woman who was run over by a car driven by a white supremacist"; published, with favorable comment, her mother's statement that [Heyer] "was plowed down by a young man who was intent on spreading hate and thought hate would fix the world"; and published an article stating that "[w]hen the Dodge Charger of 20-year-old Nazi sympathizer James Alex Fields Jr., plunged into that crowd of protesters Saturday, killing 32-year-old Heather Heyer, Fields put Charlottesville on the map of modernity alongside Ferguson."[17] If there is a "preexisting narrative" at work here, it is entirely Gilmore's. Finally, Gilmore's allegation (at ¶¶ 100, 122) that the Free Speech Defendants demonstrated that they "entertain[ed] serious doubts about the veracity of their claims…by…disavowing the simplest (and factually accurate)

---

[17] Amber Randall, Antifa Protesters Crash Heather Heyer's Funeral, https://www.infowars.com/antifa-protesters-crash-heather-heyers-funeral/; Mother of Charlottesville Victim Thanks Trump for Words of "Comfort," https://www.infowars.com/mother-of-charlottesville-victim-thanks-trump-for-words-of-comfort/; Patrick J. Buchanan, If We Erase Our History, Who Are We?, https://www.infowars.com/buchanan-if-we-erase-our-history-who-are-we/. A "district court is entitled to take judicial notice of matters in the public record without converting the Rule 12(b)(6) motion into a motion for summary judgment." *Bannon v. Edgewater Medical Center*, 406 F. Supp. 2d 907, 919 n.16 (D.N.D. 2005); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contain[] certain information, without regard to the truth of their contents.");

explanation" that Gilmore was not involved in a criminal conspiracy is precisely the kind of "naked assertion devoid of further factual enhancement" rejected by the Fourth Circuit in *McCleary-Evans*. In sum, what's missing from Gilmore's allegations is the "something more" necessary to render plausible Gilmore's assertions of the Free Speech Defendants' intent.

## IV. Plaintiff's "Emotional Distress" Claim Should Also Be Dismissed

Gilmore's claim of intentional infliction of emotional distress ("IIED") is frivolous. To sustain an IIED claim, the plaintiff must plausibly allege four elements: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe." *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003); *see also Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991) (same under Virginia law and noting that such claims are "not favored"). Gilmore's claim fails for five independent reasons.

*First*, like the defamation claims, it is unsupported by a plausible allegation of actual malice, as the First Amendment requires. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988). *Second*, Gilmore fails to allege "extreme and outrageous" conduct. "To be extreme and outrageous, a defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Wal-Mart*, 121 S.W.3d at 740–41. But Gilmore alleges only that the Free Speech Defendants defamed him in two publications, and even those claims don't hold up. This is precisely the kind of "frivolous suit[]" where "mere hurt feelings are involved" and dismissal is therefore required. *Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006) (quotation marks omitted). *Third*, Gilmore fails to allege that the Free Speech Defendants knew "of a substantial certainty that emotional harm would befall" Gilmore. *Twyman v. Twyman*, 855 S.W.2d 619, 623 (Tex. 1993). *Fourth*, the Complaint indicates that the Free Speech Defendants' alleged conduct is not the proximate cause of Gilmore's asserted emotional distress. *See Milo v. Martin*, 311 S.W.3d 210, 222 (Tex. App. 2010). That asserted distress is, per Gilmore's own telling, the result of alleged threats and harassments made by third parties, not the Free Speech Defendants. Compl.

23

¶¶ 150–63. *Fifth*, "to maintain a claim for intentional infliction of emotional distress," Gilmore "was required to allege facts independent of [his] defamation claim," *Draker v. Schreiber*, 271 S.W.3d 318, 323 (Tex. App. 2008), but the two claims involve the same underlying allegations.

## V.     The Court Should Award the Free Speech Defendants Their Costs and Attorneys' Fees in Responding to this SLAPP Suit Brought To Harass Them

The Free Speech Defendants are entitled to dismissal and a cost and fee award under the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code § 27.001 *et seq*. The Act requires dismissal when "a legal action is based on…a party's exercise of the right of free speech" unless the plaintiff "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id*. §§ 27.003(a), 27.005(c). Because Gilmore's claims arise from the Free Speech Defendants' "communication made in connection with a matter of public concern," *id*. § 27.001(3), and those claims are (as shown above) legally defective, the Act requires dismissal. And that, in turn, entitles the Free Speech Defendants to an award of costs and fees, as well as "sanctions…sufficient to deter the party who brought the legal action from bringing similar actions." *Id*. § 27.009. Likewise, Virginia's anti-SLAPP statute provides that "[a]ny person who has a suit against him dismissed pursuant to the immunity provided by this section may be awarded reasonable attorney fees and costs." Va. Code § 8.01-223.2(B). The circumstances of this suit indicate that it is a SLAPP—a "strategic lawsuit against public participation"—brought with no possibility of success to harass and burden the Defendants. The purpose of the statute is to protect SLAPP targets from suffering the consequences of abusive litigation, and so a cost and fee award here would achieve that purpose.

