# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

BRENNAN M. GILMORE,

                Plaintiff,

    v.

ALEXANDER ("ALEX") E. JONES;
INFOWARS, LLC, a Texas Limited Liability
Company; FREE SPEECH SYSTEMS, LLC, a
Texas Limited Liability Company; LEE
STRANAHAN; LEE ANN MCADOO A/K/A
LEE ANN FLEISSNER; SCOTT CREIGHTON;
JAMES ("JIM") HOFT; ALLEN B. WEST;
DERRICK WILBURN; MICHELE HICKFORD;
and WORDS-N-IDEAS, LLC,

                Defendants.

No. 3:18-CV-00017-NKM

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Elizabeth B. Wydra, admitted *pro hac vice*
Brianne J. Gorod, admitted *pro hac vice*
CONSTITUTIONAL ACCOUNTABILITY
  CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

Andrew Mendrala, Virginia Bar No. 82424
Aderson Francois, admitted *pro hac vice*
CIVIL RIGHTS CLINIC
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9065
andrew.mendrala@georgetown.edu

*Counsel for Plaintiff Brennan Gilmore*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 3

STANDARD OF REVIEW ................................................................................. 5

ARGUMENT ...................................................................................................... 5

I. THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO ARTICLE III OF THE CONSTITUTION AND 28 U.S.C. § 1332 BECAUSE THERE IS COMPLETE DIVERSITY AND THE AMOUNT IN CONTROVERSY EXCEEDS $75,000 .................................................................. 5

    A. There Is Complete Diversity of Citizenship Between the Plaintiff and Every Defendant ........................................................................................ 5

    B. The Amount in Controversy Exceeds $75,000 ............................................ 11

II. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS ........... 12

    A. This Court Can Assert General Personal Jurisdiction Over *Infowars*, *Free Speech Systems*, and Alex Jones .................................................................... 14

    B. This Court Can Assert Specific Jurisdiction Over All Defendants ................. 16

III. VIRGINIA LAW APPLIES TO GILMORE'S CLAIMS .......................................... 21

IV. GILMORE HAS STATED A CLAIM FOR DEFAMATION AGAINST EACH DEFENDANT ........................................................................................................ 22

    A. Gilmore Has Alleged That Defendants Made False Statements .................... 23

    B. Defendants' False Statements Were Defamatory ........................................... 36

    C. Gilmore Is Not a Public Figure, So He Must Show Only Negligence ........... 38

    D. Even If Gilmore Is a Public Figure, Gilmore Has Alleged Actual Malice ..... 42

V. GILMORE HAS STATED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST EACH DEFENDANT .................................. 46

VI. SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT PRECLUDE GILMORE'S CLAIMS ...................................................................... 48

i

Page(s)

VII.  UNDER EITHER TEXAS OR VIRGINIA LAW, GILMORE SHOULD NOT BE
REQUIRED TO PAY ATTORNEYS' FEES IF DEFENDANTS PREVAIL ........... 51

A.  Under Virginia Law, Gilmore Should Not Be Required To Pay Attorneys'
Fees .................................................................................................................... 51

B.  Under Texas Law, Gilmore Should Not Be Required To Pay Attorneys'
Fees .................................................................................................................... 53

CONCLUSION ...................................................................................................................... 55

Case 3:18-cv-00017-NKM-JCH   Document 70   Filed 06/19/18   Page 3 of 67   Pageid#: 1167

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ............................................................... 54

*AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*,
    903 F.2d 1000 (4th Cir. 1990)................................................................... 33

*Almy v. Grisham*,
    639 S.E.2d 182 (Va. 2007)........................................................................ 46

*ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*,
    293 F.3d 707 (4th Cir. 2002)................................................ 13, 14, 18, 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................. 3, 45

*Axel Johnson, Inc. v. Carroll Carolina Oil Co.*,
    145 F.3d 660 (4th Cir. 1998)...................................................................... 6

*Biospherics, Inc. v. Forbes, Inc.*,
    151 F.3d 180 (4th Cir. 1998)..................................................... 2, 26, 28, 34

*Briley v. United States*,
    2016 WL 5402216 (E.D. Va. Sept. 26, 2016) ........................................... 7

*CACI Premier Tech., Inc. v. Rhodes*,
    536 F.3d 280 (4th Cir. 2008)..................................................................... 43

*Calder v. Jones*,
    465 U.S. 783 (1984) ........................................................................ 2, 17, 18

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
    334 F.3d 390 (4th Cir. 2003)..................................................... 13, 16, 17

*Carr v. Forbes, Inc.*,
    259 F.3d 273 (4th Cir. 2001)..................................................................... 43

*Carwile v. Richmond Newspapers*,
    82 S.E.2d 588 (Va. 1954)..................................................................... 23, 24

*Castro v. Goggins*,
    2016 WL 7217282 (M.D.N.C. Dec. 12, 2016).......................................... 21

*CFA Inst. v. Inst. of Chartered Fin. Analysts of India*,
  551 F.3d 285 (4th Cir. 2009)......................................................... 13

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993)......................................... 23, 30, 36, 37, 38

*Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*,
  807 F.3d 553 (4th Cir. 2015)......................................................... 22

*Coastal Video Commc'ns., Corp. v. Staywell Corp.*,
  59 F. Supp. 2d 562 (E.D. Va. 1999)............................................... 15, 16

*Coles v. Carilion Clinic*,
  894 F. Supp. 2d 783 (W.D. Va. 2012)............................................... 47

*Coremetrics, Inc. v. Atomic Park.com, LLC*,
  370 F. Supp. 2d 1013 (N.D. Cal. 2005)............................................. 15

*Cutaia v. Radius Eng'g Int'l., Inc.*,
  2012 WL 525471 (W.D. Va. Feb. 16, 2012)......................................... 23

*Daniczek v. Spencer*,
  156 F. Supp. 3d 739 (E.D. Va. 2016)............................................... 48

*Dworkin v. Hustler Magazine, Inc.*,
  647 F. Supp. 1278 (D. Wyo. 1986) ................................................. 22

*English & Smith v. Metzger*,
  901 F.2d 36 (4th Cir. 1990)......................................................... 13

*Eramo v. Rolling Stone, LLC*,
  209 F. Supp. 3d 862 (W.D. Va. 2016)......................................... 42-43, 44

*FIREClean, LLC v. Tuohy*,
  2016 WL 3952093 (E.D. Va., July 21, 2016) ....................................... 20

*Fitzgerald v. Penthouse Int'l, Ltd.*,
  691 F.2d 666 (4th Cir. 1982)..................................................... 41-42

*Flippo v. CSC Assocs. III, L.L.C.*,
  547 S.E.2d 216 (Va. 2001)......................................................... 52

*Foretech v. Capital Cities/ABC, Inc.*,
  37 F.3d 1541 (4th Cir. 1994)..................................................... 39, 40

Case 3:18-cv-00017-NKM-JCH   Document 70   Filed 06/19/18   Page 5 of 67   Pageid#: 1169

**Page(s)**

*Foster v. Arletty 3 Sarl*,
278 F.3d 409 (4th Cir. 2002) ........................................................... 13

*Fryfogle v. First Nat. Bank*,
2009 WL 700161 (W.D. Va. Mar. 17, 2009) ................................... 21

*Fuste v. Riverside Healthcare Ass'n, Inc.*,
575 S.E.2d 858 (Va. 2003) ............................................................. 23, 26

*Gambelli v. United States*,
904 F. Supp. 494 (E.D. Va. 1995) ................................................... 6

*Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett*,
2015 WL 5148732 (W.D.N.C. Sept. 2, 2015) ................................. 53

*Gazette, Inc. v. Harris*,
325 S.E.2d 713 (Va. 1985) ............................................................. 32, 38

*Gen. Steel Domestic Sales, LLC v. Chumley*,
2015 WL 4911585 (D. Colo. Aug. 18, 2015) ................................... 50

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ....................................................................... 2, 23, 28

*Goldwater v. Ginzburg*,
414 F.2d 324 (2d Cir. 1969) ........................................................... 45

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*,
541 U.S. 567 (2004) ....................................................................... 5-6

*Hall v. Nestman*,
2015 WL 3948158 (W.D. Va. June 29, 2015) ................................. 7

*Harbourt v. PPE Casino Resorts Md., LLC*,
820 F.3d 655 (4th Cir. 2016) ........................................................... 5

*Hatfill v. Foster*,
415 F. Supp. 2d 353 (S.D.N.Y. 2006) ............................................. 21

*Hatfill v. N.Y. Times Co.*,
416 F.3d 320 (4th Cir. 2005) ........................................................... *passim*

*Hatfill v. N.Y. Times Co.*,
532 F.3d 312 (4th Cir. 2008) ........................................................... 41

Case 3:18-cv-00017-NKM-JCH   Document 70   Filed 06/19/18   Page 6 of 67   Pageid#: 1170

**Page(s)**

*In re Lipsky*,
   460 S.W.3d 579 (Tex. 2015) ........................................................................ 53, 54

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) .......................................................................................... 13

*Jenoff v. Hearst Corp.*,
   644 F.2d 1004 (4th Cir. 1981) ......................................................................... 40

*JTH Tax, Inc. v. Frashier*,
   624 F.3d 635 (4th Cir. 2010) ........................................................................... 12

*Katz v. Gladstone*,
   673 F. Supp. 76 (D. Conn. 1987) ................................................................ 21-22

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) .......................................................................................... 14

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ....................................................................... 11, 16

*Kylin Network (Beijing) Movie & Culture Media Co. Ltd v. Fidlow*,
   2017 WL 2385343 (E.D. Va. June 1, 2017) ..................................................... 21

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) .......................................................................................... 26

*McDonald v. Patton*,
   240 F.2d 424 (4th Cir. 1957) ........................................................................... 12

*McMillan v. McMillan*,
   253 S.E.2d 662 (Va. 1979) ............................................................................... 22

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990) .............................................................................................. 26

*Milton v. IIT Research Inst.*,
   138 F.3d 519 (4th Cir. 1998) ........................................................................... 21

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826 (1989) .......................................................................................... 11

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ........................................................................... 49

                                                                    **Page(s)**

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................ 23, 42

*Peanut Corp. of Am. v. Hollywood Brands, Inc.*,
    696 F.2d 311 (4th Cir. 1982) ............................................................... 13

*Perdue Foods LLC v. BRF S.A.*,
    814 F.3d 185 (4th Cir. 2016) ............................................................... 16

*Peterson v. Paddy*,
    2017 WL 2655854 (W.D. Va. June 19, 2017) ............................. 6-7, 8, 11

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*,
    829 F.2d 1280 (4th Cir. 1987) ........................................................ 24, 26

*Reuber v. Food Chem. News, Inc.*,
    925 F.2d 703 (4th Cir. 1991) ............................................................... 42

*Richmond Newspapers, Inc. v. Lipscomb*,
    362 S.E.2d 32 (Va. 1987) ................................................................... 38

*Rodarte v. Wal-Mart Assocs., Inc.*,
    2013 WL 1898999 (W.D. Va. May 6, 2013) ........................................ 23

*Rosenblatt v Baer*,
    383 U.S. 75 (1966) ............................................................................. 38

*Russo v. White*,
    400 S.E.2d 160 (Va. 1991) ................................................................. 48

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ........................................................................... 54

*Shrader v. Biddinger*,
    633 F.3d 1235 (10th Cir. 2011) .......................................................... 14

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ...................................................................... 42, 45

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
    303 U.S. 283 (1938) ...................................................................... 11, 12

*Time, Inc. v. Firestone*,
    424 U.S. 448 (1976) ........................................................................... 39

Case 3:18-cv-00017-NKM-JCH   Document 70   Filed 06/19/18   Page 8 of 67   Pageid#: 1172

**Page(s)**

*Tronfield v. Nationwide Mut. Ins. Co.*,
    636 S.E.2d 447 (Va. 2006) ........................................................... 36

*Walters v. McMahen*,
    684 F.3d 435 (4th Cir. 2012) ........................................................ 5

*Walter E. Heller & Co. v. Video Innovations, Inc.*,
    730 F.2d 50 (2d Cir. 1984) ........................................................... 22

*Walters v. McMahan*,
    684 F.3d 435 (4th Cir. 2012) ........................................................ 54

*Webb v. Nolan*,
    484 F.2d 1049 (4th Cir. 1973) ...................................................... 6

*Webb v. Nolan*,
    361 F. Supp. 418 (M.D.N.C. 1972) ............................................. 10

*Wells v. Liddy*,
    186 F.3d 505 (4th Cir. 1999) ........................................... 21, 40, 41

*Westlake Legal Grp. v. Yelp, Inc.*,
    599 F. App'x 481 (4th Cir. 2015) ................................................ 49

*Williams v. North Carolina*,
    325 U.S. 226 (1945) ................................................................ 6, 10

*Wis. Dep't of Corrs. v. Schacht*,
    524 U.S. 381 (1998) ...................................................................... 5

*WJLA-TV v. Levin*,
    564 S.E.2d 383 (Va. 2002) ........................................................... 23

*Womack v. Eldridge*,
    210 S.E.2d 145 (Va. 1974) ........................................................... 46

*Young v. New Haven Advocate*,
    315 F.3d 256 (4th Cir. 2002) ................................................. 19, 20

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ....................................................... 49

*Zupnik v. Assoc'd Press Inc.*,
    31 F. Supp. 2d 70 (D. Conn. 1998) ............................................. 21

Case 3:18-cv-00017-NKM-JCH   Document 70   Filed 06/19/18   Page 9 of 67   Pageid#: 1173

**Page(s)**

STATUTES

28 U.S.C. § 1332 ........................................................................................................... 11

47 U.S.C. § 230(c)(1) .................................................................................................... 49

47 U.S.C. § 230(f)(3) ..................................................................................................... 49

Tex. Civ. Prac. & Rem. Code § 27.001 ......................................................................... 51

Tex. Civ. Prac. & Rem. Code § 27.005(b) ..................................................................... 53

Tex. Civ. Prac. & Rem. Code § 27.005(b)(1) ................................................................ 53

Tex. Civ. Prac. & Rem. Code § 27.005(c) ..................................................................... 53

Tex. Civ. Prac. & Rem. Code § 27.009(a)(1) ................................................................ 55

Tex. Civ. Prac. & Rem. Code § 27.009(a)(2) ................................................................ 55

Tex. Elec. Code Ann. § 1.015(a) .................................................................................... 7

Tex. Elec. Code Ann. § 11.001(a)(1) ............................................................................. 7

Tex. Elec. Code Ann. § 11.002(a)(5) ............................................................................. 7

Tex. Elec. Code Ann. § 14.001(a) .................................................................................. 8

Tex. Elec. Code Ann. § 14.002(a) .................................................................................. 8

Tex. Elec. Code Ann. § 14.002(b) .................................................................................. 8

Tex. Elec. Code Ann. § 14.021 ....................................................................................... 8

Tex. Elec. Code Ann. § 15.022(b) .................................................................................. 8

Tex. Elec. Code Ann. § 15.051(a) .................................................................................. 8

Tex. Elec. Code Ann. § 15.053(a) .................................................................................. 8

Tex. Elec. Code Ann. § 15.081(a)(1) .............................................................................. 8

