**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**

_____
                                        )

BRENNAN M. GILMORE,           )
                                        )

        Plaintiff,           )
                                        )

v.                                )    No. 3:18-cv-00017-NKM
                                        )

ALEXANDER E. (ALEX) JONES, *et al.***,**  )
                                        )

        Defendants.        )
                                        )
_____)

**BRIEF OF FIRST AMENDMENT AND MEDIA LAW
SCHOLARS**

## I.    INTEREST OF AMICI

As *amici curiae*, the signatories to this brief urge the Court to reject the instant Motions to Dismiss and to allow this suit to proceed. Each signatory is a distinguished professor of constitutional and/or media law, with expertise and interest in application of the First Amendment. They file this brief in order to share their perspective on the twin considerations of protection of speech and protection of reputation that are implicated in this case. Ultimately, they urge the Court that the First Amendment does *not* counsel dismissal of this suit. Further, they urge the Court to consider the detrimental effects that dismissal of this case would have on witnesses who seek to come forward with facts others deem inconvenient.

## II.    INTRODUCTION

On August 12, 2017, in Charlottesville, Virginia, Brennan Gilmore witnessed James Alex Fields, Jr., a neo-Nazi, deliberately drive into a crowd of peaceful protestors, killing Heather Heyer and injuring many others. After hearing that media outlets were suggesting that the attack

was an accident or an act of self-defense, Mr. Gilmore shared his account of the attack with the public via *Twitter*. In response to Mr. Gilmore's eyewitness account, Defendants targeted Mr. Gilmore with publications alleging false and absurd conspiracy theories implicating Mr. Gilmore in the planning of the attack. As a direct result of these statements, Mr. Gilmore has been subject to threats and harassment.

The Defendants' publications, written with the intention of destroying Mr. Gilmore's reputation for the benefit of their own political agenda, are not protected by the First Amendment. While "some false statements are inevitable if there is to be open and vigorous expression of views in public and private conversation," *United States v. Alvarez*, 567 U.S. 709, 718 (2012), the Supreme Court has never endorsed the view that knowingly false statements causing direct, legally cognizable harm to another should be protected. The law of defamation serves to anchor public discourse in truth and protect our system of freedom of expression from knowing or malicious lies about an individual. Indeed, defamation has always involved two interests—protection of speech on the one hand and protection of reputation on the other. Reputation is "a concept at the root of any decent system of ordered liberty" and it should not be treated lightly here. *Rosenblatt v. Baer*, 383 U.S. 75, 93 (1966) (Stewart, J., concurring). To do so would be to grant an undue privilege to untrue statements of facts, maliciously made. And it would do so at the expense of a private individual who stepped forward with newsworthy information in the wake of a troubling event. This would set a dangerous precedent. Further, it is unwarranted by the law. The statements made by the Defendants *were* defamatory. Mr. Gilmore is not a public figure but, even if he were, he has properly pleaded actual malice. The Motions to Dismiss should be rejected.

## III.    ARGUMENT

### A.    *Protection of reputation is an important societal interest.*

The protections afforded to speech under the First Amendment have been much expounded upon. Content-based restrictions on speech are presumed invalid, save for a few "historic and traditional categories of expression," including defamation. *Alvarez*, 567 U.S. at 717 (internal citations omitted). Indeed, defamation law creates and enforces social boundaries about what speech is and is not acceptable. It "exists not merely to validate the dignitary interests of individual plaintiffs" but also "helps to make meaningful discourse possible," and "gives society a means for announcing that certain speech has crossed the bounds of propriety." Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, 49 Duke L.J. 855, 885-86 (2000) (citing Robert C. Post, Constitutional Domains (1995); Robert C. Post, *The Social Foundations of Defamation Law: Reputation and the Constitution*, 74 Cal. L. Rev. 691, 713 (1986)). Nor is it a recent innovation—defamation is a feature of ancient laws dating back at least to the ecclesiastical courts of the Middle Ages. Van Vechten Veeder, *The History and Theory of Defamation Law*, 3 Columbia L. Rev. 546 (1903).

