IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| BRENNAN M. GILMORE,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER E. JONES, et al.,<br><br>Defendants. | Case No. 3:18-cv-00017-NKM |

**REPLY IN SUPPORT OF MOTION TO DISMISS
AND MOTION FOR ATTORNEY FEES PURSUANT TO THE
TEXAS CITIZENS PARTICIPATION ACT OR THE VIRGINIA ANTI-SLAPP ACT**

Thomas E. Albro
Evan D. Mayo
Tremblay & Smith, PLLC
105-109 E. High Street
Charlottesville, VA 22902
Telephone: (434) 977-4455
Facsimile: (434) 979-1221
tom.albro@tremblaysmith.com
evan.mayo@tremblaysmith.com

Elizabeth A. Scully
Mark I. Bailen
Andrew M. Grossman
Richard B. Raile
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
escully@bakerlaw.com

Eric J. Taube
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, TX 78701
Telephone: (512) 685-6401
eric.taube@wallerlaw.com

Robb S. Harvey
Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-5380
robb.harvey@wallerlaw.com

*Counsel for Defendants Alexander E. Jones,
Infowars, LLC, Free Speech Systems, LLC and
Lee Ann McAdoo a/k/a Lee Ann Fleissner*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

    **I.**    The Court Lacks Personal Jurisdiction Over the Free Speech Defendants ........... 3

           **A.**    None of the Free Speech Defendants Are "at Home" in Virginia, as Required for General Jurisdiction .................................................................. 3

           **B.**    The Free Speech Defendants Had No "Intent To Target and Focus" on a Virginia Audience, as Required To Support Specific Jurisdiction ........... 5

    **II.**    Texas Law Governs Gilmore's Claims Against the Free Speech Defendants ........ 8

    **III.**    Gilmore's Defamation Claims Fail As A Matter of Law ......................................... 9

           **A.**    The Stranahan Interview Is Not Actionable .............................................. 10

           **B.**    The Jones Commentary Is Not Actionable ............................................... 12

           **C.**    Gilmore Does Not Plausibly Allege Actual Malice ................................. 15

    **IV.**    Gilmore's Emotional Distress Claim Should Be Dismissed................................. 22

    **V.**    The Free Speech Defendants Are Entitled to an Award of Costs and Fees .......... 24

CONCLUSION................................................................................................................... 25

**INTRODUCTION**

The fundamental error of Plaintiff Brennan Gilmore's charge that the Free Speech Defendants accused him by implication of having "planned or participated in James Alex Fields, Jr.'s car attack" that killed Heather Heyer[1] is that it relies entirely on language ripped out of context and then assigned a meaning that it cannot reasonably bear. But the Court, on a motion to dismiss defamation claims, must consider the publication as a whole, including the portions Gilmore declines to acknowledge. That includes, in one of the two InfoWars video segments challenged by Gilmore, Lee Ann McAdoo's statement pinning the crime on "white terrorists." In the other, Alex Jones also fingered "white supremacists" and stated, with respect to Gilmore and others he felt were unfairly spinning the tragedy for political purposes, "I'm not saying that they did the violence." Indeed, Infowars consistently reported, in numerous articles, that Ms. Heyer was killed by a "white supremacist." Because the allegedly defamatory charge must be considered as part of the whole publication, and the Free Speech Defendants' own words in the very segments Gilmore challenges repudiate the implication he alleges, his claims fail as a matter of law. Nothing in his Opposition brief or in the briefing by *amici* surmounts this fundamental defect.

The Court, however, need not reach the merits of this dispute because it lacks personal jurisdiction over the Free Speech Defendants. None are "at home" in Virginia as required to support general jurisdiction, and the demand by Gilmore and his *amici* for a radical expansion of specific jurisdiction is at odds with Fourth Circuit precedent and would throw the doors open for national media to face suit in any and all jurisdictions. If Gilmore seriously believes he has claims against the Free Speech Defendants, he must bring them in Texas.

---

[1] Compl. ¶ 248. In his Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss ("Opposition" or "Opp."), Gilmore double downs on this charge, claiming that the Defendants (including Alex Jones, Lee Ann McAdoo, Infowars LLC, and Free Speech Systems, LLC, collectively, the "Free Speech Defendants"), accused him of having "participated first-hand" in a conspiracy to stage events in Charlottesville, that included the "killing [of] Heyer and injuring [of] dozens of others." Opp. at 1.

1

Whether under Texas or Virginia law, Gilmore's claims also fail, for lack of defamatory meaning and failure to plausibly allege actual malice. Despite his prominence in the national media to address all things related to the Charlottesville protests, Gilmore and his *amici* assert that he is just a random Twitter user plucked briefly from obscurity to bear witness to a tragedy. That contention cannot be squared with his pervasive presence in the media, his eagerness to appear in print and before television cameras, and his self-appointed mission to use his media platform to frame the events in Charlottesville and help set "the bounds of what's acceptable in our political discourse in the United States."[2] Gilmore and his *amici* labor mightily to avoid his obvious public-figure status because his allegations supporting actual malice (or really any intent standard) consist entirely of legal conclusions and naked assertions devoid of factual support. Indeed, the central "fact" upon which his actual malice argument relies—that the Free Speech Defendants inserted him into a "preconceived narrative" to avoid pinning the blame for the violence in Charlottesville on white supremacists—is refuted by the very video segments that he challenges.

Gilmore does not dispute that his emotional distress claim conflicts with Texas law and requires, no less than his defamation claims, a showing of actual malice. In addition, the conduct he challenges as "outrageous" falls far short of any recognized in previous cases; his showing of recklessness is unsupported by any allegation that the Free Speech Defendants knew that their conduct would lead to his injury; and he makes no showing of causation—indeed, according to his own allegations, his claimed injuries are the result of conduct by third parties.

Finally, Gilmore's arguments against a cost and fee award under the Texas Citizens Participation Act or Virginia anti-SLAPP statute do not seriously engage either law. The Texas statute (as interpreted by the Supreme Court of Texas) mandates a fee award to a prevailing party. Likewise, the Virginia statute (while uninterpreted to date by the state's appellate courts) should be read to require the same, as remedial fee-shifting statutes typically are. An award is

---

[2] Transcript, 8/23/17 PBS NewsHour with Jim Lehrer, 2017 WLNR 25999828.

particularly warranted here, where the Plaintiff targets and seeks to silence speakers with legal claims that are contradicted by the very statements they challenge.

## ARGUMENT

### I. The Court Lacks Personal Jurisdiction Over the Free Speech Defendants

Because the Free Speech Defendants lack any substantial connection to Virginia and did nothing to target a Virginia audience, Gilmore is forced to advocate for a radical expansion of personal jurisdiction that, at least for the national media, would demolish the "[d]ue process limits on the State's adjudicative authority [that] principally protect the liberty of the nonresident defendant." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). His arguments for both general and specific personal jurisdiction clash with governing authority.

#### A. None of the Free Speech Defendants Are "at Home" in Virginia, as Required for General Jurisdiction

Gilmore's argument in support of general jurisdiction runs aground on Supreme Court jurisprudence holding that even "a substantial, continuous, and systemic course of business" is not sufficient to render a business "at home" in a forum state, as required. *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014). Gilmore's asserted basis for general jurisdiction—alleged business contacts through Internet sales—is insufficient.

