## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| **BRENNAN M. GILMORE,** | **CASE NO.: 3:18-cv-00017-NKM-JCH** |
| **Plaintiff** | |
| **v.** | |
| **ALEXANDER JONES, et al.,** | **BRIEF IN SUPPORT OF MOTION FOR SANCTIONS FILED BY DEFENDANTS HOFT, STRANAHAN, CREIGHTON, WILBURN, HICKFORD, AND WORDS-N-IDEAS, LLC.** |
| **Defendants** | |

# TABLE OF CONTENTS

Table of Authorities ................................................................................ iii

Introduction and Summary of Argument ................................................ 1

Facts ........................................................................................................ 2

I.      The Plaintiff Violated Rule 11(b)(2) and (3) When Asserting That This Court Has Subject Matter Jurisdiction .............................................................................. 2

II.     The Plaintiff Violated Rule 11(b)(3) When Asserting That This Court Has Personal Jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and Words-N-Ideas, LLC ............................................................................................ 4

III.    The Plaintiff Violated Rule 11(b)(2) and (3) When Asserting That the Undersigned Defendants Committed Defamation or Intentional Infliction of Emotional Distress ......... 5

IV.     The First Amended Complaint as a Whole and Statements Made Outside of Court Demonstrate That This Suit Was Filed with the Improper Purpose of Harassing the Undersigned Defendants ............................................................................. 9

Conclusion .............................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 3

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ............................................................. 3, 4 and 8

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993) ................................... 7

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) .................................................. 6

*M. Rosenberg & Sons v. Craft*, 182 Va. 512 (1944) .................................................. 3

*U.S. v. Alvarez*, 567 U. S. 709 (2012) ...................................................................... 14

## STATUTES AND RULES

Fed. R. Civ. P. 11 ................................................................................................ passim

VA. CODE § 8.01-223.2 ............................................................................................ 1

## ARTICLES AND BOOKS

*Civil Rights Clinic*, GEORGETOWN LAW School, https://www.law.georgetown.edu/experiential-learning/clinics/civil-rights-clinic/ (last visited Sept. 27, 2018) ................................... 12

*Constitutional Accountability Center Announces Elizabeth B. Wydra As New President*, CONSTITUTIONAL ACCOUNTABILITY CENTER, Jan. 20, 2016, https://www.theusconstitution.org/news/constitutional-accountability-center-announces-elizabeth-b-wydra-as-new-president/ (last visited Sept. 26, 2018) ................................................................. 11

Oliver Darcy, *Charlottesville Witness Files Defamation Suit Against InfoWars and Other Far-Right Figures*, CNN, March 27, 2018, http://money.cnn.com/2018/03/13/media/charlottesville-defamation-lawsuit-infowars/index.html (last visited April 12, 2018) ................................ 15

Brennan Gilmore, *Alex Jones is a Menace to Society. I'm suing him*, WASHINGTON POST, March 14, 2018, https://www.washingtonpost.com/news/posteverything/wp/2018/03/14/alex-jones-is-a-menace-to-society-im-suing-him/ (last visited April 12, 2018) ................................ 14

*Brianne J. Gorod*, CONSTITUTIONAL ACCOUNTABILITY CENTER, https://www.theusconstitution.org/staff/brianne-j-gorod/ (last visited Sept. 26, 2018) .................................................................. 11

Julia Harte, *Witness to Charlottesville attack sues U.S. media outlets over 'false' stories,* REUTERS, March 13, 2018, https://in.reuters.com/article/usa-extremism-lawsuit/witness-to-charlottesville-attack-sues-u-s-media-outlets-over-false-stories-idINKCN1GP1KL (last visited Apr 12, 2018) ....
.......................................................................................................................... 14

Karena Landler, *Law Center Files Defamation Suit Against Alex Jones, InfoWars*, March 16, 2018, http://www.thehoya.com/law-center-files-defamation-suit-alex-jones-infowars/ (last visited Sept. 27, 2018) ............................................................................................................ 16

*Staff*, GEORGETOWN LAW SCHOOL, https://www.law.georgetown.edu/experiential-learning/clinics/civil-rights-clinic/staff/ (last visited Sept. 27, 2018) ................................................. 11

Mark Steyn, *Mumbo-Jumbo for Beginners*, National Review, Dec. 24, 2013, https://www.nationalreview.com/corner/mumbo-jumbo-beginners-mark-steyn/ (last visited April 12, 2018) ....
.......................................................................................................................... 13

Sarah Rankin, *Charlottesville Car Attack Witness Sues Alex Jones, Others*, U.S. NEWS & WORLD REPORT, March 13, 2018, https://www.usnews.com/news/us/articles/2018-03-13/charlottesville-attack-witness-sues-alex-jones-others (last visited April 12, 2018) ............................... 17

*What is a SLAPP?*, PUBLIC PARTICIPATION PROJECT, https://anti-slapp.org/what-is-a-slapp/ (last visited Apr 12, 2018) .................................................................................................... 13

