CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

03/29/2019

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA

## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BRENNAN M. GILMORE, | CASE NO. 3:18-cv-00017 |
| *Plaintiff* | |
| v. | **MEMORANDUM OPINION** |
| ALEXANDER ("ALEX") JONES, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

Plaintiff Brennan Gilmore was among hundreds of individuals who gathered in Charlottesville, Virginia on August 12, 2017 to protest various white supremacist and neo-Nazi groups participating in the "Unite the Right" rally. As Gilmore recorded footage of protestors that afternoon, he captured James Alex Fields, Jr. driving into a crowd, killing Heather Heyer and injuring approximately thirty-six others. Gilmore posted this footage on Twitter, and the video quickly went viral. Gilmore alleges that, in the days after August 12, Defendants published articles and videos falsely portraying him as a "deep state" operative who conspired to orchestrate violence in Charlottesville for political purposes. Gilmore brought suit in this Court against Defendants for defamation and intentional infliction of emotional distress (IIED).

Defendants move to dismiss on multiple grounds. Various defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), arguing that the Court lacks subject matter jurisdiction. All defendants move to dismiss under Fed. R. Civ. P. 12(b)(2), asserting that this Court cannot exercise personal jurisdiction over any defendant. All defendants contend under Fed. R. Civ. P. 12(b)(6) that Gilmore fails to state claims against them for either defamation or IIED.

1

The Court holds that it can exercise diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, and that it can exercise specific personal jurisdiction over all defendants except Defendant Allen B. West, who will be dismissed. The Court further holds that Gilmore has adequately pled defamation against Defendants but has not adequately pled IIED. Thus, Gilmore's defamation claims will survive, but his IIED claims will be dismissed.

PARTIES

Gilmore brings claims for defamation and IIED against eleven defendants. The parties' alleged identities and roles are outlined below.

I.    Plaintiff Brennan Gilmore ("Gilmore")

Gilmore is domiciled in Albemarle County, Virginia. (Am. Comp.[1] ¶ 13). In 2017, Gilmore took leave from the U.S. State Department, where he is employed as a Foreign Service Officer. (*Id.*). Gilmore served as chief of staff for Tom Perriello during Perriello's 2017 Virginia gubernatorial campaign. (*Id.*). He now serves as a business consultant for an information technology company. (*Id.*).

II.   Defendant Scott Creighton ("Creighton")

Creighton is domiciled in Tampa, Florida, and is the owner and author of the website *American Everyman*.[2] (Am. Comp. ¶ 19; dkt. 47-2 at 2). On August 13, 2017, Creighton wrote and published an article entitled "*Charlottesville Attack, Brennan Gilmore and . . . the STOP KONY 2012 Pysop? What?*". (*Id.*). Creighton also allegedly published a video entitled "*Charlottesville Attack: Brennan Gilmore – Witness or Accessory?*" on the same day on the

---

[1]    "Am. Comp." denotes Gilmore's amended complaint. (Dkt. 29).

[2]    The link to the *American Everyman* website Gilmore provides is no longer functional due to the website's suspension for "a violation of [WordPress.com's] Terms of Service." (Am. Comp. ¶ 19, n.13).

since-suspended *American Everyman* YouTube channel.  (Am. Comp. ¶ 19).

### III.    Defendant James Hoft ("Hoft")

Domiciled in St. Louis, Missouri, Hoft is the owner and author of the website *Gateway Pundit*.  (Am. Comp. ¶ 20; dkt. 47-3 at 2).  On August 14, 2017, Hoft wrote and published an article entitled "*Random Man at Protests Interviewed by MSNBC, NY Times Is Deep State Shill Linked to George Soros*" on the *Gateway Pundit* website.  (*Id.*).

### IV.    Defendant Lee Stranahan ("Stranahan")

On August 15, 2017, Stranahan appeared alongside Defendant Lee Ann McAdoo in a video posted on InfoWars.com entitled "*Bombshell Connection Between Charlottesville, Soros, CIA.*"  (Am. Comp. ¶ 17; dkt. 29-6).  A former employee of *Breitbart News*, Stranahan currently operates *The Populist*, a "political journalism" website.  (Am. Comp. ¶ 17).  Stranahan is also allegedly an employee of *RT*, a Russian television network that recently registered with the Department of Justice as a foreign agent.  (*Id.*).  Gilmore alleges that Stranahan is domiciled in Dallas, Texas but temporarily lives and works in the Washington, D.C. metropolitan area, "conduct[ing] business" from a "shared workspace in Arlington, Virginia."  (*Id.*).  Stranahan is the only defendant who disputes that he is domiciled outside of Virginia.  (Dkt. 47 at 8–9).

### V.    Defendant Lee Ann Fleissner, a.k.a. Lee Ann McAdoo ("McAdoo")

McAdoo is domiciled in Sarasota, Florida, and works as an independent contractor and reporter for Free Speech Systems, LLC, in which capacity she "produce[s] content for Infowars."  (Am. Comp. ¶ 18; dkt. 57-3 at 1).  On August 15, 2017, McAdoo authored an article posted on the *InfoWars* website entitled "*Bombshell Connection Between Charlottesville, Soros, CIA.*"  (Am. Comp. ¶ 18; dkt. 29-6).  The article included a video "produced" by McAdoo of the same title, featuring McAdoo interviewing Stranahan.  (Am. Comp. ¶ 18; dkt. 57-3 at 1).

## VI. Defendants Alex Jones ("Jones"), InfoWars, LLC ("InfoWars"), and Free Speech Systems, LLC ("Free Speech Systems")

Domiciled in Austin, Texas, Jones is the owner and publisher of the *InfoWars* website, as well as the host of associated radio and web-based shows. (Am. Comp. ¶ 14; dkt. 57-1 at 1). InfoWars is a Texas limited liability company (LLC) operating as the website InfoWars.com. (Am. Comp. ¶ 15). InfoWars "presents itself as a news media outlet" and "funds its work by the sale of various dietary supplements on its online store." (*Id*. ¶¶ 123–24). Free Speech Systems is a related Texas LLC that operates InfoWars.com and *The Alex Jones Channel* on YouTube.[3] (*Id.* ¶ 16; dkt. 57-2 at 1). Jones allegedly owns Free Speech Systems. (Am. Comp. ¶ 16). Infowars.com is labeled a "Free Speech Systems, LLC website," and purchases of InfoWars dietary supplements "may result in a billing entry on the purchaser's credit card as Free Speech Systems, LLC or Magnolia Management." (*Id*.).

Gilmore alleges that these defendants published defamatory statements about him in the August 15, 2017 article authored by McAdoo and the accompanying video featuring McAdoo and Stranahan. (*Id.* ¶¶ 16, 83). Jones allegedly posted the article text and video on his YouTube channel and Twitter account. (*Id.* ¶¶ 87–88). Gilmore asserts that these defendants also published defamatory statements in a video Jones produced entitled "*Breaking: State Department / CIA Orchestrated Charlottesville Tragedy*." (*Id.* ¶ 102; dkt. 57-1). This video was posted on InfoWars.com and *The Alex Jones Channel* on YouTube. (Am. Comp. ¶ 102).

## VII. Defendants Allen B. West ("West"), Derrick Wilburn ("Wilburn"), Michele Hickford ("Hickford"), and Words-N-Ideas, LLC ("Words-N-Ideas")

West, a former congressman and regular contributor to Fox News, is domiciled in Dallas, Texas. (Am. Comp. ¶ 21; dkt. 59-1 at 1). Gilmore alleges that West owns the *Allen B. West*

---

[3]   Since the events giving rise to this lawsuit, *The Alex Jones Channel* has been suspended by YouTube and is no longer accessible.

4

website,[4] which published an allegedly defamatory article entitled "*BOMBSHELL: New evidence suggests Charlottesville was a complete SET-UP.*" (Am. Comp. ¶ 21). Wilburn, domiciled in Colorado Springs, Colorado, authored that article. (*Id*. ¶ 22; dkt. 47-5). Words-N-Ideas, an allegedly inactive Florida LLC, is identified by Gilmore as the "purported owner" of the *Allen B. West* website. (Am. Comp. ¶ 24). Hickford, also domiciled in Florida, is the managing member, registered agent, and self-described "President" of Words-N-Ideas, (*id*. ¶ 23; dkt. 47-4 at 2), as well as the alleged "editor-in-chief" of the *Allen B. West* website. (Am. Comp. ¶ 23). West contends that Hickford and Words-N-Ideas owned and operated the *Allen B. West* website when Wilburn's article was published, and that he had "no involvement with operating the website" or publishing the article. (Dkt. 59-1 at 1–2).

### FACTS AS ALLEGED

Gilmore, in "his personal capacity," was among the many "peaceful counter-protestors" who gathered in Charlottesville, Virginia on August 12, 2017 "in opposition" to the Unite the Right rally. (Am. Comp. ¶ 27). The rally was organized by various white supremacist and neo-Nazi groups as a response to the Charlottesville City Council's decision to remove a statue of Confederate General Robert E. Lee from a city park and change that park's name from "Lee Park" to "Emancipation Park." (*Id*. ¶¶ 25–26). Gilmore captured footage of James Alex Fields, Jr. driving into a crowd of protestors, and shared this video on Twitter to show that the attack was "deliberate" and "to help convince the public to stay off the streets." (*Id*. ¶¶ 29–32).

Soon after sharing this footage, Gilmore received interview requests from local, national, and international media outlets. (*Id*. ¶ 33). Between August 12 and 13, 2017, Gilmore spoke with multiple outlets "to provide an eyewitness account." (*Id*. ¶ 34). Gilmore did not solicit

---

[4] The link Gilmore provides to the *Allen B. West* website is not functional due to website "construction." (Am. Comp. ¶ 21, n.19).

these interview requests "or ask media outlets to share his video." (*Id.* ¶ 35). Defendants published articles and videos containing statements about Gilmore between August 13, 2017 (the publication date of Creighton's article and video) and August 21, 2017 (the publication date of Jones's video). (*Id.* ¶¶ 37–144). Gilmore alleges that these publications falsely portray him as "a 'Deep State operative' who helped orchestrate the violence in Charlottesville." (*Id.* ¶ 150).

After Defendants' publications appeared online, Gilmore allegedly "became the subject of a barrage of harassing and threatening messages that made him fear for his personal safety as well as the safety of his family members." (*Id.*). Gilmore describes disturbances such as attempted hacks into his online accounts, the posting of his parents' address online, a confrontation with a disgruntled stranger on the street, and the mailing of an unknown chemical substance to his parents' home. (*Id.* ¶¶ 154, 157–63). As a result of stress related to these disturbances, Gilmore has been diagnosed with a medical condition causing a loss of vision in his right eye, and has experienced "exacerbated" symptoms of depression. (*Id.* ¶¶ 181–83).

Defendants' publications have also allegedly harmed Gilmore professionally. Gilmore claims that his company has lost potential clients and partners, and that he "may need to remove himself altogether from the company's client-facing work" to prevent harm to the business. (*Id.* ¶ 187). Gilmore asserts that it will be "difficult" for him to serve as a diplomat if he returns to the State Department due to the reputational harm inflicted by Defendants' publications, and claims that "government officials who have endorsed Defendants' lies" would "likely" seek to "oust him from government service entirely." (*Id.* ¶¶ 188–89).

## ANALYSIS

Defendants move to dismiss on three grounds. First, some defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), arguing this Court cannot exercise diversity jurisdiction

6

under 28 U.S.C. § 1332. (Dkts. 46; 58). Second, all defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), arguing that the Court cannot exercise personal jurisdiction over any defendant. (Dkts. 46; 56; 58). Third, all defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Gilmore fails to state claims for either defamation or IIED. (*Id*.). The Court addresses each argument in turn.

## I.     Rule 12(b)(1) – The Court's Subject Matter Jurisdiction

Gilmore invokes this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), which requires complete diversity between the parties and an amount in controversy exceeding $75,000. Defendants Creighton, Hoft, Stranahan, Wilburn, Hickford, and Words-N-Ideas move to dismiss pursuant to Rule 12(b)(1), arguing that (1) the parties are not completely diverse because Stranahan, like Gilmore, is a citizen of Virginia; and (2) Gilmore fails to adequately allege that the amount in controversy exceeds $75,000.[5] (Dkt. 47 at 7–21).

A motion to dismiss pursuant to Rule 12(b)(1) tests a district court's subject matter jurisdiction. Typically, the Court must accept as true all material factual allegations in the complaint and construe the complaint in the plaintiff's favor. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). But where a defendant challenges the factual basis for subject matter jurisdiction, "the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347–48 (4th Cir. 2009). "Unless the jurisdictional facts are intertwined with the facts central to the merits of the dispute," the district court may "go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings." *Id*. at 348. "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled

---

[5]     West also moves to dismiss pursuant to Rule 12(b)(1), arguing that the parties are not completely diverse. (Dkt. 59 at 5–6).

7

to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

### A. Complete Diversity

Defendants first contend that the parties are not completely diverse because Stranahan, like Gilmore, is a citizen of Virginia, rather than of Texas as Gilmore asserts. (Dkts. 47; 59). To satisfy § 1332(a)'s complete diversity requirement, "the citizenship of every plaintiff must be different from the citizenship of every defendant." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC,* 636 F.3d 101, 103 (4th Cir. 2011). "[R]esidency is not sufficient to establish citizenship." *Johnson v. Advance Am.*, 549 F.3d 932, 937 n.2 (4th Cir. 2008). "To be a citizen of a State, a person must be both a citizen of the United States and a domiciliary of that State." *Id.* "Domicile requires physical presence, coupled with an intent to make the State a home." *Id.* In evaluating complete diversity, the relevant unit of analysis is the party's domicile "at the time the complaint is filed." *Martinez v. Duke Energy Corp.*, 130 F. App'x 629, 634 (4th Cir. 2005) (citing *Grupo Dataflux v. Atlas Glob. Grp. L.P.*, 541 U.S. 567, 571 (2004)).

When a party's citizenship "is questioned, a court must make an individualized inquiry relying on certain factors such as voter registration; current residence; the location of real and personal property; location of bank and brokerage accounts; membership in clubs, churches, or other associations; place of employment or business; driver's license and automobile registration; and the state to which a person pays taxes." *Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 195 (4th Cir. 2017). "No single factor is dispositive." *Id.*

In support of their position that Stranahan was domiciled in Virginia at the time this action was filed,[6] Defendants present declarations by Stranahan stating that, although he

---

[6]     Gilmore filed suit on March 13, 2018. (Dkt. 1). The amended complaint was filed on

8

previously resided in Texas, he has rented an apartment in Virginia since March 2017, had no home or property in Texas in 2017, has had no family living in Texas since November 2016, has no Texas driver's license, has not voted in Texas since 2012, and intends to live in Virginia "for the foreseeable future."[7]  (Dkts. 47-1; 91-1).  Stranahan also presents W-2 forms indicating his employer withheld Virginia income taxes in 2017.  (Dkt. 91-2).

Gilmore counters with evidence that Stranahan is actively registered to vote in Texas, (dkts. 70-1; 70-7); a "skip tracing" report indicating that Stranahan at one point resided at a Texas address and had a Texas driver's license,[8] (dkt. 70-2); a screenshot of Stranahan's Facebook page stating that he lives in Dallas, Texas, (dkt. 70-3); records indicating that Stranahan's wife is registered to vote in Texas, (dkt. 70-4); and an assertion that Stranahan solicited payments and donations "via a Pay-Pal account belonging to Stranahan Strategies," (dkt. 70 at 9), which Texas Comptroller records indicate is an inactive Texas LLC.  (Dkt. 70-5).

The Court finds that Gilmore has established by a preponderance of the evidence that Stranahan was domiciled in Texas at the time this action was filed.  Although Stranahan currently rents an apartment in Virginia, (dkt. 47-1), "residency is not sufficient to establish

---

April 24, 2018.  (Dkt. 29).  Gilmore has established by a preponderance of the evidence that Stranahan was domiciled in Texas on both of these dates.

[7]     Stranahan also presents affidavits from individuals who registered to vote in one state, moved to another state, and never took steps to remove themselves from the voter rolls of the state in which they formerly resided.  (Dkt. 47-7–14).  These affidavits have no bearing on Stranahan's domicile.  A majority of the affidavits are not from individuals who were previously registered to vote in the state of Texas.  The two affidavits from individuals who were once registered to vote in Texas and never took affirmative steps to remove themselves from Texas's voter rolls do not state whether their voter registration status remained active in Texas following their inaction.  (Dkts. 47-7; 47-13).  Thus, these affidavits are of no value to the Court.

