```
1                    IN THE UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF VIRGINIA
2                        CHARLOTTESVILLE DIVISION

3      ****************************************************************
       BRENNAN M. GILMORE,              CIVIL NO.: 3:18CV00017
4                                       July 17, 2020
                                        Charlottesville - Teleconference
5              Plaintiff,               Motions Hearing

6      vs.

7      ALEXANDER E. JONES, et al,       Before:
                                        HONORABLE JOEL C. HOPPE
8                                       UNITED STATES MAGISTRATE JUDGE
               Defendants.              WESTERN DISTRICT OF VIRGINIA

9      ****************************************************************
       APPEARANCES:
10
       For the Plaintiff:
11
       ANWAR GRAVES               BRIANNE JENNA GOROD
12     HASSEN AMIR SAYEED         ASHWIN PRADYUMNA PHATAK
       OMelveny & Myers LLP       Constitutional Accountability Center
13     1625 Eye Street, NW        1200 18th Street NW, Suite 501
       Washington, DC 20006       Washington, DC 20036
14     202-383-5300               202-296-6889
       agraves@omm.com            brianne@theusconstitution.org
15     hsayeed@omm.com            ashwin@theusconstitution.org

16     ANDREW CHARLES MENDRALA
       Cohen Milstein Sellers & Toll PLLC
17     1100 New York Ave. NW Fifth Floor
       Washington, DC 20005
18     202-408-4600
       AMendrala@cohenmilstein.com
19


20

21     _____
                    Mary J. Butenschoen, Transcriber
22                  210 Franklin Road, S.W., Room 540
                       Roanoke, Virginia  24011
23                      540-857-5100, Ext. 5312

24     PROCEEDINGS RECORDED BY AT&T CONFERENCE CENTER TRANSCRIBED
       USING COMPUTER-AIDED TRANSCRIPTION.
25
```

```
 1     APPEARANCES (Continued):

 2     For Free Speech System Defendants:

 3     ELIZABETH ANNE SCULLY
       Baker & Hostetler LLP
 4     1050 Connecticut Avenue, NW, Suite 1100
       Washington, DC 20036
 5     202-861-1698
       escully@bakerlaw.com
 6
       EVAN DAVIS MAYO
 7     Tremblay & Smith, PLLC
       105 East High Street
 8     Charlottesville, VA 22902
       434-977-4455
 9     evan.mayo@tremblaysmith.com

10
       For Defendants Creighton, Hoft, Wilburn, Hickford,
11     Words-N-Ideas, LLC:

12     AARON J. WALKER
       P. O. Box 3075
13     Manassas, VA 20108
       703-216-0455
14     AaronJW1972@gmail.com

15
       For Defendant Stranahan:
16
       LEE STRANAHAN
17     2908 S. Louise Avenue
       Apartment 7
18     Sioux Falls, SD 57106
       PRO SE
19

20

21

22

23

24

25
```

```
 1    (Proceedings commenced 1:04 p.m.)
 2            THE COURT:  Hi, good afternoon.  Who is on the line
 3    for the plaintiff, Mr. Gilmore?
 4            MR. GRAVES:  Good afternoon.  Your Honor, this is
 5    Anwar Graves on behalf of plaintiff, Brennan Gilmore.  I'm
 6    joined by my colleague, Hassen Amir Sayeed.
 7            MR. SAYEED:  Good afternoon, Your Honor.
 8            THE COURT:  All right.  Good afternoon.
 9            MR. MENDRALA:  You've also got Andrew Mendrala of
10    Cohen Milstein Sellers & Toll for Mr. Gilmore.
11            MS. GOROD:  Good afternoon.  You've also got Brianne
12    Gorod from the Constitutional Accountability Center for
13    Mr. Gilmore.
14            MR. PHATAK:  And also Ashwin Phatak from the
15    Constitutional Accountability Center.
16            THE COURT:  All right, thank you.  Good afternoon to
17    all of you.
18            And then -- all right, let's see.  How about is
19    Mr. Stranahan on the phone?
20            MR. STRANAHAN:  Yes, Your Honor.  This is Lee
21    Stranahan representing myself in this matter.
22            THE COURT:  Okay, all right.  Good afternoon.
23            Let's see, and then for Mr. Walker, are you on the
24    line for a number of defendants?
25            MR. WALKER:  Yes, that's a good way to put it.
```

1          I will also just give you a heads up.  I am

2    experiencing currently a medical issue that might require me

3    to, frankly, run to the restroom.  It's embarrassing to have

4    to admit that.  But what I propose to do if, God forbid, that

5    happens, is I will mute my phone so you guys do not have to

6    hear any of that but take the phone with me and try to follow

7    along as best as I can.  And otherwise, you know, hopefully it

8    won't even be an issue, but I wanted to address that very

9    quickly.

10          THE COURT:  Okay.  Well, just let me know if you

11   need to leave or mute the phone if you are participating and

12   just -- just say so, and then just let me know when you're

13   coming back, okay?

14          MR. WALKER:  Okay, I appreciate that.  And I -- I'm

15   deeply sorry that's occurring.

16          THE COURT:  Okay.  Well, I'm sorry -- sorry for you

17   as well.

18          All right.  And then how about for -- it's Free

19   Speech Systems and Infowars.

20          MS. SCULLY:  Yes, Your Honor.  On behalf of the Free

21   Speech Systems defendant parties, Elizabeth Scully with

22   BakerHostetler, and Evan Mayo is also on the line on behalf of

23   those parties, but I'll let him speak up.

24          MR. MAYO:  Thanks, Elizabeth.  Yes, Evan Mayo on

25   behalf of the Free Speech defendants for local counsel,

1    Tremblay & Smith.

2                THE COURT:  Okay.  All right.  Well, good afternoon

3    to you-all as well.

4                And is there anyone else on the line for any of the

5    parties?

6                All right.  Well, thanks for calling in.  The

7    purpose of today's hearing is to take up the plaintiff's

8    motion to compel regarding Mr. Stranahan.  And then the

9    plaintiff had also indicated that there were a number of other

10   discovery issues involving the other defendants as well.  So

11   I'd like to take those up, too.

12               Perhaps, given Mr. Walker's medical issues, we

13   can -- we can take up any issues related to discovery for his

14   clients first.  What do you-all think about that?

15               And Mr. Graves, are you going to be -- are you going

16   to be addressing the plaintiff's arguments?

17               MR. GRAVES:  Yes, I will, Your Honor.

18               THE COURT:  Okay.  All right.  Mr. Walker and

19   Mr. Graves, do you want to go -- do you-all want to proceed

20   first then?

21               MR. GRAVES:  Sure.

22               MR. WALKER:  This wasn't noticed, but that's fine.

23   I can talk about whatever is going on.  That's fine.

24               THE COURT:  Okay.  All right.  And, you know, what

25   I -- other than the motion to compel for the other defendants,

1   I really want to hear what each side's positions are and see

2   if we can -- see if we can resolve some of these disputes

3   informally today without having to resort to motions practice.

4   And really, the idea behind that is just to try and deal with

5   the discovery disputes efficiently.

6         If there's some need to brief the issues, you know,

7   if they are a little bit more detailed or complex, then

8   you-all -- I'll certainly allow you-all to do that.  But let's

9   see if we can -- what we can get accomplished today, okay?

