# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIACHARLOTTESVILLE DIVISION

| | |
|---|---|
| BRENNAN M. GILMORE,<br><br>    Plaintiff,<br><br>v.<br><br>ALEXANDER E. (ALEX) JONES, et al.,<br><br>    Defendants. | No. 3:18-cv-00017-NKM-JCH |

## DEFENDANT JAMES HOFT'S OPPOSITION TO THIRD PARTIES CITY OF CHARLOTTESVILLE AND ALFRED THOMAS' JOINT MOTION TO QUASH

*"Sauce for the goose is sauce for the gander"*

-Western Proverb.

## I.  INTRODUCTION

Jim Hoft did not voluntarily join this litigation: he was compelled by force, on the basis of allegations leveled by Mr. Gilmore. Hoft and the other Defendants filed Motions to Dismiss, but these were denied. Hoft's primary means of defending himself in this *defamation* action – for which truth is an **absolute defense**, and material falsity is Plaintiff's burden – is to deliver evidence of the truthfulness of his own statements, and to refute the allegations made by Gilmore. Hoft's subpoenas to the City of Charlottesville (City) and former Chief Alfred Thomas (Mr. Thomas)[1] (collectively, Movants), are only as narrow or as broad as the allegations in the First Amended Complaint (FAC). As a matter of due process and the First Amendment, to defend himself, Hoft is entitled to investigate those allegations.

Both the City and Mr. Thomas have evidence relevant to this case. To date, neither have produced documents, arguing Hoft requests irrelevant materials (they **are** relevant), seeks privileged materials (he does not), or that the requests are unduly burdensome (they are not). Accordingly, the Court should deny Movants' Joint Motion to Quash (Motion), order Movants to produce themselves for deposition with 14 days, order them to produce all documents they have already produced in response to every subpoena served upon them by the *Sines* plaintiffs (3:17-cv-00072) within ten days, and order them to produce all documents responsive to the subpoena within ten days.

---

[1] Mr. Thomas has not been employed by the City since 2019. Although he resigned in 2017, terms of his severance continued into 2019.

2

# CHARLOTTESVILLE'S INVESTIGATION
# OF THE UNITE THE RIGHT RALLY

On or about August 25, 2017, the City hired Timothy Heaphy, a former US Attorney and partner at Hunton & Williams, LLP (Hunton)[2] to conduct an investigation into the all aspects of the UTR, including but not limited to the failures of government at all levels in protecting the public.  *See* notes 3 and 12, *infra*.  The City voted for an independent, **external** review of its "preparations for and responses to [the various events] and will extend beyond the Charlottesville Police Department."[3]  Heaphy and Hunton were provided with **unlimited** access to the City's documents, communications, records, and other materials relating to the UTR.[4]  Indeed, Hunton ESI/data management subsidiary <u>Cognicion</u> boasted that it created a curated library of "more than a half million documents":

> That large volume of material was received and made usable by the team of litigation support professionals at Cognicion LLC. They traveled to Charlottesville and worked with IT and other City staff to create an efficient system of document production and review.

---

[2] Subsequently, Hunton & Williams, LLP merged and rebranded as Hunton, Andrews, Kurth, LLP.

[3] See, *Charlottesville Hires Former US Attorney to Review City's Response to White Nationalist Rallies,* Daily Progress, August 25, 2017, (https://richmond.com/news/virginia/charlottesville-hires-former-u-s-attorney-to-review-city-s/article_138c439b-e68b-5971-a798-412affead241.html) (last accessed May 17, 2021.

[4] *See* **Exhibit 1**, Timothy Heaphy, et al, *Final Report: Independent Review of the 2017 Protest Events in Charlottesville, Virginia*, Hunton & Williams, LLP (hereafter, Heaphy Report), p. 10. (Emphasis added).

> **We began our review by obtaining all relevant information from our client, the City of Charlottesville. We made a specific request for access to all documents that touched upon the summer protest events. We asked for all communications regarding those events, including e-mails and text messages. We requested any documents prepared before or after the events, including briefings, presentations, drafts, and final versions. We coordinated with the City's Department of Information Technology to directly obtain e-mails and electronically stored information for sixty-two City custodians**. In obtaining these documents, we followed best practices in electronic document collection and maintained an appropriate chain of custody.
>
> **The City Attorney's office also established a process through which City employees, including the Charlottesville Police Department, could provide us with information. First, the City Attorney directed that all City employees preserve all relevant information. <u>The City Attorney's office then created a process through which employees could upload documents for our review. This process resulted in the production of voluminous documents from City employees.</u>** Hunton & Williams lawyers reviewed all documents and isolated particularly significant documents for internal and external discussion.

