**IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF VIRGINIACHARLOTTESVILLE
DIVISION**

BRENNAN M. GILMORE,

      Plaintiff,

v.

ALEXANDER E. (ALEX) JONES, et al.,

      Defendants.

No. 3:18-cv-00017-NKM-JCH

**DEFENDANT JAMES HOFT'S OPPOSITION TO THIRD PARTY NORTHERN
VIRGINIA REGIONAL INTELLIGENCE CENTER'S (NVRIC) MOTION TO QUASH**

I.    **INTRODUCTION**

Hoft's primary means of defending himself in this defamation action – for which truth is

an **absolute defense**, and material falsity is Plaintiff's burden – is to deliver evidence of the

truthfulness of his own statements, and to refute the allegations made by Gilmore.  Hoft's subpoena

to the Northern Virginia Regional Intelligence Center ("NVRIC"), are only as narrow or as broad

as the allegations in the First Amended Complaint (FAC).  As a matter of Fifth and Fouteenth

Amendment due process and the First Amendment, to defend himself  and his rights, Hoft is

entitled to investigate those allegations.

NVRIC evidence relevant to this case.  To date, it has failed to even SEARCH for

documents, let alone produce them; it has also failed to meet and confer, arguing Hoft requests

irrelevant materials (they **are** relevant), seeks impermissible, law enforcement privileged materials

(he seeks factual materials, properly disclosed), or that the requests are unduly burdensome (they

are not).  Accordingly, the Court should deny Movant's Motion to Quash (Motion), Order it to

produce all documents it has already produced in response to every subpoena served upon it by

the *Sines* plaintiffs (No. 3:17CV72 (W.D. Va.)) within ten days, Order it to produce a privilege log

within ten days, and Order it to produce all documents responsive to the subpoena within ten days,

as well as all further relief sought in the **Conclusion**.

II.    **LAW**

A party to litigation also may serve on any non-party a subpoena to produce discoverable

material in the non-party's possession, custody, or control.  *Sines v. Kessler*, No.: 3:17-cv-00072

(Dkt. #765), at p. 2 (W.D. Va. June 12, 2020) (citations omitted).  The scope of discovery from a

non-party is the same as the scope of a discovery request made upon a party to the action, and a

2

party is entitled to information that is relevant to a claim or defense in the matter at issue. *Id.* (citations and quotations omitted). The party or person resisting discovery bears the burden[1] to show it should not be allowed. *Id.*, at p. 3 (citations omitted). Specifically, the parties claiming privilege bear the burden of demonstrating the applicability of the privilege to *specific documents*. *Id.*, at p. 5 (citations omitted). The proponents must *establish the particular communications at issue* are privileged and that the privilege was not waived.[2] *Id.*, at p. 6. Conclusory assertions of privilege are not proper objections under Rule 45(e)(2)(A)(ii). *Id.* (citations omitted). "It certainly do not justify the decision to withhold responsive documents that are neither privileged attorney-client communications, nor protected trial preparation materials." *Id.* (citations omitted). "Rule 45(d)(3) provides no basis for relief where, as here, the subpoena does not require disclosure of privileged matters or work-product materials. *Id.*, at p. 6-7 (citations and quotations omitted) (subpoenas at issue explicitly instructed objecting counsel *not to produce* documents protected by attorney-client privilege or the work-product doctrine).

Executive privilege protects the government from the disclosure of certain information whose disclosure would be contrary to the public interest, including intra-governmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by

---

[1] A person who withholds subpoenaed information based on a claim that it is privileged bears the burden of proof to expressly make the claim and "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(ii).

[2] This Court cited to *U.S. v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982), which observed:

> Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege. Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter. *In re Sealed Case,* 676 F.2d 793, 808-09 (D.C.Cir.1982).

See also *United States v. Nobles*, 422 U.S. 225, 239 (1975) ("The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived").

which governmental decisions and policies are formulated. *Daly v. Virginia*, No. 3:14CV250(HEH), 2014 WL 12607788, at *1–2 (E.D. Va. July 15, 2014). However, executive privilege is an extraordinary assertion of power not to be lightly invoked. *Id.* (internal citations and quotations omitted). Consequently, the Court must strictly construe the application of executive privilege and apply the privilege only when the public interest in protecting such evidence would transcend the normally predominant principle of utilizing all rational means for ascertaining the truth. *Id.* (internal citations and quotations omitted).

To properly invoke the privilege, the party seeking its use must follow certain requirements. *Corbin v. Woolums*, No. 3:08CV173, 2008 WL 11512533, at *3, n. 5 (E.D. Va. July 1, 2008). "First, the privilege must be claimed by the head of the applicable agency after actual personal consideration by that officer. Secondly, there must be 'a specific designation and description of the documents' claimed to be privileged.... **Finally, there must be a demonstration of precise and certain reasons for preserving' the confidentiality of the governmental communications. Courts note that such claims usually must be raised via affidavit.**" *Id.* (emphasis added; internal citations and quotations omitted).

The law enforcement privilege is a species of executive privilege. *Castle v. Jallah*, 142 F.R.D. 618, 620–22 (E.D. Va. 1992). It is not to be confused with the work product privilege. *Miller v. Holzmann*, No. C.A.95-01231 RCL/JMF, 2007 WL 779393, at *1 (D.D.C. Mar. 8, 2007) ("Moreover, even if one could consider a criminal investigation as potentially anticipating litigation because it may lead to indictment and trial, the materials in the file are, at best, fact work product and available upon a showing of substantial need because there is no substitute"). It is a qualified privilege, designed to protect files related to ongoing criminal investigations. *Brown v. Meehan*, No. 3:14-CV-442, 2014 WL 4701170, at *5 (E.D. Va. Sept. 22, 2014). The privilege

4

permits courts to balance the interests of the litigant seeking the information against the government's interest in nondisclosure. *Id.* ("As Brown highlights, all the cases cited in VSP's Motion in support of its argument for a qualified privilege only relate to ongoing investigations") (see also at *4, describing the burden to the movant seeking the application of a privilege as a "heavy burden"), also quoting *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973) ("[T]he great majority of cases that have considered the discoverability of law enforcement investigations have held that in general such discovery should be barred in ongoing investigations, but should be permitted when investigation and prosecution have been completed, and ... in some instances, under the balancing test, discovery might be justified despite the ongoing nature of the investigation").

