IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

BRENNAN M. GILMORE,

    Plaintiff,

v.

ALEXANDER E. JONES, et al.,

    Defendants

Case No. 3:18-cv-00017

*In re subpoena to*
*WVIR-TV, WSLS-TV, WRC-TV and*
*Journalists Ashley Curtis and Julie Carey*

## OBJECTIONS AND MOTION TO QUASH SUBPOENAS TO WVIR-TV, WSLS-TV WRC-TV AND JOURNALISTS ASHLEY CURTIS AND JULIE CAREY

COME NOW, by special appearance, non-parties Gray Media Group, Inc., d/b/a WVIR-TV ("WVIR");[1] Graham Media Group, Virginia, LLC d/b/a WSLS-TV ("WSLS");[2] NBC Subsidiary (WRC-TV) LLC d/b/a WRC-TV ("WRC"),[3] WSLS journalist Ashley Curtis, and WRC journalist Julie Carey (collectively, the "Non-Party Journalists"), by counsel, and respectfully move this Court pursuant to Fed. R. Civ. P. 45 for entry of an Order quashing the subpoenas issued to them in this matter.

### BACKGROUND

The Non-Party Journalists are individual journalists and three television stations that reported on the deadly "Unite the Right" rally that took place in Charlottesville, Virginia, in 2017. At that rally, a white supremacist named James Fields drove his car into a crowd of anti-

---

[1] Gray Media Group, Inc., not Gray Television, Inc. (the entity named in the subpoena), owns and operates WVIR.
[2] Graham Media Group, Virginia, LLC, not Graham Media Group, Inc. (the entity named in the subpoena), owns and operates WSLS.
[3] NBC Subsidiary (WRC-TV) LLC, not NBC Telemundo License, LLC (the entity named in the subpoena), owns and operates WRC.

1

racism protestors. He killed a woman named Heather Heyer and injured many others. Convicted of murder and also on federal hate crime charges, Fields was sentenced to life in prison by both state and federal courts.

This lawsuit arises from those events. Specifically, Plaintiff Brennan Gilmore alleges that, after he witnessed Fields's attack and posted a video of it on Twitter, right-wing conspiracy theorists, including Defendants, began targeting and defaming him, including by falsely accusing him of being "part of some 'Deep State' conspiracy" and "participat[ing] in the orchestration of" Fields's attack. (ECF Doc. 29, ¶ 214.)

One of the Defendants is James Hoft, who has subpoenaed the Non-Party Journalists. Gilmore alleges that "Hoft wrote and published an article containing false and defamatory statements about [him] entitled '*Random Man at Protests Interviewed by MSNBC, NY Times Is Deep State Shill Linked to George Soros.*'" (*Id.* ¶¶ 20, 62-82.) Gilmore alleges that Hoft's article implies the following false assertions of fact:

1. That the State Department organized the Charlottesville rioting and/or attack;
2. That Gilmore participated in the State Department's planning of the Charlottesville riots and/or attack;
3. That the State Department conspired to conceal these facts by removing information about Gilmore from a number of internet sources;
4. That media outlets were involved in the conspiracy because they knew Gilmore was a State Department employee;
5. That the media characterized Gilmore as a casual observer because they were working in concert with Gilmore, the State Department, and other government agencies to cover up their involvement in the conspiracy; and
6. That all of these conspirators worked together to deceive the public about what happened in Charlottesville that day.

(*Id.* ¶ 67.) Count I asserts a claim of defamation against all Defendants, and Count VI asserts a claim of defamation against Hoft. (*Id.* ¶¶ 204-15, 233-40.)

Despite the privilege that protects journalists from compelled testimony except in extreme circumstances not present here, Hoft, by counsel, served subpoenas on the Non-Party

2

Journalists on or about May 21, 2021 (attached to the Declaration of Leita Walker ("Walker Decl.") as Exhibits A-E). He later served a broader, amended subpoena on WVIR (attached to Walker Decl. as Exhibit F). The subpoenas are extremely overbroad and unduly burdensome. They seek virtually *every* court filing, police report, email, press release, video, photo, or other document that the Non-Party Journalists received from *anyone*—government sources, witnesses to the events, social media, fellow journalists, wire services, etc.—in connection with their coverage of the Unite the Right Rally, the death of Heyer, and the trials of Fields, which were all major news events, covered over the course of many months, indeed, years.

