IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| BRENNAN M. GILMORE, | ) | |
| Plaintiff, | ) | Civil Action No. 3:18-cv-00017 |
| | ) | |
| v. | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| ALEXANDER ("ALEX") E. JONES, et al., | ) | By:    Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |

This matter is before the Court on several non-party motions to quash subpoenas served by Defendant James Hoft ("Hoft"). The movants are (1) the Commonwealth's Attorney for the City of Charlottesville, ECF No. 273; (2) Commonwealth's Attorney Joseph Platania ("Platania"),[1] ECF No. 303; (3) the City of Charlottesville and former Chief of Police for the City of Charlottesville Alfred S. Thomas, Jr. ("Thomas"), ECF No. 275; (4) City of Charlottesville Police Detective Declan Hickey ("Hickey"), ECF No. 292; (5) former City Manager Maurice T. Jones ("Jones"), ECF No. 324; (6) the Virginia State Police ("VSP") and the Virginia Fusion Center ("VFC"), ECF No. 287; (7) the Northern Virginia Regional Intelligence Center ("NVRIC"), ECF No. 289; and (8) the Office of the Governor of Virginia, ECF No. 293. The motions have been fully briefed and argued, ECF Nos. 300, 301, 308, 313, 320, 329, 331, 336, 337, 345, 351, 353, 358, 360, 363, 364, and are ripe for disposition. *See* Pretrial Order ¶ 13 (citing 28 U.S.C. § 636(b)(1)(A)), ECF No. 54. For the reasons stated below, the Court GRANTS the motions to quash.

---

[1] Platania is the Commonwealth's Attorney for the City of Charlottesville. Hoft served one subpoena *duces tecum* on the Commonwealth's Attorney, *see* ECF Nos. 273, 274, and he also served a subpoena on Platania to appear for a Rule 30(b)(1) deposition, *see* ECF Nos. 303, 304. Platania moved to quash both subpoenas. *See* ECF Nos. 273, 303.

I. Background[2] & Procedural History

This is a defamation case arising out of the "Unite the Right" rallies in Charlottesville, Virginia on August 11–12, 2017. On August 12, supporters of "Unite the Right" and counter-protesters filled the streets of downtown Charlottesville. Am. Compl. ¶¶ 25–28.[3] That afternoon, James Alex Fields Jr. ("Fields") drove his car into a crowd of counter-protesters, killing one woman, Heather Heyer, and injuring many others. *Id.* ¶ 29. Plaintiff Brennan Gilmore was a counter-protester who captured the attack on video. *Id.* ¶¶ 27, 30. He then posted the video on Twitter and spoke with reporters about what he had seen. *See id.* ¶¶ 31–35.

Plaintiff alleges that two days later, Defendant Hoft published on his website *Gateway Pundit* an article titled, "*Random Man at Protests Interviewed by MSNBC, NY Times Is Deep State Shill Linked to George Soros.*" *See id.* ¶ 62. Plaintiff alleges that Hoft "unequivocally" asserted Plaintiff was a "'deep state shill' who is part of the State Department's attempt to cover up its involvement in instigating the attack in Charlottesville." *Id.* ¶ 63. Specifically, he claims that Hoft wrote:

> The random Charlottesville observer who was interviewed by MSNBC and liberal outlets turns out to be a deep state shill with links to George Soros. It looks like the State Department was involved in Charlottesville rioting and is trying to cover it up. But after Deep State got caught they are trying to erase this guy from their records.
>
> . . . .
>
> The State Department is very familiar with Brennan Gilmore. He was involved in the Kony 2012 operation. The State Department later removed any reference of Brennan. Why would the State Department react in such a way? Why would the State Department scrub that? . . . This weekend Brennan Gilmore happened to be in Charlottesville with the rioters. The media knows exactly who he is yet played it

---

[2] This section summarizes certain factual allegations in Plaintiff's Amended Complaint, ECF No. 29. It focuses solely on facts relevant to Plaintiff's claims against Hoft. It does not include facts relevant to Plaintiff's claims against any other defendants to this action.

[3] Pinpoint citations to documents filed electronically in this Court use the header page numbers generated by CM/ECF and the exhibit labels assigned by the filing party.

off like a casual observer. This is how the Deep State is working with the liberal media to shape narrative and fool the American people.

*Id.*; *accord* Am. Compl. Ex. E, Jim Hoft, "Random Man at Protests Interviewed by MSNBC, NY Times is Deep State Shill Linked to George Soros," www.thegatewaypundit.com (Aug. 14, 2017), ECF No. 29-5. Plaintiff alleges that Hoft's statements were false and defamatory. *See* Am. Compl. ¶¶ 64–82. Gilmore claims that Hoft's accusation that he "participated in a government-orchestrated scam in Charlottesville is an assertion of fact that is objectively and verifiably false." *Id.* ¶ 64; *see also id.* ¶ 67. Similarly, he claims that Hoft "implie[d] a number of assertions of fact that are provably false," namely:

> 1) that the State Department organized the Charlottesville rioting and/or attack; 2) that Mr. Gilmore participated in the State Department's planning of the Charlottesville riots and/or attack; 3) that the State Department conspired to conceal these facts by removing information about Mr. Gilmore from a number of internet sources; 4) that media outlets were involved in the conspiracy because they knew Mr. Gilmore was a State Department employee; 5) that the media characterized Mr. Gilmore as a casual observer because they were working in concert with Mr. Gilmore, the State Department, and other government agencies to cover up their involvement in the conspiracy; and 6) that all of these conspirators worked together to deceive the public about what happened in Charlottesville that day.

*Id.* ¶ 67. Plaintiff alleges that Hoft, who "shared a link to the article with his 83,000 followers on *Twitter*," *id.* ¶ 69, intended that his readers understand his statements as assertions of fact, *id.* ¶¶ 68–69 (noting that Hoft's followers "quickly re-posted and shared the article over one hundred times" and responded with comments that suggested they believed Hoft's article to be factual). Plaintiff also alleges that Hoft failed to investigate his claims, explaining that Hoft did not contact Plaintiff for comment, contact any of the other individuals or organizations named in the article, identify any reputable human sources in his article, or have the statements independently fact-checked prior to publication. *Id.* ¶¶ 72–76. Plaintiff contends that Hoft instead "relied entirely on screenshots from an anonymous, disreputable Reddit post as his 'research,'" *id.* ¶ 77, "despite entertaining serious doubts about the veracity of his claims," *id.* ¶ 82. And he alleges

3

that "[a]ll of these failures clearly demonstrate that Hoft deliberately distorted the facts and their context and departed from even the most basic journalistic standards of accuracy and fact-checking for factual reporting." *Id.* ¶ 78; *see also id.* ¶ 79 (alleging that Hoft "consciously set out to make his false statements about Mr. Gilmore conform to [the] narrative" that the Deep State was attempting to plan a coup and "was behind" Fields's car attack).

