Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1                    UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF VIRGINIA
2                     CHARLOTTESVILLE DIVISION
   * * * * * * * * * * * * * * * *
3  BRENNAN M. GILMORE,
                              CIVIL ACTION 3:18-CV-00017
4  Plaintiff,                 AUGUST 27, 2021  1:05 P.M.
                              TELEPHONIC MOTIONS HEARING
5  vs.

6  ALEXANDER F. JONES, ET AL.      Before:
                                   HONORABLE JOEL C. HOPPE
7  Defendants.                     UNITED STATES MAGISTRATE JUDGE
   * * * * * * * * * * * * * * *   WESTERN DISTRICT OF VIRGINIA
8
   APPEARANCES:
9

10 For the Plaintiff:              ANWAR GRAVES, ESQUIRE
                                   HASSEN SAYEED, ESQUIRE
11                                 O'Melveny & Myers LLP
                                   1625 Eye Street, NW
12                                 Washington, DC 20006

13 For the Defendants Alex Jones, InfoWars, and Free Speech
   Systems:                       JAY M. WOLMAN, ESQUIRE
14                                 MARC RANDAZZA, ESQUIRE
                                   Randazza Legal Group PLLC
15                                 100 Pearl Street, 14th Floor
                                   Hartford, CT 06103
16
   For the Defendant James Hoft:  JONATHON C. BURNS, ESQUIRE
17                                 Burns Law Firm
                                   P.O. Box 191250
18                                 Saint Louis, MO  63119

19

20

21 FTR Operator:     Karen Dotson

22 Transcriber:      Lisa M. Blair, RMR, CRR, FOCR
                     255 West Main Street, Room 304
23                   Charlottesville, Virginia 22902
                     (434) 296-9284
24
   Proceedings recorded by electronic recording. Transcript
25 produced by computer.

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   APPEARANCES CONTINUED:

2   For the Defendant Lee Ann McAdoo:
                              DAVID S. WACHEN, ESQUIRE
3                             Wachen  LLC
                              11605 Montague Ct
4                             Potomac, MD 20854

5

6   For the Defendant Richard Creighton:
                              RAYMOND CREIGHTON, PRO SE
                              9214 13th Street N, Apt A
7                             Tampa, FL 33612

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  (Proceedings commenced, 1:05 p.m.)

2          THE COURT:  This is Joel Hoppe.  Who is on the line

3  for the plaintiff, Mr. Gilmore?

4          MR. GRAVES:  Good afternoon, Your Honor.  This is

5  Anwar Graves, O'Melveny and Myers, counsel for the plaintiff.

6  I'm joined by my colleague, Haseen Sayeed.

7          THE COURT:  Good afternoon.

8          Let's see.  And then who do we have on the line for

9  the InfoWars defendants?

10         MR. WOLMAN:  Good afternoon, Your Honor.  This is Jay

11 Wolman of Randazza Legal Group for Alex Jones, InfoWars, and

12 Free Speech Systems.  And I believe I'm joined by my colleague,

13 Mr. Randazza.

14         THE COURT:  Hello, everybody.

15         Now, I think, Ms. Dotson, you're on the line as well?

16         THE CLERK:  Yes, Your Honor.

17         THE COURT:  And recording this call?

18         THE CLERK:  Yes, sir.

19         THE COURT:  Okay.  Now, who else do we have on the

20 line?

21         MR. WACHEN:  Your Honor, David Wachen on behalf of

22 Defendant Lee Ann McAdoo.

23         MR. BURNS:  Your Honor, this is John Burns on behalf

24 of Jim Hoft.

25         THE COURT:  Good afternoon.

                    Gilmore v. Jones, et al., 3:18CV17, 8/27/21


 1          MR. CREIGHTON:  Your Honor, this is Raymond Creighton

 2   on my own behalf.

 3          THE COURT:  Good afternoon, Mr. Creighton.

 4          Anybody else?

 5          Okay.  Well, Counsel, thank you for calling in.  The

 6   purpose of today's call is to address some discovery that was

 7   issued by the defendants, Mr. Jones and InfoWars and Free

 8   Speech Systems, to the plaintiff, and the plaintiff's

 9   responses.  There have been several letters that have gone back

10   and forth in the last couple of weeks.  We briefly addressed

11   these issues at our last hearing.  And the plaintiff and

12   counsel for the defendants have agreed to discuss the issue

13   further, and to try and confer.  And I think that these latest

14   two letters were the product of that.

15          Let me ask this:  Mr. Randazza, have you -- since the

16   letters of August 23rd, the plaintiff's letter and your letter

17   of August 26th have been exchanged, have you all had any

18   further discussions about these discovery issues?

19          MR. WOLMAN:  This is Jay Wolman.

20          No, Your Honor.

21          THE COURT:  Well, then, Mr. Wolman, what else would

22   you like to say about these -- about these discovery requests?

23   I think we can just take them up category by category.  I'd

24   like to see if we can reach a resolution on some of them, and

25   then it may be necessary that others would be briefed.

                    Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1           MR. WOLMAN:  Certainly.

2           On the identification of allegedly false defamatory

3    statements, certainly while we recognize that whether something

4    may be defamatory may be in context, we still need to know

5    specifically what is alleged to be false, because we need to be

6    able to then prove either truth or substantial truth, or

7    otherwise show that our clients did not entertain serious

8    doubts about particular factual statements made.  And different

9    facts may have come from different places.  And some parts of

10   them may, in fact, be true.  Some may just be an honest mistake

11   by our clients.  And so we need to better understand exactly

12   what will be told to the jury, because we don't want a trial by

13   ambush:  Ladies and gentlemen of the jury, when Alex Jones said

14   X, that was false and we knew it.  Well, we need to know that

15   today in order to examine whether or not it was true, or

16   whether -- or address the issue of whether or not it was with

17   knowing falsity or reckless disregard.  That is our primary

18   concern in that first category.  And while they have identified

19   some of that information that they claim is false, you know, we

20   need to know now, lock in what it is at trial they will be

21   claiming is false.

22           THE COURT:  All right.  And Mr. Graves?

23           MR. GRAVES:  Yeah, so I guess to take a step back

24   here, so there are -- if you review the complaint, Your Honor,

25   there are two categories of defamation practically.  One is

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1    that there were false statements on the face of the document.

2    And as you see in our discovery responses to the defendants, we

3    have identified those specific false statements, and we

4    included in our letter to Mr. Randazza, which the Court is now

5    in possession of, an example of how we identified the specific

6    false statements in response to one of their interrogatories.

7    And I can represent that we did something similar for the

8    remaining request regarding other videos and publications that

9    we were asked about.  And I've only --

10          THE COURT:  And Mr. Graves, you cited an example in

11   your letter, but in your response to the defendants did you

12   identify all of the false statements?

