1

2                    IN THE UNITED STATES DISTRICT COURT

3                  FOR THE WESTERN DISTRICT OF VIRGINIA

4                        CHARLOTTESVILLE DIVISION

5   BRENNAN M. GILMORE,              )
                                     )
6              Plaintiff,            )   Civil Case No.
                                     )   3:18-cv-00017-NKM-JCH
7   vs.                              )
                                     )
8   ALEXANDER E. JONES, et al,       )   Tuesday, October 19, 2021
                                     )
9              Defendants.           )
   _____

10

11                  TRANSCRIPT OF DISCOVERY DISPUTE
                MAGISTRATE JUDGE JOEL C. HOPPE PRESIDING
12                   UNITED STATES DISTRICT COURT

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by FTR and transcribed using computer

```
 1                    A P P E A R A N C E S

 2   On behalf of Plaintiff Brennan M. Gilmore:
                     Anwar Graves
 3                   O'Melveny & Myers LLP
                     1625 Eye Street, NW
 4                   Washington, DC 20006

 5                   Hassen Amir Sayeed
                     O'Melveny & Myers LLP
 6                   Times Square Tower
                     7 Times Square
 7                   New York, NY 10036

 8                   Kimya Saied
                     O'Melveny & Myers LLP
 9                   1625 Eye Street, NW
                     Washington, DC 20006

10

11   On behalf of Defendant Alexander E. Jones:
                     Marc J. Randazza
12                   Randazza Legal Group, PLLC
                     2764 Lake Sahara Drive, Suite 109
13                   Las Vegas, NV 89117

14                   Jay Marshall Wolman
                     Randazza Legal Group, PLLC
15                   100 Pearl Street, 14th Floor
                     Hartford, CT 06103

16
     On behalf of Defendant Lee Ann McAdoo:
17                   David S. Wachen
                     Wachen LLC
18                   11605 Montague Ct
                     Potomac, MD 20854

19
     On behalf of Defendant Scott Creighton:
20                   Scott Creighton, pro se
                     9214 13th Street N, Apt A
21                   Tampa, FL 33612

22   On behalf of Defendant James Hoft:
                     Jonathon Christian Burns
23                   Burns Law Firm
                     PO Box 191250
24                   Saint Louis, MO 63119

25
```

```
 1          (FTR recording began at 9:35 A.M.)

 2          THE COURT:  All right.  And quickly, who's on the

 3     line for the plaintiffs?

 4          MR. GRAVES:  Good morning, Your Honor.  This is

 5     Anwar Graves with O'Melvney and Meyers.  I'm joined by my

 6     colleague, Hassen Sayeed.

 7          MR. SAYEED:  Good morning, Your Honor.

 8          THE COURT:  Mr. Randazza, you're on the line?

 9          MR. RANDAZZA:  Yes, Your Honor.  And my colleague,

10     Jay Wolman is on as well, I believe.

11          Jay, are you here?

12          MR. WOLMAN:  Yes, I am.  Thank you.

13          Good morning, Your Honor.

14          MR. GRAVES:  And, Your Honor, on behalf of the

15     plaintiffs, we also have Kimya Saied.

16          THE COURT:  Yes.  Yes, I think I've got that.

17          All right.  And then how about for the Free Speech?

18          MR. RANDAZZA:  I'm sorry, Your Honor, somebody's --

19          THE COURT:  Someone's typing in the background.

20     Whoever is typing, please put your phone on mute.  It's hard

21     to hear other people speaking.

22          For the Free Speech defendants, who's on the line?

23          MR. RANDAZZA:  That would be myself, Mark Randazza,

24     and Mr. Wolman.

25          THE COURT:  All right.  Let's see, and then how
```

```
 1    about Mr. Stranahan, are you on the line?  Is Mr. Stranahan on

 2    the line?

 3            Okay.  How about Mr. Creighton?

 4            MR. CREIGHTON:  Yes.  Good morning, Your Honor, I'm

 5    here.

 6            THE COURT:  All right.  Good morning.

 7            Let's see, and then, Mr. Burns, are you on the line

 8    for Mr. Hoft?

 9            MR. BURNS:  Yes, Your Honor.  Good morning.

10            THE COURT:  Good morning.

11            All right.  I think that's everybody who should be

12    on the line; is that right?

13            MR. WACHEN:  Your Honor, David Wachen on behalf of

14    Defendant Lee Ann McAdoo is also on the line.

15            THE COURT:  Mr. Wachen, that's right.

16            Good morning.

17            All right.  Well, counsel and Mr. Creighton, I think

18    I'd ask, Mr. Graves, were you anticipating Mr. Stranahan being

19    on the line?

20            MR. GRAVES:  I don't believe so.  I haven't heard

21    from him and none of these issues pertain to him, unless

22    Your Honor decides to go into trial scheduling.  So I don't

23    see a need for him to be here, unless we have that

24    conversation.

25            THE COURT:  Well, and that was one thing I thought
```

1    we were going to take up is getting this scheduled to trial.

2           MR. GRAVES:  Yeah.  And so I know we corresponded

3    with Mr. Stranahan via e-mail.  And I think we -- I mean, the

4    entire -- all the parties here are included on those

5    communications.  I don't recall him having any objection to

6    the dates that we were offered, but I don't want to confirm

7    that without him making his own representation to the Court on

8    that.

9           THE COURT:  Okay.  All right.  Well, why don't we

10   just -- can we take up that issue getting this case set for

11   trial.  In looking at the e-mail about the various conflicts,

12   it seems like there should be some time to get, what is that,

13   an 8-day trial scheduled certainly before next fall.

14          Are there any times -- it looks like there's some

15   windows perhaps in the late spring, early summer for the

16   parties.

17          MR. GRAVES:  Yes.  I know as a group we all were

18   corresponding about this issue, and we thought we would take

19   the Court on its offer of late July, early August as a trial

20   date.  But I believe Mr. Randazza believed that he might be in

21   trial during that timeframe.  And so, I guess I'd defer to him

22   as to whether or not he has a conflict during that time.

23          I know one thought that we had was if we -- if there

24   was a conflict, we all know how trials can sometimes go away.

25   Maybe we could schedule something end of summer and then have

1    another scheduling conference in the spring to see if our

2    current conflicts are still conflicts or if they've gone away.

3            With that said, I'll turn this to Mr. Randazza

4    because I believe he had the conflict in the summer.

5            MR. RANDAZZA:  Yeah, I'm going to defer to

6    Mr. Wolman on this because he -- this is a -- it's a

7    Connecticut matter, and I will not pretend to understand the

8    peculiarities of the Connecticut practice book.

9            So, Jay, I'm going to tag you in here.

10           MR. WOLMAN:  All right.  Thank you.  Good morning

11   again, Your Honor, Jay Wolman.

12           So Your Honor is familiar that Mr. Jones, Free

13   Speech Systems, LLC, and Infowars, LLC, are also defendants in

14   other litigation, which includes a case in Connecticut that's

15   been ongoing since 2018.  Filed, I believe, two months after

16   this case was filed.  That trial date has moved a few times as

17   well.  And it is presently scheduled, it kind of gets a little

18   funny, where it gets marked down in the calendar as the start

19   of jury selection/trial.  But as with any other case, jury

20   selection comes first, obviously.  Because the nature of the

21   case which arises from Sandy Hook-related publication

22   statements, the Court has scheduled and anticipated

23   essentially a one-month period for jury selection, which is to

24   begin on August 2nd, with then opening statements/evidence the

25   first week of September, depending upon, more or less, when

Gilmore v. Jones, et al, 3:18cv17-NKM-JCH                          7

1    the jury selection wraps up.

2           As Your Honor can expect, the Sandy Hook incident is

3    highly sensitive in Connecticut and pretty much can't find

4    anyone who doesn't have an opinion, wasn't affected by it in

5    the state, especially in the counties closest to New Town,

6    Connecticut.  And the process for selecting a jury in

7    Connecticut is pretty much unlike any I'd seen throughout the

8    country.  I can't claim to be familiar with all 50 states.

9    But it is private individual voir dire of witnesses where the

10   parties actually get to voir dire -- not witnesses, the

11   jurors, potential jurors, outside the presence of the judge.