An award of fees is warranted here to prevent Gilmore, a SLAPP perpetrator, from abusing the Court's authority over legal process to impose unjustifiable burdens on parties for the purpose of chilling their political advocacy. In addition, the following considerations further justify this request.

- *First*, the Complaint is deficient on its face. Its defamation claims are premised on wild-eyed extrapolations from fairly typical news and political commentary, for the purpose of punishing the Free Speech Defendants for what Gilmore views as their

"hateful agenda."

- *Second*, Gilmore and his attorneys neglect to mention that both Infowars publications they challenge (among other Infowars publications) acknowledge that Ms. Heyer was killed by a white supremacist, not some kind of plot involving Gilmore, contradicting the central claim of their case. At best, this suggests that they were so intent on harassing Jones and Infowars that they neglected to review the publications in full; at worst, they were well aware of what the publications said but ignored it in their zeal to launch this lawsuit and accompanying media blitz against Jones and Infowars.

- *Third*, the Complaint gratuitously swipes at Jones and InfoWars, amounting to a list of gripes and misrepresentations regarding events that have nothing to do with Gilmore, Charlottesville, or any topic of this suit. *E.g.*, Compl. ¶¶ 165–74. If Gilmore disagrees with Jones and Infowars, he has the right to speak out, but a court pleading is not the proper vehicle to do so. The inclusion of these extraneous and irrelevant allegations underlines that the Complaint is nothing more than a publicity vehicle for Gilmore and his advocacy.

- *Fourth*, the Complaint has no good-faith basis, in particular, to name McAdoo as a Defendant. It alleges no conduct on her part for which it seeks to impose liability, and Gilmore could have no basis to assert actual malice (or any degree of culpability) against a person who was merely interviewing the person who made the statement he challenges. Having baselessly dragged her into a lawsuit, Gilmore proceeded to gratuitously malign McAdoo by identifying her as a "reporter" in scare quotes. Orig. Compl. ¶ 17.

- *Fifth*, the Court should not overlook that Gilmore and his attorneys launched this lawsuit with a publicity blitz, taking every opportunity to insult Jones across major outlets in the mainstream media. Gilmore is using this Court for a publicity stunt against a political opponent. Far from being injured, Gilmore relishes in his role as an anti-Jones crusader, judging by his writings, his revelry on Twitter, the invocations in the Complaint itself, and his media statements.

- *Sixth*, a cost and fee award is required to avoid further abuses. Gilmore is represented by a legal clinic, and likely incurred no cost in bringing suit—to the contrary, he benefitted through widespread publicity. Even if this suit is dismissed, he still comes out on top, having gained public notice for himself and imposed costs on his targets. That is a terrible incentive and only encourages future SLAPP perpetrators.

For all these reasons, Gilmore should be required to compensate the Free Speech Defendants for having haled them into court without any legitimate basis to do so.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice and find that the Free Speech Defendants are entitled to an award of their costs and attorney fees.

May 22, 2018

Respectfully submitted,

TREMBLAY & SMITH, PLLC

BAKER HOSTETLER LLP

Thomas E. Albro (VSB #12812)
Evan D. Mayo (VSB #89383)
105-109 E. High Street
Charlottesville, VA 22902
Telephone: (434) 977-4455
Facsimile: (434) 979-1221
tom.albro@tremblaysmith.com
evan.mayo@tremblaysmith.com

*Counsel for Defendants Alexander E. Jones,
Infowars, LLC, Free Speech Systems, LLC
and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

/s/ Elizabeth A. Scully
Elizabeth A. Scully (VSB #65920)
Mark I. Bailen (*admitted pro hac vice*)
Andrew M. Grossman (*admitted pro hac vice*)
Richard B. Raile (VSB #84340)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
escully@bakerlaw.com
mbailen@bakerlaw.com
agrossman@bakerlaw.com
rraile@bakerlaw.com

*Counsel for Defendants Alexander E. Jones,
Infowars, LLC, Free Speech Systems, LLC
and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

WALLER LANSDEN DORTCH & DAVIS,
LLP

Eric J. Taube
100 Congress Avenue, Suite 1800
Austin, TX 78701
Telephone: (512) 685-6401
eric.taube@wallerlaw.com

Robb S. Harvey
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
robb.harvey@wallerlaw.com

*Of Counsel for Defendants Alexander E.
Jones, Infowars, LLC, Free Speech Systems,
LLC and Lee Ann McAdoo a/k/a Lee Ann
Fleissner*

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Elizabeth A. Scully
Elizabeth A. Scully (VSB #65920)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
escully@bakerlaw.com