Va. Code Ann. § 8.01-223.2 ........................................................................................... 51

Va. Code Ann. § 8.01-223.2(A) ...................................................................................... 51, 52

Va. Code Ann. § 8.01-223.2(B) ...................................................................................... 52

Case 3:18-cv-00017-NKM-JCH   Document 70   Filed 06/19/18   Page 10 of 67   Pageid#: 1174

<u>OTHER AUTHORITIES</u>

The Alex Jones Channel, *Bombshell Connection Between Charlottesville, Soros, CIA*, YouTube (Aug. 15, 2017), https://www.youtube.com/watch?v=L58T2dl997A ........ 28-29

The Alex Jones Channel, *Dystopic Book Banning at Virginia School!*, YouTube (Dec. 1, 2016), https://www.youtube.com/watch?v=hFTXuV9miUI.................................. 15

The Alex Jones Channel, *Infowars Reporter Rallies Patriots in Chantilly, Virginia*, YouTube (June 3, 2017), https://www.youtube.com/watch?v=dbp0s2dstCw............ 16

Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. Mag. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html ............................................................ 15

*Crystal City*, WeLive, http://www.welive.com/dc (last visited June 19, 2018) ............. 10

*Domicile,* Black's Law Dictionary (8th ed. 2004)............................................................ 6

Lee Stranahan, Facebook, https://www.facebook.com/stranahan ................................... 9

Michael J. Gaynor, *What It's Like to Live in WeLive, Crystal City's 'Dorm for Adults'*, Washingtonian (May 19, 2017) ...................................................................... 10

*Identification Cards in Virginia,* DMV.org, https://www.dmv.org/va-virginia/id-cards.php#VA-ID-Card-Eligibility-Requirements ...................................................... 9

Gregory S. Schneider, *Northam Wins Democratic Gubernatorial Primary in Virginia*, Wash. Post (June 13, 2017), https://tinyurl.com/ycpvhvfg ......................................... 39

*Stranahan Strategies, LLC,* PayPal (last visited June 19, 2018), https://www.pay-pal.me/LeeStranahan ..................................................................................................... 9

*Skip Tracing Jobs and Training*, BountyHunterEdu.org, https://www.bountyhun-teredu.org/what-is-skip-tracing/ (last visited June 19, 2018) ...................................... 8

Case 3:18-cv-00017-NKM-JCH   Document 70   Filed 06/19/18   Page 11 of 67   Pageid#: 1175

# INTRODUCTION

In August 2017, Plaintiff Brennan Gilmore was distressed that neo-Nazis and white supremacists planned to hold a large rally near his home in Charlottesville, and so, like hundreds of other Virginia residents, he went to the rally to participate in a peaceful counter-protest. While there, he happened to see, and film on his cell phone, a car driving into a crowd of peaceful protesters, killing thirty-two-year-old Heather Heyer and injuring dozens of others. Horrified by what he had witnessed and convinced that others should know they might be in danger, Gilmore posted the video on Twitter. After it went viral, Defendants in this case authored and published articles and videos online claiming that Gilmore was part of an elaborate conspiracy to stage the events that took place that day in Charlottesville. They claimed that Gilmore participated first-hand in this conspiracy, and then subsequently conspired to cover it up, all as part of an attempt to overthrow the Trump Administration. As a result of Defendants' dissemination of these smears, Gilmore's reputation was irreparably tarnished, and he and his family faced months of death threats and harassment, both online and in person.

Gilmore now asserts claims of defamation and intentional infliction of emotional distress (IIED) against each Defendant. Gilmore alleges that each Defendant published false and defamatory statements about him in articles and videos they posted online, that they did so with reckless disregard of the truth (and certainly with negligence), and that these false statements directly and predictably caused Gilmore harm. Moreover, Gilmore alleges that Defendants' statements were outrageous and intentional, and that they caused extreme emotional distress.

Defendants move to dismiss the Amended Complaint on a variety of grounds, all of which are without merit. Most fundamentally, they invoke the First Amendment as a defense. But false statements are not protected by the Constitution. As the Supreme Court has recognized, "[n]either

1

the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Defendants also seek to minimize their statements as mere "opinion," but "[a]n unsupported opinion that implies defamatory facts . . . 'can cause as much damage to reputation' and may be just as actionable" as a false statement of fact, *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183 (4th Cir. 1998) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). Defendants' articles and videos asserted again and again that the Charlottesville events were staged by individuals hoping to overthrow the Trump Administration, and that Gilmore was a key player in that conspiracy. Defendants cannot present themselves as journalists reporting news and then absolve themselves of liability for the serious consequences of their reckless peddling of false and defamatory statements simply by claiming that they were giving their opinions.

Defendants also argue that this Court lacks jurisdiction to hold them liable for their defamatory statements, but these arguments are wholly without merit. Gilmore has alleged facts sufficient to show that there is diversity of citizenship between the parties and that the amount in controversy is greater than $75,000. Moreover, this Court can assert personal jurisdiction over every Defendant because their articles and videos were Virginia-focused—they concerned the activities of a Virginia resident at a Charlottesville event concerning a Virginia controversy—and they caused harm to Gilmore in Virginia. Virginia was "the focal point both of the story and of the harm suffered," *Calder v. Jones*, 465 U.S. 783, 789 (1984).

Defendants also suggest that if they are successful in dismissing this case, they deserve attorneys' fees and costs. But even assuming the state laws they cite apply in federal court, this Court has discretion to determine whether to award attorneys' fees and costs, and such an award

is inappropriate here where Gilmore in good faith presented what are, at minimum, colorable arguments that Defendants defamed him and caused intentional infliction of emotional distress.

Finally, Defendants repeatedly throughout their papers appear to contest the factual allegations of the Amended Complaint. But Defendants have chosen to file a motion to dismiss, and the Court at this stage must "assum[e] the factual allegations are true" and permit this case to proceed if "the plaintiff has stated a ground for relief that is plausible," *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009). To the extent Defendants wish to contest the factual allegations in the Complaint, they are free to do so at a subsequent stage of the litigation. However, applying the Rule 12(b)(6) standard, Gilmore has plainly stated plausible grounds for relief. For all these reasons, the Court should deny Defendants' motions to dismiss.

## STATEMENT OF FACTS

On August 12, 2017, hundreds of white supremacists and neo-Nazis gathered in Charlottesville, Virginia for a rally in response to a decision by the City Council to change the name of a city park from "Lee Park" to "Emancipation Park," and to remove a statue of Confederate General Robert E. Lee. Am. Compl. ¶ 25. This rally was countered by Charlottesville residents and other concerned individuals; Gilmore was among the peaceful counter-protesters. *Id.* ¶ 27.

Around 1:40 p.m. that day, Gilmore was filming a group of peaceful counter-protesters when James Alex Fields, Jr., a neo-Nazi sympathizer, deliberately drove his Dodge Challenger into the crowd, killing Heather Heyer, a thirty-two-year-old woman, and injuring dozens more. *Id.* ¶ 29. Believing that he had just witnessed a deliberate act of terror, Gilmore concluded that he should warn others about the violent and dangerous situation in Charlottesville. *Id.* ¶¶ 31-32. Gilmore therefore shared the video of the attack on Twitter, where it went viral. *Id.* As a result, Gilmore was contacted by several media and news outlets to provide an eyewitness account of the attack, and subsequently appeared on, or was quoted by, various television, print, and radio news

3

media outlets. *Id.* ¶¶ 33-34. None of these media appearances was solicited by Gilmore. *Id.* ¶ 35.

Less than a day after posting his video, Gilmore became the subject of various false and defamatory conspiracy theories by Defendants. *Id.* ¶ 36. On August 13, 2017, Defendant Creighton published an article falsely accusing Gilmore of organizing the "mass casualty event" to "destabilize [President] Trump's tenure." *Id.* ¶¶ 37-38. The same day, Creighton uploaded a video to YouTube in which he reiterated his false and defamatory accusations about Gilmore's supposed foreknowledge of, and involvement in planning and executing, Fields' terrorist attack. *Id.* ¶¶ 46-47. On August 14, 2017, Defendant Hoft published an article about Gilmore on Hoft's *Gateway Pundit* website, in which he falsely asserted that Gilmore, as a "deep state shill with links to George Soros," was part of the State Department's plan to instigate violence and rioting in Charlottesville, which the State Department then tried to cover up by "scrub[bing]" references to Gilmore from its records and from news articles about the attack. *Id.* ¶¶ 62-63.

On August 15, 2017, Defendant *InfoWars*, a website owned and operated by Defendants Jones and *Free Speech Systems*, published an article, authored by Defendant McAdoo, and an accompanying video featuring an interview between Defendants McAdoo and Stranahan. *Id.* ¶ 83. The article and interview falsely asserted that George Soros and United States government actors, including Gilmore, sponsored the violence in Charlottesville to orchestrate a "coup" to oust President Trump. *Id.* ¶ 84. On August 20, 2017, Jones created and published a video on *Free Speech Systems*' and *InfoWars*' website falsely asserting that Gilmore was a "high-level CIA" official "on the payroll of [George] Soros" and an actor in the "enormous set-up event" in Charlottesville to stage the rioting and Fields' attack. *Id.* ¶¶ 102-105. Finally, on August 19, 2017, Defendants West, Hickford, and *Words-N-Ideas, LLC* published an article written by Defendant Wilburn in which they falsely asserted that Gilmore was an actor in the "enormous set-up event" by the "deep state" and the "Soros/Clinton/Obama one-world cabal" to stage the violence in Charlottesville in order

to "realize their desires for 'fundamental transformation.'" *Id.* ¶¶ 125-27.

In the wake of Defendants' publications, Gilmore experienced harassment and threats to his family, his life, and his well-being so severe that he was required to seek protection from the police. *Id.* ¶¶ 150-63. This campaign of threats and harassment by Defendants' readers was a direct and foreseeable result of Defendants' characterizations of Gilmore as a "deep state shill" who orchestrated, or was involved in the planning and execution of, staged violence. *Id.* ¶¶ 164-77. Moreover, as a result of the publication of Defendants' statements, Gilmore has experienced reputational and professional damage and severe emotional and physical harm. *Id.* ¶¶ 178-203.

## STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court will "accept as true the well-pled allegations of the complaint and construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Harbourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 658 (4th Cir. 2016) (internal citations omitted). A plaintiff "must allege sufficient facts to establish th[e] elements" of his or her claim, but "need not forecast evidence sufficient to prove the elements of the claim." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (internal quotation marks omitted).

## ARGUMENT

**I.     THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO ARTICLE III OF THE CONSTITUTION AND 28 U.S.C. § 1332 BECAUSE THERE IS COMPLETE DIVERSITY AND THE AMOUNT IN CONTROVERSITY EXCEEDS $75,000.**

### A. There Is Complete Diversity of Citizenship Between the Plaintiff and Every Defendant.

There is complete diversity of citizenship between Gilmore and Defendants because "there is no plaintiff and no defendant who are citizens of the same State," *Wis. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 388 (1998). Diversity is determined "at the time of filing." *Grupo Dataflux v. Atlas*

5

*Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004). To determine citizenship, courts look to the parties' domicile: "a person's true, fixed, principal and permanent home." *Domicile,* Black's Law Dictionary (8th ed. 2004). Put differently, "[d]omicil[e] implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance." *Williams v. North Carolina*, 325 U.S. 226, 229 (1945).

Gilmore is domiciled in Albemarle County, Virginia. Am. Compl. ¶ 13. All but one of the Defendants do not dispute that they are domiciled in a state other than Virginia. *See* Am. Compl. ¶¶ 14-16, 18-24. Defendant Stranahan, however, disputes the Amended Complaint's allegation that he is domiciled in Texas, *see* Am. Compl. ¶ 17, and argues that he changed his domicile from Texas to Virginia in 2017 because he has been residing at an apartment at "2221 S. Clark Street, Arlington, Virginia, 22202" since March 2017. *See* Dkt. No. 47-1 at 2; Dkt. No. 33-1 at 2 (Stranahan Declarations).[1] But "state citizenship for purposes of diversity jurisdiction depends not on residence, but on national citizenship and domicile, . . . and the existence of [state] citizenship cannot be inferred from allegations of mere residence, standing alone." *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660, 663 (4th Cir. 1998). After all, a party can have "more than one residence but only one domicile," *Gambelli v. United States*, 904 F. Supp. 494, 496 (E.D. Va. 1995), and "[t]o change domiciles, a person must intend to make the new place her home," *Jahed v. Acri*, 468 F.3d 230, 236 (4th Cir. 2006); *see Webb v. Nolan*, 484 F.2d 1049, 1051 (4th Cir. 1973).

Domicile is determined "on a case by case basis, considering all of the circumstances surrounding an individual's situation." *Peterson v. Paddy*, 2017 WL 2655854, at *3 (W.D. Va. June

---

[1] In his declaration accompanying his Response in Opposition to Gilmore's Motion to Set a Briefing Schedule, Stranahan said his address was "2221 S. Clark Street," Dkt. No. 33-1 at 2, the address that appeared on the "skip tracing" report obtained by Plaintiff, *see* Ex. B, and that was used on Stranahan's summons, *see* Dkt. No. 6 at 1. For whatever reason, in other versions of his declaration, Stranahan said his address was "221 S. Clark Street." *See* Dkt. No. 26-1 at 2; Dkt. No. 47-1 at 2. Gilmore assumes that this was simply a typographical error.

6

19, 2017) (quoting *Bloom v. Library Corp.*, 112 F. Supp. 3d 498, 502 (N.D. W. Va. 2015)). These circumstances include "current residence; voter registration and voting practices; situs of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; place of employment or business; driver's license and automobile registration; [and] payment of taxes." *Id.* (quoting *Bloom*, 112 F. Supp. 3d at 502). The totality of objective evidence demonstrates that Stranahan was domiciled in Texas, not Virginia, at the time Gilmore commenced this action. *See Briley v. United States*, 2016 WL 5402216, at *4 (E.D. Va. Sept. 26, 2016) (courts "may consider evidence outside the pleadings" to determine jurisdiction).

*First*, Stranahan was, and continues to be, registered to vote in Texas. *See* Ex. A (Voter Registration and Voter History).[2] As this Court has noted, "the state in which an individual is registered to vote raises a presumption that the individual is a citizen of that state." *Hall v. Nestman*, 2015 WL 3948158, at *4 (W.D. Va. June 29, 2015) (quoting *Brooks v. Shope*, 2010 WL 2176073, at *2 (W.D.N.C. May 21, 2010)). Indeed, to be eligible to vote in the state of Texas, a person must be a Texas resident, Tex. Elec. Code Ann. §§ 11.001(a)(1), 11.002(a)(5), and "[r]esidence," as defined by the Texas election code, "*means domicile*, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence," Tex. Elec. Code Ann. § 1.015(a) (emphasis added). Thus, Stranahan's "voter registration is 'tantamount to a representation of [Texas] domicile to voting officials,' and constitutes 'significant countervailing evidence of intent to remain' in [Texas]." *Peterson*, 2017 WL 2655854, at *3 (quoting *Lundquist v. Precision Valley Aviation, Inc.*, 946 F.2d 8, 12-13 (1st Cir. 1991)).