Defamation law seeks to protect both public and private figures from malicious lies, which debase our entire system of free expression. To do this, defamation law deems certain types of speech beyond the pale—when it comes to public figures, this includes speech uttered with reckless disregard for the truth. For private figures, the law places even more speech beyond the pale—and there are sound reasons behind this, including the fact that private figures do not have the same means and ability to disseminate their own side of the story.

Without defamation law, public discourse "would have no necessary anchor in truth." David A. Anderson, *Is Libel Law Worth Reforming?*, 140 U. PA. L. Rev. 487, 490 (1991). Defamation law thus protects the public, who must ascertain what of the myriad of information

presented to them is accurate. Defamation suits are public and, if successful, exonerating; conduct that does not rise to the level of actionable libel thus maintains a certain amount of credibility. Without defamation law, the ordinary citizen would be left unsure of who and what can be trusted, and those subject to knowing or malicious untruths left without recourse. The press would likewise be impoverished by this state—"[w]ithout libel law, credibility of the press would be at the mercy of the least scrupulous among it." *Id*. Defamation and libel law thus protect legitimate fact-based journalists, who seek to present true information to the public.

Libel and defamation law further serve the interests of the press—and the public—by protecting individuals like the Plaintiff who are injected into public debate. Mr. Gilmore was not a public figure prior to the events in Charlottesville (as discussed below, nor was he a public figure at the time he was defamed). Instead, he was a private citizen who happened to capture something newsworthy—footage of James Alex Fields Jr. deliberately driving his car into a crowd of peaceful protestors—and who then felt comfortable coming forward with that footage. That footage was deemed newsworthy by many news outlets, many of whom welcomed the chance to interview Mr. Gilmore himself. Had Mr. Gilmore known that he could be defamed with no recourse for sharing his footage, he would have had a powerful incentive to stay quiet, depriving the press and the public of an eyewitness account of an important event. Defamation law allows individuals thrust into the public light redress should untruths be spread, and thus encourages them to come forward.

Protection of speech under the First Amendment is a priority of the first order. But in the field of defamation law, it is not and cannot be the only priority. Protection of reputation is an important social good in and of itself. And in a case, such as this, where a private citizen steps forward with information of great public import, that individual's reputation should not be lightly

cast aside. It should be valued as, in Justice Stewart's words, "at the root of any decent system of ordered liberty." *Rosenblatt*, 363 U.S. at 92 (Stewart, J., concurring).

The Supreme Court has written at length about the vital necessity of ensuring that both speech and the press are largely unburdened by states as well as by the Federal Government. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 277-78 (1964). But as Justice Stewart wrote in his seminal concurrence in *Rosenblatt*, "[i]t is a fallacy . . . to assume that the First Amendment is the only guidepost in the area of state defamation laws." 383 U.S. at 92 (Stewart, J., concurring). Instead, there is a public interest in the protection of reputation that is as important in its way as effectuating the purposes of the First Amendment. Indeed, "[i]mportant social values . . . underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Id.* It is this countervailing principle that allows courts to consider "the line between speech unconditionally guaranteed and speech which may legitimately be regulated." *Speiser v. Randall*, 357 U.S. 513, 525 (1958).

Protection of reputation is fundamental. As Justice Stewart wrote:

> The right of a man to the protection of his own reputation from
> unjustified invasion and wrongful hurt reflects no more than our
> basic concept of the essential dignity and worth of every human
> being—a concept at the root of any decent system of ordered
> liberty.

*Rosenblatt*, 383 U.S. at 92 (Stewart, J., concurring). For this reason, protection of individuals against defamation is a protection of individual liberty. Defamation law should not be seen merely as a restraint on speech, but as a safeguard of reputation, an important societal good in and of itself. Further, it is one that should be protected by the federal courts: "[t]he protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Id.* (Stewart, J., concurring).