To begin with, Gilmore cannot overcome the conclusory nature of his jurisdictional allegations. The Amended Complaint contains no specific allegations regarding Jones's and McAdoo's business contacts with Virginia, *see* Compl. ¶¶ 9–10 (addressing only InfoWars and Free Speech Systems), and Gilmore's Opposition waives any general jurisdiction argument as to McAdoo.[3] As for InfoWars and Free Speech Systems, Gilmore argues only that his allegation that they "solicit and transact business through their online stores" suffices, Opp. at 14–15, but that is the kind of conclusory allegation that courts reject out of hand as incapable of supporting

---

[3] "Each defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). Infowars' or Free Speech System's contacts with Virginia therefore cannot be imputed to McAdoo or Jones. Gilmore does not contend that InfoWars or Free Speech Systems is Jones's alter ego, and any argument that they are his agents would be unavailing. *See Daimler*, 571 U.S. at 135 (rejecting agency theory).

general jurisdiction.[4] It is simply not enough to observe that a defendant engages in Internet sales and, based on that, assume that its contacts with the forum state render it "at home" there.

Plausibility aside, even "sizable" sales into a state (which Gilmore does not allege) cannot establish general jurisdiction. *See Daimler*, 571 U.S. at 139 (noting that allowing general jurisdiction in every state with sizeable sales would be an "exorbitant exercise[ ] of all-purpose jurisdiction"); *Goodyear*, 564 U.S. at 929 (rejecting notion that "any substantial manufacturer or seller of goods would be amenable to suit, on any claim for relief, wherever its products are distributed"). The business operations in a state must be so pervasive as to make the entity at "home" there, a status typically reserved for the entity's state of incorporation and principal place of business. *Daimler*, 571 U.S. at 139. Tellingly, Gilmore avoids even mentioning *Daimler*—which "considerably altered the analytic landscape for general jurisdiction and left little room for these arguments," *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016)—and relies entirely on pre-*Daimler* precedent. But *Daimler* is dispositive, such that Gilmore's request for jurisdictional discovery would be futile. There is, after all, no indication that InfoWars and Free Speech Systems are equally "at home" in Virginia as in their actual home state of Texas.

Nor does InfoWars' coverage of the Charlottesville protests support general jurisdiction. Gilmore argues that Free Speech Systems, InfoWars, and Jones "engage in significant reporting

---

[4] *See, e.g.*, *Barnett v. Surefire Med., Inc.*, 2017 WL 4279497, at *2 (D. Md. Sept. 25, 2017) (rejecting allegation that "upon information and belief, each Defendant regularly solicits and conducts business in Maryland" as sufficient for general jurisdiction); *Intercarrier Commc'ns LLC v. WhatsApp Inc.*, 2013 WL 5230631, at *1, 3 (E.D. Va. Sept. 13, 2013) (rejecting general jurisdiction under similar conclusory "information and belief" allegation); *JPB Installers, LLC v. Dancker, Sellew & Douglas, Inc.*, 2017 WL 2881142, at *5 (M.D.N.C. July 6, 2017) (rejecting allegations on information and belief as conclusory, even in the absence of evidentiary materials rebutting those allegations); *Carbone v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 4158354, at *7 (D. Md. Aug. 5, 2016) (finding generic, information-and-belief allegations insufficient); *see also Cleveland v. Accumarine & Transp., LP*, 2011 WL 939011, at *2 (D.S.C. Mar. 16, 2011); *see also Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 618–19 (E.D. Va. 2009); *Essex Ins. Co. v. Miles*, 2010 WL 5069871, at *2–3 (E.D. Pa. Dec. 3, 2010) ("[R]eliance…on information and belief cannot transform legal conclusions into plausible factual allegations.").

activities in Virginia under the InfoWars name," Opp. at 15, but the Complaint alleges (at ¶ 11) only coverage of "the 'Unite the Right'" rally. A "single trip" to a state is obviously "inadequate to sustain general jurisdiction." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1075 (9th Cir. 2011) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984)); *see also FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1093 (D.C. Cir. 2008) (denying jurisdictional discovery based on single contact).

### B. The Free Speech Defendants Had No "Intent To Target and Focus" on a Virginia Audience, as Required To Support Specific Jurisdiction

Gilmore and the his *amici* advance a novel theory of specific jurisdiction that would subject national media to suit in practically any forum state where the subject of a news report or commentary happens to reside and make news of national interest. That theory conflicts with governing Fourth Circuit precedent, which permits specific jurisdiction only when media defendants "manifest an intent to target and focus on Virginia readers." *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002). Applying that rule, district courts in the Fourth Circuit have consistently held that publication to a nationwide audience on matters of national concern does not suffice to support specific jurisdiction. *See, e.g.*, *FireClean, LLC v. Tuohy*, 2016 WL 3952093 (E.D. Va. July 21, 2016); *KMLLC Media, LLC v. Telemetry, Inc.*, 2015 WL 6506308 (E.D. Va. Oct. 27, 2015); *Fertel v. Davidson*, 2013 WL 6842890 (D. Md. Dec. 18, 2013). That rule precludes the exercise of specific jurisdiction over the Free Speech Defendants.

Gilmore's argument is that the Free Speech Defendants voluntarily elected to subject themselves to specific personal jurisdiction in the Commonwealth of Virginia by, in the course of reporting on a national news story that took place in Virginia, mentioning a person who happened to be a resident of Virginia. *See* Opp. at 18. That loose standard, he argues, is supported by *Calder v. Jones*, 465 U.S. 783 (1984). But the Fourth Circuit has long recognized that "*Calder* does not sweep that broadly." *Young*, 315 F.3d at 262 (discussing *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625–26 (4th Cir. 1997)). Instead, it has "emphasized how important it is in light of *Calder* to look at whether the defendant has expressly aimed or directed

its conduct toward the forum state," *id.*, and in *Young* it identified how to conduct that inquiry with respect to Internet publications. In particular, where Internet publications are concerned, the defendant "must, through the Internet postings, manifest an intent to target and focus on *Virginia readers.*" *Id.* at 263 (emphasis added). Thus, it reversed a district court's finding of specific jurisdiction over newspapers that had published articles allegedly defaming a Virginia prison warden with respect to events in Virginia because (1) the newspapers' "websites [we]re not designed to attract or serve a Virginia audience" and (2) the articles at issue were not "posted on the Internet with the intent to target a Virginia audience." *Id.* In so doing, the court specifically rejected the same argument that Gilmore makes here: "that *Calder* requires a finding of jurisdiction in this case simply because the newspapers posted articles on their Internet websites that discussed the warden and his Virginia prison, and he would feel the effects of any libel in Virginia, where he lives and works." *Id.* at 262; *see* Opp. 18 (quoting Compl. ¶ 4) ("Defendants deliberately targeted Gilmore, a Virginia resident, by making false and defamatory statements about his presence at and observation of an event that took place in Virginia.").

Given that *Young* addresses how to apply *Calder* in the Internet-publication context that prevails here, Gilmore's heavy reliance on *Calder* is misplaced. And applying *Young* according to its own terms disposes of Gilmore's claim that this Court may exercise specific jurisdiction over the Free Speech Defendants.