*Witness to Tragedy, a Victim of Fake News Conspiracies Sues Alex Jones and Others*, GEORGETOWN LAW SCHOOL, March 13, 2018 https://www.law.georgetown.edu/news/witness-to-tragedy-a-victim-of-fake-news-conspiracies-sues-alex-jones-and-others/ (last visited Sept. 27, 2018) ............................................................................................................................. 15

# INTRODUCTION AND SUMMARY OF ARGUMENT

This case is a classic example of a recent phenomenon in the law: The use of abusive, frivolous lawsuits as a method of punishing speakers for engaging in expression with which a plaintiff disagrees. As demonstrated in the Brief in Support of the Joint Motion to Dismiss and Motion for Attorney Fees and Costs of Defendants Hoft, Creighton, Stranahan, Wilburn, Hickford, and Words-N-Ideas, LLC ("MTD Brief") (Dkt. 47), this Court does not have subject matter jurisdiction and does not have personal jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and Words-N-Ideas, LLC ("WNI")—and the Plaintiff failed to state a claim for which relief can be granted for either cause of action. Indeed, Defendants Hoft, Creighton, Stranahan, Wilburn, Hickford, and WNI (the "Undersigned Defendants") enjoy immunity from defamation suits under VA. CODE § 8.01-223.2, and this Court can order the Plaintiff to pay costs and attorney fees under that statute. Furthermore, a basic understanding of the law or a minimal investigation into the facts would have revealed that the Plaintiff had no valid case. It is not plausible that experienced attorneys would file such a frivolous complaint out of ignorance.

Fed. R. Civ. P. 11(b) is designed to prevent the abuse of the courts. Preventing such abuse is particularly important when, as in the instant case, the right to Freedom of Expression is under attack. The Plaintiff's and his attorneys' apparent calculus is as cynical as it is damaging to First Amendment freedoms: Force the Defendants to spend money to respond to a frivolous case so that they might think twice before engaging in protected speech in the future. Win or lose, the Plaintiff and his lawyers will probably be satisfied because they recognize that the process is the punishment: Each Defendant will likely lose thousands of dollars even if he or she wins. Rule 11(c) gives this Court the power to change that calculus. By imposing monetary sanctions, including attorney fees, this Court can teach this Plaintiff and his attorneys a different lesson: That

abusive lawsuits to suppress protected expression can and should backfire. Imposing such

discipline will not only help to reduce the workload in an overworked court system, but it will also

protect Freedom of Expression.

## **FACTS**

This Brief incorporates in full the facts set out by the MTD Brief pp. 2-7.

## **I.**
## **THE PLAINTIFF VIOLATED RULE 11(B)(2) AND (3) WHEN ASSERTING THAT THIS COURT HAS SUBJECT MATTER JURISDICTION**

Fed. R. Civ. P. 11(b)(2) and (3) states in relevant part that:

(b)     Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:...

　　(2)     the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

　　(3)     the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

When asserting that subject matter jurisdiction is present in the instant case, the Plaintiff frequently

violated both principles.

First, in relation to actual diversity, the First Amended Complaint (Dkt. 29) (the "FAC")

makes an assertion of fact—that Mr. Stranahan was domiciled in Texas—that apparently has no

evidentiary support. After all, when Mr. Stranahan offered an evidentiary challenge to the claim

of actual diversity, the Plaintiff offered absolutely no admissible evidence in support of the

contention that Mr. Stranahan was domiciled in Texas in violation of Rule 11(b)(3). Indeed, the

2

Plaintiff was reduced to alleging that a blind man had a valid driver's license. FAC ¶ 17, Stranahan Declaration, MTD Brief Exhibit A ¶ 4.

Second, with respect to the amount in controversy requirement, the FAC frequently includes damages that were actually caused by third persons not named as defendants without any proper theory of law that would allow the Undersigned Defendants to be legally responsible for the wrongful conduct of those third parties. The FAC principally relies on the concept of incitement when calculating damages. FAC ¶¶ 5,153, 164, 167, 177, 209, 220, 228, 236, 244 and 273. However, with respect to defamation claims, Virginia law states that a defamation plaintiff cannot recover for the wrongful acts of third parties at all. *M. Rosenberg & Sons v. Craft*, 182 Va. 512, 520-21 (1944). The Plaintiff has made no attempt to show *Craft* did not control or should be overturned. This is a prima facie violation of Rule 11(b)(2).

Meanwhile, with respect to the amount in controversy related to Intentional Infliction of Distress ("IIED"), the FAC never properly alleges incitement, and no incitement occurred. As noted in the MTD Brief, the test for incitement was laid down in *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) as follows:

> the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

The Plaintiff made no effort whatsoever to meet this test. Instead, the FAC just repeatedly uses some variation of the word "incitement." Thus, the FAC does not make specific allegations of incitement as required by *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)—instead relying on the most conclusory of allegations—and what specific words and conduct the FAC does allege on the Undersigned Defendants' part does not meet any part of that test. By failing to make a claim that

even approached legal validity, the Plaintiff has violated Rule 11(b)(2).