[8]     According to Gilmore, "skip tracing" is the "act of discovering the current location . . . of an individual who has 'skipped' town."  (Dkt. 70 at 8, n.4).  "[S]kip tracers consult public records databases and other information to determine an individual's current and past addresses and contact information."  (*Id.*).  The Court finds it unnecessary to consider or rely on this report.

citizenship." *Johnson*, 145 F.3d at 937, n.2. Similarly, although Stranahan's declaration states that he "intend[s] to live in Virginia for the foreseeable future," (dkt. 47-1), such self-serving statements are entitled to "little weight" to the extent that they "conflict with the facts." *Peterson for Peterson v. Paddy*, No. 3:16-cv-00026, 2017 WL 2655854, at *3 (W.D. Va. June 19, 2017). *See also Manning v. Alamance Cty., N. Car.*, No. 1:15-cv-290, 2016 WL 843309, at *3 (M.D. N.C. Mar. 1, 2016) (noting that "a party's own statements of his intended domicile are not conclusive" and should be "accepted with considerable reserve").

The most compelling evidence of Stranahan's domicile is his place of voter registration. Records from the Secretary of State of Texas show that, at the time this action was filed, Stranahan was actively registered to vote in Texas.[9] (Dkt. 70-1). Indeed, Stranahan concedes this point, stating only that it "never occurred" to him to remove himself from Texas's voter rolls because he has "not been an active voter" since 2012. (Dkt. 47-1 at 3). In assessing a party's domicile, voter registration is of "great importance," as voting practices "raise a presumption that the voter is a citizen in the state in which he votes." *Am. Heartland Port, Inc. v. Am. Port Holdings, Inc.*, No. 5:11-cv-50, 2014 WL 1123384, at *5 (N.D. W. Va. Mar. 21, 2014).[10] This presumption "must be rebutted by evidence showing a clear intention" that the party's "citizenship is otherwise." *Id.*

Here, evidence of Stranahan's active voter registration in Texas is particularly weighty

---

[9]     Defendants argue that the Court cannot consider these records because they are not properly authenticated and thus not admissible evidence. (Dkt. 91 at 10). This argument fails, as these records are admissible under Federal Rule of Evidence (FRE) 902(1) as a self-authenticating domestic public document and under FRE 803(8) as a public record.

[10]     District courts in this circuit consistently treat voter registration and voting as particularly important in deciding a party's domicile. *See, e.g., Welles v. Aamodt*, No. 5:15-cv-613, 2016 WL 1625503, at *2 (E.D. N.C. Apr. 21, 2016); *Bloom v. Library Corp.*, 112 F.3d 498, 503 (N.D. W. Va. 2015); *Goode v. STS Loan & Mgmt., Inc.*, No. Civ.A. DKC 2004-0999, 2005 WL 106492, at *7 (D. Md. Jan. 14, 2005).

10

because to remain active on Texas's voter rolls, Texas law requires that voters be capable of receiving a non-forwardable renewal certificate mailed by the registrar to the Texas address listed on the voter's last registration application.[11]  *See* Tex. Elec. Code Ann. §§ 14.001(a), 14.002(a)-(b).  If the renewal form is returned as undeliverable to the registrar, the voter is placed on the "suspense list."  *Id*. § 14.021.  Stranahan's voter registration records indicate that he remained actively registered in Texas following a "change / audit date" of December 5, 2017. (Dkt. 70-1 at 2).  Under Texas law, Stranahan was almost certainly capable of receiving mail at a Texas address in December 2017.  Otherwise, the renewal certificate mailed to the address he previously listed on his voter registration application would have been returned to the registrar as undeliverable, and the registrar would have placed Stranahan on the suspense list.  The evidence Stranahan offers of Virginia domicile—including statements that he intends to reside in Virginia for the "foreseeable future," (dkt. 47-1 at 1), and a W-2 form indicating that his employer withheld Virginia income taxes in 2017, (dkt. 91-2)—is insufficient to rebut the presumption of Texas domicile created by his active voter registration in Texas.

Four additional factors weigh in favor of finding that Stranahan was domiciled in Texas at the time Gilmore filed this action.  First, although Stranahan presents W-2 forms indicating his employer withheld Virginia income taxes in 2017, (dkt. 91-2), his statement that he had not actually "filed a Virginia Income Tax Return" but rather "filed for an extension" diminishes the significance of this evidence.  (Dkt. 47-1 at 1).  Second, Stranahan does not dispute Gilmore's

---

[11]     Specifically, "[o]n or after November 15 but before December 6 of each odd-numbered year," Texas county voting registrars mail a renewal certificate "to the mailing address on the voter's registration application."  Tex. Elec. Code Ann. §§ 14.001(a), 14.002(a).  The certificate cannot be forwarded to another address and will be returned to the registrar "if the addressee is no longer at the address to which the certificate was mailed," at which point the registrar places the voter's name on the "suspense list."  *Id*. §§ 14.002(b), 14.021.  "At least monthly," registrars must solicit any information from the U.S. Postal Service "indicating address reclassifications" of registered voters.  *Id*. § 15.022(b).  *See also id*. §§ 15.051(a), 15.053(a), 15.081(a)(1).

allegation that he solicited payments "via a Pay-Pal account belonging to Stranahan Strategies," which Texas Comptroller records indicate is an inactive Texas LLC.[12] (Dkts. 70 at 20; 70-5).

Third, Stranahan currently rents an apartment in a "We Live/We Work complex" in Arlington, Virginia.[13] Gilmore alleges that this complex is a "temporary shared housing community where patrons are able to utilize living and office space without a long-term commitment." (Dkt. 70 at 20–21). Although Stranahan's residence in such a housing complex does not necessarily preclude him from establishing domicile in Virginia, it suggests he has not made a permanent home in Virginia. Fourth, Stranahan has been evasive about where his family, specifically his wife, resided at the time this action was filed. Gilmore alleges that Stranahan's wife is actively registered to vote in Texas and that she voted there as recently as 2016. (*Id.* at 20). Although Stranahan avers in his declarations that he had "no immediate family" in Texas in 2017, (dkt. 47-1), and that "to the best of [his] knowledge, no one related to [him] by blood or marriage has lived in Texas since November 2016," (dkt. 91-1), Stranahan does not assert that his wife or any other family member lived in Virginia when this action was filed.[14] Indeed, Stranahan has never revealed where his wife resided when this action was filed, and his counsel could not answer questions on this subject at oral argument.[15]

---

[12] These records are admissible under FRE 803(8) as a public record.

[13] Stranahan provided his address, (dkt. 33-1), and Gilmore provided a link to the We Live/We Work website showing a We Live/We Work complex at this address. (Dkt. 70 at 21). The Court takes judicial notice of this fact pursuant to FRE 201(b)(2).

[14] Both of Stranahan's declarations indicate they were signed in 2017, a year before this action and the declarations themselves were filed. (Dkts. 47-1; 91-1). Although this appears to be a typographical error, it is not an insignificant one, and it further compounds confusion on the subject of Stranahan's domicile when this action was filed in 2018.

[15] Stranahan's counsel stated during oral argument that Stranahan had no family in Texas. But when pressed about where Stranahan's wife resided at the time this action was filed, counsel stated he did not know because he had never asked his client, calling into question how counsel

In sum, the Court finds that Gilmore has established by a preponderance of the evidence that Stranahan was domiciled in Texas at the time this action was filed.[16]  Thus, § 1332(a)'s requirement of complete diversity is satisfied.

### B.  Amount in Controversy

Defendants Creighton, Hoft, Stranahan, Wilburn, Hickford, and Words-N-Ideas argue that Gilmore fails to allege an amount in controversy in excess of $75,000.  (Dkt. 46).

"When a plaintiff invokes federal-court jurisdiction, the plaintiff's amount-in-controversy allegation is accepted if made in good faith." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S.Ct. 547, 553 (2014).  "If the plaintiff claims a sum sufficient to satisfy the statutory requirement, a federal court may dismiss only if it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed."  *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010).  Parties seeking dismissal for an insufficient amount in controversy "shoulder a heavy burden" of demonstrating that the "legal impossibility" of the claimed recovery is "so certain as virtually to negative the plaintiff's good faith in asserting the claim."  *Id.*

Here, Gilmore alleges defamation *per se* against Defendants, and seeks "an amount greater than $75,000" from each defendant for "presumed damages, as well as actual, reputational, emotional, and professional injuries" suffered as a "direct and proximate" result of Defendants' publications.  (*See, e.g.,* Am. Comp. ¶¶ 214–15, 232).  Gilmore also seeks damages "in an amount greater than $75,000" from each defendant for his IIED claims, for the "severe emotional distress," physical ailments, and "irreparable damage to his professional reputation"

could state so unequivocally just moments earlier that Stranahan had no family in Texas.

[16]     In finding that Stranahan was domiciled in Texas, the Court finds it unnecessary to consider or rely on the "skip tracing" report, (dkt. 70-2), the screenshot of Stranahan's Facebook page stating that he lives in Dallas, Texas, (dkt. 70-3), or records indicating that Stranahan's wife is registered to vote in Texas, (dkt. 70-4).

13

he has experienced as a "result of Defendants' actions." (*Id.* ¶¶ 289, 293).

With respect to Gilmore's defamation claims, Defendants assert that Gilmore impermissibly "includes harms caused by the wrongful conduct of third parties" (*i.e.*, individuals not named as defendants who allegedly harassed Gilmore because of Defendants' publications) in his calculation of damages. (Dkt. 47 at 23, 25). Defendants argue that Virginia law does not permit "the wrongful actions of third parties to be included in the calculation of damages at all." (*Id.* at 23). With respect to Gilmore's IIED claims, Defendants contend that the essence of the harm Gilmore alleges is the "distress" caused by "third parties who are not named as defendants," but that Gilmore fails to allege Defendants "incited" these third parties to harm him under *Brandenburg v. Ohio*, 395 U.S. 444 (1969). (*Id.*).

Defendants fail to shoulder their "heavy burden" of establishing the "legal impossibility" of Gilmore's claimed recovery. *JTH Tax,* 624 F.3d at 638. Defendants do not adequately support either of their arguments with binding precedent.[17] Moreover, Defendants' arguments are substantively without merit. With respect to Gilmore's defamation claims, Defendants mischaracterize Gilmore's damages calculation as "always" including the "wrongful conduct of third parties," (dkt. 47 at 25), as the complaint plainly alleges that Defendants' publications themselves were the cause of Gilmore's alleged injuries. (Am. Comp. ¶ 215). With respect to Gilmore's IIED claims, consideration of any First Amendment defense is inappropriate at this stage. *See Zulveta v. State Auto. Mut. Ins. Co.*, No. 6:15-2880, 2015 WL 9286698, at *4 (D. S.C. Nov. 30, 2015) ("[W]here the plaintiff makes his claim in obvious good faith, it is sufficient for

---

[17] To support their arguments regarding Gilmore's defamation claims, Defendants rely on an overruled Virginia Supreme Court opinion and a district court opinion interpreting Arizona law. (Dkt. 47 at 24–25). To support their contention regarding Gilmore's IIED claims, Defendants rely on a single out-of-circuit district court decision. *See Wilson v. Midway Games, Inc.*, 198 F.Supp.2d 167, 182 (D. Conn. 2002). Accordingly, Defendants fall far short of establishing to a legal certainty that Gilmore cannot recover damages exceeding $75,000.

14

jurisdictional purposes" even where the defendant may have "a valid defense." (quoting *McDonald v. Patton*, 240 F.2d 424, 425 (4th Cir. 1957))). Moreover, to the extent that Defendants' argument concerning third parties is essentially a claim that Gilmore fails to adequately plead the causation element of IIED, such arguments are cognizable under Rule 12(b)(6), not Rule 12(b)(1).

In sum, the Court finds that it can exercise diversity jurisdiction over this action. Defendants' motions to dismiss pursuant to Rule 12(b)(1), (dkts. 46; 58), will be denied.

## II. Rule 12(b)(2) – Personal Jurisdiction over Defendants

All Defendants except Stranahan[18] move to dismiss pursuant to Rule 12(b)(2), arguing that this Court cannot exercise personal jurisdiction over them. (Dkts. 46; 56; 58).

The standard of review for personal jurisdiction issues "varies according to the posture of the case and the evidence that has been presented to the court." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). Where, as here, a district court "considers a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a *prima facie* showing in support of its assertion of jurisdiction." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). In conducting its analysis, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.*

For a court to "assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm

---

[18] Stranahan did not move to dismiss for lack of personal jurisdiction under Rule 12(b)(2), and thus has waived that defense. *See* Fed. R. Civ. P. 12(h)(1). Nonetheless, analysis of whether the Court can exercise personal jurisdiction over other defendants, namely McAdoo and Words-N-Ideas, necessarily yields analysis of whether the Court can exercise personal jurisdiction over Stranahan. The Court concludes that, although Stranahan has waived the defense, it can properly exercise specific personal jurisdiction over him.

statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). "Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-prong test collapses into a single inquiry when Virginia is the forum state." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 301 (4th Cir. 2012). "A Virginia court thus has jurisdiction over a nonresident defendant if the exercise of such jurisdiction is consonant with the strictures of due process." *Id.*

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in the state 'does not offend the traditional notions of fair play and substantial justice.'" *Carefirst,* 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). The standard for determining whether personal jurisdiction over a nonresident defendant exists varies "depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Id.* If a defendant's contacts form the basis for the suit, those contacts may establish "specific jurisdiction." *Id.* "If, however, the defendant's contacts with the state are not also the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent but unrelated contacts with the state." *Id.*

### A.    General Personal Jurisdiction

"To establish general jurisdiction, the defendant's activities in the state must have been 'continuous and systematic.'" *Carefirst,* 334 F.3d at 397. Gilmore presents no argument that the Court can exercise general personal jurisdiction over Creighton, Hoft, McAdoo, Stranahan, Wilburn, Hickford, Words-N-Ideas, or West, and the Court sees no indicia that these defendants

16

have "general, "persistent," "continuous[,] and systematic" contacts with Virginia.[19]  *Id.*  Gilmore presents two arguments why the Court can exercise general personal jurisdiction over Jones, InfoWars, and Free Speech Systems.  Both fail.  First, Gilmore contends that these defendants have "sold and delivered [InfoWars-branded] dietary supplements to persons residing in Virginia" through their online stores, and "a substantial portion of this revenue is the result of transactions with individuals in Virginia."  (Am. Comp. ¶ 10; dkt. 70 at 25–26).  But "mere purchases, even if occurring at regular intervals . . . are not enough to warrant a [s]tate's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."  *Daimler AG v. Bauman*, 571 U.S. 117, 131 (2014).

Second, Gilmore contends that these defendants "engage in significant reporting activities in Virginia," citing coverage of a book banning in a Virginia school, events in Chantilly, Virginia, and the Unite the Right rally.  (Am. Comp. ¶ 11; dkt. 70 at 25–26).  But such "single or isolated items of activities in a state" are not sufficient to subject a defendant to the state's general jurisdiction.[20]  *Pharmabiodevice Consulting, LLC v. Evans*, No. GJH-14-00732, 2014 WL 3741692, at *7 (D. Md. July 28, 2014) (quoting *Int'l Shoe Co.,* 326 U.S. at 317).  *See also Daimler AG*, 571 U.S. at 133, n.11 ("[G]eneral jurisdiction requires affiliations so continuous and systematic as to render the foreign corporation essentially at home in the forum State.").  Thus, the Court cannot exercise general personal jurisdiction over any defendant.

---

[19]     The Court need not parse whether Stranahan's residence in Virginia is sufficient to support general personal jurisdiction because Stranahan has waived any personal jurisdiction defense and because the Court can exercise specific personal jurisdiction over Stranahan.

[20]     Gilmore also avers that Jones's radio show airs on the "Virginia affiliate stations" of the "Genesis Communication Network," which "publishes content to Virginians."  (Am. Comp. ¶ 10).  Although the Court doubts these contacts are "so continuous and systematic as to render" Jones "essentially at home" in Virginia, the Court need not decide this question because it can exercise specific personal jurisdiction over Jones.  *Daimler AG*, 571 U.S. at 133, n.11.