10        Mr. Graves, do you want to go ahead then?

11        MR. GRAVES:  Yes, Your Honor.  So in regards to

12  Mr. Walker, the reason why we raised this issue is because

13  Mr. Walker has been completely unresponsive to our request.

14  Specifically, we have not heard from him since we reviewed

15  discovery responses which were deficient, in our view, on the

16  18th.  Once we received his discovery responses on May 18, we

17  sent him letters on June 8, June 12, and June 22.  And we sent

18  these letters for various reasons.

19        First, Mr. Walker represents a number of defendants

20  in this matter, but he has only produced a total of 30

21  documents in relation to those defendants.  And when he made

22  such a production notice where he failed to Bates stamp that

23  production, so, therefore, there was no way for us to identify

24  or label them in a sufficient manner according to the federal

25  rules.

 1              Furthermore, there was insufficient search terms for

 2     the defendants represented by Mr. Walker.  He failed to

 3     respond to our request that he search his defendants', or his

 4     clients', materials using a comprehensive list of search terms

 5     that we provided him with, and most of the documents that he

 6     produced appears to have no relevance to this case.  For

 7     instance, of the 30 documents that he produced is a texting

 8     between Mr. Wilburn and Mr. Wilburn's handyman which have,

 9     obviously, no relevance or reference to anything related to

10     this litigation.

11              And he also has failed to produce documents related

12     to his clients Michele Hickford and Words-N-Ideas, LLC.  He

13     previously advised us that these documents contained Malware,

14     or, in other words, that they would be harmful to our

15     computers if we downloaded them.  So we provided him with

16     instructions to receive those documents safely, but we again

17     have yet to hear from him.

18              Other defendants, in our correspondence with them,

19     have confirmed that they have not received any copies of

20     Mr. Walker's discovery responses that he's provided to us and

21     were specifically made up of what we believe to be deficient

22     interrogatory responses and 30 responsive -- or not even

23     responsive documents.

24              Our last request to him was to confirm whether a

25     certain video that contains defamatory or allegedly defamatory

1     statements regarding our client is in his possession.  Or,

2     alternatively, if he would stipulate to the authenticity of

3     the video, or a copy of the video, that we were able to locate

4     online.  He's failed to respond to that letter as well.

5           So in sum, we have attempted to try to resolve these

6     issues with him in order to not bring this issue to the

7     Court's attention, but we, frankly, have been with silence.

8     And we find that to be surprising because we have notice that

9     he has been active on social media, and so we are confused as

10    to why he has not been responding to us in our request.

11          THE COURT:  All right.  Mr. Walker, what's your

12    response?

13          MR. WALKER:  I have been very sick, and I've been

14    bedridden a lot of times that allows me, yes, to go on

15    Twitter, but it doesn't allow me to go through multiple

16    letters and all that.  I apologize for that situation.  It is

17    not a desire to obstruct them.  It is just -- you know, the --

18    the mind is willing but the body is weak at the moment, as

19    even intruding into this hearing, and, again, I apologize for

20    that situation.  But I have had this sinus infection for quite

21    some time.  It has made they very dizzy all the time.  It may,

22    frankly, be interacting with some heart medication that has

23    that as a side effect.  But as in not -- like as in it doesn't

24    do it by itself, but it may be causing it in conjunction with

25    something else.  I say this not as a medical doctor, but

1    speaking to my doctor he does think that's possible.  I have

2    talked to him about cutting back on the medication or going

3    off of it, and he doesn't recommend that at the moment.  So I

4    apologize for the lack of response.

5            You know, one specific thing they mentioned whether

6    or not they had the videos, they are talking about Scott

7    Creighton's video that's referred to in the complaint.  I

8    presume we're talking about the same thing.  Then he does

9    actually have a copy of that.  We probably -- you know, as

10   long as I have a chance to look at it, we probably will

11   stipulate to the accuracy of whatever they have as well.

12           Like I -- so it's not a matter of not wanting to,

13   you know, cooperate or -- but rather instead that, you know,

14   just frankly, I wasn't able to physically.  I was having

15   physical issues.

16           The other thing to note, they claim that, you know,

17   there was only something like 30 documents.  There will be

18   more when I provide the Words-N-Ideas of Michele Hickford.

19   The thing to understand is none of these people produced a

20   great deal of documents related to any of this stuff.  These

21   people are mostly just doing their own thing.  They were not

22   constantly being monitored by super (technology drop) where

23   they had this long process, you know, everybody goes through.

24   They just simply write what they want, and, you know, in the

25   case of Mr. Hoth and Mr. Creighton, they either hit publish or

1    they don't if they're happy.  In the case of Mr. Wilburn, who

2    does have an approval process, but it's not massively involved

3    and it doesn't generate a lot of paperwork.  So as I said at

4    the beginning, I didn't expect us to produce very many

5    documents, and that continues to be true.  Having looked to

6    their information, I don't believe there's many documents that

7    are responsive period.

8             But again, I do apologize to the extent that I

9    haven't been as responsive as, frankly, they deserve.  But,

10   you know, again, I have been very ill for the last couple

11   months and it has made it very difficult to even get out of

12   bed or to get out of my chair once I get down to the living

13   room, et cetera.  It has been very debilitating.  I am going

14   to try to see the doctor, frankly, either this afternoon or

15   next week and try to say we need to do something.  This cannot

16   go on like this.  But that's all I can respond to on that,

17   Your Honor.

18            THE COURT:  All right.  Well, so Mr. Walker, with

19   the video for Scott Creighton, he has the video?

20            MR. WALKER:  Yeah.

21            THE COURT:  And really the only issue is whether

22   you'll stipulate to the authenticity?

23            MR. WALKER:  Well, I haven't had a chance to, but I

24   don't expect that to -- bluntly, Mr. Graves seems to be a

25   reasonably honorable person.  I would be very surprised if

1  there was anything hanky going on there, him using something

2  that was inauthentic.  So, you know, I have a high degree of

3  confidence I can agree with it, but I always check before I

4  say yes.

5        THE COURT:  Okay.  And for Hickford and

6  Words-N-Ideas you have additional documents that you're

7  planning on --

8        MR. WALKER:  Yeah, the -- I'm sorry, I didn't go

9  over this.  The problem was that it was marked as having

10  potentially Malware, and hopefully the company that was

11  cleaning it out, you know, did finish cleaning it out.  When I

12  can get it to them, I will get it to them.  But I will -- I

13  mean, it will be -- it will probably be the biggest packet of

14  documents, but that might mean 60 documents at most from them.

15        THE COURT:  All right.

16        MR. WALKER:  As I said at the beginning, I would be

17  very surprised if we had more than a hundred documents

18  produced by all of my defendants.  They are just not the kinds

19  of people who produce a lot of paperwork --

20        THE COURT:  Okay.  And --

21        MR. WALKER:  -- when they do this sort of thing.

22        THE COURT:  There's a company that's trying to clean

23  out the Malware?

24        MR. WALKER:  Yeah, when we -- I contracted for

25  electronic discovery I came to them and said, look, we have a

1    Malware problem, can you guys do something.  They said they

2    can clean out the Malware issue.  So, I mean --

3              THE COURT:  Do you have any information from that

4    company about when they are going to finish?

5              MR. WALKER:  They may very well be finished.

6    Hopefully they are.

7              THE COURT:  All right.  And then, let's see, as to

8    Creighton and Wilburn and Hoth, I think Mr. Graves indicated

9    that a lot of the documents seemed like they were -- they were

10   just irrelevant and had a question about whether the search

11   terms were used?

12             MR. WALKER:  Yeah, I can run additional search terms

13   for them as long as they are reasonable.  I mean, if they want

14   me to search for the word "the", that's obviously not

15   reasonable, but if it's reasonably targeted toward this I will

16   search for that and produce whatever I think is relevant.