3

> Their work was timely and ensured our access to important information … In light of the public-service focus of this matter, Cognicion agreed to provide their services to the City of Charlottesville at no charge, saving the City tens of thousands of dollars.[5]

In his report, Heaphy went into great detail about the breadth of materials collected from Charlottesville and the public. For example, he explained how he amassed 2,000 still images and over 300 hours of video footage.[6] "The value of these images is tremendous. We were able to actually view these events from numerous perspectives via the social media feeds and images available on the internet. Rather than relying on witnesses' memories and second-hand reports, we were able to see for ourselves what actually happened as these large demonstrations unfolded." The purpose of this production was to enable Heaphy to scrutinize, for the benefit of public transparency and accountability, the City's planning, management and conduct surrounding the UTR. *See* note 10, *infra*.

*Additionally*, Heaphy and his team were able to review audio and video recordings from law enforcement sources:

> We were able to view footage from several cameras mounted in Justice and Emancipation Parks during the protest events as well as the footage recorded by CPD officers' body cameras. We also obtained footage taken by cameras mounted to Virginia State Police helicopters during both events. These videos were the same images available to law enforcement leaders in the command centers during the events. The cameras were specifically focused by officers in the command centers or in the helicopter in response to particular events on the ground. We also obtained more than seventy hours of radio communications of Charlottesville Police Department from July 8 and August 12. We were able to synch the radio communications to the video images, creating a real time account of the tactical decisions made by police agencies during the events.[7]

---

[5] *Id. at*, p. xi.
[6] *See* **Exhibit 1**, Heaphy Report, at p. 11.
[7] *Id*.

However, Heaphy was blunt about Chief Al Thomas' extensive attempts at obstructing and disrupting his investigation, including destruction of evidence, manipulation of staff, misdirection, and fabrication of evidence.[8]

---

[8] *Id.*, at p. 12-14 (emphasis added):

> The approach to our review within the Charlottesville Police Department evolved over time. **Chief Al Thomas initially attempted to sequence our review by limiting our access to information about various topics**. He directed subordinates to provide us only with information regarding the planning for the protest events, not the events themselves. He later admitted to us in an interview that his goal in this process was to educate our review team in a methodical process which he controlled. **He told officers that he wanted to first convince us that the planning for the protest events was thorough and considered all contingencies before going into the unexpected turns during the events themselves.** Pursuant to the Chief's strategy of controlling the flow of information to our review team, we had several interviews with officers in which they refused to discuss certain topics. We objected to those limitations, after which they were removed by the Chief. Nonetheless, we had to schedule multiple interviews with several lieutenants and other key personnel. The initial limitation made those interviews less productive and unduly lengthened and complicated our review process.
>
> **In our interviews with CPD personnel, we learned that Chief Thomas and other CPD command staff deleted text messages that were relevant to our review. Chief Thomas also used a personal e-mail account to conduct some CPD business, then falsely denied using personal e-mail in response to a specific FOIA request. Chief Thomas and the commanders with whom we spoke denied any effort to hide information from our review team. Conversely, they indicated that we received everything in the Department's possession that bears upon the issues at stake in our evaluation.**
>
> In addition to limiting our initial access to all relevant information, Chief Thomas directed the creation of various documents that outlined CPD's preparation for these events. For example, Chief Thomas asked his captains to create a "checklist" to document CPD's preparation for each event. In response to the Chief's direction, Captain David Shifflett located a Department of Justice Document entitled "Checklist for the Preparation of Mass Unrest Events." This document is essentially a planning guide, designed to be used in advance of large demonstrations. Captain Shifflett asked the Chief's executive assistant to convert this checklist to a format in which it could be edited. She did so, and sent the template to Captain Shifflett for his use in creating a checklist for the July 8 event. Captain Shifflett then went through the various items in the checklist and "checked" each task that had been performed. He then sent the completed document to the Chief's assistant, who affixed a CPD logo to the front of the document and created a finished checklist for delivery to our independent review team.
>
> When the July 8 checklist was uploaded to the system created for production of documents to our review team, **Deputy City Attorney Lisa Robertson** noticed that it was undated. Ms. Robertson then directed that the checklist and other documents created for our review be dated to reflect the time of their creation and contain a footer that makes clear the document was created for Hunton & Williams for the purpose of the firm's provision of legal services to the City of Charlottesville. Captain Shifflett then complied with that request and produced a finished checklist with the footer included.
>
> **Chief Thomas and Captain Shifflett both denied any intent to "back-date" the checklist or any other document. They indicated that the checklist was created as a mechanism to catalogue the preparation that informed the Department's approach to the July 8 event. Chief Thomas acknowledged that the document was designed to be used in advance of these events, though he denied any intention to suggest it had been used in advance of these events.**