"There are two important limitations on the executive privilege doctrine. First, the privilege does not protect communications or reports made after completion of the deliberative process. Discovery of such material does not jeopardize the decisionmaking function. Second, the privilege does not prohibit disclosure of factual materials. An agency must produce compiled factual material or purely factual material contained in deliberative memoranda and severable from its context." *Greene v. Thalhimer's Dep't Store*, 93 F.R.D. 657, 659–60 (E.D. Va. 1982) (internal citations and quotations omitted); accord *Rhodenizer v. City of Richmond Police Dep't*, No. CIV. 3:09CV306, 2009 WL 3334744, at *3–4 (E.D. Va. Oct. 14, 2009) (emphasizing that the investigations were completed, thereby not jeopardizing the decisionmaking function of law enforcement), *Johnson v. Rankin*, No. 2:11CV415, 2011 WL 5358056, at *1–6 (E.D. Va. Nov. 7, 2011) (noting that compiled factual material or purely factual material contained in deliberative memoranda, but severable from its context generally must be disclosed).

Virginia federal courts look to the "*Frankenhauser* factors" to determine whether a

qualified privilege applies (*Maki v. United States*, No. CIV.A. 7:07CV443, 2008 WL 1756330, at

*6 (W.D. Va. Apr. 16, 2008); see also *Brown v. Meehan*, No. 3:14-CV-442, 2014 WL 4701170,

at *5 (E.D. Va. Sept. 22, 2014)), including:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information;

> (2) the impact upon persons who have given information of having their identities disclosed;

> (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure;

> (4) whether the information sought is factual data or evaluative summary;

> (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question;

> (6) whether the police investigation has been completed;

> (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation;

> (8) whether the plaintiff's suit is non-frivolous and brought in good faith;

> (9) whether the information sought is available through other discovery or from other sources; and

> (10) the importance of the information sought to the plaintiff's case.

## FUSION CENTERS AND DISCLOSURE – PUBLIC OR OTHERWISE

NVRIC is a US Department of Justice certified "fusion center," attached to Fairfax County,

Virginia, constituting a particular information program or "project"[3] established by a state or local

agency,[4] established for the purpose of coordinating with law enforcement at all levels, and which

---

[3] 28 C.F.R. § 23.3(b)(5): Intelligence Project or Project means the organizational unit which operates an intelligence system on behalf of and for the benefit of a single agency or the organization which operates an interjurisdictional intelligence system on behalf of a group of participating agencies.

[4] 28 C.F.R. § 23.3(b)(4): Participating Agency means an agency of local, county, State, Federal, or other

6

generally receives and disseminates information from and to law enforcement agencies. Pursuant to 28 C.F.R. § 23.02(e), "A project or authorized recipient shall disseminate **criminal intelligence information** only where there is a **need to know** and a **right to know** the information in the performance of a law enforcement activity." (Emphasis added). "Criminal Intelligence Information" is defined as "data which has been evaluated to determine that it: (i) Is relevant to the identification of and the criminal activity engaged in by an individual who or organization which is reasonably suspected of involvement in criminal activity, and (ii) Meets criminal intelligence system submission criteria." 28 C.F.R. § 23.3(b)(3). 28 C.F.R. § 23.20 (emphasis added) provides further guidance on information dissemination:

> (f)(1) Except as noted in paragraph (f)(2) of this section, a project shall disseminate criminal intelligence information only to law enforcement authorities who shall agree to follow procedures regarding information receipt, maintenance, security, and dissemination which are consistent with these principles.
>
> (2) **Paragraph (f)(1) of this section shall not limit the dissemination of an assessment of criminal intelligence information to a government official or to any other individual, when necessary, to avoid imminent danger to life or <u>property</u>.**
>
> (g) A **project** maintaining criminal intelligence information shall ensure that administrative, technical, and physical safeguards (including audit trails) are adopted to insure against unauthorized access and against intentional or unintentional damage. A record indicating who has been given information, the reason for release of the information, and the date of each dissemination outside the project shall be kept. *Information shall be labeled to indicate levels of sensitivity, levels of confidence, and the identity of submitting agencies and control officials. **Each project must establish written definitions for the need to know and right to know standards** for dissemination to other agencies as provided in paragraph (e) of this section. The project is responsible for establishing the existence of an inquirer's need to know and right to know the information being requested* either through inquiry or by delegation of this

---

governmental unit which exercises law enforcement or criminal investigation authority and which is authorized to submit and receive criminal intelligence information through an interjurisdictional intelligence system. A participating agency may be a member or a nonmember of an interjurisdictional intelligence system.

7

> responsibility to a properly trained participating agency which is subject to routine inspection and audit procedures established by the project …

NVRIC, as a "project," is responsible for determining levels of information confidentiality or sensitivity.[5]  For example, at a minimum, the Virginia Fusion Center (VFC), NVRIC's Virginia State Police sister fusion center, uses the following information classifications: Law Enforcement Sensitive (LES); For Official Use Only (FOUO); and Open Source (OS).[6]  NVRIC's dissemination guide is not readily available on the internet, but it would be surprising if it substantially differed from that of the VFC.  VFC's Privacy Policy explains that it receives law enforcement investigative information, tips and leads, suspicious activity reports (SARs), classified and non-classified reporting, and public records.[7]  VFC maintains a separate privacy policy for SARs, but this is not available publicly.[8]

It is up to VFC to determine who has a "right to know" or a "need to know."[9]  Access to information gathered or retained by VFC may be provided to other entities and individuals who VFC deem authorized to access the materials, and then, only for legitimate law enforcement, public protection, prosecution, or other justice purposes, and only for the performance of official duties in accordance with applicable laws and procedures."[10]  Additionally, any law enforcement agency receiving any information from VFC must sign a non-disclosure agreement that outlines the proper handling of the report and penalties for the dissemination to unauthorized users who do not have a "right" or "need" for the information.[11]  **Notably, anyone in private industry is eligible to train**

---

[5] Id.  See also **Exhibit 1** – Fusion Center: Privacy, Civil Rights, and Civil Liberties – Policy Development Template, at p. 21-23. US DOJ Global Justice Information Sharing Initiative (2019). at p. 21-23.
[6] See **Exhibit 2** – Virginia Fusion Center (VFC) Privacy Policy, at p. 8.
[7] *Id.*, at p. 5.
[8] *Id.*
[9] *Id.*, at p. 5, 11-12.
[10] *Id.*, at p. 11 (emphasis added).
[11] *Id.*  Such a non-disclosure agreement is highly reminiscent of the Protective Order entered in this case…

8

**for Fusion Liaison Offier status.**[12]

Not all information is completely confidential.  The VFC specifically authorizes itself to release information to the public if it is not endangering law enforcement, furthers law enforcement goals, is a public record by law, or is otherwise appropriate for release.[13]  VFC and the Virginia State Police regularly turn over records in response to public inquiry.[14]  Among other things, VFC keeps confidential those records which are:[15]

(a)    required to be kept confidential or exempt from disclosure pursuant to Va. Code Ann. § 52-48;

(b)    classified as investigatory records exempt from disclosure by Va. Code Ann. § 2.2-3706;

(c)    protected federal, state, or tribal records originated and controlled by the source agency that cannot be shared without permission or are exempt from disclosure by Section 52-48 Code of Virginia; or

(d)    which violates an authorized disclosure agreement.