The undersigned counsel for the Non-Party Journalists first spoke to counsel for Hoft on May 27, 2021 and notified him that she represented WVIR and WSLS. Walker Decl. ¶ 9. In follow up email correspondence on June 1 (attached to Walker Decl. as Exhibit G), she notified him that she also represented WRC and the two individual journalists he had subpoenaed and asked if he planned to serve amended subpoenas to anyone other than WVIR. Counsel for Hoft did not respond to that inquiry. *Id.* ¶ 13.

In her conversation with Hoft's counsel on May 27, the undersigned attempted to ascertain whether the information Hoft seeks from the Non-Party Journalists is in any way relevant to his case, to explain to his counsel the privilege against compelled disclosure available to the Non-Party Journalists, to persuade him to withdraw the subpoenas, and (when he refused to withdraw) to obtain an extension of the deadline to file this motion to quash.[4] *Id.* ¶ 10. During this phone call, opposing counsel represented that, notwithstanding the extremely broad scope of the subpoenas, Hoft would be satisfied to receive information showing how the Non-Party Journalists came into possession of certain aerial video footage captured by a law enforcement

---

[4] On behalf of his client, Hoft's counsel agreed that the Non-Party Journalists could have up to and including June 14 to file this Motion.

3

helicopter on the day of Heyer's murder. *See Id.* ¶ 11. Counsel alleged that "someone broke the law" in providing this footage to the Non-Party Journalists and that Hoft needs to know the identity of their source to defend against Gilmore's claims. *Id.*

Hoft has referenced this helicopter footage and his belief that it was leaked to the press in connection with opposing other motions to quash subpoenas he has served. For example, in his opposition to the Virginia State Police and Virginia Fusion Center's Motion to Quash (ECF Doc. 313), Hoft claims that helicopter footage "was leaked to the press immediately after James Fields was sentenced" and that it is "unclear who leaked the footage" but that, at a minimum, the State Police "acquiesced" to the leak." (ECF Doc. 313 at 17.) In making these claims, Hoft cites to WRC and WSLS news coverage that included the aerial footage. (ECF Doc. 313 at 17 n.22.) This is the same news coverage he references in the subpoenas to WRC and WSLS and their journalists. *See* Walker Decl. Ex. B-E.[5]

However, it is clear from the face of those news reports—published after Fields's sentencing by both federal and state courts—that the footage was publicly available in that it was "key evidence prosecutors used to argue for a life sentence." *See* WRC news report at https://archive.ph/BCd74 (published July 17, 2019); *see also* WSLS news report at https://archive.ph/yCITC#selection-1543.18-1543.114 (published July 17, 2019) (stating footage was "newly released"). In fact, the Exhibit and Witness List in the federal case against Fields lists "Video Aerial surveillance" as an exhibit, and the public docket entry for that list, filed on July 2, 2019—more than two weeks before the news reports aired—states that "Video and Audio

---

[5] Hoft does not bother to cite any news report by WVIR that includes the helicopter footage. After a reasonable search, WVIR does not believe it ever aired the footage shown in the WRC and WSLS news reports, and it has not been able to locate a copy of that footage in its possession. WVIR did air aerial footage of the Governor's motorcade when it reported in May 2002 on the findings of the National Transportation Safety Board ("NTSB") regarding the helicopter's crash. *See* https://www.nbc29.com/2020/05/14/report-reveals-new-details-investigation-into-deadly-vsp-helicopter-crash/. That footage was presumably part of NTSB's report.