*

In April and May 2021, Hoft issued subpoenas *duces tecum* to several nonparties, including the Commonwealth's Attorney for the City of Charlottesville, ECF No. 274-1; the City of Charlottesville, ECF No. 275-1; Thomas, ECF No. 275-2; Jones, ECF No. 324-1; Hickey, ECF No. 292-1; the VSP, ECF No. 287-1; the VFC, ECF No. 287-2; the NVRIC, ECF No. 289-1; and the Office of the Governor of Virginia, ECF No. 293-1. Hoft also issued subpoenas to conduct a Rule 30(b)(6) deposition of the City of Charlottesville, ECF No. 275-1; and to depose Thomas, ECF No. 275-2; Hickey, ECF No. 292-1; Jones, ECF No. 324-1; and Platania, ECF No. 304-1, in their personal capacities. Each of Hoft's subpoenas broadly seek government documents purportedly relating to the Unite the Right Rally. The subpoenas are not identical, but they can be grouped into four categories:

First, the subpoenas *duces tecum* issued to the City of Charlottesville, the Commonwealth's Attorney, Thomas, Hickey, and Jones are substantially similar.[4] *See, e.g.*, Commw.'s Att'y's Br. in Supp. Ex. A, Subpoena to Commw.'s Att'y 11–14, ECF No. 274-1. These subpoenas broadly seek all communications, videos, photos, and documents exchanged

---

[4] At oral argument, counsel for the City of Charlottesville moved for a protective order to prohibit Hoft from subpoenaing current and former Charlottesville employees in the future. I decline to impose a protective order for that purpose at this time. But I caution that "[i]n the event additional over broad subpoenas are brought to the attention of the Court, appropriate remedial steps will be considered." *In re Bunce*, No. TDC-19-3084, 2020 WL 1331991, at *4 (D. Md. Mar. 23, 2020).

between the subpoena recipient and various individuals, businesses, and government entities from June 2017 through the present, *id.* ¶ 11; *see also id.* ¶¶ 1–5 (requesting similar information from August 10–14, 2017); all documents[5] and electronic communications in the possession of the subpoena recipient "pertaining to or otherwise referencing the Unite the Right Rally, [Jason] Kessler, [Richard] Spencer, James Fields, Heather Heyer, and/or Brennan Gilmore," *id.* ¶¶ 6–7; all documents relating to the Heaphy Report[6] and provided to Tim Heaphy, *id.* ¶¶ 8–9; all documents relating to witnesses to the Unite the Right Rally (including their names, addresses, and phone numbers), *id.* ¶ 10; all investigative documents relating to and videos/photographs of Heather Heyer, *id.* ¶¶ 13, 16; all investigative documents and hearing/trial transcripts relating to the Fields prosecution, as well as all videos and photographs of Fields, *id.* ¶¶ 13–15 (citing eleven different criminal case numbers); criminal investigative and other documents relating to various other individuals, *id.* ¶¶ 13, 18–20; and all photographs and videos of Brennan Gilmore from 2010 through the present, *id.* ¶ 17. Hoft's subpoena to the Commonwealth's Attorney's Office also seeks "[a]n Index of the names of all standard forms used by all departments of the City of Charlottesville, and/or [the] Charlottesville Commonwealth Attorney's Office, and/or

---

[5] Hoft's definition of the term "Document" is expansive. *See* Subpoena to Commw.'s Att'y 7, ¶ n, ECF No. 274-1. It provides that "'Document' shall mean[] any kind of written, printed, typed, recorded, or graphic matter, however produced or reproduced, of any kind or description, whether sent or received or neither, including originals, copies, and drafts of both sides thereof, and including without limitation: [over 100 different kinds of documents], and things similar to any of the foregoing however denominated, whether currently in existence or already destroyed." *Id.*

[6] The Heaphy Report is a publicly available report that was prepared following a third-party investigation into the Unite the Right Rally. Hoft explains that "[o]n or about August 25, 2017, the City [of Charlottesville] hired Timothy Heaphy, a former US Attorney and partner at Hunton & Williams, LLP . . . to conduct an investigation into . . . all aspects of the [Unite the Right Rally], including but not limited to the failures of government at all levels in protecting the public. . . . Heaphy and Hunton were provided with **unlimited** access to the City's documents, communications, records, and other materials relating to the UTR." Hoft's Opp'n to City of Charlottesville's & Thomas's Mot. to Quash 3, ECF No. 301.

Joseph Platania, including but not limited to all naming conventions used for purchasing orders and the preservation of documents, records, and things." *Id.* ¶ 21 (emphasis omitted).

Second, the Rule 30(b)(6) subpoena issued to the City of Charlottesville asks the City to produce a corporate representative(s) to testify as to additional information. *See* City of Charlottesville's & Thomas's Mot. to Quash Ex. A, Subpoena to City of Charlottesville 15, ECF No. 275-1. It lists multiple topics for deposition, including all the "topics or subjects mentioned or otherwise referenced" in the subpoena *duces tecum* issued to the City, *id.* ¶ 1; all training provided by the City in anticipation of or because of the Unite the Right Rally, *id.* ¶ 4; all information relating to the Heaphy Report, *id.* ¶ 5, the firing, resignation, and/or departure of Thomas, Jones, and former Charlottesville Mayor Michael Signer, *id.* ¶ 6, the Fields criminal trial, *id.* ¶ 9, and the investigation of Heather Heyer's death, *id.* ¶ 10; an index of the names of all standard forms used by all departments of the City, *id.* ¶ 11; the "site, location and method of all file storage for the City of Charlottesville; the location of all City of Charlottesville email servers; the location of all physical files; and the processes by which public business on private email and cell/mobile phones, are preserved," *id.* ¶ 12; and the custodian(s) of records for all of the requested information, *id.* ¶¶ 2–3.

Third, the subpoenas *duces tecum* issued to state law enforcement agencies, the VSP, the VFC, and the NVRIC are almost identical to each other. *See, e.g.*, VSP's & VFC's Mot. to Quash Ex. A, Subpoena to VSP 17–21, ECF No. 287-1. They seek all documents, materials, notes, records, communications, videos, photos, and/or other materials concerning and/or relating to the Unite the Right Rally, the Heaphy Report, the Fields prosecution, the death of Heather Heyer, and the subpoenas recipients' collection of evidence, documents,

communications, and records related to these topics, *id.* ¶ 1; all field reports, SAR[7] reports, entity/group or individual dossiers, intelligence updates, and/or threat assessments for ANTIFA,[8] BLM,[9] and white nationalists or white supremacists, including but not limited to concerns about violence or terrorism, from January 2017 through January 2018, *id.* ¶¶ 2, 4; all documents, emails, and communications pertaining to ANTIFA, Black Lives Matter, and about seventy other identified individuals and entities, *id.* ¶¶ 3, 5, 6; and all documents and communications exchanged between the subpoena recipient and the same list of about seventy individuals and entities (including Plaintiff, ANTIFA, Black Lives Matter, certain federal agencies (DNI, CIA, FBI, NGIA, DHS, US Army), George Soros, and various other entities and individuals) regarding the Unite the Right Rally and related individuals, *id.* ¶ 6.