13          MR. GRAVES:  Yes.  What I have in the letter is a

14   copy/paste from what is in the discovery responses.

15          THE COURT:  Okay.  But are there other false

16   statements that you allege that Mr. Jones or InfoWars made, and

17   you have also identified those?

18          MR. GRAVES:  Yeah, so that's what I was getting at,

19   Your Honor, is we identified the specific false statements --

20   all of the specific false statements of each publication as we

21   were asked to do in the interrogatory.

22          What I was going to go on to say is what I think the

23   issue surrounds is on the defamation by implication allegation

24   that we have made.  And what we're simply trying to convey to

25   Mr. Randazza -- and we can turn briefing into this Court -- is

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1    that defamation by implication does not require an

2    identification of specific false statements, because in that

3    context -- in that allegation the core, entirety of the article

4    of publication is examined, decide if it has a defamatory

5    meaning or innuendo or implication.  And the Fourth Circuit

6    explained that well in the *Chapin* case where it said a

7    plaintiff can plead defamation by implication where there is no

8    actionable false statement on the face of the document.  The

9    question there becomes:  Is the defamatory innuendo, or what a

10   reader would glean from that publication, what that gleaning or

11   what a reader -- what that fact would be, would that be

12   defamatory in and of itself, not so much on the face.

13          So all we're trying to explain is on the face of the

14   document we've identified the specific false statements, all of

15   them; however, we do intend to argue to the jury that the

16   entire article is defamatory by implication.

17          THE COURT:  Okay.  All right.  Mr. Wolman, is that --

18   is that sufficient for you, or do you think there needs to be

19   something further?

20          MR. RANDAZZA:  Your Honor, this is Mr. Randazza.

21          I think that the way my friend is describing this is

22   legally inaccurate.  As we outlined in our letter that we sent

23   back yesterday, you can look at the gist of an article for the

24   purpose of saying that it is non-defamatory, but you can't

25   simply say -- I mean, I can't tell you how many times I see

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   cases where a plaintiff says, You defamed us.  And we say, By

2   doing what?  And they simply throw up their hands and say, All

3   of it.  That's simply not how the First Amendment works.

4   That's not how defamation law works.

5          In the case that they cited in *Jackson*, isolating

6   parts of an allegedly defamatory statement relates only to the

7   issue of whether the statement was one of fact or opinion.  So

8   that's not -- you don't get to just say the whole thing implies

9   this quite honestly imagined meaning of the article.  You can't

10  simply say, We, in our imagination, say that this is what the

11  article says, so we get to go to trial to see if the jurors

12  have the same imagination as us, and then determine as to

13  whether or not that is still defamatory.

14         So no, that is not how it works.  I think that that

15  would be clear legal error to permit them to simply say, Well,

16  you've implied these things that we imagined; therefore, it's

17  defamatory.  That's not how it works.

18         THE COURT:  Mr. Graves, in your discovery response

19  you're saying that you've identified particular statements that

20  you think support your defamation claim, and you identify

21  the -- really the exact statements, but that you also have

22  another theory, the defamation by implication.  Have you

23  identified the whole works, or what you believe would show your

24  claim for defamation by implication?

25         MR. GRAVES:  If I'm understanding Your Honor's

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  question correctly, we haven't done any response to discovery,

2  but that's because we weren't asked to.  What we were asked to

3  identify is the interrogatory question that is the subject of

4  this conversation, is to identify what are the false statements

5  and how are those false statements defamatory?

6         From a legal perspective -- and that's what I'm

7  trying to convey; and, in fact, Your Honor has already -- this

8  Court has already ruled on this, and it's on the motion to

9  dismiss -- the issue is whether or not in dealing with

10  defamation by implication is whether the defamatory -- whether

11  the implication is defamatory in and of itself.  And they have

12  not asked us to identify what the implication is.  They haven't

13  asked us to identify what the innuendo is.  We have done that,

14  though.  If they were to do that, we would just simply refer

15  them to the complaint to our briefing on the motion to dismiss

16  where these issues were litigated.  But that wasn't asked.

17  What we were specifically asked were:  Identify the false

18  statements.  And as Your Honor is aware, the Fourth Circuit has

19  already held that there could be a defamatory -- someone can be

20  liable by defamation by implication when every statement in

21  your article is 100 percent true.  And that's because the

22  question for defamatory -- or defamation by implication is:

23  What does the reader imply based on the tone and tenor of the

24  publication?  It just doesn't make legal sense or even

25  formulaic sense for when you're doing that type of

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   publication-based analysis to identify specific statements.

2   That goes against the whole concept of the purpose of

3   defamation by implication.

4           So to answer your question, I haven't done that in

5   response to discovery, but we weren't specifically asked to do

6   so.  If we did get an interrogatory to that question to explain

7   what is the defamatory innuendo that we're relying on and that

8   we intend to argue to the jury, we would be glad to answer that

9   question.  But that wasn't what we were asked.

10          THE COURT:  All right.

11          MR. RANDAZZA:  Your Honor, if I may respond to that.

12          THE COURT:  Yeah, please.  And something that I'm

13  trying to get at, Mr. Randazza, is:  Is this just a

14  disagreement among counsel about what the nature of the claim

15  is and what's adequate to prove the claim, or is this a

16  discovery dispute about what has been identified in support of

17  the claims?

18          MR. RANDAZZA:  Your Honor, it's a discovery dispute.

19  And if we've asked the fundamental question in a defamation

20  claim:  What is the defamation, and now we're being told, well,

21  you didn't ask us what's the defamatory implication, really

22  this sounds like a false light claim, not a defamation claim.

23  And we're being told now if you had just asked us with that

24  little word in it, we would have answered, but we would have

25  pointed you to the complaint -- which still doesn't really say

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   it -- I think that's a bad faith argument.  A defendant in a

2   defamation case -- all of the defendants in a defamation case

3   have a right to know what it is that is false.  What is the

4   false statement of fact?  This is just basic defamation law,

5   first day of any defamation course, first five minutes of any

6   defamation CLE.  Defamation requires a false statement of fact

7   that injures the plaintiff.

8          They don't want to tell us:  What is the false

9   statement of fact?  And I think if they can't do that at this

10  point, or they refuse to do that at this point, perhaps it is

11  no longer a discovery dispute.  Perhaps it is simply a subject

12  for dismissal, because if they don't know, how can I know?  And

13  if what they intend to do is then again use their imagination

14  to say, This is what we imagine, and then try to place that

15  into the minds of the jury, that's not proper.