12   And then, of course, we bring in the judge as absolutely

13   necessary.  And certainly having one's client involved in the

14   process of selecting the juror is crucial in order to

15   maintain, you know, due process and make sure their client has

16   a fair trial.  And so we're starting that process on

17   August 2nd.

18          And, of course, the week beforehand is a lot of

19   preparation.  Presumably there will be some motions that will

20   lead into that.  So I want to make sure that the Court and the

21   parties are clear as to, you know, the nuance of Connecticut

22   and how lengthy that's going to be.

23          It's going to be a long trial in and of itself.

24   There are now 15 plaintiffs in that case, multiple defendants,

25   not even just our clients.  I want to make sure that the Court

1    has a full picture of that.

2            THE COURT:  Okay.  All right.  And what about --

3    have you -- did you-all look at getting dates in June or

4    earlier in July from Heidi?

5            MR. GRAVES:  I don't have that.  Let me -- I'm

6    trying to pull up the dates that she offered to us.

7            I believe there was a conflict with the spring, but

8    I'm trying to refresh my recollection.  I remember there's a

9    reason why we chose the summer, why we thought that might be

10   best, but I am trying to find our correspondence on that

11   issue.  And my apologies for not knowing offhand.

12           UNIDENTIFIED SPEAKER:  I'm looking at an e-mail from

13   September 1st where she suggests July 27th through 29th and

14   August 1st through 5th.  And then she suggests any 8-day

15   combination in August.

16           THE COURT:  All right.  So what I was saying, if

17   you-all think that the case could be ready for trial by --

18   well, by sometime in May.

19           MR. GRAVES:  I think it depends.  I think there are

20   (indiscernible) fact discovery, and there may be issues.  As

21   Your Honor knows, we're discussing another motion to compel

22   related to discovery.  I know there's one currently pending.

23   And I don't believe any of us are -- want to take the ultimate

24   depositions, meaning of the main parties, until these

25   discovery issues are resolved.  So that's one complication, I

1    guess.

2            And then regardless of the way the Court rules, if

3    the Court grants these various motions, then actually there

4    will be some time needed to produce them and for review of

5    those documents.  And then after that we'll have to have

6    expert discovery.  As Your Honor knows, we're dealing with

7    analytics, so our damages experts will have to review those.

8    Once those are actually reviewed -- or produced, or I assume

9    Your Honor grants that motion, if you do, they'll need to

10   review that.  They'll need to do a report.  They'll need to be

11   deposed.  And then we'll obviously have summary judgment

12   briefing.  So I assume that May may be a little tight.  But if

13   the defendants have an opposing view, I'd defer to them and

14   what their thoughts are.

15           THE COURT:  All right.  Well, what I'll do on the

16   trial then is I would just suggest that -- that you contact

17   Heidi and see if there are any dates in June or earlier in

18   July for that 8-day trial.  It seems like that -- you know,

19   that should work with the schedule.

20           I'm not sure why -- maybe we're looking at end of

21   July and August just to be abundantly cautious.  But if August

22   just isn't going to work, counsel is not available, the

23   parties aren't available, then there's not -- it sounds that

24   way.

25           So, and then on the motion to compel, talking about

1    Free Speech Systems, is there a request for hearing on that or

2    do you want me just to address that on the papers?

3              MR. WOLMAN:  Your Honor, this is Jay Wolman.  I

4    believe that could be addressed on the papers.

5              THE COURT:  All right.  Mr. Graves or Mr. Sayeed,

6    would you like a hearing in the matter, or would you like it

7    just to be addressed on the papers?

8              MR. GRAVES:  I never like to pass up an opportunity

9    to have a hearing, but I guess -- if a hearing -- I guess if

10   the Court believes that a hearing would be helpful to help

11   discuss or clarify some of the issues that are present, we'd

12   definitely be amenable to one.  But I think we'd be fine

13   proceeding on the papers as they are written.

14             MR. SAYEED:  And I may join Mr. Graves in that, you

15   know, sentiment.  I want to make sure that's clear.  As far as

16   the Court believes it's beneficial, we are happy to do it.

17             THE COURT:  Okay.  Well, thank you for that.  I will

18   plan on addressing that motion on the papers.

19             MR. GRAVES:  Okay.

20             THE COURT:  Okay.  All right.  So, I'll make sure

21   that Heidi knows that you're going to be in touch with her

22   this week to try and get a date for the trial in June or the

23   first part of July.  And then after that's set, we can --

24   you-all can confer about a schedule.  And if we need to have a

25   hearing on the schedule, we can do that.

1          MR. GRAVES:  Sounds good.

2          THE COURT:  Okay.  All right.  And I think that

3    there were kind of two groups of discovery issues to take up.

4          MR. GRAVES:  Yes, Your Honor.

5          THE COURT:  So Mr. Hoft's supplemental productions

6    and then the other is discovery requests for marketing and

7    analytics data from the Free Speech defendants and also

8    Mr. Hoft.

9          MR. GRAVES:  That's correct.  And which issue would

10   you prefer us to address first?

11         THE COURT:  Well, why don't we take up the marketing

12   and analytics.

13         MR. GRAVES:  Okay.  Yeah, with regards to that --

14   and let me set the table a little bit.  This has been an issue

15   within the Sandy Hook cases in Connecticut, this particular

16   question of analytics.  The court granted those requests.  But

17   the reason why we learned of certain things I'm about cite to

18   during our discussion on this is a lot of deposition testimony

19   was taken in that case related to analytics.  And those

20   transcripts were produced as part of public filings related to

21   motions to compel which we have read to review and to learn

22   about the Infowars operation that becomes the analytics and

23   how the analytics reviews within that organization.

24         So taking it from a higher level, just so Your Honor

25   is aware, analytics are a tool of e-commerce businesses.  They

Gilmore v. Jones, et al, 3:18cv17-NKM-JCH                                    12

 1   typically allow one to track sales activity, demographics,

 2   unique users that come to a website, those types of -- that

 3   type of data is what analytics specifically is.  And those

 4   analytics are stored on a cloud-based server.  So typically

 5   one would just log into a server, pull down a report, you

 6   know, enter using a password, download various reports,

 7   however they want to slice and dice the data, and they can use

 8   that to inform their business practices is typically how

 9   analytics are used.

10          In regards to Infowars specifically, there's been

11   testimony provided by a few people related to how they're used

12   at Infowars.  One with Alex Jones's father, who at the time

13   that he testified, or in May of 2019, he was the manager of

14   human resources at Free Speech Systems.  And he said that Free

15   Speech Systems would look at these analytics, specifically the

16   sales spikes, and that Free Speech Systems will attempt to

17   recreate whatever narrative or assertion, or allegations were

18   made within that broadcast that produced the high spike, where

19   they can routinely see high sales that would (inaudible) with

20   their publication.

21          He said that they looked at specifically unique

22   visitors, click views, how people were referred, how long did

23   they stay on the site, and used all of that to govern their

24   business.

25          Robert Du, who is their nightly news director, says

1   that he does the same thing but on YouTube.  He does that.

2   And the purpose of doing that is to assess whether Free Speech

3   Systems should publish a particular video on its website.  And

4   YouTube, same with their rationale, a popular video would

5   attract an audience which in turn would attract people to buy

6   certain products from their store.  There's similar testimony

7   from their IT manager and also from their business manager.

8          And so the relevance of this data is, number 1, it

9   goes to malice.  It shows is there a business incentive or a

10  business motivation for producing certain types of story.  And

11  the benefit of looking at that, as Your Honor knows, is that

12  it's our burden, obviously, to prove that actual malice

13  occurred here.  And one way that courts have allowed for that

14  point to be established is through the business marketing

15  metrics plan and analytics and things (inaudible.)

16         Similarly, it also is relevant to getting the sense

17  of revenue data.  How much money was made off of these

18  publications?  As Your Honor may know, we've heard in

19  discovery related to revenue that was garnered by the Infowars

20  or Free Speech Systems through these publications.  And in

21  their response was that because YouTube has deleted the

22  channel, they couldn't really gather any response or documents

23  with (inaudible.)  So analytics is a way for us to back door

24  that information and also pick up what were the specific

25  financials related to these specific publications.

1          So duly seeking that is the long and short as to why

2   we're seeking this data.  We were told by Infowars defendants

3   and also by Mr. Hoft that they're refusing to produce it.  So

4   they're not saying that it does not exist, but that they don't

5   believe that it's relevant and should not be produced to us.