Stranahan claims that "it never occurred to [him] to remove [himself] from [Texas] voter

---

[2] Gilmore has filed redacted versions of the exhibits attached to this brief. Gilmore possesses the unredacted versions and can file them under seal at the Court's request.

rolls." Dkt. No. 33-1 at 1. This suggestion, however, is belied by evidence that Stranahan *confirmed* his Texas voter registration in December 2017, months after he claims he moved to Virginia. Texas has put in place strict procedures to determine whether individuals continue to be domiciled there for purposes of voter registration. Specifically, "[o]n or after November 15 but before December 6 of each odd-numbered year," Texas county voter registrars mail renewal certificates to the mailing address listed on each individual's registration. Tex. Elec. Code Ann. §§ 14.001(a), 14.002(a). This certificate is non-forwardable and is returned to the registrar if the addressee is no longer at that address, *id.* § 14.002(b), leading the registrar to enter the voter's name on the "suspense" list, *id.* § 14.021. According to Stranahan's voter registration information obtained from the Texas Secretary of State, the "change/audit date" is listed as Dec. 5, 2017 and his current status is "ACTIVE." *See* Ex. A. Under Texas law, this outcome would occur *only* if Stranahan was able to receive mail at his Dallas address in November or December 2017 (eight to nine months after Stranahan claims he established domicile in Virginia), and he returned the renewal certificate confirming that he is domiciled in Texas. These objective facts regarding his Texas voter registration should "carry considerable weight" in establishing that Stranahan is domiciled in Texas. *Peterson*, 2017 WL 2655854, at *3.[3]

*Second*, in addition to Stranahan's active voter registration in Texas, a "skip tracing" report completed prior to the commencement of this action indicated that Stranahan had a Texas-issued driver's license. *See* Ex. B (Skip Tracing Report for Lee Stranahan).[4] The skip tracing report does

---

[3] Texas law also requires that registrars regularly monitor for changes in voters' residence. *See* Tex. Elec. Code Ann. § 15.022(b). There is no indication that since the December 2017 audit, Texas voter officials received any indication from the Postal Service that Stranahan changed his address or initiated mail forwarding services. *See id.* §§ 15.051(a), 15.053(a), 15.081(a)(1).

[4] "Skip tracing" is the act of discovering the current location ("tracing") of an individual who has "skipped" town. To do this, skip tracers consult public records databases and other information to determine an individual's current and past addresses and contact information. *See Skip Tracing Jobs and Training*, BountyHunterEdu.org, https://www.bountyhunteredu.org/what-is-

8

not indicate whether this license is still valid, and Stranahan suggests that he "do[es] not presently have any driver's license," Dkt. No. 47-1 at 3. However, the report did not list any other state identification documents. Virginia residents are eligible to apply for a Virginia ID card if they do not have a driver's license or learner's permit, *see Identification Cards in Virginia,* DMV.org, https://www.dmv.org/va-virginia/id-cards.php#VA-ID-Card-Eligibility-Requirements, and there is no evidence Stranahan had one of those cards when this action was commenced.

*Third*, at the time this case commenced, Stranahan was conducting his affairs as though he were domiciled in Texas. For instance, Stranahan's Facebook profile stated that he "lives in Dallas, TX." Ex. C (Facebook profile screenshot). This is consistent with the address listed on his active voter registration. *See* Ex. A. Furthermore, Stranahan actively updates his Facebook page, and he has posted links, pictures, and videos to this page as recently as June 15, 2018, while failing to update his place of residence. Lee Stranahan, Facebook, https://www.facebook.com/stranahan. Stranahan's Facebook profile also states that he is "married to Lauren Stranahan." Ex. C. A Lexis public records search for Lauren Stranahan shows that she is actively registered to vote in Dallas, Texas at the same address as Stranahan and that she voted there as recently as 2016. *See* Ex. D (Lexis Public Records Search for Lauren Stranahan). In addition to this evidence, Stranahan also continues to solicit payments to his various journalistic endeavors, as well as donations, via a Pay-Pal account belonging to Stranahan Strategies, LLC, a Texas limited liability company. *See* Ex. E (Tex. Comptroller Certificate); *Stranahan Strategies, LLC*, PayPal (last visited June 19, 2018), https://www.paypal.me/LeeStranahan.

*Fourth*, Stranahan asserts that he is currently residing at 2221 S. Clark St., Arlington, VA 22202, *see, e.g.*, Dkt. No. 33-1 at 2, but that appears to be a WeLive/WeWork complex.

---

skip-tracing (last visited June 19, 2018).

WeLive/WeWork is essentially a "dorm for adults," *see* Michael J. Gaynor, *What It's Like to Live in WeLive, Crystal City's 'Dorm for Adults'*, Washingtonian (May 19, 2017)—that is, a temporary shared housing community where patrons are able to utilize living and office space without a long-term commitment. WeLive provides fully furnished rooms, including "[b]eds and couches, towels and utensils, and everything in between," and has "flexibl[e]" leasing options, including "month-to-month" leases. *See Crystal City*, WeLive, http://www.welive.com/dc (last visited June 19, 2018); *see also* Gaynor, *supra* ("You don't have to bring anything except your clothes."). The temporary and flexible nature of Stranahan's choice of residence in Virginia hardly "implies a nexus between [Stranahan] and [Virginia] of such permanence as to control the creation of legal relations and responsibilities of the utmost significance," *Williams*, 325 U.S. at 229.

As noted above, a party's own statements of his intended domicile are "not conclusive" and are "entitled to little weight when in conflict with the facts." *Webb v. Nolan*, 361 F. Supp. 418, 421 (M.D.N.C. 1972), *aff'd*, 484 F.2d 1049 (4th Cir. 1973). Here, Stranahan's own statements should be given particularly little weight, given that he has made several contradictory representations about his domicile. For example, Stranahan went from stating in his April 24, 2018 declaration that he "d[id] not know whether [it] is true or not" that he is registered to vote in Texas but that he "suspect[ed] it is true," Dkt. No. 33-1, at 2, to stating through his counsel on April 26, 2018 that "he has verified that he is not registered to vote in the state of Texas," Ex. F (Correspondence with Aaron Walker, April 26, 2018, 1:21 p.m.), to admitting though his counsel later that day that he was wrong and that Texas's website states that he *is* registered to vote in Texas, Ex. H (Correspondence with Aaron Walker, April 26, 2018, 11:09 p.m.); Ex. G. Moreover, Stranahan's counsel suggested in an April 26, 2018 email that Stranahan "was a Virginian for tax purposes," Ex. F, but in an email later that same day referenced "the fact that [Stranahan] declared himself a Texan for tax purposes," Ex. H. Rather than rely on these contradictory representations, this Court should

rely on incontrovertible evidence obtained from government agencies and other disinterested third-party sources. That evidence all supports the conclusion that Stranahan is domiciled in Texas.

If this Court were to decide that it is unable to conclusively determine Stranahan's domicile at this time, Gilmore respectfully asks the Court to allow limited jurisdictional discovery on this issue. After all, when a defendant challenges the veracity of facts supporting subject matter jurisdiction, "the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). Especially in the face of contradictory declarations and representations by Stranahan himself, permitting Gilmore to depose Stranahan would be useful, as would discovery on the other factors enumerated in *Peterson* that are probative of domicile: "situs of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; . . . [and] payment of taxes," *Peterson*, 2017 WL 2655854, at *8.

Finally, if this Court were to conclude that Stranahan *is* domiciled in Virginia, "it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered," *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989), and Gilmore would request to drop Stranahan from this case in order to maintain diversity.

### B. The Amount in Controversy Exceeds $75,000.

Under Section 1332, this Court has jurisdiction "where the matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. § 1332. The long-standing rule is that "the sum claimed by the plaintiff controls if the claim is apparently made in good faith," and "[i]t must appear *to a legal certainty* that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) (emphasis added). For that reason, to show jurisdiction is lacking, defendants "shoulder a heavy burden" of "show[ing] 'the

legal impossibility of recovery' to be 'so certain as virtually to negative the plaintiff's good faith in asserting the claim.'" *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010) (quoting *Wiggins v. N. Am. Equitable Life Assurance Co.*, 644 F.2d 1014, 1017 (4th Cir. 1981)). Importantly, defenses on the merits are irrelevant to the jurisdictional question. "[W]here the plaintiff makes his claim in obvious good faith, it is sufficient for jurisdictional purposes; and this is so even where it is apparent on the face of the claim that the defendant has a valid defense." *McDonald v. Patton*, 240 F.2d 424, 425 (4th Cir. 1957).

Here, Gilmore's Amended Complaint seeks more than $75,000 in presumed, actual, and punitive damages from each of the eleven defendants. Am. Compl. ¶¶ 3, 215, 224, 232, 240, 257, 269, 282, 293. In response, Defendants Hoft, Creighton, Stranahan, Wilburn, Hickford, and *Words-N-Ideas, LLC* suggest that Gilmore cannot recover that amount because he "cannot recover, as a matter of law, any damages from the . . . Defendants for any harm caused by third persons who allegedly committed wrongful acts against the Plaintiff with respect to defamation." Dkt. No. 47 at 25. Similarly, they argue that Gilmore's IIED claim fails because Gilmore must show that they incited the misconduct of third parties, and he cannot. *Id.* at 17-18. Those arguments, however, are legal defenses to Gilmore's claims—namely, that Gilmore has not shown causation because third parties caused the harm he alleges resulted from Defendants' statements. They do not demonstrate that Gilmore's claims are legally impossible, much less that Gilmore's allegations were made in bad faith. For that reason the "sum claimed by [Gilmore] controls," *St. Paul Mercury Indem. Co.*, 303 U.S. at 288, and this Court has jurisdiction.

## II. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.

All Defendants, other than Stranahan, argue that this Court lacks personal jurisdiction over

them.[5] When, "as here, a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). "In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Id.*

"Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law." *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002). In general, courts assessing personal jurisdiction first "determine whether the [state long-arm] statutory language applies to the defendant" and second "determine whether the statutory assertion of jurisdiction is consistent with the due process clause of the Constitution." *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990). "The Virginia long-arm statute, . . . has been construed to extend *in personam* jurisdiction to the outmost perimeters of due process." *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1982); *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009) (if defendants' contacts "in Virginia satisfy due process, then they also satisfy Virginia's long-arm statute"). Due process requires that "if [a person] be not present within the territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

"Determining the extent of a State's judicial power over persons outside of its borders under the *International Shoe* standard can be undertaken through two different approaches—by finding specific jurisdiction based on conduct connected to the suit or by finding general jurisdiction."

---

[5] The requirement of personal jurisdiction "is subject to waiver," *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 413 (4th Cir. 2002), so Stranahan has waived that defense.

*ALS Scan, Inc.*, 293 F.3d at 711. This Court can assert general jurisdiction over *Infowars*, *Free Speech Systems*, and Alex Jones, and it can assert specific jurisdiction over all Defendants.

A. **This Court Can Assert General Personal Jurisdiction Over *Infowars*, *Free Speech Systems*, and Alex Jones.**

Defendants *Free Speech Systems*, *InfoWars*, and Alex Jones have sufficient contacts with Virginia for the Court to assert general personal jurisdiction. To assert general personal jurisdiction, a party must have "minimum contacts" with a state by way of its "continuous and systematic" business activity with Virginians. *Id*. at 712 (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & n.9 (1984)); *see Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984) (personal jurisdiction appropriate where "respondent is carrying on a 'part of its general business' in [the forum state]" (quoting *Perkins v. Benguet Mining Co.*, 342 U.S. 437, 438 (1952))).

In the context of an internet business, a court may assert general jurisdiction "over out-of-state persons who regularly and systematically transmit electronic signals into the State via the Internet" so long as a plaintiff alleges that contact plus "[s]omething more." *ALS Scans, Inc.*, 293 F.3d at 715. Put differently, although the mere existence of a web-based store accessible in Virginia is not always enough to confer general jurisdiction, "most courts would agree that operating a web site selling products to residents of a state *can* subject the seller to general jurisdiction in that state, depending on the nature and degree of commercial activity with the forum state." *Shrader v. Biddinger*, 633 F.3d 1235, 1243 (10th Cir. 2011).

Here, Defendants *Free Speech Systems*, *InfoWars*, and Alex Jones have continuous and systematic business contact with Virginia. First, *InfoWars* and *Free Speech Systems* "solicit and transact business through their online stores, which results in the transmission of currency in exchange for their goods or services." Am. Compl. ¶ 10. Indeed, reporting has shown that the "vast

14

majority" of *InfoWars*' operating revenue comes from the sale of *InfoWars*-branded dietary supplements. *See* Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. Mag. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html. "Defendant *InfoWars* sold and delivered its dietary supplements to persons residing in Virginia," and "a substantial portion of this revenue is the result of transactions with individuals in Virginia." Am. Compl. ¶ 10; *see Coastal Video Commc'ns., Corp. v. Staywell Corp.*, 59 F. Supp. 2d 562, 572 (E.D. Va. 1999) (finding it "significant that defendant's site is commercial in nature, in that it is designed to not only advertise and solicit sales, but also provides a direct method by which a customer may purchase defendant's products"); *Coremetrics, Inc. v. Atomic Park.com, LLC*, 370 F. Supp. 2d 1013, 1021, 1022 (N.D. Cal. 2005) (general jurisdiction exists based on defendant's website which "clearly [did] business over the Internet" as a "virtual store . . . designed so as to approximate physical presence in a forum," and which "actually made sales to [a state's] consumers" of a "substantial" number).

Second, in addition to advertising and soliciting business from Virginia residents on their web store, Defendants *Free Speech Systems*, *InfoWars*, and Alex Jones also engage in significant reporting activities in Virginia under the *InfoWars* name. Am. Compl. ¶ 11. Defendants frequently cover events in Virginia, interview guests in Virginia, and employ agents in Virginia, including Defendant Lee Stranahan. Am. Compl ¶¶ 7, 11, 14-18. Moreover, Defendants send reporters to Virginia to take video, gather factual information, and develop stories about events occurring in Virginia that primarily concern Virginia residents. *See, e.g.*, The Alex Jones Channel, *Dystopic Book Banning at Virginia School!*, YouTube (Dec. 1, 2016), https://www.youtube.com/watch?v=hFTXuV9miUI. Prior to their coverage of the events in Charlottesville, *InfoWars* reporters interviewed members of the Virginia state legislature on the *InfoWars* show to discuss events in Virginia that have particular salience to Virginia residents. *See*

The Alex Jones Channel, *Infowars Reporter Rallies Patriots in Chantilly, Virginia*, YouTube (June 3, 2017), https://www.youtube.com/watch?v=dbp0s2dstCw. Indeed, the facts underlying this case provide yet another example of *InfoWars* reporting in Virginia: "*InfoWars* reporters attended and reported on the 'Unite the Right' rally in Charlottesville" and "Jones, *Infowars*, McAdoo, Stranahan, and *Free Speech Systems* produced multiple segments, articles, and other content about the Virginia event and covered the event as part of a journalistic endeavor." Am. Compl. ¶ 11.