**B.** ***There is no constitutional value in knowing or malicious false statements of fact.***

The false statements of fact that were made about Mr. Gilmore were numerous.

Defendants said, variously:

- That Mr. Gilmore had links to the Central Intelligence Agency ("CIA") and "various other black ops kind of actors."

- That Mr. Gilmore had foreknowledge the events in Charlottesville were going to happen.

- That Mr. Gilmore was a "deep state shill."

- That Mr. Gilmore had links to George Soros or was even in his pay.

- That Mr. Gilmore had links to the campaigns of Hillary Clinton and Barack Obama.

- That Mr. Gilmore colluded to remove his name from the State Department website.

And the statements, taken together, connoted an even bigger falsehood: that Mr. Gilmore was a CIA agent who participated in planning the attack in Charlottesville. Mr. Gilmore has been harmed by these verifiably false statements of fact in ways that were eminently predictable.

Readership of the Defendants' publications, for instance, shared his parents' address online and sent him threatening and harassing messages. As a direct result of Defendant's statements, Mr. Gilmore has been subject to hate mail, death threats, hacking attempts, and harassment. Amended Complaint ¶¶ 151-156, ECF No. 29. He was even physically accosted in the street. Amended Complaint ¶ 158. His career as a Foreign Service Officer has been compromised; he has lost potential partners and clients in his most recent business venture; and

his social and romantic relationships have been polluted by the content that comes up in a Google search of Mr. Gilmore's name. Amended Complaint at 3, ¶ 184-85.

One way in which courts can distinguish between protected speech and speech that is unduly damaging to reputation is by examining the truth of the statements at issue. False speech does not serve the public interest the way that true speech does. And indeed, "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues.'" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) (citing *N.Y. Times Co.*, 376 U.S. at 270).[1] Nor can Defendants excuse themselves from making false statements on the basis that it is merely "connotation" or "opinion." A statement that contains a "provably false factual connotation" is actionable. *WJLA-TV v. Levin*, 564 S.E.2d 383, 392 (Va. 2002); *see also Hatfill v. N.Y. Times Company*, 416 F.3d 320, 331 (4th Cir. 2005) ("A defamatory charge may be made expressly or by inference, implication, or insinuation." (internal quotations omitted)); *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 592 (Va. 1954) ("[I]t matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory."). And opinion itself is no defense—as the Supreme Court has recognized, "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18 (1990).

Likewise, despite the claims of Defendants, repetition is not a defense. "Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted." *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969).

---

[1] In *Alvarez*, the Court clarified that this does not mean false statements receive no First Amendment protection. But it did so in the context of, essentially, invalidating a statute for overbreadth—the statute in question sought "to control and suppress all false statements [on the subject of military honors] in almost limitless times and settings." It did not do away with defamation law in that opinion, and instead clarified merely that in defamation law, the lies in question must be reckless or knowing.

The Defendants' attempt to parse their words to avoid the clear connotations of them should not be allowed. Not only are the ultimate implications of their words clear—that Mr. Gilmore participated in planning the Charlottesville attacks—they contain numerous explicit falsehoods that are equally damaging to Mr. Gilmore (for example, assertions that he, a State Department official, is connected to the CIA). Ruling for Defendants in this case would set a dangerous precedent. It would allow unscrupulous news organizations to couch their language as "opinion" and to mask their meaning with implication and insinuation, leaving readers clear as to the message but avoiding all liability for defamatory remarks. This should not be allowed and, in fact, *is* not allowed. Courts have rejected attempts, like that by the Defendants, to avoid liability through insinuation. *See WJLA-TV*, 564 S.E.2d at 392; *see also Hatfill*, 416 F.3d at 331; *Carwile*, 82 S.E.2d at 592.