Contrary to Gilmore's contention, *Young* is indistinguishable. Infowars is not specifically directed at a Virginia audience, and the publications at issue did not target at a Virginia audience, but concerned a story of national interest. *See* MTD at 9 (discussing relevant allegations and declarations). Gilmore makes much of that fact that the articles in *Young* principally focused on the Connecticut community where the publisher was located. Opp. at 19–20. But *Young* does not suggest that jurisdiction lies by process of elimination, such that a publication will be held to target a Virginia audience unless it specifically targets an audience in some other state. To the contrary, its rule is that the defendant must "manifest an intent to target and focus on Virginia readers." 315 F.3d at 263. And that rule is necessary: "[d]ue process requires that a defendant be

haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *Walden*, 134 S. Ct. at 1123 (quotation marks omitted). "[M]ere injury to a forum resident is not a sufficient connection to the forum." *Id*. at 1125.

That is how *Young* has consistently been interpreted and applied. In *FireClean*, the court—applying *Young*—rejected specific jurisdiction over a defendant who admittedly "aimed his statements at a Virginia company with full awareness that [it] would feel the harmful effects of those statements in Virginia." 2016 WL 3952093, at *5. The relevant considerations were (1) that the websites at issue targeted "the nationwide marketplace of consumers of firearms" and were not "specifically directed to Virginia readers" and (2) that the articles, despite discussing a Virginia business, were "addressed to a nationwide audience of firearms enthusiasts and had no special appeal for Virginia readers." *Id*. at *6–7. Likewise, *KMLLC*—also applying *Young*— rejected specific jurisdiction over a defendant who wrote a report discussing a Virginia resident, even though "the injury to Plaintiff's reputation occurred in the Commonwealth of Virginia; most notably, in the eyes of its clients and the online-advertising industry of the forum State." 2015 WL 6506308, at *9. That consideration was irrelevant because the report "targeted the entire online advertising industry; an industry that spans the Internet, not just Northern Virginia." *Id*. at *10. And *Fertel*—again, applying *Young*—rejected specific jurisdiction over a defendant who criticized a Maryland business on Ripoffreport.com because "there is nothing in [the Defendant's] Internet posts to suggest that they were meant for a Maryland audience, as opposed to a national or even a global audience." 2013 WL 6842890 at *4. The posts were available "not just in Maryland, but nationally and globally," and it discussed matters of concern beyond Maryland because the plaintiff's business (which was the subject of the posts) extended beyond Maryland. *Id*. at *4–5.

Finally, the *amici* brief, which purports to explain how the 34-year-old, pre-Internet ruling in *Calder v. Jones* applies to this case, adds nothing of value. It advocates (at 10) "holding defendants liable for defamatory or libelous statements made over the Internet when the

statements are about the plaintiff and the core effects of those statements are felt in the plaintiff's community." But that is the precise argument that the plaintiff in *Young* advanced and the Fourth Circuit rejected, holding instead that the publisher "must…manifest an intent to target and focus on Virginia readers." 315 F.3d at 263. Further, the other cases it discusses all involve allegations of personal misconduct by individuals that could not have much or any resonance outside their local communities. For example, *Bochan v. La Fontaine*—a pre-*Young* case that conceded it was addressing "a novel question" with no guidance, *id.* at 698—involved Internet postings accusing a Virginia resident of being a pedophile, statements that had little or no relevance other than to a Virginia audience. 68 F. Supp. 2d 692 (E.D. Va. 1999).[5] By contrast, the events covered in the publications challenged here were ones of interest to a national audience, such that "an intent to target and focus on Virginia readers" cannot be inferred.[6]

## II. Texas Law Governs Gilmore's Claims Against the Free Speech Defendants

Gilmore acknowledges that, under Virginia's *lex loci delicti* choice-of-law doctrine, the relevant "place of the wrong" for his claims is "'the place where the defamatory statement was published.'" Opp. at 21 (quoting *Wells v. Liddy*, 186 F.3d 505, 521–22 (4th Cir. 1999)). For Gilmore's claims against the Free Speech Defendants, that place is indisputably Texas, Compl. ¶¶ 14–16, and Texas law therefore governs. That Gilmore allegedly suffered injury in Virginia is irrelevant to the inquiry. *See Milton v. IIT Research Institute*, 138 F.3d 519, 522 (4th Cir. 1998) (rejecting argument, under Virginia's approach, to apply Virginia law on the basis that, "because [the Plaintiff] resides in Virginia the effects of the damages he alleges, including lost income and

---

[5] Similarly, Internet comments that a cheerleader "slept with every other Bengal Football player," *Jones v. Dirty World Entertainment Recordings, LLC*, 766 F. Supp. 2d 828, 830, 831, 834–36 (E.D. Ky. 2011); that an individual sexually abused children, including the poster's daughter, *Hawbecker v. Hall*, 88 F. Supp. 3d 723, 728 (W.D. Tex. 2015); or that a small business owner stole data, *Tamburo v. Dworkin*, 601 F.3d 693, 705–06 (7th Cir. 2010), all involved matters of little or no interest outside of the plaintiff's community within his or her forum state.

[6] Gilmore's allegation that InfoWars reporters covered the "Unite the Right" rally is irrelevant because there is no allegation that Gilmore's "claims arise out of those activities directed at the state." *Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 397 (4th Cir. 2003). Gilmore does not claim that alleged contact supports specific jurisdiction.

8

emotional distress, actually occur in Virginia").

To avoid that result, Gilmore urges the Court to abandon *lex loci delicti* doctrine in favor of the Restatement's "most significant relationship" test. Opp. at 9. But unlike in *Wells* and the other cases cited by Gilmore, the Supreme Court of Virginia has decidedly not "indicated its willingness to apply more flexible choice-of-law rules from the Second Restatement." 186 F.3d at 528. To the contrary, "the Virginia Supreme Court has declined the invitation to adopt the so-called 'modern trend' that focuses on the parties' domicile, choosing instead to reaffirm 'the place of the wrong' rule." *Milton*, 138 F.3d at 522 (quotation marks omitted); *see also McMillan v. McMillan*, 253 S.E.2d 662 (1979); *Jones v. R.S. Jones & Assocs., Inc.*, 431 S.E.2d 33, 34 (Va. 1993). The "settled rule," according to the Supreme Court of Virginia, is that "the *lex loci* will govern as to all matters going to the basis of the right of action itself." *Id.* (quotation marks omitted). That rule is binding on this Court. *Wells*, 186 F.3d at 521 ("A federal court sitting in diversity must apply the choice-of-law rules from the forum state."). That is what led Judge Hudson, in the only decision on the books to consider the question, to express "skepticism" that Virginia would apply its own substantive law of defamation to statements that, like those here, were published outside of Virginia. *Kylin Network (Beijing) Movie & Culture Media Co. Ltd v. Fidlow,* 2017 WL 2385343, at *3 n.2 (E.D. Va. June 1, 2017).