Furthermore, the claim that the Undersigned Defendants committed incitement is not true. Each of the Undersigned Defendants submitted affidavits stating that none of them had met even the most basic requirement under *Brandenburg*. Specifically, none of them advocated violence or lawless behavior.[1] Therefore, the FAC's assertion that the Undersigned Defendants engaged in incitement violates Rule 11(b)(3).

In summary, when asserting that subject matter jurisdiction was present, the Plaintiff asserts facts that were not true and legal theories that were not valid and did so without any argument that the relevant law should be changed in violation of Rule 11(b)(2)-(3).

## II.
## THE PLAINTIFF VIOLATED RULE 11(B)(3) WHEN ASSERTING THAT THIS COURT HAS PERSONAL JURISDICTION OVER MR. HOFT, MR. CREIGHTON, MR. WILBURN, MS. HICKFORD, OR WORDS-N-IDEAS, LLC

Meanwhile, in alleging personal jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and Words-N-Ideas, LLC, the FAC made a number of statements that were patently false.

For instance, FAC ¶ 7 states that:

Upon information and belief, all Defendants regularly do and/or solicit significant business in Virginia, engage in other persistent courses of conduct, or derive substantial revenue from goods sold to, goods used or consumed, or services rendered in Virginia, such that they have made minimum contacts with the state and have purposefully availed themselves of its laws.

All of these statements are contradicted by Declarations written by Mr. Hoft, Mr. Creighton, Mr.

---

[1] Stranahan Declaration ¶ 5; Creighton Declaration, MTD Brief Exhibit B ¶ 4; Hoft Declaration, MTD Brief Exhibit C ¶ 4; Hickford Declaration, MTD Brief Exhibit D ¶ 5; and Wilburn Declaration, MTD Brief Exhibit E ¶ 4.

Wilburn and Ms. Hickford (speaking about herself and WNI),[2] and the Plaintiff presented absolutely no evidence that any of these Defendants did engage in such conduct. Furthermore, one would not normally expect it to be true. It is not self-evident that defendants from Florida, Missouri, and Colorado are likely to have any interaction with the Commonwealth of Virginia.

Likewise, FAC ¶ 6 states that "Defendants' false and defamatory statements were directed at, received, and read by individuals and businesses in Virginia." The FAC never makes any proper allegation that the allegedly defamatory statements were received or read by anyone in Virginia (except the Plaintiff), and the claim that these statements were directed at Virginia is contradicted by Declarations written by Mr. Hoft, Mr. Creighton, Mr. Wilburn, and Ms. Hickford (speaking about herself and WNI), and once again the Plaintiff presented no evidence to the contrary.

Simply put, every allegation in the FAC asserting jurisdiction over Mr. Hoft, Mr. Creighton, Mr. Wilburn, Ms. Hickford, and WNI is dead wrong. Such conduct plainly violates Fed. R. Civ. P. 11(b)(3).

## III.
## THE PLAINTIFF VIOLATED RULE 11(B)(2) AND (3) WHEN ASSERTING THAT THE UNDERSIGNED DEFENDANTS COMMITTED DEFAMATION OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

This Brief will not rehash in detail every failure the FAC makes when attempting to state a claim upon which relief can be granted, but will briefly highlight some of the more egregious errors.

First, the FAC repeatedly attempts to penalize the Undersigned Defendants for stating undisputed facts. For instance, the entire piece by Mr. Wilburn simply factually describes and

---

[2] Creighton Declaration ¶ 2-3; Hoft Declaration ¶ 2-3; Hickford Declaration 3-4; and Wilburn Declaration 2-3.

quotes from a piece written by a third person not named as a defendant. MTD Brief 36-41. Thus, the principal factual allegation made by Mr. Wilburn—that this article made certain allegations—is true. Likewise, FAC ¶ 66 claims that somehow it is defamatory for Mr. Hoft to note that at one point a NEW YORK TIMES report on the car attack mentioned the Plaintiff's relationship to the State Department and that at some point that information was removed while also admitting that is precisely what had happened, MTD Brief pp. 52-53. These are but two examples. In each instance, the Plaintiff did not allege that the allegations were false, but that repeating them was somehow defamatory.

Second, the FAC frequently attempts to penalize the Undersigned Defendants for having forbidden opinions in the form of conclusions based on disclosed facts. The most egregious example of this comes in FAC ¶ 38:

> In this article, Defendant Creighton notes [the Plaintiff's] experience as a Foreign Service Officer in the Central African Republic and his work as chief of staff to Tom Perriello. On the basis of these true facts, along with [the Plaintiff's] statement of belief that the attack was an act of terrorism, Defendant Creighton falsely states that [the Plaintiff] cannot have been a mere bystander who happened to record the attack.

In other words, the Plaintiff did not dispute any of the facts Mr. Creighton relied on, but rather claimed that the conclusion Mr. Creighton draws from those stated facts are somehow defamatory. One could hardly come up with a more perfect illustration of a protected opinion drawn from disclosed facts described in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 27 n. 3 (1990).