17

## B.    Specific Personal Jurisdiction

Specific personal jurisdiction is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tire Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). To warrant the exercise of specific personal jurisdiction, a "defendant must have purposefully established minimum contacts in the forum State such that [it] should reasonably anticipate being haled into court there." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016). The Fourth Circuit employs "a three-part test to determine whether the exercise of specific personal jurisdiction over a nonresident defendant" comports with due process, examining "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Universal Leather,* 773 F.3d at 559. In deciding whether it can exercise specific personal jurisdiction over a defendant, "a court must weigh the totality of the facts before it." *Perdue Foods*, 814 F.3d at 189. The court "should not merely . . . count [a defendant's] contacts [with the forum state] and quantitatively compare this case to other preceding cases." *Carefirst*, 334 F.3d at 397. "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of fair play and substantial justice is not thereby offended." *Id.*

In assessing whether Defendants' contacts with Virginia support specific personal jurisdiction, three decisions are particularly salient. In *Calder v. Jones*, 465 U.S. 783, 788–89 (1984), the Supreme Court held that a California court could exercise personal jurisdiction over two Florida newspapermen in a libel action arising out of a *National Enquirer* article written in Florida but "concern[ing] the California activities" of Shirley Jones, a Hollywood actress and

18

California resident. The Court noted that the "article was drawn from California sources, and the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California." *Id*. Because "California [was] the focal point both of the story and of the harm suffered," jurisdiction was "proper in California based on the 'effects' of [defendants'] Florida conduct in California." *Id*. at 789.

The Fourth Circuit has adapted the *Calder* "effects" test for cases involving online activity in two important decisions.[21] In *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002), the Fourth Circuit held that "a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." Applying this standard, the Fourth Circuit found that a Maryland court could not exercise specific personal jurisdiction over a Georgia-based Internet service provider (ISP) whose only role in the alleged trademark infringement was "provid[ing] bandwidth" that allowed another company "to create a website and send information over the Internet." *Id*. at 714–15 (noting that the ISP-defendant "did not select or knowingly transmit infringing photographs" or "direct its electronic activity specifically at any target in Maryland").

In *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002), the Fourth Circuit refined the *ALS Scan* test for cases where "the Internet activity" at issue involves "the posting of news articles on a website." In such cases, the test "works more smoothly when parts one and

---

[21]    Defendants' characterization of *Calder* as merely a "34-year-old, pre-Internet ruling" is off-base. (Dkt. 90 at 7). *Calder*—although adapted for cases involving online activity—remains binding Supreme Court precedent. Both *ALS Scan* and *Young* cite *Calder* as a viable precedent. *See ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002); *Young v. New Haven Advocate*, 315 F.3d 256, 262–63 (4th Cir. 2002). Moreover, the Supreme Court continues to cite *Calder*. *See, e.g., Walden v. Fiore*, 571 U.S. 277, 286–87 (2014).

19

two" are "considered together," such that courts ask "whether the [defendants] manifested an intent to direct their website content . . . to a Virginia audience." *Id*. The fact that a defendant's website can "be accessed anywhere, including Virginia, does not by itself demonstrate that the [defendant was] intentionally directing their website content to a Virginia audience." *Id*. "Something more than posting and accessibility is needed"—the "general thrust and content" of the online publications must "manifest an intent to target and focus on Virginia readers." *Id*.

Applying this standard in *Young*, the Fourth Circuit determined that a Virginia court could not exercise specific personal jurisdiction over Connecticut newspapers that published online articles commenting on conditions at a Virginia prison and allegedly defaming Young, a warden at the prison, in the midst of reporting on the "Connecticut prison transfer policy." *Id*. at 263–64. The Fourth Circuit reasoned that (1) the "content of the websites [was] decidedly local, and neither newspaper's website contain[ed] advertisements aimed at a Virginia audience,"[22] and (2) "Connecticut, not Virginia, was the focal point of the articles." *Id*.

In deciding whether to exercise specific personal jurisdiction over Defendants, the Court must ask whether (1) each defendant "manifested an intent to direct their website content" to a "Virginia audience," *Young*, 315 F.3d at 263, such that the defendant "should reasonably anticipate being haled into court" in Virginia, *Perdue Foods*, 814 F.3d at 189; and (2) whether each defendant's activity "creates, in a person within the State, a potential cause of action" under Virginia law. *ALS Scan,* 293 F.3d at 714. Below, the Court undertakes this inquiry for each of the eleven defendants by examining each of the allegedly tortious publications at issue.

---

[22]     Defendants suggest that the dispositive factor in *Young* was that the websites did not "contain[] advertisements aimed at a Virginia audience." (Dkt. 57 at 11). No single factor was determinative in *Young*, and the reasoning in that decision leaves open the possibility that where Virginia "is the focal point of the articles," specific personal jurisdiction may be appropriate in Virginia, even if the websites in question do not contain advertisements explicitly aimed at Virginians. *Young*, 315 F.3d at 264.

20

### 1. Creighton's *American Everyman* Article & Video

On August 13, 2017, Creighton published an article on the *American Everyman* website entitled "*Charlottesville Attack, Brennan Gilmore and . . . the STOP KONY 2012 Pysop? What.*" (Dkt. 29-1).[23]  In the article, Creighton asked readers to "look at the video Brennan Gilmore posted of the Charlottesville attack" to see "[s]omething very odd and OBVIOUS." (*Id.* at 2 (emphasis in original)).[24]  Noting Gilmore's "rather suspicious positioning," Creighton wrote that Gilmore "filmed Fields's car "heading all the way down the street into the crowd of protestors . . . almost as if he knew it would run into them rather than simply brake and sit and wait like the cars in front of it." (*Id.* at 4–5).  Creighton wrote that Gilmore is a "former State Department employee" and "was also part of" Tom Perriello's 2017 Virginia gubernatorial campaign, describing Perriello's record and ideological views at length. (*Id.* at 6–8).  Creighton questioned whether it is "possible" that Gilmore, a "convenient witness" with "links to Special Ops and CIA and various other black ops kinds of actors[,] just HAPPENED to be there" at the "particular moment" of Fields's attack. (*Id.* at 9).  Stating that he is "not into" such "coincidence theories," Creighton wrote that "Gilmore, like Tom [Perriello], seem[s] particularly invested in undermining the 'alt-right' in the lead-up to the next round of elections." (*Id.*).

Gilmore alleges that Creighton posted a video entitled "*Charlottesville Attack – Brennan Gilmore: Witness or Accessory*" to his YouTube channel on August 13, 2017. (Am. Comp. ¶¶ 46–50).  In the video, Creighton allegedly stated: "This guy happens to be on that fucking corner with his camera rolling, watching that car drive by for five seconds, and he's former State

---

[23]  Gilmore alleges that Creighton subsequently published this same article on other websites, including BeforeItsNews.com, (dkt. 29-2), and Sott.net, (dkt. 29-3).

[24]  Except where noted otherwise, emphasis in any quotation from the publications at issue in this case should be assumed to have appeared in the original.

Department, and close to Tom Perriello, who is also former State Department obviously, he's got a fucking ax to grind, that's one hell of a goddamn coincidence, and you got to be a special kind of stupid to buy that." (*Id.* ¶ 14). Creighton also allegedly stated that he was "suggesting" that "someone had foreknowledge[] that this event [*i.e.*, Fields's attack] was going to happen." (*Id.*).

Considering the "general thrust" of Creighton's article and video, *Young*, 315 F.3d at 263, the Court concludes that both were sufficiently targeted at a Virginia audience such that Creighton should have "anticipate[d] being haled into court in" Virginia to defend his statements. *Perdue Foods*, 814 F.3d at 189. Although neither the *American Everyman* website nor YouTube channel has a Virginia-specific focus,[25] the exclusive focus of Creighton's publications was a Virginia event and a Virginia citizen. Indeed, the title of both the article and video references the "Charlottesville Attack" and "Brennan Gilmore." (Dkt. 29-1). These publications' Virginia-specific focus is further reinforced by Creighton's discussion in both of Perriello, a Virginia gubernatorial candidate. Thus, unlike in *Young*, 315 F.3d at 263, the "focal point" of Creighton's publications was a Virginia event and citizen, making his publications of particular interest to a Virginia audience.[26] Additionally, Gilmore alleges that the harm he suffered as a result of

---

[25] The websites at issue in this case typically focus on national, rather than Virginia-specific, events. But websites with a national focus are still capable of publishing content that, although perhaps of interest to many readers, is of special concern for citizens of a particular state. Indeed, *Calder* establishes this point, since the *National Enquirer*'s nationwide circulation did not preclude a holding that personal jurisdiction was proper in California. *See Calder*, 465 U.S. at 785. To hold otherwise would mean that online publications engaging in national coverage and attracting a national audience could *never* be subject to personal jurisdiction in any state except the state where the publication is at home.

[26] Defendants argue that their publications were not "aimed at a Virginia audience" because the Unite the Right rally was a subject of "national and even international interest." (Dkt. 57 at 11). This argument fails. Events—even those that garner widespread attention—are most intensely felt in the states and communities where they occur. Online publications focused on the Unite the Right rally, and a Virginia citizen who protested the rally, would be of particular interest to a Virginia audience. *Calder* establishes that an article with broad national appeal can

22

Creighton's online postings occurred in Virginia, where he lives and works.[27]  (Am. Comp. ¶¶ 179–88).  Accordingly, as in *Calder*, 465 U.S. at 789, personal jurisdiction is warranted in Virginia because Virginia is "the focal point both of [Creighton's publications] and of the harm suffered."  Moreover, unlike the "passive" ISP-defendant in *ALS Scan*, 293 F.3d at 714, Creighton wrote the article, spoke in the video, and published both on platforms he owns and operates.  (Dkt. 47-2).  Lastly, Gilmore's claims against Creighton arise directly from Creighton's publications.[28]  *See ALS Scan,* 293 F.3d at 714.

In sum, since Creighton "manifested an intent to direct his website content" at a Virginia audience,[29] *Young*, 315 F.3d at 263, the Court finds that it can exercise specific personal jurisdiction over him.

---

nonetheless be aimed at an audience in a particular state.  Moreover, other courts addressing online content of national and international importance have found specific personal jurisdiction in the state where the plaintiff is a citizen and experienced harm.  *See, e.g., Gubarev v. Buzzfeed, Inc.*, 253 F.Supp.3d 1149, 1158–59 (S.D. Fla. 2017) (finding, under *Calder*, that Buzzfeed's publication of the Fusion GPS dossier could support specific personal jurisdiction in Florida because the dossier allegedly defamed a Florida plaintiff who sustained harm in Florida).

[27]    Gilmore similarly alleges that the harm he suffered because of Defendants' other publications occurred in Virginia.  (Am. Comp. ¶¶ 6, 145–63; 178–203).  The Court will not repeat this allegation, or its analysis of this allegation, for each publication.

[28]    Gilmore's claims against the remaining defendants similarly arise from those defendants' publications, thereby satisfying the last prong of the *ALS Scan* test.  The Court will not repeat its analysis of this prong for each publication or defendant.

[29]    Defendants rely on three decisions where district courts found that online publications were not aimed at an audience of the forum state.  (Dkt. 90 at 9). But these cases involved publications that made only glancing references to the forum state.  *See FireClean, LLC v. Tuohy*, No. 1:16-cv-0294, 2016 WL 3952093, at *6–7 (E.D. Va. July 21, 2016) (finding an article that "never reference[d] Virginia" was not aimed at a Virginia audience); *KMLLC Media, LLC v. Telemetry, Inc.*, No. 1:15-cv-432, 2015 WL 6506308, at *9 (E.D. Va. Oct. 27, 2015) (finding the same for a report because there was "simply no focus on Virginia" beyond identifying plaintiff's location in Virginia); *Fertel v. Davidson*, No. CCB-13-2922, 2013 WL 6842890, at *4 (D. Md. Dec. 18, 2013) (finding the same for defendant's posts because "the subject matter" of the posts "was not focused on Maryland" apart from mention of a company's Maryland address).  Here, Defendants' publications do not simply make fleeting references to Virginia—they are predominately, if not exclusively, focused on Virginia.

### 2. Hoft's *Gateway Pundit* Article

On August 14, 2017, Hoft published an article on *The Gateway Pundit* website entitled "*Random Man at Protests Interviewed by MSNBC, NY Times Is Deep State Shill Linked to George Soros*." (Am. Comp. ¶ 62, dkt. 29-5). Hoft wrote that the "random Charlottesville observer" (*i.e.*, Gilmore) is a "deep state shill with links to George Soros," and that "[i]t looks like the State Department was involved in Charlottesville rioting and is trying to cover it up." (Dkt. 29-5 at 2, 4). After noting that Gilmore was "Chief of Staff for liberal Rep. Tom Perriel[l]o," Hoft embedded screenshots of articles about Gilmore and Perriello from *Augusta Free Press*, a news-site covering Waynesboro, Staunton, and Augusta County, Virginia, and the *Richmond Times Dispatch*. (*Id*. at 5–8).

Hoft then quoted the following statement, among others, from a Reddit thread: "So the former Chief of Staff for Tom Perriel[l]o who ran in the Virginia gubernatorial election and whose campaign received a ridiculous amount of 'dark money', including $380k from George Soros . . . also happened to go viral and was interviewed because he just happened to be close to the Charlottesville event." (*Id*. at 8). Hoft concluded by writing in his own words: "This weekend Brennan Gilmore happened to be in Charlottesville with the rioters. The media knows exactly who he is yet played it off like a casual observer. This is how the Deep State is working with the liberal media to shape [the] narrative and fool the American people." (*Id*.).

The Court finds that the "general thrust and content" of Hoft's article was sufficiently targeted at a Virginia audience to warrant the exercise of specific personal jurisdiction over Hoft. *Young*, 315 F.3d at 263. Although *The Gateway Pundit* does not have a Virginia-specific focus, Hoft's article was exclusively about a particular Virginia citizen's participation in a Virginia event. Indeed, the title makes clear that the article's focus is a "Random Man" (*i.e.*, Gilmore) "at

24

Protests." (Dkt. 29-5 at 1). The Virginia-specific focus of the article is further emphasized by Hoft's discussion of Perriello, a Virginia political figure, and by Hoft's use of articles by local Virginia newspapers as sources for his assertions. *See Calder*, 465 U.S. at 788 (noting that the article at issue, although written in Florida, "was drawn from California sources"). Unlike in *Young*, the exclusive focus of Hoft's article is a Virginia event and citizen, and, unlike the ISP-defendant in *ALS Scan*, Hoft's involvement with this allegedly tortious article was not merely passive. Rather, Hoft authored and published the article. (Dkt. 47-3 at 2). As with Creighton's publications, Virginia was "the focal point both of" Hoft's article "and of the harm suffered." *Calder*, 465 U.S. at 789. Accordingly, the Court finds that Hoft "manifested an intent" to target a Virginia audience by publishing an article drawn in part from Virginia sources and focused exclusively on a Virginia citizen's role in a Virginia event. *Young*, 315 F.3d at 263.

### 3. McAdoo & Stranahan's *InfoWars* Article & Video

On August 15, 2017, InfoWars published an article by McAdoo with an accompanying video on InfoWars.com., both entitled "*Bombshell Connection Between Charlottesville, Soros, CIA.*" (Am. Comp. ¶ 83; dkt. 29-6). The three-sentence article authored by McAdoo reads as follows: "As demonstrated this weekend, a civil war is brewing in this country, laying the foundation for a violent coup to take out Trump. Soros-funded NGO's have been able to achieve regime change in other countries by quite literally teaming up with Neo-nazis and 'moderate' terrorists. Now, investigative reporter Lee Stranahan reveals the same players involved in the Ukraine overthrow are working behind the scenes to oust President Trump." (Dkt. 29-6 at 3).

In the accompanying video, McAdoo interviewed Stranahan about a "deep state coup underway to oust Trump." (Dkt. 122 at 3). Stranahan asserted that "the US sponsored a coup" in the Ukraine "that was funded by [George] Soros" and "set up by the Obama administration."

(*Id*. at 7).  Stranahan made several comparisons between this alleged Ukrainian coup and the Unite the Right rally, describing the rally as "an agitation situation like we saw in Ukraine in 2013 and 2014."  (*Id*. at 7, 8, 10).  McAdoo made similar comparisons, stating that "these white nationalists in Charlottesville were chanting" the "exact same slogan, the blood and soil" and "had the same tiki torches" as "paid protestors" in the Ukraine, asserting that "we are also seeing those same protestors" in the United States.  (*Id*. at 12).  McAdoo later stated that "the media" is "using what's going on in Charlottesville" to "label[]" "everyone on the right that doesn't disavow" white nationalists as a "Nazi or a Russian agent."  (*Id*. at 24–25).