17             I certainly took the attitude when producing

18   documents of if I'm not sure if it's relevant I would err

19   towards disclosing more.  And, I mean, because, after all, I

20   knew I wasn't going to be giving them a massive pile of

21   documents anyway.  This wasn't one of those situations where

22   they get 12 boxes full of paper or -- you know, like often

23   happens with large corporations.  This was again, you know,

24   more like a large envelope.  And so it -- I figured it

25   wouldn't bother them too much to have a couple documents that

1   they don't truly care about, but I -- you know, I did

2   produce -- you know, so I threw a wider net to be more

3   accommodating toward them.

4        THE COURT:  And were there some search terms that

5   the plaintiff provided to you earlier that you used?

6        MR. WALKER:  I may have missed it.  I am -- I'll go

7   back to my email.  And, certainly, if they have any search

8   terms -- you know, like I said, as long as they are

9   reasonable, I don't object, you know.  I mean, as long -- you

10  know, as long as it's not so generic it will turn up

11  everything (indiscernible) sun, but, you know, something

12  that's reasonably targeted toward, you know, the events that

13  happened.  But, I mean, I -- what I did, Your Honor, just FYI,

14  was I went through literally everything they wrote the day

15  before the incident, the day (indiscernible) incident to see,

16  you know, what -- what were they even talking about.  Because

17  often you might get hits that wouldn't be necessarily obvious,

18  you know what I'm sayin'?  It may not hit any search term.

19  But also to see how they talk about these things.  You know,

20  maybe they would call Charlottesville "C-ville," maybe they --

21  who knows, you know.  And the answer was, was they barely

22  talked about it at all, any of them.  It was not a huge deal

23  to them one way or the other.

24        But I went through that, you know, for those two

25  reasons, just because that's the most focused day and to see

 1    how they discussed the events, the plaintiff, you know,

 2    Mr. Fields, et cetera, and in order to determine, you know,

 3    how they did that.  Then I started going through, you know,

 4    various search terms which I disclosed to them when providing

 5    the actual documents themselves.

 6            THE COURT:  Okay.  All right.  Well, Mr. Graves,

 7    you-all did provide some search terms to Mr. Walker?

 8            MR. GRAVES:  Yes, provided search terms to all

 9    defendants I want to say in March or April of this year.  We

10    asked Mr. Walker if he would apply those terms.  He responded

11    to that email advising that he didn't believe that those terms

12    were (indiscernible) and he provided us with his list that he

13    would be applying.  And the issue is we've seen the result of

14    that list where we've seen 30 documents, again, one

15    conversation with the handyman for some reason was a part of

16    that.

17            But I think we're probably -- one thing that I think

18    Mr. Walker has shown throughout this is that there is

19    substantial amount of work to be done, and our concern is that

20    the proposed scheduling order has that discovery closing on

21    August 31, and I don't see how we can -- with the current

22    schedule we can actually meet the deadline if Mr. Walker is

23    just now beginning to endeavor to, one, apply search terms to

24    address the Malware issue and the other issues that we -- I

25    raised earlier.

1          THE COURT:  All right.  Well, it sounds like the

2   Malware issues may be resolved.  Mr. Walker is not sure about

3   that.

4          MR. WALKER:  I can't guarantee, but I feel a high

5   degree of confidence it's probably resolved and I just need to

6   turn it over when I can.

7          THE COURT:  All right.  Well, I do want to get this

8   moving.  And Mr. Walker, I am sensitive to the fact that

9   you've been ill and that that has had some impact on your

10  ability to --

11         MR. WALKER:  Yeah.  And I apologize to all of you,

12  including Mr. Graves.  And I've said to him whatever is -- you

13  know, whatever he wants reasonably to avoid any prejudice, you

14  know, I'm not here to try to win an unfair fight.  You know, I

15  will vigorously defend my client, but I'm not here to obstruct

16  this process.  And I think I said to him, and certainly the

17  thought is, is one of the best curatives is time, you know.

18  Certainly, if they are butting up against a deadline because

19  of my problems, then the solution seems pretty obvious to me.

20         And again, I -- I apologize again for this

21  situation.  And then just honestly dealing with the

22  Coronavirus fallout has been like nothing I've ever seen in my

23  life.  I think we'd have to live to 1918 to maybe see

24  something comparable.  But anyway, I'll let this -- let you

25  move on to the next thing, Your Honor.

1      THE COURT:  All right.  Well, what I do want to do

2   on this is I'll do a short order on it, but for -- as far as

3   the video of Scott Creighton and then the documents that may

4   have been infected with Malware that are with the company, it

5   sounds like those -- it wouldn't take a whole lot of time to

6   be able to tie those -- those things up.  So I do want you

7   to -- I'm going to ask that you respond within 14 days about

8   whether you'll stipulate on the video from Mr. Creighton and

9   then --

10      MR. WALKER:  Okay.

11      THE COURT:  And then for the documents from

12   Words-N-Ideas and Hickford also within -- within 14 days.

13   Because it sounds like if the documents are restored, then it

14   shouldn't be -- and you said there aren't a lot of them

15   anyway.  It should not be onerous to produce those.

16      MR. WALKER:  Okay.

17      THE COURT:  As far as -- let's see, the -- there may

18   be additional documents from Creighton, Wilburn, and Hoth.  It

19   sounds like you-all have not agreed on search terms yet, so

20   what I would want you to do is to -- Mr. Walker and Mr. Graves

21   for you-all to confer within seven days and reach an agreement

22   on search terms.  If you can't do that within -- within the

23   week, I want you to contact Ms. Dotson and set up another

24   conference call with me and we'll get those finalized.  And

25   then --

1      MR. WALKER:  I feel a high degree of confidence we

2  can work something out, Your Honor.

3      THE COURT:  Okay.  I think so, too.

4      And then, Mr. Walker, I'll give you one -- I'll give

5  you 21 days from the entry of the order.  So, essentially, it

6  will be, you know, another two weeks or so after you-all are

7  required to reach an agreement on the search terms to -- to

8  produce any documents that would fall under those -- those

9  search terms.

10     MR. WALKER:  Okay.  I appreciate your accommodation,

11 Your Honor.

12     THE COURT:  All right.  I think that --

13     MR. GRAVES:  One thing I was going to say, Your

14 Honor, is we did send letters to Mr. Walker regarding his

15 interrogatory responses as well.  So as part of that seven-day

16 meet-and-confer process, we would ask that Mr. Walker would

17 also have responses to those objections that we -- you know,

18 issues that we raised in that letter regarding the

19 responses.

20     THE COURT:  Okay.  And Mr. Walker, what I was

21 intending to do on the deficiency letters is that I would want

22 you to -- and Mr. Graves, did they -- did they, essentially,

23 say the same thing?

24     MR. GRAVES:  No.

25     THE COURT:  Okay.

1          MR. GRAVES:  They raised up -- there are three

2     letters, the 8th, the 12th, and the 22nd of June.

3          THE COURT:  All right.  Mr. Walker, I would want you

4     to respond to -- to those within 14 days as well so you-all

5     know what each person's position is, okay?

6          MR. WALKER:  Okay.

7          THE COURT:  All right.  Mr. Graves, is there

8     anything else for Mr. Walker's clients?

9          MR. GRAVES:  No, Your Honor.

10         THE COURT:  Okay.  All right.

11         Then why don't we move on to Mr. Stranahan and the

12    motion to compel.