Heaphy and Hunton eventually released a report on their findings on November 24, 2017.[9] The "goal in preparing [the] report," Heaphy stated in the preface, "[was] to enhance our community's ability to understand and learn from the difficult events of 2017. … We hope that an honest pursuit of the issues identified in this report leads to more informed discussion, increased understanding, and a more unified Charlottesville." [10] "To construct the narrative contained in this report, we spoke to hundreds of people and gathered a wide array of perspectives about these events. We reviewed **hundreds of thousands of documents** that provide important information. We viewed many hours of video and thousands of photographs, which have allowed us to re-experience those difficult days. **We sifted through and consolidated all of this information** to produce a cogent summary of what happened in Charlottesville during the turbulent summer of 2017."[11]

Among other findings, Heaphy concluded that Chief Alfred Thomas utterly failed to properly prepare or lead the Charlottesville Police leading up to and during the event, and this left enormous safety gaps for UTR participants, counter-protesters, and everyone else present.[12]  For example, Heaphy noted that multiple officers gave statements that Thomas gave an order not to break up violence in order to create an excuse to declare an unlawful assembly and prematurely

---

In addition, Chief Thomas attempted to gather information from CPD personnel about the substance and tenor of our interviews. He questioned his assistant and members of the command staff after interviews occurred, asking about what areas were covered. His attempts to follow our interviews resulted in the City Manager directing all CPD employees to refrain from discussing the substance of our interviews with others.

**Chief Thomas's attempts to influence our review illustrate a deeper issue within CPD—a fear of retribution for criticism**. Many officers with whom we spoke expressed concern that their truthful provision of critical information about the protest events would result in retaliation from Chief Thomas. They described a culture of conformity within the Department that discourages officers from raising issues and providing feedback. These officers suggested that this hierarchical approach hampered the planning for the July 8 and August 12 events, as lieutenants, sergeants, and line officers were not sufficiently consulted or asked to provide input.

[9] *Id., at* p. x.
[10] *Id.* pgs., ix-x.
[11] *Id.*
[12] Id., at p. 153-166.

shut down the rally.[13]  Shortly after the Heaphy Report issued, Thomas resigned.  *See* note 26, *infra*.

Interestingly, Heaphy offered little analysis of the James Fields car crash, except to refer to it throughout the report as a "car attack," and consistently imply Fields was a murderer through the use of conclusory statements.[14]  The report mentioned nothing about any events immediately prior to or after the attack, such as "counter-protesters" attacking Fields' car immediately before and after the crash and smashing its windows, though the report does acknowledge that approximately 400-500 "counter-protesters" swarmed the intersection of 4th and Water immediately **prior** to the crash.[15]  This is odd and imbalanced.  Presumably, given the centrality of the "car attack," Heaphy would have interviewed one of the lead detectives investigating that case, Detective Steve Young.  Less than a month after the report's release, Young testified in Fields' criminal case, that video footage showed Fields' car was violently attached immediately *before* and after the crash.  *See* **Exhibit 2**, at p. 38-44.

## GILMORE'S ALLEGATIONS

In his *ninety-nine* page FAC, in which he incorporates **all** of his allegations into a collective defamation Count I against all Defendants, Gilmore makes an astonishing number of allegations. Gilmore alleges Hoft and the other Defendants conspired to propagandize and publish a conspiracy theory about Gilmore and the events surrounding the Unite the Right Rally (UTR).  In this alleged theory, *inter alia*, Gilmore was a highly connected government official and political operator who

---

[13] *Id*., at p. 133 ("Let them fight, it will make it easier to declare an unlawful assembly").

[14] *See, for e.g., id*., at p. 162 ("The sawhorse barricade blocking 4th Street was moved by unknown persons, and several vehicles were able to travel southbound across the Downtown Mall. James Fields **exploited** this vulnerability when he drove his Dodge Challenger southbound along 4th Street into a crowd of counter-protesters, causing the death of Heather Heyer") (emphasis added).

[15] *Id*., at p. 145.