Under Virginia state law, VFC cannot disclose "Criminal Intelligence Information."  Va. Code Ann. § 52-48.  However, the statute – tracking the same term of art in 28 C.F.R. § 23.20 – specifically notes that "Criminal intelligence information" **does not include "criminal investigative files**." Va. Code Ann. § 52-48.  Portions of criminal investigative files **are** obtainable

---

[12] See https://fusion.vsp.virginia.gov/flo/#who ("A Fusion Liaison Officer (FLO) is an individual that serves as the main point of contact for their agency and corresponds with the Virginia Fusion Center in matters related to suspicious activity and intelligence. The FLO continues to work for and is under complete control of their parent agency. The VFC supplies the FLO and their agency with a place to send information and receive vetted intelligence") (last accessed May 28, 2021).

[13] *Id*., at p. 13; see also **Exhibit 3** – VFC Distribution Lists.  VFC regularly disseminates advisories to private industry to promote community safety.

[14] See, for e.g., **Exhibit 4** – FOIA letters.

[15] See **Exhibit 2**, at p. 13.

9

through Virginia's Freedom of Information Act, however.  VA LEGIS 1SS 483 (2021), 2021 Virginia Laws 1st Sp. Sess. Ch. 483 (H.B. 2004).[16]  This spring, Governor Northam signed H.B. 2004, which dramatically opens criminal investigative files to public scrutiny.[17]  The new law opens, by mandate or discretion, the following records:

> Adult arrestee photographs taken during the initial intake following the arrest and as part of the routine booking procedure, except when necessary to avoid jeopardizing an investigation in felony cases until such time as the release of the photograph will no longer jeopardize the investigation;
>
> *2.* Information relative to the identity of any individual, other than a juvenile, who is arrested and charged, and the status of the charge or arrest; and
>
> *3.* Records of completed unattended death investigations to the parent or spouse of the decedent or, if there is no living parent or spouse, to the most immediate family member of the decedent, provided the person is not a person of interest or a suspect. For the purposes of this subdivision, "unattended death" means a death determined to be a suicide, accidental or natural death where no criminal charges will be initiated, and "immediate family" means the decedent's personal representative or, if no personal representative has qualified, the decedent's next of kin in order of intestate succession as set forth in § 64.2-200.
>
> B. Discretionary releases. The following records are excluded from the mandatory disclosure provisions of this chapter, but may be disclosed by the custodian, in his discretion, except where such disclosure is prohibited by law:
>
> Criminal investigative files, defined as any documents and information, including complaints, court orders, memoranda, notes, diagrams, maps, photographs, correspondence, reports, witness

---

[16] See **Exhibit 5** - (H.B. 2004).
[17] See Amy Friedenberger, "Del. Chris Hurst's Bill Opening Up Criminal Investigative Files Sent to Governor," February 27, 2021, The News & Advance (https://newsadvance.com/news/state-and-regional/del-chris-hursts-bill-opening-up-criminal-investigative-files-sent-to-governor/article_c38e9cd0-19bd-5334-a856-6c69db650527.html) (last accessed May 28, 2021); see also "Virginia Moves to Open Police Records," April 27, 2021, The Daily Progress (https://starexponent.com/opinion/editorial/editorial-virginia-moves-to-open-police-records/article_92501b24-067c-5cca-9ff9-edbf97e0e4f5.html) (last accessed May 28, 2021);  Jonathan Edwards, "Police in Virginia Can No Longer Keep All Their Reports Secret Forever, Thanks to a New Law," April 2, 2021, The Virginian-Pilot. (https://www.pilotonline.com/news/crime/vp-nw-police-records-open-hurst-20210402-kgrgotwx4rhihiqc3hvs66s7sy-story.html) (last accessed May 28, 2021).

statements, and evidence, relating to a criminal investigation or prosecution, other than criminal incident information subject to release in accordance with subdivision A 1 *not required to be disclosed in accordance with § 2.2-3706.1*;

1.    Reports submitted in confidence to (i) state and local law-enforcement agencies, (ii) investigators authorized pursuant to Chapter 3.2 (§ 2.2-307 et seq.), and (iii) campus police departments of public institutions of higher education established pursuant to Article 3 (§ 23.1-809 et seq.) of Chapter 8 of Title 23.1;

2.    Records of local law-enforcement agencies relating to neighborhood watch programs that include the names, addresses, and operating schedules of individual participants in the program that are provided to such agencies under a promise of anonymity;

3.    All records of persons imprisoned in penal institutions in the Commonwealth provided such records relate to the imprisonment;

4.    Records of law-enforcement agencies, to the extent that such records contain specific tactical plans, the disclosure of which would jeopardize the safety or security of law-enforcement personnel or the general public;

5.    All records of adult persons under (i) investigation or supervision by a local pretrial services agency in accordance with Article 5 (§ 19.2-152.2 et seq.) of Chapter 9 of Title 19.2; (ii) investigation, probation supervision, or monitoring by a local community-based probation services agency in accordance with Article 9 (§ 9.1-173 et seq.) of Chapter 1 of Title 9.1; or (iii) investigation or supervision by state probation and parole services in accordance with Article 2 (§ 53.1-141 et seq.) of Chapter 4 of Title 53.1;

6.    Records of a law-enforcement agency to the extent that It disclose the telephone numbers for cellular telephones, pagers, or comparable portable communication devices provided to its personnel for use in the performance of their official duties;

7.    Those portions of any records containing information related to undercover operations or protective details that would reveal the staffing, logistics, or tactical plans of such undercover operations or protective details. Nothing in this subdivision shall operate to allow the withholding of information concerning the overall costs or expenses associated with undercover operations or protective details;

8.      Records of (i) background investigations of applicants for law-enforcement agency employment,

(ii) administrative investigations relating to allegations of wrongdoing by employees of a law-enforcement agency, and (iii) other administrative investigations conducted by law-enforcement agencies that are made confidential by law;

9.      The identity of any victim, witness, or undercover officer, or investigative techniques or procedures. However, the identity of any victim or witness shall be withheld if disclosure is prohibited or restricted under § 19.2-11.2; and

10.     Records of the Sex Offender and Crimes Against Minors Registry maintained by the Department of State Police pursuant to Chapter 9 (§ 9.1-900 et seq.) of Title 9.1, including information obtained from state, local, and regional officials, except to the extent that information is required to be posted on the Internet pursuant to § 9.1-913.