Exhibits available on discs provided to and available in the clerk's office." *See* ECF Doc. 59, *United States v. Fields*, Case No. 3:18-cr-00011-MFU (W.D. Va.). On June 4, 2021, the undersigned spoke to Christopher Robert Kavanaugh, one of the federal attorneys who prosecuted Fields, and confirmed that the referenced "Video Aerial surveillance" is indeed the helicopter footage and that it was publicly filed not only in the federal hate crimes prosecution but also in the state murder prosecution. Walker Decl. ¶ 14. In other words, there is no reason for Hoft and his attorney to believe this footage was "leaked"—it is publicly available from both state and federal courts and has been since before publication of the news reports Hoft references.

Finally, information responsive to the subpoenas—including not only documents showing how the Non-Party Journalists obtained the helicopter footage but also many other documents responsive to requests that Hoft has now withdrawn—are available from sources other than the Non-Party Journalists.[6] Hoft admits as much by having served extremely broad subpoenas on a wide range of law enforcement individuals and entities (many of whom have also moved to quash and have a hearing set on their motions for June 14, 2021). Indeed, in his opposition to the City of Charlottesville and Alfred Thomas's Motion to Quash (ECF Doc. 301), Hoft explicitly admits that much (perhaps all) of what he requests from the Non-Party Journalists is in the hands of the City of Charlottesville as well as Hunton & Williams, LLP. (ECF Doc. 301 at 3-4.)

On information and belief, Hoft has not yet bothered to depose the Plaintiff, yet he has issued dozens of subpoenas to third parties to this case—perhaps as many as 60. Walker Decl. ¶ 12. The Non-Party Journalists cannot say for sure because his counsel refused to confirm or

---

[6] Hoft also seeks paystub information from the individual journalists, which admittedly is not available from government sources. Such information, however, bears absolutely no relation to his claims and defenses in this case and his request for it should be dismissed out of hand.

5

provide copies of these subpoenas. *Id.* Regardless of the exact number, he is clearly engaged in a massive and massively inappropriate fishing expedition that, in the case of the Non-Party Journalists, seeks information they obtained in the course of their newsgathering activities. Hoft's subpoenas and his refusal to withdraw them ignore well-established law that protects members of the media from being compelled to testify and from being compelled to disclose unpublished newsgathering materials (including but not limited to the identities of their sources). Pursuant to Virginia state law and the First Amendment of the United States Constitution, the subpoenas should be quashed and a protective order entered.

## ARGUMENT

Courts in Virginia recognize a qualified journalist's privilege rooted in the First Amendment that, unless overcome, protects reporters from being compelled to disclose information obtained in the course of their newsgathering. *See, e.g.*, *LaRouche v. NBC*, 780 F.2d 1134, 1139 (4th Cir. 1986); *Brown v. Commonwealth*, 214 Va. 755, 757 (1974). The privilege applies in federal court where jurisdiction is based on diversity, as it is here. *See, e.g.*, *Hatfill v. N.Y. Times*, 242 F.R.D. 353, 356 (E.D. Va. 2006) ("the notes are not discoverable because they are protected by the qualified reporter's privilege under Virginia state law").

In *LaRouche*, the court explained that the privilege yields only if the subpoenaing party can show that: (1) the information sought is relevant, (2) it is not available from alternative sources, and (3) there is a compelling interest in it. *LaRouche*, 780 F.2d at 1139; *see also Hatfill*, 242 F.R.D. at 356 ("the Virginia courts have applied the three-part balancing test adopted by the Fourth Circuit in *LaRouche*").

Following *LaRouche* and *Brown,* courts in Virginia have made clear that the privilege applies to *any* "unpublished" information, whether or not confidential sources are involved. *See*