---

[7] Hoft's subpoenas to the VSP, the VFC, and the NVRIC define "SAR" to refer to "Suspicious Activity Report[s]." *See* Subpoena to VSP 16, ¶ zzz, ECF No. 287-1. Specifically, Hoft provides that "'**SAR**' shall mean and refer to the Nationwide SAR Initiative, also known as the Nationwide Suspicious Activity Reporting Initiative, a program of the US Department of Homeland Security, and all departments and entities comprising it, and/or past and present employees, agents, officers, directors, managers, and/or representatives." *Id.*

[8] Hoft defines "ANTIFA" broadly. *See* Subpoena to VSP 9–11, ¶ rr, ECF No. 287-1. Specifically, Hoft provides that "'**ANTIFA**' shall mean and refer to the American variant of a global left-wing 'anti-fascist' political movement, including all domestic (American) autonomous groups which self-identify as being part of the Antifa movement, or which have been identified or known by the subpoenaed party as being part of the Antifa movement. Antifa shall also mean and refer to a loose confederation of far-left wing smaller cells, sometimes called 'affinity groups', that coordinate to undertake criminal actions and activity that include disruption of events, counter-protesting, agitation, infiltration. This group generally espouses far-left wing ideological goals and aims, and generally speaking has a favorable disposition to Communism and the violent means and methods necessary to achieve that political system. Typically, the group members wear all-black. '**ANTIFA**' shall also mean and refer to any **Affinity Group** or **MEMBER** of ANTIFA." *Id.* "'**ANTIFA**' shall also mean and refer to" any of the seventy-five individuals, organizations, and associations listed in subparagraph rr(a)–(www). *Id.*

[9] Hoft defines "BLM" to refer to the Black Lives Matter movement. *See* Subpoena to VSP 12, ¶ tt, ECF No. 287-1. Specifically, Hoft provides that "'**Black Lives Matter**' and '**BLM**' shall mean and refer to the American variant of a global left-wing 'anti-racism' political movement known as Black Lives Matter, including all domestic (American) autonomous groups which self-identify as being part of the BLM movement, or which have been identified or known by the subpoenaed party as being part of the BLM movement, and/or any person or group which is a **MEMBER AFFINITY GROUP** of BLM." *Id.*

Fourth, the subpoena *duces tecum* issued to the Office of the Governor of Virginia requests somewhat different information. *See* Governor's Mot. to Quash Ex. A, Subpoena to Va. Governor 17–21, ECF No. 293-1. It seeks the same information sought in the law enforcement subpoenas, *see id.* ¶¶ 1–2, 11–14, as well as all kinds of information about former Virginia Governor Terry McAuliffe's ("McAuliffe") communications, whereabouts, and security detail for August 10–14, 2017, *see id.* ¶¶ 3–10. It seeks, for example, all schedules and itineraries, *id.* ¶ 3; an index of all personnel and vehicles (including aircraft and helicopters) providing support for McAuliffe and/or his motorcade, *id.* ¶¶ 5–6; all documents and communications relating to McAuliffe's whereabouts, *id.* ¶ 10; and all documents, communications, and/or messages between McAuliffe and "himself, and/or any other person, organization, or entity," *id.* ¶ 9; for August 10–14, 2017. It also seeks detailed information about McAuliffe's motorcade:

> All fuel logs, security logs, cargo manifests, fleet logs, travel logs, trip logs, deployment logs, transportation logs, flight logs, take-off and landing logs, time-in-flight logs, airframe logs, rotor logs, engine logs, logs to determine air-worthiness, personnel lists, receipts, invoices, payroll records, passenger manifests, itineraries, and/or maintenance logs, relating to Governor Terry McAuliffe, his motorcade, and/or all vehicles, automobiles, fixed-wing aircraft, and/or helicopters (including but not limited to security detail vehicles) associated with his motorcade, for the period of August 10, 2017 through August 14, 2017.

*Id.* ¶ 4, *see also id.* ¶ 7 (requesting similar information), ¶ 8 (requesting similar information for the period from January 2017 through January 2018).

**

The nonparties move to quash Hoft's subpoenas. They argue that Hoft's subpoenas are overbroad, that compliance would be unduly burdensome, and that much of the information Hoft seeks is privileged. They also contend that the information Hoft seeks is unrelated to the claims at issue in this case. Specifically, they explain that Hoft seeks an enormous amount of information regarding the nonparties' involvement in, preparation for, and investigation of the

August 12, 2017 Unite the Right Rally and associated events. *See, e.g.*, Commw.'s Att'y's Br. in

Supp. 2–4, ECF No. 274. And they argue that none of this information is relevant to Plaintiff's

defamation claim against Hoft. *See, e.g.*, *id.* at 5–6 (explaining that to succeed on his claims,

Plaintiff must prove Hoft's state of mind at the time of publication, and arguing that because

Hoft "obviously did not have the information" he now seeks at the time of publication, it could

not have influenced his state of mind at that time).

      Hoft disagrees. He argues that truth is an "<u>absolute</u> defense to a claim of defamation."

Hoft's Opp'n to VSP's & VFC's Mot. to Quash 6 (citing *Phila. Newspapers, Inc. v. Hepps*, 475

U.S. 767, 776 (1986)), ECF No. 313. Accordingly, he contends that if he can prove that his

statements were accurate—that Plaintiff really was a "deep state" operative working with the

State Department to orchestrate the rioting and violence in Charlottesville on August 12 and to

cover up the same—he will prevail in this litigation. *Id.* He explains, for example:

> The factual allegations in play – i.e., *inter alia*, whether or not Mr. Gilmore engaged in a public-private conspiracy aimed at either instigating violence in Charlottesville, a "cover up," or misleading the public, are central and *material* facts to Gilmore's causes of action, and Hoft's defenses thereto. . . .
>
> For example, during the UTR, was Charlottesville truly under violent siege by pro-Lee protesters? Did these right-wing individuals <u>really</u> come, *as a militia or paramilitary group*, to Charlottesville for the express purpose of rioting, destruction, violence, and murder? Further, were the 'peaceful anti-racist counter-protesters' <u>really</u> nonviolent? . . .
>
> Political leaders within Virginia and beyond portrayed the UTR as a siege – with the pro-Lee protesters cast exclusively as all bigots and as the aggressors. There was no room for subtlety by the political actors, no room for accommodating opposing views, you were either all in favor or all opposed to the political question of the day. It is directly relevant whether the officials and governmental entities shared this 'all or nothing' attitude towards undesirable political actors and their use of the First Amendment, and whether this view caused them to collectively work together to suppress political speech they found repugnant.