16         So I don't think they should get away with saying, if

17  you had only asked us with this extra word, we would have

18  answered.  But of course we have their answer.  Their answer

19  is:  Look at our complaint.  Well, if their complaint made it

20  clear, we wouldn't be having a discovery dispute.

21         MR. GRAVES:  I know we're not getting into a back and

22  forth, Your Honor, and I'm not intending to.  I would just

23  reiterate that the specific false statements were identified in

24  our interrogatory responses.  So I -- I'm at a loss as to what

25  else is needed.  But again, Your Honor, we are happy to brief

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   this, and maybe that will shed light on this and make it clear

2   for the Court.

3           THE COURT:  Yeah, I think it would be helpful to

4   brief it just so that each one of you can put forth your full

5   arguments.  And also I think it would be helpful to see exactly

6   what the discovery requests are and what the responses are.

7           So why don't -- let's see.  Mr. Randazza, why don't

8   you -- if you can go ahead and file a motion to compel, would

9   you need 14 days to file that, or can you do it sooner?

10          MR. RANDAZZA:  We'd like the 14, Your Honor, but we

11  will do our best to get it in early.

12          THE COURT:  Okay.  All right.  So 14 days for the

13  motion and then 14 days for the response.

14          MR. RANDAZZA:  Sounds good, Your Honor.  Thank you.

15          THE COURT:  Let's move on to the next issue.  This is

16  the media communication and payments.

17          MR. WOLMAN:  Yes, Your Honor.  This is Jay Wolman

18  again.

19          On this issue we're still looking for identification

20  of what Mr. Gilmore's media interviews were.  Certainly we are

21  entitled to know what his press relationship was before the

22  Unite the Right rally, and especially what it was he later said

23  about the Unite the Right rally.  And while the parties have

24  agreed in principle that he doesn't have to produce anything

25  that's already public, that doesn't mean that you don't have to

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  identify what those appearances and communications were,

2  because we can't simply Google "Brennan Gilmore" anymore.  You

3  know, this lawsuit has taken care of that.  Any time you Google

4  "Brennan Gilmore," now you find articles about the lawsuit.

5  You don't find out what his appearances were on video or in

6  interviews -- in any print interviews that he had given

7  previously or radio.  So, you know, while they may be public,

8  they may be, you know, the 35th page of a Google search that we

9  don't necessarily find at this point because they've been

10  buried behind, you know, the coverage of this suit.  So we

11  still need -- we're not saying that they need to produce an

12  interview that's available somewhere on YouTube, but we still

13  need to know that it's there, and what it is, and how to find

14  it.

15          THE COURT:  And what's the scope that you're looking

16  for at this point, the time period?

17          MR. WOLMAN:  We're looking for documents regarding

18  actual potential interviews from August 1st, 2012 to the

19  present.

20          THE COURT:  Was that time frame narrowed some?

21          MR. WOLMAN:  I mean, it's five years before the

22  event, essentially.  So it's giving us a baseline of, you know,

23  what his media outlets and access was, you know, in the runup,

24  essentially, to the Unite the Right rally.

25          THE COURT:  And then I think Mr. Gilmore had said

14

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  that he has not received any payments from the media.  Is that

2  sufficient for you?

3          MR. WOLMAN:  Yes.  If he's representing he has not

4  gotten any payments, that's fine.  But we still need to know

5  what these interviews were.  You know, they go towards his

6  reputation; they go towards his figure status; and they go

7  towards the liability issues in this case.

8          THE COURT:  All right.  Mr. Graves, as to the

9  communications --

10          MR. GRAVES:  Sure.  And sorry, Your Honor.  Did I

11  interrupt you, or were you finished?

12          THE COURT:  No, go ahead.

13          MR. GRAVES:  Okay.  So I guess first addressing the

14  temporal scope, I don't understand what the relevance is for

15  any media interview that occurred prior to the Unite the Right

16  rally.  This Court has already determined that he was a public

17  figure for purposes of this litigation, and I don't know

18  what -- I truly don't track the logic as to what anything

19  needed before the Unite the Right rally related to media

20  interviews.

21          Secondly, we made an agreement with former counsel,

22  who was Ms. Scully, that we would not be producing anything

23  that was public, because as she articulated to us during our

24  conversations, public stuff is equally available to both

25  us and -- in her situation -- to them and also to us when we

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  were looking for Mr. Jones's material.  And so as a result, we

2  agreed to that, and we did not push for an accounting of every

3  single public document, communication, radio show, anything

4  that Mr. Jones may have mentioned Mr. Gilmore or the Unite the

5  Right rally.  We just asked for private or non-public

6  communications that we would not have access to generally

7  speaking.

8          If Mr. Randazza is going to change that, that's fine.

9  We would just ask that that be done part and parcel on their

10 end as well, that they also provide us with an accounting of

11 every public time Mr. Jones has mentioned Mr. Gilmore and/or

12 the Unite the Right rally.  So that's on that point.

13         Outside of that, I believe that's the long and short

14 of it.  We produced all of his nonpublic publications relating

15 to the rally -- I'm sorry, interviews relating to the rally.  I

16 think it's just an issue of temporal scope and this accounting

17 issue.

18         THE COURT:  Okay.  All right.  Mr. Wolman, why would

19 you need nonpublic communications or interviews from before

20 August 2017?

21         MR. WOLMAN:  Because his reputation is part of the

22 issue.  How was he known prior to the Unite the Right rally?

23 Now, if they're going to be conceding public figure status --

24 that was already taken for our side on the motion to dismiss.

25 But if that's not going to come up again, you know, public

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   figure status wouldn't relate to that.  But to the extent that

2   they might challenge it, you know, access to the media would be

3   included.  And that would be even prior to what his access was

4   before the Unite the Right rally.  The -- but to his

5   reputation, how he was known prior to the Unite the Right

6   rally, he had done interviews, then we're entitled to know

7   them, because those speak to how he was known to the public,

8   why people would reach out to him.  It also goes, you know,

9   towards whatever general factors about his employment and

10  employability, his business opportunities that he may have had.

11  Why would he have been in the media?  You know, it goes

12  specifically towards the issues that are at stake in this

13  litigation.

14          THE COURT:  All right.  Mr. Graves, anything else on

15  that?