6          THE COURT:  All right.  And it looks like from their

7   responses that -- let's see, that Infowars says it has no such

8   responsive documents.  And then Mr. Jones and Free Speech, I

9   think their response is that each one of them is withholding

10  any such responsive documents.  (Inaudible.)

11         Tell me about the timeframe in your request.  It

12  looks like (inaudible).  Why is that (inaudible) reasonable

13  scope?

14         MR. GRAVES:  Sure.  Well, first of all, the January

15  through August date is what is done in every discovery request

16  in this case.  January 2017 being the start of the year where

17  (inaudible.)  And April 2018 is the filing of the amended

18  complaint.  So that has been the timeframe that we've used for

19  everything.

20         Why is that critical for this request?  It is

21  because it's important for us to establish a trend line.  We

22  need to see spikes.  So, for example, as Your Honor knows

23  through addressing the various motions in this case, courts

24  have -- or I should say litigants or plaintiffs have shown

25  that there may be a business motivation by looking at spikes.

1   So we've noticed that there's a trend line.  If someone says X

2   in April, they noticed their sales go up.  So let's see if we

3   can repeat that behavior again in June, in August, and

4   November.  And so we need to be able to establish that so that

5   our experts can make opinions and render opinions on whether

6   or not there is a business motivation involved.

7            Is there a trend that they're able to see and pick

8   up on where certain events trigger more viewers when certain

9   assertions are made on the broadcast?  So we can't do that in

10  isolation.  We need to be able to see that.

11           It's akin to -- if you'll recall during our last

12  hearing when we were discussing Mr. Gilmore's discovery

13  responses, the defendants argued that they need to see a

14  longer timeframe of publication to see what his baseline was

15  prior to the event when it comes to publications, or his

16  reputation in the community and how it extended after the

17  Unite to Right rally and after he published his video.

18           Similar here, we need to see a baseline.  See where

19  things have spiked and where they have not.  So that's why the

20  timeframe is relevant.

21           The last request, which as Your Honor knows, we

22  submitted three RFPs related to this topic.  The last one of

23  those does not have a built-in timeframe, and the reason why

24  is because we're only looking for the request.  And

25  specifically, the reason why that's relevant is we want to see

1   the targeted nature of the request.

2          So, for example, if Info -- Alex Jones sent a note

3   to Google saying I want to see what events over the past four

4   years have triggered the greatest amount of sales so I can

5   increase my own sales.  Or I want to see what type of events

6   got the most clicks.  Those requests like that can be made at

7   any time.  But they could pull information that's responsive

8   to this matter, Number 1.  And Number 2, just the nature of

9   the request and how it's framed could be insightful as to why

10  it's relevant to Free Speech Systems.  And so we wanted to see

11  those -- just that communication, not so much any broad

12  responses we may observe.  In our opinion there's something

13  really enlightening there, insightful there.  But that is what

14  we're looking at just to see how they target their request to

15  YouTube and to these other entities.

16          And one thing I will note just so that Your Honor is

17  aware, these materials have already been produced.  So this

18  isn't an issue of them having to do a substantial amount of

19  work and searching.  They're simply just reprinting or

20  repackaging what's already been produced in Connecticut.  And

21  that shoulda shortened timeframe.  Connecticut had a much

22  longer window of time.  We're looking for a much more discrete

23  period with regards to two, at least, their requests -- two of

24  their requests.

25          THE COURT:  Okay.  All right.  Thank you.

1          Let's see, Mr. Randazza or Mr. Wolman, do you want

2    to address that?

3          MR. WOLMAN:  Sure.  If I may, Your Honor, this is

4    Jay Wolman.  You know, the Connecticut case is governed under

5    the Connecticut practice book under different, you know,

6    rubric.  What the Connecticut judge determined to be under

7    Connecticut law, which also is, again, you know, interlocutory

8    opinion that could be subject to appeal where she gave no

9    explanation as to why she would order certain production, that

10   is not in any way persuasive or binding on this court and

11   should not be looked to.

12         The issue here is --

13         THE COURT:  Didn't I already address this issue, at

14   least in, you know, to some extent, in a January order from

15   earlier this year?  I said that the marketing and research

16   interrogatories -- I mean, they are different requests, but

17   they're sort of the same general subject matter -- was

18   probative as to the showing of actual knowledge?

19         MR. WOLMAN:  And while we understand that some

20   things may, in terms of marketing, you know, tend to show

21   actual malice, there's nothing here in terms of what's been

22   represented by the plaintiff that this data would be, that it

23   actually drove any particular content, any editorial takes,

24   any, you know, opinions here.  Any -- we're dealing with a

25   couple of publications from Free Speech Systems that were done

1   right as Charlottesville was, you know, happening.  That was

2   the news of the day as a general proposition.  There's no

3   indication whatsoever from anyone in this case that that had

4   anything -- that any analytics were addressed in terms of

5   what, you know, Ms. McAdoo's publication interview with

6   Mr. Stranahan that was aired on Free Speech Systems or

7   Mr. Jones's one, you know, brief commentary on Mr. Gilmore.

8   There's nothing that has been indicated at all in this case to

9   suggest that this expansive need for analytics data is

10  necessary.

11          Now, I also need to address the scope of their

12  request.  You know, this is the first time I'm hearing

13  Mr. Graves limiting it to what was produced in Connecticut.

14  Because the entire scope of the request is for analytics data.

15  Well, one, the only thing we can really do to export Google

16  analytics is to become, for example, an Analytics 360 member

17  to get the raw data, and that costs $150,000 is my

18  understanding.  And if Mr. Gilmore wanted to put that up,

19  that's up to him.  But, otherwise, if you're looking for

20  certain reports that are already in existence, you know, or

21  can easily be produced, that's not the entirety of analytics.

22          What we have produced in terms of, you know, what --

23  already, if I recall correctly, is that if you go into Google

24  Analytics and you punch in Charlottesville, you know, it was a

25  very small return in terms of sales that could be tied to any

 1   articles or any publications on the Infowars website that are

 2   directly attributable to any article that says

 3   Charlottesville, let alone anything that would then more

 4   narrowly mention Mr. Gilmore.  There's nothing to suggest that

 5   we should have to undertake to produce any of this where there

 6   is no showing that analytics in any way drove the two

 7   publications at issue and given the breadth of it.  We don't

 8   believe that we're entitled to Connecticut.  But, you know,

 9   things were produced in June of 2019 to opposing counsel in

10   that case.  And if the Court orders --

11           THE COURT:  Mr. Wolman, tell me about -- you said

12   there's nothing that indicates that this analytics drove the

13   statements at issue in this case.  I mean, is that -- is that

14   the issue that, I guess, is in dispute between the parties?

15   And you're saying that as if it's established.  What -- tell

16   me more why you think it's established.

17           MR. WOLMAN:  Let's look at the case, Your Honor.

18   What we have first is an interview that Ms. McAdoo did with

19   Mr. Stranahan that was published on Infowars.  You know,

20   that's the major one that they point to.  And in that, you

21   know, there's been nothing to suggest Mr. Stranahan was

22   motivated by any form of analytics to, you know, make his

23   statements or that Ms. McAdoo in acknowledging Mr. Stranahan's

24   statements as a host would have seen in terms of analytics

25   going forward and deciding to do this project, do this

 1  interview.

 2        Neither is there anything in what's been produced to

 3  suggest that Mr. Jones's statement on, I forget which state it

 4  was, afterwards, that his decision on the topics of the day

 5  had anything to do with, you know, the analytics based on the

 6  prior interview Ms. McAdoo did with Mr. Stranahan.  There is

 7  none of that.  You know, so why do you even need to look at

 8  analytics when there's been nothing in the discovery to date?

 9  And they've had opportunity to depose folks before going into

10  this invasive discovery request to then say we need this to

11  establish their motivation for actual malice.  No, because

12  they have no baseline to say that analytics were done here.

13        You know, if analytics were used a handful of times

14  over the course of, you know, an 8-year period as one would

15  look at in the Sandy Hook case, that doesn't mean that

16  analytics were specifically used for the two publications at

17  issue for Free Speech Systems.  And so why should we have to

18  do any of this intrusive, potentially exorbitantly costly

19  document production when it has nothing to do with any

20  motivation, any showing that it related to these statements?

21        THE COURT:  Okay.  And I think you indicated that

22  producing the raw data would be, you know, $150,000, but that

23  there are still existing analytics reports.