All of these facts taken together demonstrate that Defendants *Free Speech Systems*, *InfoWars*, and Alex Jones have continuous and systematic contacts with Virginia. At minimum, Gilmore has asserted more than "speculation or conclusory assertions" about the business contacts that these Defendants have in Virginia, *Carefirst of Md., Inc.*, 334 F.3d at 402. If this Court believes that it does not have the facts to assess general jurisdiction at this time, Gilmore respectfully asks for permission to conduct limited jurisdictional discovery to resolve the issue. After all, the specific sales and revenue information that would clarify the extent of these Defendants' business in Virginia "is uniquely in the control of the defendant[s]," *Coastal Video Commc'ns, Corp.*, 59 F. Supp. 2d at 572; *see Kerns*, 585 F.3d at 193, and this Court has broad discretion to grant limited discovery where Gilmore seeks only to confirm the factual information that he has already alleged and that Defendants unquestionably track as part of their regular course of business.

### B. This Court Can Assert Specific Jurisdiction Over All Defendants.

This Court also has specific jurisdiction over all Defendants. "For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'" *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "In determining whether specific jurisdiction exists, [a court must] consider (1) the extent to which the defendant has purposefully availed itself

16

of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Md., Inc.*, 334 F.3d at 397. The Fourth Circuit has insisted that "[e]ven a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." *Id.* For those types of cases, "a court may exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident." *Id.* at 397-98.

In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that personal jurisdiction existed in a defamation case strikingly similar to this one. There, although the defamatory article reached a nationwide audience, the Court held that the defendants should have "'reasonably anticipated being haled into court [in California]'" because the article had California as "the focal point both of the story and of the harm suffered." *Id.* at 790, 789 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). First, "the allegedly libelous story concerned the California activities of a California resident," "impugned the professionalism of an entertainer whose television career was centered in California," and "was drawn from California sources." *Id.* at 788. Second, "the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 789. The Court explained that the defendants could not avoid responsibility for the circulation of the article in California simply because they did not control sales decisions; rather, their "intentional, and allegedly tortious, actions were expressly aimed at California" because "they knew that the brunt of th[e] injury would be felt by [the Plaintiff] in the State in which she lives and works." *Id.* at 789-90. Thus, jurisdiction was proper "based on the 'effects' of [the defendant's out-of-state] conduct in California." *Id.* at

789 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297-98); *see ALS Scan, Inc.*, 293 F.3d at 714 (describing *Calder* as holding that "a California court could constitutionally exercise personal jurisdiction over a Florida citizen whose only material contact with California was to write a libelous story in Florida, directed at a California citizen, for a publication circulated in California, knowing that the 'injury would be felt by [the Californian] in the State in which she lives and works'" (quoting *Calder*, 465 U.S. at 789-90)).

The facts are almost identical here. As the Complaint alleges, "Defendants deliberately targeted Mr. Gilmore, a Virginia resident, by making false and defamatory statements about his presence at and observation of an event that took place in Virginia." Am. Comp. ¶ 4. Indeed, the event happened "on the campus of the University of Virginia, concerned the proposed removal of a Confederate statu[e] in Virginia and the renaming of a Virginia park," and was therefore of "particular importance to local Virginians." *Id.*; *id.* ¶ 5 ("Defendants were aware that the larger controversy driving the event in which Mr. Gilmore was implicated was a divisive issue of Virginia history."). Moreover, these defamatory statements "ultimately resulted in injury to Plaintiff Gilmore in Virginia": Gilmore "experienced irreversible personal and professional damage in Virginia, including reputational harm, the loss of business opportunities in Virginia, irreparable damage to his career as a Foreign Service Officer, and the loss of friendships with individuals in Virginia." *Id.* ¶ 6. None of this should be at all surprising to Defendants given that Gilmore lives and works in Virginia. *Id.* ¶ 13. Because all these facts tie the focus of Defendants' articles and videos to Virginia, they should have "'reasonably anticipate[d] being haled into court there' to answer for the truth of the statements made in their article[s]." *Calder*, 465 U.S. at 790 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297).[6]

---

[6] To be sure, in *Calder*, the National Enquirer had its "largest circulation" in California, 465 U.S. at 790, but the Court never suggested that that fact was dispositive. In any event, Gilmore

Defendants are of course correct that "a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received," *ALS Scan, Inc.*, 293 F.3d at 714, but Virginia is not just *a* state in which "the electronic signal [was] transmitted and received." Rather, Virginia is *the* state in which the events in the articles and videos took place and the harm was suffered. Defendants published stories about a Virginia resident's activities at a Virginia event concerning a Virginia controversy that was of particular salience to Virginians, and they knew the harm caused by their statements would be felt in Virginia. Thus, the facts of this case easily satisfy the *ALS Scans* test: "specific jurisdiction in the Internet context may be based only on an out-of-state person's Internet activity directed at [Virginia] and causing injury that gives rise to a potential claim cognizable in [Virginia]," *id.*[7]

Defendants place great weight on the Fourth Circuit's decision in *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002), but that case is not to the contrary. There, local Connecticut newspapers mentioned a Virginia-based plaintiff in the context of articles that had a "focus" on "the Connecticut prisoner transfer policy and its impact on the transferred prisoners and their families back home in Connecticut." *Id.* at 263. Therefore, the court highlighted that "[t]he articles reported on and encouraged a public debate *in Connecticut* about whether the transfer policy was sound or practical for that state and its citizens." *Id.* at 263-64 (emphasis added). "Connecticut, not Virginia, was the focal point of the articles." *Id.* at 264. In contrast, Virginia—and no other state— is the focal point of Defendants' defamatory articles: Defendants made a Virginia resident and his

_____

has alleged that "a significant portion of viewers of each website are Virginia residents." Am. Compl. ¶ 9.

[7] Significantly, the facts of *ALS Scans* are completely inapposite here. There, the Fourth Circuit held that personal jurisdiction was improper because the defendant acted as a passive website host, not a publisher of content. As the court explained, the defendant "did not select or knowingly transmit infringing photographs specifically to [the forum state] with the intent of engaging in business or any other transaction in [the forum state]." 293 F.3d at 714-15.

activities at a prominent Virginia event addressing a Virginia controversy the centerpiece of their publications, and these publications had particular salience for Virginia readers above all others.

Moreover, in *Young*, the content of the two websites at issue was "decidedly local": the newspapers "maintain[ed] their websites to serve local readers in Connecticut, to expand the reach of their papers within their local markets, and to provide their local markets with a place for classified ads." *Id.* at 263. That is not true here. Like *Calder*, the websites on which these defamatory articles and videos were published have a national readership, with a "significant portion of viewers" in Virginia, Am. Compl. ¶ 9, and the articles at issue here were "direct[ed] . . . to a Virginia audience" particularly concerned about the Charlottesville event and its aftermath, *Young*, 315 F.3d at 263. This case therefore squarely presents the "[s]omething more than posting and accessibility" that the Fourth Circuit concluded was lacking in *Young*.[8]

Indeed, if the purely Virginia focus of the articles and videos combined with the harm felt in Virginia is not enough to support specific jurisdiction, then Gilmore could not show specific jurisdiction in *any* state other than the one in which that specific defendant resides. That would mean that for Defendants over whom the Court lacks general jurisdiction, Gilmore would be forced to initiate multiple cases to vindicate his claims. That makes no sense. Here, the only reasonable place where a court could assert specific personal jurisdiction, and the only place where Defendants could be expected to defend their statements in court, is Virginia.

---

[8] Some Defendants cite *FIREClean, LLC v. Tuohy*, 2016 WL 3952093 (E.D. Va. July 21, 2016), but that case is equally inapposite. The allegedly defamatory article in that case was about a Virginia manufacturer, but the article "never reference[d] Virginia and d[id] not focus on [the manufacturer's] Virginia origin or affiliations." *Id.* at *7. "Instead, the articles and comments plainly focus[ed] on [the oil's] chemical composition, recommended uses for [it], and product testing performed outside Virginia," and were therefore "addressed to a nationwide audience of firearms enthusiasts and had no special appeal for Virginia readers." *Id.*

## III.    VIRGINIA LAW APPLIES TO GILMORE'S CLAIMS.

This Court should apply Virginia law because this is a multi-defendant internet defamation claim and the plaintiff is domiciled in Virginia. "A federal court sitting in diversity must apply the choice-of-law rules from the forum state." *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999). In tort actions, "Virginia applies the *lex loci delicti*, the law of the place of the wrong," *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998), which "has generally been interpreted as the place where the last event necessary to make an actor liable for an alleged tort takes place," *Fryfogle v. First Nat. Bank*, 2009 WL 700161, at *3 (W.D. Va. Mar. 17, 2009) (citation and quotation marks omitted). For purposes of defamation, "the place of the harm has traditionally been considered to be the place where the defamatory statement was published," *Wells*, 186 F.3d at 521-22, which "occurs when the defendant communicates the . . . defamatory statement to a third party intending the statement to be heard by that party, *Fryfogle*, 2009 WL 700161, at *3.

Significantly, "the Supreme Court of Virginia has never addressed how this rule applies in situations where the defamatory content is 'published' in multiple jurisdictions, such as on a national television broadcast or, as here, a website that can be accessed worldwide." *Kylin Network (Beijing) Movie & Culture Media Co. Ltd v. Fidlow*, 2017 WL 2385343, at *3 n.2 (E.D. Va. June 1, 2017). But as the Fourth Circuit has noted in the context of a nationally syndicated radio show, "application of the traditional *lex loci delicti* rule becomes cumbersome, if not completely impractical," where allegedly defamatory statements are published simultaneously in many places. *Wells*, 186 F.3d at 527. Given these difficulties, almost all other *lex loci* jurisdictions look "to the law of the jurisdiction where the plaintiff suffered the greatest injury," which is "usually the one in which the plaintiff was domiciled." *Hatfill v. Foster*, 415 F. Supp. 2d 353, 364 (S.D.N.Y. 2006); *see, e.g.*, *Castro v. Goggins*, 2016 WL 7217282, at *3 (M.D.N.C. Dec. 12, 2016); *Zupnik v. Assoc'd Press Inc.*, 31 F. Supp. 2d 70, 72 n.1 (D. Conn. 1998); *Katz v. Gladstone*, 673 F. Supp. 76, 79 (D. Conn.

1987); *Dworkin v. Hustler Magazine, Inc.*, 647 F. Supp. 1278, 1281 (D. Wyo. 1986). This Court should apply that standard. Because Gilmore is domiciled in Virginia, Virginia law should govern.

To be sure, as some Defendants note, Virginia generally applies "the law of the place where the wrongful act occurred, even when that place differs from the place where the effects of injuries are felt." Dkt. No. 57 at 10 (quoting *Milton*,138 F.3d at 522). But as noted, determining the place of the wrong—*i.e.*, the place where the statement is made available for viewing by third parties— is no easy task in an Internet defamation case given the immediate transmission of the statement to a nationwide audience. Indeed, in explaining why it generally applies the place-of-the-wrong test, the Virginia Supreme Court has explained that such a test furthers interests like "uniformity, predictability, and ease of application." *McMillan v. McMillan*, 253 S.E.2d 662, 664 (Va. 1979). But in a multi-defendant and multi-state defamation case like this one, interests like "uniformity" and "ease of application" point in favor of applying the law of the place where the plaintiff is domiciled, rather than having to decide how to choose among the laws of many different states when the content is simultaneously made available for viewing by third parties in many states at once. For all of these reasons, this Court should apply Virginia law.[9]

## IV. GILMORE HAS STATED A CLAIM FOR DEFAMATION AGAINST EACH DEFENDANT.

"In Virginia, the elements of libel are (1) publication of (2) an actionable statement with

---

[9] Only Defendants Jones, McAdoo, *InfoWars*, and *Free Speech Systems* make any serious argument about choice of law. *See* Dkt. No. 57 at 10. Defendant West suggests that Texas law should apply because he has always been a resident of Texas, Dkt. No. 59 at 10 n.1, but that is not the standard, *see infra* at 21-22. Defendants Hoft, Creighton, Stranahan, Wilburn, Hickford, and *Words-N-Ideas* assume that Virginia law applies, *see* Dkt. No. 47 at 34, so they have waived any choice of law argument, *see Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984) ("the parties to litigation may consent by their conduct to the law to be applied"); *cf. Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 n.11 (4th Cir. 2015) (applying Maryland law where the parties agree).

(3) the requisite intent." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). "Publication simply means communication of a statement to a third person so as to be understood by that person," *Rodarte v. Wal-Mart Assocs., Inc.*, 2013 WL 1898999, at *4 (W.D. Va. May 6, 2013), and no one contests this prong. To be actionable, a statement must be false and defamatory. *Chapin*, 993 F.2d at 1092. To be false, the statement must "contain a provably false factual connotation." *WJLA-TV v. Levin*, 564 S.E.2d 383, 392 (Va. 2002). To be defamatory, a statement must "tend[] to 'harm the reputation of another [so] as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Cutaia v. Radius Eng'g Int'l., Inc.*, 2012 WL 525471, at *3 (W.D. Va. Feb. 16, 2012) (quoting *Chapin*, 993 F.2d at 1092). Gilmore has pleaded facts showing that each Defendant made false and defamatory statements. Finally, Gilmore is a private citizen and therefore need only show negligence, which he has done. Even if he were a public figure, he has pleaded facts sufficient to state a claim for actual malice because Defendants' statements were made with "reckless disregard of whether [they were] false or not," *N.Y. Times. Co.*, 376 U.S. at 279-80.

### A. Gilmore Has Alleged That Defendants Made False Statements.

First, a statement is actionable if it is false, *i.e.*, it "contain[s] a provably false factual connotation," *WJLA-TV*, 564 S.E.2d at 392; *see Gertz*, 418 U.S. at 340 ("there is no constitutional value in false statements of fact"). A statement is provably false if it can "reasonably be interpreted as stating actual facts about a person" that are false. *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003).

In determining whether a statement is false, "allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 592 (Va. 1954). For that reason, "[a] defamatory charge

may be made expressly or by 'inference, implication or insinuation.'" *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 331 (4th Cir. 2005) (quoting *Carwile*, 82 S.E.2d at 592); *see Carwile*, 82 S.E.2d at 592 ("[I]t matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory."). Courts thus must "consider the language of the statement in question, the context of the statement within the article as a whole, and the broader social context within which the statement was made." *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1289 (4th Cir. 1987). Finally, because this is a motion to dismiss, "[i]n determining whether the words and statements complained of in the instant case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Carwile*, 82 S.E.2d at 592.

Reading the statements in the complaint in the light most favorable to Gilmore, each Defendant made statements about Gilmore that, at minimum, implied that Gilmore participated in a conspiracy to stage a violent rally and counter-protest in Charlottesville and knew that an attack on peaceful protesters would take place before he filmed it. These assertions are provably false.