In sum, the statements at issue in this case have all the hallmarks of unprotected speech. There is no social value in permitting the falsehoods that have harmed Mr. Gilmore's reputation and career to stand. The Defendants' arguments to the contrary should be rejected.

### C. *Mr. Gilmore is not a public figure.*

Defendants argue that Mr. Gilmore is a limited-purpose public figure. This is not true. As Defendants point out, the test for limited public purpose figures is clear:

> (1) the plaintiff had access to channels of effective communication;
> (2) the plaintiff voluntarily assumed a role of special prominence
> in the public controversy; (3) the plaintiff sought to influence the
> resolution or outcome of the controversy; (4) the controversy
> existed prior to the publication of the defamatory statement; and
> (5) the plaintiff retained public figure status at the time of the
> alleged defamation.

*Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982). Defendants are wrong that Mr. Gilmore passes this test. "A libel defendant must show more than mere newsworthiness to

justify application of the demanding burden of *New York Times*." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167-68 (1979). Defendants here have failed to do that.

First, Mr. Gilmore did not have access to effective channels of communication. Mr. Gilmore, like everyone with an Internet connection, had access to *Twitter*; he posted one video that was retweeted by a variety of sources and which became popular. That does not mean that he had an effective channel of communication by which to disseminate his side of the story once he was defamed. At minimum, that would depend on Mr. Gilmore's actual followers—the audience that would likely see the tweets in question—and is not appropriate for resolution at the motion to dismiss stage. To hold otherwise would require finding that this prong of the limited public figure test is satisfied by everyone with a social media account, thereby rendering it meaningless.

Nor does the fact that Mr. Gilmore was interviewed by national media about a single event mean that he had access to those channels of communication in order to rebut defamatory statements later on. Mr. Gilmore was a citizen on the spot who was interviewed in news stories about a discrete event. He is not a public figure whose utterances *are* news; nor is he a member of the media with his own platform. In short, Mr. Gilmore has no more platform to put out his side of the story than does any private citizen.

Likewise, Mr. Gilmore did not seek to influence events. Instead, he presented a recording and an eyewitness account. His tweet identified the event as terrorism—a gloss on events that he shared with Attorney General Jeff Sessions,[2] but hardly an attempt at persuasion. Mr. Gilmore's actions should be viewed not as an attempt to influence but rather as an attempt to inform. Indeed, Mr. Gilmore's conduct is exactly the type of conduct that the law should

---

[2] Charles Savage & Rebecca Ruiz, *Sessions Emerges as Forceful Figure on Condemning Charlottesville Violence*, N.Y. Times (Aug. 14, 2017), https://www.nytimes.com/2017/08/14/us/politics/domestic-terrorism-sessions.html.

encourage.  If an eyewitness to events knew he could be deemed a public figure merely by coming forward and stating what he knew, there would be a powerful disincentive to refrain from coming forward at all.  Mr. Gilmore behaved precisely as we would hope one in his position would behave—he shared footage and an eyewitness account in order to inform his fellow citizens about a newsworthy event he happened to witness.  That should not be deemed sufficient to transmute a private figure into a public one; nor should it be considered an attempt to influence the outcome of the controversy at hand.  Certainly it should not be deemed sufficient to rule that Mr. Gilmore attempted to influence events at the motion to dismiss stage of the lawsuit.

The Supreme Court has declined to adopt rules that would, for instance, "sweep all lawyers under the *New York Times* rule as officers of the court and distort the plain meaning of the 'public official' category beyond all recognition."  *Gertz*, 418 U.S. at 351.  And, in fact, the Court held in that case that "an attorney was not a public figure even though he voluntarily associated himself with a case that was certain to receive extensive media exposure."  *Wolston*, 443 U.S. at 167.  Here, Defendants would have every eyewitness to a crime who told their story to news organizations cast as a public figure.  This, like the proposed rule in *Gertz*, would distort the public figure rule beyond all meaning and should be rejected.