## III.    Gilmore's Defamation Claims Fail As A Matter of Law

Gilmore abandons any argument that the two InfoWars video segments he challenges are defamatory on their face. Instead, he contends only that they imply that he "planned or participated in James Alex Fields, Jr.'s car attack in Charlottesville on August 12, 2017, which killed one person and injured many others, as part of a conspiracy to stage a 'coup' and overthrow a sitting president." Compl. ¶ 157. Because Gilmore alleges libel by implication, his burden is to show not only that a challenged statement is "reasonably read to impart the false innuendo," but also that "the author intends or endorses the inference." *Chapin*, 993 F.2d at 1093. He makes no attempt to do so, likely because the Stranahan interview segment expressly blames "white terrorists" for the crime and because Jones expressly rejects the asserted

inference, specifically stating, with respect to Gilmore and other commentators on the protests, "I'm not saying that they did the violence." Indeed, Gilmore simply ignores these statements that refute the implication he seeks to ascribe to the videos. Lacking any defamatory meaning, the commentaries he challenges are immune from liability as a matter of law, requiring dismissal of his claims.

### A.    The Stranahan Interview Is Not Actionable

Despite recognizing that the Court must consider "'the article as a whole'" in interpreting a challenged statement, Opp. at 24 (quoting *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1289 (4th Cir. 1987)), Gilmore does not himself do so, and that leads him to wildly misinterpret what the Stranahan interview has to say about the events in Charlottesville and Gilmore. *See also Chapin*, 993 F.2d at 1098 (explaining that, in assessing the actionability of allegedly defamatory statements, "we would err if we did not consider the article as a whole").

In Gilmore's telling (at 28–29), the interview was all about him. But, in fact, Gilmore had no more than a bit part. Stranahan's focus was not Gilmore, but the parallels between the spinning of protests in Ukraine to discredit that country's government (as portrayed in a movie, "Ukraine on Fire") and what Stranahan viewed as efforts to exploit the Charlottesville protests to "smear[] Trump and his supporters." Early in the interview, Stranahan stated that he was going to talk about what he calls the "Peace and Justice Movement," a coalition that he says includes the leaders of the "Occupy," "Black Lives Matter," and "Antifa" (or "Anti-Fascist") movements. The leaders of these groups, he argued, are prepared to take advantage of any violence that may arise when pro- and anti-Trump factions collide at public protests. Rather than engage in violence themselves—there was none, Stranahan noted, at the march following Trump's inauguration— their aim is to promote protests that create the circumstances for violent clashes and then, if those ensue, "to be able to blame the violence on the right." The protestors on the ground will go along because they "are dupes," with "no idea" of the Peace and Justice Movement's purposes and means. And so will the media, which is eager to run stories critical of Trump and lacks the

skepticism necessary to recognize and report their political origins.[7]

Gilmore ignores this lengthy exposition—it is, to be fair, excruciatingly long and dense—which immediately preceded Stranahan's brief comments concerning Gilmore. But it explains why Stranahan was so intrigued that Gilmore labeled Ms. Heyer a "martyr" and why, in his view, the media ought to be asking questions about the story, about why violence that involved a "white supremacist" with "no political power whatsoever" was being spun against Trump. Understood in context, Stranahan's point was not that Gilmore was responsible for any violence, but that the media would never question, much less investigate, how the protests were being used—despite that "Democrats have investigated Trump for a lot less" and had even "convened the FBI" to do so. The result is that that the Peace and Justice Movement would "win" because it would advance their aim of removing Trump from power, whether through a coup, impeachment, or "smearing Trump and his supporters so much that they'll be able to elect another elitist." Stranahan does not suggest that any of that has to do with Gilmore, who was so incidental to it all that Stranahan could not even remember his name.

Gilmore asserts (at 29–30), without really arguing the point, that Stranahan was talking about him when he asked whether "they [are] trying to get a coup," but that does not make any sense. Stranahan's entire commentary focuses on the Peace and Justice Movement and returns to it again and again, consistently using the word "they" to refer to its leaders. By contrast, Stranahan's few references to Gilmore are in the singular, using words like "he" and "his." Moreover, at the same point where he transitioned from the singular "he" to the plural "they," Stranahan informed listeners that he was returning to his overarching theme of the parallels with Ukraine: "And again, I will tell people, watch this. I don't agree with everything in 'Ukraine on Fire.'" Only then did he proceed to "point out what's happening": that "they" may be "trying to

---

[7] The full video is available at https://www.youtube.com/watch?v=L58T2dl997A; Compl. ¶ 87. The Court may take notice of the complete publication because it is "integral to and explicitly relied on in the complaint and because the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

get a coup," will "settle for impeachment," or "will settle for smearing Trump…to elect another elitist." None of this concerns Gilmore, as is required to support his claim. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) (allegedly defamatory statement must be of and concerning plaintiff); *WJLA–TV v. Levin*, 564 S.E.2d 383 (2002) (same).[8]

Finally, if there were any doubt remaining as to what the Stranahan interview has to say about the events in Charlottesville, McAdoo clearly dispelled it when she stated that what happened there was that "white terrorists mowed down some people." Stranahan's response: "Right." Far from implying that a conspiracy involving Gilmore was at fault, McAdoo and Stranahan blamed "white terrorists." For Gilmore to insist that they meant the opposite of what they said is nonsensical. That exchange also demonstrates that neither Stranahan nor McAdoo "intend[ed] or endorse[d] the inference" that Gilmore asserts, an independent basis for dismissal of his claim. *Chapin*, 993 F.2d at 1093; *Dallas Morning News, Inc. v. Tatum*, 2018 WL 2182625, at *13 (Tex. May 11, 2018) (plaintiff "must point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'" (quotation marks omitted)).

### B. The Jones Commentary Is Not Actionable

Gilmore commits the same fundamental error in his interpretation of the Jones commentary, disregarding a raft of statements contradicting his assertion that it implies that he "planned, orchestrated, or knowingly participated in a secret "Deep State" or government operation to carry out a terrorist attack in Charlottesville." Compl. ¶ 264*; see also* Opp. at 33 (arguing that Jones implied that "Gilmore staged the Charlottesville event").

The problem with Gilmore's interpretation is that Jones said no such thing and expressly

---

[8] And, even if the statement could be misunderstood as referencing him, it is not actionable as defamation. Gilmore argues (at 31) that Stranahan's use of the word "coup" cannot be hyperbole because Stranahan describes himself as a "fact-based journalist." Opp. at 31. But journalism may employ standard rhetorical devices like hyperbole. *See, e.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 147 (D.D.C. 2017) (holding that statement in Associated Press article was hyperbole).

repudiated it. Jones said, as Gilmore recounts (at 32), that "[t]hey had known CIA and State Department officials in Charlottesville, first tweeting, first being on MSNBC, CNN, NBC and the mayor is involved." But then, after discussing how his comments questioning the media coverage of previous events had been distorted in the past, Jones clarified that he did not believe that any of those people had anything to do with the violence that had erupted at the protests: "I'm not saying that they did the violence. I'm not saying that white supremacists don't exist. I'm saying they were there."[9] Gilmore has nothing to say about the fact that Jones expressly repudiated the view that Gilmore seeks to pin on him. But, as a legal matter, it is dispositive of his claim concerning the Jones commentary: taken as a whole, Jones's language cannot be "reasonably read to impart the false innuendo" and, even were that not so, Jones's disclaimer rebuts any claim that Jones "intend[ed] or endorse[d] the inference" that Gilmore asserts. *Chapin*, 993 F.2d at 1093. Instead, Jones's view was the same as the one expressed by McAdoo and reported by numerous InfoWars articles: Ms. Heyer was killed by a white supremacist.