Nor is that an isolated instance. Mr. Wilburn clearly stated that he was drawing a conclusion based on hypothetical facts. MTD Brief p. 39. Mr. Hoft stated that he had concluded that the Plaintiff is a "Deep State Shill" based on facts disclosed throughout his article. *Id.* at 50-51. Mr. Stranahan concluded that there was reason for further journalistic investigation of the

Plaintiff. *Id.* at 59-60. In each case, the Plaintiff attempted to penalize the Defendants for their opinions, rather than alleged false statements of fact.

Third, the Plaintiff repeatedly pretended to know facts that he could not possibly know. Specifically, the Plaintiff claimed to know of the full investigative process the Undersigned Defendants went through before publishing their works. FAC ¶ 51, 72, and 93. The Plaintiff claimed to know who the Undersigned Defendants spoke to with respect to their articles, *id.* at ¶¶ 52, 76, and 94; and whether the Undersigned Defendants had their claims independently checked, *id.* at ¶¶ 54, 74, and 95. In each instance, there is no logical way the Plaintiff can pretend to know that any of these factual assertions are true. Common sense tells us he was merely guessing.

Fourth, the Plaintiff attempted to use the valid theory of defamation by implication but completely disregarded the limitations to this theory set down in cases such as *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993):

> A defamatory implication must be present in the plain and natural meaning of the words used.... Moreover, because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.

(internal citations omitted). While the Plaintiff paid lip service to this rule, he repeatedly urges this Court to abandon it for the most ludicrous flights of fancy. The most ridiculous example of this comes in FAC ¶ 84 where the Plaintiff claimed that Mr. Stranahan and co-Defendant McAdoo conveyed an absurd amount of meaning by body language:

> *Stranahan and McAdoo's body language falsely convey* to the audience that [the Plaintiff's] tribute to a woman who died in the traumatizing attack that he and other bystanders witnessed indicates that he was actually a knowing participant in a Soros-sponsored conspiracy to stage violence and create a martyr—Heather Heyer—for their cause.

7

(emphasis added). Again, the FAC doesn't allege that Mr. Stranahan used sign language, blinked in Morse Code, was playing charades, or anything like that. The FAC claims that when Mr. Stranahan "looks knowingly at the camera, eyebrows raised, arm raised, [Ms. McAdoo] nods comprehendingly, laughs" that these actions somehow conveyed an absurdly detailed message to the audience. The MTD Brief spent several paragraphs mocking this claim, MTD Brief ¶¶ 57-58, because (as the saying goes) the Plaintiff's assertion does not pass the laugh test.

Finally, with respect to IIED, the FAC's attempt to allege that the Undersigned Defendants committed incitement when there is no allegation or evidence that their expression met any part of the *Brandenburg* test for incitement undermines nearly every part of the Plaintiff's claim for IIED. That failure reduces what can be properly considered when determining if the Undersigned Defendants engaged in extreme and outrageous conduct to nothing more than one or two allegedly defamatory publications for each. Likewise, it reduces what emotional distress can be considered since the majority of the emotional distress alleged flows not from the allegedly defamatory statements of the Undersigned Defendants but rather from the conduct of third parties that cannot, as a matter of constitutional law, be blamed on the Undersigned Defendants.

This motion has focused purely on the most egregious errors—demonstrating a failure to apply basic principles of defamation law, constitutional law, the law of IIED or clear failures regarding factual assertions under Rule 11(b)(3). There is no excuse for claiming an opinion is defamatory. There is no excuse for claiming that admittedly factual statements are defamatory. There is no excuse for taking what are obviously guesses about the facts and presenting them as factual certainties. There is no excuse for using the defamation by implication doctrine to launch into absurd interpretations of even facial expressions. There is no excuse for alleging incitement when none occurred. Finally, there is no way to square these failures the duties imposed by Fed.

R. Civ. P. 11(b)(2) and (3).

## IV.
## THE FIRST AMENDED COMPLAINT AS A WHOLE AND STATEMENTS MADE OUTSIDE OF COURT DEMONSTRATE THAT THIS SUIT WAS FILED WITH THE IMPROPER PURPOSE OF HARASSING THE UNDERSIGNED DEFENDANTS

Rule 11(b)(1) prohibits the Plaintiff from filing his FAC for an improper purpose as follows:

> (b)     Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)     it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation[.]

However, it is clear on the face of the litigation and statements made by the Plaintiff and his attorneys out-of-court, that the overwhelming purpose of this suit is to harass the Defendants and to make them think twice before exercising their First Amendment Rights in the future.

First, the FAC is, on its face, so completely frivolous that it invites the intuition that it was filed in bad faith. Overall, one gets the feeling that the Plaintiff knows he cannot make a case but hopes that a sympathetic judge—or perhaps, a judge *unsympathetic* to one or more of the Defendants—would ignore the legal shortcomings in the FAC and allow this case to go forward.