Stranahan also discussed Gilmore, describing him as "with the U.S. State Department" and having "worked for a Democratic representative."  (*Id*. at 19).  Stranahan and McAdoo then displayed screenshots of Gilmore's Twitter page where Gilmore had posted "a picture of the young woman who was murdered" with the caption "martyr."  (*Id*. at 19–22).  Stranahan noted that protestors in Ukraine's Maidan Square also "needed martyrs" or "someone dead," and later stated that "someone really needs to investigate."  (*Id*. at 19).  Gilmore alleges that Jones posted this video and the text of McAdoo's article on *The Alex Jones Channel* on YouTube on August 15, 2017, and shared a link to both on Twitter the same day.  (Am. Comp. ¶ 87).

Although this article and video present a closer question than Creighton or Hoft's publications, the Court finds that Gilmore has satisfied his burden of "making a *prima facie* showing in support of [his] assertion of jurisdiction" over McAdoo, Stranahan, InfoWars, Free Speech Systems, and Jones on the basis of these publications.  *Universal Leather*, 773 F.3d at 558.  To be sure, the video contains a lengthy discussion of a supposed Ukrainian coup.  But the clear purpose of the article and video is to connect this "coup" to the Unite the Right rally, and to frame the rally as part of an ongoing "deep state coup" designed to undermine and "oust"

26

President Trump. Indeed, the title of the article and video make clear that the purpose of these publications is to reveal a "[b]ombshell [c]onnection" between "Charlottesville, Soros, [and the] CIA." (Dkt. 29-6 at 3). Similarly, the article's text suggests that the video will reveal that the "same players involved in the Ukraine overthrow" were working "behind the scenes" at the rally and elsewhere to "oust President Trump." (*Id.*). Moreover, the video transcript is littered with discussion of the rally, (dkt. 122 at 7–12, 18, 24–25, 29, 48), and Gilmore, (*id.* at 19–22). That Stranahan and McAdoo did not discuss the rally or Gilmore e*xclusively* is unremarkable, since the "general thrust and content" of the video was a discussion of "deep state" forces supposedly underlying a Virginia event. *Young*, 315, F.3d at 263.

Thus, the Court concludes that these defendants "manifested an intent" to target a Virginia audience by publishing an article and video focused on the political forces supposedly underlying a Virginia event and a Virginia citizen's role in that event. *Id.* Unlike the ISP-defendant in *ALS Scan*, none of the defendants allegedly involved with these publications played a passive role: McAdoo wrote the article containing the video and allegedly defamed Gilmore during her interview with Stranahan; Stranahan uttered much of the allegedly tortious content in the video; InfoWars published the article on InfoWars.com, a website operated by Free Speech Systems; and Jones republished the article and video on his YouTube channel.[30] (Am. Comp. ¶ 87). In sum, the Court finds that it can exercise specific personal jurisdiction over Defendants McAdoo, Stranahan, Jones, InfoWars, and Free Speech Systems based on this article and video.

---

[30]     With respect to Jones's alleged republication of the article and video on YouTube, "[u]nder the republication rule, one who repeats a defamatory statement is as liable as the original defamer." *Reuber v. Good Chemical News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991). *See also Dragulescu v. Va. Union Univ.*, 223 F.Supp.3d 499, 509 (E.D. Va. 2016) ("[E]ach successive publication of an old or preexisting defamatory statement gives rise to a new cause of action under Virginia law.").

### 4.  Jones's *InfoWars / Alex Jones Channel* Video

On August 21, 2017, Jones posted a video entitled "*Breaking: State Department / CIA Orchestrated Charlottesville Tragedy*" on both his YouTube channel and the *InfoWars* website.[31] (Am. Comp. ¶ 102; dkt. 29-7).  On InfoWars.com, the video was posted alongside text reading: "The deep state is working overtime trying to divide America. . . . Alex Jones breaks down shocking revelations into the Charlottesville riots including who was behind the attack and why they did it!!".  (Dkt. 29-7 at 3).  In the video, Jones allegedly asserted that the violence in Charlottesville was part of an orchestrated plot involving "known CIA and State Department officials in Charlottesville" and "[t]he mayor" of Charlottesville, all of whom Jones described as "cut-out[s]," a term Gilmore asserts denotes individuals "involved in espionage who act[] as an intermediary or channel of communication between a spymaster and other subagents of a covert operation."  (Am. Comp. ¶¶ 104, n. 62; 109).  The video allegedly featured a "narration of the alleged testimony" of a Charlottesville police officer stating that the violence in Charlottesville was "set up to further the agenda of the elites."  (*Id*. ¶ 105).

Jones's video allegedly included commentary about Gilmore, spoken by a narrator while various images of Gilmore were successively displayed, including side-by-side photographs of Gilmore and George Soros.  (*Id*.).  After noting Gilmore's experience with the State Department and Perriello, the narrator framed as "fishy" that "the first man on the scene whose tweet went viral and who was later interviewed on mainstream news as a witness just happened to be a State Department insider with a long history of involvement in psy-ops."  (*Id*.).  The narrator then asserted that Gilmore's "information was suddenly removed from the State Department

---

[31]     This video is no longer accessible on YouTube following the suspension of *The Alex Jones Channel*, and no party has presented the Court with a transcript. At this stage, the Court must assume the accuracy of Gilmore's allegations about the video's contents.  *See Universal Leather*, 773 F.3d at 558.

websites" following his tweet and media appearances, citing this as evidence that the "elites know we're on to them and are trying to cover their tracks." (*Id.*).

Here again, the Court finds that this video was sufficiently aimed at a Virginia audience to warrant the exercise of specific personal jurisdiction over Jones, InfoWars, and Free Speech Systems. Although neither InfoWars.com nor *The Alex Jones Channel* has a Virginia-specific focus, Jones's video was exclusively focused on a Virginia event, and a significant portion of the video discussed particular Virginia citizens' alleged roles in that event. The video's title makes clear that the "Charlottesville [t]ragedy" is the focal point of the video. (Dkt. 29-7). As with Hoft and Creighton's publications, Jones's discussion of Perriello further reinforces the video's Virginia-specific focus. And, here again, there are significant distinctions between this video and the facts of *ALS Scan* and *Young*. Unlike in *Young*, Jones's video is exclusively, not tangentially, focused on Virginia residents and a Virginia event. And, unlike the ISP-defendant in *ALS Scan*, Defendants' involvement with the video here was not passive: Jones produced the video, (dkt. 57-1), and posted it on his YouTube channel and InfoWars.com, which is operated by Free Speech Systems, a company Jones allegedly owns. (Am. Comp. ¶ 16; dkt. 57-2). Accordingly, because Jones, InfoWars, and Free Speech Systems "manifested an intent to direct" this video at a Virginia audience, the Court finds that it can exercise specific personal jurisdiction over these defendants. *Young*, 315, F.3d at 263.

### 5.     Wilburn's *Allen B. West* Article

On August 19, 2017, Wilburn, Hickford, Words-N-Ideas, and West allegedly published an article authored by Wilburn on the *Allen B. West* website, entitled "*BOMBSHELL: New evidence suggests Charlottesville was a complete SET-UP*." (Am. Comp. ¶¶ 125–26; dkt. 29-8). The article stated that a Charlottesville police officer had "come forward" to "reveal the truth"

that "what went down in the city was not only condoned by city governance but was intentional, orchestrated and may have been *planned* as long ago as May." (Dkt. 29-8 at 2). Wilburn's article quoted material from a YourNewsWire.com article where this officer allegedly said that police "were specifically instructed to bring the radical left and right wing groups together to instigate violence and then told to 'stand down' once violence ensued in a deliberate effort to ignite a race riot." (*Id*.). Wilburn wrote that, "if true," this "revelation . . . may implicate Mayor Signer [of Charlottesville] and possibly other city officials in the death of a citizen." (*Id*. at 3).

Wilburn also quoted material from the YourNewsWire.com article about Gilmore, the substance of which appears identical to the commentary about Gilmore in Jones's video, including statements suggesting that Gilmore was one of the "actors in this enormous set-up event," that Gilmore's presence in Charlottesville during the rally was "fishy," that Gilmore is a "State Department insider with a long history of involvement in psy-ops," and that Gilmore was "presented as an accidental witness." (*Id*. at 6).

The Court finds that Wilburn's article was sufficiently targeted at a Virginia audience to permit the exercise of specific personal jurisdiction over Wilburn, Hickford, and Words-N-Ideas. As with the previously discussed publications, the "general thrust and content" of Wilburn's article is focused on a Virginia event and, in part, on a Virginia citizen's role in that event. *Young*, 315, F.3d at 263. Here again, the article's Virginia-specific focus is also highlighted by the title, which promises "[n]ew evidence" about "Charlottesville." (Dkt. 29-8 at 2). In addition to discussing Gilmore, the article also contains repeated references to Virginia political figures like Perriello and Signer. (Dkt. 29-8 at 2–3, 5–6). Here again, there are crucial distinctions between this article and the facts of *ALS Scan* and *Young*. Unlike in *Young*, Wilburn's article is focused only on Virginia events, a Virginia citizen, and Virginia political figures. And, unlike in

*ALS Scan*, Defendants' involvement with this article was not passive: Wilburn wrote the article, and Hickford allegedly published it on the *Allen B. West* website as the site's editor-in-chief and as the "managing member and registered agent" of Words-N-Ideas, which allegedly owned AllenBWest.com. (*Id.* ¶¶ 23–24, 125). Accordingly, the Court finds that it can exercise specific personal jurisdiction over Wilburn, Hickford, and Words-N-Ideas.

The Court finds, however, that it cannot exercise specific personal jurisdiction over West. Gilmore does not allege that West authored the article or played any direct role in developing the article's content. Setting aside conclusory allegations that West "published" and "ratified" Wilburn's article, (Am. Comp. ¶¶ 271, 280), Gilmore simply alleges that West owned AllenBWest.com, (*id.* ¶ 21), and "shared a link to the article" on Twitter.[32] (*Id.* ¶ 133). West disputes these assertions, stating in a declaration that he "was not involved with any decision to publish or republish" the article, that he "did not author or contribute to the article in any way," that Words-N-Ideas and Hickford "purchased and operated" the *Allen B. West* website and exclusively operated his Facebook and Twitter accounts. (Dkt. 59-1). In response, Gilmore presents only a letter sent to West's counsel declining to drop his claims against West because the *Allen B. West* website contained West's picture, biography, and contact information, creating the appearance that West "owned, controlled, and endorsed" all content published on the

---

[32]     Gilmore does not explicitly assert that West's alleged sharing of a link on Twitter constitutes publication or republication of Wilburn's article, or that such conduct is sufficient to subject West to specific personal jurisdiction in Virginia. The Court concludes that this allegation is not alone enough to make a *prima facie* showing that West "manifested an intent to direct" the article at a Virginia audience. *Young*, 315, F.3d at 263. *See also Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F.Supp.3d 1311, 1321 (M.D. Fla. 2015) (finding that simply "[d]istributing a link via Twitter" triggers immunity under Section 230 of the Communications Decency Act (CDA)). Similarly, a bare allegation that an individual owns a website where defamatory material appears, without other plausible factual allegations, is insufficient to show that an individual aimed content at a Virginia audience. This is precisely the sort of passive role found inadequate with respect to the ISP-defendant in *ALS Scan*. 293 F.3d at 714–15.

website.  (Dkts. 70 at 45, n.15; 70-10 at 5).

Gilmore fails to make a *prima facie* showing that this Court can exercise specific personal jurisdiction over West.  Unlike with the other defendants and publications discussed above, Gilmore makes no concrete factual allegation that West played any direct role in writing, editing, or developing Wilburn's article, or that West generally exerted editorial control over AllenBWest.com.  Moreover, Gilmore's allegation that West owned the *Allen B. West* website, (Am. Comp. ¶ 21), is not plausibly pled because the amended complaint includes conflicting and overlapping allegations that Words-N-Ideas was the "purported owner" of the *Allen B. West* website, and that Hickford was the "managing member and registered agent" of Words-N-Ideas and served as the "editor-in-chief" of the website.  (*Id.* ¶¶ 22–23; dkt. 70 at 61).  Because Gilmore's allegation that West owned AllenBWest.com is not plausibly pled, neither are his allegations that Wilburn acted as West's agent or employee in writing the allegedly tortious article.  (Am. Comp. ¶¶ 278–81).

Without any plausible, concrete factual allegations that West played a direct role in creating, editing, or publishing the article in question, the Court cannot say that West "intentionally direct[ed] Internet activity to Virginia."  *Young*, 315 F.3d at 264, n.*.  Thus, the Court cannot exercise personal jurisdiction over West, and he will be therefore be dismissed from this action.[33]

\*

In sum, the Court finds that it can exercise diversity jurisdiction over this action, and can exercise specific personal jurisdiction over all defendants except West.[34]  West's motion to

---

[33]    Since West's motion to dismiss pursuant to Rule 12(b)(2) will be granted, his motion to dismiss pursuant to Rule 12(b)(6) will be dismissed as moot.  (Dkt. 58).

[34]    Having concluded that it can exercise specific personal jurisdiction against all defendants

dismiss pursuant to Rule 12(b)(2) will be granted, and the remaining defendants' motions to dismiss pursuant to Rules 12(b)(1) and 12(b)(2) will be denied.

### III. Communications Decency Act Immunity

Defendants Hoft, Wilburn, Hickford, and Words-N-Ideas argue that they are immune from suit under Section 230 of the Communications Decency Act (CDA). (Dkt. 47 at 28–33).

The CDA states that "[n]o provider or user of an interactive computer service shall be" held liable "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Under § 230, "[s]tate-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 252 (4th Cir. 2009). An "interactive computer service" is defined as any "information service, system or access software that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2). The "CDA's grant of immunity applies only if the interactive computer service provider is not also an 'information content provider'" with respect to the publication at issue. *Russell v. Implode-Explode Heavy Indus., Inc.*, No. DKC-08-2468, 2013 WL 5276557, at *6 (D. Md. Sept. 18, 2013). An

---

except West, the Court assesses whether the exercise of jurisdiction over the remaining defendants is "constitutionally reasonable." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (4th Cir. 2009). The Court must consider whether litigating this action in Virginia would be so "difficult and inconvenient" as to place Defendants at a "severe disadvantage." *Id*. Several factors inform this analysis, including "the burden on [the defendant], the interests of the Commonwealth as the forum state, and the [plaintiff's] interest in obtaining relief." *Id*. Here, Defendants make no argument concerning constitutional reasonableness, and the Court finds that litigating this action in Virginia will not be "so gravely difficult" as to place any defendant at a "severe disadvantage." *Id*. Any "inequity" involved with "being haled into" Virginia is "mitigated" by the fact that it was "reasonably foreseeable" that Defendants "could be subject to suit" in Virginia, *id*., each having aimed allegedly tortious publications at a Virginia audience.

"information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

The CDA does not define "what makes a party responsible for the 'development' of content" but courts examine "the totality of the circumstances" to determine whether a party "engage[d] in an act beyond the normal [editorial] functions of a publisher (such as deciding to publish, withdraw or modify third party content) that changes the meaning and purpose of the content." *Russell*, 2013 WL, at *6 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008)). If a party "only passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content" and thus shielded from suit under § 230. *Id.* But if a party creates, authors, or otherwise materially contributes to a publication such that the content "is properly attributable to them," CDA immunity will not apply. *Id.* at 6–7. Under this standard, the Fourth Circuit has found that § 230 shields "interactive computer services" like Yelp, Consumeraffairs.com, and AOL from liability for allegedly defamatory messages, comments, and reviews posted by third parties. *See Westlake Legal Grp. v. Yelp, Inc.*, 599 F. App'x 481, 485 (4th Cir. 2015); *Nemet Chevrolet*, 591 F.3d at 254; *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 328 (4th Cir. 1997).

Here, Hoft, Wilburn, Hickford, and Words-N-Ideas are either providers or users of "interactive computer services," since each of these defendants either used or provided access to a website with respect to the publications at issue. *See Russell,* 2013 WL, at *5 ("Courts generally conclude that a website falls within [the] definition" of "interactive computer services."); *Hare v. Richie*, No. ELH-11-3488, 2012 WL 3773116, at *15 (D. Md. Aug. 21, 2012) ("It is well settled that website operators are providers of interactive computer services.").