13         MR. GRAVES:  Sure.

14         THE COURT:  And Mr. Graves, I reviewed the -- your

15    motion and the documents that you've attached to it.  And are

16    there any updates for that?  Have you and Mr. Stranahan

17    conferred any further, or any changes at this point?

18         MR. GRAVES:  No, Your Honor.

19         MR. STRANAHAN:  Yes, no, Your Honor.  This is

20    Mr. Stranahan.  No, Your Honor.

21         THE COURT:  All right.  Well, Mr. Stranahan, are you

22    opposing the motion to compel?  I mean, do you acknowledge

23    that you need to provide additional responses on the -- or

24    supplemental responses on the interrogatories and produce

25    documents?

1          MR. STRANAHAN:  Yes.  So if I may, Your Honor, first

2     off, I would -- I would like to be able to have at some point

3     a -- and if we can arrange this with Ms. Dotson, I would

4     appreciate it -- a brief conference with you on how I ended up

5     becoming pro se in this.  But let me point out that the --

6     that me being pro se in this is a factor in that there are --

7     I would -- I would divide the slowness in responses on some of

8     the issues into two categories:

9          One are things that I've simply been overwhelmed

10    with, a combination of a move, losing a job, a divorce

11    situation where I've saw my children for the first time in six

12    months about three days ago, and that is about to be over.

13    I'm almost -- by the end of the month, I will be completely

14    moved up to South Dakota.  I'm partially moved now.  I'll be

15    going back to Virginia in a week.  So some of the issues are

16    simply that bit of overwhelm which is about to be over because

17    I'm almost settled here.

18          And but the other side of the issues from reading

19    the motion -- and again, I'm not an attorney and not trying to

20    be one.  It seems that the -- Mr. Gilmore's counsel's

21    objections relate to me going along basically with what the

22    Free Speech Systems (technology skip), and there's a very

23    specific reason I'm doing that.  (Technology drop.)

24          THE COURT:  Mr. Stranahan, you've cut out.  I can't

25    hear anything that you're -- that you're saying if you're

1   still talking.

2                  MR. STRANAHAN:  Sure.  Yeah, okay.  Let me just go

3   back.  Where did you lose me, Your Honor?

4                  THE COURT:  You said there's -- as to the other

5   defendants' response there's very specific reason why, and

6   then you cut off.

7                  MR. STRANAHAN:  Yes, okay.  It's -- it's because my

8   case seems to me to be bound somewhat to the case specifically

9   of Free Speech Systems, Lee Ann McAdoo, and to a lesser extent

10  Alex Jones is named there, and that's because I was on the

11  Alex Jones show when I made certain statements.  Many parts of

12  Lee Ann McAdoo -- in fact, almost all of them -- overlap with

13  mine.

14                 And when I read the responses from Baker, from Free

15  Speech Systems' counsel, they were making specific claims

16  about why they felt, for instance, the period of time for the

17  search should be limited.  And again, I'm not an attorney, but

18  it seemed to me that, based on my reading of that, it would be

19  a mistake for me to go against what Baker was doing.  And, in

20  other words, for me to decide on my own, well, I'm just going

21  to give them everything from every day, and that I -- what I

22  would prefer to do is let that issue be adjudicated, which I

23  assume would be for -- for both Baker and I, for both Free

24  Speech Systems and I.

25                 And so that's why on those -- the things that aren't

1  in dispute that I simply haven't produced yet I should be able

2  to produce within two or three weeks, something like that,

3  with no problem.

4           Then the other issues are related to --

5           MR. WALKER:  Your Honor, I'm sorry to interject.

6  I'm going to have to excuse myself for a moment and mute the

7  phone.

8           THE COURT:  That's fine, Mr. Walker.

9           MR. WALKER:  And I will try to follow along, as I

10  mentioned, but I just -- sorry to interject.

11          THE COURT:  Sure, that's fine.

12          Mr. Stranahan, what -- what are you proposing to

13  produce?

14          MR. STRANAHAN:  Everything that is not disputed.  In

15  other words, all of the material where there is no date

16  dispute, for instance, on a number of -- on, you know, my

17  response.  Again, I -- I was very clearly following Free

18  Speech Systems' response, and opposing counsel is aware that I

19  told them I'd be doing that.  So all of the search terms and

20  everything else, I can produce those, no problem.  And again,

21  I would -- you know, I would ask for whatever you'll give me,

22  two or three weeks, but something reasonable based on what you

23  just said to Mr. Walker.  It sounds like we're in that

24  ballpark.

25          THE COURT:  All right.  So documents that would be

 1    responsive to their request for production and that you are to

 2    use the search terms that -- have you agreed with some search

 3    terms with plaintiff's counsel?

 4            MR. STRANAHAN:  Yes.  I believe so, although when I

 5    went back and I looked at the document, I was actually -- I

 6    didn't -- when I went back and looked at the document, I've

 7    been able to -- unable to find specific search terms for me.

 8    So if Mr. Graves and the other counsel there could refresh me

 9    on those, I don't know what happened, but I can't find -- I

10    found a document, but it doesn't seem to list me so I might be

11    missing it.

12            THE COURT:  All right.

13            MR. GRAVES:  I'm sorry, this is -- do you want me to

14    respond, Your Honor?

15            THE COURT:  Sure, yeah.  Mr. Graves, can you just

16    weigh in on what's been said so far?

17            MR. GRAVES:  Sure.  So I -- with regards to search

18    terms, we emailed Mr. Stranahan the list of search terms.

19    They were the same search terms that the Free Speech

20    defendants agreed to.  And he responded to our email agreeing

21    to use those search terms.  So I believe that -- or I know

22    that he is in possession of the fullness of search terms.

23            It's unclear at this point for plaintiff to

24    understand what he's actually agreeing to produce.  As

25    Ms. Scully and counsel for Free Speech defendants can advise,

1    we've reached certain agreements with them.  Certain

2    objections that they have raised that they are no longer

3    raising.  And I guess this goes to the core issue which is

4    that Mr. Stranahan is not engaged in an authentic process of

5    reviewing the requests and deciding which objections actually

6    apply to him and which do not.

7          Specifically, he wrote in his letter to us that, "I

8    agree with your arguments that Free Speech Systems' counsel

9    makes in the letter.  To the extent that such arguments apply

10   to me, I agree with them.  Some of the arguments do not apply

11   to me, as I am an individual and do not have any real company

12   structure or any employees to speak of."

13         And so despite acknowledging that some of the

14   arguments made in BakerHostetler's letter does not apply to

15   him, he did not identify what those arguments were, nor did he

16   modify his responses to the extent that the copy/pasted

17   arguments in his own view did not apply to him.

18         So we're still left in this position of we're not

19   sure where he's objecting, where he's not objecting, because,

20   obviously, conversations with Ms. Scully have preceded and

21   we've reached certain agreements.  And frankly, I don't think

22   that's proper for him to proceed, generally speaking, in

23   responding to discovery requests simply copy/pasting from what

24   another attorney has done.

25         THE COURT:  Yeah, Mr. Stranahan, the -- I understand

 1    that you -- you don't want to act inconsistently with what

 2    attorneys (indiscernible) the discovery rules require that you

 3    respond individually and also specifically to each request and

 4    where there's an objection, but you also agree to respond or

 5    agree to produce documents notwithstanding the objection.  You

 6    have to indicate what you're agreeing to produce so that -- so

 7    the plaintiffs know what you're agreeing to and what you're

 8    not agreeing to.  It can't be so opaque.