7

participated in a widespread effort, by **governmental** agencies, at all levels, in coordination with numerous non-governmental organizations, to either instigate violence at the UTR (including but not limited to James Fields' car crash and other assaults), and/or manipulate and skew the media's coverage of the events. *See, for e.g.*, FAC, at pars. 63-70. Every page of Mr. Gilmore's FAC contains either a direct allegation that he is not a member of a government conspiracy, or a factual allegation which implies that he is not. For the Court's benefit, Mr. Hoft compiled a non-exhaustive chart of these allegations by relevant category. See Figure 1, immediately below.

| Allegation Category | Page or Paragraph |
|---|---|
| There was no public-private conspiracy surrounding the UTR | Page 2; Par. 30, 31, 32, 33, 34, 35, 36, 38, 42, 43, 46, 47, 48, 49, 50, 58, 59, 60, 63, 64, 65, 66, 69, 70, 79, 80, 83, 84, 85, 91, 94, 101, 105, 109, 110, 120, 126, 129, 144, 145, 208, 214, 239 |
| Gilmore was not part of any public-private conspiracy surrounding the UTR | Page 2; Par. 27, 30, 31, 32, 33, 34, 35, 36, 38, 42, 43, 46, 47, 48, 49, 50, 58, 59, 60, 63, 64, 65, 66, 69, 70, 79, 80, 83, 84, 85, 91, 94, 101, 105, 109, 110, 120, 126, 129, 144, 145, 208, 214, 239 |
| Media involvement was purely organic and not staged, scripted, or message coordinated to skew coverage | Page 2; Par. 31, 32, 35, 36, 38, 42, 43, 46, 47, 48, 49, 50, 58, 59, 60, 63, 64, 65, 66, 69, 70, 79, 80, 83, 84, 85, 91, 94, 101, 105, 126, 129, 144, 145 |
| Fields' car crash was deliberate **terrorism** | Page 1, 2, 62 (Tweet of Gilmore); Par. 29, 30, 31, 34, 38, 43, 49, 62, 120, 160 n. 74 |
| Gilmore's told the truth in his numerous interviews | Page 2, 3; Par. 31, 32, 34 |
| Defendants are propagandists, while facts as presented by Plaintiff are objectively true | Page 2, 3; Par. *Passim*. |
| UTR Pro-Lee consisted exclusively of bigots | 25, 26, 145, and implicit throughout. |
| Defendants are grotesque bigots | Page 2, 3; Par. *Passim*. |

Beyond his direct allegations against the defendants, he makes a number of factual allegations which provide a misleading context for all of the direct allegations. For example, he

8

alleges, in Manichean terms,[16] that the pro-Lee participants in the UTR were either violent, bigoted militants, bent on overwhelming the town or at least wholly intimidating its citizens, on the one hand, or generally peaceful anti-bigots and ordinary folk, on the other. *See, for e.g.*, FAC, Pages 1-3, and pars. 25, 26, 27, 28, 29, 31.  In fact, Gilmore alleges he was just an *ordinary man* attending a rally of public interest – and fame was *thrust* upon him owing to his sense of *civic duty* and by virtue of happenstance.  *Id*., at p. 3; par. 27.  Gilmore repeatedly states in his FAC that every statement he made to the media was absolutely true.  *Id*., at p. 2-3; par. 34, *passim*.  If those allegations are proven to be false or misleading, evidence of such may be admissible at trial to impeach his credibility, or directly refute the allegations in his Complaint.

Moreover, any allegations made by Gilmore in any interview referencing the UTR are directly relevant, such as the following:

> **I was filming actually a peaceful nonviolent march of anti-racist protesters who were coming up a very narrow street**. I was in the middle of the street myself filming them and her from behind me. The acceleration of a vehicle spun around and saw the vehicle in question, barreling down a very narrow street with no traffic on it **at a high rate of speed, clearly intent on doing damage and disruption** to the crowd passed over a barrier and went down the street and accelerated hard as barreled into the crowd sending bodies flying.
>
> ANCHOR:  Oh, God. Among the things you had publicly said yesterday, via Twitter and elsewhere. 'Let there be no confusion. This was deliberate terrorism.' You stand by that?
>
> Absolutely. And you know, I don't know if the authorities here have used the word terrorism yet there's a judicial process which will play out. **But it was clearly perpetrated by one of these racist Nazis who came to Charlottesville to spread their their their vile ideology. And he targeted this crowd very clearly. There's no**

---

[16] Notably, this Manichean juxtaposition is an omnipresent feature of every interview Gilmore has given on the topic.  *See, for e.g.*, MSNBC television interview with Brennan Gilmore, August 13, 2017, https://www.youtube.com/watch?v=GAgIkuGQeHs (last accessed May 15, 2021).