C.      Prohibited releases. The identity of any individual providing information about a crime or criminal activity under a promise of anonymity shall not be disclosed.

D.      Noncriminal records. Public bodies (i) engaged in emergency medical services, (ii) engaged in fire protection services, (iii) engaged in criminal law-enforcement activities, or (iv) engaged in processing calls for service or other communications to an emergency 911 system or any other equivalent reporting system may withhold those portions of noncriminal incident or other noncriminal investigative reports or materials that contain identifying information of a personal, medical, or financial nature where the release of such information would jeopardize the safety or privacy of any person. Access to personnel records of persons employed by a law-enforcement agency shall be governed by the provisions of subdivision B 9 of this section and subdivision 1 of § 2.2-3705.1, as applicable.

E.      Records of any call for service or other communication to an emergency 911 system or communicated with any other equivalent reporting system shall be subject to the provisions of this chapter.

F.      Conflict resolution. In the event of conflict between this section as it relates to requests made under this section and other provisions of law, this section shall control.

12

*§ 2.2-3706.1. Disclosure of law-enforcement records; criminal incident information and certain criminal investigative files; limitations.*

*A.      For purposes of this section:*

*"Immediate family" means the decedent's personal representative or, if no personal representative has qualified, the decedent's next of kin in order of intestate succession as set forth in § 64.2-200.*

*"Ongoing" refers to a case in which the prosecution has not been finally adjudicated, the investigation continues to gather evidence for a possible future criminal case, and such case would be jeopardized by the premature release of evidence.*

*B.      All public bodies engaged in criminal law-enforcement activities shall provide the following records and information when requested in accordance with the provisions of this chapter:*

*C.*

*1.      Criminal incident information relating to felony offenses contained in any report, notes, electronic communication, or other document, including filings through an incident-based reporting system, which shall include:*

*2.*

*a.      A general description of the criminal activity reported;*

*b.      The date and time the alleged crime was committed;*

*c.      The general location where the alleged crime was committed;*

*d.      The identity of the investigating officer or other point of contact;*

*e.      A description of any injuries suffered or property damaged or stolen; and*

*f.      Any diagrams related to the alleged crime or the location where the alleged crime was committed, except that any diagrams described in subdivision 14 of § 2.2-3705.2 and information therein shall be excluded from mandatory disclosure, but may be disclosed by the custodian in his discretion, except where such disclosure is prohibited by law.*

*A verbal response as agreed to by the requester and the public body is sufficient to satisfy the requirements of this subdivision 1; and*

*3.      Criminal investigative files, defined as any documents and information, including complaints, court orders, memoranda, notes, initial incident reports, filings through any incident-based reporting system, diagrams, maps, photographs, correspondence, reports, witness statements, or evidence, relating to a criminal investigation or proceeding that is not ongoing.*

13

*D.      The provisions of subsection B shall not apply if the release of such information:*

*1.      Would interfere with a particular ongoing criminal investigation or proceeding in a particularly identifiable manner;*
*2.      Would deprive a person of a right to a fair trial or an impartial adjudication;*
*3.      Would constitute an unwarranted invasion of personal privacy;*
*4.      Would disclose (i) the identity of a confidential source or (ii) in the case of a record compiled by a law-enforcement agency in the course of a criminal investigation, information furnished only by a confidential source;*
*5.      Would disclose law-enforcement investigative techniques and procedures, if such disclosure could reasonably be expected to risk circumvention of the law; or*
*6.      Would endanger the life or physical safety of any individual. Nothing in this subsection shall be construed to authorize the withholding of those portions of such information that are unlikely to cause any effect listed herein.*
*E.      Nothing in this section shall prohibit the disclosure of current anonymized, aggregate location and demographic data collected pursuant to § 52-30.2 or similar data documenting law-enforcement officer encounters with members of the public.*
*No photographic, audio, video, or other record depicting a victim or allowing for a victim to be readily identified, except for transcripts of recorded interviews between a victim and law enforcement, shall be released pursuant to subdivision B 2 to anyone except (i) the victim; (ii) members of the immediate family of the victim, if the victim is deceased; or (iii) the parent or guardian of the victim, if the victim is a minor.*
*F.      In the event of a conflict between this section as it relates to requests made under this section and other provisions of law, the other provisions of law, including court sealing orders, that restrict disclosure of criminal investigative files, as defined in subsection B, shall control.[18]*

As stated above, unless releasing the information would compromise a confidential informant, or a witness specifically granted confidentiality, a victim, an ongoing criminal investigation, expose specific law enforcement battle plans, or divulge classified or highly classified intelligence, the information is *essentially* presumptively open to public inspection.

---

[18] VA LEGIS 1SS 483 (2021), 2021 Virginia Laws 1st Sp. Sess. Ch. 483 (H.B. 2004).

14

III.   **ARGUMENT**

    A.    **HOFT'S REQUESTS ARE RELEVANT.**

Truth is an <u>absolute</u> defense to a claim of defamation. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986). Not only this: in defamation actions, Plaintiff bears the burden of proving material falsity. *Id*. As the guarantors of Hoft's First Amendment rights, the Constitution and this Court are obliged to secure Hoft's ability to investigate Gilmore's claims against him to mount and prepare the legal defense available to him.

The factual allegations in play – i.e., *inter alia*, whether or not Mr. Gilmore engaged in a public-private conspiracy aimed at either instigating violence in Charlottesville, a "cover up," or misleading the public, are central and *material* facts to Gilmore's causes of action, and Hoft's defenses thereto. This would also include whether the conspirators, **as alleged by <u>Gilmore</u>**, including but not limited to Gilmore, members of the media, and political leaders (Alleged Conspirators) deliberately mischaracterized the events surrounding the UTR for a sociopolitical agenda.

For example, during the UTR, was Charlottesville truly under violent siege by pro-Lee protesters? Did these right-wing individuals <u>really</u> come, *as a militia or paramilitary group*, to Charlottesville[19] for the express purpose of rioting, destruction, violence, and murder? Further, were the "peaceful anti-racist counter-protesters" <u>really</u> nonviolent? Former Charlottesville Mayor Michael Signer, like Brennan Gilmore, argued just this.[20]

---

[19] Charlottesville is one of the most politically progressive cities in the nation. In the 2020 Presidential election, 85.5% of the city voted Democrat. (https://dailyprogress.com/news/state-and-regional/interactive-virginia-election-results-by-the-virginia-public-access-project/article_08816181-d3ac-5a47-a028-20eee706575b.html) (last accessed May 21, 2021).