6

*Hatfill,* 242 F.R.D. at 356 (quashing subpoena for non-confidential information in a Virginia defamation case); *see also, e.g.*, *Johnson v. Bass*, 69 Va. Cir. 97, 97-98 (Orange Cnty. 2005) (noting that "courts agree that there exists an important constitutional privilege that protects the private files of journalists under the provisions of the First Amendment to the United States Constitution and Article I, Section 12, of the Virginia Constitution" and quashing subpoena to reporter for non-confidential newsgathering information); Order, *In re: Subpoena Issued to Scott Daugherty*, Nos. CR 17000428-01 – CR 17000447-01 (City of Portsmouth Cir. Ct. July 5, 2018) (quashing subpoena for non-confidential information where there was "no showing" that reporter "possesses highly relevant material and information unavailable from another source") (copy attached to Walker Decl. as Exhibit H); Transcript, *HJN Enters., LLC v. Mehlman-Orozco*, No. CL16000876 (Pr. Wm. Cnty. Cir. Ct. Aug. 10, 2018), at 23:3-24:2 (quashing subpoena to reporter pursuant to privilege) (copy of relevant portions of transcript attached to Walker Decl. as Exhibit I); *Commonwealth v. Townley*, 2018 Va. Cir. LEXIS 39, at *2-5 (Roanoke City Cir. Ct. Jan. 31, 2018) (same).

The purpose of the privilege is to protect journalists from having to testify and turn over their work product just because it may possibly be helpful to a civil or criminal litigant. As one court has explained, subpoenas to journalists cause a "chilling effect" on newsgathering because of:

> the threat of administrative and judicial intrusion into the newsgathering and editorial process; the disadvantage of a journalist appearing to be an investigative arm of the judicial system or a research tool of government or of a private party; the disincentive to compile and preserve non-broadcast material; and the burden on journalists' time and resources in responding to subpoenas.

7

*Mark v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (citation omitted) (quashing subpoena for non-confidential information); *see also Livingston v. Kehagias*, 2018 U.S. Dist. LEXIS 39545, at *6-7 (E.D.N.C. Mar. 12, 2018) (quashing subpoena for non-confidential information because need for information was "not sufficiently compelling to warrant intrusion into the rights of the free press"); *Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9, 16 (D.D.C. 2015) (privilege for non-confidential information was designed to prevent "wholesale exposure of press files to litigant scrutiny" and the "burden [to] the press [of the] heavy costs of subpoena compliance" (citation omitted)); *United States v. Thompson*, 2015 U.S. Dist. LEXIS 47110, at *3 (S.D. Fla. Apr. 10, 2015) (privilege, which "bars a litigant from compelling production or testimony in all but the most exceptional cases[,] . . . is derived from the chilling effect that 'forcing journalists to testify in judicial proceedings about the substance of their news reports' would have on an independent and free press'" (citations omitted)).

Applying the *LaRouche* test here, it is clear that Hoft cannot overcome the privilege because (1) the particular information sought from the Non-Party Journalists is not sufficiently "relevant," nor does it serve a sufficiently "compelling interest," to defeat the privilege and (2) numerous alternative sources are available for information relevant to Hoft's defense of Gilmore's defamation claim. *See, e.g.*, *Goldberg*, 123 F. Supp. 3d at 15-16 ("in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege," which should "prevail in all but the most exceptional cases" (quoting *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981)).

    1.    **The information sought from the Non-Party Journalists is not sufficiently relevant or compelling to overcome the privilege.**

As noted, Hoft has issued subpoenas in this case to a wide range of government entities and their employees, and motions to quash many of those subpoenas are pending before the

Court. In his responses to those motions, Hoft repeatedly takes the position that he needs a wide range of documents from the government to prove the statements he made about Gilmore—that Gilmore was part of a vast government-media conspiracy that perpetrated the violence in Charlottesville on August 12, 2017—were true and thus not actionable.[7]

The Non-Party Journalists expect Hoft to similarly respond to this Motion. That is, based on his counsel's representations about what Hoft seeks from them—how they got the helicopter footage—they expect him to argue that the Non-Party Journalists' testimony and newsgathering materials will reveal some government leak and that this leak will help Hoft establish that the media, the government and Gilmore were all "work[ing] together to deceive the public about what happened in Charlottesville that day." (ECF Doc. 29, ¶ 67.)