*Id.* at 7–8 (footnote omitted). Hoft complains that he is the one who has been defamed by lies

surrounding the Unite the Right Rally, not the other way around:

The *archetype* – that the violence surrounding the UTR was exclusively an expression of rightwing, **violent** bigotry, is entirely predicated on lies. Perhaps they are lies with noble intentions. They are lies, nonetheless. They are used to incessantly defame political dissenters and journalists like Hoft. They are used as a rallying cry and moral justification to urge technology firms, governments, and advertisers to censor and deplatform Hoft and others for having views they compare to the views they describe as synonymous with "Charlottesville."

*Id.* at 9 (footnotes omitted). Relatedly, Hoft appears to contest the validity of Fields's criminal

convictions and explains that he seeks information that he believes would exculpate Fields:

Any evidence contradicting Gilmore's characterization [of Fields's car attack] is directly relevant to this suit. This would include any evidence that the protesters on 4th Street included contingents of violent ANTIFA, BLM and socialist militants, attacked Fields' car, threw canisters of urine at him, and broke the law in shutting down numerous major arteries all over Charlottesville – without a permit, and without objection, let alone consequence from the police. It would also include evidence that James Fields **didn't** drive into the protesters at full speed, that he actually **did** apply his brake before approaching the crowd, that he plugged his home address *in Ohio* into his GPS minutes before the crash, that the crowd violently attacked his car before and after the crash, that he refused medical attention – instead asking that it be directed to those injured in the crowd, that the crowd threw urine on him, that he expressed extreme remorse to law enforcement four minutes after the crash, that the pro-Lee protesters were not exclusively composed of bigots, and were a small group, outnumbered perhaps ten to one by "counter-protesters." In short, if *these* facts are true, then virtually everything Mr. Gilmore has stated about the UTR has been a lie, and his motivations are highly suspect.

. . . .

If evidence of coordination by public and/or private forces connected to Gilmore to, *inter alia*, impose a false or misleading narrative on the events surrounding UTR, or instigate violence, then not only is Gilmore proven to be wrong – possibly even a liar – but 20 year-old Fields' convictions in state and federal court and consecutive life sentences – plus *four hundred and nine* (409) years – were quite plainly influenced by something other than justice. If Hoft proves any of this, he wins.

Hoft's Opp'n to Commw.'s Att'y's Mot. to Quash 5–6 (footnotes omitted), ECF No. 300. Hoft

also rejects the nonparties' assertions of privilege, contending that blanket assertions of privilege

are inadequate under the federal rules and that the Court should order the nonparties to prepare

privilege logs specifically itemizing their privilege claims. *See, e.g.*, *id.* at 9–10; Hoft's Opp'n to

VSP's & VFC's Mot. to Quash 13–17, ECF No. 313.

## II. The Legal Framework

The Federal Rules of Civil Procedure authorize litigants to subpoena nonparties to testify

and/or produce documents relevant to the case. *See* Fed. R. Civ. P. 45(1)(A)(iii); *Bell, Inc. v. GE*

*Lighting, LLC*, No. 6:14cv12, 2014 WL 1630754, at *6 (W.D. Va. Apr. 23, 2014) ("The scope of

discovery for a nonparty litigant under a subpoena . . . is the same as the scope of a discovery

request made upon a party to the action, and a party is entitled to information that is relevant to a

claim or defense in the matter at issue" (quotation marks and brackets omitted)) (Moon, J.). But

because nonparties are "'strangers' to the litigation" who have "no dog in [the] fight," the

standard of review for a nonparty subpoena is higher than that used to assess discovery requests

to litigants. *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (quoting *Cusumano*

*v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)) (alteration in original).

Rule 26 allows parties to "obtain discovery regarding any nonprivileged matter that is

relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ.

P. 26(b)(1). Relevance "is not, on its own, a high bar." *Jordan*, 921 F.3d at 188 (explaining that

there may be a "mountain" of evidence that is "relevant in some way to the parties' dispute");

*see Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 199 (N.D. W. Va. 2000) (noting

that "courts broadly construe relevancy in the context of discovery" and that "[r]elevance for

discovery purposes is defined more broadly than relevance for evidentiary purposes"). But even

relevant information may not be discoverable if it is not "proportional to the needs of the case."

Fed. R. Civ. P. 26(b)(1); *see* Fed. R. Civ. P. 26(b)(2)(C)(iii). In assessing proportionality, courts

must consider multiple factors: "the importance of the issues at stake in the action, the amount in

controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Moreover, when a subpoena is directed to a nonparty, "courts must give the recipient's nonparty status 'special weight,' leading to an even more 'demanding and sensitive' inquiry than the one governing discovery generally." *Jordan*, 921 F.3d at 189 (quoting *In re Pub. Offering PLE Antitrust Litig.*, 427 F.3d 49, 53 (1st Cir. 2005)). Thus, "even if they have information that falls within the scope of party discovery," nonparties "should not be drawn into the parties' dispute without some good reason." *Id.* Accordingly, when assessing a subpoena directed to a nonparty, the court must also consider three additional factors. *Id.* at 189–90. First, the court must consider whether the requesting party "need[s]" the information sought, meaning that the information "likely (not just theoretically) . . . offer[s] some value over and above what the requesting party already has." *Id.* at 189. Second, the court must consider whether the requesting party can obtain the same or comparable information "that would also satisfy its needs" from other sources. *Id.* And third, the court must consider whether the request will impose a "cognizable burden[]" on the nonparty. *Id.* at 189–90 (explaining that "[a] nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs" and listing costs, overbreadth, privacy, and confidentiality interests as examples of cognizable burdens); *see also Eshelman v. Puma Biotechnology, Inc.*, No. 7:16cv18, 2017 WL 5919625, at *7 (E.D.N.C. Nov. 30, 2017) ("A subpoena is overbroad if it does not limit the documents requested to subject matter relevant to the claims or defenses.") (quoting *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 612 (E.D. Va. 2008)).

Rule 45(d)(3)(A) provides that "[o]n timely motion," the Court "must quash or modify" a subpoena that "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). A subpoena subjects a nonparty to undue burden if it "seeks information irrelevant to the case or that would require [the] non-party to incur excessive expenditure of time or money." *Cook v. Howard*, 484 F. App'x 805, 812 n.7 (4th Cir. 2012). Courts also consider the general discovery standards in Rule 26 when determining whether to quash or modify a subpoena directed to a nonparty. *Id.* at 812 ("Although Rule 45(c) sets forth additional grounds on which a subpoena against a third party may be quashed, taking into consideration facts peculiar to their status as a non-party, those factors are co-extensive with the general rules governing all discovery that are set forth in Rule 26."); *see also Jordan*, 921 F.3d at 189 ("As under Rule 26, the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient."); Fed. R. Civ. P. 26(c)(1) (authorizing the court, upon good cause shown, to issue a protective order to protect "a party or person from annoyance, embarrassment, oppression, or undue burden or expense").