16          MR. GRAVES:  Yeah, I just don't see it.  I say that

17  respectfully.  I just -- a simple law school principle, which

18  is you take a plaintiff as they come.  So even if -- and this

19  is not the case for Mr. Gilmore, but let's say Mr. Gilmore was

20  someone that was hated in Charlottesville prior to this

21  publication.  Our argument is that he then became more hated as

22  a result of their publications.  Nothing about what occurred

23  previously or the prior view of him would somehow be relevant,

24  nor do I see how an interview that he may have given with -- I

25  don't know -- his alma mater about his work at the State

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  Department, and about the things that he likes to do, or about

2  his astronomy hobby, I don't see how any of that somehow bears

3  on the facts of this case.  And so I completely find -- again,

4  as long as the InfoWars defendants, if they want to back out of

5  the agreement we had with Ms. Scully, no problem giving an

6  accounting of the public communications or public interviews

7  that were given, so long as they do the same for us, because we

8  have not insisted on it as a result of that.

9        But the temporal scope, I do not see how it's

10  relevant, except for the period of the Unite the Right rally

11  going forward.  And again, we can brief this as well, Your

12  Honor.

13        THE COURT:  All right.  Okay.  So Mr. Wolman, as to

14  the identification of the public interviews, is that -- is that

15  something that you're still seeking, and would you be willing

16  to make the same disclosures for Mr. Jones?

17        MR. WOLMAN:  Well, that I'm going to just talk to my

18  co-counsel on and our client.  We may.  But if we do, then we

19  would want it certainly to be part and parcel.

20        But, you know, on the temporal scope -- and this also

21  goes towards the issue of injury and damages -- knowing

22  someone's condition beforehand -- you know, if somebody has a

23  car crash and claims a back injury, you need to know if they've

24  had a back condition beforehand.  And to the extent that

25  they're claiming exacerbation, you know, we would need to know

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   what is being exacerbated, what the prior reputation is.  So

2   that's why we need to know in the runup, in the years

3   beforehand, what was his baseline reputation?  How was he

4   known?  So that way we can assess how is he known now.  And a

5   jury can say it is better; it is worse.  You know, for all we

6   know, it is significantly better that he has come out as

7   somebody who is, you know, standing up against Alex Jones, and

8   that's viewed as a positive thing from some people.  We don't

9   know.  But if you're going to say it's a worse reputation, we

10  need to know how was he injured?  What was the degree of change

11  in either direction?

12          THE COURT:  In your view, a way to identify that is

13  the number of interviews and the type of interviews that

14  Mr. Gilmore may have had before August of 2017?

15          MR. WOLMAN:  Exactly.  If they're interviews because

16  he was -- he succeeded in brokering some major thing at the

17  State Department, you know, giving him platitudes, we need to

18  know that.  Or if he's being interviewed because of some bad

19  performance at work, we need to know that.

20          MR. GRAVES:  And Your Honor, this is Anwar Graves

21  again.  Happy to brief this issue.  I think this goes

22  against -- as a foundational matter, I just do not see how

23  media interviews could somehow define one's reputation

24  generally speaking in a community.  I'm sure there are many

25  people on this call that have been interviewed.  And simply

19

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  because we are interviewed at a varsity football game in high

2  school does not mean anything about how our reputation has been

3  damaged as a result of a defamatory publication that came

4  later.  So I'm, again, happy to brief this.  I just do not see

5  the nexus between the two here.

6          MR. WOLMAN:  I mean, O.J. Simpson's reputation as a

7  football player was stellar until he hit the media with

8  unfortunately his family incident.  So, you know, one prior

9  reputation, even in something adjacent, something different, is

10 still affected here in what they're claiming now.  And this

11 again goes towards injuries.  You know, just like he's

12 claiming, for example, a central serous chorioretinopathy --

13         THE COURT:  Before you move on, I can -- I think the

14 temporal scope is too broad here.  I would think that if you're

15 trying to get some sort of gauge of reputation based on the

16 frequency of interviews and the type of interviews, I think two

17 years before August 2017 would be sufficient for that.  I

18 don't -- let's see.  So that would cut down on this by I think

19 three years.  And it seems like that would be more related.  I

20 could see how -- I mean, if somebody is recognized as an

21 authority in a certain area and is contacted frequently by

22 media outlets to be interviewed in a certain area, then I think

23 that that would suggest that the person has a good reputation

24 in that area of information.

25         But if you all want to brief this, you can -- I'll

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  certainly allow that.  I would just -- I would just want you to

2  consider it further and confer in the next few days, and just

3  confirm this is something that needs to be briefed, rather than

4  just -- or if you can just identify any nonpublic appearances

5  for the two years preceding August 2017.

6         And then it sounds like Mr. Wolman wants to talk with

7  his client and see if they're interested in identifying the

8  public appearance -- not necessarily producing them, but

9  identifying Mr. Jones's public appearances.  And if that's the

10  case, Mr. Wolman, if Mr. Jones is willing to do that, then it

11  sound like Mr. Graves would be willing to make those

12  identifications, too, for Mr. Gilmore.  But I do agree that if

13  there was some sort of an understanding reached between the

14  parties, that those public appearances would not be identified.

15         MR. WOLMAN:  Sounds good, Your Honor.

16         THE COURT:  All right.  We'll go on to the third

17  category.

18         MR. WOLMAN:  All right.  Your Honor, let's see.

19  Sorry.  Let me just pull it up.

20         Injury and damages, you know, we're looking -- we've

21  got very little that's been given to us on that issue at all.

22  In the complaint, for example, Mr. Gilmore claims, as I

23  mentioned before, the ocular condition known as a central

24  serous chorioretinopathy.  That's S-E-R-O-U-S for serous.  We

25  haven't gotten any information about, you know, who his

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  ophthalmologist or retinologist would be.  I am, however,

2  specifically quite familiar with that condition, having had it

3  myself.  And, you know, we haven't seen any records that would

4  indicate any diagnosis or treatment for that condition, nor

5  whether or not it was caused by the incidents alleged in the

6  complaint.  Don't have anything about certainly, you know, his

7  condition prior to the Unite the Right rally, either.  We don't

8  have any information about billing, nothing on that respect.

9         With respect to his emotional state, which is

10  still -- his mental health, the injuries he's claiming that

11  arise with respect to the defamation as damages of defamation,

12  which he has pleaded as emotional distress arising from

13  defamation separate and apart from his now dismissed IIED

14  claim, you know, we still need the documentation.  What we have

15  is in billing statements.  We don't have any of the treatment

16  records.  We don't know if that's the end all and be all of it.

17         We don't have information as to his lost business

18  opportunities that he claims results from the defamation.

19  While it certainly can be the case that he may say, I don't

20  know what I haven't lost -- you know, that there's some

21  opportunities that never came his way that he wasn't told

22  about -- you know, he's affirmatively pleaded that he lost

23  business opportunities.  If there are specific opportunities he

24  ever had that were then terminated, we have a right to know

25  about that.