24        MR. WOLMAN:  Yeah, on terms of Google analytics.

25        THE COURT:  Yes.

1        MR. WOLMAN:  And YouTube, I don't believe we can

2   even access any analytics there were because, again, their

3   accounts been terminated.  You know, for the same reason

4   Mr. Graves mentioned that we can't produce earnings.

5        THE COURT:  All right.  And it looks like from your

6   response that Mr. Jones and Free Speech Systems do have some

7   analytic documents that each one is withholding; is that

8   right?

9        MR. WOLMAN:  Mr. Jones, we answered, in his

10  capacity, the possession company and control company that keep

11  control.  So to the extent he can control Free Speech Systems

12  and that it's attributable to him, you know, anything he would

13  have is actually in the possession of Free Speech Systems.

14       THE COURT:  Okay.  All right.  Anything else on this

15  topic?

16       MR. WOLMAN:  I should note that to the extent that

17  third request about communications, you know, again, that's

18  going to have us do a search that we don't believe is

19  necessary to do and then have us search over years and review

20  however many communications regarding -- to determine what, if

21  anything, is requested about analytics.  Because other than

22  the search term "analytics", one would have to look through

23  potentially however many communications came with Alphabet,

24  Facebook, or Twitter that might theoretically have some

25  numbers in it or requesting some numbers.  And so there's, you

1   know, an undue burden in that.

2          THE COURT:  All right.  All right.  Thank you,

3   Mr. Wolman.

4          All right.  And Mr. Burns, what's your view?

5          MR. BURNS:  Yes, Your Honor.  I would echo a lot of

6   the sentiment of Mr. Wolman.  I think that in our case it's

7   even more limited than in the case against Mr. Jones or Free

8   Speech Systems or Infowars because the allegations against

9   Mr. Hoft all relate to a single article.  And the way that,

10  you know, the Gateway Pundit works, Mr. Hoft's, you know,

11  online blog is that there are about 40 or 45 articles that

12  get -- you know, 30 to 45 articles per day that get published

13  every, you know, day in, day out, seven days a week.  The

14  article that's at issue here in this case is a single article.

15  There has been no deposition testimony suggesting that

16  Mr. Hoft or Gateway Pundit look at analytical spikes or

17  anything like that to drive their editorial process or article

18  selection or anything like that.  And so I think what our

19  primary problem with the request is is that it's just way over

20  broad and it's not tailored to the particular article at

21  issue.

22          And if they want a baseline or something like that,

23  I can -- you know, I can understand if they want a week before

24  or a week after, something that was more meaningfully

25  tailored.  You know, given the fact that we're talking about a

```
 1    single article, if they had something that they wanted to

 2    tailor it, we wouldn't object to that, assuming it was

 3    reasonable.  But they're asking for 15 months' worth of data,

 4    I mean, of every shred of data that we have.  And that just

 5    seems, frankly, oppressive.

 6              THE COURT:  I mean, describe to me what that looks

 7    like.

 8              MR. BURNS:  Well, let me look here.

 9              MR. GRAVES:  And, Your Honor, I can tell you.  It's

10    in the deposition testimony for -- at least for the Infowars

11    defendants.  I assume it's the same system.

12              THE COURT:  I do want to hear from you in just a

13    moment, but I'll hear from Mr. Burns on this.

14              MR. BURNS:  Yes.  So some of that is certainly true.

15    However, I mean, it just -- to be perfectly honest, I'm not --

16    I haven't gone through and looked for every, every -- under

17    every single stone.  I don't know -- so there's some answers

18    to the question -- so some answers to these questions I don't

19    know because it just -- I mean, it was facially, you know,

20    it -- I mean, it was breathtaking to me.  So, I mean, I know

21    that it would be an enormous undertaking, let's put it that

22    way.

23              THE COURT:  All right.  Mr. Hoft doesn't have any

24    reports that are prepared that analyze -- or the, I guess, any

25    document that analytics, it would all just be raw data from
```

Gilmore v. Jones, et al, 3:18cv17-NKM-JCH                                    24

```
 1   him; is that right?
 2              MR. BURNS:  No.  I mean, so, you know, Gateway
 3   Pundit does have access to a Google Analytics, you know,
 4   platform --
 5              THE COURT:  Mm-hmm.
 6              MR. BURNS:  -- which is pretty much what everybody
 7   uses.  And initial -- as far as a, you know, the subsequent
 8   dispute that we'll be discussing in a few minutes, you know,
 9   we're about to turn over some information to plaintiff which
10   will provide the information that they need so that they can
11   see precisely what, you know, the analytics related to the
12   article at issue.  So, yeah.
13              THE COURT:  Okay.  All right.  So you do have the
14   information about the analytic -- analytics related to the one
15   article?
16              MR. BURNS:  Yes, Your Honor.
17              THE COURT:  Okay.  All right.
18              Mr. Burns, anything else?
19              MR. BURNS:  No, Your Honor.
20              THE COURT:  Okay.  All right.  For plaintiff?
21              MR. GRAVES:  Yes, Your Honor.  So, I guess first to
22   talk about the burden of accessing these reports.  So,
23   again -- and if Your Honor permits us to brief this, we can
24   point you to the testimony and attach it as an exhibit.  But
25   it's nowhere close to as onerous as it's being represented to
```

```
1    be.  As the testimony explains, it's very much akin to logging

2    on to your bank and downloading a certain period of data.  You

3    may go on there and say I want my bank statements from June to

4    September.  15 bucks for the requested periods.  You wait the

5    ten seconds for that document to be prepared and then you open

6    it from your download folder.  That's it.  There's nothing

7    else that's crazy about it.  It's the most simple task to

8    retrieve.

9            So there isn't even a burden there or anything

10   that's particularly onerous.  And Mr. Hoft -- I'm sorry,

11   Mr. Burns it seems like hasn't attempted to retrieve the data.

12   But if he did, he would see that it really is a simple

13   process.

14           Similarly, it seems like based on hearing

15   Mr. Wolman's argument is that the standard is we need to have

16   a preliminary showing that there was a business motivation

17   involved before we can seek discovery into whether there

18   actually was a business motivation involved.  And that just

19   seems very circular.

20           We have deposition testimony, again, as mentioned

21   from five employees.  We know three of them, or at least

22   Mr. Du to still be currently there, that talks about how they

23   do access the data and how they access it routinely, and for a

24   specific purpose, which is the business purpose of determining

25   what works to generate more sales to their website.  So we
```

 1    have a preliminary showing.  Surely, we don't have one related

 2    to Gilmore.  We haven't finished deposition practice.  But

 3    it's clear that this provides relevant data.

 4         And Your Honor has already mentioned this in your

 5    order and, as you mentioned earlier, found this to be relevant

 6    already.  We're just trying to get the data which they are

 7    refusing to provide.

 8         And again, the data release with regard to Free

 9    Speech Systems already exists.

10         So the Sandy Hook case, just to drive a little bit

11    more color, their discovery request was around 2018, 2019.  I

12    believe Mr. Wolman just stated it was produced actually in

13    2020.  Our timeframe is just the reports within that same

14    timeframe.  We're looking at 2017 through 2018.  So that data

15    that was already produced in Sandy Hook would necessarily

16    already be the same data that we're looking for because the

17    Sandy Hook data has a longer timeframe than we do.  They go to

18    2020; we go to 2018.  So it's nothing new.  This is just

19    simply going to be a copy job for the Free Speech Systems.

20    And for Mr. Hoft, it's a downloading of a bank statement.

21         So that is -- that's basically all I have,

22    Your Honor.  And again, if Your Honor would like us to brief

23    this issue, I'm happy to provide you with these exhibits and

24    the deposition testimony by these Infowars or Free Speech

25    Systems employees so you can review it yourself and see how

1    it's used and how easy it is to retrieve.

2             MR. WOLMAN:  Your Honor, I need to make a correction

3    of Mr. Graves's misrepresentation as to how analytics works.

4    You know, you have to put in a specific request for a specific

5    thing.  It's not just you say state -- it's not a bank

6    statement download.  There are all sorts of different queries

7    that you could run, thousands of different queries, hundreds

8    of thousands of different queries, depending upon the

9    permutations of their able -- you include.  And what was

10   produced for Sandy Hook was over a broader time period and

11   therefore we cannot simply easily disambiguate.

12            You know, this is not what we believe has to do with

13   anything in this case.  And it's an excessive burden.  This

14   is, you know, this would not be a request that anybody would

15   ever allow for the New York Times.  It is not a request that

16   anybody would ever allow for the Miami Herald.  This is not

17   something that then (inaudible) should be required to produce.