*First*, Defendant Creighton made numerous false statements about Gilmore in an article posted August 13, 2017 on his website, *AmericanEveryman*. Am. Compl. ¶ 37. In the article, Creighton purported to "share with [the reader] some things [he] found out about Brennan Gilmore, the former State Department employee who just HAPPENED to be at the exact right place at the exact right time already filming with his camera to capture the entire event from beginning to end." *Id.* Ex. A. According to Creighton, Gilmore "film[ed] the Charger . . . almost as if he knew it would run into them." *Id.*; *see id.* (noting "Brennan's rather suspicious positioning before the fact"); *id.* (stating that Gilmore was, in quotes, a "'convenient witness'"); *id.* (observing that Gilmore was "ready to go with the divide and conquer establishment version of events for CNN while people were still lying on the hot pavement"). According to Creighton, none of this could possibly be a

24

coincidence; "the mass casualty event . . . was PLANNED to destabilize the nation." *Id.* And

Creighton even offered an apparently fact-based rationale for Gilmore's supposed participation in

the conspiracy: he was a "former" State Department employee who would "delight in destabilizing

Trump's tenure." *Id.* Finally, Creighton specifically stated that although it was possible that Gil-

more just happened to be there "if you're into coincidence theories," he is "*not into such things*."

*Id.* (emphasis added); *see id.* ("Waaaaaay too much coincidence for me folks. Waaaaaay too

much."). These are all false statements of fact about Gilmore.

Creighton's companion YouTube video contains even more egregious falsehoods about

Gilmore. There, Creighton directly states that "someone had foreknowledge" that Fields was going

to drive his car into the crowd of peaceful protesters, that that someone was Gilmore, and that

Creighton knew that because of Gilmore's ties to people who have "a long career of doing this

kind of thing." Am. Compl. ¶ 46. In Creighton's own words:

> [Gilmore] has ties to special operations, special forces, CIA, State Department, Hillary Clinton, and Tom Perriello, who has a long career of doing this kind of thing. People will call me a conspiracy theorist because what I am suggesting here is that someone had foreknowledge, that this event was going to happen . . . *This man has every reason to want to see the support, the base for Donald Trump again mischaracterized as Nazis*. He has every reason to do that. . . .
>
> This guy just happens to be on that fucking corner with his camera rolling, watching that car drive by for five seconds, and he's former State Department, and close to Tom Perriello, who is also former State Department obviously, he's got a fucking ax to grind, *that's one hell of a goddamn coincidence, and you got to be a special kind of stupid to buy that*.

*Id.* (emphasis partially omitted).

By stating that "someone had foreknowledge, that this event was going to happen," and

that "you got to be a special kind of stupid to buy that" Gilmore's presence on the "corner with his

camera rolling" was a "coincidence," Creighton could "reasonably be interpreted as stating actual

facts about a person" that are false, *Fuste*, 575 S.E.2d at 861. Certainly the "inference, implication

25

or insinuation" of Creighton's statements, if not their direct claim, is a clear factual assertion that Gilmore had foreknowledge of Fields' attack because he was a party to a conspiracy to stage the Charlottesville incident, *Hatfill*, 416 F.3d at 331. As the Amended Complaint makes clear, Gilmore knew no such thing, and there was no such conspiracy. Am. Compl. ¶¶ 27-35, 47.[10]

In response, Creighton suggests that he was merely "expressing an opinion . . . that these coincidental occurrences are not just coincidences." Dkt. No. 47 at 45; *see id.* at 49. But merely labeling a statement as "opinion" does not shield the speaker from liability if it "can be reasonably interpreted to declare or imply untrue facts." *Biospherics, Inc.*, 151 F.3d 184; *Milkovich*, 497 U.S. at 19 ("Simply couching such statements in terms of opinion does not dispel these implications."). After all, "[a]n unsupported opinion that implies defamatory facts . . . 'can cause as much damage to reputation' and may be just as actionable" as a false statement of fact. *Biospherics, Inc.*, 151 F.3d at 183 (quoting *Milkovich*, 497 U.S. at 18). The "minimum threshold issue" for distinguishing facts from opinions is "the verifiability of the statement in question"—that is, whether "the defendant's words can[] be described as either true or false." *Potomac Valve & Fitting Inc.*, 829 F.2d at 1288. The statement that "these coincidental occurrences are not just coincidences" is a verifiable fact—either Gilmore knew what was going to happen in advance and was therefore intentionally positioned to record it, as Creighton states, or Gilmore did not know what was going to happen

---

[10] By asserting that Gilmore was "ready to go with the divide and conquer establishment version of events while people were still lying on the hot pavement," Creighton also asserted that Gilmore intentionally decided not to aid victims of the attack. But having just witnessed a horrific attack, Gilmore was in shock, and concerned that additional acts of violence could occur. He posted his video to inform his friends and Twitter followers as to what he had just witnessed. *Id.* ¶ 32. And Gilmore was not a "disgruntled former [State Department] employee"; he is currently on long-term unpaid leave. *Id.* ¶ 13. Creighton argues that this false statement is a "[m]inor inaccurac[y]," *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991), but that statement was a key part of Creighton's defamatory article, ascribing a motive to Gilmore's supposed conspiracy to stage the Charlottesville attack that did not exist.

in advance and just happened to be in proximity to the horrific events of that day when they oc-

curred, as is true.

*Second*, Defendant Hoft made numerous false statements about Gilmore in an August 14,

2017 article published on his website, *Gateway Pundit*. Am. Compl. ¶ 62. The article is entitled

"Random Man at Protests Interviewed By MSNBC, NY Times Is Deep State Shill Linked to

George Soros." Am. Compl. Ex. E. The article reads:

> The random Charlottesville observer who was interviewed by MSNBC and liberal
> outlets turns out to be a deep state shill with links to George Soros. It looks like
> the State Department *was involved in Charlottesville rioting and is trying to cover it
> up*. But after Deep State got caught they are trying to erase this guy from their
> records. . . .
>
> The State Department is very familiar with Brennan M. Gilmore. He was involved
> in the Kony 2012 operation. The State Department later removed any reference of
> Brennan. Why would the State Department react in such a way? Why would the
> State Department scrub that? . . .
>
> This weekend Brennan Gilmore happened to be in Charlottesville with the rioters.
> *The media knows exactly who he is yet played it off like a casual observer*. This is
> how the Deep State is working with the liberal media to shape narrative and fool
> the American people.

*Id.* ¶ 63, Ex. E (emphasis added).

In other words, according to Hoft, Gilmore was no "casual observer" of the events in Char-

lottesville, but instead was there as part of the "Deep State" effort to "work[] with the liberal me-

dia" to "fool the American people." According to Hoft, the State Department and liberal media

staged the Charlottesville incident and then scrubbed Gilmore from its websites once the conspir-

acy was uncovered. These assertions are provably false. *See supra* at 25-26. Moreover, Hoft makes

a number of false statements to support this false insinuation. The State Department did not remove

Gilmore's name to scrub him from its records; rather, it simply "rebuilt its website to reflect current

staff information, after Mr. Gilmore left the Embassy," Am. Compl. ¶ 65. Similarly, the *New York*

*Times* removed Gilmore's quote not at Gilmore's or the State Department's request, but rather

27

because "the article in question reflected a breaking news story published on the Times' website that was revised and updated as the story developed." *Id.* ¶ 66.

Hoft responds that he was just speculating about what certain facts meant, offering his own "uncertain opinion." Dkt. No. 47 at 55. But as already noted, "[a]n unsupported opinion that implies defamatory facts . . . 'can cause as much damage to reputation' and may be just as actionable" as a false statement of fact. *Biospherics, Inc.*, 151 F.3d at 183 (quoting *Milkovich*, 497 U.S. at 18). And much of Hoft's statement plainly reads as an assertion of fact, not "uncertain opinion" or speculation. For example, Hoft wrote that the "random Charlottesville observer who was interviewed by MSNBC and liberal outlets turns out to be a deep state shill with links to George Soros," and "[t]he media knows exactly who he is yet played it off like a casual observer." Am. Compl. ¶ 63, Ex. E. There is nothing "uncertain" about those statements. The fact that Hoft in places used language like "it looks like" or qualified his statements with question marks and elliptical language does not change the fact that he also made unqualified (false) assertions of fact.

*Third*, Defendants Stranahan, McAdoo, Jones, *InfoWars*, and *Free Speech Systems* made a host of false statements about Gilmore in an August 15, 2017 article and video.[11] The article is entitled "Bombshell Connection Between Charlottesville, Soros, CIA," and states in an embedded video that "investigative reporter Lee Stranahan reveals the same players involved in the Ukraine overthrow are working behind the scenes to oust President Trump." Am. Compl. Ex. F. In the video, McAdoo interviews Stranahan, who states that the Charlottesville attack was an "agitation situation" similar to what he alleged to be a U.S.-funded coup in Ukraine. *See The Alex Jones*

---

[11] The article was authored by McAdoo, Am. Compl. ¶ 83, and Stranahan was interviewed in the embedded video. *Id.* The article was published by *InfoWars*, which is owned and operated by Jones. *Id.* The video was hosted on The Alex Jones Channel, a *YouTube* channel owned by Jones and *InfoWars*. *Id.* ¶ 87. Jones shared a link to the article and video on his *Twitter* page. *Id.* ¶ 88. Finally, *Free Speech Systems* "operates Infowars.com" and is owned by Jones. *Id.* ¶ 16.

Channel, *Bombshell Connection Between Charlottesville, Soros, CIA*, YouTube (Aug. 15, 2017), https://www.youtube.com/watch?v=L58T2dl997A, at 3:18; *see id.* at 2:58 ("nothing I'm saying is conjecture"). Turning to Gilmore's involvement in this supposed scheme, Stranahan asserts that "it's come out that Brennan Gilmore was working with the U.S.—the guy who happened to catch that shot—with the U.S. State Department." Am. Compl. ¶ 84. Stranahan goes on:

> If you go to Brennan Gilmore's page, his Twitter page, you'll see he has a picture of the young woman who was murdered, and you know what is [sic] says? "Martyr." . . . Literally it says "martyr." You can't be more explicit than this. So here's what I'm saying. I'm not a conspiracy theorist, I'm a fact-based journalist. The facts are enough. However, the Democrats have investigated Trump for a lot less. For a lot less. They have called for investigations, and secret meetings, they have convened the FBI. When you have this many things going on, I think someone really needs to investigate. Again, I don't like to jump to conclusions, I'd like to ask some questions about who this kid was, where he came from, what do we know, get it all out in the open, but I'll also point out that we can't count on the media to do this.

*Id.* As he is saying all of this, "scenes of violent riots and people in riot gear from Oliver Stone's 'Ukraine on Fire' film plays on the screen," presumably in a deliberate attempt to have the viewer associate the violence they see on the screen with Gilmore. *Id.* Finally, Stranahan and McAdoo scroll through Gilmore's Twitter page on screen, and Stranahan continues:

> [I]f you scroll . . . you'll see the photo of the young woman . . . when I saw this, uh, I was shocked . . . by the way, his bio, if you look at this guy's bio, it says he's with the State Department, and the fact that he called her a 'martyr' . . . I don't know, but this is clearly, the way she's being used is she's a martyr to the cause.

*Id.* Less than a minute later, Stranahan identifies the "cause":

> STRANAHAN: And let me point out what's happening. They, uh, they win no matter what they do. Are they trying to get a coup? I think clearly they are. But if they can't get a coup, they'll settle for impeachment. And if they can't get impeachment, they'll settle for smearing Trump and his supporters so much that they'll be able to elect another elitists [sic]. Does that make sense?
>
> MCADOO: Absolutely.

*Id.*

These passages from the video clearly imply that Gilmore is connected to George Soros

and part of a Soros plot to sponsor a "coup" in the United States; that Gilmore was working with elements in the U.S. government to execute this "coup" (though they would "settle for impeachment"); and that Gilmore described Heather Heyer as a martyr to promote that coup. *Id.* ¶ 84. The language in the video is "reasonably read to impart th[is] false innuendo," *Chapin*, 993 F.2d at 1093, especially because McAdoo describes Stranahan as someone who is "saving journalism" and providing "real news" to viewers, Am. Compl. ¶ 83; *see id.* ¶ 84 (Stranahan calling himself a "fact-based journalist" and "not a conspiracy theorist"). Again, however, all of these claims are demonstrably false. Nothing about Gilmore's filming of the deadly attack was planned, and none of it had anything to do with Soros or Gilmore's employment at the State Department.

Stranahan argues that he was "not saying that the Plaintiff did anything wrong, only that someone—possibly in the news media—should explore whether anything untoward has occurred." Dkt. No. 47 at 59. As an initial matter, that is hardly a fair characterization of Stranahan's comments. To be sure, at one point he said that he does not "like to jump to conclusions" and would "like to ask some questions," but he subsequently stated his conclusion in unequivocal terms: "let me point out what's happening. They, uh, they win no matter what they do. Are they trying to get a coup? I think clearly they are." Am. Compl. ¶ 84.

And as the Fourth Circuit has explained, a defendant cannot "escape liability simply by pairing a charge of wrongdoing with a statement that the subject must, of course, be presumed innocent." *Hatfill*, 416 F.3d at 333-34. Thus, that court allowed a defamation case to move forward where a defendant wrote columns that would make "a reasonable reader . . . conclude that [the plaintiff] was responsible for the anthrax mailings in 2001," even though he also told his readers that they "should entertain a presumption of [the plaintiff's] innocence" and that the FBI could exculpate him. *Id.* at 333. The Court held that the "unmistakable theme of [the] columns is that the FBI should investigate [the plaintiff] more vigorously because all of the evidence (known to [the

30

author]) pointed to him." *Id.* So too here, Stranahan cannot avoid liability simply by pointing to other statements he made calling for further investigation of Gilmore.

McAdoo, Jones, *InfoWars*, and *Free Speech Systems* try to minimize the statements in the video as "hyperbolic political invective," Dkt. No. 57 at 14, but Stranahan himself claims in the video to be a "fact-based journalist" not offering opinions, Am. Compl. ¶ 84. Moreover, looking at the statements themselves, nothing about them suggests that they constitute, or would have been understood by third parties to constitute, mere hyperbolic commentary. Rather, Stranahan repeatedly states *as fact* that there is a connection between a supposed government-sponsored coup in the Ukraine and the events in Charlottesville, that Gilmore was a part of that conspiracy, that he filmed the attack and used the term "martyr" on his Twitter page for that reason, and that Gilmore should be investigated as a result. Again, these statements are demonstrably false.[12]

*Fourth*, Defendants Jones, *InfoWars*, and *Free Speech Systems* made false statements about Gilmore in an August 20, 2017 article and video entitled "Breaking: State Department/CIA Orchestrated Charlottesville Tragedy." Am. Compl. ¶ 102. The description states that Jones will "break[] down . . . [w]ho was behind th[e] attack and why they did it[.]" *Id.* ¶ 103. In the video, Jones states about Charlottesville: "I knew a lot of it, but I did deep research . . . I did research, and I confirmed it all. They had *known CIA and State Department officials in Charlottesville, first tweeting, first being on MSNBC, CNN, NBC*. . . . Everybody is a cut-out . . ." *Id.* ¶ 104.[13] Again referring to Gilmore, Jones stated:

---

[12] McAdoo argues that she should not face liability because she merely interviewed Stranahan. *See* Dkt. No. 57 at 14 n.10. However, McAdoo was the author of the article in which the interview was embedded, and she adopted Stranahan's statements as facts, specifically stating that in the video, "investigative reporter Lee Stranahan reveals the same players involved in the Ukraine overthrow are working behind the scenes to oust President Trump." Am. Compl. Ex. F.