      **D.**     **Mr. Gilmore has properly pleaded actual malice.**

Even if this Court finds that Mr. Gilmore is a limited purpose public figure, Mr. Gilmore has established that the statements in question were made with actual malice.  The Supreme Court has made clear that "neither lies nor false communications serve the ends of the First Amendment," and that the actual malice standard represents the line between false statements about public figures that are protected and those that are not.  *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  As noted, the false statements made by Defendants are numerous

and—in point of fact—absurd. Mr. Gilmore has met his burden to plead that they were made with actual malice.

Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989), such that the defendant "in fact entertained serious doubts as to the truth of his publication," *St. Amant*, 390 U.S. at 731, and that there were "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 732. Nor are professions of good faith sufficient, as the Court found in *St. Amant:*

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.

*Id.*

At the motion to dismiss stage, the showing required of the defendant's state of mind is only that the allegations are plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mr. Gilmore has met that burden, alleging sufficient facts to support an inference that the defendants failed to investigate their allegations against Mr. Gilmore; that Defendants departed from the most basic journalistic standards of accuracy for factual reporting; that Defendants harbored ill will toward "psy-ops" and the "Deep State" and actors allegedly connected with those actions and entities; and that Defendants entertained serious doubts as to the veracity of their claims.

First, Mr. Gilmore alleges that the Defendants failed to adequately investigate or conform to basic journalistic standards of accuracy for factual reporting. Defendants failed to reach out to

Mr. Gilmore, either to confirm each publication's statements and conclusions or for a response to the allegations contained in each publication. Nor did any of the Defendants independently fact-check, update, or correct the facts they alleged in their publications. Amended Complaint ¶¶ 52-55, 72-77, 93-95, 114-18, 135-40. Second, Mr. Gilmore alleges that the Defendants harbored animosity and ill-will against him for his political leanings, pointing to evidence that defendants labeled him in their publications as part of the "Deep State" and a participant in a "psy-op," as well as to previously-published articles authored by Defendants claiming that other national tragedies were hoaxes created by the government to push a leftist agenda. Amended Complaint ¶¶ 57, 79, 97, 119-20, 141. Although failure to investigate, a departure from journalistic standards, and evidence of ill will do not on their own support a finding of actual malice, proof of all three supports such a finding. *See Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d. 862, 871-72 (W.D. Va. 2016); *see also Harte-Hawks Commc'ns, Inc.*, 491 U.S. at 692 ("[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of truth is in a different category." (internal citations omitted)).

Mr. Gilmore goes further, alleging sufficient facts to support an inference that Defendants twisted the truth to conform to a preconceived narrative about the violence in Charlottesville, and that Defendants harbored doubts as to the veracity of their own reporting. First, Mr. Gilmore alleges that the Defendants inserted Mr. Gilmore into a preconceived narrative that the events in Charlottesville were a "psy-op" staged by individuals and government entities, and that George Soros, the State Department, and the Democratic Party were behind the attack. Among other facts, Mr. Gilmore points to previous articles by Defendant Creighton labeling the counter-protestors in Charlottesville as "Soros-backed" (Amended Complaint ¶ 59); Defendant Hoft's previously authored articles claiming that the "Deep State" plans to oust President Trump and

that the State Department would attempt to overthrow the U.S. Government (Amended Complaint ¶ 79); previously published articles by *InfoWars* and *Free Speech Systems* claiming that national tragedies were "inside jobs" created by the government to push a leftist agenda (Amended Complaint ¶ 98); and that Defendant Wilburn used select facts, misinterpreted information about Mr. Gilmore's professional history, and relied on unverified and false testimony of an anonymous Charlottesville police officer he found on the Internet (Amended Complaint ¶ 143).