Gilmore's interpretation also fails to account for the entirety of Jones's commentary. Like Stranahan, Jones questioned how the events in Charlottesville were being put to political use, particularly by people like Gilmore (a State Department employee who had taken a leave of absence to work in high-level Democratic politics) and the Charlottesville mayor Michael Signer (who had worked for John Podesta, a prominent Democratic politician)[10] who were taking to the airwaves to parrot anti-Trump "talking points." That is why Gilmore (at 31–34) is unable to point to a single word or statement by Jones that connects Gilmore and the attack that killed Ms.

---

[9] The full video is available at https://www.youtube.com/watch?v=52C5-GplKxg. Compl. ¶ 102. The Court may take notice of the complete publication. *Phillips*, *supra*.

[10] Gilmore offers no response to the points that, contrary to Gilmore's allegations, Jones's reference to Podesta indicates that he was obviously referring to Mayor Signer, not Gilmore. Likewise, there is no indication that Jones's reference to the "CIA" concerned Gilmore, particularly since Evan McMullin, "a former CIA officer who ran as an independent against Trump in 2016," was also active in denouncing Trump in the wake of the protests. *See* Elaine Godfrey, The Hidden Meaning of Trump's Charlottesville Remarks, The Atlantic (Aug. 12, 2017), https://www.theatlantic.com/politics/archive/2017/08/the-hidden-meaning-of-trumps-charlottesville-remarks/536688/.

13

Heyer—Jones said nothing on the matter. Instead, Jones's focus was on media coverage of the events: Gilmore's prominent tweet, MSNBC, CNN, NBC, the television interviews, etc.

If Jones was seriously trying to convey that Gilmore was part of a government conspiracy to stage a murder, he would not have made the centerpiece of his comments on Gilmore a parody of Gilmore's and Mayor Signer's appearances on television. Likewise, if Jones actually sought to convey that "Gilmore staged the Charlottesville event," Opp. at 33, he would have at least mentioned the name of such a major player in a major national story. But he did not, because to Jones Gilmore was only a minor figure in yet another story about manipulation of the media and media bias, not the mastermind of an unprecedented government conspiracy to murder citizens exercising their First Amendment right to protest. Moreover, Jones, like other talk radio hosts, is known for his effective use of hyperbole to make his points. His listeners know to expect over-the-top characterizations and colorful language when he comments on current events. Again, if Jones's intended implication was that Gilmore was at the center of this unprecedented conspiracy, the force of his language and strength of his condemnation would have reflected that. But those things are notably absent.

Finally, Gilmore fails to grapple with the rule that a defamation-by-implication plaintiff may "not introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain." *Webb v. Virginian-Pilot Media Cos*., 752 S.E.2d 808, 811 (Va. 2014) (quoting *Carwile v. Richmond*, 82 S.E.2d 588, 592 (1954)); *see also Overstreet v. Underwood*, 300 S.W.3d 905, 910 (Tex. App. 2009) (similar). The Virginia Supreme Court's decision in *Webb* is instructive on this point. The challenged article in that case reported that, after two high school students were criminally convicted for fighting, only the one whose father was a school official was allowed to remain at his high school. 752 S.E.2d at 810. The court rejected the father's contention that the article falsely implied he had engaged in "unethical conduct by obtaining preferential treatment for his son." *Id*. Even though that article "insinuates" that the one student "may have benefited from special treatment," that was not sufficient because the article "does not state or suggest that [the father] undertook any affirmative action to arrange or endorse the school

14

system's disciplinary response to the incidents." *Id.* The same is true here. Jones's commentary does not state or imply that Gilmore took any action other than witnessing the attack and appearing on television to promote anti-Trump "talking points" and so cannot be taken as an assertion that Gilmore undertook specific criminal acts. *See also CACI Premier Tech. Inc. v. Rhodes*, 536 F.3d 280, 303 (4th Cir. 2008) (no claim where talk radio host named military contractor in "open-ended list of potential targets for [criminal] investigation without assigning blame to any particular contractor").

### C.   Gilmore Does Not Plausibly Allege Actual Malice

Having appointed himself in the wake of the Charlottesville protests as a public arbiter of "the bounds of what's acceptable in our political discourse in the United States"—as he put it to Judy Woodruff on one of his many network-television appearances—Gilmore "voluntarily inject[ed] himself or [was] drawn into a particular public controversy." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). He is therefore a limited purpose public figure and bears the burden, at this stage, of plausibly alleging actual malice: that each of the Free Speech Defendants "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 511 n.30 (1984). Gilmore also overlooks that Virginia law (should it apply) imposes that same burden on him. Va. Code § 8.01-223.2(A). He comes nowhere near carrying it, relying entirely on conclusory allegations unsupported by any plausible factual basis.

### 1.   Gilmore Thrust Himself into the Public Controversy Over Charlottesville and "Political Discourse in the United States"

An eager participant in the public controversy over the meaning of the events in Charlottesville, Gilmore is the quintessential limited purpose public figure. His protestations that there is no controversy and that he is but a "witness to history" ring hollow, particularly in light of his many statements to media taking sides on the controversy.[11]

---

[11] Gilmore is also a public official and, for that reason, subject to the actual malice standard. *See* MTD at 18 n.14. The test, as the Fourth Circuit recently explained, is whether a government employee can be said to exercise "either actual or apparent substantial responsibility." *Horne v.*

Of the five factors relevant to public figure status laid out by the Fourth Circuit in *Foretich v. Capital Cities/ABC, Inc*., 37 F.3d 1541, 1553 (4th Cir. 1994), Gilmore disputes only two: that he "voluntarily assumed a role of special prominence in the public controversy" and "sought to influence the resolution or outcome of the controversy." *See* Opp. at 39–42. He does not dispute that he "had access to channels of effective communication."[12] As a practical matter, Gilmore wields a powerful megaphone for his advocacy and was, for example, a driving force (according to the *Atlantic* and Slate) publicizing last month's major news story of a Virginia restaurant refusing to serve White House Press Secretary Sarah Huckabee Sanders.[13]

Although he contends that there was no "real dispute" about "the demonstrations in Charlottesville, Gilmore in the same paragraph actually concedes that there was a controversy concerning "the broader questions of white supremacy and the meaning behind the rally and

---

*WTVR LLC*, -- F.3d --, 2018 WL 3014903, at *3 (4th Cir. 2018). A Foreign Service Officer like Gilmore is a "U.S. diplomat" whose job is "to promote peace, support prosperity, and protect American citizens while advancing the interests of the U.S. abroad." U.S. State Dept., Foreign Service Officer, https://careers.state.gov/work/foreign-service/officer/. The title and job description, like those in *Horne*, reflect "apparent substantial responsibility" regarding matters of "importance…to both the government and the public." *Horne*, *supra*, at *5. That his advocacy regarding Charlottesville may not have been undertaken in his "capacity as a government employee," Opp. at 38, is irrelevant because that advocacy "'might touch on [his] fitness for office,'" *id*. (quoting *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964)), insofar as a Foreign Service Officer's seeking to police the terms of public debate and bar certain speech conflicts with the State Department's promotion of democratic norms, including free speech.