The Plaintiff might be tempted to plead ignorance, and even if he did not, this Court might consider it as a possibility. If the Plaintiff were pro se, undersigned counsel would be inclined to accept a plea of ignorance and probably would not have bothered to file this motion. However, this Plaintiff is represented by four attorneys, all with long resumes, and thus, ignorance is unlikely to be a valid excuse. For instance, Georgetown Law School's website provides the following

9

information about Messrs. Francois and Mendrala as leaders of that school's Civil Rights Clinic:

**Aderson Francois** is a Professor of Law and the Director of the Civil Rights clinic, and the Voting Rights Institute. Prior to joining the Georgetown faculty, Professor Francois directed the Civil Rights Clinic at Howard University School of Law, where he also taught Constitutional Law, Federal Civil Rights, and Supreme Court Jurisprudence. His scholarly interests include voting rights, education law, and the history of slavery and Reconstruction. His practice experience encompasses federal trial and appellate litigation concerning equal protection in education, employment discrimination, voting rights, marriage equality, and the right to a fair criminal trial. Professor Francois received his J.D. from New York University School and clerked for the late Honorable A. Leon Higginbotham, Jr., Chief Judge of the United States Court of Appeals for the Third Circuit. In 2008, the Transition Team of President Barack Obama appointed Professor Francois Lead Agency Reviewer for the United States Commission on Civil Rights. He has provided pro bono death penalty representation to inmates before the United States Court of Appeals for the Fifth Circuit, served as a Special Assistant in with the United States Commission on Civil Rights in Washington, D.C., and practiced commercial litigation in the New York Offices of Paul Weiss Rifkind Wharton &Garrison. He has testified before Congress on civil rights issues and drafted numerous briefs to the United States Supreme Court, the Supreme Court of California, the Supreme Court of Iowa, and Maryland's highest court. Before joining Howard's faculty, Professor François was the Assistant Director of the Lawyering Program at New York University School of Law....

**Andy Mendrala** graduated from Washington and Lee University with his B.A. in Religion in 2004, and from Howard University School of Law with his J.D. in 2011. Before joining the clinic, Andy was a senior associate at Wilmer, Cutler, Pickering, Hale, and Dorr LLP, in Washington D.C., where he was a member of the firm's Litigation/Controversy practice group. At Wilmer Hale, worked on a variety of high-stakes civil and criminal matters. While there, he drafted and filed briefs in federal and state court, at both the appellate and trial level, and represented clients before a number of law enforcement and regulatory agencies. He also had an active pro bono practice, representing clients in complex matters relating to racial discrimination, the constitutional right to counsel, and human trafficking. Andy clerked for then Chief Judge Deborah Chasa now of the United States District Court for the District of Maryland, and he was a judicial intern for Judge Ricardo Urbina of the United States District Court for the District of Columbia. He is admitted to the bars of Virginia and the District of Columbia.

While in law school, Andy was a student attorney in Howard University's civil rights clinic and a senior staff editor of the Howard Law Journal. Prior to his legal career, Andy was the associate director for development at the Nativity Miguel

Network of Schools in Washington DC.[3]

Similarly, the Constitutional Accountability Center provides the following resume[4] for Brianne

Gorod, Esq.:

> Brianne is Constitutional Accountability Center's Chief Counsel. Before taking her current role, Brianne served as CAC's Appellate Counsel.
>
> Brianne joined CAC from private practice at O'Melveny & Myers (OMM), where she was Counsel in the firm's Supreme Court and appellate practice. From 2009-11, prior to joining OMM, Brianne was an Attorney-Adviser in the Office of Legal Counsel at the U.S. Department of Justice. She also served as a law clerk for Justice Stephen Breyer on the U.S. Supreme Court, a law clerk for Judge Robert A. Katzmann on the U.S. Court of Appeals for the Second Circuit, and a law clerk for Judge Jed S. Rakoff on the U.S. District Court for the Southern District of New York.
>
> Brianne's academic writings have appeared in, among others, the Yale Law Journal, the Duke Law Journal, the Northwestern University Law Review, the Washington Law Review, and the NYU Journal of Law & Liberty, and her popular writings have appeared in outlets such as the Washington Post, LA Times, Slate, The New Republic, CNN.com, and Reuters, and on numerous blogs, including Huffington Post, SCOTUSblog, Take Care, ACSblog, and Balkinization.
>
> Brianne received her J.D. from Yale Law School and her M.A./B.S. from Emory University. Her master's thesis in political science examined judicial behavior on the U.S. Supreme Court.

Likewise, Elizabeth Wydra, Esq. is provided the following biography on the same website[5] circa

2016:

> Wydra is a graduate of Claremont McKenna College and Yale Law School, joining CAC from private practice at Quinn Emanuel Urquhart & Sullivan in San Francisco, where she was an attorney working with former Stanford Law School

---

[3] *Staff*, GEORGETOWN LAW SCHOOL, https://www.law.georgetown.edu/experiential-learning/clinics/civil-rights-clinic/staff/ (last visited Sept. 27, 2018).