34

The only remaining question is whether "the complaint pleads nonconclusory facts that plausibly indicate that any alleged drafting or revision by [Defendants] was something more than a website operator performs as part of its traditional editorial function, thereby rendering it an information content provider." *Westlake Legal Grp.*, 599 F. App'x at 485.

Gilmore adequately alleges that Hoft, Wilburn, Hickford, and Words-N-Ideas are "information content providers." Gilmore alleges that both Hoft and Wilburn authored their respective articles, (Am. Comp. ¶¶ 63–64, 126, 134), and both defendants concede this point in sworn declarations. (Dkts. 47-3 at 2; 46-5 at 2). Although Hoft included screenshots from a Reddit thread in his *Gateway Pundit* article, he contributed significant original content, including a headline, statements about Gilmore, and an assertion that "the State Department was involved in [the] Charlottesville rioting and is trying to cover it up." (Dkt. 29-5 at 1–5, 8). Similarly, although Wilburn quoted a YourNewsWire.com article, Wilburn added an original headline and statements, asserting that the "depth of this conspiracy runs deeper" before quoting material about Signer and Gilmore, and stating that, "if true," the information his article imparts "points directly to the reality of the 'deep state'" and the "lengths that the Soros/Clinton/Obama one-world government cabal will go." (Dkt. 29-8 at 2, 6). Thus, Gilmore adequately alleges that Hoft and Wilburn did more than allow "others' content to be posted or re-posted" but rather "created [at least] some of the defamatory statements" in the articles. *Ascend Health Corp. v. Wells*, No. 4:12-cv-00083, 2013 WL 1010589, at *8 (E.D. N.C. Mar. 14, 2013). "Section 230 immunity does not cover content which [the defendant] created [himself] or other content, although originating with a third party, which [the defendant] significantly altered." *Id*.

With respect to Hickford and Words-N-Ideas, these defendants concede that one theory under which they could be held liable for Wilburn's *Allen B. West* article is that "WNI or Ms.

35

Hickford was Mr. Wilburn's employer." (Dkt. 47 at 40). Gilmore alleges liability under this exact theory. (Am. Comp. ¶¶ 278–79, 281). If either Hickford or Words-N-Ideas was "the creator or developer, in whole or in part, of the content at issue," neither is "entitled to immunity under § 230(c)(1) as to that content." *Hare*, 2012 WL, at *17. Here, Gilmore's plausible allegations that Hickford served as editor-in-chief of AllenBWest.com[35] and "president" of Words-N-Ideas, that Words-N-Ideas owned AllenBWest.com, and that these two defendants "produced and ratified" Wilburn's article support an inference that these defendants played some role in developing Wilburn's article or maintained some agency relationship with Wilburn. (Am. Comp. ¶¶ 23–24, 280; dkts. 47-4; 70 at 61). Making all "reasonable factual inferences" in Gilmore's favor, the Court finds that Gilmore plausibly alleges that Hickford and Words-N-Ideas acted as information content providers. *Hare*, 2012 WL, at *17. In sum, the Court concludes that Hoft, Wilburn, Hickford, and Words-N-Ideas are not immune from suit under § 230.

## IV. Rule 12(b)(6) – Whether Gilmore States Claims for Defamation and IIED

Defendants move to dismiss Gilmore's claims pursuant to Rule 12(b)(6), arguing that Gilmore fails to adequately plead defamation and IIED. (Dkts. 46; 56; 58). A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim; it "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). The Court must accept as true all well-pleaded factual allegations in the complaint. *See Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013). The Court must take all facts and reasonable inferences in favor of the plaintiff, disregard any

---

[35] To support this allegation, Gilmore includes links to an article containing a quote from, and a screenshot of, a Facebook post where Hickford describes herself as the editor-in-chief of the *Allen B. West* website, (Am. Comp. ¶ 23, n.21), as well as to a video where West describes Hickford as the editor-in-chief of the *Allen B. West* website. (*Id.* ¶ 23, n.23).

legal conclusions, and not credit any formulaic recitations of the elements. *See Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).

The Court finds that Gilmore has plausibly alleged sufficient facts to state a claim for defamation against each defendant. However, Gilmore has not adequately pled IIED, and those claims will be dismissed. Before analyzing the adequacy of Gilmore's factual allegations, the Court must first address which state's law applies.

### A. Choice of Law – Virginia Law Applies to All Defendants

Defendants Jones, McAdoo, InfoWars, and Free Speech Systems argue that Texas law should apply to Gilmore's claims against them because, they contend, the articles and videos associated with them were published in Texas. (Dkt. 57 at 12). The remaining defendants did not raise any choice of law issue and cited only Virginia law in briefing and at oral argument.[36] Gilmore argues that Virginia law should apply to all his claims. (Dkt. 70 at 21–22).

Since this is a diversity action, the Court applies the choice of law principles of Virginia. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). For tort actions, such as defamation and IIED, "Virginia applies the doctrine of *lex loci delicti*, meaning the law of the place of the wrong governs all matters related to the basis of the right of action." *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006). *See also McMillan v. McMillan*, 253 S.E.2d 662, 663 (Va. 1979) ("In resolving conflicts of laws, the settled rule in Virginia is

---

[36]     The Court construes these defendants' silence and consistent citation of Virginia law as consent to apply Virginia law to Gilmore's claims against them. *See Vanderhoof-Forschner v. McSweegan*, 215 F.3d 1323, at *2, n.3 (4th Cir. 2000) ("[B]ecause the parties agree that Maryland law governs their claims, we need not inquire further into the choice-of-law questions." (unpublished table opinion)); *Am. Fuel Corp. v. Ut. Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."); *Jackson v. Michalski*, No. 3:10-cv-00052, 2011 WL 3679143, at *11, n.13 (W.D. Va. Aug. 22, 2011) (applying Virginia law where the "[p]lainitff brought his tort claims under Virginia law" and the defendants "agree[d] that Virginia law should apply").

37

that the substantive rights of the parties in a multistate tort action are governed by the law of the place of the wrong."). Virginia courts typically define the "place of the wrong" as the "state in which the wrongful act took place, wherever the effects of that act are felt." *Gen. Assur. Of Am., Inc., v. Overby-Seawell Co.*, 893 F.Supp.2d 761, 777–78 (E.D. Va. 2012) (quoting *Milton v. IIT Research Inst.*, 138 F.3d 519, 522 (4th Cir. 1998)). In actions involving allegedly tortious publications, Virginia courts define the place of the wrongful act as the state where the content at issue was published. *See ABLV Bank v. Ctr. for Advanced Def. Studies Inc.*, No. 1:14-cv-1118, 2015 WL 12517012, at *1 (E.D. Va. Apr. 21, 2015) ("[F]or libel claims, Virginia looks to where the statement was published."). Publication occurs when the allegedly tortious content is "communicated to a third party" so as to be "heard and understood by such person." *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F.Supp.2d 909, 915 (E.D. Va. 2004) (citing *Thalhimer Bros. v. Shaw*, 159 S.E. 87 (Va. 1931)).

The Supreme Court of Virginia has yet to address how the "place of the wrong" should be defined in "situations where the defamatory content is 'published' in multiple jurisdictions," such as on a "website that can be accessed worldwide," or in Internet tort cases involving, as here, multiple defendants and multiple allegedly tortious publications. *Kylin Network (Beijing) Movie & Culture Media Co. Ltd. v. Fidlow*, No. 3:16-cv-999, 2017 WL 2385343, at *3, n.2 (E.D. Va. June 1, 2017). *See also Galustian v. Peter*, 561 F.Supp.2d 559, 565 (E.D. Va. 2008) ("The Virginia courts have yet to address the *lex loci* rule in the context of multistate defamation by means of mass communication."), *reversed in part on other grounds*, 591 F.3d 724 (4th Cir. 2010). Since the Supreme Court of Virginia has not addressed this precise question, the Court must predict how it would apply *lex loci delicti* in a case like this. *See Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008) ("Because we are sitting in diversity,

38

our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue.").

The Court concludes that the Supreme Court of Virginia, if applying *lex loci delicti* in a multi-defendant, multi-state Internet tort case, would define "the place of the wrong" as the state where the plaintiff is injured as a result of the allegedly tortious content, as opposed to the state where publication occurs.[37] This is so for several reasons. First, the underlying rationale for Virginia's traditional interpretation of *lex loci delicti* as the place of the tortious action is that approach's "uniformity, predictability, and ease of application." *McMillan*, 253 S.E.2d at 664. In a multi-defendant, multi-state Internet tort case, those values are effectuated only by defining the "place of the wrong" as the place where the plaintiff's injuries are concentrated and thereby applying only one state's law. Defining the "place of the wrong" as the place of publication in a case like this would inevitably require the cumbersome application of a patchwork of state law. Indeed, in a case involving defamatory statements made on a nationally syndicated radio show "published simultaneously in multiple state jurisdictions," the Fourth Circuit noted that "application of the traditional *lex loci delicti* rule becomes cumbersome, if not completely impractical" when applied in such a case. *Wells v. Liddy*, 186 F.3d 505, 527 (4th Cir. 1999).

---

[37]     The Court does not hold that the Supreme Court of Virginia would apply the Second Restatement's "most significant relationship" test, which provides that defamation cases should be decided under the law of the state with "the most significant relationship to the occurrence and the parties," which will "usually" be the state of the plaintiff's domicile. *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999) (quoting Restatement (Second) of Conflict of Laws § 150 (1971)). Defendants assert that Gilmore "urges the Court to abandon *lex loci delicti* doctrine in favor of" this test. (Dkt. 90 at 9). But this mischaracterizes Gilmore's argument, which appears to primarily advocate not for adoption of the Second Restatement test but rather for another variant of *lex loci delicti* that defines the "place of the wrong" as the site of the plaintiff's injury. (Dkt. 70 at 32–33). *See Main St. Bank v. Nat'l Excavating Corp.*, 791 F.Supp.2d 520, 530 (E.D. Va. 2011) (describing the two variants). Had Gilmore asked the Court to adopt the "most significant relationship" test, the Court could not have done so because the Supreme Court of Virginia has explicitly and consistently rejected that test. *See, e.g., Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993); *McMillan*, 253 S.E.2d at 664.

Second, defining the "place of the wrong" as the place of publication in a case like this raises thorny questions about the nature of online publication, a process that does not necessarily occur at one readily identifiable geographic point. The traditional *lex loci delicti* rule "presumes that the defamatory statement is published (*i.e.,* communicated to third parties) in one geographic location," but publication via the Internet results in instantaneous "multistate (if not[]) worldwide) publication." *Ascend Health Corp.*, 2013 WL, at *2. If "publication" is defined as the place where content is communicated to third parties, it is unclear whether "publication" of online content occurs in the state where an individual uploads content, the state where the relevant media platform or publication maintains headquarters, the state where a website's servers are located, or the state where third parties actually view the content (which, absent restrictions on the geographic reach of a particular online publication,[38] will be in all fifty states and across the world). *See Katz*, 332 F.Supp.2d at 915. Indeed, district courts in this circuit have reached varying conclusions about the meaning of publication in different online contexts.[39]

Given the underlying values animating the Supreme Court of Virginia's approach to *lex loci delicti* and the complexity of online publication, the Court finds that the Supreme Court of Virginia, in extending *lex loci delicti* to multi-defendant, multi-state Internet tort cases, would

---

[38]    *See* A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71, 91–93 (2005) (outlining methods Internet publishers can use to "restrict the global availability" of online "content to a more limited geographical area than otherwise results from simply posting information on the Internet").

[39]    *Compare ABLV Bank*, 2015 WL, at *2 (defining the place of publication as the location of the office in which an online report was published), *with Wiest v. E-Fense, Inc.*, 356 F.Supp.2d 604, 608 (E.D. Va. 2005) (defining the place of publication as the "corporate headquarters" of the company controlling a website where allegedly defamatory statements appeared), *with Velocity Micro, Inc., v. J.A.Z. Mktg., Inc.*, Nos. 3:11-cv-473, 3:12-cv-245, 2012 WL 3017870, at *6 (E.D. Va. July 23, 2012) (defining the place of publication in a case involving defamation "executed via email correspondence" as the "place where the email was opened and read"), *and Galustian*, 561 F.Supp.2d at 565 (same).

define the "place of the wrong" as the state where the plaintiff is primarily injured as a result of the allegedly tortious online content. Here, Gilmore alleges that the brunt of the personal and professional injury he suffered as a result of Defendants' publications occurred in Virginia, where he lives and works. (*See, e.g.,* Am. Comp. ¶¶ 1–6). Accordingly, the Court will apply Virginia law with respect to all of Gilmore's claims against Defendants.

### B.     Gilmore's Defamation Claims

Defendants contend under Rule 12(b)(6) that Gilmore fails to state claims for defamation against them. Under Virginia law, the elements of defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Choi v. Kyu Chul Lee*, 213 F. App'x 551, 552 (4th Cir. 2009) (quoting *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005)). No party disputes that the statements at issue here were published online for third parties to view and digest. Thus, the Court's inquiry focuses only on whether Gilmore adequately alleges that the statements at issue are actionable and that Defendants published these statements with the requisite intent. The Court first addresses what level of intent Gilmore must allege.

### 1.     Gilmore Qualifies as a Limited-Purpose Public Figure.

"The requisite intent a plaintiff must prove in a defamation action depends upon the plaintiff's status as a public or private figure." *Reynolds v. Pionear, LLC*, No. 3:15-cv-209, 2016 WL 1248866, at *5 (E.D. Va. Mar. 25, 2016). Plaintiffs who qualify as private figures must show that the defendant who published an allegedly defamatory statement either "knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Askew v. Collins*, 722 S.E.2d 249, 251 (Va. 2012). Plaintiffs who qualify as public officials, public figures, or limited-purpose public figures must show that a defendant published the allegedly defamatory content with

41

"actual malice." *Eramo v. Rolling Stone, LLC*, 209 F.Supp.3d 862, 871 (W.D. Va. Sept. 22, 2016) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). The Court defines the actual malice standard after assessing whether Gilmore qualifies as a private or public figure.

Gilmore is presumed to have been a "private individual at the time of publication, subject to defendants' burden of proving" that he was a "public official or a limited-purpose public figure." *Id*. Defendants argue that Gilmore qualifies as a limited-purpose public figure.[40] (Dkts. 47 at 61–64; 57 at 18–19). "When a person thrusts himself into the forefront of public debate, he is treated as a 'limited-purpose public figure' for purposes of comment on issues arising from that debate." *Carr v. Forbes, Inc*., 259 F.3d 273, 278 (4th Cir. 2001).

In deciding whether a plaintiff qualifies as a limited-purpose public figure, the Court must ask "whether a public controversy gave rise to the defamatory statement[s]" and "whether the plaintiff's participation in that controversy sufficed to establish him as a public figure within the context of that public controversy." *Id*. Defendants must prove that "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation." *Eramo*, 209 F.Supp.3d at 869 (quoting *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982)).

---

[40] Defendants aver that Gilmore is also a public official, since he is currently on leave from his role as a Foreign Service Officer with the U.S. State Department. (Dkts. 57 at 20, n.14; 90 at 17–18, n.11; Am. Comp. ¶ 13). The Court has serious doubts about the merits of this claim. *See Horne v. WTVR, LLC*, 893 F.3d 201, 207 (4th Cir. 2018) (noting that a plaintiff qualifies as a public official if he has, "or appear[s] to the public to have, substantial responsibility for or control over the conduct of governmental affairs"). But the Court need not decide this issue, because Gilmore qualifies as a limited-purpose public figure, subjecting him to the same actual malice standard applicable to public officials.

Before assessing whether Defendants satisfy this test, the Court must make the "threshold determination" whether a public controversy gave rise to the alleged defamation and, if so, decide "the scope of the controversy." *Id.* A public controversy "must be a real dispute" that "in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *New Life Ctr., Inc. v. Fessio*, 229 F.3d 1143, at *4 (4th Cir. 2000) (unpublished table decision) (quoting *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1554 (4th Cir. 1994)). The Court "defines the scope" of a public controversy "through a fair reading of the [publications] in [their] entirety." *Eramo*, 209 F.Supp.3d at 870.