 9          So you really are going to need to rewrite these,

10    your interrogatory, and your request for production of

11    document responses so that -- so that it's clear what your

12    objections are, what you're standing on, and what you're

13    agreeing to produce because it's -- from the way that the

14    responses are written now, it's pretty hard to tell what

15    you're agreeing to do and what you're not.

16          MR. STRANAHAN:  Well, if it -- Your Honor, if I may,

17    if it seems opaque to you, it's opaque to me as well because

18    when the motion to compel was filed I literally had to take

19    apart -- you have to understand when I'm saying moving.  My

20    wife and older kids basically abandoned the house.  I just had

21    my bank accounts shut down.  And so when the motion to compel

22    was filed, I'm literally sitting in a house full of stuff that

23    I had to get rid of to come to South Dakota.  And so if there

24    are -- and I'm saying this not as an excuse, but as an

25    explanation saying if there are agreements that the counsel

1   for Free Speech Systems and for Mr. Gilmore have come to, now

2   that the smoke has cleared a little bit in my move, I -- any

3   areas that are agreed to by Free Speech Systems almost

4   certainly I will be agreeing to as well, you know, with just I

5   can say that broadly.  And it's literally just been a matter

6   of time.

7           So what I -- what I would like to do, Your Honor, is

8   just get a little bit -- a reasonable amount of time, whatever

9   you determine that to be, and to be able to comply with

10  these -- these requests.

11          THE COURT:  All right.  Well, part of that process

12  and for you to understand what agreements may have been

13  reached between Mr. Graves and other defendants, you know,

14  would involve you conferring with Mr. Graves and seeing if you

15  can reach, you know, some sort of an agreement as well.  But

16  it's also just important that -- that Mr. Graves is able to

17  tell what you're -- you know, what your objections are and

18  what you're agreeing to produce, you know, as part of that

19  process.

20          So Mr. Graves, I'm sure that you're -- you're

21  willing to further confer with Mr. Stranahan to try and get

22  this moving forward.

23          MR. GRAVES:  Yes, I'd agree with that, Your Honor.

24          I think the only caveat is if it still appears that

25  Mr. Stranahan is looking to simply copy/paste from what

1   Ms. Scully has provided us with.  And that's I think will crux

2   of our objection is that it can't just be a recitation of,

3   well, Ms. Scully said this, so, therefore, I agree.  There has

4   to be a genuine authentic process to this, which is I think --

5   I'm not hearing from Mr. Stranahan that that's not going to

6   occur.  It seems like it's simply, well, if the Free Speech

7   defendants agreed, I agree, which isn't an authentic approach

8   to the discovery process.

9        THE COURT:  No.  And Mr. Stranahan, I am going to

10  require that you revise your discovery responses and state

11  them on your own.  I'm not telling you what you can or can't

12  say, but it's going to have to, you know, be your -- your

13  position and not just adopting another party's position, okay?

14       MR. STRANAHAN:  Well, I -- with due respect, Your

15  Honor, I don't -- I actually don't understand Mr. Graves'

16  argument.  In other words, he -- again, I will say this:

17  Mr. Graves and I have had a good relationship so far, and when

18  we've conferred and everything they have always been -- I feel

19  it's been very civil and everything else.  But I -- I

20  literally don't understand what he's talking about.  I don't

21  understand why I as a layperson cannot look to what a -- what

22  professional lawyers are doing on my own, try to read it -- I

23  could explain it if we went through.  I think I could

24  reasonably explain it as a layperson, but I'm not sure is

25  it -- if his objection is to me copying, I'm not sure what --

1    I'm not sure that's illegal.  And if it is, I'm a layperson,

2    so I don't know that.

3          But if he could suggest another process, I'm open to

4    it.  But all I'm hearing is criticism and no -- again, he's

5    not my lawyer, but if someone can give me some guidance on

6    this, like, oh, go do this, I'm more than willing to do it.

7    Other than that, I'm pursuing the process that -- literally

8    about the only process that makes sense to me.  Literally --

9          THE COURT:  And Mr. Stranahan -- and I'm not going

10   to tell you what you should write.  That's for you to decide.

11   But I will provide some guidance about -- about where I think

12   your interrogatory answers fall -- fall short.  And it's --

13   for example, in Interrogatory Number 2 that asks that you

14   identify all individuals or entities with knowledge and facts,

15   and the answer is, "Subject to and without waiving foregoing

16   objections, defendant states plaintiff and other defendants

17   likely have knowledge of at least some facts and

18   circumstances."  And then the defendants further refer to

19   documents being produced that, you know, another defendant

20   is -- is producing, and then there's a -- you know, there are

21   a number of documents that are identified.

22         But that -- those are documents that another

23   defendant is producing, so it -- I don't see how that is your

24   response.

25         MR. STRANAHAN:  Well, what I --

1          THE COURT:  And what you have to (technology skip)

2     interrogatory is state specific -- specific facts in response

3     to the interrogatory.  And just adopting what another

4     defendant has said, that defendant's -- you know, that

5     defendant's identification of other individuals or entities

6     is -- wouldn't be adequate.  I mean, you'd need to say who

7     those individuals -- who those individuals are.

8          MR. STRANAHAN:  Well, on my interrogatories, I -- I

9     have done my -- I have done my best.  In other words, if I've

10    made that mistake, I don't even understand the mistake.  And

11    it's not your fault, and it's certainly not Mr. Graves fault

12    or anybody else that I'm pro se in this.  I simply don't have

13    any other choice.  I don't have any means to represent myself.

14    And as I said, I'd like to request a side conference with you

15    to explain why I'm pro se.

16         But I -- if -- I hear what you're saying, and I've

17    attempted to do that.  In fact, in some of the

18    interrogatory -- well, certainly on the initial responses, for

19    instance, I put things in specifically where I was trying to

20    do it.  So in our -- if we confer further and Mr. Graves can

21    point those things out, again, not as my attorney -- I

22    understand nobody here is my attorney.  But if he can point

23    those out, what I'm saying is I'm completely willing to -- to

24    do that.  And if there's something I've done that's a mistake,

25    I'm absolutely willing to correct that mistake, but I can't

1    correct a mistake that I'm too stupid to understand I've made,

2    so...

3            THE COURT:  Well, and so -- and I do want to provide

4    you a bit of guidance, and that's what I'm trying to do.

5            MR. STRANAHAN:  Yes.

6            THE COURT:  So like for Interrogatory Number 4 where

7    it says, "Describe your process for ensuring that assertions

8    concerning plaintiff were factually accurate," you know, your

9    response is, "Defendant used publicly available open source

10   information and made no inaccurate statements."  It just needs

11   to be more specific than that.  Just saying "publicly

12   available open source information" doesn't -- doesn't tell the

13   plaintiff what -- you know, what that process is or

14   identify -- you know, identify sources and things like that.

15           It just needs to be -- the answers need to be more

16   specific and just need to contain more facts about -- you

17   know, about what you did.

18           MR. STRANAHAN:  Okay, that -- that does help, Your

19   Honor.  Thank you.

20           THE COURT:  All right.  And -- but, you know, part

21   of the process in getting discovery responses, or in you

22   providing discovery responses, is a meet and confer, you know,

23   when there are -- when the party who propounds discovery

24   thinks that there are deficiencies and tells the responding

25   party that, then it's really both of your obligations to --

1    you know, to try and hash it out and -- and make sure that,

2    you know, you're providing discovery that the -- that, you

3    know, the plaintiff is requesting.