> **question of anyone who witnessed it, that his intent was to cause a mass casualty incident and it's a domestic terrorist incident as far as what I witnessed.[17]**

Gilmore claimed then and claims now in his FAC, that the "counter-protesters" at 4th and Water Street were peaceful, non-violent, anti-bigots, and that James Fields, one of a crowd **exclusively** composed of bigoted, violent lunatics, drove down 4th Street, *unprovoked*, and with the deliberate intention to commit a terroristic, "mass casualty incident."

Any evidence contradicting Gilmore's characterization is directly relevant to this suit. This would include any evidence that the protesters on 4th Street included contingents of violent ANTIFA, BLM and socialist militants, attacked Fields' car, threw canisters of urine at him, and broke the law in shutting down numerous major arteries all over Charlottesville –without a permit,[18] and without objection, let alone consequence from the police. It would also include evidence showing that James Fields **didn't** drive into the protesters at full speed, that he actually **did** apply his brake before approaching the crowd, that he plugged his home address *in Ohio* into his GPS minutes before the crash, that the crowd violently attacked his car before and after the crash, that he refused medical attention – instead asking that it be directed to those injured in the crowd, that the crowd thew urine on him, that he expressed extreme remorse to law enforcement four minutes after the crash,[19] that the pro-Lee protesters were not exclusively composed of bigots, and were a small group, outnumbered perhaps ten to one by "counter-protesters." In short, if *these* facts are true, then virtually everything Mr. Gilmore has stated about the UTR has been a lie, and his motivations are highly suspect.

---

[17] *Id*.
[18] The UTR organizers spent months litigating in federal court for the privilege of obtaining a lawful permit.
[19] Mr. Platania and the City of Charlottesville have bodycam footage which establish this. *See for e.g.*, **Exhibit 2**, hearing transcript (Dec. 14, 2017), *Commonwealth v. Fields*, 17-296, Charlottesville Circuit Court, cross examination of Detective Steve Young. p. 38-44.

Gilmore's "moral clarity" on the Fields' was not without effect. He was certainly not alone in casting Fields as a terrorist or demonizing the UTR event organizers and blaming them, solely, for every tragedy occurring on August 12th, but his voice was certainly one of the loudest[20] – odd for an "ordinary man" with only a few hundred Twitter followers at the time.[21]

Thanks to these portrayals, every soul in Charlottesville believed James Fields committed premeditated, "cold-blooded,"[22] neo-nazi-inspired, terroristic murder. This pre-judgment enveloped the entire city. Indeed, jurors in Fields' murder trial were forced to walk across *Heather Heyer Way* to enter the Court each day. And yet, we're told Fields received a fair trial. Notably, Fields' attorneys moved to change the venue, but Commonwealth Attorney Joseph Platania refused to consent, and Judge Moore demurred. *See Commonwealth v. Fields*, 17-296, Charlottesville Circuit Court, Order of Sept. 7, 2018. This mob fervor didn't develop in a vacuum. The public was whipped into a frenzy by political leaders and the media. Mr. Gilmore was a big part of this.

If evidence of coordination by public and/or private forces connected to Gilmore to, *inter alia*, impose a false or misleading narrative on the events surrounding UTR, or instigate violence, then not only is Gilmore proven to be wrong – possibly even a liar – but 20 year-old Fields' convictions in state and federal court and consecutive life sentences – plus *four hundred and nine* (409) years – were quite plainly influenced by something other than justice. If Hoft proves any of this, he wins.

---

[20] Out of the hundreds of people who shot video footage of critical minutes of events surrounding UTR, Gilmores' has been viewed more than six million times on Twitter, and this doesn't include the hundreds of times his interviews have been broadcast all over the country. These interviews have each been carefully stated "on-message." And this is precisely why defendants have refused to believe his involvement in the affair was pure chance.

[21] FAC, at 32.

[22] *See, for e.g.*, Facebook comments from former City Council Member (and mayoral candidate) Kristin Layng Szakos for a flavor of Charlottesville's social environment at the time. **Exhibit 4**, attached.