[20] Mary McCord and Michael Signer, "This Legal Tactic Can Keep Neo-Nazi Protests Out of Your City." Washington Post, August 10, 2018. (https://www.washingtonpost.com/outlook/this-legal-tactic-can-keep-neo-nazi-

Signer wasn't alone.  Political leaders within Virginia and beyond portrayed the UTR as a siege – with the pro-Lee protesters cast exclusively as all bigots and as the aggressors.  There was no room for subtlety by the political actors, no room for accommodating opposing views, you were either all in favor or all opposed to the political question of the day.  It is directly relevant whether the officials and governmental entities shared this 'all or nothing' attitude towards undesirable political actors and their use of the First Amendment, and whether this view caused it to collectively work together to suppress political speech It found repugnant.  For example, at the same time police chief Al Thomas declared an unlawful assembly, shutting down the protest, Governor Terry McAuliffe declared a state of emergency.[21]  This state of emergency declaration added additional state resources to Charlottesville, even though the Governor had already dispatched national guard and state troopers for the event.  The reason necessitating the state of emergency declaration?

> It is now clear that public safety cannot be safeguarded without additional powers, and that the mostly out-of-state protesters have come to Virginia to endanger our citizens and property.  I am disgusted by the hatred, bigotry and violence these protesters have brought to our state over the past 24 hours. The actions I have taken are intended to assist local government and restore public safety.
>
> My entire team will continue to monitor this situation throughout the day, and take appropriate action as necessary.[22]

This mirror's what Plaintiff himself told journalists immediately after the Fields crash:

> The white supremacists came to town looking for violence and to provoke people," Gilmore said. "It billed it as one of the largest alt-right gatherings. There's no equivalency among these groups; it was a peaceful protest and a group of hateful ideology with a man that

---

protests-out-of-your-city/2018/08/10/c80bc240-9c07-11e8-8d5e-c6c594024954_story.html) (last accessed May 21, 2021).

[21] McAuliffe Tweet from August 12, 2017. (https://archive.ph/BuSzk) (last accessed May 23, 2021).

[22] *Id*.

16

ran down those peaceful protests.[23]

It is no surprise that citizens echo what their City, State and Police officials were saying: these were violent outsiders whose views are universally condemned; It should be resisted with all force.

The state of emergency declaration is just one of innumerable examples in the context of the UTR, of political leaders, the media, and others engaging in political theater for the purpose of harming political and ideological opponents, but also smearing anyone who disagreed with the dismantling of historical monuments.   Today, "Charlottesville" has become a sociopolitical archetype or meme in the collective consciousness of American society.   Further, "Charlottesville," works as a magic word that instantly shuts down debate and dissent.   All someone need do is compare someone, some group, or some event to "Charlottesville," and it leaves it socially, economically, and politically radioactive.[24]

The *archetype* – that the violence surrounding the UTR was exclusively an expression of rightwing, **violent** bigotry, is entirely predicated on lies.   Perhaps It are lies with noble intentions. It are lies, nonetheless.   It are used to incessantly defame political dissenters and journalists like Hoft.   It are used as a rallying cry and moral justification to urge technology firms, governments, and advertisers to censor[25] and deplatform[26] Hoft and others for having views It compare to the

---

[23] Nick Penzenstadler and Saray Toy, "Why is Charlottesville Ground Zero for White Supremacists?" USA Today, August 12, 2017. (https://archive.ph/zrBAG#selection-1023.1-1023.305) (last accessed May 23, 2021).

[24] See, for e.g., Aila Slisco, "ADL CEO Jonathan Greenblatt Says Antisemitic Attacks are 'Like a Charlottesville Every Day." Newsweek, May 21, 2021.  https://www.newsweek.com/adl-ceo-jonathan-greenblatt-says-antisemitic-attacks-are-like-charlottesville-every-day-1593877) (last accessed May 23, 2021); see also Patrice Taddonio, "'Enabling It to Happen Again': How Charlottesville Led to the Capitol Attack." PBS, January 26, 2021. (https://www.pbs.org/wgbh/frontline/article/how-charlottesville-led-to-the-capitol-attack/) (last accessed May 23, 2021) (arguing Trump enabled racist bigots throughout his presidency, enabled the widespread neo nazi violence in Charlottesville at the UTR, and, drawing power and influence from his vast bigot support network, instigated a white supremacist armed insurrection at the US Capitol on January 6, 2021).  There are countless numbers of articles like these.

[25] Hoft was banned from Twitter in February.

[26] See Jim Hoft, "Not Satisfied with Twitter Suspension of Gateway Pundit – Sleeping Giants Founder Matt Rivitz Calls on Shopify to Cancel TGP Account." The Gateway Pundit, February 6, 2021.

views It describe as synonymous with "Charlottesville."

This political power to silence political dissent grew from a concerted effort that started before August 12, 2017, and whose presence on the ground coordinating media, counter-protesters, and others on the day of the event carefully curated what the public would know about the event, and ultimately what It would think. City and Police were engaged in a coordinated attempt to silence pro-Lee protesters in court,[27] to provoke the violence necessary on the day of the event in order to justify shutting the event down in violation of a court order, and to protect dozens and hundreds of bad actors who provoked the violence but whose arrest would reveal their hidden hands.

More lies.  After surveilling the UTR and subsequent events, a Virginia State Police helicopter carrying two troopers tragically crashed while en route to follow Governor McAuliffe's motorcade.[28]  The crash was due to a combination of the helicopter entering a vortex ring state, and the pilot's inexperience and lack of training with the helicopter he was flying.[29]  However, this did not stop Governor Terry McAuliffe from lying to the public.  Sensationalizing UTR events further, he added the two deceased state troopers to the underline casualty list caused by the UTR, announcing to the media that **three** people died and 35 were injured because of the white nationalist rally in Charlottesville.[30]

At the UTR, state and local authorities deployed underline hundreds of heavily armed Charlottesville Police, state police, and national guardsmen to provide for the safety of the public.  The Governor

---

[27] The UTR organizers were forced to file suit in federal court to obtain a court order forcing Charlottesville to grant it a permit for their rally.

[28] Vortex Ring State: Virginia State Police Bell 407 Fatal Accident.  Aerossurance, July 18, 2020. (https://archive.ph/jqNie) (last accessed may 23, 2021).

[29] *Id*.