The notion that every leak to the media is part of some "conspiracy" of the magnitude Hoft imagines is of course ridiculous. But even if the Court takes Hoft's theory at face value, his rationale for subpoenaing the Non-Party Journalists ignores the indisputable fact that the helicopter footage was a judicial record made available to the general public prior to the publication of the news reports his subpoenas reference. The information he seeks is thus simply not relevant to his claims and defenses in this lawsuit. There is no reason that Hoft needs, for example, the Non-Party Journalists to provide a copy of the aerial footage available to him through public sources. Likewise, there is no reason Hoft needs the name of the person at the

---

[7] *See* Hoft Opposition to Motion to Quash of Commonwealth Attorney for City of Charlottesville (ECF Doc. 300) at 6 ("If evidence of coordination by public and/or private forces connected to Gilmore to, *inter alia*, impose a false or misleading narrative on the events surrounding UTR, or instigate violence, then not only is Gilmore proven to be wrong—possibly even a liar—but 20 year old Fields' convictions in state and federal court and consecutive life sentences—plus *four hundred and nine* (409) years—were quite plainly influenced by something other than justice. If Hoft proves any of this, he wins."); *see also* ECF Doc. 301 at 11 (same); ECF Doc. 313 at 7 ("The factual allegations in play—i.e., *inter alia*, whether or not Mr. Gilmore engaged in a public-private conspiracy aimed at either instigating violence in Charlottesville, a "cover up," or misleading the public, are central and material facts to Gilmore's causes of action, and Hoft's defenses thereto. This would also include whether the conspirators, as alleged by Gilmore, including but not limited to Gilmore, members of the media, and political leaders (Alleged Conspirators) deliberately mischaracterized the events surrounding the UTR for a sociopolitical agenda."); Hoft Opposition to Declan Hickey Motion to Quash (ECF Doc. 320) at 7 (same).

state or federal courthouses who may have provided a copy of it to members of the media or email correspondence between members of the media and court staff about how to obtain the footage. *See, e.g.*, *Mark*, 48 F.3d at 417 ("cumulative" evidence insufficiently relevant to overcome privilege); *New England Teamsters & Trucking Indus. Pension Fund v. N.Y. Times Co.*, 2014 U.S. Dist. LEXIS 55417, at *8 (S.D.N.Y. Apr. 17, 2014) ("The relevancy requirement is not met if the information sought in the subpoena is merely duplicative or serving a solely cumulative purpose."). Yet his overbroad, incredibly burdensome, subpoena (even as narrowed by his counsel's representations) asks for all of this.

Because the information Hoft seeks is not relevant, he cannot establish a "compelling interest" in it, either. Typically, a "compelling interest" may be present when a criminal defendant claims that being deprived of the information would impact his Sixth Amendment rights or when the journalist from whom information is sought is a party to the litigation. *See, e.g.*, *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 119 (D.D.C. 2002) ("When the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure" (citation omitted)); *In re Multi-Jurisdictional Grand Jury*, 64 Va. Cir. 423, 426-27 (Chesterfield Cnty. Cir. Ct. 2004) (finding that court could compel journalist to provide information to grand jury about statements made by target of murder investigation and suggesting that privilege is more easily overcome in criminal context). Neither of those circumstances is present here, nor does there appear to be any other reason that Hoft's desire for information from the Non-Party Journalists is particularly "compelling."

### 2. There are alternative sources.

Beyond the completely absurd premise underlying the subpoenas to the Non-Party Journalists—that the media relied on some governmental "leak" to obtain the helicopter footage at issue when that footage was freely available to the press and public alike, in both state and federal court—the subpoenas must be quashed because the information they seek is available from other sources. This is clear from the face of the subpoenas themselves: they seek disclosure of documents related to the events of August 12, 2017 that the Non-Party Journalists received or obtained *from others*. Clearly, this information is directly available from those "others," including all of individuals and entities mentioned in the subpoenas (e.g., Office of the Commonwealth Attorney for the City of Charlottesville, Virginia State Police, Virginia Fusion

Center, Al Thomas, Maurice Jones, Joseph Platania, Lisa Robertson, Miriam Dickler, and Michael Signer). *See, e.g.*, Walker Decl. Ex. F Nos. 5–8. Hoft apparently recognizes this fact, because, in addition to serving subpoenas on the Non-Party Journalists, he has separately subpoenaed many of these entities and individuals. Under the journalist's privilege law, he cannot obtain information like this from journalists where it is readily available elsewhere.