"[T]he burden of proof is with the party objecting to the discovery to establish that the challenged production should not be permitted." *Jimmy A. Dunn Excavating Co. v. Eagle Pipeline, LLC*, No. 2:16cv4409, 2020 WL 1876338, at *2 (S.D. W. Va. Apr. 15, 2020) (quoting *Sherrill v. DIO Transp., Inc.*, 317 F.R.D. 609, 612 (D.S.C. 2016)) (alteration in original); *see also In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d at 612 ("When a non-party claims that a subpoena is burdensome and oppressive, the non-party must support its claim by showing how production would be burdensome."). But at the same time, the requesting party "should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation–or, in appropriate cases,

13

from other third parties that would be more logical targets for the subpoena" and should tailor the subpoena to its needs before serving it upon a nonparty. *Jordan*, 921 F.3d at 189–90.

IV. Discussion

Hoft has directed subpoenas for depositions and for production of documents to at least ten non-party government officials and entities, or former government officials, requesting an enormously extensive list of documents and information from each of them. He seeks, in short, everything they have pertaining to the Unite the Right Rally. Hoft's reasoning is simple: He has set out to prove that he was right all along, that the "Deep State" orchestrated the August 11–12, 2017 rioting and violence in Charlottesville, and that his allegedly defamatory statements about Plaintiff were, therefore, true. *See, e.g.*, Hoft's Opp'n to Jones's Mot. to Quash 7, ECF No. 353. This is clearly a fishing expedition for which Hoft has shown no good faith basis.

\*

First, I consider whether the discovery Hoft seeks is relevant to the claims and defenses at issue in this case. Fed. R. Civ. P. 26(b)(1); *Jordan*, 921 F.3d at 189. Hoft argues that the subpoenaed information is relevant because it may allow him to prove that his statements about Plaintiff were true. He contends, for example, that he will prevail if he can prove that Plaintiff "was part of any governmental conspiracy to instigate violence at the Unite the Right Rally, or to cover-up or hoodwink the public." *See, e.g.*, Hoft's Surreply in Opp'n to VSP's & VFC's Mot. to Quash 3, ECF No. 360. To succeed on his defamation claim, Plaintiff must show "(1) publication of (2) an actionable statement with (3) the requisite intent." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 666 (W.D. Va. 2019) (quoting *Choi v. Kyu Chul Lee*, 312 F. App'x 551, 552 (4th Cir. 2009)); *accord Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005)). A statement is not "actionable" unless it is both false and defamatory. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d

14

1087, 1092 (4th Cir. 1993). Therefore, truth is an absolute defense to defamation under Virginia

law. *Ebersole v. Kline-Perry*, 292 F.R.D. 316, 321 (E.D. Va. 2013). "A statement 'is not false if

its content or imputation is substantially true,' meaning that the 'statement is a fair and accurate

description of the event in question.'" *Id.* (quoting *PBM Prods., LLC v. Mead Johnson Nutrition

Co.*, 678 F. Supp. 2d 390, 400 (E.D. Va. 2009)). Hoft is correct that *some* evidence showing his

published statements about Plaintiff were true could be relevant to his defenses in this action.[10]

But the information Hoft seeks *in these non-party subpoenas* is wildly overbroad and has little (if

any) relevance to the veracity of his allegedly defamatory statements about Plaintiff.

---

[10] The presiding District Judge has previously held that for purposes of this litigation, Plaintiff is a
limited-purpose public figure. *See Gilmore v. Jones*, 370 F. Supp. 3d at 666–70. Accordingly, Plaintiff
must prove that Hoft published an actionable statement with "actual malice." *Id.* at 671 (citing *New York
Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323,
351 (1974). This requires Plaintiff to show that Hoft acted "with knowledge of falsity or reckless
disregard to truth or falsity" when he published the statement. *Masson v. New Yorker Magazine, Inc.*, 501
U.S. 496, 510 (1991); *see Gilmore*, 370 F. Supp. 3d at 679 (citing *Spirito v. Peninsula Airport Comm'n*,
350 F. Supp. 3d 471, 481 (E.D. Va. 2018)). I recently analyzed the actual malice standard as it applies to
discovery in this case. *See Gilmore v. Jones*, No. 3:18cv17, 2021 WL 68684, at *4–6 (W.D. Va. Jan. 8,
2021). I found, in part, that Plaintiff could seek discovery of documents that post-dated the allegedly
defamatory statements because "materials that post-date the publication (including, for example, the
publisher's own statements) may be probative of actual malice." *Id.* at *6. I distinguished evidence that
post-dated publication, however, from evidence that the publisher *did not have* at the time of publishing,
explaining that the latter simply "could not have influenced his state of mind in making the statement." *Id.*
Movants cite to this prior opinion to argue that the information Hoft seeks here is wholly irrelevant
because Hoft did not have it at the time of publication. *See, e.g.*, Commw.'s Att'y's Br. in Supp. 6 ("None
of the documents requested in the subpoena are relevant to the issues in this case. Hoft obviously did not
have the information that he is seeking from Platania at the time he published the statements concerning
Gilmore. Therefore, the information within Platania's possession, custody, or control could not have
influenced Hoft's state of mind."), ECF No. 274. Movants are correct that because Hoft did not have any
of the information he now seeks at the time of publication, that information cannot be relevant to the
actual malice inquiry. Nonetheless, evidence tending to show that Hoft's allegedly defamatory statements
were true would be relevant to Hoft's defense that his statements are not "actionable" because they were
not false. *See Bustos v. A&E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (Gorsuch, J.) ("So
a defendant who truthfully calls the plaintiff a member of the Aryan Brotherhood doesn't suffer any
liability, no matter how much the statement may have defamed or hurt the plaintiff's reputation in the
public's estimation. Neither does it matter if the defendant doesn't know the truth of the matter when he
makes the defamatory statement. So long as what he says turns out to be true, he is free from liability; the
truth, whenever discovered, serves as a complete defense."); *A Fisherman's Best, Inc. v. Recreational
Fishing All.*, 310 F.3d 183, 196 (4th Cir. 2002) ("Truth of the matter or substantial truth is a complete
defense to a claim for defamation.").

Plaintiff's allegations against Hoft are fairly narrow. He alleges that Hoft published one defamatory article about him on August 14, 2017. *See* Am. Compl. ¶¶ 62–82. The article states that Plaintiff was a "deep state shill with links to George Soros" and that the "State Department was involved in Charlottesville rioting and is trying to cover it up." *Id.* ¶ 63. It goes on to say that the State Department and the New York Times removed information from their websites to hide Plaintiff's identity as a "State Department asset" and suggests that Plaintiff must have been working with the "deep state" because he formerly worked for Democrat Tom Perriello, whose gubernatorial campaign "received a ridiculous amount of 'dark money', including $380k from George Soros." Am. Compl. Ex. E, "Random Man at Protests Interviewed by MSNBC, NY Times is Deep State Shill Linked to George Soros," ECF No. 29-5, at 4–8. Plaintiff alleges that Hoft's statements were defamatory because they were false and because Hoft made them with actual malice. *See Gilmore*, 370 F. Supp. 3d at 674–75; Am. Compl. ¶¶ 67–82.