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1          And similarly, he pleaded he lost romantic

2    opportunities, and that is part of his -- you know, the

3    injuries, the damaged reputation, the stress that he's claiming

4    as part of his defamation claim.  So to the extent that he has

5    put that at issue and will be telling the jury, I couldn't get

6    a date because of this, or my girlfriend dumped me, we need to

7    know who that is to explore this injury that is being claimed.

8    We don't have the facts to actually explore his damages in the

9    slightest.

10          THE COURT:  All right.  Mr. Graves?

11          MR. GRAVES:  Sure.  So starting with lost business

12   opportunities, we have provided all the information that we

13   have on that.  We have provided an interrogatory response, but

14   that's literally the extent of what we have to provide.  And of

15   course Mr. Randazza and Mr. Wolman are free to depose

16   Mr. Gilmore relating to that claim, but we have provided

17   everything.  So there is nothing that we're holding back.

18   There isn't really a dispute here.  It's just that we have

19   literally provided it all.

20          With regards --

21          THE COURT:  As I understand it, there are no

22   beginnings of business dealings that were ended?  It's more

23   that -- well, is that right?

24          MR. GRAVES:  Yeah, it's mainly -- and as we explained

25   in our letter, it's -- Mr. Gilmore did not interview these

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   people and say, Why did you stop associating with me?

2   Similarly in the romantic context, it's not like he performed

3   an interview and said, Why did you break up with me and no

4   longer want to date me?

5           What he can point to is that certain things started

6   happening soon in temporal scope to when these publications

7   came out.  And the jury obviously is permitted to infer that

8   those damages should apply in this case.

9           That brings us to the other point, which is that the

10  plaintiff pled defamation per se.  And as Your Honor is aware,

11  in defamation per se cases, the plaintiff does not need to

12  prove damages.  Damages are presumed, and arguments can be made

13  to the jury as to how they should compensate the plaintiff for

14  that.

15          But nevertheless, what we have endeavored to do --

16  and we are endeavoring to do -- is to get the medical records.

17  So we have contacted our client to get the medical records from

18  his retinologist and ophthalmologist relating to that eye

19  condition.  We have also asked him to contact his therapist to

20  get notes from those sessions.  And to the extent that those

21  notes relate -- we'll obviously produce just the notes that

22  relate to this.  We don't want his whole personal life being

23  brought up.  But the notes relating to this we'll be happy to

24  produce.

25          So this is not an issue where we are trying to hide

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   the ball.  It's an issue where we are endeavoring to get the

2   medical records.  We will gladly produce them when we do.  But

3   everything else regarding lost business opportunities and

4   romantic evidence, we've produced all the documentary evidence

5   that we have.

6              MR. WOLMAN:  Your Honor, this is Jay Wolman again.

7              With respect to the business and the romantic, this

8   sounds like a specious claim here that's being made, because

9   how are we supposed to know whether or not, you know, someone

10  broke up with him or someone chose not to do business with him

11  because they simply didn't like that he even went to the Unite

12  the Right rally in the first place, you know, because he put

13  himself out there in the first place, that it had something to

14  do with Alex Jones or anything of that nature?  You know, we

15  don't know -- if he doesn't know why people are turning him

16  down, how can a jury possibly know that it has specifically

17  something to do with Alex Jones?  Maybe they don't like people

18  who file lawsuits.  That could be what makes him non-palatable

19  to potential partners.

20              And as to medical records --

21              THE COURT:  Well, Mr. Wolman, have any of these

22  potential business ventures or romantic partners been

23  identified?

24              MR. WOLMAN:  I don't believe so.

25              MR. GRAVES:  Sorry, this is Anwar Graves again.  We

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  have produced records relating to the romantic stuff.  But the

2  key thing here is we produced all documentary evidence.

3  Obviously, some of these conversations -- and I think we all

4  know from our personal lives -- aren't necessarily recorded,

5  nor are they transcribed.  So we produced all documentary

6  evidence that we have.  And the romantic partner question was

7  an RFP, not interrogatory.  So we've produced documentary

8  evidence.  And if defendants wish to explore more on that,

9  again, there is the deposition.  I think they're past the

10  interrogatory limits, so I'm not sure they can serve that.  But

11  they can ask him more about that.  But the key part there is to

12  produce all documentary evidence, which is what we were asked

13  to do.

14         THE COURT:  Okay.

15         MR. WOLMAN:  Your Honor, if I may, we don't know if

16  he uses any form of online dating, if there's any form of

17  Tinder or Match.com account that he may use where he got

18  certain rejections in terms of if he is claiming that these

19  people, you know, would have said no to him and swiped left --

20  or swiped right -- I don't use it; I don't know which is

21  which -- the one that says no, we need to know who potentially

22  these people are.  And so that would be documentary evidence.

23         MR. GRAVES:  And if that's the case, we invite them

24  to subpoena Bumble, Hinge, Tinder, and all those third-party

25  entities that control those dating apps, if they want that

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  information.  We don't have that.

2          MR. WOLMAN:  We don't know which ones he even uses.

3          MR. GRAVES:  That wasn't asked of us.

4          MR. WOLMAN:  Right.  But we asked for the documents

5  that are within the plaintiff's control, and those would be

6  within his control as the user.

7          MR. GRAVES:  So Your Honor, again, this may be

8  something that may require briefing to explain what the request

9  was, what our answer is, and why our answer is what it was.

10         THE COURT:  Well, you know, if there are --

11  Mr. Graves, I think the distinction you're drawing with your

12  request for production of documents versus interrogatories

13  makes some sense.  Mr. Wolman, if he doesn't have any of these

14  other documents, it seems like that's sort of the end of the

15  inquiry there.

16         Now, if there are some -- I guess some dating apps

17  and things like that, then I guess there is a question of

18  control.  I think, Mr. Graves, if -- I haven't heard you say

19  that any of these actually exist, but --

20         MR. GRAVES:  I haven't.  That's a good point, Your

21  Honor.  I think maybe -- and Mr. Wolman acknowledges he doesn't

22  use them -- but the technology of those apps don't keep a

23  record of who swiped left on you or who -- and those types of

24  things.  So these are not -- that isn't documentary evidence.

25  We weren't asked to identify dating apps.  Again, I think all

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

 1  these are -- these are deposition-type questions that

 2  Mr. Gilmore would gladly provide answers to, but that's -- we

 3  just don't have documentary evidence of the type that

 4  Mr. Wolman thinks exists.

 5          MR. WOLMAN:  Your Honor, there would be billing

 6  records.  There would be communications within them.  Our

 7  understanding is that there are chat functions.  And certainly

 8  one can use data, because Mr. Graves is suggesting that it

 9  changed.  And so, that's how the inference is made.  So

10  certainly we will need the data to assess whether or not, you

11  know, he was having more success on these apps before the Unite

12  the Right rally versus after.