18            MR. BURNS:  Your Honor, this is John Burns.

19   (Inaudible.)

20            THE COURT:  Mr. Wolman, tell me what that process

21   for selecting -- (inaudible) put into the request for

22   analytics, and what would that look like for the information

23   that's been requested?

24            MR. WOLMAN:  Well, it's tough to say, Your Honor,

25   because, first, what happened in Connecticut was they asked

1    for similar things.  And, you know, we produced a 35-page

2    report and for some reason, Judge Bellows thought that was

3    insufficient but didn't explain why, although she originally

4    thought it was.  And then the plaintiffs in that case provided

5    a 100-page document of a few dozen, I don't remember how many

6    there were, at least a dozen, different queries to run over,

7    you know, broad periods of time.  So those were specifically

8    run based on individual queries that the plaintiff requested.

9    Here, they haven't requested any particular query.  They just

10   say produce your analytics data.  That just can't be done.

11   There are, you know, hundreds of thousands of data points

12   potentially.  And in order to -- you can't just export all

13   data points in the particular years, you have to produce a

14   particular report.  The only other alternative is to export

15   the entire raw data set which costs, you know, in our

16   understanding, at least $150,000 to become an Analytics 360

17   member, which gives you that access.  We are not Analytics 360

18   members.  You know, it's not a simple process.

19          THE COURT:  Okay.  And Mr. -- okay.  Mr. Graves, I

20   take it you're not seeking all the raw data.  Do you have a

21   particular query in mind?  How do you see that this process

22   unfolding if I were to -- you know, if I were to require the

23   defendants --

24          MR. GRAVES:  We definitely can work with defendants

25   to create a query.  Again, I challenge the notion that it is

1    as onerous as Mr. Wolman is representing.  Again, that's why I

2    mentioned, we're happy to brief the issue and provide you the

3    expert testimony related to this.  But there is a -- I'm not

4    quite sure what that query would look like.  Again, I can look

5    to see and meet and confer with them on this issue.  But we

6    weren't given that opportunity because we were told that we're

7    not going to produce anything.  And so that's why we haven't

8    done the meet and confer process.  Well, we did, but we were

9    told none of this was relevant and so there was nothing that

10   we could retrieve.  However, if that door is now open again,

11   we're happy to meet and confer with the defendants on that

12   particular point.

13          But just on the overburden part, it sounds like from

14   Mr. Wolman's representation that, again, the work has already

15   been done, he just doesn't want to give us too much data.  So

16   the work is now going to be in limiting it.  So, again, I

17   defer to the Court, and I'm not sure if Mr. Wolman will accept

18   responsibility, but you can just give us everything that you

19   produced in Sandy Hook to reduce the burden.  And therefore,

20   there is no need for redactions and no need for any type of

21   curating.  That just comes over and we can analyze that to

22   make things simple if that's the problem.

23          MR. WOLMAN:  Now it sounds like they're asking for a

24   different timeframe, an extended timeframe.

25          THE COURT:  Right.  And I'm not -- I understand

1   Mr. Graves's point.  It does seem like, you know, that

2   report -- it would encompass more information than has been

3   sought and that I have said would be, you know, potentially

4   relevant in this case.  So, you know, it does seem like the,

5   you know, the more tailored approach would be agreeing to a

6   particular query.

7             MR. GRAVES:  So we're happy to negotiate that with

8   defendants.  Again, the meet and confer was basically -- and

9   I'm not blaming Mr. Wolman, he just didn't think there was

10  anything regarding the topic was relevant, so we (inaudible).

11  Happy to (indiscernible).

12            MR. WOLMAN:  And what I'm hearing from them is, of

13  course, they didn't propose -- they don't even know what

14  they're looking for.  They're just asking for everything,

15  which is not what we should be required to produce.

16            THE COURT:  Right.

17            MR. WOLMAN:  And they didn't suggest anything more

18  narrowly tailored that they actually need.

19            THE COURT:  All right.  And Mr. Burns, is there

20  something else that you wanted to say?

21            MR. BURNS:  No.  I just wanted to echo a slight

22  concern about the queries.  You know, again, we're perfectly

23  willing to discuss some sort of narrowed, tailored approach,

24  perfectly willing to entertain that.  Of course, my one

25  concern is that, you know, is an endless stream of different

1   queries.  And if we could just have -- I guess what I'm

2   hearing is we need to confer to discuss the different queries

3   or whatever.  But just so long as there's not an endless train

4   of, you know, new queries that are just popping up.  Just so

5   that we can keep it tight.  That's all.

6           THE COURT:  Okay.  All right.  Well here's what I'm

7   going to do on this issue.  I don't think it needs to be

8   briefed any further.  You know, this -- the nature of this

9   information was briefed and argued.  And I addressed it in an

10  Order and Opinion back in January finding that as long as the

11  requests were, you know, tailored to the time around the

12  publications that the information would be relevant.  You

13  know, here these requests cover -- it's a little bit more than

14  a year.  I think that when you're analyzing trends and things

15  like that that it's a reasonable timeframe.  Perhaps it could

16  be narrowed to 12 months, but I'm not sure that that really

17  achieves much at all.

18          So let me just say this.  I do think that the

19  information sought is relevant.  And it -- and I think any

20  concern about the cost or the burdensomeness in producing raw

21  data, it appears that that's not what plaintiff is requesting.

22  And that that concern can be addressed by having the parties

23  meet and confer on having a particular query for the

24  information.  And what I'm going to do is require that you-all

25  would do that within the next seven days.

1          Like Mr. -- I echo Mr. Burns's concern about not

2    having this go on and have repeated requests.  I think this

3    needs to be addressed soon and taken care of.  So that's what

4    I will ask that you-all do is that you meet and confer in the

5    next seven days so that a particular query can be developed

6    and that the resulting report of the analytics can be

7    produced.  I do think it's -- I think it's relevant.

8               MR. GRAVES:  Yes, Your Honor, we will do that.

9               THE COURT:  All right.  Is there anything else on

10   that issue?

11              MR. GRAVES:  Nothing from plaintiff.

12              MR. WOLMAN:  No, Your Honor.

13              MR. BURNS:  No, Your Honor.

14              THE COURT:  All right.  Then moving on to the issues

15   with Mr. Hoft.

16              MR. GRAVES:  Yes, Your Honor.  For this one, I'm

17   going to defer to my colleague, Miss Kimya Saied.  She'll be

18   arguing for plaintiff with regard to Mr. Burns and Mr. Hoft.

19              THE COURT:  All right.  Miss Saied.

20              MS. SAIED:  Good morning, Your Honor.

21          Plaintiff has identified four specific discovery

22   issues regarding Mr. Hoft's discovery responses on which,

23   Your Honor, guidance would be appreciate.  And we're happy to

24   take those in the order that they were laid out in the e-mails

25   Mr. Hoft sent or whatever order Your Honor prefers.

1          THE COURT:  That's fine.

2          MS. SAIED:  Okay.  I'll start with a bit of

3     procedural background which I think underscores the difficulty

4     plaintiff has faced in getting the discovery to which

5     plaintiff is entitled and to also just timely and efficiently

6     moving this case forward.  All four discovery disputes concern

7     information sought by plaintiff's first set of RFPs which

8     plaintiff served in March of last year, so March 2020.  At

9     this point these requests have been outstanding for more than

10    18 months.  And they also concern information sought by the

11    second set of RFPs which were served in January of this year,

12    so ten months at this point.

13          Both sets of these RFPs were also the subject of the

14    Court's April 2021 order, that's Docket 271, which required

15    Mr. Hoft to supplement his production to the first set of RFPs

16    by the end of April, and to RFP42 and the second set of RFPs

17    by May 5th.  This is all to say, Your Honor, plaintiff has

18    been waiting for these discovery responses for months at this

19    point and it's concerned that the continued delay will -- has

20    severely prejudiced plaintiff's ability to advance this case

21    and prepare for depositions now that we're nearing the end of

22    fact discovery.

23          With that foundation, Your Honor, I'll take the

24    first issue that was laid out in the e-mail which concerns

25    plaintiff's RFPs seeking documents showing the revenue

 1    generated by Mr. Hoft's defamatory publication.  These RFPs

 2    were, again, a part of the first set from March 2020.  In

 3    response to plaintiff's RFPs, Mr. Hoft did not assert any

 4    specific objections, instead representing that he would

 5    produce whatever documents he had in his possession.