[13] A "cut-out" is a person "who acts as an intermediary or channel of communication between a spymaster and other subagents of a covert operation." Am. Compl. ¶ 104 n. 62.

They got State Department and high-level CIA. *One guy is paid 320,000 a year on the payroll of [George] Soros*. He doesn't just get money from Soros, he personally is paid 320 a year, and then he is there—CIA, State Department—and he is on the news. And when people pointed out who he was, they took his name of [sic] the State Department website and stuff, but Google has all the [screen] shots of it. I mean it's like WOW, WOW—*CIA? Your senior guys?* . . . He worked for Podesta too, John Podesta.. . . "I'm just witness standing here, huh yeah huh huh" . . . *formerly worked for Obama, Podesta, Hillary, the CIA* . . . and when we have Pieczenik on and he says they're CIA . . . he has all the connections, he's gonna say he thinks they are and here's the evidence to why he thinks so . . . he can't legally tell you, but there's a civil war going on in the government so they're going to tell you.

*Id.* ¶ 104 (emphasis added).[14] Later in the video, after describing other fake conspiracies, a narrator says "wait 'til you hear about the other actors in this enormous set-up event." *Id.* ¶ 105. The screen then cuts to an image of Gilmore and his dog, and the narrator says "Brennan Gilmore was on the scene, and the author of the first viral tweet about Charlottesville. He was later interviewed by MSNBC. He was presented as an accidental witness, but who is he really?" *Id.* The screen cuts to a screenshot of Google search results about Gilmore's State Department assignments in Africa, and later, images of Gilmore and Soros side by side. Meanwhile, the narrator says:

Gilmore worked in Africa as a State Department Foreign Officer under Hillary Clinton. The New York Times mentioned this coincidence and then later deleted it. Brennan Gilmore was also involved with the Kony hoax in 2012, and he's currently Chief of Staff for Tom Perriello, who's running for governor of Virginia, and received $380,000 from George Soros.

So the first man on the scene whose tweet went viral and who was later interviewed on mainstream news as a witness just happened to be a State Department insider with a long history of involvement in psy-ops? If you think that isn't fishy, how about this? Since the Charlottesville protest, and his appearance in the media, his information was suddenly removed from the State Department websites. The elites know we're on to them and are trying to cover their tracks.

*Id.*

This video contains numerous assertions that are demonstrably false. First, Soros' donation

---

[14] Significantly, a defamation plaintiff "need not show that he was mentioned by name in the publication," only that "the publication was intended to refer to him and would be so understood by persons reading it." *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 738 (Va. 1985).

to Perriello's campaign was not a personal payment to Gilmore. *Id.* ¶ 106. Second, Gilmore did not work for the campaigns or offices of President Obama, Secretary Clinton, or John Podesta. *Id.* ¶ 107. Third, Gilmore's information was not removed from State Department websites because "the elites know we're on to them and are trying to cover their tracks"; Gilmore was removed because he left the Embassy where he worked. *Id.* ¶ 108. Fourth, Gilmore was not "high-level CIA." On top of these false statements, the "inference, implication or insinuation" of the statements is that Gilmore was part of a wide-ranging conspiracy to stage the violence in Charlottesville and that Soros paid him for that involvement. Again, that claim is false. Am. Compl. ¶¶ 27-35.

Jones, *InfoWars*, and *Free Speech Systems* appear to concede that the video contains numerous demonstrably false assertions, but suggest that none of these falsehoods is material. Dkt. No. 57 at 15. This is wrong. The many false statements in the video—regarding Soros' supposed payment to Gilmore, that Gilmore was a "cut-out," Gilmore's supposed ties to Obama, Clinton, and Podesta, the supposed cover-up on the State Department's website, and Gilmore's supposed status as "high-level CIA"—all provide key ingredients in Jones' fabricated narrative about Gilmore's participation in the conspiracy. Together with the numerous other insinuations in the same video, they plainly assert, and at minimum imply, that Gilmore staged the Charlottesville event, an assertion that is demonstrably false. *Cf. AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990) (false statements not material because they "did not occur in connection with any portion of the broadcast that tended to injure [plaintiff's] reputation").

Jones, *InfoWars*, and *Free Speech Systems* also claim that Jones was simply expressing his opinion "off-the-cuff in the passionate, hyperbolic, over-the-top style that is characteristic of his radio show and videos," Dkt. No. 57 at 17, but Jones begins the video by proclaiming that he "did deep research . . . and [he] confirmed it all," Am. Compl. ¶ 104. Moreover, the article's title says "Breaking," *id.* ¶ 102, implying that it was reporting news that was recently discovered. And that

news, according to the video's description, was reporting about "[w]ho was behind this attack and why they did it[.]" *Id.* ¶ 103. Jones cannot have it both ways: if he publicly represents himself as a journalist who is doing research and reporting breaking news, then he should be held liable if his assertions are demonstrably false and defamatory. And again, even if these statements were just "opinion," an "unsupported opinion that implies defamatory facts . . . can . . . be just as actionable" as a false statement of fact, *Biospherics, Inc.*, 151 F.3d at 183.

*Fifth* and finally, Defendants Wilburn, West, Hickford, and *Words-N-Ideas, LLC* made false statements about Gilmore in an August 19, 2017 article entitled "BOMBSHELL: New Evidence Suggests Charlottesville Was a Complete SET-UP."[15] This article republished the text of Jones' video described above:

> If you think that is suspicious, wait until you learn about the other actors in this enormous set-up event. Brennan Gilmore was the first man "on the scene" and was the author of the first viral tweet about Charlottesville. He was later interviewed by MSNBC. He was presented as an accidental witness. But who is he really? Gilmore worked in Africa as a State Department foreign officer under Hillary Clinton. The New York Times mentioned this "coincidence" – and then later deleted it. Brennan Gilmore was also involved with the Kony hoax in 2012, and he is currently Chief of Staff for Tom Perriello, who is running for Governor of Virginia and received

---

[15] Wilburn wrote the article, Am. Compl. ¶ 126, which was published on the *Allen B. West* website. *See id.* Ex. H. Hickford "is the managing member and registered agent of Defendant Words-N-Ideas, LLC and the editor-in-chief of the *Allen B. West* website." *Id.* ¶ 23. *Words-N-Ideas, LLC* is "the purported owner of the *Allen B. West* website." *Id.* ¶ 24. Finally, West is the "owner of the national news website bearing his own name, *Allen B. West*." *Id.* ¶ 21. West argues that "he possessed no ownership interest in either of the two domains and had no involvement with operating the website." Dkt. No. 59 at 3. Similarly, on May 7, 2018, West's counsel sent Gilmore a letter demanding that Gilmore dismiss his claims against West for that same reason. *See* Ex. I. In a May 10, 2018 response, Gilmore noted the following facts: (1) the site features West's signature and a large picture of West, (2) the bottom of the homepage features a short biography of West, (3) the "About" page features a full biography of West, and (4) the "Contact" page invites readers to "Keep up with Allen" and provides information on how to book West for a speaking engagement or receive updates from him. Ex. J. Moreover, "the website does not mention that any other individual or entity owned the website or had editorial control over its content; nor does anything on the website otherwise disclaim Mr. West's involvement with it." *Id.* West did not respond to this letter, and has not provided any objective evidence to support his assertion that he did not control or endorse the site's content. Thus, there is at least a factual dispute about the extent of West's involvement, and dismissal of West under Rule 12(b)(6) would be inappropriate.

$380k from George Soros. So the first man on the scene, whose tweet went viral, and who was later interviewed on mainstream news as a witness, just happened to be a State Department insider with a long history of involvement in psy-ops? If you think this isn't fishy, how about this – since the Charlottesville protests and his appearance in the media, his information was suddenly removed from State Department websites.

Am. Compl. ¶ 126. The article goes on to say:

We need to clarify that these are early accounts and as yet unverified, but if true this is very, very serious stuff. It points directly to the reality of the "deep state" and more importantly to the lengths that the Soros/Clinton/Obama one-world government cabal will go in order to realize their desires for "fundamental transformation."

*Id.* ¶ 127.

Just like Jones' video, Wilburn, West, Hickford, and *Words-N-Ideas, LLC* at minimum imply that Gilmore was an "actor in [the] enormous set-up event [in Charlottesville]" orchestrated by the CIA and State Department, that Gilmore's information was removed from State Department websites to hide his involvement, and that the *New York Times* also removed a reference to Gilmore and his State Department work from one of its articles to cover up his involvement in the conspiracy. As noted repeatedly, however, these claims are false. *Id.* ¶¶ 27-35.

West argues that the use of the phrase "[w]e need to clarify that these are early accounts and as yet unverified" absolves him of liability. Dkt. No. 59 at 11. But this statement must be viewed in context. By using the word "BOMBSHELL" and claiming that the article will provide "[n]ew [e]vidence," the title suggests to readers that the article contains factual evidence to support Defendants' assertions. Am. Compl. ¶ 125. Moreover, immediately following the "unverified" language, the article states that "if true this is very, very serious stuff," and "points directly to the reality of the 'deep state' and more importantly to the lengths that the Soros/Clinton/Obama one-world government cabal will go in order to realize their desires for 'fundamental transformation.'" *Id.* ¶ 127. The inference fairly attributable to the words in this article is that the author has evidence

that Gilmore was an "actor in [the] enormous set-up event [in Charlottesville]" and that his partic-

ipation was subsequently covered up by the State Department and the *New York Times*.

**B. Defendants' False Statements Were Defamatory.**

In addition to being false, a statement must be defamatory to be actionable. A defamatory

statement is one that tends to "harm the reputation of another [so] as to lower him in the estimation

of the community or to deter third persons from associating or dealing with him." *Chapin*, 993

F.2d at 1092. Defamatory words "make the plaintiff appear odious, infamous, or ridiculous." *Id.*

(quoting *McBride v. Merrell Dow and Pharms., Inc.*, 540 F. Supp. 1252, 1254 (D.D.C. 1982)).

Moreover, certain defamatory statements are actionable *per se*:

> [t]hose which impute to a person the commission of some criminal offense involv-
> ing moral turpitude, for which the party, if the charge is true, may be indicted and
> punished . . . [and] [t]hose which impute to a person unfitness to perform the duties
> of an office or employment of profit, or want of integrity in the discharge of the
> duties of such an office or employment.

*Tronfield v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 449-50 (Va. 2006).

Each Defendant made statements that are defamatory *per se*. Each article and video falsely

asserted that Gilmore had foreknowledge of Fields' terror attack, that he was party to a conspiracy

to plan the Charlottesville events, including the murder of Heather Heyer, and that he was part of

a cover-up involving the State Department and news media. In short, Defendants have suggested

that Gilmore committed "criminal offense[s] involving moral turpitude, for which [he], if the

charge[s] [are] true, may be indicted and punished," *id.* at 449. In *Hatfill*, the Fourth Circuit held

that an author's columns were "capable of defamatory meaning" by "imput[ing] to [the plaintiff]

the commission of a crime involving moral turpitude" despite the author cautioning that "readers

should entertain a presumption of innocence" and that the FBI could end up exculpating the plain-

tiff. 416 F.3d at 333-34. The statements here are at least as defamatory as the column in *Hatfill*.

Moreover, the statements constitute defamation *per se* for the additional reason that the

36

articles "impute to [Gilmore] unfitness to perform the duties of an office or employment of profit," *id.* (quoting *Carwile*, 82 S.E.2d at 591). After all, if it were true that Gilmore had participated in a conspiracy involving terrorism and murder, he would be unfit to "perform the duties of an office or employment of profit." Such claims are particularly damaging to Gilmore, a State Department Foreign Service Officer who is on leave, because his "ability to continue to do diplomatic work is severely hindered by the false claim that he participated in a secret operation to stage riots and a violent attack and commit murder." Am. Compl. ¶ 71; *see id.* ¶¶ 50, 92, 113, 133 (same).

Moreover, at the very least, accusing Gilmore of participating in a violent terror attack that led to death and injury has "lower[ed] him in the estimation of the community [and] deter[red] third persons from associating or dealing with him," and therefore constitutes ordinary defamation, *Chapin*, 993 F.2d at 1092. Indeed, each article above literally had that effect, as evidenced by the comments left by each article's readers, *see* Am. Compl. ¶¶ 44-45 (Creighton article); ¶ 69 (Hoft article); ¶ 91 (*InfoWars*/McAdoo/Stranahan interview); ¶ 133 (Hickford/Wilburn/West article), as well as the threats and harassment Gilmore received and continues to receive as a result, *see id.* ¶¶ 150-63. The Amended Complaint describes in great detail the "barrage of harassing and threatening messages" that he has received since the Charlottesville event, *id.* ¶ 150, including the public sharing of his address, *id.* ¶ 151, attempts to login to his online accounts, ¶ 157, and multiple implied death threats against him and his family, *id.* ¶¶ 161-63. For example, Gilmore has been told on Twitter that it is a "[g]ood time" for him to "hide," *id.* ¶ 153, that his family will "feel[] the violence," *id.* ¶ 156, and that his "body [would be] found in [the] Rivanna River," *id.* ¶ 163. Gilmore was even accosted on the street in Charlottesville by an anonymous person who questioned him about his ties to Perriello, the Charlottesville mayor, and his work overseas, *id.* ¶ 158, and his parents received in the mail "a suspicious powdery residue and a letter explaining why Mr. Gilmore would 'burn in hell,'" *id.* ¶ 159. In short, the false statements in Defendants' articles and

37

videos made Gilmore seem "odious" and "infamous" to society, *Chapin*, 993 F.2d at 1092, and they are therefore defamatory.[16]

### C. Gilmore Is Not a Public Figure, So He Must Show Only Negligence.

Regarding the final defamation prong, the intent a plaintiff must prove in a defamation action depends on whether the plaintiff is a public or private figure. A plaintiff is required to prove actual malice in a defamation suit only when he is a "public official" or "public figure." *Gertz*, 418 U.S. at 348. By contrast, where a plaintiff is a private figure, Virginia requires him to show only negligence to obtain relief. *See Gazette, Inc.*, 325 S.E.2d at 724-27. Here, Gilmore is neither a public official nor a public figure, and therefore need only show negligence.

*First*, Gilmore is not a public official. A "public official" is one whose "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). Gilmore is a civil servant at the State Department who is currently on leave without pay, Am. Compl. ¶ 13; he never made public comments regarding the Charlottesville attack in his capacity as a government employee; and the Charlottesville attacks had no connection to his work for the State Department. In short, "the public had no independent interest in [Gilmore's] qualifications and performance beyond its general interest in the qualifications and performance of all government employees," *Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 37 (Va. 1987) (quotation marks omitted). And although Gilmore previously served as chief of staff to Tom Perriello during Perriello's gubernatorial campaign, the chief of staff to a gubernatorial candidate during a primary is not a person of "such apparent importance" that he should always be treated as a public

---

[16] Defendants deny that they could have foreseen these consequences, *see, e.g.*, Dkt. No. 47 at 81-86, but the Amended Complaint describes prior occasions on which these Defendants peddled similar conspiracies with similar harms resulting, Am. Compl. ¶¶ 164-77. In any event, these questions involve factual disputes that cannot be resolved at the pleading stage.

official. In any event, Perriello's campaign ended over a month before the Charlottesville events. *See* Gregory S. Schneider, *Northam Wins Democratic Gubernatorial Primary in Virginia*, Wash. Post (June 13, 2017), https://tinyurl.com/ycpvhvfg.