As evidence indicative of the Defendants' doubts as to the truth of their claims, Mr. Gilmore points out that in authoring each publication, the Defendants disavowed the simplest (and factually accurate) explanation for the events in Charlottesville: that Mr. Gilmore's witnessing of Fields' attack was a coincidence unrelated to his employment at the State Department. Amended Complaint ¶¶ 60, 82, 100, 122, 144. Mr. Gilmore also pointed to the fact that Defendant Hoft exclusively relied on screenshots from an anonymous, disreputable Reddit post as his "research" (Amended Complaint ¶ 77); that while Defendant Jones stated in his video *Breaking: State Department/CIA Orchestrated Charlottesville Tragedy* that he "did the research," the referenced research seems to be limited to Google screen shots and it is dubious what, if anything, the screen shots revealed (Amended Complaint ¶ 117); and that Defendant Wilburn and the Defendants associated with AllenWest.com noted that the factual claims made in their article were "unverified" (Amended Complaint ¶ 144). But a defendant's assertion that the statements at issue were published with a belief that they were true is not sufficient to defeat a defamation action. *St. Amant*, 390 U.S. at 732.

By presenting evidence that Defendants twisted true facts about Mr. Gilmore's employment history with false, unverified assertions for which defendants had ample reason to

doubt the veracity, Mr. Gilmore has presented a plausible inference that the Defendants entertained serious doubts as to the truth of the statements and implications published in their articles. *See id.* at 731 (evidence that the defendant in fact entertained serious doubts as to the truth of his publication "shows reckless disregard for truth or falsity and demonstrates actual malice."); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice."). Here, at the motion to dismiss stage, this Court must "accept as true all of the allegations contained in a complaint," *Ashcroft*, 556 U.S. at 678, and find that Mr. Gilmore has met his burden to establish actual malice. To find otherwise would be to countenance a shocking departure from journalistic standards which resulted in putting forth allegations so absurd that only a "reckless man would have put them in circulation." This court should reject such an outcome.

IV.    **CONCLUSION**

This Court should reject the Motions to Dismiss filed by each Defendant and allow this suit to proceed.

Respectfully submitted,

*/s/ Michael B. Hissam*

Lyrissa B. Lidsky                              Michael B. Hissam (Va. Bar No. 76843)
Dean and Judge C.A. Leedy Professor of Law     BAILEY & GLASSER, LLP
UNIVERSITY OF MISSOURI SCHOOL OF LAW           209 Capitol Street
230 Hulston Hall                               Charleston, WV 25401
Columbia, MO 65211-4300                        Phone: (304) 345-6555
Phone: (573) 882-3246                          mhissam@baileyglasser.com
lidskyl@missouri.edu                           *Amicus Counsel for Plaintiff*

Tamara R. Piety
Professor of Law
UNIVERSITY OF TULSA COLLEGE OF LAW
3120 E. 4th Place
Tulsa, OK 74104
Phone: (918) 631-2490
tamara-piety@utulsa.edu

David A. Strauss
Gerald Ratner Distinguished Service Professor
  of Law
Faculty Director, Supreme Court and
  Appellate Clinic
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 East 60th Street
Chicago, IL 60637
Phone: (773) 702-9601
d-strauss@uchicago.edu

Carlos A. Ball
Distinguished Professor of Law and Judge
  Frederick Lacey Scholar
RUTGERS UNIVERSITY
123 Washington Street
Newark, NJ 07102
Phone: (973) 353-3008
cball@law.rutgers.edu

Katharine M. Mapes (DC Bar No. 993784)
Katherine J. O'Konski (DC Bar No. 1014691)
SPIEGEL & MCDIARMID LLP
1875 Eye Street, NW
Suite 700
Washington, DC 20006
Phone: (202) 879-4000
katharine.mapes@spiegelmcd.com
katherine.okonski@spiegelmcd.com
*Of Counsel*

June 19, 2018

**CERTIFICATE OF SERVICE**


      I HEREBY CERTIFY that on this 19th day of June, 2018, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

      Dated: June 19, 2019


                              */s/ Michael B. Hissam*
                                Michael B. Hissam