[12] Remarkably, despite Gilmore's concession, the "First Amendment Scholars" claim that Gilmore did not have access to effective channels of communication, which begs the question of whether these scholars actually read Gilmore's Complaint. Gilmore admits that he used his Twitter account to connect with the public (the image of his "Tweet" in the Complaint shows over 88,000 "Retweets") and he "spoke with multiple television news networks and other news media to provide an eyewitness account" and "to convey the seriousness of what he had seen." Compl. ¶¶ 32-34.

[13] Ben Zimmer, "A Restaurant 'Eighty-Sixed' Sarah Huckabee Sanders. What Does That Mean?," The Atlantic, https://www.theatlantic.com/entertainment/archive/2018/06/a-restaurant-eighty-sixed-sarah-huckabee-sanders-what-does-that-mean/563588/; Slate, Online Reviewers Descend on Restaurant That Refused to Serve Sarah Huckabee Sanders, https://slate.com/news-and-politics/2018/06/the-red-hen-virginia-restaurant-reportedly-kicks-out-sarah-huckabee-sanders.html (stating that Mr. Gilmore "appears to have been the one to make the post go viral").

counter protests." Opp. at 39–40. But he insists that he was "not a spokesperson on any of these types of matters," only a witness. Opp. at 40. Gilmore's own pleadings, however, contradict that assertion. In his Original Complaint, he stated that he appeared on television not only to "relay[] his account" but also to use the platform to emphasize the "seriousness" of the incident and to condemn "the hate-filled display and violence" he had seen in Charlottesville. ECF No. 1, ¶¶ 30–31.[14] He was determined to be more than a mere witness.

That explains Gilmore's many public appearances to weigh in on the controversy. Mere days after the protests he published an article in Politico addressing at length "the broader questions of white supremacy and the meaning behind the rally and counterprotests."[15] The headline of the article alone—"What I Saw in Charlottesville Could Be Just the Beginning"— gives away that Gilmore does not regard himself as a mere witness to history, but an interpreter and analyst, as well. He discusses at length the meaning of the protests, concluding that they demonstrate that "violence will continue unless we commit universally to condemning and standing against it" and faulting President Trump's response.

Similarly, on August 13, he appeared on CNN to address the controversy over the meaning of the events in Charlottesville. Rejecting the view that James Alex Fields's attack was the work of a lone lunatic, Gilmore spun it as a "terrorist attack by a motorist member of a group whose ideology is based on violence" and criticized "hatred-filled ideology that would deny certain classes of citizens their right to exist." And then he unloaded on President Trump for not taking a similar tack, deeming Trump's response "a failure of leadership." Transcript, 8/13/17 CNN Newsroom, 2017 WLNR 25021156. Gilmore expressed similar views in a front-page

---

[14] The Court may take judicial notice of allegations made by the Plaintiff in prior pleadings. *See* 5c Fed. Prac. & P. § 1364 n.40 & surrounding text.

[15] Brennan Gilmore, What I Saw in Charlottesville Could Be Just the Beginning, Politico, Aug. 14, 2017, https://www.politico.com/magazine/story/2017/08/14/what-i-saw-in-charlottesville-could-be-just-the-beginning-215487. A "district court is entitled to take judicial notice of matters in the public record without converting the Rule 12(b)(6) motion into a motion for summary judgment." *Bannon v. Edgewater Medical Center*, 406 F. Supp. 2d 907, 919 n.16 (D.N.D. 2005); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

profile (with which he participated) published by the (Lexingon, Va.) *News-Gazette*.[16]

Then, in an interview on PBS NewsHour, Gilmore announced that he would be stepping up his public advocacy on the controversy over the meaning of the events in Charlottesville and "political discourse" in general:

> Well, yes, I mean, if anything, **it's emboldened me to speak more**. You know, the threats have come in, and this is a tactic from the alt-right to try and intimidate people and not calling things as they see them and not talk about the truth of a very, very difficult situation for our country, and that is the resurgence of a violent ideology of white supremacy. So, you know, if anything, **it's convinced me to be even louder in condemning this**, and the reason I went to Charlottesville in the first place was to stand up against it. And so, you know, certainly I was taken aback, and worried for my family's safety. But, you know, they've also been incredibly insistent that **I continue to speak out and use this platform** which I came by in a very unfortunate way to push back against something that, you know, can do a lot of damage to us.…
>
> The broader question here is how dangerous this ideology is for our country, what we saw in Charlottesville. And this is what I've seen overseas as well. I worked in a lot of conflict areas in Africa, where you see these very destructive forces of tribalism, of racism be manipulated and instrumentalized by political leaders. And they're forces that once they are sort of -- once the Pandora's box of racism is opened up, it can spiral out of control very, very quickly. And so, I think, you know, it's imperative that political leaders on all sides condemn this and say, **here's the bounds of what's acceptable in our political discourse in the United States**, and we draw a very firm line, and absolutely exile the idea of and ideology of white supremacy which by its very nature is violence, which necessitates, you know, removing certain classes or race of citizens. And we've seen some leaders do this, but not enough.

Transcript, 8/23/17 PBS NewsHour with Jim Lehrer, 2017 WLNR 25999828 (emphases added).[17] The media appearances discussed here are just the tip of the iceberg; Gilmore's views have appeared in practically every major media outlet. Indeed, Gilmore launched this lawsuit with a *Washington Post* op-ed, a powerful bully pulpit to express his view that the marketplace of

---

[16] Kit Huffman, Witness to Violence: Former Resident Videoed Attack in Charlottesville, The News-Gazette, Aug. 16, 2017, at A1.

[17] *See also* Charlottesville Rally Videographer on becoming 'Fake News', NPR All Things Considered (Aug. 24, 2017), 2017 WLNR 26185013 ("So the threats are still coming in. **But you know, I'm here on NPR. I've done other television programs to call this what it is**, and that is repugnant ideology that's completely against what we are and should aspire to be as Americans that has no place in our political discourse.").

ideas should be closed to Alex Jones and InfoWars.[18]

In short, Gilmore's assertion (at 40) that "he merely posted on social media a video of events he was witnessing" is false, as a simple Google search can confirm. His own statements and appearances demonstrate that he "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved," *Gertz*, 418 U.S. at 345, and is therefore a limited-purpose public figure at least with respect to the events in Charlottesville.

### 2. Gilmore's Allegations Regarding the Free Speech Defendants' Intent Fail To Satisfy the *Iqbal/Twombly* Plausibility Standard

Lacking a plausible basis to allege that any of the Free Speech Defendants "realized that his [or her] statement was false or that he subjectively entertained serious doubt as to the truth of his [or her] statement," *Bose*, *supra*, Gilmore seeks to sidestep that requirement with speculative allegations that are not rooted in fact. His actual-malice argument relies entirely upon the kind of "'naked assertion[s] devoid of further factual enhancement'" that must be disregarded in assessing the plausibility of a complaint's allegations in support of liability. *McCleary-Evans v. Maryland Dep't of Transp.*, *State Highway Admin.*, 780 F.3d 582, 585–86 (4th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). That is true of each of the four supposed indicia of actual malice identified in his Opposition.