[4] *Brianne J. Gorod*, CONSTITUTIONAL ACCOUNTABILITY CENTER, https://www.theusconstitution.org/staff/brianne-j-gorod/ (last visited Sept. 26, 2018).

[5] *Constitutional Accountability Center Announces Elizabeth B. Wydra As New President*, CONSTITUTIONAL ACCOUNTABILITY CENTER, Jan. 20, 2016, https://www.theusconstitution.org/news/constitutional-accountability-center-announces-elizabeth-b-wydra-as-new-president/ (last visited Sept. 26, 2018).

Dean Kathleen Sullivan in the firm's Supreme Court/appellate practice. Previously, Elizabeth was a supervising attorney and teaching fellow at the Georgetown University Law Center appellate litigation clinic, a law clerk for Judge James R. Browning of the U.S. Court of Appeals for the Ninth Circuit, and a lawyer at Pillsbury Winthrop Shaw Pittman, a law firm in Washington. Wydra's legal practice focuses on Supreme Court litigation and high-stakes cases in the federal courts of appeals. She has represented CAC as well as clients including congressional leaders, preeminent constitutional scholars and historians, state and local legislators and government organizations, and groups such as Justice at Stake, League of Women Voters, and AARP. Wydra appears frequently in print and on air as a legal expert for outlets including the New York Times, Washington Post, NBC, ABC, CNN, FOX, BBC, and NPR. Her writings have appeared in the New York Times, Washington Post, Reuters, USA Today, POLITICO, CNN.com, and Slate, and in 2014 she was recognized by the National Law Journal as one of D.C.'s 40 Rising Stars Under 40.

Undersigned counsel is loath to make things personal in this case, but these attorneys have far too much experience to plead ignorance at this point in their respective careers. Indeed, two of these attorneys run the Georgetown Civil Rights Legal Clinic and, therefore, are held up by that prestigious law school as being persons who know the practicalities of the law—how to actually work as a lawyer from day-to-day—as opposed to the more theoretical instruction presumably provided in Georgetown Law School's ordinary classes.[6] Any plea of ignorance is not credible.

However, if ignorance is not the explanation, then one must conclude the Plaintiff's attorneys are deliberately wasting this Court's time and the Undersigned Defendants' money. In

---

[6] The Georgetown Law School portrays its Civil Rights Law Clinic as follows:

> The Civil Rights Clinic operates as a public interest law firm…. Students interview clients, develop case theories, draft and file complaints in state and federal courts, conduct discovery, engage in motions practice, and prepare appeals. Students also file FOIA requests and analyze responsive documents, and work in coalition with other public interest organizations to develop impact cases.

*Civil Rights Clinic*, GEORGETOWN LAW School, https://www.law.georgetown.edu/experiential-learning/clinics/civil-rights-clinic/ (last visited Sept. 27, 2018).

short, this case is a classic SLAPP suit. As stated by the Public Participation Project:[7]

> SLAPPs are Strategic Lawsuits Against Public Participation. These damaging suits chill free speech and healthy debate by targeting those who communicate with their government or speak out on issues of public interest.

> SLAPPs are used to silence and harass critics by forcing them to spend money to defend these baseless suits. SLAPP filers don't go to court to seek justice. Rather, SLAPPS are intended to intimidate those who disagree with them or their activities by draining the target's financial resources.

> SLAPPs are effective because even a meritless lawsuit can take years and many thousands of dollars to defend. To end or prevent a SLAPP, those who speak out on issues of public interest frequently agree to muzzle themselves, apologize, or "correct" statements.

In this situation, victory or defeat is not the point. As Mark Steyn said about another dubious defamation lawsuit: "the process is the punishment."[8] It is easy for lawyers and judges who practically live in courthouses to forget that going to court is unpleasant for most ordinary people. It is often stressful and expensive—even more so when the court is far from home. This is true even if victory is reasonably certain. Given that this suit is plainly motivated by hostility toward what the Defendants have said, and given this suit's utter lack of merit, the Plaintiff's attorneys' strategy is clear: Harass the Defendants, cost them money, and next time they will think twice before engaging in protected expression.

This suspicion is bolstered by various statements by the Plaintiff and his attorneys outside of court. For instance, Reuters quoted the Plaintiff as saying, "If my case makes these conspiracy theorists think twice about just outright attacking someone without any type of journalistic review,

---

[7] *What is a SLAPP?*, PUBLIC PARTICIPATION PROJECT, https://anti-slapp.org/what-is-a-slapp/ (last visited Apr 12, 2018).

[8] Mark Steyn, *Mumbo-Jumbo for Beginners*, National Review, Dec. 24, 2013, https://www.nationalreview.com/corner/mumbo-jumbo-beginners-mark-steyn/ (last visited April 12, 2018).

then good."[9] That sounds defensible until one remembers that it is clear that the Plaintiff and his attorneys have no idea what journalistic review went on—substituting their guesses for facts. *Supra* p. 7. Stripped of the apparent falsehood in that Reuters quote, the Plaintiff wants people of certain viewpoints to "think twice" before "attacking [read: Criticizing] someone."