Although Gilmore argues that "there was no public controversy" giving rise to Defendants' publications, (dkt. 70 at 50), he effectively concedes that such a controversy existed, stating that "the controversial aspects of the Charlottesville events were the broader questions of white supremacy and the meaning behind the rally and counter-protests." (*Id.* at 50–51). Given this statement, and having reviewed Defendants' publications, the Court concludes that a public controversy about the meaning underlying the Unite the Right rally and associated counter-protests gave rise to Defendants' publications. Although Defendants' statements regarding a "deep state" conspiracy to orchestrate violence in Charlottesville were not themselves the subject of a genuine public controversy, "it would be inappropriate to shrink all controversies to the specific statements of which a plaintiff complains." *Eramo*, 209 F.Supp.3d at 870. The Court finds that the publications' broader focus on the meaning underlying the Unite the Right rally and associated counter-protests was addressed to a public controversy on that subject.

The Court next asks whether Gilmore's "participation" in this controversy "sufficed to establish him as a public figure within the context of that public controversy." *Carr*, 249 F.3d at 278. Applying the five-factor test utilized in the Fourth Circuit, *Eramo*, 209 F.Supp.3d at 869,

43

the Court finds that Gilmore qualifies as a limited-purpose public figure with respect to the controversy surrounding the meaning of the Unite the Right rally and attendant counter-protests.

First, Gilmore plainly "had access to channels of effective communication." *Id.* Gilmore uploaded his video of Fields's attack to his Twitter account and subsequently "spoke with multiple television news networks and other news media to provide an eyewitness account." (Am. Comp. ¶¶ 32–34). At oral argument, Gilmore conceded that he gave interviews to, at a minimum, CNN, NBC, and *The New York Times* in the hours and days following the rally, and that he wrote an online editorial for *Politico* on August 14, 2017 describing and analyzing what he witnessed in Charlottesville.

With respect to the second and third factors, Defendants have established that Gilmore "voluntarily assumed a role of special prominence in the public controversy" and "sought to influence the resolution" of the controversy. *Foretich,* 37 F.3d at 1553. Gilmore admits that he spoke with the press on multiple occasions in the hours and days after the rally, (Am. Comp. ¶¶ 32–34), but asserts that he did so only as a "witness to history in response to their repeated requests." (Dkt. 70 at 41). But Gilmore's media appearances went beyond serving as a mere "witness to history." *Wells*, 186 F.3d at 537. Although Gilmore did not solicit interview requests, he voluntarily "consented to appear" when asked, (Am. Comp. ¶ 35), and voluntarily penned a *Politico* editorial describing, and commenting on the broader significance of, what he witnessed at the rally. Having reviewed a transcript of Gilmore's August 13, 2017 appearance on CNN, as well as the text of the August 14, 2017 *Politico* editorial,[41] the Court observes that,

---

[41] Defendants provide links to the CNN transcript and *Politico* article. (Dkt. 90 at 17–21). In ruling on motions to dismiss, "courts are permitted to consider facts and documents subject to judicial notice [under FRE 201] without converting the motion to dismiss into one for summary judgment." *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015). Courts may also "properly take judicial notice of matters of public record," *Philips v. Pitt Cty. Mem'l*

in addition to providing a factual account of what he witnessed, Gilmore commented on the rally

organizers' ideological views and President Trump's reaction to the rally.[42]  Such public

commentary, even construed in the light most favorable to Gilmore, indicates that Gilmore was

not "simply giving an eyewitness account of events that [were] no longer controversial."  *Wells*,

186 F.3d at 537.  Rather, Gilmore "sought to influence" the resolution of the public debate about

the meaning of the rally.  *Hatfill,* 532 F.3d at 319.  Indeed, the complaint states that part of

Gilmore's motivation for posting his footage of Fields's attack was to rebut "media outlets [that]

were suggesting the incident was something other than a deliberate attack" by showing that the

"attack was a deliberate attempt to injure and kill peaceful counter-protestors."  (Am. Comp. ¶

31).  The CNN transcript and *Politico* editorial reflect a similar motivation to influence the

burgeoning controversy about the meaning of Fields's attack and the rally's ideological

underpinnings.  Thus, the Court concludes that Gilmore "voluntarily assumed a role of special

prominence in," and "sought to influence the resolution of," the public controversy surrounding

---

*Hosp*., 572 F.3d 176, 180 (4th Cir. 2009), as well as "newspaper articles" attached to the motion to dismiss when the articles "discuss the subject matter of the case."  *AdvanFort Co. v. Int'l Registries, Inc.*, No. 1:15-cv-220, 2015 WL 2238076, at *10, n.10 (E.D. Va. May 12, 2015).  The same is presumably true for transcripts of a plaintiff's television appearances where, as here, those appearances concern the subject matter of the case.  Thus, the Court takes judicial notice of the CNN transcript and the *Politico* editorial.  The Court construes these materials "in the light most favorable to" Gilmore, and does not use them for the impermissible purpose of "contradicting the complaint."  *Zak*, 780 F.3d at 607.

[42]     For instance, Gilmore stated on CNN that the rally's organizers were motivated by a desire to "deny certain classes of citizens their right to exist," and that President Trump's response to the rally was "a failure in leadership."  (Dkt. 90 at 17 (citing 2017 WLNR 25021156)).  Similarly, in the *Politico* editorial, Gilmore wrote that the violence in Charlottesville was a "logical outcome of our escalating, toxic politics of hate," that "we now have a president who has emboldened white supremacists," and that "the president's refusal to specifically denounce the groups responsible for the violence . . . is the kind of enabling that I have seen turn other countries into bloody war zones."  (*Id*. at 19, n.15 (linking to editorial)).

45

the Unite the Right rally's underlying meaning. *Eramo*, 209 F.Supp.3d at 869.[43]

The fourth and fifth factors are also satisfied here. The controversy about the rally's underlying meaning "existed prior to the publication" of Defendants' articles and videos. *Id.* Gilmore alleges that "media outlets" were "already suggesting" that Fields's attack "was something other than a deliberate attack" prior to his Twitter post, which preceded Gilmore's initial media appearances and the posting of Creighton's *American Everyman* article (the first of Defendants' publications). (Am. Comp. ¶ 31). Moreover, Gilmore "retained public-figure status at the time of the alleged defamation," since his media appearances on the subject of the rally spanned from August 12, 2017[44] (the day before Creighton's article was published) through, at least, August 24, 2017[45] (three days after the publication of Jones's video, the last of Defendants' publications). (Dkt. 90 at 15–19).

---

[43] Gilmore's media contacts are analogous to the activities of other individuals courts have deemed limited-purpose public figures. *See, e.g., Carr v. Forbes*, 259 F.3d 273, 281 (4th Cir. 2001); *Eramo*, 209 F.Supp.3d at 870; *Faltas v. State Newspaper*, 928 F.Supp. 637, 645 (D. S.C. 1996). To be sure, the controversy surrounding the rally developed rapidly, as did Gilmore's status as a limited-purpose public figure. But it is unremarkable that an event that received extensive national news coverage could spawn a public controversy, and thus public figures, within hours. The ubiquity of social media and a twenty-four hour news cycle increasingly fosters an environment where public controversies develop at lightning speed. Indeed, Gilmore acknowledges this reality, noting that a public controversy about the meaning of Fields's attack had already taken shape prior to his August 12, 2017 tweet. (Am. Comp. ¶ 31).

[44] Gilmore alleges that his media appearances began as early as August 12, 2017. (Am. Comp. ¶¶ 33–35). Questions remain at this stage about the exact timing of these initial media appearances. However, as discussed below, Gilmore has plausibly alleged actual malice—a more stringent pleading standard than he would have to meet as a private figure—against Creighton. Thus, even were he not a limited public figure at the time of Creighton's publication, Gilmore has satisfactorily stated a claim for defamation against Creighton.

[45] Defendants cite the transcripts of Gilmore's appearances on *PBS Newshour* on August 23, 2017, and NPR's *All Things Considered* on August 24, 2017. (Dkt. 90 at 20, n.17). In both appearances, Gilmore commented on the rally's underlying meaning and broader political significance. For the purpose of evaluating the temporal span of Gilmore's media appearances, the Court takes judicial notice of these transcripts, the authenticity and accuracy of which Gilmore has not disputed. *See Zak*, 780 F.3d at 606–07.

46

In sum, the Court finds that Gilmore qualifies as a limited public figure and must therefore allege that Defendants published their allegedly defamatory articles and videos with actual malice. The Court now turns to whether Gilmore adequately alleges that Defendants' publications were actionable and published with the requisite intent.

### 2. Gilmore Adequately Alleges that Defendants' Publications are Actionable and were Published with Actual Malice.

To survive Defendants' motion to dismiss, Gilmore must plausibly allege that Defendants published "actionable statement[s]" with actual malice. *Choi,* 213 F. App'x at 552. Under Virginia law, "[a]n actionable statement is one that is both false and defamatory." *Id.* Actionable statements must also be "of or concerning" the plaintiff. *Eramo*, 209 F.Supp.3d at 875. *See also Gazette, Inc. v. Harris*, 325 S.E.2d 713, 738 (Va. 1985) (noting that a plaintiff need only show "the publication was intended to refer to him and would be so understood by persons reading it who knew him"). False statements are those that "contain a provably false factual connotation." *Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 450 (Va. 2006). Defamatory statements are those that tend to "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Choi*, 312 F. App'x at 552. *See also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (noting that defamatory words "are those that make the plaintiff appear odious, infamous, or ridiculous").

The First Amendment "provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *CACI Premier Tech., Inc., v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). Such protection applies to "rhetorical hyperbole, a vigorous epithet," and "loose, figurative, or hyperbolic language." *Milkovich*, 497 U.S. at 17, 21. *See also Yeagle v. Collegiate*

47

*Times*, 497 S.E.2d 136, 137 (Va. 1998) (noting that "rhetorical hyperbole" is not actionable even if "insulting, offensive, or otherwise inappropriate").

However, "a defamatory charge need not be made in direct terms; it may be made by inference, implication, or insinuation." *Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 144 (Va. 1997). *See also Eramo*, 209 F.Supp.3d at 876 (noting that if a "reasonable factfinder could conclude" that the statements "imply an assertion [of fact], the statements are not protected"). A "[defamation]-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true." *Chapin*, 993 F.2d at 1092–93. The defamatory implication must be "present in the plain and natural meaning of the words used" such that the words can be "reasonably read to impart [a] false innuendo." *Id*. *See also Tronfeld*, 636 S.E.2d at 450 ("Although a defamatory statement may be inferred, a court may not extend the meaning of the words beyond their ordinary and common acceptance."). In evaluating defamation-by-implication claims, "every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Webb v. Virginian-Pilot Media Cos., LLC*, 752 S.E.2d 808, 811 (Va. 2014) (quoting *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 592 (Va. 1954)).

Statements of opinion—defined as statements that are "relative in nature and depend largely upon the speaker's viewpoint"—are "generally not actionable because such statements cannot be objectively characterized as true or false[.]" *Jordan*, 612 S.E.2d at 206. However, "[f]actual statements made to support or justify an opinion . . . can form the basis of an action for defamation." *Tharpe v. Saunders*, 737 S.E.2d 890, 893, n.3 (Va. 2013). Since expressions of "opinion" can "often imply an assertion of objective fact," the U.S. Supreme Court has "refused to 'create a wholesale defamation exemption for anything that might be labeled 'opinion'." *Id*. (quoting *Milkovich*, 497 U.S. at 18).

48

"Whether a statement is an actionable statement of fact or non-actionable opinion is a matter of law to be determined by the court." *Jordan*, 612 S.E.2d at 206–07. In making this determination, courts should not "isolate parts of an alleged defamatory statement" but rather must consider the statement "as a whole." *Gov't Micro Res., Inc. v. Jackson*, 624 S.E.2d 63, 69 (Va. 2006). *See also Eramo*, 209 F.Supp.3d at 875 (noting that courts should "look[] to the context and tenor" of the publication in deciding whether statements "convey a factual connotation"). "On a motion to dismiss a [defamation] suit because of no actionable statement, the court must of course credit the plaintiff's allegation of the factual falsity of a statement." *Chapin*, 993 F.2d at 1092.

As a limited-purpose public figure, Gilmore must also allege that Defendants published their statements with actual malice. A statement is published with actual malice where a defendant has "knowledge that it was false" or acts with "reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 280. A defendant's "failure to investigate" or observe journalistic standards, although not determinative, is relevant to the actual malice inquiry. *Eramo*, 209 F.Supp.3d at 871–72. *See also Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice"). A defendant's "[r]epitition of another's words" that the "repeater knows" are "false or inherently improbable" is similarly non-dispositive but relevant, as is "evidence that a defendant conceived a story line in advance" and then "set out to make the evidence conform" to that story. *Eramo,* 209 F.Supp.3d at 872 (citations omitted). *See also Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (noting that, although "courts must be careful not to place too much reliance on such factors," it "cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry").

49

"[C]onclusory allegation[s]" and "mere recitation[s]" of the actual malice standard are insufficient. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012). "Nevertheless, because actual malice is a subjective inquiry, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Spirito v. Peninsula Airport Comm'n*, 350 F.Supp.3d 471, 481 (E.D. Va. 2018). Gilmore "need only plead sufficient facts that, if proven, create a plausible inference" of actual malice. *Id.* The Court now examines each publication to assess whether Gilmore adequately alleges that Defendants' statements are actionable and were published with actual malice.

### i. Creighton's *American Everyman* Article & Video

Gilmore alleges that Creighton's August 13, 2017 *American Everyman* article "falsely implies his knowledge of and participation in Fields'[s] attack" by asserting "as a fact" that "Gilmore's presence during the car attack was due to his foreknowledge that the attack would happen." (Am. Comp. ¶¶ 39–43). Creighton allegedly wrote the following:

> Not only did [Gilmore] HAPPEN to be at the right place at the right time, but he was ALREADY recording with his camera and it was focused on that car, for SOME REASON as it drove by the corner at a reasonable rate. . . . But Brennan wasn't filming [other cars in front of Fields's car] was he? No. But he did film the Charger heading all the way down the street into the crowd of protestors . . . almost as if he knew it would run into them rather than simply brake and sit and wait like the other cars in front of it. Again, not a smoking gun in and of itself, but when combined with all the other coincidences surrounding his video PLUS the fact that he was ready to go with the divide and conquer establishment version of events for CNN while people were still lying on the hot pavement, it kind of makes you wonder, doesn't it? [. . .]

> [I]s it possible this man with links to Special Ops and CIA and various other black ops kinds of actors just HAPPENED to be there at a particular moment in history? Yeah, I guess that's possible, if you're into coincidence theories I suppose. But I'm not into such things. Clearly the State Department has a lot of disgruntled former employees who would delight in destabilizing Trump's tenure even more than they already have. And Gilmore, like Tom [Perriello], seem[s] particularly invested in undermining the 'alt-right' in the lead-up to the next round of elections. Waaaaaay too much coincidence for me folks. Waaaaaay too much.

50

(*Id*. ¶ 38; dkt. 29-1 at 4, 9).

Creighton allegedly made similar statements about Gilmore in his August 13, 2017

*American Everyman* video, stating the following:

> [Gilmore] just happened to be there, at the specific place, where he could film the whole thing . . . He just happened to have his camera running, he just happened for some reason to record this car driving for five seconds, before it did anything out of the ordinary, and just happened to have the right message, just the right establishment message for CNN. . . . [Gilmore] has ties to special operations, special forces, CIA, State Department, Hillary Clinton, and Tom Perriello, who has a long career of doing this kind of thing. People will call me a conspiracy theorist because what I am suggesting here is that someone had foreknowledge, that this event was going to happen. . . . This man has every reason to want to see the support, the base for Donald Trump again mischaracterized as Nazis. . . . This guy just happens to be on that fucking corner with his camera rolling, watching that car drive by for five seconds, and he's former State Department, and close to Tom Perriello, who is also former State Department obviously, he's got a fucking ax to grind, that's one hell of a goddamn coincidence, and you got to be a special kind of stupid to buy that."

(Am. Comp. ¶ 46).