4           But also, you know, if you have certain objections

5    that you think are well-founded in the law, then -- I mean,

6    you can certainly stand on those, but you've got to -- you've

7    got to identify what those objections are and then also

8    identify what you actually are responding to and what you're

9    going to produce, okay?

10          MR. STRANAHAN:  Okay.  That does help, Your Honor.

11          I guess I was a little bit confused about that

12   because it -- I hadn't seen that in the other responses, that

13   level of specificity, so -- but we can do that.  And again, I

14   think Mr. Graves knows I'm, you know, more than willing to

15   confer with him.  And I'm really not trying to slow down the

16   process, and I apologize to the extent I've done so.

17          THE COURT:  All right.  Well, what I'll do then

18   is -- and Mr. Graves, I'm going to -- I'm going to grant the

19   motion to compel, and I'll require that Mr. Stranahan provide

20   revised responses within 21 days.  And, you know, they need to

21   be -- Mr. Stranahan, they need to be specific and fully

22   respond to the plaintiff's interrogatories and also requests

23   for production.

24          MR. STRANAHAN:  May I ask -- may I ask a question,

25   Your Honor?

1              THE COURT:  Yes.

2              MR. STRANAHAN:  In terms of that -- and Mr. Graves,

3     I guess this is a question for you as well.  If I provide --

4     there's a 21-day deadline.  If I provide responses, let's say,

5     in a week, Mr. Graves, that you find half of them still

6     deficient, you would be able to get back to me so I can still

7     revise them to get up to near or a hundred percent within the

8     21-day period.  Is that -- is that correct?

9              MR. GRAVES:  Your Honor, I'm not --

10             THE COURT:  Mr. Stranahan, I'd suggest that you

11    confer with Mr. Graves, to talk to him in the next few days,

12    so that when you make your -- when you make your production of

13    documents or when you -- when you respond to the

14    interrogatories that it's -- that's your best effort.  And

15    there may be further, you know, back and forth after that,

16    but -- but you -- I mean, you want to give a good response the

17    first time around, too, okay?

18             MR. STRANAHAN:  Yeah, yes, Your Honor.

19    Understood.

20             THE COURT:  All right.  Mr. Graves, is there

21    anything else on the motion to compel that we need to address?

22             MR. WALKER:  FYI, Your Honor, I have been able to

23    return.

24             THE COURT:  Okay.  All right, Mr. Walker.

25             Mr. Graves, is there anything else on the motion to

1    compel?

2              MR. GRAVES:  No, Your Honor.

3              THE COURT:  Okay.  The Speech defendants, it sounds

4    like you-all have worked out at least some of the

5    disagreements?

6              MR. GRAVES:  Some of the disagreements, yes, but the

7    email that we sent to the Court was after the resolution of

8    some agreement, so there's some -- still some open issues

9    there which we can go into with the Court if you're ready.

10             THE COURT:  Okay, sure.  Go ahead.

11             MR. GRAVES:  So Mr. Stranahan actually mentioned

12   during his speech there at the end that the level of

13   specificity that Your Honor suggested was not something that

14   he had attained in the other discovery responses, and that's

15   the crux of our potential motion to compel with regard to the

16   Free Speech defendants.

17             So specifically, one example of that would be a

18   interrogatory where we asked for the process to ensure that

19   any assertions made by them concerning plaintiff were

20   factually accurate.  Their response says they rely on years of

21   news gathering, reporting, and broadcasting, but they ever go

22   into any type of description of what any process is, or even

23   if one exists.  So that's the -- that's the level of

24   specificity that we were seeking, and there are other issues

25   as well.  So specifically, the relevant time frame is another

1   example.  So the Free Speech defendants argue that only

2   documents between August 1, 2017, which was just ten days

3   before the rally, the Unite the Right rally, and March 12 --

4   between August 1 of 2017 and March 12, 2018, are relevant to

5   this litigation, and, therefore, they refuse to search for our

6   produce documents outside of that time period.

7          Plaintiff's issue with that is that we are aware of

8   the fact that some of the Infowars defendants have made public

9   statements and postings about the plaintiff after March 12,

10  2000 -- 2017.  I'm sorry, after March 12, 2018.

11         We also believe that statements made prior to ten

12  days before the rally are relevant because they would show

13  prior similar practices, ill will, various other things that

14  are relevant to the actual malice inquiry, which is part of

15  the plaintiff's burden in this case.

16         So that's one element of issue, or I guess two

17  issues there.  And I'm not sure, Your Honor, if you want me to

18  stop there or if you just want me to run through the full

19  list?

20         THE COURT:  Well, why don't -- why don't we hear

21  from the Free Speech defendant on those items.

22         MS. SCULLY:  Thank you, Your Honor.  Elizabeth

23  Scully speaking on behalf of the Free Speech defendants.  I'd

24  like to start first with the time frame issue.

25         For the Free Speech defendants in this case, it

1    concerns two publications.  One that was published on August

2    15, 2017, and a second that was published on August 21, 2017,

3    addressing issues that arose during the Charlottesville

4    protest on August 12, 2017.

5         The starting of the time frame of August 1, 2017,

6    was, in fact, a time period that was included within the

7    plaintiff's discovery request to us with respect to what is a

8    reasonable period of time.  They had used August 1, 2017, and

9    then they were going through present day.

10        We thought that the -- starting with August 1, 2017,

11   was appropriate.  It is two weeks before the protest arose

12   and -- and is before the plaintiffs published their

13   publication.  We have represented to the plaintiff's counsel

14   that the defendants never heard of, didn't know, knew nothing

15   of Mr. Gilmore before Mr. Gilmore posted his Tweets about his

16   attendance at the Charlottesville protest and went on to

17   various national media news sources and spoke.  And we also

18   indicated we were more than willing to have that as a verified

19   statement from the defendants and not just a representation

20   from the plaintiff's counsel themselves.

21        But so we -- we don't see how looking for

22   information prior to August 1, 2017, is going to lead to the

23   discovery of relevant evidence with respect to any party's

24   claim or defense when the claim or defense here is dealing

25   with defamation for these two publications that happened on

1   those two dates in August and what the parties' relative
2   subjective mindset was at the time of publication.
3          Which then brings us to what is relevant and when do
4   you cut off the time frame.  We believe that it was
5   appropriate to provide the plaintiff with discovery of
6   information post publication, but being mindful of the
7   proportionality requirements within the discovery rules that
8   providing them with any statements that arose, you know, for a
9   seven-month period post publication was a reasonable position
10  and was something that balanced both the issue of is the
11  discovery relevant and is the discovery proportional to the
12  needs of the case.
13         The plaintiffs, however, are seeking to discover
14  information leading up to today, you know, almost three years
15  from the date of the initial publications at issue.  And while
16  we don't dispute that some post publication statements may
17  have some bearing on the state of mind of Alex Jones and
18  Ms. McAdoo at time of publication related to the element of
19  actual malice, the probative value of such evidence
20  significantly diminishes over time and becomes outweighed by
21  the proportionality standards to be applied under the Federal
22  Rules.
23         And so for those reasons we -- through our meet and
24  confers we have remained on our position that we believe going
25  up to March of 2018 is -- is appropriate and continuing

1  thereafter post suit is not appropriate in this case.

2          THE COURT:  All right.  And how -- how did you

3  settle on the March 12, 20 --

4          MS. SCULLY:  We just used the it's the day before

5  suit.

6          THE COURT:  Okay.

7          MS. SCULLY:  We went up to right until the suit

8  being filed.