11

## II. LAW

A party to litigation also may serve on any non-party a subpoena to produce discoverable material in the non-party's possession, custody, or control. *Sines v. Kessler*, No.: 3:17-cv-00072 (Dkt. #765), at p. 2 (W.D. Va. June 12, 2020) (citations omitted). The scope of discovery from a non-party is the same as the scope of a discovery request made upon a party to the action, and a party is entitled to information that is relevant to a claim or defense in the matter at issue. *Id*. (citations and quotations omitted). The party or person resisting discovery bears the burden to show it should not be allowed. *Id*., at p. 3 (citations omitted). Specifically, the parties claiming privilege bear the burden of demonstrating the applicability of the privilege to *specific documents*. *Id*., at p. 5 (citations omitted). The proponents must *establish the particular communications at issue* are privileged and that the privilege was not waived.[23] *Id*., at p. 6. Conclusory assertions of privilege are not proper objections under Rule 45(e)(2)(A)(ii). *Id*. (citations omitted). "They certainly do not justify the decision to withhold responsive documents that are neither privileged attorney-client communications, nor protected trial preparation materials." *Id*. (citations omitted). "Rule 45(d)(3) provides no basis for relief where, as here, the subpoena does not require disclosure of privileged matters or work-product materials. *Id*., at p. 6-7 (citations and quotations omitted) (subpoenas at issue explicitly instructed objecting counsel *not to produce* documents protected by attorney-client privilege or the work-product doctrine).

---

[23] This Court cited to *U.S. v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982), which observed:

> Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege. Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter. *In re Sealed Case,* 676 F.2d 793, 808-09 (D.C.Cir.1982).

See also *United States v. Nobles*, 422 U.S. 225, 239 (1975) ("The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived").

### III. ARGUMENT

#### A. HOFT'S REQUESTS ARE RELEVANT.

Truth is an <u>absolute</u> defense to a claim of defamation. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986). Not only this: in defamation actions, plaintiff bears the burden of proving material falsity. *Id*. This case has arrested Hoft from the peace of his private life, and has placed his material well-being in jeopardy – all because of an opinion piece he published on his blog. As the guarantors of Hoft's First Amendment rights, the Constitution and this Court are obliged to secure Hoft's ability to investigate Gilmore's claims against him. The factual allegations in play – i.e., *inter alia*, whether or not Mr. Gilmore engaged in a public-private conspiracy aimed at either instigating violence in Charlottesville, a "cover up," or misleading the public, are central and *material* facts to Gilmore's causes of action, and Hoft's defenses thereto. This would also include whether the City and/or Thomas encouraged violent conflict at the UTR to obtain an excuse to end the rally prematurely.[24] And it would further include whether all efforts by Thomas to destroy evidence, fabricate evidence, and lie to investigators. Mr. Hoft has a Fifth and Fourteenth Amendment right to due process. He also has a First Amendment right to express himself. Because of this, he has a right to fully investigate the claims that *haled him into this Court*.

As truth is an absolute defense, Hoft is not limited to uncovering evidence of information available to him at the time of publication, though such information may or may not be relevant to an evaluation of malice. On the contrary, conduct and events occurring prior or subsequent to the Unite the Right Rally may refute Gilmore's allegations against Hoft. *Cf., Gilmore v. Jones*, No.

---

[24] Besides the City's illegal and unconstitutional refusal to provide a permit to the UTR organizers, the City made numerous efforts to prevent the rally, discourage the rally through public relations, and discourage attendance through initiate alternate events. See Exhibit 1, at 46-47.

13

3:18-cv-00017, 2021 WL 68684, at *6 (W.D. Va. Jan. 8, 2021) ("evidence that the publisher had not yet obtained at the time of publication … may be probative of actual malice").

Gilmore's allegations put the issue of a public-private conspiracy surrounding the UTR to manipulate events or the public's perception of events, squarely in play. Hoft didn't ask to be forced into investigating these topics – *he filed a motion to dismiss*. To defend himself, he is now obliged to investigate. The subject matter being entirely relevant, Movants' Motion should be denied, and Movants should be ordered to produce responsive records within ten days. Movants should further be ordered to produce themselves for deposition within 14 days. *Finally*, the Court should Order Movants to provide Hoft with a privilege log in accordance with the instructions provided by Hoft in Subpoena Schedule A, page 8. *See* **Exhibit 3**, attached.

**B.   HOFT NEVER SOUGHT PRIVILEGED MATERIALS; HE ASKED FOR A PRIVILEGE LOG.**

Hoft clearly tried to avoid a battle over privileged materials. In Schedule A to the subpoena, after the definitions, but before the requests, are a series of instructions directing Movants to produce a *privilege log* for all materials he deemed privileged. In lieu of producing responsive materials, along with a privilege log, Movants have elected to produce no documents. Movants' protestations of privilege are completely mooted by Hoft's explicit injunction against producing privileged materials. Any concerns about privilege can be resolved either by specific identification in a privilege log, or Protective Order designation. *See* Dkt. #194 (Stipulation and Protective Order), and Dkt. #196 (adopting Protective Order); *cf. Sines v. Kessler,* No.: 3:17-cv-00072 (Dkt. #765), at p. 7 (W.D. Va. June 12, 2020) ("Again neither Mr. Hill nor Ms. Lunsford identified **specific information** withheld under this Rule…Plaintiffs also point out that a lawyer can reveal such information to comply with law or a court order … and that Mr. Hill and Ms.