[30] Joe Ruiz and Doreen McCalister, "Events Surrounding White Nationalist Rally Turn Fatal." NPR, August 12, 2017. (https://archive.ph/NZKzr) (last accessed May 23, 2021).

18

of Virginia heavily involved himself with preparations for the event, and was in communication with local officials throughout the day.  Despite all of the resources deployed, all of the attention, and all of the manpower deployed, police, state police, and national guardsmen stood by and permitted unprovoked violence to occur upon citizens.  **It deliberately, and consciously decided not to intervene, and opted to let the bigots "attack" the "peaceful counter-protesters."** ("let it fight, it will make it easier to declare an unlawful assembly").[31]   Why? Who made these decisions?   Who was coordinating with whom?   Who was ultimately responsible for this conspiracy to deprive the UTR organizers – and even the counter-protesters – of their Constitutional rights?  Who was in an active coordinated effort to circumvent the Court's orders?

Chief Al Thomas is saddled with most of the blame by Timothy Heaphy in his audit of Charlottesville's handling of the UTR.  However, as Heaphy notes in his report, the Virginia State Police and Governor's office refused to cooperate with his investigation, or provide necessary information.[32]   For example, VSP "failed to provide information regarding VSP briefings, trainings, presentations, intelligence reports, video footage, plans, after-action reviews, meeting notes or minutes, indicating that 'release of those materials would jeopardize law-enforcement and the general public."[33]  The idea that all of these various law enforcement agencies – let alone the US Army – would take their marching orders from the chief of police of Charlottesville, is absurd on its face.  Thomas' decision to fall on his sword and resign, shouldering all of the blame,[34]

---

[31] Statement of multiple CPD officers, quoting Chief Al Thomas.  See **Exhibit 1**, Timothy Heaphy, et al, "Final Report: Independent Review of the 2017 Protest Events in Charlottesville, Virginia." Hunton & Williams, November 23, 2017.

[32] *Id.*, at p. 10.

[33] *Id.*

[34] Notably, while Thomas resigned, he was technically kept on the Charlottesville payroll until July 15, 2019, as part of his severance agreement.  Ruth Serven Smith, Nolan Stout, "Former Charlottesville Police Chief Getting City Paycheck Until July." The Daily Progress, October 1, 2018.  (https://archive.ph/fwLiR) (last accessed May 23, 2021).

permits all other political and law enforcement actors to shift blame and "cover up" what actually happened on August 12, 2017, who was responsible and giving orders, and why.

This raises many questions. Did Thomas unilaterally declare the unlawful assembly, or was he ordered to declare the unlawful assembly by Governor McAuliffe? Why didn't the national guardsmen or VSP troopers actually act to protect anyone? Why were all of the law enforcement centralized at Emancipation Park, instead of providing security throughout the city? Why were ANTIFA permitted to shut down entire arteries of the City with impunity? Who made these decisions? What security intelligence did all of these actors possess about the composition of the protesters/counter-protesters? What real-time information was collected on August 12, 2017? What did civic leaders and Governor McAuliffe know as It were making these decisions? Did It anticipate the presence of violent left-wing radicals? Violent right-wing radicals? Did It deliberately intend to instigate violence? Who was coordinating this effort? Who was involved? Were those making decisions police officials, politicians, or outside interest groups? All of these questions are directly relevant to Mr. Hoft's investigation of the defense of his case. VSP and Fusion possess documents, communications and media which provide some of the answers.

Gilmore alleges, *inter alia*, that there was no conspiracy on the day-of the UTR rally, and that there was no conspiracy and no coordination to silence the event and control the media narratives arising from the event. These requested documents from the Virginia State Police and Virginia Fusion Center will either show the relevant coordination, damaging Gilmore's claims, or It will show that Gilmore's claims may have validity.

Gilmore's allegations put the issue of a public-private conspiracy surrounding the UTR to manipulate events or the public's perception of events, squarely in play, and all of the records sought from VSP/ Fusion are relevant to these issues. The subject matter being entirely relevant,

20

Movant's Motion should be denied, and Movant should be ordered to produce responsive records within ten days.  The Court should Order Movant to provide Hoft with a privilege log in accordance with the instructions provided by Hoft his subpoena.

> ### B.     VIRGINIA'S NEW FOIA LAW MANDATES DISCLOSURE OF LARGE PORTIONS OF CRIMINAL INVESTIGATIVE FILES AND OTHER MATERIALS;  HOFT NEVER SOUGHT <u>LEGITIMATELY</u> PRIVILEGED MATERIALS - HE ASKED FOR A PRIVILEGE LOG.

To date, Movant has produced nothing.  To date, Movant has made no effort to meet and confer with Hoft.  Movant alleges, in section "C" of its Motion, that any responsive materials, should It exist, are "privileged criminal investigative files."  As discussed at length above, criminal intelligence information is a different animal than criminal investigative file.  Specifically, the former is entitled to heightened protection; the latter is not.  At a minimum, Hoft is entitled to criminal investigative file materials, and all less sensitive responsive materials.  Hoft is entitled to criminal intelligence information as well, because he has a "right" and "need" to know, because his **property** is in jeopardy due to this lawsuit.[35]

Movant alleges, very generally, that privileges, including the law enforcement privilege and various state laws preclude disclosure of **any** documents or other materials to Hoft.  NVRIC's position is completely incredible.  It's position is: *we don't know if we have anything relevant, it's probably not relevant, but checking is too hard, and even if we did have anything, it's all a state secret – but we surely don't have anything*.  This is ridiculous.  Not every record maintained by NVRIC contains Al Qaeda hideouts or the locations of Trumpist *insurrectionist* cells.  Indeed,

---

[35] *Cf.*, 28 C.F.R. § 23.20(f)(2): "(f)(1) Except as noted in paragraph (f)(2) of this section, a project shall disseminate criminal intelligence information only to law enforcement authorities who shall agree to follow procedures regarding information receipt, maintenance, security, and dissemination which are consistent with these principles. (2) Paragraph (f)(1) of this section shall not limit the dissemination of an assessment of criminal intelligence information to a government official or to any other individual, *when necessary, to avoid imminent danger to life or property*."

some of the information possessed by NVRIC and its sister, VFC, are regularly released to private industry, *and even to the public, via FOIA request*.[36]

Hoft isn't seeking attorney-client privileged materials or work product, assuming any exists.  He is not seeking classified or highly classified information.  He is not seeking records relating to *legitimate*, ongoing criminal investigations,[37] information which would compromise confidential informants, or which would compromise promises of confidentiality.  Hoft *does* seek a privilege log, because Hoft wishes to verify the accuracy of any claim to privilege.  *In fact, without a privilege log, it's impossible to properly evaluate Movant'ss bare assertions of <u>hypothetical</u> privilege*.  As discussed above, a movant objecting to disclosure must *properly* raise the issue of privilege.  "First, the privilege must be claimed by the head of the applicable agency after actual personal consideration by that officer. Secondly, there must be 'a specific designation and description of the documents' claimed to be privileged.... **Finally, there must be a demonstration of precise and certain reasons for preserving' the confidentiality of the governmental communications.  Courts note that such claims usually must be raised via affidavit.**" *Corbin v. Woolums*, No. 3:08CV173, 2008 WL 11512533, at *3, n. 5 (E.D. Va. July 1, 2008) (emphasis added; internal citations and quotations omitted).