Moreover, and as discussed above, the many subpoenas Hoft has issued are apparently part and parcel of his decision to try to prove that what he said about Gilmore was true—that Gilmore was part of a conspiracy by the State Department, other government agencies, and the media to instigate the violence in Charlottesville and then cover up the government's role in that violence. Even taking this far-fetched conspiracy theory seriously, there are many ways to go about proving its truth other than by subpoenaing members of the media, including by deposing Gilmore himself, which Hoft has not bothered to do. *See, e.g.*, *Jimenez v. City of Chi.*, 733 F. Supp. 2d 1268, 1272 (W.D. Wash. 2010) (privilege not overcome where information could be obtained from party to the litigation); *Shoen v. Shoen*, 5 F.3d 1289, 1296-98 (9th Cir. 1993) (quashing subpoena to non-party journalist where defamation plaintiff had not deposed defendant).

Beyond Gilmore, public records requests for the correspondence of those government officials Hoft suspects of participating in the conspiracy can and should be made, government officials can and should be subpoenaed (and motions to quash those subpoenas should be resolved), and findings and conclusions of independent investigators such as Timothy Heaphy at Hunton & Williams, LLP can and should be studied before the media is approached. Hoft has not fully exhausted these or other alternative sources and thus the subpoenas to the Non-Party

12

Journalists should be quashed. *See, e.g.*, *Johnson*, 69 Va. Cir. at 98 (privilege not overcome where information "comparable" to that of reporter is available from alternative sources)

The journalist's privilege clearly prevents civil litigants from seeking discovery from third-party journalists such as the Non-Party Journalists except in "exceptional cases" where the journalist is the *only person* who has evidence *necessary* to a subpoenaing party's claim. *See, e.g.*, *Zerilli*, 656 F.2d at 712-14 (in "civil cases . . . in which the reporter is not a party[,]" the privilege prevails "in all but the most exceptional cases" where the subpoenaing party "has exhausted every reasonable alternative source of information"). Here, as noted, there are many other (and better) sources of information, yet Hoft has failed to actually investigate what they know, choosing instead to burden umpteen third parties, including the Non-Party Journalists, with scattershot subpoenas. Hoft's failure to exhaust alternative sources for the information sought by the subpoenas to the Non-Party Journalists dooms at the outset any effort by Hoft to overcome the journalist's privilege. *See, e.g.*, *Church of Scientology Int'l v. Daniels,* 992 F.2d 1329, 1335 (4th Cir. 1993) (affirming subpoena properly was quashed where subpoenaing party had "made no effort to pursue alternative sources of information"); *Goldberg*, 123 F. Supp. 3d at 20 (quashing subpoena for non-confidential information where party failed to subpoena or depose "obvious alternative sources"); *Hutira*, 211 F. Supp. 2d at 122 (quashing subpoena for non-confidential information, finding that plaintiff "should (at a minimum) attempt to contact the other individuals discussed in the article," even if doing so presents "considerable difficulty"; concluding that the "alternative sources" factor of test "weighs so heavily in favor of quashing the subpoena, that [the court] does not need to address the other factors").

## **CONCLUSION**

For the foregoing reasons, the Non-Party Journalists respectfully request that this Court enter an appropriate order granting their Motion to Quash and Motion for a Protective Order.

Dated: June 14, 2021

Respectfully submitted,

BALLARD SPAHR LLP

By: _____
Charles D. Tobin
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com

Leita Walker (*pro hac vice pending*)
BALLARD SPAHR LLP
2000 IDS Center
80 South 8th Street
Minneapolis , MN 55402-2119
Telephone: (621) 371-6222
Fax: (612) 371-3207
walkerl@ballardspahr.com

*Attorneys for Non-Party Journalists*