Courts have recognized that nonparty subpoenas seeking information about the truth of an allegedly defamatory statement may be properly tailored to obtain information relevant to a party's defenses to defamation. *See, e.g.*, *Weinstein v. Brisman*, No. 18-3910, 2020 WL 1485960, at *1, *6 (D.N.J. Mar. 26, 2020) (denying in part motion to quash where evidence "pertain[ing] to expenses, loans, and other transactions involving Plaintiff" might show whether "Plaintiff legitimately acquired [certain] artwork in exchange for settlement of his debts" and thus could be relevant to whether defendant's statement that plaintiff had "stolen works of art from his mother" was true); *BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 364–65 (D.D.C. 2018) (granting publisher's motion to compel nonparty subpoena responses from high-level federal agencies where publisher sought brief, written responses to three discrete questions that were directly related to the veracity of the allegedly defamatory statements); *Eshelman*, 2017 WL

16

5919625, at *5 (denying in part motion to quash nonparty subpoenas where the information

sought was "highly relevant" to the veracity of the alleged defamatory statements, was tailored to

the subject matter of the statements, and was available, perhaps "exclusively," from the

subpoenaed nonparty); *Matter of Appl. of O'Keefe*, 184 F. Supp. 3d 1362, 1365, 1369–71 (S.D.

Fla. 2016) (denying motion to quash where libel defendant subpoenaed nonparty to testify and

produce documents in an effort to prove the truth of defendant's statement that plaintiff was

"foul-mouthed," because defendant showed that the nonparty had personal knowledge of

plaintiff's use of foul language and because there was no evidence that the subpoena was "a

fishing expedition," "a vehicle for harassment," or "needlessly cumulative" of other discovery).

         In evaluating whether the scope of a subpoena is overbroad, courts must ensure that the

requested information is relevant to the truth or falsity of the particular statements at issue. *See*

*Sheindlin v. Brady*, No. 1:21cv1124, 2021 WL 2075483, at *3–5 (S.D.N.Y. May 24, 2021)

(quashing multiple nonparty subpoenas, through which defendant sought evidence to prove that

his allegedly defamatory statements were true because defendant had failed to show that the

information he sought was relevant and necessary to the claims or defenses in the action);

*Weinstein*, 2020 WL 1485960, at *4, *6 (quashing in part nonparty subpoenas that sought "fifty-

six categories of documents" and broadly requested "all documents pertaining to [the

nonparties'] financial transactions, financial statements, audit files, formation and management

agreements," none of which was relevant to the veracity of the alleged defamatory statements or

to any other claims or defenses in the action); *Eshelman*, 2017 WL 5919625, at *5, *8 (granting

in part motion to quash nonparty subpoena  that requested all documents produced in "all" prior

civil lawsuits involving the nonparties because the subpoena was "facially overbroad" and

constituted a "fishing expedition" that likely would require production of "wholly irrelevant

documents"); *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007) (quashing multiple nonparty subpoenas where "the virtually limitless financial and other information" plaintiffs sought was "unnecessary and irrelevant" to the case and "the burden the[] demands place[d] on the subpoenaed non-parties and diversion of their staff to provide it far outweigh[ed] any probative value of the information").

Here, Hoft's subpoenas seek documents responsive to more than twenty broad requests to multiple nonparties, supplemented by expansive definitions. They are facially overbroad and are not tailored to the claims and defenses at issue in this litigation. The information Hoft seeks has nothing to do with whether the State Department and the New York Times purportedly deleted information from their websites to cover up Plaintiff's involvement in a State Department plot or whether Plaintiff was somehow part of the "deep state" because his former employer had received campaign donations from George Soros. The requests seek information about a supposed conspiracy between the media and numerous local and state government officials and entities. Plaintiff makes only a cameo appearance in these requests. Indeed, Hoft seems much more interested in arguing his narrative of the UTR, criticizing local and state officials, and challenging James Fields's criminal convictions than uncovering any information of Plaintiff's alleged role in a State Department/George Soros/mainstream media plot to turn the UTR violent then scrub all links to Plaintiff's role in a coverup.

"Furthermore, I get no suggestion of evidentiary support for [Hoft's] proposed defenses, other than that [*he*] says they are well-founded." *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. at 74. At oral argument, I asked Hoft's counsel, John Burns, Esq., to explain how the subpoena requests to the Commonwealth's Attorney's Office and to Platania, specifically, relate to Plaintiff and to explain what evidence he had developed so far to show Hoft's need for the

Commonwealth's Attorney to produce the requested materials. Hr'g on Mots. to Quash (June 14, 2021). In response, Burns vaguely suggested that the materials might lead to the discovery of some evidence about Plaintiff. *Id*. Burns acknowledged that requested information was not supported by any discovery from Plaintiff, and he did not cite any information developed in his investigation of the case that supported the scope of his requests.[11] *Id.* Burns attempted to provide some minimal evidentiary support for the relevance of some of the other subpoena requests. He argued that the Heaphy Report and deposition testimony from former Charlottesville Mayor David Norris show that law enforcement failures abounded during the Unite the Right Rally. *Id.*; *see also, e.g.*, Hoft's Opp'n to Jones's Mot. to Quash 4–7, 9–10, ECF No. 353. But, he conceded that the Heaphy Report does not mention Plaintiff, Hr'g on Mots. to Quash, and he acknowledged that Norris had not been mayor for at least five years before the Unite the Right Rally, *id.*; *see also* Hoft's Opp'n to Jones's Mot. to Quash Ex. 1, Dep. Tr. of D. Norris 66 (June 2, 2021), ECF No. 353-1. Burns also argued that Gilmore was a Foreign Service Officer ("FSO") for the State Department, alleged that the FSO title is a common cover for intelligence operatives, and suggested that Plaintiff might have been working with a public relations firm that he alleged was connected to Tom Perriello and was "working with activists" in Charlottesville for about a week prior to the Unite the Right Rally. Hr'g on Mots. to Quash ("So I think that there's a firm connection for a possibility that Mr. Gilmore was part of a media conspiracy in this -- um -- in the Unite the Right Rally."). Even if any of these dots connected— they do not—the subpoena requests to the state and local government officials and entities are not tailored to obtain this information.

---

[11] Burns represented that although he recently served Plaintiff with discovery requests, Plaintiff objected to most (if not all) of his requests and has provided little substantive information.

The sheer breadth of the subpoenas shows that Hoft has embarked on a fishing expedition into the existence of some amorphous "deep state."[12] Such broad discovery requests abuse the discovery process, particularly when directed to nonparties. "A nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs; the requesting party should have done that before serving it." *Jordan*, 921 F.3d at 190. Even if Hoft were to find some kernel of evidence suggesting the existence of some kind of "deep state," the requests are not tailored to find evidence that Plaintiff, himself, is a "deep state shill with links to George Soros," Am. Compl. ¶ 63; that the State Department was "involved in [the] Charlottesville rioting," *id.*; or that the State Department and/or the New York Times tried to cover up Plaintiff's involvement in the same, *id.* ¶ 65–66. *See Eshelman*, 2017 WL 5919625, at *7 ("[C]ourts in the Fourth Circuit have concluded that a subpoena for an entire file constitutes an overbroad request where that file likely contains both relevant and irrelevant information.").