13          MR. GRAVES:  We wouldn't have that data, Your Honor.

14          MR. WOLMAN:  You would know --

15          MR. GRAVES:  I certainly can ask him, but we don't

16  have data on that.  There is no way you can pull a report from

17  a dating app as to how many swipes you got last week versus

18  this week.  The dating app may have that data, but we don't.

19  It's like asking us to produce something that may be in

20  Facebook's possession regarding how many people have clicked on

21  an article that I posted.  I wouldn't know unless I had some

22  type of metrical widget installed, but I'm sure Facebook would

23  know.

24          MR. WOLMAN:  What about the chat?  What about the

25  discussions that the parties had?

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1      MR. GRAVES:  And again, as I stated earlier, if there

2  was documentary evidence of these discussions, then we would

3  produce them; however, as we all know I think from our personal

4  lives, a lot of dating conversations occur orally, and not

5  necessarily via a dating message app as the relationship

6  progressed.

7      So again, I think with regards to the evidence -- and

8  I can make this very simple:  We don't have any further

9  documentary evidence relating to romantic partners, and we were

10  only asked to produce documentary evidence.  If the defendants

11  want more information regarding that, we are happy to --

12  obviously, Mr. Gilmore will be sitting for a deposition with

13  them at some point, or if they have room for an

14  interrogatory -- which I don't think they do -- they can serve

15  that.  But based on the request as it currently stands, we have

16  produced everything that we have.

17      MR. WOLMAN:  Well, chats can be -- communications can

18  be used as a metric.  Certainly we can look at how his chats

19  were going beforehand versus how they went afterwards.

20  Similarly, you know, billing statements can be used to --

21      THE COURT:  Mr. Wolman, I think you're probably going

22  a little bit far afield.  If there is something that is -- that

23  is clearly -- some chat where there's some -- even a reasonable

24  inference that a potential romantic relationship ended because

25  of -- because of the defendant's statements or actions, then

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  I'm sure Mr. Graves would turn that over.  And I'm hearing him

2  saying he doesn't have any.  I think sifting through every

3  communication with a potential -- you know, for a potential

4  date for over some period of time to try and assess how

5  Mr. Gilmore was doing before August 2017 and after 2017, I

6  mean, I just -- I just think that that is -- it just doesn't --

7  it just doesn't seem like it's a good and reliable measure

8  of -- you know, of this claim.  I mean, I do think that you're

9  going to be able to ask Mr. Gilmore questions about this during

10  his deposition, and try and hone in on whether there is --

11  whether there is really anything to -- you know, this part of

12  his damages claim.

13          MR. WOLMAN:  I understand, Your Honor.  And I know it

14  sounds a little bit ridiculous, but we're trying to figure out

15  if he's trying to suggest that he has lost opportunities --

16  whether in business or in romance -- because of what our

17  clients are alleged to have done, you know, there needs to be

18  some way to quantify that, some metric, some statistics we can

19  use.  And those would be solely in the possession of

20  Mr. Gilmore, who has made this claim.

21          THE COURT:  I don't know that you need statistics.  I

22  don't know that you need dating statistics to be able to really

23  get at that evidence.  It seems like --

24          MR. WOLMAN:  Well, if he's saying that nobody told

25  him, Well, I saw you on Alex Jones so I'm not going to date

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  you, then he's only making a supposition that it's because of

2  this.  And so we need to determine whether or not there has

3  been a downward trend in any way, shape, or form; and then

4  whether or not that is causally related to anything our clients

5  did, or maybe somebody just didn't like his voice on TV.

6           THE COURT:  All right.  Well, I'm pretty skeptical

7  about -- you know, about whether this -- well, one, it sounds

8  like whether this information even exists or would be

9  obtainable from -- essentially from Mr. Gilmore; and then, two,

10 whether it's really relevant to try and develop some sort of

11 statistical modeling of Mr. Gilmore's success in dating.  But

12 if that's something that you feel like you want to brief or

13 need to brief, then you're certainly welcome to include that in

14 the motion to compel.

15          It sounds like for the -- for the medical

16 information, that Mr. Graves is going to try and track that

17 down and produce it.  As far as any therapy sessions --

18          MR. GRAVES:  That's correct.

19          THE COURT:  -- he's going to do that as well.  I do

20 think that if there were therapy sessions before August of

21 2017, that some period before that would be appropriate.  I do

22 think that is an area when you have a claim for emotional

23 damages for having some sort of a baseline is necessary.  And

24 so I think that a year prior to August 2017 -- so going to

25 August 1st of 2016 -- would be sufficient to give a picture of

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  that.

2          MR. GRAVES:  And to be clear on that point, Your

3  Honor -- and maybe this may be a point that we may consider

4  briefing, if Your Honor doesn't mind.  But going back to that

5  old eggshell theory that I was articulating earlier, if he was

6  in a state of depression prior to the Unite the Right rally, it

7  surely doesn't -- it does not matter if he was in a depressive

8  state prior to the Unite the Right rally, as long as we can

9  establish the Unite the Right rally increased or somehow

10  contributed to his current state.  And so the baseline argument

11  isn't relevant to anything, especially in a per se world where

12  injuries are just presumed, and do not necessarily need to be

13  proved to that degree.

14          So that is -- and again, we're happy to brief that

15  point -- but that is one issue where I don't see the relevance

16  of a baseline, so to speak.

17          MR. WOLMAN:  Well, if they're giving up the

18  defamation by implication claim and relying solely on

19  defamation per se, we can talk maybe about that and how you

20  then quantify those damages.  But certainly this is not purely

21  a per se case.  This is -- you know, we spent a lot of time on

22  this call about defamation by implication.  There is no

23  defamation by implication per se.  So we do need to know what

24  his condition was beforehand, just like one would do in an auto

25  accident to know how much there is -- whether or not there is

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   an exacerbation of prior injury, what is -- what is the

2   condition they were in, and what is the condition they're in

3   now, or imagine just even a car where, you know, what's the

4   value of the car before the crash and what's the value of the

5   car after the crash where the car already had dents and dings

6   in it?

7           MR. GRAVES:  So Your Honor, I would just ask to brief

8   that -- that one issue of potential scope of the records, but

9   we again are endeavoring to recover them.

10          THE COURT:  Okay.  All right.  I think that's fine.

11  You can -- so --

12          MR. WACHEN:  Your Honor, this is David Wachen for

13  Lee Ann McAdoo.  Can I -- because this also relates to my

14  client, as well as all the other defendants.  There was

15  something Mr. Graves said earlier that may have been lost.