 6             In May of 2020, he produced four documents.  None of

 7    those documents reflected the revenue generated by the

 8    defamatory publication.  And in response to Your Honor's

 9    April 2021 order requiring Mr. Hoft to review and supplement

10    his production to these RFPs by the end of April and early

11    May, plaintiff had not received any responsive documents.

12    Instead, last month, Your Honor, we learned that there were

13    responsive documents that Mr. Hoft had just not yet produced.

14    And he represented during our meet and confer that he would

15    provide those documents to plaintiff by September 21st.  And,

16    unfortunately, we did not receive any documents from Mr. Hoft

17    on that day.  And we've also followed up multiple times over

18    e-mail and our requests about the status of these documents,

19    our e-mails have been ignored.  So we would appreciate

20    Your Honor's guidance on how best to move this forward, again,

21    given how long this has been outstanding.

22             THE COURT:  All right.  Mr. Burns?

23             MR. BURNS:  Yes, Your Honor.  So, as far as that's

24    concerned, as far as the revenue information for the

25    particular article, as I indicated earlier in the hearing,

```
 1    we're prepared to produce that today.  We've got it, so we
 2    will turn those over today.
 3              THE COURT:  All right.  And just e-mail that
 4    information over or how are you --
 5              MR. BURNS:  Yeah.  There's only like two different
 6    documents, so, yeah, I will e-mail it to them.
 7              THE COURT:  Okay.  All right.
 8              All right.  Is there -- Mr. Burns, is there any
 9    reason for the -- why is that issue coming to me to resolve
10    here?  It sounds like --
11              MR. BURNS:  Your Honor, yeah.  You know, Your Honor,
12    I apologize about that.  My client is currently a litigant in
13    another lawsuit that required me to be in Denver all -- well,
14    for most of last week.  And it has been extremely challenging
15    given the lack of human resources in that particular case
16    because it's even more complex in some respects than -- well,
17    it is more complex than this current case, and it has required
18    nearly all of my attention.  So I am sorry that it has come to
19    this.
20              THE COURT:  All right.  Okay.  Ms. Saied, let's move
21    on to the second one.
22              Well, let me say this.  Mr. Burns, of these other
23    three categories, are you prepared to produce documents for
24    any of these others as well or is there an actual dispute?
25              MR. BURNS:  So the only actual dispute would be --
```

1    hold on, let me look through this one moment, Your Honor.

2              So for the fourth item, I'm waiting for about six --

3    there's about six different of those text messages or Facebook

4    messages that -- they're seeking the broader context, you

5    know, for messages before and after.  I'm waiting for a

6    vendor, and I should have that by the end of the week.  But

7    all the rest of them I will be producing today.

8              For the -- they had a concern about -- for the third

9    item.  They had -- plaintiffs had a concern about metadata for

10   all -- for various graphics, different items that were

11   produced as part of a 94-page PDF.  And according to our

12   vendor, there are -- there is no native metadata except --

13   except for one particular photograph.  So we can produce that.

14   I may need by the end of the week to get that particular one,

15   but there's only a single one.

16             Let's see here.  I guess the only real dispute here,

17   Your Honor, would be the various social media accounts.

18   Plaintiff asked -- so we had our vendor go through and try to

19   pull these different social media accounts.  Some of these

20   different social media accounts, and there's a number of them,

21   were only set up within the past 18 months or less.  The

22   difficulty has been that the vendor has not been able to gain

23   access, not because of what -- not because of us.  But they've

24   either -- it's different in every case.  It's different in --

25   I mean, case by case.  But in some of the cases the particular

```
 1    social media platform won't give the vendor access to assist

 2    this -- to assist with this.  I have written to some of the

 3    vendors -- I'm sorry, some of the different platforms asking

 4    them to just turn over access, you know, of our -- what are

 5    essentially Mr. Hoft's posts so that we can have --

 6                 THE COURT:  Mr. Burns, are you still there?

 7                 Mr. Burns?

 8                 THE CLERK:  He was connected, Your Honor.  But now

 9    he just dropped from the call.  So hopefully he'll call back

10    in.

11                 THE COURT:  Okay.  All right.  Well why don't we

12    just sit tight for a minute then.

13                 THE CLERK:  Okay.

14                 MR. BURNS:  Your Honor, this is John Burns.  I got

15    disconnected.  I apologize.  I don't know what happened.

16                 THE COURT:  That's okay.  Thanks for calling back

17    in.  You were just telling me about your attempt to --

18                 MR. BURNS:  Yes.  Yes, Your Honor.

19                 THE COURT:  -- (inaudible) platform.

20                 MR. BURNS:  Yes, sir.

21                 So in some of the situations I tried to circumvent

22    any sort of, you know, problem.  Because in some instances,

23    you know, their tech people were just simply not responding to

24    the vendor.  So I wrote, you know, to the legal, you know, web

25    address for the site where I could find them.  In the one
```

1    instance -- in the case of gab.com, their counsel wrote me

2    back and said, you know, that I'd have to get a court order in

3    order to get the information.

4         Now to this, plaintiff says, well, we want you to

5    turn over all of your correspondence, you know, with these

6    different -- these different platforms.  And it just, you

7    know, it's suggesting -- it's implying that I didn't actually

8    do what I said I did.  And it just simply kind of rubbed me

9    the wrong way.  Because it reminded me of something that

10   Mr. Hassen Sayeed said in response to one of my pleadings in

11   which I suggested that he misrepresented something.  And he

12   brought up a really good point that alleging misrepresentation

13   is a very serious allegation.

14        So, I mean, we've done our due diligence.  I've had

15   vendors try to pull this information.  We've turned over

16   information where we were able to get it.  If we have not been

17   able to provide the information regarding the social media

18   stuff, it hasn't been for a lack of trying.  It's just

19   simply -- it's, frankly, outside of our possession, custody,

20   or control.  And, you know, I think that it's -- at this point

21   it's something that plaintiff just needs to subpoena.

22        THE COURT:  Well, and are you willing to just

23   provide a consent so that the plaintiff can access those?

24        MR. BURNS:  Sure.  Sure.

25        THE COURT:  Yeah, okay.

```
 1              MR. BURNS:  So long as it's reasonable.  And I'm
 2      willing to, you know, work with the plaintiff on setting those
 3      parameters.  But absolutely.  Yeah.  No problem.
 4              MS. SAIED:  Your Honor, this is Kimya.  May I
 5      respectfully interject and respond to some of those issues?
 6              THE COURT:  Yes.  Hold on a second.
 7              Mr. Burns, is there anything else?
 8              MR. BURNS:  I think that that's it.
 9              THE COURT:  Okay.  All right.  Miss Saied.
10              MS. SAIED:  Sure.  Your Honor, just in the interest
11      of making sure the record is clear on what -- on what
12      plaintiff has requested and what Mr. Burns is agreeing to
13      provide by when.  Taking that last issue first.  The dispute
14      concerns specifically 13 social media sites where either
15      Mr. Hoft or Gateway Pundit maintains accounts and where
16      plaintiff has not -- I should say Mr. Burns has represented
17      that he has been unable to collect, search, or review the
18      documents.  We learned about this, these 13 sites, on
19      September 20th.  So that's months after the Court's deadline
20      and well after -- well after when these responses were due
21      last year.  So we followed up with Mr. Burns inquiring about
22      the specific basis for each of these sites and why it was not
23      possible for Mr. Hoft to collect and review the responsive
24      documents and merely trying to understand the basis for the
25      delay.  And Mr. Burns has not responded to three e-mails that
```

Gilmore v. Jones, et al, 3:18cv17-NKM-JCH                          40

```
 1   we have sent since September 20th wanting to understand the

 2   basis for the delay and whether, in fact, all of them were

 3   requiring, for example, a court order or not.

 4          We are also somewhat skeptical that Mr. Hoft can't,

 5   in fact, access his own documents on at least some of these

 6   sites.  A Google search shows that Gateway Pundit has been

 7   active on at least some of these sites as recently as this

 8   month.  And under these circumstances, plaintiff thought it

 9   was reasonable to request either Mr. Hoft's correspondence

10   reflecting his attempts to collect these documents from the

11   social media accounts and/or substantiation to support his

12   assertion that he can't access the documents on his own

13   accounts.

14          As Your Honor may recall, earlier this year

15   Mr. Stranahan made some similar claims regarding his access to

16   documents on social media accounts.  And Your Honor ordered

17   Mr. Stranahan to provide plaintiff's counsel contact

18   information and the correspondence for the individuals who may

19   have the social media content.  And that was the animating

20   basis for plaintiff's request to Mr. Hoft.  And plaintiff

21   respectfully requests that a similar order makes sense here

22   given the number of outstanding social media sites and the

23   difficulty plaintiff has had in gaining any sort of detailed

24   insight into the specific basis why we are still waiting

25   18 months later for the documents from these sites to be
```

1    collected and reviewed for production.