*Second*, Gilmore is also not a public figure. To determine whether an individual is a "'public figure for a limited range of issues,'" there must first exist "a particular public controversy that gave rise to the alleged defamation." *Foretech v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 & n.9 (4th Cir. 1994) (quoting *Gertz*, 418 U.S. at 351). If there is a public controversy, the court then determines whether "the nature and extent of the plaintiff's participation in that particular controversy [was] sufficient to justify 'public figure' status." *Id.* at 1553. Here, neither prong is met.

First, there was no public controversy giving rise to the alleged defamation. The Fourth Circuit has clarified that "[a] public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Id.* at 1554 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)); *see Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) (refusing "to equate 'public controversy' with all controversies of interest to the public"). For that reason, "a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Foretech*, 37 F.3d at 1554 (quoting *Waldbaum*, 627 F.2d at 1296). To that end, courts will often look to whether "the controversy existed prior to the publication of the defamatory statement." *Id.* at 1553.

Here, although the events in Charlottesville were the subject of great "interest to the public," there was no "real dispute" about either the demonstrations in Charlottesville or Gilmore himself prior to Defendants' defamatory publications, *id.* at 1554 (quoting *Waldbaum*, 627 F.2d at 1296). Attorney General Jeff Sessions declared that the "attack by a white supremacist was an act of domestic terrorism." Am. Compl. ¶ 29. The controversial aspects of the Charlottesville events

were the broader questions of white supremacy and the meaning behind the rally and counter-protests, but Gilmore was not "a spokesperson on any of these types of matters," *Wells*, 186 F.3d at 537. Instead, he merely posted on social media a video of events he was witnessing.

To the extent there is any "public controversy" here, it is only the one that Defendants themselves have created by suggesting repeatedly that there was a plot to stage the Charlottesville events, including the murder of a peaceful bystander, and to subsequently cover up this conspiracy. Defendants suggest that their articles and videos spoke to much broader issues like "the meaning of the events in Charlottesville," Dkt. No. 57 at 19, or "using a car as a weapon against protesters," Dkt. No. 47 at 64 (quoting Am. Compl. ¶ 146), but the articles and videos do not discuss these broad issues of public concern. Rather, Defendants' defamatory statements are singularly focused on a supposed conspiracy to stage the Charlottesville events, and Gilmore's alleged participation in that conspiracy, a "controversy" that did not exist until Defendants fabricated it. *See Jenoff v. Hearst Corp.*, 644 F.2d 1004, 1007 n.7 (4th Cir. 1981) (noting that although "domestic spying and the use of police informants were and are of general public concern," the specific controversy about the plaintiff acting as an informant for the Baltimore Police Department was "generated" by the defamatory articles and therefore did not constitute a public controversy).[17]

In any event, even if there were a public controversy, the nature and extent of Gilmore's participation was not sufficient to justify public-figure status. The facts of this case are strikingly similar to *Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999). There, the plaintiff sued for defamation after the defendant published statements accusing the plaintiff—the Secretary of the Democratic

---

[17] Of course, any media appearances following Defendants' defamatory statements where Gilmore defended himself from their false accusations "clearly fall[] within the category of self-help and reasonable response to reputation-injuring statements" that cannot form the basis of a public-figure finding, *Wells*, 186 F.3d at 537; *see Foretech*, 37 F.3d at 1558 ("[W]e are extremely reluctant to attribute public-figure status to otherwise private persons merely because they have responded to such accusations in a reasonable attempt to vindicate their reputations.").

National Committee (DNC)—of being part of a prostitution ring that could have been an impetus

for the Watergate break-in. Despite the plaintiff having made multiple media appearances, includ-

ing giving interviews to the *Washington Post* and the BBC, the Court held that she was not a public

figure. *Id.* at 537. The court noted that the plaintiff did not "sp[eak] to the press in any role other

than as a witness to history in response to their repeated requests." *Id.*; *see id.* (plaintiff "ha[d] a

story to tell about the facts of the break-in and the circumstances surrounding the investigation,"

but "[t]elling that story . . . [was] simply giving an eye-witness account of events that [were] no

longer controversial" and were "strictly personal observation[s]"). The controversial aspects of

Watergate were "bigger issues" like "why the break-in occurred, who was responsible, [and]

whether our Constitutional checks and balances are adequate," and the plaintiff did not "ma[ke]

any attempt to become a spokesperson on any of these types of matters." *Id.* For that reason, the

court concluded that the plaintiff was not a public figure.

Likewise here, Gilmore did not "sp[eak] to the press in any role other than as a witness to

history in response to their repeated requests," *id.* Gilmore had the misfortune of being a private

citizen that witnessed a tragic but important event in our nation's history—the attack on a peaceful

protest in Charlottesville—and he posted a video of the attack that he happened to capture on his

cell phone. He then gave interviews to news outlets to provide his first-hand eye-witness account

of the Charlottesville attack after receiving many media requests (which, importantly, he never

solicited). Am. Compl. ¶¶ 33-35. And this case contrasts starkly with cases where the Fourth Cir-

cuit has held that a plaintiff assumed a role of special prominence in a public controversy. *See,*

*e.g.*, *Hatfill v. N.Y. Times*, 532 F.3d 312, 324 (plaintiff "[t]hroughout his career, . . . was not only

repeatedly sought out as an expert on bioterrorism, but was also a vocal critic of the government's

unpreparedness for a bioterrorist attack, as evidenced by the topics of his lectures, writings, par-

ticipation on panels, and interviews"); *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 669 (4th

Cir. 1982) (plaintiff "lectured publicly on the subject and published several articles and reports on dolphin technology," "published brochures which refer to the use of dolphins in anti-submarine warfare," and appeared on *60 Minutes* to discuss the issue).

Indeed, if any private citizen who happens to capture news and shares it on social media or speaks about it to the press automatically qualifies as a public figure, countless private citizens would become public figures, erecting barriers to bringing libel claims if false and defamatory statements are subsequently made about them. Such a holding would deter private individuals from sharing important content that they capture. That cannot be right. For all those reasons, Gilmore is not a public figure and should be required to show only negligence. He plainly meets this burden for the same reasons he has adequately pleaded actual malice, as the next Section discusses.

### D. Even If Gilmore Is a Public Figure, Gilmore Has Alleged Actual Malice.

Even if Gilmore is a public figure, he has sufficiently alleged that Defendants acted with actual malice, which means that their statements were made "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *N.Y. Times Co.*, 376 U.S. at 279-80. Actual malice can exist "where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Gilmore has shown that each Defendant acted at least with reckless disregard of whether the statements they made about him were false.

*First*, although Defendants presented their publications and videos as fact-based journalism, they all severely departed from journalistic standards, failing to investigate any of the "facts" they alleged about Gilmore. Though "departures from journalistic standards" are not "determinant of actual malice," they "serve as supportive evidence for a reviewing court." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991); *see Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d

862, 871 (W.D. Va. 2016) ("reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice" (quoting *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015))); *see also CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 298-99 (4th Cir. 2008) (no actual malice where defendant consulted military reports, interviews, speeches, and articles before making statements); *Carr v. Forbes, Inc.*, 259 F.3d 273, 283 (4th Cir. 2001).

Here, Gilmore has alleged that—for each defamatory article and video—Defendants failed to conduct even the most basic investigation to verify their statements, and that they failed to follow even elementary journalistic standards. Am. Compl. ¶¶ 51-56, 72-78, 93-96, 114-18, 210-11, 238, 246-47, 263. Instead, Defendants relied on disreputable sources and failed to confirm their statements with anyone named in their "reports." *Id.* ¶¶ 51-54 (Creighton "conducted no research beyond identifying a few disparate facts from Mr. Gilmore's biography" and "did not have the facts alleged independently fact-checked"); ¶¶ 76-77 (Hoft "relied entirely on screenshots from an anonymous, disreputable Reddit post"); ¶¶ 93-95 (Stranahan, McAdoo, Jones, *InfoWars*, and *Free Speech Systems* "conducted no research of Mr. Gilmore beyond identifying a few, readily available disparate facts from his biography" and "did not identify any human sources in the article or video for their information regarding Mr. Gilmore other than from Mr. Gilmore's Twitter page or media appearances"); ¶¶ 114-17 (similar for Jones, *InfoWars*, and *Free Speech Systems*); ¶ 138 (Wilburn, West, Hickford, and *Word-N-Ideas* "did not identify any sources in the article relevant to the accusations about Mr. Gilmore other than an anonymous police statement, and no one associated with AllenWest.com independently fact-checked any of the allegations included in the article"). Moreover, no Defendants reached out to Gilmore for comment. *Id.* ¶¶ 52-53, 73, 76, 94, 115-16, 136-37.

*Second*, Defendants demonstrated through their articles and videos ill will toward Gilmore based on their fabricated narrative that he was connected to the "deep state," George Soros, the

43

CIA, and others. *See id.* ¶ 57 (Creighton "ha[d] a long history of accusing individuals and government entities of staging controversial and newsworthy events"); ¶ 79 (animosity by Hoft toward the "Deep State," "a perceived left-wing, organized bureaucratic resistance to the Trump Administration," and identified Gilmore as part of it); ¶ 97 (similar with respect to Stranahan); ¶ 119 (similar with respect to Jones); ¶ 141 (similar with respect to Wilburn). "[W]hile actual malice cannot be inferred from ill will or intent to injure alone, '[i]t cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry.'" *Eramo*, 209 F. Supp. 3d at 872 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)).

*Third*, the Amended Complaint alleges that Defendants conceived a storyline in advance of any adequate investigation and then set out to insert Gilmore into their preconceived narrative. Am. Compl. ¶¶ 58-59 (Creighton "utilized a preconceived and well-worn narrative that the attack was a 'psy-op' staged by individuals and government entities" and made Gilmore "a central actor in the narrative he had already crafted"); ¶ 79 (same for Hoft); ¶¶ 98-99 (same for Stranahan, McAdoo, Jones); ¶¶ 120-21 (Jones had "previously published similar statements claiming that other national tragedies were hoaxes created by the government to push a leftist agenda" and "twisted the[] elements" of Charlottesville "to fit [his] preconceived narrative"); ¶ 143 (Wilburn misrepresented information about Gilmore to "fit his preconceived narrative"); *see Eramo*, 209 F. Supp. 3d at 872 (finding that an author preconceived a storyline about a university's inaction regarding sexual assault on campus and for that reason did not listen to the students she interviewed). Indeed, Defendants have previously published numerous stories that conformed to a similar plot and attacked many of the same groups and institutions Defendants attacked here. *See, e.g.*, Am. Compl. ¶¶ 57-59, 79-80, 97-99, 119-20. The fact that Defendants continue to make the same spurious claims without any factual basis shows their reckless disregard for the truth.

*Fourth* and finally, the sheer outrageousness of Defendants' insinuations demonstrates that

they showed at least reckless disregard for the truth. *See St. Amant*, 390 U.S. at 732 (actual malice "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation"). Defendants insinuated through their articles and videos that Gilmore was a participant in a criminal conspiracy involving individuals and entities as far-flung as George Soros, Hillary Clinton, and the CIA, all to stage the Charlottesville events and the murder that occurred there in order to trigger a coup to overthrow the Trump Administration. In doing so, they were willfully blind to the truth: white supremacists rallied in Charlottesville, a crazed individual ran his car through a crowd of peaceful protesters, and Gilmore happened to be on the scene filming on his cell phone when it happened and posted the video online.

On top of all that, this case comes before the Court on a motion to dismiss, so the Court must "assum[e] the factual allegations are true" and permit the case to proceed if "the plaintiff has stated a ground for relief that is plausible," *Ashcroft*, 556 U.S. at 696. If Defendants wish to present evidence to the Court that they did in fact adequately research their articles and conform to journalistic standards, that they harbored no ill will toward Gilmore, that they did not conceive a storyline and then create false narratives to fit the storyline, or that their articles and videos are anything other than the gross fabrications that they appear to be on their face, Defendants can do so at subsequent stages of the litigation. However, they may not dispute the well-pled allegations of the complaint in their motions to dismiss, and the Court should reject their effort to have this case dismissed without any further factual development.

Finally, though many of the false and defamatory statements made by Wilburn, Hickford, West, and *Words-N-Ideas, LLC* rely on statements by Jones and *InfoWars*, it is well established that "[r]epetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports," *Goldwater v. Ginzburg*, 414 F.2d 324, 337

(2d Cir. 1969). Holding otherwise would create a loophole in defamation law, allowing countless publications to reprint blatantly defamatory statements and avoid liability simply because they did not write the statements to begin with. Because Wilburn's article quoted blatantly false and inherently improbable statements by Jones and *InfoWars* without engaging in any effort to corroborate or confirm the veracity of those statements, the Defendants that quoted that language should be accountable for the harm caused by those statements as well.

## V. GILMORE HAS STATED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST EACH DEFENDANT.

Under Virginia law, "[a] plaintiff seeking to recover for intentional infliction of emotional distress . . . must allege that (1) the defendant's conduct was intentional and reckless; (2) the conduct was outrageous and intolerable; (3) the conduct caused the plaintiff's emotional distress; and (4) the plaintiff's distress was severe." *Hatfill*, 416 F.3d at 336. Gilmore has met this burden for many of the same reasons he has stated a claim for defamation.

*First*, Gilmore has sufficiently alleged that Defendants' conduct was reckless. *See Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974) (reckless means the defendant "intended his specific conduct and knew or should have known that emotional distress would likely result"); *Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007) (defendant "acted intentionally to falsely accuse [the plaintiff], with the specific purpose of causing her humiliation, ridicule, and severe emotional distress"). As described in more detail above, Gilmore has alleged specific facts indicating that Defendants knew or should have known that their publication of false statements about Gilmore implicating him in the murder of Heather Heyer and other criminal conspiracies would cause him severe emotional distress, and they failed to do even the bare minimum of factual investigation to determine the truth of their statements before publishing them. *See* Am. Compl. ¶¶ 72-82, 93-100, 114-22, 210-13, 238, 246-47, 263; *see also supra* at 42-46.

46

*Second*, Defendants' conduct was outrageous and intolerable. Under Virginia law, IIED claims require the defendant's conduct to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Hatfill*, 416 F.3d at 336 (quoting *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)). In *Hatfill*, the Fourth Circuit held that conduct was extreme or outrageous where a newspaper "intentionally published false charges accusing [the plaintiff] of being responsible for anthrax mailings that resulted in five deaths, without regard for the truth of those charges and without giving [the plaintiff] an opportunity to respond." *Id.* Here, Defendants' statements place Gilmore at the heart of an attempted coup and accuse him of multiple serious crimes, including criminal conspiracy and murder. Moreover, Defendants did not bother to contact Gilmore regarding the truth of their statements. Defendants' intentional publication of these statements is plainly outrageous and should be considered "utterly intolerable in a civilized community." *Id.* (quoting *Russo*, 400 S.E.2d at 162).