The first is that the Free Speech Defendants allegedly "severely departed from journalistic standards," Opp. at 42, but that conclusion lacks any factual basis. Although Gilmore would know if he did not speak with the Free Speech Defendants, he cites no facts to support the allegation that they did not "investigate" and "conducted no research" (¶¶ 93, 114), did not "reach out…to other individuals…for comment" (¶¶ 94, 115), and did not identify other sources or fact-check (¶¶ 95, 117). In fact, this allegation is contradicted by the challenged publications themselves. For example, rather than opine herself on the events in Charlottesville, McAdoo interviewed Lee Stranahan, an investigative reporter with years of experience covering politics

---

[18] "Alex Jones is a menace to society. I'm suing him.," Wash. Post, Mar. 14, 2018.

and national affairs. Stranahan, in turn, cited a wealth of primary and secondary sources in his interview remarks, including Gilmore's own Twitter feed. Likewise, Jones included in his commentary an article that relied upon, quoted, and cited a variety of primary and secondary sources concerning the events in Charlottesville. All of this demonstrates that the Free Speech Defendants conducted factual investigation that then formed the factual backdrop for their commentary. Against these facts demonstrating investigation—which Gilmore declines to acknowledge, much less discuss—Gilmore's unsupported assertion (at 43) that the Free Speech Defendants "failed to conduct even the most basic investigation" falls flat. In any instance, failure to investigate does not itself demonstrate actual malice; "[r]ather, the plaintiff must plead facts giving rise to a reasonable inference that the defendants acted to intentionally avoid learning the truth." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 704 (11th Cir. 2016); *Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1335 (4th Cir. 1993) (rejecting argument based on reporter's "failure to read every court case involving the Church of Scientology").

Second, Gilmore's assertion (at 43–44) that the Free Speech Defendants possess "ill will towards Gilmore" is another "naked assertion" lacking factual support, such as any statements demonstrating the supposed "ill will." The Complaint does not allege that McAdoo said anything whatsoever about Gilmore, let alone some statement that might reflect "ill will" toward him. As for Stranahan and Jones, the only alleged statements they made about Gilmore are the ones challenged as defamatory. Far from setting out to injure Gilmore, Stranahan initially did not even remember his name, and his questions about Gilmore—"who this kid was, where he came from, what do we know"—and other comments reflect that he had no opinion of Gilmore. *Cf. Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993) (Such "question[ing] simply provokes public scrutiny of the plaintiffs' activities. Voluntary public figures must tolerate such examination."). Jones, meanwhile, also seemed not to know Gilmore's name, which he did not mention, and expressly denied that anyone other than white supremacists "did the violence" in Charlottesville—hardly an expression of "ill will." In any instance, even factually supported allegations of ill will are entitled to little or no weight: as a constitutional matter, "even if [a

defamation defendant] did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Garrison v. State of La.*, 379 U.S. 64, 73 (1964). For that reason, "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). If bare assertions of "ill will" like those here could suffice, the actual malice standard would be a toothless one indeed.

Third is Gilmore's assertion (at 44) that the Free Speech Defendants sought to "insert Gilmore into their preconceived narrative of the violence in Charlottesville." The problem with this assertion is that the challenged statements themselves refute it. McAdoo stated clearly in the Stranahan interview that the violence in Charlottesville was attributable to "the white terrorists [who] mowed down some people." Stranahan stated that he wanted "to ask some questions" about Gilmore, rather than proffer answers himself. *Cf. Chapin*, 993 F.2d at 1094 ("[I]nquiry itself, however embarrassing or unpleasant to its subject, is not accusation."). And, as noted, Jones likewise pinned the blame for violence only on "white supremacists," expressly disavowing that Gilmore and other commentators on the protests "did the violence." There was no "preconceived narrative" to the contrary—which is why InfoWars published numerous articles identifying a "white supremacist" (not Gilmore or anyone else) as being responsible for Ms. Heyer's death. *See* MTD at 22 n.17.

Finally, Gilmore asserts (at 44–45) that the "sheer outrageousness" of the Free Speech Defendants' statements demonstrates "reckless disregard for the truth." But that criticism is perhaps better leveled at Gilmore's disregard for what the Free Speech Defendants actually said in their challenged video segments. Notably, Gilmore identifies no express statement by any of the Free Speech Defendants or Stranahan that he contends to be "outrageous." There are none.

In sum, Gilmore's allegations regarding the Free Speech Defendants' intent amount to a heap of assertions unsupported by fact. Accordingly, Gilmore's claims that the Free Speech Defendants spoke with actual malice, or even recklessly or negligently, are implausible and therefore incapable of satisfying his pleading burden.

**IV.    Gilmore's Emotional Distress Claim Should Be Dismissed**

Gilmore does not dispute that his emotional distress claim is untenable under Texas law because he has failed "to allege facts independent of [his] defamation claim," *Draker v. Schreiber*, 271 S.W.3d 318, 323 (Tex. App. 2008). That requires dismissal. Further, Gilmore's emotional distress claim fails for four additional reasons under either Texas or Virginia law.

First is Gilmore's failure to plausibly allege actual malice as the First Amendment requires. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).

Second is that, contrary to Gilmore's contention (at 47), the challenged conduct is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). Gilmore identifies nothing that McAdoo said about Gilmore, and no authority has held silence to constitute "intolerable" conduct. Stranahan, in turn, asked a few questions about Gilmore, hardly an indecency. To the contrary, "public figures must tolerate such examination." *Chapin*, 993 F.2d at 1094. And Jones stated that Gilmore and other commentators on the protests did not "do the violence." That is hardly atrocious. The off-the-cuff commentary here is simply not comparable to the series of reported columns challenged in Gilmore's principal authority, *Hatfill v. New York Times Co.*, 416 F.3d 320, 333 (4th Cir. 2015). Those columns conveyed in detail that a scientist, Steven Hatfill, "had the motive, means, and opportunity to prepare and send the anthrax letters in the fall of 2001 [that killed five people]; that he had particular expertise with powder forms of anthrax, the type used in the mailings; that his own anthrax vaccinations were current; that he was the prime suspect of the biodefense community as well as federal investigators; that he had failed numerous polygraph examinations; that specially trained bloodhounds had 'responded strongly' to Hatfill, his apartment, and his girlfriend's apartment but not to anyone else or any other location; and that Hatfill was probably involved in similar anthrax episodes in recent years." *Id*. at 333. Where those deeply reported columns provided a complete prosecutor's brief that Hatfill abused his scientific skill to carry out a terrorist campaign, the informal commentary challenged here only asked questions about

Gilmore and avoided drawing any conclusions about what he may have done—other than to state that it was not he who "did the violence."

Second, Gilmore fails to allege that the Free Speech Defendants intended to cause him emotional distress or acted "recklessly…in deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement (Second) of Torts § 460 cmt. i.[19] For an act to be "reckless" under Virginia law requires "the defendant's consciousness of his act, his awareness of the dangers or probable consequences, and his reckless decision to proceed notwithstanding that awareness." *Infant C. v. Boy Scouts of Am., Inc.*, 391 S.E.2d 322, 327 (Va. 1990). Yet Gilmore (at 46) identifies no non-conclusory allegations that McAdoo was conscious that her inaction would somehow cause him to suffer the kind of severe emotional distress causing physical injury recognized by Virginia law. Instead, he simply asserts, in conclusory fashion, that she (along with all the other Defendants) "knew or should have known" that her conduct would have that result. Compl. ¶¶ 286–87. That is plainly insufficient under *Iqbal*. And the same is true with respect to the other Free Speech Defendants and, for that matter, Stranahan.[20] *Almy v. Grisham*, which Gilmore cites on this point (at 46), is inapposite, given that the defendants there acted "with the specific purpose of causing [the plaintiff] humiliation, ridicule, and severe emotional distress" in retaliation for salacious letters they believed she had written accusing them of adultery. 639 S.E.2d 182, 187 (Va. 2007).