> A similar point can be made when the Plaintiff writes in a WASHINGTON POST Op-Ed[10] that

> I decided to sue Infowars, [sic] the individual behind [The] Gateway Pundit [Mr. Hoft] and others because of the stunning effect their absurd dispatches have had on me and my family. But also because of the danger they pose to our country....

> Fact-based journalism is essential to a health democracy because it provides citizens with objective information on issues of public concern. Infowars and Gateway Pundit do the opposite—poisoning our civil discourse by distorting the truth and blurring the line between news and propaganda.

As with the previous quote, this sounds high-minded until one realizes that the FAC fails to name a single statement of fact made by the Undersigned Defendants that was false and defamatory. Instead, the FAC attempts to declare conclusions to be actionable if the Plaintiff disagrees with them. In that context, it becomes clear that it is not falsehoods that the Plaintiff considers dangerous to society, but opinions he does not agree with.

Further, the very idea that the courts can and should be general clearinghouses for truth is at odds with what the Supreme Court has said about Freedom of Expression. As stated in *U.S. v. Alvarez*, 567 U. S. 709, 723 (2012): "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth. See G. Orwell, NINETEEN EIGHTY-FOUR (1949) (Centennial ed.

---

[9] Julia Harte, *Witness to Charlottesville attack sues U.S. media outlets over 'false' stories*, REUTERS, March 13, 2018, https://in.reuters.com/article/usa-extremism-lawsuit/witness-to-charlottesville-attack-sues-u-s-media-outlets-over-false-stories-idINKCN1GP1KL (last visited April 12, 2018).

[10] Brennan Gilmore, *Alex Jones is a Menace to Society. I'm suing him*, WASHINGTON POST, March 14, 2018, https://www.washingtonpost.com/news/posteverything/wp/2018/03/14/alex-jones-is-a-menace-to-society-im-suing-him/ (last visited April 12, 2018).

2003)." Some categories of falsehood can be punished, civilly and criminally, but only if the false statement also causes one of a few narrow categories of harm. This is because our founders believed that the first and best defense against falsity is free and open discussion rather than censorship.

The Plaintiff combined the above sentiments and adds a new layer in an article on CNN's website.[11] In addition to the Plaintiff's inappropriate desire to turn the courts into a "Ministry of Truth" and his unfounded accusation that the Defendants have violated journalistic practices, the Plaintiff added a new dark desire: To "blunt the ability" of the Defendants to speak their minds.

> [The Plaintiff] said he hopes the lawsuit helps "blunt the ability" of fringe websites and individuals to spread baseless conspiracy theories.

> "The primary motivation was accountability and trying to confront what I consider to be an incredibly dangerous trend in our civil discourse, our democracy," he told CNN. "And that is the widespread saturation these sites have and their unwillingness to go by traditional journalistic practices."

*Id.* Likewise, the comments of one of the Plaintiff's attorneys also shows the censor's mindset. For instance, the Georgetown Law School's website quoted Plaintiff's counsel as saying the following about this lawsuit:

> "The First Amendment does not and cannot protect deliberate lies designed to incite incessant harassment and violence against private citizens," [the Plaintiff's Counsel Andrew] Mendrala said. "This case is a simple defense of democracy. A well-informed public is essential to a healthy democracy. But a deliberately misinformed public is fatal to it."[12]

---

[11] Oliver Darcy, *Charlottesville Witness Files Defamation Suit Against InfoWars and Other Far-Right Figures*, CNN, March 27, 2018, http://money.cnn.com/2018/03/13/media/charlottesville-defamation-lawsuit-infowars/index.html (last visited April 12, 2018).

[12] *Witness to Tragedy, a Victim of Fake News Conspiracies Sues Alex Jones and Others*, GEORGETOWN LAW SCHOOL, March 13, 2018, https://www.law.georgetown.edu/news/witness-to-tragedy-a-victim-of-fake-news-conspiracies-sues-alex-jones-and-others/ (last visited Sept. 27, 2018).

Putting aside that the FAC never properly alleges incitement or that any deliberate false statements were made by the Undersigned Defendants, counsel has joined his client in arguing that the courts can or should serve a "Ministry of Truth" function.

Furthermore, the statements of both the Plaintiff and his counsel about the possibility of settlement clearly indicate that they are not actually seeking redress for harms but to obtain the very chilling effect warned of above. For instance, in THE HOYA, the student newspaper of Georgetown University, an article[13] discussed co-Defendant Alex Jones' history of settlement in order to lead into a discussion of whether the instant Plaintiff was interested in settlement:

> Mendrala said settling cases makes sense for many plaintiffs, but would not allow for the kind of impact the clinic is hoping for with this case.

> "If he settles an individual case, then that individual case goes away and those people are pacified," Mendrala said. "But it doesn't have a larger effect on the future."