Gilmore plausibly alleges that Creighton's statements about him were false, defamatory, and published with actual malice. Creighton's statements in both the article and video are "reasonably capable of conveying the defamatory innuendo" that Gilmore filmed Fields's attack because he had foreknowledge of the attack and as part of an effort to use the rally to undermine President Trump and the "alt-right." *Pendleton v. Newsome*, 772 S.E.2d 759, 765 (Va. 2015). Creighton's statements about Gilmore are not reasonably characterized as mere expressions of opinion. Pure expressions of opinion generally are not "subject to objective verification." *Eramo*, 209 F.Supp.3d at 875. But Creighton's insinuation that Gilmore filmed Fields's attack because he had foreknowledge of the attack and intended to use the footage for political purposes is "capable of being proven true or false." *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 862 (Va. 2003). Thus, Gilmore has adequately alleged that Creighton's statements "contain

51

a provably false factual connotation." *Tronfeld*, 636 S.E.2d at 450.

Moreover, Gilmore plausibly alleges that Creighton's statements were defamatory. Creighton's insinuation that Gilmore had foreknowledge of a violent attack and filmed it for clandestine political purposes is precisely the sort of factual assertion that would tend to "harm the reputation of another as to lower him in the estimation of the community," "deter third persons from associating" with him, and make him "appear odious" or "infamous." *Choi*, 312 F. App'x at 552. Indeed, Gilmore asserts that Creighton's publications "exposed [him] to hatred and contempt," and "deterred friends, acquaintances, and members of the community from associating" with him.[46] (Am. Comp. ¶ 50). Furthermore, Gilmore adequately alleges that Creighton's statements are defamatory *per se* under Virginia law because, at a minimum, they would tend to "prejudice" Gilmore in his "profession or trade." *Fuste*, 575 S.E.2d at 861. Creighton's insinuation that Gilmore had advance knowledge of a violent attack and filmed it to undermine the President of the United States "casts aspersions" on his honesty and "carr[ies] the connotation" that he "lacks the integrity and fitness" to serve as a diplomat. *Tronfeld*, 636 S.E.2d at 450; *JTH Tax*, 8 F.Supp.3d at 741.

Finally, Gilmore's allegations are sufficient at this stage to create a "plausible inference" that Creighton published his statements with actual malice.[47] *Spirito*, 350 F.Supp.3d at 481. Citing examples, Gilmore alleges that Creighton has published previous articles "accusing individuals and government entities of staging controversial and newsworthy events." (Am. Comp. ¶¶ 57, n.35; 59, n.37). Gilmore presents these previous articles as evidence that

---

[46] Gilmore makes similar allegations with respect to all of Defendants' publications. (Am. Comp. ¶¶ 71, 92, 113, 134).

[47] As noted above, because Gilmore has satisfied the more stringent pleading standard required of limited public figures, he has also satisfied the lower pleading standard for private figures. *See Gazette*, 325 S.E.2d at 725 (Va. 1985) (outlining standard).

Creighton "conceived a storyline about the events in Charlottesville" and then "consciously set out to make his false statements" about Gilmore "conform" to that storyline. (*Id.* ¶ 59). Additionally, Gilmore alleges that Creighton "departed from even the most basic journalistic standards" by, for instance, failing to "reach out" to him to "confirm the story's statements." (*Id.* ¶¶ 51–56). These allegations are concrete and amount to more than a "mere recitation" of the actual malice standard: Gilmore points to specific articles Creighton previously published and has a personal factual basis to know whether Creighton ever solicited comment or confirmation from him. *Mayfield*, 674 F.3d at 378. Although neither the pursuit of a preconceived narrative nor a failure to observe journalistic standards is alone ultimately enough to establish actual malice, Gilmore's factual allegations, taken together, are sufficiently plausible to support an inference that Creighton published statements about him with actual malice. *See Spirito*, 350 F.Supp.3d at 481; *Eramo*, 209 F.Supp.3d at 871.

In sum, the Court finds that Gilmore plausibly alleges that Creighton's statements in the *American Everyman* article and video are actionable and were published with actual malice. Accordingly, Creighton's motion to dismiss Gilmore's defamation claim will be denied.

### ii.  Hoft's *Gateway Pundit* Article

Gilmore alleges that Hoft's August 14, 2017 *Gateway Pundit* article "asserts unequivocally" that he is a "'deep state shill' who is part of the State Department's attempt to cover up its involvement in instigating the attack in Charlottesville." (Am. Comp. ¶ 63). Under the headline "*Random Man at Protests Interviewed by MSNBC, NY Times is Deep State Shill Linked to George Soros*," Hoft allegedly wrote: "The random Charlottesville observer who was interviewed by MSNBC and liberal outlets turns out to be a deep state shill with links to George Soros. It looks like the State Department was involved in Charlottesville rioting and is trying to

cover it up. But after Deep State got caught they are trying to erase this guy from their records." (Dkt. 29-5 at 2). "[R]epublishing screenshots" from a Reddit thread "to bolster his claims," (Am. Comp. ¶ 63), Hoft asserted that the State Department "later removed any reference of Brennan" from its websites. (Dkt. 29-5 at 4–5). After noting that Gilmore worked for Tom Perriello and that Perriello was "given $385,000" from George Soros, Hoft wrote: "This weekend Brennan Gilmore happened to be in Charlottesville with the rioters. The media knows exactly who he is yet played it off like a casual observer. This is how the Deep State is working with the liberal media to shape [the] narrative and fool the American people." (*Id*. at 8).

Gilmore plausibly alleges that Hoft's statements were false, defamatory, and published with actual malice. The headline, lede, and original content of Hoft's article "contain a provably false factual connotation" that the State Department was "involved in" orchestrating violence in Charlottesville, that Gilmore was not a "casual observer" but rather a "deep state shill"[48] working on behalf of that effort to "fool the American people," and that the State Department tried to "erase" Gilmore from its records to "cover it up." *Tronfeld*, 636 S.E.2d at 450; dkt. 29-5 at 2, 4–5, 8. Hoft's statements are not reasonably classified as expressions of opinion because the insinuation that Gilmore attended the rally to orchestrate rioting and spin a misleading media narrative is "capable of being proven true or false." *Fuste*, 575 S.E.2d at 862. Thus, the Court finds that Hoft's statements are "reasonably capable of conveying" the false factual innuendo Gilmore alleges. *Pendleton*, 772 S.E.2d at 765.

Moreover, Gilmore adequately alleges that Hoft's statements about him were defamatory. (Am. Comp. ¶ 71). Hoft's insinuation that Gilmore's presence at the rally was part of a nefarious

---

[48]    Citing an Oxford Dictionary definition, Gilmore alleges that Hoft used the word "shill" to mean "[a]n accomplice of a confidence trickster or swindler who poses as a genuine customer to entice or encourage others." (Am. Comp. ¶ 64, n.40). Although Hoft suggests alternative definitions, (dkt. 47 at 60), the Court must draw all inferences in Gilmore's favor at this stage.

54

"deep state" effort to orchestrate rioting and mislead the public would naturally "tend to harm" Gilmore's reputation and "deter third persons from associating" with him. *Eramo*, 209 F.Supp.3d at 876. Gilmore also plausibly alleges that Hoft's insinuation about him is defamatory *per se* because, at a minimum, this innuendo would tend to "prejudice" him in his profession as a diplomat by "cast[ing] aspersions" on his honesty, integrity, and fitness for government service. *Tronfeld*, 636 S.E.2d at 450; *JTH Tax*, 8 F.Supp.3d at 741.

Lastly, Gilmore adequately alleges that Hoft published these statements with actual malice. Gilmore alleges that Hoft "did not reach out" to him "for comment" and "relied entirely on screenshots from an anonymous, disreputable Reddit post as his 'research'." (Am Comp. ¶¶ 72–74). Citing examples of previous articles by Hoft "similarly claiming that the 'Deep State' is attempting to plan a coup to oust President Trump" and that "State Department employees have worked together to overthrow governments," Gilmore alleges that Hoft "invent[ed] a nefarious role and identity" for him "to promote this preconceived narrative." (*Id*. ¶¶ 79–80, n.44). Taken together, these factual allegations are sufficiently concrete to create a "plausible inference" that Hoft published his statements with actual malice. *Spirito,* 350 F.Supp.3d at 481.

In sum, Gilmore adequately alleges that Hoft's statements are actionable and were published with actual malice. Hoft's motion to dismiss Gilmore's defamation claim against him will be denied.

### iii. McAdoo's *InfoWars* Article & Video with Stranahan

Gilmore alleges that the August 15, 2017 *InfoWars* article authored by McAdoo and accompanying video featuring McAdoo and Stranahan falsely "imply an assertion of fact" that his presence in Charlottesville "was not coincidental" but was due to his "participation in Soros- and government-staged violence in Charlottesville." (Am. Comp. ¶ 85). In her brief article

introducing the video, McAdoo wrote: "As demonstrated this weekend, a civil war is brewing in this country, laying the foundation for a violent coup to take out Trump. Soros-funded NGO's have been able to achieve regime change in other countries. . . . Now, investigative reporter Lee Stranahan reveals the same players involved in the Ukraine overthrow are working behind the scenes to oust President Trump." (Dkt. 29-6). In the video, McAdoo stated that there is a "deep state coup underway to oust Trump," and Stranahan asserted that George Soros and the Obama administration "sponsored a coup" in Ukraine. (Dkt. 122 at 3, 6). McAdoo and Stranahan connected this supposed Ukrainian coup to the Unite the Right rally, stating that the "white nationalists in Charlottesville" chanted the "exact same slogan" as "paid protestors" in the Ukraine and used "the same tiki torches." (*Id*. at 12).

After describing Gilmore as a State Department employee and "the guy who happened to catch that shot" of Fields's attack, Stranahan spoke about Gilmore while "scenes of violent riots . . . from Oliver Stone's '*Ukraine On Fire*' film play[ed]" and McAdoo "scrolled through Gilmore's Twitter page." (*Id*. at 19; Am. Comp. ¶ 84). Stranahan and McAdoo stated:

> STRANAHAN: [I]n the Maidan [in Ukraine], they needed martyrs. See, they need someone dead. . . . If you go to Brennan Gilmore's page, his Twitter page, you'll see he has a picture of the young woman who was murdered [in Charlottesville], and you know what it says? 'Martyr.'
>
> McADOO: Wow.
>
> STRANAHAN: Literally it says, 'martyr.' You can't be more explicit than this. . . . I'm a fact-based journalist. The facts are enough. However, the Democrats have investigated Trump for a lot less. . . . I think someone really needs to investigate. Again, I don't like to jump to conclusions, I'd like to ask some questions about who this kid was, where he came from, what do we know, get it all out in the open. . . . [I]f you look at this guy's bio, it says that he was with the State Department. And the fact that he called her a martyr, again, I don't know[49]. . . . This is clearly the way she's being used, is she is a martyr to the cause.

---

[49]    Gilmore alleges that Stranahan "looks knowingly at the camera, eyebrows raised, arm raised" at this point, while McAdoo "nods comprehendingly, [and] laughs." (Am. Comp. ¶ 84).

McADOO: Right.

(Am. Comp. ¶ 84; dkt. 122 at 19–22).

Gilmore adequately alleges that Stranahan and McAdoo's statements about him were false, defamatory, and published with actual malice. Stranahan and McAdoo's statements in the article and video are "reasonably capable of conveying the defamatory innuendo" that Gilmore was one of the "players" involved in a Ukrainian coup now using the Unite the Right rally to frame Heather Heyer as a "martyr" and "oust President Trump." *Pendleton*, 772 S.E.2d at 765; dkts. 29-6 at 3; 122 at 3, 6, 12, 19–22. A reasonable viewer could understand Stranahan and McAdoo to be implying that Gilmore's "tribute" to Heyer as a "martyr" indicates that he was part of a secret effort to orchestrate violence and thereby create a martyr. Similarly, by stating that "the facts" he mentions about Gilmore are "enough," that "someone really needs to investigate," and that he would "like to ask some questions about who this kid was," Stranahan implies that Gilmore's presence in Charlottesville was nefarious and worthy of serious investigation. (Am. Comp. ¶ 84). Moreover, given McAdoo's description of Stranahan as an "investigative reporter" of "real news," (*id*. ¶ 83), and Stranahan's description of himself as a "fact-based journalist," (*id*. ¶ 84), a reasonable viewer could have understood the video "as stating or implying actual facts" about Gilmore. *Schaecher v. Bouffault*, 772 S.E.2d 589, 595 (Va. 2015). Thus, the Court finds that Stranahan and McAdoo's statements about Gilmore are "reasonably capable of the meaning ascribed to them by innuendo." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 784 (4th Cir. 2018).

Furthermore, Gilmore adequately alleges that McAdoo and Stranahan's statements are defamatory. The innuendo about Gilmore described above would "tend to harm" his reputation and deter others from "dealing with him." *Eramo*, 209 F.Supp.3d at 876. Moreover, for the

57

same reasons discussed with respect to Creighton and Hoft's statements, Gilmore adequately alleges that this innuendo is defamatory *per se* because it would tend to prejudice him in his profession as a diplomat.

Finally, Gilmore alleges actual malice in sufficient factual detail to withstand a motion to dismiss. Gilmore plausibly alleges that neither McAdoo, Stranahan, nor any representative of InfoWars or Free Speech Systems ever "reach[ed] out" for comment or confirmation. (Am. Comp. ¶ 94). Moreover, Gilmore plausibly alleges that Defendants attempted to "fit [him] into [a] preexisting narrative." (*Id.* ¶ 99). Citing specific examples, Gilmore alleges that Jones, InfoWars, and Free Speech Systems have published similar content "claiming that previous national tragedies were 'false flags' and 'inside jobs' created by the government to push a leftist agenda." (*Id.* ¶¶ 98, n.56; 164–167). Similarly, Gilmore cites a video Stranahan posted on Twitter two days before the *InfoWars* video was published, in which Stranahan allegedly asserted that "the Charlottesville tragedy was a part of a coordinated plan by the CIA and the left to undermine the Trump administration through violent protests." (*Id.* ¶ 98, n.57). These allegations are adequate at this stage to create at least a "plausible inference" of actual malice. *Spirito,* 350 F.Supp.3d at 481.

In sum, Gilmore states claims for defamation against McAdoo, Stranahan, Jones,[50] InfoWars, and Free Speech Systems. These defendants' motions to dismiss will be denied.

### iv. Jones's *InfoWars* Video

Gilmore alleges that Jones's August 21, 2017 *InfoWars* video falsely states "an assertion of fact" that Gilmore "participated in a State Department/CIA operation to stage the violence and

---

[50] Jones allegedly republished the article text and video on his YouTube channel. (Am. Comp. ¶ 87). 'Under the republication rule, one who repeats a defamatory statement is as liable as the original defamer." *Reuber*, 925 F.2d at 712. *See also Dragulescu,* 223 F.Supp.3d at 509.

Fields'[s] car attack in Charlottesville." (Am. Comp. ¶ 109). Jones allegedly stated:

> I did research, and I confirmed it all. They had known CIA and State Department officials in Charlottesville, first tweeting, first being out on MSNBC, CNN, NBC. The mayor is involved. Everybody is a cut-out. . . . They got State Department and high-level CIA. One guy is paid $320,000 a year on the payroll of [George] Soros. He doesn't just get money from Soros, he personally is paid 320 a year, . . . [A]nd he is on the news. And when people pointed out who he was, they took his name of[f] the State Department website . . . I mean it's like WOW, WOW—CIA? Your senior guys? And you're so stupid on TV, 'oh I saw 'm run over, I saw the racists, I saw the white supremacists attack, oh I'm the guy being interviewed first putting out the talking points'. . . . He worked for Podesta too, John Podesta. I'll give you his name and stuff, we're gonna play a video of him on the news. They had him first on every news cast . . . I'm just [a] witness standing here . . . formerly worked for Obama, Podesta, Hillary, the CIA . . .

(*Id*. ¶ 104).

Gilmore alleges that the video "then cuts to a narration of the alleged testimony" of an anonymous Charlottesville police officer who claims that "the violent clashes [at the rally] were 'set up to further the agenda of the elites.'" (*Id*.). Telling viewers to "wait 'til you hear about the other actors in this enormous set-up event," the narrator allegedly said the following as images of Gilmore alone and alongside pictures of George Soros were displayed:

> [T]he first man in the scene whose tweet went viral and who was later interviewed on mainstream news as a witness just happened to be a State Department insider with a long history of involvement in psy-ops? If you think that isn't fishy, how about this? Since the Charlottesville protest, and his appearance in the media, his information was suddenly removed from the State Department websites. The elites know we're on to them and are trying to cover their tracks.