9          THE COURT:  Okay.  Mr. Graves, why -- why would

10 statements before August 1, why would those be relevant?

11 Especially if defendants are, you know, willing to provide a

12 statement indicating that they -- you know, that they

13 didn't -- didn't know Mr. Gilmore hadn't made any statements

14 about -- specifically about him before -- before August 2017?

15         MR. GRAVES:  Because it's relevant for actual

16 malice.  Specifically, and I'll quote from *Eramo v. Rolling*

17 *Stone,* which is a case in the Western District of Virginia

18 where the Court declined to grant summary judgement in favor

19 of defendants as to actual malice despite the fact that

20 plaintiff had uncovered circumstantial evidence through

21 discovery.  The Court said that, "Although failure to

22 adequately investigate, a departure from journalistic

23 standards, or ill will or intent to injure will not singularly

24 provide evidence of actual malice, the court believes that

25 proof of all three is sufficient to create a genuine issue of

1    material fact."

2            What we're looking for with regards to material

3    prior to August 1, 2017, is what their past behavior has been

4    like, specifically when it comes to -- and it may be

5    circumstantial, as *Eramo* has noted.  But it would show whether

6    or not they had previously departed from journalistic

7    standards, whether or not they had ill will towards the

8    specific movement, which took place at the Unite the Right

9    rally, meaning the movement to remove confederate statues.

10           All these different things are -- will be

11   illuminating to get insight into the mindset of the defendants

12   because we may not have -- you know, as this Court knows, you

13   can't read someone's mind if you can't examine what their past

14   behavior or future behavior has been, been like.

15           Specifically, again, I'll mention the Court and the

16   Fourth Circuit specifically recognizes the Doctrine of

17   Chances.  There's a case called *Westfield Insurance Company*

18   where the Fourth Circuit said that the doctrine posits that

19   the more often an accidental or infrequent incident occurs the

20   more likely it is that a subsequent reoccurrence is not

21   accidental or fortuitous.

22           So all of these different points go into us being

23   able to, one, prove actual malice.  And two, if we get

24   evidence of actual malice, making it admissible at court

25   because I know Ms. Scully will likely object on 404 grounds.

1      All these different -- having evidence of what their

2   past conduct was and what their prior statements may have been

3   would help us inform that argument and be able to respond to

4   that potential objection should we get to trial.  So that's

5   why it's relevant.

6            THE COURT:  All right.

7            MS. SCULLY:  Your Honor, may I be heard on that

8   point?  Because we're sort of getting into another area of --

9   of disagreement here, but it overlaps on these points that

10  Mr. Graves was just raising.

11           THE COURT:  Yeah, let me -- Ms. Scully, before --

12  before you address that, I certainly will let you --

13           MS. SCULLY:  Okay.

14           THE COURT:  -- Mr. Graves, what's the -- what's the

15  bookend, though?  I mean, how far -- how far are you proposing

16  and...

17           MR. GRAVES:  So I will have to pull up our letter.

18  I believe that we asked for -- I'm trying to find the specific

19  request.  While I'm looking for that, I know I submitted a

20  request to Ms. Scully with what we thought would be the

21  appropriate time frame.

22           But I guess the bookend on that, we would say

23  through -- the reason why we said through present with regards

24  to stuff going after the event is because we know that the

25  defendants have made comments recently, at least after the

1    time frame that Ms. Scully identified relating to this

2    rally.

3              With regards to prior to this, I would say at least

4    a year before the unite the rally -- Unite the Right rally

5    would give insight into this question.  I also -- and this was

6    maybe what Ms. Scully was getting at with her last comment.

7    We've also requested discovery relating to prior defamation

8    actions against the Free Speech defendants and Mr. Jones for

9    this same purpose.  Again, we need to -- we believe that it

10   will be important to establish absence of mistake should that

11   be raised as a defense at trial.  And so having ideas as to

12   the prior defamation cases would provide that insight.  Such

13   that similar to that *Westfield* case that I just cited from the

14   Fourth Circuit, it would show that this behavior is

15   consistent, and, therefore, not accidental.

16             So it's hard to me to say what that time frame is,

17   but I can say that at least with regards to this specific

18   question of the Unite the Right rally, at least a year before

19   the rally, although we are seeking discovery into prior

20   defamation cases involving the Free Speech defendants.

21             THE COURT:  Okay.  All right.  Ms. Scully, what did

22   you want to say?

23             MS. SCULLY:  Yes, Your Honor.  Focusing first on

24   this -- on this issue about circumstantial evidence and the

25   arguments about seeking evidence from other defamation

1    actions, Mr. Graves have -- well, the plaintiffs have issued

2    discovery requests asking the defendants to produce all

3    documents from any litigation involving a charge of libel or

4    defamation in which the defendants were named as a defendant

5    during the past ten years.

6          We have objected to producing those documents for

7    numerous reasons, including relevance.  The Fourth Circuit, to

8    be clear, has never ruled that 404(b) allows evidence of prior

9    unrelated acts to prove actual malice in a defamation case.

10   When you're looking at the test for actual malice in a

11   defamation case, you are looking at a test of the objective

12   mindset of the individual at the time of publication.

13         Case that Mr. Graves is referring to, the *Eramo v.*

14   *Rolling Stones* case, we do not believe supports the argument

15   that plaintiff is making.  While the Court did say in that

16   case that you could look at circumstantial evidence of a

17   preconceived storyline for the particular story that was at

18   issue, that that might be relevant and provide some

19   information in support of the actual malice position, that is

20   not and is wholly different from what Mr. Graves is trying to

21   do here.

22         Mr. Graves is looking and asking for the plaintiffs

23   to turn over all documents from any time that the defendants

24   have been charged with defamation or libel in other cases,

25   cases in which the -- Mr. Gilmore is not involved, that don't

1   involve anything along the storyline of the Charlottesville

2   protest.  They are wholly unrelated incidents; totally

3   different stories; totally different parties.  So to say that

4   because you were sued previously that means you may have --

5   that could support our actual malice element and proof of

6   actual malice in this case is -- is just not supported by the

7   Fourth Circuit case law, and we do object to plaintiffs

8   undergoing into a fishing expedition where we just would be

9   trying cases within cases having to defend ongoing litigations

10  that are going on in other matters that have nothing to do

11  with Mr. Gilmore.  So that I just don't see as appropriate

12  under the rules of discovery and the Fourth Circuit case law.

13          With respect to their searching for information a

14  year before this action that relates to something other than

15  the other defamation actions, actually, at this point I'm a

16  little unclear as to which document requests and

17  interrogatories he is specifically referring to where they are

18  looking to go more than a year before the August 1, 2017, time

19  frame that was included in -- within their actual discovery

20  requests themselves.

21          So for the reasons I've already stated, however, I

22  don't see how that is -- fits within the scope of relevance

23  under the Federal Rules given the fact that the plaintiffs --

24  given the fact that the defendants did not know of Mr. Gilmore

25  prior to the rally occurring and the things that Mr. Gilmore

Gilmore v. Jones, et al. - 3:18CV00017          42

1    published himself.

2            THE COURT:  All right.  Mr. Graves, anything else

3    you want to say on this issue?

4            MR. GRAVES:  Well, I -- I think maybe it's -- our

5    interpretation of case law is different, as I think everyone

6    would expect, and so maybe this shows that this should be

7    briefed.

8            But I will say just in short that I think the prior

9    defamation discovery is relevant to the understanding of

10   journalistic standards as well as their experience in news

11   reporting, which they often cite as being the basis for how

12   they were able to rely on certain sources and their knowledge

13   of whether or not they were able to verify these sources as

14   being fair.

15           So I do think that this may be something that would

16   be best briefed, as it seems like, based on what Ms. Scully

17   has just stated, we have a different view on the case law that

18   exists on this question.

19           THE COURT:  I think so, too.  I think that would

20   help me in addressing the issue.  So why don't -- as to the

21   time frame of the responses and then also information about --

22   about other -- other actions for libel, defamation, I think it

23   would be helpful to have some briefing on that.

24           Mr. Graves, do you think that you could file a brief

25   within -- within seven days or do you think you need a longer

1    period?

2          MR. GRAVES:  I think -- well, I think seven days may

3    be a little short for us.  I would request two weeks just

4    because I think that with Ms. Scully -- or with the Free

5    Speech defendants.  I keep saying Ms. Scully.  With the Free

6    Speech defendants we don't have the same procedural issues

7    that we do with Mr. Walker and Mr. Stranahan.  These are a lot

8    more complex and substantive, so I think two weeks would be

9    appropriate for us to fully brief all the issues, assuming

10   that you would like all the issues to be resolved via motion.

11         THE COURT:  Ms. -- all right.  I think we'll just do

12   the normal briefing schedule then of 14 days to file a motion,

13   Ms. Scully 14 days to respond, and then a seven-day period for

14   a reply.  And if you all would like a further hearing, just

15   contact Ms. Dotson and let her know.  Otherwise -- otherwise

16   I'll address motion on the papers.

17         I know there were a couple other topics, Mr. Graves,

18   that you've identified.  Do you want to go over those today

19   or -- to see if we can try and resolve them, or do you think

20   that they are similarly going to -- going to require briefing?

21         MR. GRAVES:  I think they are similarly going to

22   require briefing --

23         THE COURT:  All right.

24         THE COURT:  -- unless Ms. Scully disagrees.

25         MS. SCULLY:  I'm fine with dealing with briefing at

 1   this point.

 2            THE COURT:  Okay.  Well, let's just -- let's just do

 3   that.  I do think -- I do think these issues would require it,

 4   so...

 5            All right.

 6            MS. SCULLY:  May I ask -- sorry.  Go ahead, Your

 7   Honor.

 8            THE COURT:  No, I was just going to bring us to

 9   conclusion.  So Ms. Scully, what else?

10            MS. SCULLY:  I do have a question, Your Honor.

11            Yes, so we have been engaged in a meet-and-confer

12   process with the plaintiff's counsel with respect to

13   plaintiff's discovery responses.  That process has not yet

14   concluded.  That's why we have not asked that it be

15   substantively addressed on this call.  But I would like to

16   clarify your preferred process as we move forward in

17   anticipation that there are some issues, just given our

18   conversations to date, that I think we may -- we may just be

19   at a loggerhead with respect to the plaintiff's view on the

20   law and the defendants' interpretation of the law on these

21   points.

22            So when those -- when we think we have thoroughly

23   exhausted that meet-and-confer process, is your preference

24   that we do first reach out to -- to Your Honor to ask for a

25   conference call.  Or if both parties agree that it's something

1    that needs to be briefed, do you prefer to just have us submit

2    the motion to compel?  I just would like to act consistently

3    with your preferred process on this.

4              THE COURT:  Yeah, I would like you-all to reach out

5    through Ms. -- through Ms. Dotson --

6              MS. SCULLY:  Okay.

7              THE COURT:  -- to set up a conference call and we'll

8    see if we can resolve --

9              MS. SCULLY:  Sure.

10             THE COURT:  -- some of the issues.  I think

11   that's -- I think that's the way to go.

12             MS. SCULLY:  Okay.  Well, I appreciate that, and we

13   will do that after that process plays out.

14             THE COURT:  Okay.  All right.  Mr. Graves, is there

15   anything else that you think we need to address?

16             MR. GRAVES:  No.  The only thing -- I guess I

17   mentioned this earlier -- would be timing.  It seems like with

18   21 days for Mr. Stranahan to respond, similarly for

19   Mr. Walker, that our August 1 discovery deadline is untenable.

20   So I would request with the Court that all parties be

21   permitted to meet and confer regarding scheduling and then

22   we'll provide the Court with a new schedule.

23             MS. SCULLY:  And had -- I'm sorry, but Anwar -- this

24   is Elizabeth.  I thought we had already previously submitted a

25   request to extend that when the trial date was moved, did we

```
 1    not, or am I not remembering that information correctly?
 2              MR. GRAVES:  No order has been issued by the Court,
 3    I don't believe.
 4              MS. SCULLY:  Hasn't been issued, you're correct.
 5              MR. GRAVES:  And so I know that -- so but the order
 6    that I have in front of me has deadline to complete fact
 7    discovery on August 31.  Nevertheless, I think with it being
 8    21 days from now for --
 9              MS. SCULLY:  Yes.
10              MR. GRAVES:  -- production of certain materials,
11    that regardless what the deadline is probably now needs to be
12    re-contemplated.  So with permission of the Court, I would
13    request that the parties confer to figure out some new
14    dates.
15              MS. SCULLY:  And I would agree with that request,
16    Anwar, on behalf of my clients.
17              MR. WALKER:  And I would agree as well.
18              MR. STRANAHAN:  This is Mr. Stranahan.  I agree as
19    well.
20              THE COURT:  Okay.  I think that makes sense for
21    you-all to confer, and I'm certainly happy to consider
22    whatever -- whatever you-all can agree to and propose, all
23    right?
24              MS. SCULLY:  Thank you, Your Honor.
25              THE COURT:  Okay.  Well, thank you-all.  Mr. Walker,
```

```
 1   anything else from you?
 2              MR. WALKER:  No.  No, Your Honor.  I was just saying
 3   that I agreed with that.
 4              THE COURT:  All right.  Mr. Stranahan, anything
 5   else?
 6              MR. STRANAHAN:  No, Your Honor.  I should talk to
 7   Ms. Dotson about today a conference with you.
 8              THE COURT:  Okay, and I -- I'll tell you that I
 9   can't do just an ex parte conference with you about your
10   counsel situation, so I want you to understand that.
11              MR. STRANAHAN:  Yes.  That's why I was asking, Your
12   Honor.  If you can't do that, understood.  Thank you.
13              THE COURT:  Yeah.  I mean, if there's something that
14   you want me to consider, you're always welcome to, you know,
15   put it in a motion, and, you know, we can take it up in a
16   hearing if that's warranted, okay?
17              MR. STRANAHAN:  Okay.  And that motion could be just
18   an affidavit, Your Honor?
19              THE COURT:  Well, you have to -- you would have to
20   ask for some relief in the motion.  You know, tell me what
21   you're asking for and what you want if there's some -- you
22   know, if there's --
23              MR. STRANAHAN:  Okay, understood.
24              THE COURT:  -- something that you want to submit you
25   can always put that in an affidavit if you want.
```

1          MR. STRANAHAN:  Okay, very good.  Thank you, Your

2     Honor.

3          THE COURT:  Okay.  All right.  Well, thank you-all

4     for calling in, and take care.

5          (The proceedings concluded at 2:11 p.m.)

6                          **CERTIFICATE**

7          I, Mary J. Butenschoen, do hereby certify that the
      foregoing is a correct transcript of the teleconference
8     recording in the above-entitled matter.

9          _____/s/_____7/29/2020
               Mary J. Butenschoen, Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25