14

Lunsford may use the **Protective Order** in this case to designate materials that contain "confidential" or "highly confidential" information") (emphasis added).

For these reasons, this Court should deny Movants' Motion and order them to produce documents responsive to Hoft's requests within ten days. *Further*, the Court should Order Movants to provide Hoft with a privilege log in accordance with the instructions provided by Hoft in Subpoena Schedule A, page 8. *See* **Exhibit 3**, attached.

### C. CHARLOTTESVILLE HAS WAIVED ALL OBJECTIONS AND PRIVILEGES ASSOCIATED WITH MATERIALS IT PRODUCED TO THE *SINES* PLAINTIFFS.

Relatively recently, plaintiffs in a parallel lawsuit in this District (*Sines v. Kessler*, 3:17-cv-00072) requested a large number of documents from the City. *Sines*, Dkt. #672, p. 5 n. 1. There, unlike the present case, the City decided to comply with the plaintiffs' subpoena. *Id*. In fact, *Sines* plaintiffs have averred to this Court that the City "**produced documents and represented to Plaintiffs it has produced all of the responsive documents it still possesses.** The city's production, however, does not include all of the documents regarding Fields that were available to Hill and Lunsford. The City of Charlottesville designated the documents it produced as "highly confidential" under the Protective Order. To the extent Hill or Lunsford have any confidentiality concerns, they can also designate the documents with appropriate confidentiality designations under the Protective Order." *Id*. (Emphasis added). This Court found plaintiffs' arguments persuasive, and ordered Lunsford and Hill to produce records. *Sines*, Dkt. #765.

More importantly, this revelation exposes the weakness of the City's argument, as well as its bad faith *in failing to produce any records, or even a privilege log*. Instead, the City filed its instant Motion. The Motion fails to identify any specific privileged documents, and speaks in vague generalities.

The City has waived privilege of any kind for all of the documents and materials it produced to the *Sines* plaintiffs. Accordingly, this Court should deny the City's Motion and Order it to produce all responsive documents, less any privileged materials, within ten days. *Further*, the Court should Order the City to turn over *all materials produced to the Sines plaintiffs*, irrespective of any privilege which may have applied, pre-waiver, within ten days. The Court should Order Movants to produce themselves for deposition within 14 days. *Finally*, the Court should Order the City to provide Hoft with a privilege log in accordance with the instructions provided by Hoft in Subpoena Schedule A, page 8. *See* **Exhibit 3**, attached.

### D.   HOFT'S REQUESTS ARE NOT OVERLY BURDENSOME.

<u>Movants have already indexed and produced these same items previously for other litigation or for the external audit conducted by Timothy Heaphy</u>. *Sines,* Dkt. #672, at p. 5, n.1; *see also* notes 4 through 7, *supra*.

Movants claim Hoft's subpoena requests require the City to reinvent the wheel. As discussed at length above, the City, with enormous, *pro bono* assistance from Timothy Heaphy and Hunton, *have already culled through all and organized all of these documents and communications*. **The documents already reside in a <u>Cognicion</u> database, to which the City almost certainly retains remote access**.

The City argues it lacks personnel with any knowledge sufficient to produce any records. This is false. First, these records have already been produced, so the argument that the records are inaccessible is spurious. Second, Charlottesville is now served by a City Attorney who, as *Deputy City Attorney*, is highly knowledgeable about UTR, having written legal memos about the propriety, or lack thereof, of a permit denial.[25] Robertson also collaborated with Timothy Heaphy

---

[25] *See* **Exhibit 1**, p. 184, ("July 14, 2017 – Deputy City Attorney Lisa Robertson delivers memorandum setting forth legal standards for denying or modifying permit application … July 17, 2017 – Lisa Robertson tells Mayor Signer

16

in generating his report, and was even mentioned in that report multiple times. *See* note 8, *supra* (noting the efforts of "Deputy City Attorney Lisa Robertson"); *see also* note 4, *supra* (noting the City Attorney's assistance in streamlining record production to Heaphy). Further, on information and belief, at least three key detectives in the Fields case are still employed by the City – Hoft subpoenaed one of them, Declan Hickey, who is now the subject of another of the City's Motions to Quash.[26] Dkt. #292.

More fundamentally, even if the City were incapable of locating all of the records responsive to Hoft's subpoena due to legitimate personnel and/or logistical challenges, the City is required to make a good faith effort to comply. Their position, heretofore, has been to produce absolutely nothing, and also fail to identify specific documents entitled to specific privileges. The City is required to present whatever knowledgeable persons are necessary to comply with the subpoena's command to deposition and records production.

Accordingly, the Court should deny Movants' Motion and Order them to produce responsive documents and materials within ten days. *Further*, to the extent Movants possesses responsive, non-privileged materials heretofore not provided to the *Sines* plaintiffs, the Court should Order Movants to provide Hoft with all such further and responsive documents and materials, less any which are privileged, within ten days. The Court should also Order the City to produce itself for deposition within 14 days. *Finally*, Order Movants to provide Hoft with a privilege log in accordance with the instructions provided by Hoft in Subpoena Schedule A, page 8. *See* **Exhibit 3**, attached.

---

that Council involvement with operational function like location of Unite the Right raises prospect of personal liability").
[26] The other two are Detectives Steve Young and Braden Kirby.

17

### E.    ALFRED THOMAS HAS NO LEGITIMATE ARGUMENTS.

Somewhat surprisingly, the City is representing Mr. Thomas for the purpose of the instant Motion. Mr. Thomas has not been employed by the City since at least 2019. Thomas' primary argument (and defense for his refusal to even conduct a search for materials in his possession or control) is that Hoft unduly burdens him by asking him for records he doesn't have. If, after a good faith inspection of his papers, Thomas truly has no records, then all he need do is say so. However, lacking records is no reason to refuse to attend one's deposition. Thomas claims he will be unavailable on his set deposition date – but he refuses to provide alternative dates in hoping the Court will quash his deposition.

No single person, other than perhaps James Fields and Jason Kessler, have been more severely criticized than former Chief Al Thomas. He resigned in disgrace after the Heaphy report assailed his management of public security during the UTR.[27] Heaphy also went out of his way to document Thomas' misconduct in destroying evidence, fabricating evidence, lying to Heaphy, and obstructing his audit of Charlottesville's collective performance. *See* note 8, *supra*. In the days after the UTR, rally attendees – of all stripes – accused Thomas and CPD of not only deliberately failing to intervene in dangerous situations, but also of forcing protesters on each side into direct confrontation. They were dismissed as conspiracy theorists until Heaphy's report confirmed that, at a minimum, Thomas gave an order to "let them fight," to allow events to escalate sufficiently so he would have an excuse to shut down the rally. *See* note 12, *supra*.

Mr. Thomas has information and documents relevant to this case. The Court should deny his Motion and Order him to produce responsive documents within 10 days. The Court should

---

[27] *Charlottesville Police Chief Al Thomas Retires After Criticism Over Rally,* NBC News, December 19, 2017 (https://www.nbcnews.com/news/us-news/charlottesville-police-chief-al-thomas-retires-after-criticism-over-rally-n831026) (last accessed May 17, 2021).

further Order him to produce himself for deposition within 14 days. Finally, the Court should Order Thomas to provide Hoft with a privilege log in accordance with the instructions provided by Hoft in Subpoena Schedule A, page 8. *See* **Exhibit 3**, attached.

## IV. CONCLUSION.

For all of the foregoing reasons, the Court should Deny Movants' Motion and make and enter an Order requiring Movants to produce themselves for deposition within 14 days, and to produce to Hoft within ten days:

1. all documents and materials shared with the *Sines* plaintiffs in response to their subpoena(s), including but not limited to all indexes applicable to such materials;

2. all non-privileged documents which are responsive to Hoft's subpoena and Schedule A, thereto, including but not limited to all indexes applicable to such materials; and

3. a privilege log listing all withheld documents – not simply classes or categories of materials – and Movants' specific, corresponding privileges pertinent to the respective requests, all as more fully described in Hoft's Subpoena Schedule A, page 8. *See* **Exhibit 3**, attached.

Dated: May 18, 2021

        Respectfully submitted,

By:   */s/ John C. Burns*
John C. Burns, admitted *pro hac vice*
BURNS LAW FIRM
P.O. Box 191250
Saint Louis, MO 63119
Tel: (314) 329-5040
Fax: (314) 282-8136
TBLF@PM.ME

Timothy B. Hyland
Virginia Bar No. 31163
HYLAND LAW PLLC
1818 Library Street, Ste. 500
Reston, VA 20190
(703) 956-3548 (Tel.)
(703) 935-0349 (Fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of May, 2021, a true and accurate copy of the foregoing was served on all parties of record via the Court's ECF System.

*/s/ John C. Burns*