Movant makes no showing that any officer of their organizations lent the records their "actual personal consideration."   Similarly, Movant has failed to specifically designate and describe the documents It wishes to withhold.  It has also failed to explain their "precise and

---

[36] Virginia State Police and Virginia Fusion Center **advertise their** FOIA request system on their website.  The system celebrated a nifty upgrade in 2020, and VSP sent out a press release, even.  VIRGINIA STATE POLICE LAUNCHES NEW FREEDOM OF INFORMATION REQUEST WEBSITE, October 1, 2021, Emporia News. (http://wap.emporianews.com/article/virginia-state-police-launches-new-freedom-information-request-website) (last accessed May 28, 2021).

[37] NVRIC needs to make a credible showing that there is an ongoing criminal investigation.  However, given the new Virginia FOIA law, even then some portions of records from ongoing criminal investigations will be disclosable.

certain" reasons for non-disclosure.  He has not, for example, provided anything resembling a privilege log, affidavit or other evidence demonstrating privilege. In lieu of fulfilling their obligations, Movant proffer generalized objections.  For these reasons alone, Movant's Motion should be denied.  At a minimum, It should be required to fulfill their obligations to Hoft and the Court and make a specialized identification of the possessed materials and the "precise and certain reasons for preserving' the confidentiality of the governmental [records]**." *Id*.  **Critically, Movant should be required to explain to the Court why, given the Court's entry of a Protective Order (Dkt. #193-94) in this case, their materials cannot be properly be produced subject to the Protective Order.**  These are all points Movant should have addressed in their opening brief.

Movant offer no evidence of on-going investigations related to the sought materials.  This makes some sense: the bad guys have been convicted.  For example, James Fields is serving back-to-back life sentences, plus 419 years.  The DeAndre Harris attackers were convicted as well.  In fact, while most will be imprisoned for a number of years to come, at least one was convicted, sentenced, and is on the verge of completing his sentence.  **The investigations are over**.  The criminal defendants were **convicted**.  <u>There is no on-going criminal investigation</u>.[38]  Whatever legitimate purpose existed for privileging Movant's materials has largely evaporated.  Given the closure of the various investigations, and the passage of time, there are likely numerous materials which would be disclosable to the public via FOIA request, let alone produced subject to the **<u>Protective Order</u>** in the present case. At a minimum, Hoft is entitled to receive all materials which would otherwise be produced by NVRIC in response to a Virginia FOIA request.  Production beyond this should be governed by balancing the Frankenhauser factors.

---

[38] Of course, if there were, we at least know that the *Virginia State Police* would be of no help to NVRIC, given that It certainly can't access their own emails from three years ago.  See generally, VSP's Motion to Quash, in which It allege, without evidence, that their emails prior to March of 2018 are inaccessible.

23

As stated above, the law enforcement privilege is a qualified privilege that permits the courts to balance the interests of the litigant seeking the information against the government's interests in nondisclosure. *Brown v. Meehan*, No. 3:14-CV-442, 2014 WL 4701170, at *5 (E.D. Va. Sept. 22, 2014). Importantly, Virginia state common law on the law enforcement privilege vis-à-vis criminal investigative files has been largely invalidated by the passage of H.B. 2004 (*cf., Harrington v. Roessler*, 89 Va. Cir. 366, *1-2 (2014)), and the liberalization of access to police records in Virginia. This being the case for mere FOIA requests, *a fortiori*, a defendant in a civil suit is entitled to the same records, *if not more*. Virginia federal courts look to the *Frankenhauser* factors in balancing these interests. *Maki v. United States*, No. CIV.A. 7:07CV443, 2008 WL 1756330, at *6 (W.D. Va. Apr. 16, 2008), see the factors listed, *supra*. Given that the Virginia Supreme Court has not forbidden the release of criminal investigatory files and the state legislature has explicitly opened portions of those files to the public, it is highly appropriate for this Court to use the *Frankenhauser* factors in balancing the needs of Mr. Hoft and NVRIC's interest in maintaining the confidentiality of highly sensitive materials.

**Factors 1 and 2 weigh in favor of Hoft**. Movant has failed to make any showing to the contrary. *Cf., Rhodenizer v. City of Richmond Police Dep't*, No. CIV. 3:09CV306, 2009 WL 3334744, at *3–4 (E.D. Va. Oct. 14, 2009) ("As in *Frankenhauser,* it is unlikely that a limited disclosure to Plaintiff and her counsel, especially under the controlled conditions of an appropriate Protective Order, would thwart governmental process by discouraging citizens or officers from being forthcoming in the future. Moreover, any negative impact upon the individuals who provided information seems unlikely as well"); see also *Daly v. Virginia*, No. 3:14CV250(HEH), 2014 WL 12607788, at *2–3 (E.D. Va. July 15, 2014) ("Therefore, because those providing information had no assurances of confidentiality when giving their statements, the Department's confidentiality

24

argument lacks merit and this factor weighs in favor of disclosure").

**Factor 3 weighs in Hoft's favor**.  Not only has Movant failed to make an argument to the contrary, but given that four years have passed since the UTR, it's unclear how VSP or Fusion would be negatively affected.  On the other hand, in the event there are records in Movant possession which indicate law enforcement abstained from separating the warring political groups resulting in injuries and death, then Hoft has a right to this information, notwithstanding any shame to the agencies or their political leadership.

**Factor 4 weighs in Hoft's favor**.  Hoft doesn't seek evaluative summaries of factual data. Hoft seeks factual data.  *Cf.*, *Rhodenizer v. City of Richmond Police Dep't*, No. CIV. 3:09CV306, 2009 WL 3334744, at *2 (E.D. Va. Oct. 14, 2009) ("Additionally, the court noted that the disclosure, limited to purely factual matters, would not reveal any details of police self-evaluation in any event"), see also *Greene v. Thalhimer's Dep't Store*, 93 F.R.D. 657, 659–60 (E.D. Va. 1982), and *Johnson v. Rankin*, No. 2:11CV415, 2011 WL 5358056, at *1–6 (E.D. Va. Nov. 7, 2011) (noting that compiled factual material or purely factual material contained in deliberative memoranda, but severable from its context generally must be disclosed).

**Factor 5 is inapplicable**.

**Factors 6 and 7 weigh in Hoft's favor**.  The criminal investigations relating to the information sought have completed.  Further, there is no evidence that any intradepartmental disciplinary proceedings have arisen or may arise from the investigation.

**Factor 8 weighs in Hoft's favor**.  Hoft, like the other Defendants, filed a Motion to Dismiss.  The Court denied these motions.  Notwithstanding Hoft's opinion of the validity of the suit, the Court determined the suit was not frivolous.

**Factor 9 weighs in Hoft's favor**.  The information Hoft seeks is largely unavailable from

other sources, with the exception of VSP and VFC.  For example, the materials include SAR ("Suspicious Activity Reporting") reports and threat analyses leading up to the UTR, as well as witness statements, videos, radio logs, radio recordings, VSP briefings, trainings, presentations, intelligence reports, plans, after-action reviews, meeting notes or minutes, and other factual materials.  *Cf., Castle v. Jallah*, 142 F.R.D. 618, 620–22 (E.D. Va. 1992) ("It also is clear that the factual statements plaintiff seeks may be very important to his case. These internal factual statements and reports **were made at a time much closer to the incident in question and are therefore more likely to be accurate**. It is doubtful that plaintiff could receive detailed factual accounts of the incident from any other source") (emphasis added) (note that the incident in *Castle* occurred only two years, roughly, prior to the court's analysis).

**Factor 10 weighs in Hoft's favor**.  The information Hoft seeks is essential to his defense. The Heaphy Report found that law enforcement utterly failed to protect the public during the UTR. Heaphy also discovered that Chief Al Thomas deliberately avoided intervening in violent scenes to achieve a political end: the dismissal of the rally due to unlawful assembly.[39]  Movant avoided scrutiny because It refused to cooperate with Heaphy's investigation.[40]  Should it exist, evidence of state and various governmental and non-governmental entities colluding to achieve political ends and deprive citizens of their Constitutional rights, will be found in Movant's possessed materials.

For the foregoing reasons, the Court should deny Movant'ss Motion and order it to produce documents responsive to Hoft's requests as well as a privilege log for all records withheld pursuant to any law or privilege, within ten days.

---

[39] **Exhibit 6**, Heaphy Report, at p. 133.
[40] *Id*., at p. 10.

### D.     HOFT'S REQUESTS ARE NOT OVERLY BURDENSOME.

Movant already indexed and organized these same items previously for other litigation (e.g., *Commonwealth v. James Fields*, among others).  Numerous investigators have had access to these materials, and It did not stumble around a database simply hoping to find materials that would help it prosecute Fields and others.  Beyond this, Movant has not made any showing whatever that any initial search indicates an unreasonably large amount of materials to be produced.[41]  To the extent any possessed materials were received from Virginia Fusion Center: (1) the existence of such records should be revealed in a privilege log; and (2) NVRIC could send a request to VFC to release the records, so long as they are not highly classified.  Nearly all other materials can be suitably dealt with through use of the Protective Order.  Lawyers may not be law enforcement officers – but they are officers of the court, and entrusted with great privileges.  Movant makes no showing that any documents are any less safe in the hands of lawyers operating under a Protective Order.

Accordingly, the Court should deny Movant's Motion and Order it to produce responsive documents and materials within ten days. The Court should also order Movant to comply with their obligations when asserting a privilege – namely, producing a privilege log detailing the specific items possessed and the corresponding "precise and certain" reasons why those items should not be produced.

---

[41] *Cf., Gilmore v. Jones*, 3:18CV17 (Dkt. #271) (W.D. Va. April, 21, 2021) (Nevertheless, for discovery requests that concern similar subject matter, those search terms should apply *absent a convincing showing that they would generate an excessive number of document hits. Hoft has not made such a showing*") (emphasis added).

IV.   <u>**CONCLUSION**</u>.

For all of the foregoing reasons, the Court should Deny Movant's Motion and make and enter an Order directing NVRIC to produce to Hoft within ten days:

1.      all documents and materials shared with the *Sines* plaintiffs in response to their subpoena(s), including but not limited to all indexes applicable to such materials;

2.      all non-privileged documents which are responsive to Hoft's subpoena and Schedule A, thereto, including but not limited to all indexes applicable to such materials;

3.       a privilege log listing all withheld documents – not simply classes or categories of materials – and Movant's **specific**, corresponding privileges and legal obligations pertinent to the respective requests, all as more fully described in Hoft's Subpoena Schedule A;

4.      all materials leaked to NBC Channel 4 Washington, D.C. and/or NBC Channel 10 Roanoke relating to the UTR and/or James Fields, including but not limited to all UTR helicopter video footage from August 12, 2017;

5.      all records shared with the Commonwealth Attorney for the City of Charlottesville;

6.      all records shared with the Commonwealth Attorney for the City of Charlottesville, which were subsequently turned over to Denise Lunsford and/or John Hill;

7.      all materials disclosable, including criminal investigative materials, pursuant to VA LEGIS 1SS 483 (2021), 2021 Virginia Laws 1st Sp. Sess. Ch. 483 (H.B. 2004);

8.      all materials disclosed to any private person or entity on, or leading up to the Unite the Right Rally;

9.      all **criminal intelligence information** not classified, highly classified, evidencing battle or confidential law enforcement techniques, exposing confidential informants, exposing witnesses promised confidentiality; and

10.     grant Hoft limited discovery, consisting of a request for all written definitions, standards, protocols, processes and policies relating to NVRIC dissemination and disclosure policies and procedures, right to know, need to know, public disclosure, and/or the gradations of sensitivity informing what can be disclosed, when, why, and to whom.


Dated:  May 28, 2021

Respectfully submitted,


By:     */s/ John C. Burns*
        John C. Burns, admitted *pro hac vice*
        BURNS LAW FIRM
        P.O. Box 191250
        Saint Louis, MO 63119
        Tel:  (314) 329-5040
        Fax: (314) 282-8136
        TBLF@PM.ME

        Timothy B. Hyland
        Virginia Bar No. 31163
        HYLAND LAW PLLC
        1818 Library Street, Ste. 500
        Reston, VA 20190
        (703) 956-3548 (Tel.)
        (703) 935-0349 (Fax)


**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of May, 2021, a true and accurate copy of the foregoing was served on all parties of record via the Court's ECF System.


*/s/ John C. Burns*

29