For example, Hoft's requests for an index of the standard forms used by the City of Charlottesville, all "videos and photos of Heather Heyer," all investigative documents relating to the Fields prosecution, "fuel logs, security logs, cargo manifests" and other information about former Governor McAuliffe's motorcade, suspicious activity reports about ANTIFA and Black Lives Matter, or the "site, location and method of all file storage for the City of Charlottesville" simply have no relevance to the allegedly defamatory statements about Plaintiff. *See* Subpoena to

---

[12] At oral argument, Burns argued that the term "deep state" was an "extremely imprecise term that means different things to different people." Hr'g on Mots. to Quash. He explained that to "most people," including Hoft, "deep state" was not limited to one particular agency or group. *Id.* Instead, Hoft understood the term to mean "a pervasive, decentralized constellation of groups, agencies, . . . aspects of agencies, or individuals . . . working to pursue different ends." *Id.* He further argued that it was inaccurate to "try to pigeonhole" the term "deep state" to refer only to the State Department, and he explained that "in this particular case," he believed the term referred to local, state, and federal government actors. *Id.* He could not provide any further specifics about which actors he believes encompass the "deep state" for purposes of Hoft's discovery requests in this case. *Id.*

Comm'w.'s Att'y 13–14, ¶¶ 13–16, 21, ECF No. 274-1; Subpoena to Va. Governor 17–18, ¶¶ 2, 4–10, ECF No. 293-1; Subpoena to City of Charlottesville 15, ¶ 12, ECF No. 275-1. Similarly, documents and communications exchanged between the VSP, the VFC, the NVRIC, former Governor McAuliffe and his staff, and about seventy different individuals and organizations, including federal prosecutors, ANTIFA, Black Lives Matter, the U.S. Army, DNI, CIA, FBI, the Southern Poverty Law Center, and various other entities between June 1, 2017, and the present are not relevant. *See* VSP's & VFC's Mot. to Quash Ex. A, Subpoena to VSP 18–21, ¶ 6, ECF No. 287-1; *id.* Ex. B, Subpoena to VFC 18–21, ¶ 6, ECF No. 287-2; NVRIC's Mot. to Quash Ex. A, Subpoena to NVRIC 19–22, ¶ 6, ECF No. 289-1; Subpoena to Va. Governor 19, ¶ 14, ECF No. 293-1. Accordingly, I cannot find that Hoft "needs" the information he seeks. *Jordan*, 921 F.3d at 189. It is simply irrelevant and not "likely" to "offer some value over and above what [he] already has." *Id.*; *see also Ernst v. Kauffman*, No. 5:14cv59, 2016 WL 11261290, at *1, 3 (D. Vt. June 23, 2016) (quashing nonparty subpoena where defendants "embarked on a broad discovery effort designed to prove the truth" of various allegedly defamatory statements but had not demonstrated why they needed broad nonparty tax and financial information to do so); *In re Subpoena Issued to Mont. Dep't of Health & Hum. Servs.*, No. MCV 06-23-M-DWM-JCL, 2007 WL 43945, at *4 (D. Mont. Jan. 3, 2007) (quashing nonparty subpoena that plaintiff argued would "help him demonstrate that he was in fact reporting the truth about [defendants'] facilities, and that defendants indeed defamed him by making false statements to the contrary regarding his journalistic integrity," because plaintiff failed to show how such information could be relevant to the claims and defenses in the case).

Second, I consider whether the subpoenas would impose "cognizable burdens" upon the nonparties if compelled to respond. *Jordan*, 921 F.3d at 189–90. Cognizable burdens include

"dollars-and-cents costs," overbreadth, and invasion of privacy and confidentiality interests of

both the subpoena recipients and "others who might be affected." *Id.* at 189–90. Hoft's

subpoenas are facially overbroad. Burns conceded as much at oral argument while discussing

Hoft's subpoenas to VSP and VFC, explaining that he had "hoped to have the opportunity to

meet and confer with" VSP to devise a more narrowed subpoena request. Hr'g on Mots. to

Quash. This "tacit admission" of the requests' overbreadth "ignores the undue burden" they

impose upon the nonparties. *Eshelman*, 2017 WL 5919625, at \*8. A small percentage of the

requests do at least mention Plaintiff and could possibly turn up some information that could

theoretically support Hoft's defenses to this action. *See, e.g.*, Subpoena to Commonwealth's

Att'y 12–14, ¶¶ 7, 12, 17, ECF No. 274-1. But the requests are also likely to require production

of a massive number of "wholly irrelevant documents." *Eshelman*, 2017 WL 5919625, at \*8; *see

also In re Bunce*, 2020 WL 1331911, at \*2 (noting that although subpoena requests referenced

"racial minorities," the treatment of whom was relevant to the case, "the balance of the

information sought by the [s]ubpoenas [was] not as tailored").

Moreover, the nonparties made credible, detailed showings that responding to the

subpoenas would require extensive preparation, would require the diversion of public resources,

and would be enormously costly. The City of Charlottesville argues, for example, that preparing

a designee(s) for a Rule 30(b)(6) deposition on the thirty-three[13] topics Hoft identified "would,

quite literally, take months of full-time preparation." City of Charlottesville's & Thomas's Mot.

to Quash 6, ECF No. 275. Similarly, "[t]o conduct a search for and to assemble the requested

---

[13] Hoft lists twelve topics for his requested Rule 30(b)(6) deposition of the City of Charlottesville. *See*
Subpoena to City of Charlottesville 15, ECF No. 275-1. But the first topic incorporates all the topics
listed in Hoft's subpoena *duces tecum* to the City of Charlottesville, *see id.* ¶ 1, for a total of thirty-three
deposition topics. *See id.* at 11–14.

Documents listed within the subpoenas would involve hundreds of hours of effort from multiple

City departments and agencies." *Id.* The Commonwealth's Attorney's Office for the City of

Charlottesville, Platania, Hickey, and Jones agree, contending that preparation would be

incredibly burdensome and/or that they lack access to the information they would need to

respond to Hoft's subpoenas. *See* Commw.'s Att'y's Br. in Supp. 7–8, ECF No. 274; Platania's

Br. in Supp. 5, ECF No. 304; Hickey's Mot. to Quash 6–7, ECF No. 292; Jones's Mot. to Quash

7–8, ECF No. 324. Likewise, the VSP, the VFC, and the NVRIC argue that compiling all

responsive information would require significant resources, the expenditure of which would be

vastly disproportionate to any possible benefit to Hoft. *See* VSP's & VFC's Mot. to Quash 6–7,

ECF No. 287; NVRIC's Mot. to Quash 7, ECF No. 289. Specifically, VSP and VFC explain that

they "transitioned their email accounts from Outlook to Google" in March 2018 and that a

"service provider would need to be enlisted to reconstruct the Outlook environment." VSP's &

VFC's Mot. to Quash 6, ECF No. 287 (explaining that one service provider quoted $20,400 to

perform an "assessment of what would be required to create the environment," and that

additional costs to create the environment and then search for responsive emails would also be

incurred).

Finally, the Governor's Office explains that the Library of Virginia is the proper

custodian for records of a prior gubernatorial administration, and the former Governor therefore

does not have access to the records Hoft seeks. *See* Governor's Reply in Supp. Mot. to Quash 2

(rejecting Hoft's claim that the Governor could "produce the records 'with a flick of his

keyboard'" (citing Va. Code § 2.2-126)), ECF No. 358.

In addition to the "dollars-and-cents costs associated with a large and demanding

document production," Hoft's subpoenas raise significant concerns about privacy and

confidentiality.[14] *See Jordan*, 921 F.3d at 189–90. For example, they seek videos, photos, and investigative records regarding Heather Heyer and other victims impacted by the Unite the Right Rally. *See, e.g.*, Subpoena to Commw.'s Att'y 12–14, ¶¶ 7, 13, 16, 20, ECF No. 274-1. They also seek extremely detailed information about the Governor's itineraries, movements, security detail, and motorcade. Subpoena to Va. Governor 18, ¶¶ 3–10, ECF No. 293-1. None of this information has any bearing on whether Plaintiff was a "deep state shill" for the State Department with ties to George Soros, and it could substantially impair the privacy and confidentiality interests of movants and other third parties. Overall, movants have shown with specificity that complying with the subpoenas would impose "cognizable burdens," *Jordan*, 921 F.3d at 189, upon them. By contrast, Hoft has not articulated why he needs such wide-ranging discovery from these nonparties, and he has not shown that he made any effort to tailor those requests to avoid sweeping in irrelevant information. *See id.* at 189 n.2 (explaining that although the moving party bears the burdens of proof and of persuasion on a motion to quash, "they are not terribly difficult burdens to meet if the requesting party cannot articulate its need for information and address obvious alternative sources").

Third, Hoft lacks a good-faith basis for his requests. Rule 26(g) requires that every discovery request be signed by counsel, certifying "that to the best of [his] knowledge, information, and belief formed after a reasonable inquiry," the request is consistent with the federal rules, is "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," and is "neither unreasonable nor unduly

---

[14] Movants also raise various privilege arguments. *See, e.g.*, VSP's & VFC's Mot. to Quash 5–6, ECF No. 287; NVRIC's Mot. to Quash 6–7, ECF No. 289; City of Charlottesville's & Thomas's Mot. to Quash 8–9, ECF No. 275. Because I find that Hoft's subpoena requests seek irrelevant information and are overbroad and disproportionate to the needs of the case, I do not address the non-parties' privilege arguments.

burdensome or expensive, considering the needs of the case, prior discovery in the case, the

amount in controversy, and the importance of the issues at stake in the action." Fed. R. Civ. P.

26(g)(B)(i)–(iii); *see also* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing

and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense

on a person subject to that subpoena."). Here, Hoft's briefs in support primarily expound upon

his conspiracy theories. He repeatedly speculates about what the subpoenas *might* reveal:

> Did Thomas unilaterally declare the unlawful assembly, or was he ordered to
> declare the unlawful assembly by Governor McAuliffe? Why didn't the national
> guardsmen or VSP troopers actually act to protect anyone? Why were all of the law
> enforcement centralized at Emancipation Park, instead of providing security
> throughout the city? Why were ANTIFA permitted to shut down entire arteries of
> the City with impunity? Who made these decisions? What security intelligence did
> all of these actors possess about the composition of the protesters/counter-
> protesters? What real-time information was collected on August 12, 2017? What
> did civic leaders and Governor McAuliffe know as they were making these
> decisions? Did they anticipate the presence of violent left-wing radicals? Violent
> right-wing radicals? Did they deliberately intend to instigate violence? Who was
> coordinating this effort? Who was involved? Were those making decisions police
> officials, politicians, or outside interest groups?

Hoft's Opp'n to VSP's & VFC's Mot. to Quash 11–12, ECF No. 313; *see also* Hoft's Opp'n to

Platania's Mot. to Quash 9 (explaining that Hoft believes Fields "was railroaded"), ECF No. 337.

Hoft's arguments abound with questions about law enforcement failures, media cover-ups, and

the validity of Fields's convictions. Yet, his wide-ranging conspiracy theories are founded on

mere suspicions, untethered to any information about Plaintiff that Hoft can identify. Moreover,

the existence of some amorphous "deep state," proven through the actions or inactions of local

and state officials entities, is not relevant to the truth or falsity of Hoft's allegedly defamatory

statements about Plaintiff's involvement with the State Department and George Soros. In an

effort to provide some evidence, Hoft repeatedly cites the Heaphy Report and Norris's deposition

testimony. *See* Hoft's Opp'n to Jones's Mot. to Quash 5–7, ECF No. 353; *see also* Dep. Tr. of D.

Norris (June 2, 2021), ECF No. 353-1. These sources identify failures in how law enforcement responded to the Unite the Right Rally. But they do not lend any credence to the existence of a "deep state." And they certainly do not have anything to do with whether Plaintiff was a "deep state shill with links to George Soros," Am. Compl. ¶ 63, nor do they show that the State Department was involved in the Charlottesville rioting and was involved with the media in a cover up, *id.* ¶¶ 63, 66. Accordingly, I question whether Hoft's counsel has complied with his obligation to develop a good faith basis for his discovery requests under the federal rules.

### V. Conclusion

Hoft's nonparty subpoena requests are overbroad, irrelevant, and disproportionate to the needs of the case. And "While the Court has the ability to more narrowly tailor the [s]ubpoenas to a reasonable scope," I decline to do so where Hoft's subpoenas have "greatly 'missed the mark.'" *In re Bunce*, 2020 WL 1331911, at *3. Hoft has advanced no evidence-based argument for why he needs such wide-ranging nonparty discovery to prove the truth of his allegedly defamatory statements about Plaintiff. And, the subpoenas would require the nonparties to embark on an extremely burdensome and costly search for responsive materials. I decline to impose such a burden on government employees and entities that simply have "no dog in [the] fight." *Jordan*, 921 F.3d at 189 (quoting *Cusumano*, 162 F.3d at 717) (alteration in original). For the foregoing reasons, the nonparties' motions to quash, ECF Nos. 273, 275, 287, 289, 292, 293, 303, 324, are GRANTED.

It is so ORDERED.

The Clerk shall send a copy of this Memorandum Opinion & Order to the parties and non-party movants.

ENTER: July 1, 2021

Joel C. Hoppe
U.S. Magistrate Judge