16  Maybe I misunderstood.  But he said that he would produce the

17  therapist notes relating to this.  And I would submit that

18  regardless of the temporal scope, which is a separate issue, he

19  should have to produce his notes, period, from the therapist.

20  If he's seeing a therapist because he's depressed because his

21  grandmother died, and he's claiming depression, then we need to

22  know what caused that depression, and is there something else

23  that's causing that depression.  And if he's been in therapy

24  for 20 years because he's manic depressive, I think that is

25  certainly relevant.  Maybe we pick that up a year prior, but I

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   don't think he can just give us the notes that mention the

2   Unite the Right rally to the extent he's being treated for

3   other issues.

4          MR. GRAVES:  And again, Your Honor, I think all of

5   this is ripe for briefing to explain to the Court our theory

6   and rationale and basis for that.

7          THE COURT:  I think that's fine.  I think you can --

8          MR. WOLMAN:  And Your Honor, we're happy to brief it.

9   I mean, it will be hard to -- distinguishing the long line of

10  bodily injury cases that tend to permit this sort of inquiry.

11  But certainly we're happy to brief it.

12         THE COURT:  I mean, I can tell you I think where the

13  plaintiff puts the emotional data at issue, it seems like -- it

14  seems like the therapy notes are really covering -- covering

15  all therapy for after the alleged incident, but also getting a

16  baseline, that's going to be relevant.

17         But I certainly, Mr. Graves, will consider your

18  arguments and see if there is some reason to depart from how

19  I've approached other cases.

20         MR. WOLMAN:  Thank you, Your Honor.

21         THE COURT:  Why don't we move on to the next

22  category, then, communications about Unite the Right.

23         Mr. Wolman?

24         MR. WOLMAN:  Yes.  Sorry.  I still had the mute

25  button on.

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1           You know, in essence, you know, this case arises from

2    the Unite the Right rally.  And anything that he has been

3    saying about it and his purpose there, what he was hoping for

4    and what happened is relevant to the claims at issue.  It's a

5    central focus of this -- of Mr. Gilmore's own claim that he was

6    at the Unite the Right rally, that he published this video, and

7    that, you know, the things that he's complaining about are

8    about his appearance and publication at the Unite the Right

9    rally.  So anything that he's basically discussing that has to

10   do with the Unite the Right rally becomes the subject of

11   discovery because it may have information about his media

12   appearances.  It may have information about lost opportunities,

13   his work, the effect on him, his emotional state, any number of

14   things directly relevant to the issues that have to be proved

15   and the issues on the fence, you know, will arise from any

16   communications that he has regarding the Unite the Right rally.

17           MR. GRAVES:  Sorry, Mr. Wolman, are you finished?

18           MR. WOLMAN:  Yes.

19           MR. GRAVES:  So all of the listing that Mr. Wolman

20   just articulated to the Court are separate RFPs in the 188 that

21   we were served.  Everything about lost business opportunities,

22   everything about interviews, everything about why he attended

23   the Unite the Right rally, all that stuff we produced

24   responsive material to.

25           The issue that we have with RFP Number 2, which is

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   cited in Mr. Randazza's first letter, which says any and all

2   records of communications regarding the Unite the Right rally,

3   is that that can be read incredibly broadly.  And we have

4   already produced documents relating to why he attended it.  And

5   so we try to limit that breadth by saying that we will produce

6   all documents relating to why he attended the rally, all

7   documents relating to the publishing or transmitting of the

8   video that he took to media organizations after taking the

9   video, any communications regarding, you know, what he observed

10  with Ms. Heyer's murder, etc., we produced all of that.  What

11  we're lost on is what else needs to be produced that is, in

12  fact, relevant regarding the Unite the Right rally that hasn't

13  already been produced.  And if you look at Mr. Randazza's

14  initial letter that he sent on August 13th, RFP 24, 25, 26, 27,

15  all of those requests that he cites are consumed in RFP

16  Number 2, which is communications regarding the Unite the Right

17  rally.  So all we've done is asked to meet and confer with the

18  defendants to try to get a handle on what specifically -- what

19  else they need that hasn't already been covered and addressed

20  by this.  So that's point one.

21         Point two is that, as Your Honor can imagine, there

22  are going to be some communications regarding the Unite the

23  Right rally that may be completely irrelevant.  So for example,

24  let's say Clean Virginia sent an email out the morning of the

25  rally saying, hey, everyone, you may need to leave early to get

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  to work because there's so much traffic because of the rally.

2  That's a communication regarding the Unite the Right rally that

3  surely isn't relevant to any claim in this case.  And we

4  produced everything that we believed to be relevant, the

5  rationale, why he was there, the video, everything about that.

6  There is a whole category of information regarding the rally

7  that's completely irrelevant.

8          So we just want to have that conversation -- and

9  maybe the defendants don't -- of what else is missing that

10 hasn't already been captured by the 188 RFPs where we have made

11 productions.

12         MR. WOLMAN:  Your Honor --

13         THE COURT:  If you have some idea about documents

14 that you haven't produced and that you think aren't relevant,

15 and perhaps identifying some kind of categories like you've

16 just done, it would be helpful in moving that forward during

17 the meet and confer.  It does sound like this is something that

18 you all can talk about a bit further, perhaps a deadline

19 sometime next week to really wrap it up, and then Mr. Wolman

20 can decide whether it needs to be included in the motion.

21         MR. GRAVES:  That's fine with us, Your Honor.  And as

22 I said, as Mr. Wolman just articulated earlier, every category

23 that he's mentioned has already been covered by an RFP and

24 we've already produced them, except for those ones that were

25 covered by our discussion today, of course.  So maybe it would

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  be helpful if those categories Mr. Wolman thinks that we have

2  not produced that would -- I guess I'm just at a loss as to

3  what else would be needed for these buckets, but that's it.

4        I know Mr. Wolman wanted to say something.

5        MR. WOLMAN:  Well, certainly we don't know what we

6  don't know, right?  We don't know what is being turned up when

7  Mr. Gilmore is having a communication about the Unite the Right

8  rally.  And that's why, you know, we litigators always put in

9  catchall requests.  Now, if there are -- if this is overbroad

10  and unduly burdensome, if that's what the objection is, then we

11  need to know:  What is the burden?  Is it that he's got 10,000

12  emails about traffic and that's what the problem is, because he

13  subscribes to some traffic service?  I don't know.  But other

14  than that, unless -- we don't even know how large the universe

15  is that we're talking about and why they're withholding

16  documents, because if you're going to say that this is an

17  overbroad request, then you need people to articulate what the

18  scope is in order to say, yes, that truly is, because the

19  burden is so great to go through these 10,000 emails about

20  traffic.  But barring that, if it's just two emails about

21  traffic, and the rest is, you know, anything that might not

22  have been caught up in a specific request, but is nonetheless

23  relevant or may be otherwise discoverable, then, you know, we

24  would be entitled to it.

25        So I think that the burden here is on Mr. Gilmore to

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   articulate what is not being produced so that we get a sense of

2   what the scope is, what the burden is; and then can say yes, we

3   don't need to know about traffic delays.

4           MR. GRAVES:  I don't know how many more times I can

5   say we produced all documents that we believed to be relevant,

6   and I also have articulated how we did that.  And we did that

7   by producing documents that concern his rationale for

8   attending.  So any and all discussions where he was talking

9   with friends about how he was going to attend the rally, we

10  produced.

11          MR. WOLMAN:  How many documents --

12          (Unreportable crosstalk.)

13          MR. GRAVES:  If you can let me finish, we also

14  produced documents relating to conversations he had with

15  friends and family when he was deciding whether or not he was

16  going to send this video in to CNN and to other media

17  organizations.  We produced all of that.  We also produced all

18  interviews -- non-public interviews concerning the Unite the

19  Right rally where he's discussing the Unite the Right rally.

20  Everything else that we have about whether or not he enjoyed

21  the hot dog that he got at the hot dog cart, whether or not the

22  traffic was good or bad, none of that is relevant, and we did

23  not produce that.  So if there is a category or swath of

24  documents -- and again, Your Honor, I'm sorry to burden the

25  Court with this, because you're right.  This seems like a phone

                    39

                Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   call that we could have with Mr. Randazza and Mr. Wolman, and

2   we will do that.  But if there are other categories of

3   documents that they think fit within that Unite the Right rally

4   that isn't already covered by the 187 other RFPs that they

5   served, then sure, we can figure that out.  But we're at a loss

6   as to what else is needed, because we have responded to all

7   these RFPs.

8            MR. WOLMAN:  So the burden here, Your Honor, is on

9   them to articulate how many they have withheld and what the

10  categories are, not for us to try to guess at what these

11  categories are.

12           THE COURT:  And Mr. Wolman, I did ask Mr. Graves to

13  do that when you all have a meet and confer early next week.

14           MR. WOLMAN:  Thank you, Your Honor.

15           THE COURT:  I agree with you on that.  But also,

16  Mr. Wolman, if there are some gaps or something that you would

17  think, Hey, why aren't there any documents that have been

18  produced in this area, it seems like there should be something,

19  then I would suggest that to Mr. Graves too, okay?

20           All right.  I think the last thing was the

21  memberships and grants and awards.  Is that issue -- is that

22  issue resolved?

23           MR. WOLMAN:  I believe so, Your Honor.

24           THE COURT:  All right.  Well, then, is there anything

25  else that we need to take up today?

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1          MR. GRAVES:  Your Honor, two things.  One is a

2     clarification question.  And this is not related to this

3     particular topic.  So I think I can speak on behalf of all

4     parties:  Thank you for granting the motion to extend that we

5     filed.  Just a quick question regarding the language, and I

6     think all parties may appreciate the clarification.

7          Your Honor, as you may recall, in the original

8     scheduling order there was a fact discovery deadline, an expert

9     discovery deadline, as well as an all discovery deadline.  In

10    reading your order, it seems like you are -- the Court is

11    saying that the fact discovery deadline is extended by 90 days,

12    but yet the order here is that the all discovery deadline is

13    extended, which makes me think that expert and fact discovery

14    may be due earlier, based on the form of the other order.  So I

15    just wanted to confirm that that all discovery deadline of

16    December 12th corresponds to fact discovery, and that expert

17    and all discovery would go later, if that makes sense.

18          THE COURT:  Yeah, that's right.  That would be

19    extending all those deadlines.  I think the first one that is

20    coming up is the fact discovery in September, and that's the

21    one that's been moved back to -- back to December.  And what I

22    envision is that you all would get a trial date from

23    Ms. Wheeler, and then we'll have a scheduling conference to

24    talk about the schedule.  I'm not sure what Judge Moon's

25    availability is going to be, but I think that the schedule will

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1  have -- would have dispositive motions coming pretty early in

2  the scheduling, certainly more than 90 days before trial, okay?

3        MR. GRAVES:  Sure.  That sounds good to us.

4        And then the last thing that we wanted to raise is

5  Your Honor asked us to give a report on Mr. Hoft's production.

6  During the last hearing we did receive the first of Mr. Hoft's

7  production.  He advised that a supplemental production would be

8  forthcoming on Monday or Tuesday of this week.  We have not

9  received that supplemental production.  So we are awaiting

10  that.

11        Additionally, we do have some issues, but they're not

12  ripe for this Court.  We hope to send a letter to Mr. Hoft's --

13  sorry, Mr. Burns -- so send to Mr. Burns this week so he can

14  see where there may be some deficiencies.  And if we can't

15  reach an agreement, we'll raise it to the Court's attention.

16        MR. BURNS:  Your Honor, this is John Burns.  We sent

17  off a supplemental -- we sent off a supplemental production

18  on -- I think it was Monday.  So I can resend it.

19        Mr. Graves, I included you on there, but I don't --

20  so I don't know if -- so I apologize if there was some problem

21  with that; however, in addition to that particular supplement,

22  I just received yesterday what I hope is going to be the final

23  supplement, and I should be producing that to you today.  But I

24  will resend the thing -- the production that we sent on Monday.

25  I think that I just assumed that everything kind of was

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1   received, and that it went through okay.  I know that

2   Mr. Creighton received it.  He had some initial issues, but we

3   worked through them and he was able to access everything okay.

4         So anyway, but I'll -- if you would like to -- I'll

5   send it to you.  And then if you could just confirm,

6   Mr. Graves, that you received -- I can send it to you right

7   now, and if you can just confirm that you can access it okay,

8   I'd appreciate it.

9         MR. GRAVES:  I'm sorry, let me confirm.  We did

10  receive that Monday one.  I think there was a second production

11  that you just --

12        MR. BURNS:  Ah, yes.

13        MR. GRAVES:  So I think that's clear now.  We'll get

14  that second production today or later today I think is what

15  Mr. Burns said.  So we're good on that.

16        MR. BURNS:  Good deal.  Thank you.

17        THE COURT:  Anything else, Counsel?

18        MR. GRAVES:  That's all we have from the plaintiff.

19        THE COURT:  All right.  Well, thank you all very

20  much.  Take care and have a good weekend.

21  (Proceedings concluded, 2:08 p.m.)

22

23

24

25

Gilmore v. Jones, et al., 3:18CV17, 8/27/21

1                  C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair                Date: August 31, 2021

15

16

17

18

19

20

21

22

23

24

25