2          I would also like to respond to the other two issues

3    that Mr. Burns raised, but it might make sense for me to pause

4    here and for us to resolve the social media issue before

5    discussing the others.

6          THE COURT:  And would having a concern for the

7    plaintiff to be able to access the information directly

8    through the e-mail, would that address some of your concerns?

9          MS. SAIED:  I think, Your Honor, we could certainly

10   be open to that.  I'm just mindful that at the end of the day

11   these are -- we don't want the burden to be on the plaintiff

12   to try and discover the documents that are, at the end of the

13   day, within Mr. Hoft's possession and control.  These are

14   documents on his social media account.  But we certainly would

15   be open to exploring, exploring as Your Honor suggests.

16         THE COURT:  All right.

17         All right.  Mr. Burns, can you address this issue

18   about the social media accounts, and in particular that --

19         MR. BURNS:  Sure.

20         THE COURT:  Why is there so much trouble actually

21   accessing these sites?

22         MR. BURNS:  So, I'm -- I don't speak technology very

23   well.  So I'm slightly ignorant.  So I'd like to draw a

24   distinction between Mr. Hoft and Mr. Stranahan.  Mr. Stranahan

25   is, you know, obviously, operating pro se.

1          THE COURT:  And I tell you, I mean, I really just

2    want to hear, you know, what your efforts are.  I didn't find

3    that --

4          MR. BURNS:  Sure.  Sure.

5          THE COURT:  -- (indiscernible) comparison.

6          MR. BURNS:  Sure.  So I'm relying upon primarily one

7    particular -- one -- so all the different vendors that we've

8    gone through have had certain capabilities and not -- and some

9    capabilities they don't have.  There's one particular vendor

10   called Percipient which we relied upon to get all these

11   different social media, you know, all the different social

12   media information.  And the process -- Miss Saied mentioned

13   that, you know, that Mr. Hoft is posting.  There's a

14   difference between posting and then having the ability to

15   actually download or pull the data so that you can then put

16   the data into -- you know, I mean, whether it's relativity or

17   logical, you know, put it into some format where you can

18   actually cull through the information and search through it

19   using, you know, the various, you know, key words that were

20   agreed upon.  Right?  And so this is specifically what we

21   tasked Percipient with doing.

22          And what they came back to us was, and we went

23   around and around with, you know, so we were able to produce a

24   number of these.  Right?  We were able to produce, I don't

25   know, six or -- I don't know how many it was.  But we were

1    able to produce a number of the different social media

2    accounts because they were able to pull it.  For the rest of

3    them they just said, look, we're not able to get this.  You

4    know, we're not able to extract it.  We've been working with,

5    you know, these.  We've reached out to -- in the situation

6    with Twitter, for example, we've reached out to Twitter and

7    they're just simply not, you know, playing ball.  They're not

8    willing to work with us.

9         So -- and so that's what I -- you know, in a, I

10   guess, I can't remember what the date of the e-mail that I

11   sent to Miss Saied, I mentioned that this is what we were able

12   to get.  This is what we weren't able to get.  And we relied

13   upon a vendor to do this.

14        We specifically got this vendor, among others, to

15   ensure that we're looking over every -- you know, we're

16   lifting up every rock to find everything that's responsive.

17   And, you know, I just don't know what else to do, Your Honor,

18   frankly.

19        THE COURT:  What is Percipient telling you about

20   Twitter, and why Twitter isn't --

21        MR. BURNS:  So Twitter --

22        Yes.  So Twitter -- Mr. Hoft's Twitter account was

23   permanently suspended back in February.  And so when that

24   happens, they completely shut down access to your -- for lack

25   of a better term, the back end where you can actually extract

```
 1    the data.

 2              THE COURT:  All right.

 3              MS. SAIED:  Your Honor, may I briefly respond?

 4              THE COURT:  Sure.

 5              MS. SAIED:  Just for the sake of clarity, we are not

 6    looking for all data from these sites.  We are specifically

 7    looking for his posts and dropped messages, to the extent that

 8    makes a difference.  I hear Mr. Burns citing that it's hard to

 9    access or co-opt the data.  We are specifically interested in

10    actual posts.

11              And to make this more concrete, two of the social

12    media sites or apps that are pending are, like, Signal and

13    Telegram where messages and posts would be particularly

14    relevant.  And it can go through the other social media sites

15    that are pending as well.  So I'll defer to Your Honor on

16    whether that would be helpful.

17              THE COURT:  All right.  Mr. Burns, I mean, is

18    that -- can that information be pulled from the sites, just

19    the posts and direct messages?

20              MR. BURNS:  So here's the issue, Your Honor.  You

21    know, the sites that just speak generally about these

22    different platforms, they don't have good strong search

23    functionality.  And so one of the reasons why we wanted to get

24    the vendors in here, the whole genesis of us getting vendors

25    in here was that the search features were inherently faulty.
```

1    And we couldn't be sure that we were -- you know, by putting

2    the search terms in, you know, to the place -- to the

3    platforms where you could actually search.  Some of the

4    platforms just simply don't allow you to search or their

5    search functionality is just really awful.

6              So, the whole purpose of getting the -- of being

7    able to extract the data was so that you could -- you know,

8    for the -- you know, between the time periods of, you know,

9    March of 2017, you know, through the present, was so that we

10   could methodically and authoritatively and with finality

11   search through the data, run it, you know, professionally, so

12   that we could provide the plaintiff with something that we

13   were absolutely certain was the full universe of information

14   that was turned up, (indiscernible) the information that was

15   turned up by those key word searches.

16             So I don't know of any other way to do it other than

17   to extract the data because of the inherent limitations of the

18   platforms.

19             THE COURT:  All right.  And with that -- I mean, is

20   that what your vendors are telling you too?

21             MR. BURNS:  Yes.

22             THE COURT:  It can't harvest the codes and direct

23   messages?

24             MR. BURNS:  Yes.  So for example -- yes, that's

25   precisely correct.  Again, as far as Twitter is concerned, we

1   can't -- it's the same story as with the posts, the direct

2   messages are completely frozen.  And we don't have access to

3   them.

4          THE COURT:  So, I mean, can Mr. Hoft even sign in to

5   the Twitter account and see these posts?

6          MR. BURNS:  So, yes and no.  Mr. Hoft can sign into

7   the account, but he can't see any of his own posts and he

8   can't see any of his direct messages.

9          THE COURT:  Okay.  So those have all just then have

10  been removed?

11         MR. BURNS:  They're totally locked out.  It's my

12  understanding they exist, but we simply don't have it.

13  There's no way that we can access them, short of a court

14  order.

15         THE COURT:  And is that the same for Signal and

16  Telegram?

17         MR. BURNS:  No.  I think -- it's my understanding

18  that for Signal and Telegram, along with some of these other

19  ones, that they're simply just not cooperative.

20         THE COURT:  All right.  But are you -- Mr. Burns,

21  are you -- if you could access these, do you think that

22  they're not relevant?  Is there any reason not to turn over

23  the posts and direct messages from these social media

24  accounts?

25         MR. BURNS:  The ones that are -- to the extent that

 1    they're relevant to the case, of course, they're relevant.  If

 2    you're asking --

 3           THE COURT:  I was saying, is there the will to turn

 4    over these -- you know, these --

 5           MR. BURNS:  Yeah.  Absolutely.

 6           THE COURT:  But you're just saying there's not the

 7    way?

 8           MR. BURNS:  Yes, Your Honor.  We're not -- I'm not

 9    trying to be obstructionist here.  In fact, I would like --

10    really, I would like this issue to be over.

11           THE COURT:  Is there -- you mentioned a court order

12    would help.  I mean --

13           MR. BURNS:  Well, yes.

14           THE COURT:  -- what kind of court order do you need?

15           MR. BURNS:  Well, I mean, you know, if the Court

16    would be so inclined, if we could get -- you know, frankly, I

17    wouldn't even have a problem with -- if you were so inclined

18    to grant us a court order which we could then take to these

19    particular platforms.  And if this is what plaintiff wants us

20    to do, then that's fine.  A court order saying look, turn over

21    the information to Hoft so that -- or to Hoft's vendor so that

22    he can cull through it and, you know, do what he needs to do

23    with it.  And I could draft up a proposed order if Your Honor

24    would like to sign it.  And we would be happy to take that to

25    the various platforms and to serve it upon them.

1           THE COURT:  All right.

2           Ms. Saied, is that something that you think would be

3    effective and that you could work with Mr. Burns on to sort of

4    craft a draft or that would, you know, require these platforms

5    to give him access to the posts and messages that you want and

6    to provide a timeframe for that production?

7           MS. SAIED:  Yes, Your Honor, that seems fine to us.

8    I think we're happy to work with Mr. Burns.  And so long as

9    Mr. Burns is taking on the burden of actually collecting and

10   searching for the documents, we are happy to meet and confer

11   with him leading up to that.

12          I think the only other thing that we're mindful of

13   is just the late stage of discovery that we're at and making

14   sure we are doing this on a timetable that is reasonable so

15   that we can actually use the information that's collected for

16   depositions and general case preparation.

17          THE COURT:  Yeah.  And what I would say is that in

18   the order, you know, allow maybe 14 days for these platforms

19   to produce the information and then there be some additional

20   period for Mr. Burns to review that information after it's

21   produced.  I would think another 14 days would be adequate.

22   And if you-all can -- can you get together on that order and

23   present it to me?  I'll get it signed and entered.

24          MR. BURNS:  Sure.

25          MR. GRAVES:  Yes, Your Honor.

1          MS. SAIED:  Yes, Your Honor.

2          THE COURT:  Okay.  All right.

3          Does that address, I guess, this fourth topic about

4    the social media?

5          MS. SAIED:  That's right, Your Honor.

6          THE COURT:  Okay.

7          MS. SAIED:  The fourth topic I believe is resolved.

8    If Your Honor will permit me to respond to the other two

9    issues that Mr. Burns touched on.

10         THE COURT:  Yes.

11         MS. SAIED:  I believe Mr. Burns indicated -- the

12   second issue concerns Mr. Hoft's production of text messages

13   that omitted the relevant surrounding the preceding and

14   subsequent messages from each produced message, as well as

15   omitting the identity of the person's involved in the

16   responsive conversations.  And I understand from Mr. Burns

17   that he just represented that he would -- he would be willing

18   to supplement his production and provide the preceding and

19   subsequent messages, as well as identify the persons involved

20   in the conversation.  I think the part that just gives me

21   pause, Your Honor, is we -- the parties -- I should say,

22   plaintiffs received Mr. Hoft's production in August.  The

23   parties met and conferred about this very issue and the fact

24   that the messages as we had received them, they were not

25   usable to the plaintiff.  We're not able to review them and

1   understand what we're looking at.  And we asked Mr. Burns what

2   was a reasonable date by which he would be able to supplement

3   the production.  And he suggested October 1st.  Plaintiff did

4   not receive any documents from Mr. Hoft on that day.  And we

5   have since followed up with Mr. Burns via e-mail and have

6   received no responses.  And so I think there is just -- while

7   I appreciate the offer I made on today's call with the Court

8   about supplementing the production with the surrounding

9   messages and identifying the identities of the individuals on

10  each conversation, we are just mindful of Mr. Hoft's prior

11  discovery record and the late stage of discovery and want to

12  make sure this is resolved in a timely way.

13          THE COURT:  It sounds like Mr. Burns has committed

14  to producing some of this information today and then some by

15  the end of the week.  And I am going to issue just a short

16  order today that would note that commitment, but also order

17  that it be done according to that schedule.

18          MS. SAIED:  Great, Your Honor.

19          So I understood Mr. Burns to say that the documents

20  reflecting the revenue generated from the defamatory

21  publication, we would be receiving those documents today.  And

22  that based on what Your Honor just said, that we would be

23  receiving the surrounding text messages to the 62 messages

24  Mr. Hoft previously produced by the end of this week.

25          So if that understanding is correct, that works for

```
1    plaintiff.
2              THE COURT:  That's what I thought Mr. Burns said.
3              Mr. Burns, is that right?
4              MR. BURNS:  That is correct, Your Honor.
5              THE COURT:  Okay.  All right.  And then for the,
6    like, for the third item, it's not like there was one
7    additional or some additional metadata about one document that
8    you thought you would produce by the end of the week.  Is that
9    also true?
10             MR. BURNS:  Yes, Your Honor.  I just have to -- I
11   have to get that particular item from one of the vendors
12   and -- but that shouldn't be a problem.
13             MS. SAIED:  And on that point, Your Honor, if I may.
14   This is a 94-page PDF that is very -- I would say impossible
15   to understand what we are looking at.  It combines several
16   otherwise separate e-mail communications, Facebook screen
17   shots, other miscellaneous images.  And we met and conferred
18   about this in June.  And Mr. Hoft represented that he would
19   remedy the deficiencies.  And I just, I guess I want to make
20   sure will we be receiving an entirely corrected production
21   such that we can actually understand what documents go with
22   which -- go together and what are actually separate documents
23   and what their sources are?  It's just not -- I'm not quite
24   sure on what Mr. Burns has represented he would remedy.
25             THE COURT:  Okay.  Mr. Burns.
```

1        MR. BURNS:  Yes, Your Honor.  That would also fall

2   under the ambit of the end-of-the-week representation.

3        THE COURT:  Okay.  So to break out these, these

4   different groups of documents that were in that 94-page PDF so

5   that it's (indiscernible), but --

6        MR. BURNS:  Comprehensible, yes.

7        THE COURT:  Okay.  Okay.

8        All right.  Ms. Saied, anything else on that?

9        MS. SAIED:  No, Your Honor.  I would just -- I guess

10   we would just ask for your court's guidance to the extent we

11   have not received some or all of these documents by the end of

12   the week, what would -- should we go ahead and reach out to

13   Miss Dotson?  We would appreciate your guidance on the best

14   way to resolve it to the extent these discovery issues are not

15   addressed by the end of the week.

16        THE COURT:  Well, Mr. -- here's what I'll tell you.

17   Mr. Burns, if there's something unforeseen, out of your

18   control that delays that production, please tell the

19   plaintiff's counsel about that and give them an update for

20   when it will be done.  I don't expect that there is going to

21   be any further delay, but sometimes things happen.

22        MR. BURNS:  Certainly, Your Honor.  I will do that.

23        THE COURT:  And if it is something that is

24   unreasonably, you know, Ms. Saied, then please let Miss Dotson

25   know on Monday and we can go ahead and get it, get it back on.

1          Yeah, at some point -- Mr. Burns, I feel like you're

2   working through this.  And I know you have a lot of other

3   things to do, but at some point there are just going to have

4   to be some sanctions that fall for delayed productions.  And

5   I, you know, I think we're probably getting close to that.

6   But I feel like you're working through this.  I know that

7   you're -- I think that you're working in good faith on this,

8   so I certainly don't think it's time.  But at a certain point

9   it's just, you know, one of those things we'll have to -- my

10  hands will just be tied at a certain point, okay?

11          MR. BURNS:  Yes, Your Honor.  I understand.

12          THE COURT:  All right.

13          All right.  Anything else to take up today?

14          MS. SAIED:  Nothing from the plaintiff, Your Honor.

15          MR. WOLMAN:  This is Jay Wolman.  No, Your Honor.

16          THE COURT:  All right.  Okay.  Counsel, thank you

17  all for calling in.  And Mr. Creighton, thank you for calling

18  in.  And take care.  Bye.

19      (FTR recording concluded at 10:56 A.M.)

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3          I, DONNA J. PRATHER, do hereby certify that the

4    above and foregoing, consisting of the preceding 53 pages,

5    constitutes a true and accurate transcription of the FTR

6    recording provided, and is a full, true and complete

7    transcript of the proceedings to the best of my ability.

8          Dated this November 4, 2021.

9

10              _____S/Donna J. Prather_____
                DONNA J. PRATHER, RPR, CRR, CBC, CCP
11              Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25