Some Defendants rely on *Coles v. Carilion Clinic*, 894 F. Supp. 2d 783, 796-97 (W.D. Va. 2012), *see* Dkt. No. 47 at 90-91, but that case is distinguishable. There, this Court dismissed an African-American employee's IIED claim against his employer that was based on his employer's "use of racially abusive language and symbols," holding that mere "'verbal abuse and use of insensitive language'" is not sufficient. *Id.* at 796-97 (quoting *Law v. Autozone Stores, Inc.*, 2009 WL 4349165, at *3 (W.D. Va. Nov. 25, 2009)). Defendants' conduct here, however, far surpasses mere "verbal abuse" and "insensitive language." Defendants publicly accused Gilmore of criminal conspiracy and murder, and disseminated these allegations to their millions of readers and viewers—allegations which, if proven true, could subject Gilmore to criminal penalties, including incarceration, and at the very least subject him to severe personal and professional reputational harm. As the Amended Complaint describes, these allegations actually caused Gilmore to become the target of persistent death threats and character assassination that continue to this day. Am. Compl.

47

¶¶ 150-63. Thus, Defendants could not be more wrong when they argue that this is simply a case of "hurt feelings," Dkt. No. 57 at 23.

*Third*, and finally, the Amended Complaint sufficiently alleges severe emotional distress as a result of Defendants' statements. The Fourth Circuit has held that an allegation that the plaintiff suffered "severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, severe emotional distress and other injury," as well as "grievous emotional distress," was sufficient under Rule 8 to state a claim for IIED. *Hatfill*, 416 F.3d at 337; *see Daniczek v. Spencer*, 156 F. Supp. 3d 739, 759 (E.D. Va. 2016) (sustaining IIED claim where plaintiff suffered "financial harm, harm to her professional reputation, stress, clinical anxiety and depression, mood swings, and insomnia"). As detailed in the Amended Complaint, as a direct result of Defendants' reckless conduct, Gilmore has experienced physical and psychological manifestations of stress, including depression and a medical condition known as Central Serous Chorioretinopathy, and "lives in fear for his life" as a result of Defendants' reckless publications. Am. Compl. ¶¶ 180-83. These physical and psychological manifestations of emotional distress have affected his sense of safety and well-being, his professional reputation, his work relationships, his ability to generate income, his relationships with his family and friends, and his ability to interact socially. Am. Compl. ¶¶ 184-203, 283-92. This is the kind of severe emotional distress that "no reasonable person should be expected to endure," *Russo*, 400 S.E.2d at 164, and these allegations are plainly sufficient to survive a motion to dismiss.

## VI. SECTION 230 OF THE COMMUNICATIONS DECENCY ACT DOES NOT PRECLUDE GILMORE'S CLAIMS.

Defendants Hoft, Wilburn, Hickford, and *Words-N-Ideas* argue that they are immune from suit under Section 230 of the Communications Decency Act (CDA), which states that "[n]o provider or user of an interactive computer service shall be" held responsible "as the publisher or

48

speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). An information content provider in turn is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3). In short, "these provisions bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). Thus, Consumeraffairs.com cannot be held liable for third-party comments made on its website, *id.* at 257-58, AOL cannot be held liable for defamatory messages posted by a third party on its bulletin board, *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 328 (4th Cir. 1997), and Yelp cannot be held liable for a third party's defamatory review posted on its site, *Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015).

Hoft and Wilburn are nothing like Consumeraffairs.com, AOL, or Yelp. To start, Hoft authored an article that contained numerous defamatory statements, and published that article on his website, *Gateway Pundit*. Though his article includes some quotes from other sources, the false and defamatory statements were all original content written and published by Hoft. *See* Am. Compl. ¶ 63. Moreover, even if some of the defamatory content came in the form of quotations, the CDA describes an internet content provider as one who "in whole or *in part*" creates or develops information provided through the internet, 47 U.S.C. § 230(f)(3) (emphasis added), so the fact that he did not develop all of the information he posted does not make him immune from liability.

Similarly, Wilburn authored an article he chose to entitle "BOMBSHELL: New Evidence Suggests Charlottesville Was a Complete SET-UP," Am. Compl. ¶ 125, which included original, defamatory content, *id.* ¶ 127 (noting that the information he learned "points directly to the reality of the 'deep state' and more importantly to the lengths that the Soros/Clinton/Obama one-world government cabal will go in order to realize their desires for 'fundamental transformation'").

49

Again, the fact that some of Wilburn's article quoted another source does not make him immune from liability where the article was "in part" created by Wilburn himself. Defendants have offered no case from any jurisdiction holding that an author of a defamatory article enjoys Section 230 immunity simply because part of the article quoted other sources. *See Gen. Steel Domestic Sales, LLC v. Chumley*, 2015 WL 4911585, at *6 (D. Colo. Aug. 18, 2015) (distinguishing between "posts made on websites by third parties" and "information obtained from the internet and published by the defendants on their website on the internet").

As for Hickford and *Words-N-Ideas*, Defendants concede that a permissible "theory allowing for responsibility for the creation of content would be that [*Words-N-Ideas*] or Ms. Hickford was Mr. Wilburn's employer." Dkt. No. 47 at 30. And Gilmore alleged precisely that: "At the time the false and defamatory statements were made, Defendant Wilburn was an employee and/or agent of Defendants West, Hickford, and/or Words-N-Ideas" and that "West, Hickford, and/or *Words-N-Ideas* are legally responsible for the acts of their employees, agents, or servants, pursuant to the doctrine of *respondeat superior*." Am. Compl. ¶¶ 278, 281; *see id.* ¶ 279 ("Defendant Wilburn was acting within the scope of his employment."). This is not "simply a conclusory allegation," as Defendants suggest, Dkt. No. 47 at 30. Hickford is the "managing member" of *Words-N-Ideas* and the editor-in-chief of the *Allen B. West* website, Am. Compl. ¶ 23, and *Words-N-Ideas* owns the website, *id.* ¶ 24. Moreover, the Amended Complaint notes that in an interview, "West claimed that Defendant Hickford, as president of *Words-N-Ideas*, owned the rights to the *Allen B. West* website at the time Defendant Wilburn's article was published and was the person who published Defendant Wilburn's article on the website." *Id.* ¶ 23. Even if Wilburn's status as an employee of *Words-N-Ideas* and Hickford were not sufficient to confer liability on *Words-N-Ideas* and Hickford, Gilmore also alleged that "Hickford and/or *Words-N-Ideas* participated in . . . Wilburn's conduct." *Id.* ¶ 280. To the extent that Hickford or *Words-N-Ideas* seek to contest these allegations

in the Complaint, they can do so at a later stage of the litigation. A motion to dismiss is not the appropriate time to challenge Gilmore's plausible factual allegations.

## VII.  UNDER EITHER TEXAS OR VIRGINIA LAW, GILMORE SHOULD NOT BE REQUIRED TO PAY ATTORNEYS' FEES IF DEFENDANTS PREVAIL.

Defendants argue that they should be granted attorneys' fees and costs under either Virginia Code § 8.01-223.2 or the Texas Citizens Participation Act (TCPA), Tex. Civ. Prac. & Rem. Code § 27.001. However, because Gilmore has stated a claim for defamation, and because Defendants acted at least with reckless disregard for whether their statements were false, neither of these statutes applies. If one of these statutes does apply, this Court should still decline to award attorneys' fees and costs because Gilmore brought this case in good faith, alleging claims that raise at least close questions of law, and based on real and serious harms that he and his family suffered. Finally, to the extent that either statute raises the burden on plaintiffs at the pleading stage above the requirements of Rule 12(b)(6), it directly conflicts with the Federal Rules of Civil Procedure and therefore cannot be applied in federal court.

### A.  Under Virginia Law, Gilmore Should Not Be Required To Pay Attorneys' Fees.

As noted above, Virginia law applies in this case. *See supra* at 21-22. Under Virginia law, "[a] person shall be immune from civil liability for . . . a claim of defamation based solely on statements . . . regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party." Va. Code Ann. § 8.01-223.2(A).[18] The statute also provides an exception: "[t]he immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false." *Id.* In short, § 8.01-223.2 essentially reiterates the standard for defamation claims, providing immunity from a defamation

---

[18] Section 8.01-223.2 does not provide immunity from IIED claims.

suit for statements "that would be protected under the First Amendment," *id.,* and does not appear to change the burden on a plaintiff at the motion-to-dismiss stage. As argued above, Gilmore has stated a claim for defamation, so Defendants' statements are not protected by the First Amendment, and § 8.01-223.2 does not apply. In any event, Defendants' statements were at least made with reckless disregard for whether they are false, *supra* at 42-46, and so Defendants' conduct falls within the exception clause.

Even if Defendants do merit immunity under § 8.01-223.2, they should not be awarded attorneys' fees and costs. The statute provides that "[a]ny person who has a suit against him dismissed pursuant to the immunity provided by this section *may* be awarded reasonable attorney fees and costs." Va. Code Ann. § 8.01-223.2(B) (emphasis added). The Court should not exercise that discretion here. At minimum, there are colorable arguments that Defendants have defamed Gilmore and that their false and defamatory statements are not protected by the First Amendment. *Cf. Flippo v. CSC Assocs. III, L.L.C.*, 547 S.E.2d 216, 227 (Va. 2001) (for motion for sanctions, considering "whether a litigant and his attorney, after reasonable inquiry, could have formed a reasonable belief that the pleading was well grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and not interposed for an improper purpose"). And this case was not brought, as Defendants suggest, "with no possibility of success to harass and burden the Defendants," Dkt. No. 57 at 24. Gilmore filed this suit in good faith, alleging serious claims for defamation and IIED after he and his family faced months of online smears and harassment—even in-person harassment—as a result of Defendants' articles and videos about him. For those reasons, attorneys' fees and costs would not be appropriate here.[19]

---

[19] Notably, this Virginia law was passed in 2017, and there is no court decision applying it to award attorneys' fees, much less in a case like this one where the equities so favor the plaintiff.

**B. Under Texas Law, Gilmore Should Not Be Required To Pay Attorneys' Fees.**

The Texas Citizens Participation Act (TCPA) provides "a special procedure for the expedited dismissal of" "retaliatory lawsuits that seek to intimidate or silence" citizens. *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015). Under that provision, if a defendant files a motion showing "by a preponderance of the evidence" that the plaintiff's claim "relates to, or is in response to the [movant's] exercise of . . . the right to free speech." Tex. Civ. Prac. & Rem. Code § 27.005(b), (b)(1), the burden shifts to the plaintiff to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c).

As an initial matter, it is unclear whether Defendants have shown "by a preponderance of the evidence" that this lawsuit responds to "the defendant's valid exercise of First Amendment rights." *Lipsky*, 460 S.W.3d at 586. There was no "valid exercise of First Amendment rights" here because, as discussed above, the First Amendment does not protect false and defamatory statements. *See supra* at 22-38. In any event, even assuming the TCPA applies, it either imposes the exact same burden on a plaintiff as Rule 12(b)(6) does—in which case Gilmore has satisfied that burden—or it imposes a higher burden—in which case the TCPA cannot apply in federal court. In either case, there is no basis for imposing liability on Gilmore pursuant to the TCPA.

The Texas Supreme Court has not clearly stated whether the TCPA's "clear and specific evidence [of] a prima facie case" standard imposes a greater burden on plaintiffs than Rule 12(b)(6) does. *Compare Lipsky*, 460 S.W.3d at 591("In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss."), *and Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett*, 2015 WL 5148732, at *4 (W.D.N.C. Sept. 2, 2015) ("[I]t appears that the analysis required by the [TCPA] does not differ substantially from that required by Rule 12(b)(6)."), *with Lipsky*, 460

S.W.3d at 590 ("pleadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's 'clear and specific evidence' requirement"). To the extent that the TCPA imposes the same standard as Rule 12(b)(6), Gilmore has pleaded facts sufficient to resist the motion, for the reasons discussed above.

To the extent that the TCPA imposes a heightened burden on plaintiffs bringing defamation or IIED claims at the pleading stage, it conflicts with the Federal Rules and cannot apply in federal court. A federal court exercising diversity jurisdiction should not apply a state law or rule if the Federal Rules of Civil Procedure "answer the same question." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-99 (2010). If the TCPA is interpreted to impose a higher burden of proof on plaintiffs at the pleading stage, it conflicts with Rule 12(b)(6). Specifically, under Rule 12(b)(6), a plaintiff "must allege sufficient facts to establish th[e] elements" of her claim, "not forecast evidence sufficient to prove the elements." *Walters v. McMahan*, 684 F.3d 435, 439 (4th Cir. 2012) (quotation marks omitted). An interpretation of "clear and specific evidence [of] a prima facie case" that raises that pleading standard would impermissibly go above and beyond what the Federal Rules require a plaintiff to show to avoid dismissal. *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1332-34 (D.C. Cir. 2015).[20] For that reason, this Court may not apply the TCPA in this federal diversity action if it places a higher burden on Gilmore than Rule 12(b)(6) does.

Finally, even if the TCPA applies and does place a higher burden on Gilmore than Rule 12(b)(6) does, the Court should still not grant attorneys' fees or costs for the reasons described

---

[20] Fed. R. Civ. P. 12(b)(6) is also a valid exercise of authority under the Rules Enabling Act. *See Abbas*, 783 F.3d at 1337. Under the Rules Enabling Act, the Supreme Court "prescribe[s] general rules of practice or procedure and rules of evidence" for the lower federal courts, and these rules will not be found to violate the Rules Enabling Act unless they "abridge[], enlarge[], or modif[y] any substantive right." *Id.* at 1336 (citing 28 U.S.C. § 2072(a), (b)). "[P]leading standards and rules governing motions for summary judgment are procedural." *Id.* at 1337.

54

above. Texas law provides that "[i]f the court orders dismissal of a legal action under [the TCPA], the court shall award to the moving party . . . court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and . . . sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter." Tex. Civ. Prac. & Rem. Code § 27.009(a)(1), (a)(2). As that text makes clear, the question whether to impose fees or sanctions is an equitable one within the discretion of the district court. Gilmore's Complaint was filed in good faith and makes claims for defamation and IIED that are, at minimum, colorable and were intended to seek redress for the real harms that Gilmore faced as a result of Defendants' statements. Thus, this Court should not award fees or costs or impose sanctions.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss and requests for attorneys' fees and costs.

Respectfully submitted,

/s/ Andrew Mendrala

Elizabeth B. Wydra, admitted *pro hac vice*
Brianne J. Gorod, admitted *pro hac vice*
CONSTITUTIONAL ACCOUNTABILITY
  CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

Andrew Mendrala, Virginia Bar No. 82424
Aderson Francois, admitted *pro hac vice*
CIVIL RIGHTS CLINIC
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9065
andrew.mendrala@georgetown.edu

*Counsel for Plaintiff Brennan Gilmore*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2018, the foregoing document was filed with the Clerk of

the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: June 19, 2018

*/s/ Andrew Mendrala*
Andrew Mendrala