Third, Gilmore provides no response to the Free Speech Defendants' point that their action did not, as required, "proximately cause" severe emotional distress. *Id.* at 188. The portions of the Complaint that he cites concerning that claimed injury (at 48) allege that he "lives

---

[19] Virginia's emotional distress cause of action is drawn from this Restatement provision and, in particular, comment i. *Womack v. Eldridge*, 215 Va. 338, 341 (Va. 1974).

[20] Of the portions of the Complaint cited by Gilmore (at 46), Paragraphs 72–82 and 238 do not concern the Free Speech Defendants, and the remainder allege nothing about their awareness that their conduct would cause Gilmore to suffer severe emotional distress. *See Infant C*, 391 S.E.2d at 327 (holding that the defendant's "awareness of the dangers or probable consequences" is an element of recklessness).

in constant, ongoing fear of vile online and in-person harassment of himself and his family" and that this "ongoing distress" is the cause of his physical symptoms of distress. Compl. ¶¶ 180–86. But the Free Speech Defendants are not the ones conducting any ongoing harassment or making any of the threats he alleges, and Gilmore does not allege otherwise. As a matter of Virginia law, the Free Speech Defendants therefore may not be held liable for others' potentially criminal acts, which constitute superseding causes cutting off the chain of causation. Independently, the First Amendment imposes the same proximate-cause limitation. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918 (1982).

## V.     The Free Speech Defendants Are Entitled to an Award of Costs and Fees

Dismissal of this action entitles the Free Speech Defendants to an award under the Texas Citizens Participation Act of "court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require." Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a)(1). The Supreme Court of Texas has rejected Gilmore's argument (at 54–55) that the Court may decline to order a fee award, holding instead "that the TCPA requires an award of 'reasonable attorney's fees' to the successful movant." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016).

Gilmore's argument that the TCPA "cannot apply in federal court," Opp. at 54, disregards the Fifth Circuit's application of the TCPA and district courts' frequent rejection of that same argument on the basis that the TCPA alters Texas's substantive law no differently than any other statutory provision determining civil liability. As the Fifth Circuit recently explained in *Cuba v. Plyant*, an anti-SLAPP statute is to be "applied in federal court under the *Erie* doctrine because it [is] functionally substantive." 814 F.3d 701, 706 n.6 (5th Cir. 2016) (citing *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 169 (5th Cir. 2009)). The only open question—as irrelevant in this action as it was in *Cuba*—is "whether, under the *Erie* doctrine, the array of state procedural rules surrounding anti-SLAPP motions to dismiss (viz. discovery stays, accelerated timetables for decision, and the like) follow the core anti-SLAPP motion to dismiss into federal court." *Id*. Accordingly, where simple dismissal is concerned, the Fifth Circuit has applied the

24

TCPA. E.g., *id.*; *Diamond Consortium, Inc. v. Hammervold*, 2018 WL 2077910, at \*4 (5th Cir. May 3, 2018), *reh'g denied* (June 12, 2018); *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 752 (5th Cir. 2014) (holding issue waived). Likewise, district courts regularly reject Gilmore's precise argument.[21]

Gilmore does not dispute that the Virginia anti-SLAPP statute, Va. Code § 8.01-223.2, properly applies in federal court, arguing only that his asserted "good faith" cuts against a fee award. Opp. at 52. But he neglects to address the fact that similarly worded anti-SLAPP statutes, like the District of Columbia's, have been interpreted to presumptively entitle a prevailing SLAPP defendant to an award of costs and fees so as to further the purposes of a SLAPP statute, in much the same way that the federal courts have interpreted and applied 42 U.S.C. § 1988. *See, e.g., Doe v. Burke*, 133 A.3d 569 (D.C. 2016). In any instance, Gilmore's assertion of his own "good faith" is undermined by his continued refusal to address the fact that the implications he claims to perceive in the Free Speech Defendants' challenged statements are expressly contradicted by what they actually said: that "white terrorists," not Gilmore or anyone associated with him, were responsible for the violence in Charlottesville and that, as to Gilmore and others commenting on the events, "I'm not saying that they did the violence." It is the rare defamation case in which the plaintiff assigns an implied meaning to a statement that expressly rejects that implication. For that reason, and the others stated in the Free Speech Defendants' motion memorandum (at 24–25), a cost and fee award is warranted.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice and find that the Free Speech Defendants are entitled to an award of their costs and attorney fees.

---

[21] *See, e.g., Pseudonym v. E. Houston Reg'l Med. Ctr.*, 2018 WL 2392200, at \*3 (S.D. Tex. Apr. 25, 2018), *report and recommendation adopted*, 2018 WL 2390129 (S.D. Tex. May 25, 2018); *Khalil v. Mem'l Hermann Health Sys.*, 2017 WL 5068157, at \*5 (S.D. Tex. Oct. 30, 2017); *Banik v. Tamez*, 2017 WL 1228498, at \*2 (S.D. Tex. Apr. 4, 2017); *Cuba v. Pylant*, 2015 WL 11018590, at \*11 (N.D. Tex. Mar. 6, 2015), *vacated on other grounds*, 814 F.3d 701 (5th Cir. 2016); *Walker v. Beaumont Indep. Sch. Dist.*, 2016 WL 1156852, at \*1 (E.D. Tex. Mar. 24, 2016); *Haynes v. Crenshaw*, 166 F. Supp. 3d 773, 776 (E.D. Tex. 2016).

July 10, 2018

Respectfully submitted,

TREMBLAY & SMITH, PLLC

BAKER HOSTETLER LLP

Thomas E. Albro (VSB #12812)
Evan D. Mayo (VSB #89383)
105-109 E. High Street
Charlottesville, VA 22902
Telephone: (434) 977-4455
Facsimile: (434) 979-1221
tom.albro@tremblaysmith.com
evan.mayo@tremblaysmith.com

/s/ Elizabeth A. Scully
Elizabeth A. Scully (VSB #65920)
Mark I. Bailen
Andrew M. Grossman
Richard B. Raile (VSB #84340)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
escully@bakerlaw.com
mbailen@bakerlaw.com
agrossman@bakerlaw.com
rraile@bakerlaw.com

*Co-Counsel for Defendants Alexander E. Jones, Infowars, LLC, Free Speech Systems, LLC and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

*Counsel for Defendants Alexander E. Jones, Infowars, LLC, Free Speech Systems, LLC and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

WALLER LANSDEN DORTCH & DAVIS, LLP

Eric J. Taube
100 Congress Avenue, Suite 1800
Austin, TX 78701
Telephone: (512) 685-6401
eric.taube@wallerlaw.com

Robb S. Harvey
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
robb.harvey@wallerlaw.com

*Of Counsel for Defendants Alexander E. Jones, Infowars, LLC, Free Speech Systems, LLC and Lee Ann McAdoo a/k/a Lee Ann Fleissner*

26

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Elizabeth A. Scully
Elizabeth A. Scully (VSB #65920)
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
escully@bakerlaw.com