> Mendrala also cautioned the case is not meant to undermine First Amendment speech laws.

> "We feel like a victory in this case would be a victory for people like Brennan nationwide," Mendrala said. "And it would shift the paradigm onto which conspiracy theorists operate by holding them legally accountable for their lies."

Given that the FAC never properly alleges any false statements of fact by the Undersigned Defendants but still attempts to penalize them for opinions the Plaintiff does not agree with, this is in reality a declaration that the Plaintiff's attorney wishes to silence protected speech—despite his protest that he does not wish to undermine the First Amendment.

---

[13] Karena Landler, *Law Center Files Defamation Suit Against Alex Jones, InfoWars*, March 16, 2018, http://www.thehoya.com/law-center-files-defamation-suit-alex-jones-infowars/ (last visited Sept. 27, 2018).

That sentiment was echoed by the Plaintiff himself in another article:[14]

> [The Plaintiff] said in an interview with The Associated Press that he "absolutely" would not consider settling the suit and that any monetary damages are a secondary goal.

> "There's no amount of money that would overcome the motivation of this case," which is to set a legal precedent to prevent the same thing from happening again, [the Plaintiff] said.

Of course, the "same thing happening again," with respect to the Undersigned Defendants, would be someone voicing an opinion that the Plaintiff does not agree with.

Taken together, the evidence shows that the FAC was filed for an improper purpose: To harass the Undersigned Defendants and to punish them for having dared to air opinions the Plaintiff and his lawyers do not agree with, all in the hope of raising the price of free expression. The only way to blunt the impact of a SLAPP suit such as this is to change the economic calculus—by sanctioning the Plaintiff and/or his lawyers and forcing them to pay attorney fees and costs. If the Plaintiff and/or his attorneys must bear all of the expenses incurred by their conduct, it will likely chill the Plaintiff's and his attorneys' litigation strategy, rather than chilling the Undersigned Defendants expression of opinions the Plaintiff disagrees with. Courts need to make it so that plaintiffs such as this and their lawyers not only lose but also regret having filed such a lawsuit.

Further, the case for sanctioning the Plaintiff's attorneys is particularly strong here. As noted above, two of the Plaintiff's attorneys—including the sole signatory of the FAC—lead the Civil Rights Clinic at Georgetown Law School. They are being held out to young law students as experts in the practice of law. They are supposed to exemplify the ideal of what the practice of law

---

[14] Sarah Rankin, *Charlottesville Car Attack Witness Sues Alex Jones, Others*, U.S. NEWS & WORLD REPORT, March 13, 2018, https://www.usnews.com/news/us/articles/2018-03-13/charlottesville-attack-witness-sues-alex-jones-others (last visited April 12, 2018).

should be, both in terms of skill and in terms of ethics. Yet, the lesson they are teaching their students is the wrong one: That it is appropriate to file suit when the law and the facts are clearly against you (or at least unknown), when the purpose of the litigation is to browbeat people into silence because you do not approve of their opinions. The future lawyers in their clinic are watching how the court system will respond to such behavior, and a misstep by this Court might lead these students to learn the wrong lesson: That frivolous lawsuits aimed at chilling speech like this one will be tolerated by the courts. By sanctioning the Plaintiff, this Court might not only stop one frivolous and abusive lawsuit, but it might stop hundreds of newly-minted lawyers from filing similar suits in the future.

Often the best way to learn is by example. In teaching future lawyers how to behave, the Georgetown Civil Rights Clinic has not chosen to provide its students with the best example of ethical advocacy. They have used a Civil Rights Clinic to file an abusive lawsuit attacking the Civil Right of Free Expression. Therefore, it seems to fall on this Court to teach those students the right lesson by making an example of the Plaintiff's lawyers. For this reason, more than any other, sanctions are appropriate.

## **CONCLUSION**

Undersigned counsel has never sought sanctions against a plaintiff's attorneys before, and does so with extreme reluctance now. However, this is a lawsuit that should not have been filed. It lacks appropriate factual and legal predicates. Further, it appears to have been filed for one of the most improper purposes imaginable: To terrorize people into silence and foregoing their right to Freedom of Expression. The only way to prevent this *in terrorem* effect the Plaintiff and his attorneys are apparently seeking is to change the incentives by shifting the expenses of this litigation to the Plaintiff and his lawyers. This is an appropriate way to prevent the Plaintiff's

18

attorneys from setting a bad example for other plaintiffs and for their students who are watching:

This Court needs to make an example out of the Plaintiff and his attorneys.

_____         Respectfully submitted,


                                          *s/ Aaron J. Walker*
                                        _____
                                        Aaron J. Walker, Esq.
                                        *Attorney for Defendants Hoft, Stranahan, Creighton,*
                                              *Wilburn, Hickford, and Words-N-Ideas, LLC*
                                        Va Bar# 48882
                                        7537 Remington Road
                                        Manassas, Virginia 20109
                                        (703) 216-0455
                                        AaronJW72@gmail.com