(*Id*. ¶¶ 104–05).

Here again, Gilmore adequately alleges that the above statements—some uttered by Jones, some by a "narrator" in a video Jones produced and published—were false, defamatory, and published with actual malice. Jones's video conveys the "provably false factual connotation" that, as the title states, "the State Department/CIA [o]rchestrated" the "Charlottesville [t]ragedy," and that Gilmore was an "actor" or "cut-out" in this "set-up event."

59

*Eramo*, 209 F.Supp.3d at 875; Am. Comp. ¶¶ 102, 104, 105.  Gilmore also plausibly alleges that the video falsely states he was personally paid $320,000 "a year on the payroll of [George] Soros."  (Am. Comp. ¶¶ 104, 106).  Given Jones's assertion that he "did deep research" and "confirmed" all of his claims, (*id.* ¶¶ 102–104), these statements could "reasonably be viewed" not as opinions but as "assertion[s] of actual fact" about Gilmore.  *Choi*, 313 F. App'x at 554.[51]

Gilmore also adequately alleges that the statements about him in Jones's video were defamatory.  (Am. Comp. ¶ 71).  Jones's insinuation that Gilmore was a "cut out" helping to "orchestrate" violence would tend to "lower him in the estimation of the community" and deter others from "dealing with him."  *Eramo*, 209 F.Supp.3d at 876.  Moreover, Gilmore plausibly alleges that this innuendo is defamatory *per se* because it prejudices him in his profession by impugning his integrity and fitness for government service.  *Tronfeld*, 636 S.E.2d at 450.

Finally, Gilmore plausibly alleges that Jones, InfoWars, and Free Speech Systems published this video with actual malice.  Gilmore asserts that neither Jones nor any other representative of InfoWars or Free Speech Systems "reach[ed] out to" him for comment or confirmation.  (Am. Comp. ¶¶ 115–16).  Moreover, Gilmore alleges that Defendants "twisted" elements of his personal and professional history to fit a pre-conceived narrative that "Charlottesville was a Soros-funded false-flag operation."  (*Id.* ¶ 121).  In support of this allegation, Gilmore provides links to four *InfoWars* publications[52] released in the days before the

---

[51]     Defendants contend that viewers would have understood Jones's statements about Gilmore as opinions delivered in Jones's characteristic "passionate, hyperbolic, over-the-top style."  (Dkt. 57 at 19).  This argument strains credulity.  To be sure, "loose, figurative, or hyperbolic language" generally is not actionable.  *Biospherics*, 151 F.3d at 184.  But Gilmore alleges that Jones's video bills itself as conveying "shocking revelations" that Jones did "deep research" on to "confirm[] it all."  (Am. Comp. ¶¶ 102–104).  Assuming the veracity of these allegations, such statements plainly communicate to a reasonable viewer that Jones is conveying factual information, not mere hyperbole or opinion.

[52]     These articles' titles alone strongly suggest that Defendants had already developed a

video in question, all of which allegedly convey a narrative that the events in Charlottesville were "staged" by some combination of George Soros, Democrats, and the "deep state."[53]  (*Id*. ¶ 101, nn. 58–59).  Gilmore's factual allegations are sufficient at this juncture to create a "plausible inference" that these three defendants published statements about him with knowledge of those statements' falsity or with reckless disregard regarding the statements' veracity.  *Spirito,* 350 F.Supp.3d at 481.

In sum, Gilmore plausibly alleges that statements about him in Jones's video were false, defamatory, and published with actual malice.  His defamation claims against Jones, InfoWars, and Free Speech Systems will therefore survive.

### v.    Wilburn's *Allen B. West* Article

Gilmore alleges that Wilburn's August 19, 2017 article "impl[ies] a clear assertion of fact" that Gilmore "participated in a 'deep state'-Soros conspiracy to stage the violence in Charlottesville."  (Am. Comp. ¶¶ 130, 134).  Wilburn wrote that a Charlottesville police officer "reveal[ed] the truth—or at least his version of it—that what went down in the city was not only condoned by city governance but was intentional, orchestrated, and may have been *planned* as long ago as May."  (Dkt. 29-8 at 2).  Noting in his own words that the "depth of this conspiracy runs deeper," Wilburn then quoted this officer's statements as they appeared in a "YourNewsWire.com" article.  This quoted material mirrors the language attributed to the officer

---

fixed narrative of the Unite the Right rally prior to publishing the video in question: "*George Soros Needs to be Charged and Arrested for Sedition and Causing Charlottesville*" (August 14, 2017); "*Breaking: Charlottesville Confirmed Agitprop Staged Event*" (August 16, 2017); "*Deep State Caught Red-Handed Causing Charlottesville Violence*" (August 17, 2017); and "*Breathtaking: Democrats Accused of Hiring Actors Prior to Charlottesville*" (August 17, 2017).

[53]    Gilmore also cites other examples where Jones, InfoWars, and Free Speech Systems pursued a similar narrative that various national tragedies—most notably the massacre of schoolchildren at Sandy Hook Elementary School in Newtown, Connecticut—were "hoaxes created by the government to push a leftist agenda."  (Am. Comp. ¶¶ 120, 167).

61

in Jones's video, including statements that Gilmore was an "actor" in a "set-up event" and that "his information was suddenly removed from State Department websites." (*Id*. at 6). Following this quoted material, Wilburn wrote: "We need to clarify that these are early accounts and as yet unverified, but if true this is very, very serious stuff. It points directly to the reality of the 'deep state' and . . . to the lengths that the Soros/Clinton/Obama one-world government cabal will go in order to realize their desires for 'fundamental transformation.'" (*Id*.).

Gilmore adequately alleges that Wilburn's article contains false and defamatory innuendo about him and was published with actual malice. "[L]ibel-by-implication claims are fraught with subtle complexities, requiring courts to be vigilant not to allow an implied defamatory meaning be manufactured from words not reasonably capable of sustaining such a meaning." *Jenkins v. Snyder*, No. 00-cv-2150, 2001 WL 755818, at *4 (E.D. Va. Feb. 6, 2001). Having considered the context and tenor of Wilburn's article, assumed "the truth of all the facts properly pleaded," and given Gilmore "the benefit of all facts implied and fairly and justly inferred from them," the Court finds that Wilburn's article is "reasonably capable of conveying the defamatory innuendo of which [Gilmore] complains." *Pendleton*, 772 S.E.2d at 765.

The article's title implies that it contains "evidence suggest[ing]" that the events in Charlottesville were a "complete set-up," priming readers to expect truthful reporting on nefarious dynamics underlying the rally. (Dkt. 29-8 at 2; Am. Comp. ¶ 125). Additionally, Wilburn introduced the alleged officer's statements about Gilmore by stating that "the depth of this conspiracy runs deeper," implying that Gilmore was part of a "conspiracy" surrounding the rally and that the officer had some factual basis for referring to Gilmore as an "actor" in a "set-up event." (Dkt. 29-8 at 5–6). Considered in their full context, these statements are "reasonably capable of conveying the defamatory innuendo" Gilmore alleges. *Pendleton*, 772 S.E.2d at 765.

For several reasons, the Court's conclusion is not altered by Wilburn's statements that the alleged officer's comments were "his version" of "the truth," that the officer's "account[]" was "as yet unverified," and that it would be "serious stuff" "if true." (Dkt. 29-8 at 2, 6). First, Wilburn contradicted these disclaimers by introducing the officer's statements about Gilmore as evidence of a "conspiracy" of considerable "depth," (*id*. at 5), and by stating that the officer's account "points directly to the reality of the 'deep state'" and the lengths "the Soros/Clinton/Obama one-world government cabal" will go to achieve "fundamental transformation." (*Id*. at 6). Second, Wilburn's "careful choice of words" does not immunize him from defamation claims stemming from an article otherwise containing "defamatory innuendo." *Pendleton,* 772 S.E.2d at 764–65. Virginia law imposes no requirement that a "defendant's words must, by themselves, suggest that the author intends or endorses the allegedly defamatory inference." *Id*. The Supreme Court of Virginia has rejected such a requirement because to embrace it would "immunize one who intentionally defames another by a careful choice of words to ensure that they state no falsehoods if read out of context but convey a defamatory innuendo in the circumstances in which they were uttered." *Id. See also Carwile*, 82 S.E.2d at 592 ("[I]t matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory."). Accordingly, considering the article in its full context, the Court concludes that Wilburn's article conveys a "provably false factual connotation" about Gilmore. *Eramo*, 209 F.Supp.3d at 875.

For the same reasons discussed above with respect to Defendants' other publications, Gilmore also adequately alleges that this false innuendo "is reasonably capable of the defamatory meaning [he] ascribes to it." *Webb*, 752 S.E.2d at 811. Similarly, for the same reasons discussed above, Gilmore adequately alleges that Wilburn's statements about him were defamatory *per se*.

*See Tronfeld*, 636 S.E.2d at 450; *JTH Tax*, 8 F.Supp.3d at 741.

Lastly, Gilmore plausibly alleges that Wilburn, Hickford, and Words-N-Ideas published statements about him with actual malice. Gilmore asserts that these defendants never "reach[ed] out to" him for comment or confirmation, and never "verified" the "veracity" of the alleged police officer's account. (Am. Comp. ¶¶ 128, 131, 137). These factual allegations are concrete: Gilmore can speak directly to whether these defendants ever contacted him, and the article states that the officer is "as-yet unidentified" and that the officer's remarks were "unverified." (Dkt. 28-9 at 2, 6). These statements support a plausible inference that Defendants failed to follow "journalistic standards" and repeated "another's words" they knew to be either "false or inherently improbable." *Eramo*, 209 F.Supp.3d at 871–72. Although such allegations may not ultimately be enough to establish actual malice, they are sufficient at this stage to create a "plausible inference" of actual malice. *Spirito,* 350 F.Supp.3d at 481.

In sum, Gilmore states claims for defamation against Wilburn, Hickford, and Words-N-Ideas. Defendants' motion to dismiss Gilmore's defamation claims will be denied.

### C. Gilmore's IIED Claims

Defendants next argue under Rule 12(b)(6) that Gilmore fails to state claims for IIED against them. (Dkts. 46; 56). To state a claim for IIED under Virginia law, a plaintiff must allege that (1) "the wrongdoer's conduct is intentional or reckless"; (2) "the conduct is outrageous and intolerable"; (3) "the alleged wrongful conduct and emotional distress are causally connected"; and (4) "the distress is severe." *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). Here, there can be no serious dispute that Gilmore sufficiently alleges that Defendants' conduct was "intentional or reckless." (*See, e.g.*, Am. Comp. ¶¶ 285–88). Defendants contend that Gilmore fails to adequately allege "outrageous and intolerable" conduct, a causal connection

64

between Defendants' conduct and Gilmore's distress, and emotional distress of sufficient severity under Virginia law. (Dkts. 47 at 97–102; 57 at 25–26).

To satisfy the second prong, a plaintiff must show that the defendant's "conduct has been so outrageous, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo*, 400 S.E.2d at 162. Accepting the veracity of Gilmore's allegations, Defendants falsely portray him as a member of a "deep state" conspiracy who helped orchestrate violence in Charlottesville and filmed Fields's attack with foreknowledge that it would occur, all for the purpose of undermining a sitting president and the "alt-right." (Am. Comp. ¶¶ 214, 284). This portrayal of Gilmore mirrors conduct the Fourth Circuit found extreme and outrageous under Virginia law in *Hatfill v. New York Times Co.*, 416 F.3d 320 (4th Cir. 2005). In that case, a newspaper "intentionally published false charges accusing [the plaintiff] of being responsible for anthrax mailings that resulted in five deaths, without regard for the truth of those charges and without giving [the plaintiff] an opportunity to respond." *Id.* at 336. Thus, at this stage, the Court finds that Gilmore plausibly alleges that Defendants engaged in "outrageous and intolerable" conduct. *Russo*, 400 S.E.2d at 162.

Similarly, Gilmore sufficiently alleges that Defendants' conduct "proximately caused" his emotional distress. *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007). Although some of the harm Gilmore alleges stems from harassment by third parties who read or watched Defendants' publications, (Am. Comp. ¶¶ 146–163), Gilmore alleges that this harassment is fairly traceable to Defendants, whose past publications have allegedly resulted in similar harassment. (*Id.* ¶¶ 164–177). Moreover, setting aside the harassment allegedly visited upon Gilmore by third parties, Gilmore plausibly claims that Defendants' publications themselves directly harmed his health

and professional reputation. (*Id.* ¶¶ 180–84, 187).

Nevertheless, the Court finds that Gilmore has not alleged distress of sufficient severity to sustain IIED claims against Defendants. Under Virginia law, liability for IIED "arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163. Although Gilmore alleges emotional distress of a serious nature, the harm he claims does not meet Virginia law's high standard for IIED claims for three reasons. First, much of the distress Gilmore alleges— such as stress, anxiety, sleeplessness, depression, and seeking counseling—has been deemed insufficiently severe by the Supreme Court of Virginia. *See, e.g., Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006) (finding symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression," "psychological treatment and counseling," "mortification, humiliation, shame, disgrace, and injury to reputation" insufficient); *Russo*, 400 S.E.2d at 163 (finding plaintiff's allegations of emotional distress insufficiently severe where plaintiff alleged "she was nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work"). Second, although Gilmore alleges that he has reduced his social activities and may have to reduce his client-facing work, Gilmore has not alleged that he is "functionally incapable of carrying out any of [his] work or family responsibilities." *Almy*, 639 S.E.2d at 188. Indeed, the amended complaint makes clear that Gilmore, although inhibited personally and professionally, continues to maintain employment and occasionally "go[] out" socially. (Am. Comp. ¶¶ 184, 187).

Third, a significant portion of the distress Gilmore alleges is of a speculative nature. For instance, Gilmore alleges that he "*may* need to remove himself altogether" from his company's client-facing work but does not allege that he has actually been forced to do so. (*Id.* ¶ 187

66

(emphasis added)).  Likewise, Gilmore claims that if he returns to the State Department, it will be "exceedingly difficult" for him to work as a diplomat abroad, but Gilmore does not allege that he has actually attempted to return to the State Department as a diplomat and been denied a role serving in this capacity.  (*Id*. ¶ 88).  Additionally, Gilmore alleges that "*[i]f* [he] is able to return to the State Department, it is *likely* that government officials" who have "suggested that the government needs to be purged of so-called 'Deep State' actors" will "work to harm [his] career or oust him from government service entirely."  (*Id*. ¶¶ 188–189 (emphasis added)).  But, here again, Gilmore alleges speculative future harm.

In sum, the Court finds that Gilmore fails to allege distress of sufficient severity to support IIED claims against Defendants under Virginia law.  These claims will be dismissed.

## V.     Defendants' Motions for Immunity & Attorneys' Fees under § 8.01-223.2

Defendants move for immunity and attorneys' fees under Va. Code § 8.01-223.2.  (Dkts. 46; 56; 58).  Section 8.01-223.2 provides that "[a] person shall be immune from civil liability" for a "claim of defamation based solely on statements . . . regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party."  However, immunity does not apply "to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false."[54]  Va. Code § 8.01-223.2(A).  Since Gilmore has plausibly alleged defamation with actual malice against all defendants except West—who will be dismissed for lack of personal jurisdiction—Defendants' motions for immunity under § 8.01-223.2 will be denied.  Moreover, Defendants' motions for attorneys fees and costs under § 8.01-

---

[54]     Immunity under § 8.01-223.2 does not extend to IIED claims, so the Court cannot grant immunity or attorneys' fees or costs under § 8.01-223.2 on the basis that Gilmore's IIED claims will be dismissed.

223.2 will similarly be denied, as the Court "may" award attorneys fees under § 8.01-223.2 only when an individual "has a suit against him dismissed pursuant to" § 8.01-223.2.

<h3 style="text-align:center">CONCLUSION</h3>

For the foregoing reasons, the Court finds that it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and can exercise specific personal jurisdiction over all defendants except West, who will be dismissed from this action without prejudice. Gilmore adequately pleads defamation under Virginia law against all remaining defendants, and his defamation claims will therefore survive. Gilmore does not, however, adequately plead IIED under Virginia law, and his IIED claims will thus be dismissed without prejudice. Defendants' motions for immunity and attorneys fees under Va. Code § 8.01-223.2 will be denied.

An appropriate order will issue.

Entered this ⎯29th⎯ day of March, 2019.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE