IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| BRENNAN M. GILMORE, | ) | |
| Plaintiff, | ) | Civil Action No. 3:18-cv-00017 |
| | ) | |
| v. | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| ALEXANDER ("ALEX") E. JONES, et al., | ) | By:   Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |

This matter is before the Court on Plaintiff Brennan Gilmore's Motion for Evidentiary

Sanctions Against Defendant Lee Stranahan ("Stranahan"), ECF No. 268 ("Pl.'s Mot. for Evid.

Sanctions"), Plaintiff's Motion for Relief for Defendant Stranahan's Failure to Comply, *see* ECF

No. 276 ("Pl.'s Mot. for Relief"), and Plaintiff's Motion to Compel Overdue Discovery from

Defendant Stranahan, ECF No. 319 (Pl.'s Mot. to Compel); *see* Pretrial Order ¶ 13 (citing 28

U.S.C. § 636(b)(1)(A)), ECF No. 54.

First, Plaintiff asks the Court to order Stranahan to comply with three discovery requests

pursuant to Rule 37(a). *See* Pl.'s Mot. to Compel 1–3 (arguing that Stranahan has not responded

to Plaintiff's Second Set of Requests for Production, Second Set of Interrogatories, or Third Set

of Requests for Production and has failed to comply with the Court's April 1, 2021 Order

regarding Stranahan's Periscope videos); *see also* Pl.'s Mot. for Relief 1–2. Second, Plaintiff

asks the Court to sanction Stranahan pursuant to either Rule 37(b)(2) or Rule 37(e) for failure to

produce articles posted on his Citizen Journalism School ("CJS") website and for failure to "take

any reasonable steps to preserve" that electronically stored information. Pl.'s Mot. for Evid.

Sanctions 1. He argues that the "only possible remedy" for Stranahan's failure to produce the

CJS documents is a "jury instruction permitting the jury to make an adverse inference regarding

the[ir] contents." *Id.* at 12. Specifically, he asks that the jury be instructed "that Mr. Stranahan

chose to intentionally withhold [these] documents, and that the jury may draw adverse inferences from that fact, including that Mr. Stranahan did so because he was aware that the documents contained evidence of his liability." *Id.* at 2; *see id.* at 12.

On June 7, 2021, I held a hearing on these motions. *See* Tr. of June 7, 2021 Disc. Hr'g, ECF No. 359. Plaintiff's counsel informed the Court that "two to three hours" before the hearing, Stranahan had provided responses to Plaintiff's second and third sets of written discovery requests. *Id.* at 4. He suggested that these responses were likely inadequate. *Id.* at 4, 35. Counsel also represented that Stranahan had not yet complied with my April 1, 2021 Order, *id.* at 28, which directed Stranahan to "either personally review the [Periscope] recordings and identify which portions thereof are responsive to Plaintiff's discovery requests or to produce full transcriptions of the recordings to Plaintiff by Friday, April 9, 2021," Order of April 1, 2021, at 3, ECF No. 255. Stranahan responded that he had valid objections to Plaintiff's discovery requests, Tr. of June 7, 2021 Disc. Hr'g 37–40, and said that he could review the Periscope videos and identify responsive information "on a rolling basis," *id.* at 29. Both parties indicated they were willing to resolve some of these issues without further Court involvement. *Id.* at 47–48. Accordingly, I directed them to meet and confer regarding both the Periscope videos and any outstanding issues related to Plaintiff's second and third sets of discovery requests. *Id.* at 48–49. Subsequently, at a status conference on July 8, 2021, Plaintiff's counsel represented that all issues relating to the Periscope videos and Plaintiff's second and third sets of discovery requests had been resolved. Thus, Plaintiff's Motion to Compel, ECF No. 319, and his related Motion for Relief, ECF No. 276, will be DENIED AS MOOT.

The parties' dispute over the CJS documents persists. Stranahan, who has represented himself pro se since May 2019, *see* ECF Nos. 128, 144, did not respond within fourteen days of

2

the filing of Plaintiff's motion for sanctions. Thus, under the Pretrial Order, this motion may be deemed unopposed. Pretrial Order ¶ 7. Nevertheless, at the hearing on June 7, 2021, Stranahan argued against it, and the Court has considered his arguments. For the reasons discussed below, Plaintiff's Motion for Sanctions, ECF No. 268, and request for a permissive adverse-inference jury instruction will be GRANTED subject to the presiding District Judge's final approval. *See Sines v. Kessler*, --- F.R.D. ---, ---, 2021 WL 2584807, at *7–11 (W.D. Va. June 23, 2021).

I. Background[1]

This is a defamation case arising out of the "Unite the Right" rallies in Charlottesville, Virginia on August 11–12, 2017. On Saturday, August 12, supporters of "Unite the Right" and counter-protesters filled the streets of downtown Charlottesville. Am. Compl. ¶¶ 25–28. That afternoon, James Alex Fields Jr. drove his car into a crowd of counter-protesters, killing one woman, Heather Heyer, and injuring many others. *Id.* ¶ 29. Plaintiff was a counter-protester who captured the attack on video. *Id.* ¶¶ 27, 30. He then posted the video on Twitter and spoke with reporters about what he had seen. *See id.* ¶¶ 31–35. Plaintiff alleges that shortly thereafter, Stranahan made defamatory statements about him that were published on the Internet. *See id.* ¶¶ 83–86, 89–100.

*

Plaintiff alleges that Stranahan is a "former employee of the website *Breitbart News* and a current employee of *RT*, a Russian state-funded and -operated television network that was recently forced to register with the Department of Justice as a foreign agent." *Id.* ¶ 17. Stranahan also operated the "Citizen Journalism School" and the "political journalism website *The*

---

[1] This section summarizes certain factual allegations in the Amended Complaint, ECF No. 29. It focuses solely on facts relevant to Plaintiff's claims against Stranahan. It does not include facts relevant to Plaintiff's claims against all other defendants to this action.

*Populist.*" *Id.* Plaintiff alleges that on August 15, 2017, "Defendant InfoWars, a website owned and operated by Defendant [Alex] Jones, published an article authored by Defendant Lee Ann McAdoo and an accompanying video, both entitled '*Bombshell Connection Between Charlottesville, Soros, CIA*,'" *id.* ¶ 83 (emphasis and footnote omitted); *see also id.* ¶¶ 87–100.

In the video, McAdoo interviewed Stranahan. *Id.* ¶¶ 83–84. She introduced him by inviting viewers to follow his Twitter account and by stating that he was "'saving journalism over at CitizenJournalismSchool.com.'" *Id.* ¶ 83. Stranahan then "allege[d] that the United States government, under the Obama Administration and Hillary Clinton State Department, and the CIA 'sponsored a coup' in Ukraine that was 'funded by [George] Soros.'" *Id.* ¶ 84. He and McAdoo "show[ed viewers] a Google Image search for Svoboda, a[] 'Ukrainian neo-Nazi party,' conducting tiki-torch marches 'exactly like we saw in Charlottesville,'" and Stranahan "talk[ed] about the importance of insurrectionist movements having 'martyrs' and suggest[ed] that Heather Heyer may have been a 'martyr' created by 'Soros-funded NGO's' to orchestrate a 'regime change' in the United States." *Id.* Plaintiff alleges that throughout the video Stranahan made multiple statements in which he suggested that Plaintiff was part of a "Soros-funded and United States government-sponsored coup beginning in Ukraine and further carried out in Charlottesville":

> STRANAHAN: So it's come out that Brennan Gilmore was working with the U.S. – the guy who happened to catch that shot [of Fields's car attack] – with the U.S. State Department. He also worked for a Democratic Representative, but let me point out something else . . .
>
> * * *
>
> STRANAHAN: If you go to Brennan Gilmore's page, his Twitter page, you'll see he has a picture of the young woman who was murdered, and you know what it says? "Martyr." . . . Literally it says "martyr." You can't be more explicit than this. So here's what I'm saying. I'm not a conspiracy theorist, I'm a fact-based journalist. The facts are enough. However, the Democrats have investigated Trump for a lot less. For a lot less. They have called for investigations, and secret meetings, they have convened the FBI. When you have this many things going on, I think someone

really needs to investigate. Again, I don't like to jump to conclusions, I'd like to ask some questions about who this kid was, where he came from, what do we know, get it all out in the open, but I'll also point out that we can't count on the media to do this.

* * *

STRANAHAN: Yeah if you scroll . . . keep scrolling . . . this is the guy, Brennan Gilmore, and if you scroll down, keep going, it's not too far, you'll see the photo of the young woman . . . this is abs [*sic*] . . . when I saw this, uh, I was shocked . . . [MCADOO continues to scroll through Gilmore's Twitter feed] by the way his bio, if you look at this guy's bio, it says he's with the State Department, and the fact that he called her a 'martyr' . . . I [STRANAHAN looks knowingly at the camera, eyebrows raised, arm raised, MCADOO nods comprehendingly, laughs] don't know, but this is clearly, the way she's being used is she's a martyr to the cause.

* * *

STRANAHAN: And let me point out what's happening. They, uh, they win no matter what they do. Are they trying to get a coup? I think clearly they are. But if they can't get a coup, they'll settle for impeachment. And if they can't get impeachment, they'll settle for smearing Trump and his supporters so much that they'll be able to elect another elitists. Does that make sense?

*Id.* ¶ 84 (alterations in original).

Plaintiff alleges that these statements "impl[ied] an assertion of fact: that Mr. Gilmore's coincidental presence at and recording of Fields'[s] car attack was not coincidental, but was due to his knowing participation in Soros- and government-staged violence in Charlottesville designed to force a coup to oust President Trump." *Id.* ¶ 85; *see also id.* ¶ 89 (Stranahan "knew that [his] readers and viewers would understand the clear factual meaning of [his] words and body language"); ¶ 92 (Stranahan "falsely impl[ied] that Mr. Gilmore is a criminal conspirator and a party to treason and murder"). He alleges that Stranahan's statements about him were "false, defamatory, and malicious, and have exposed Mr. Gilmore to hatred and contempt, as demonstrated by the threats and harassment Mr. Gilmore experienced and continues to experience." *Id.* ¶ 92. He also alleges that although Stranahan holds himself out to the public as a "fact-based journalist," whom McAdoo called an "investigative reporter" producing "real news," *id.* ¶ 90, Stranahan "conducted no research of Mr. Gilmore beyond identifying a few, readily

5

available disparate facts from his biography" and failed to "investigate [his] outrageous,

improbable, and false factual allegations and factual conclusions" prior to publishing them, *id.* ¶

93. *See also id.* ¶ 94 ("At no point did Defendant[] Stranahan . . . reach out to Mr. Gilmore to

confirm the statements or conclusions about Mr. Gilmore."); *id.* ¶ 95 ("Stranahan . . . did not

identify any human sources in the article or video for their information regarding Mr. Gilmore

other than from Mr. Gilmore's Twitter page or media appearances, nor did they update or correct

any information about Mr. Gilmore after they published the defamatory article and video.").

## II. Procedural History

A.      *The Citizen Journalism School Documents*

On March 5, 2020, Plaintiff served his First Set of Requests for Production of Documents

("RFP") upon Stranahan. *See* Pl.'s Mot. for Evid. Sanctions Ex. C, Pl.'s First Set of Reqs. for

Produc. to Def. Stranahan (Mar. 5, 2020), ECF No. 268-4, at 2–13. Among other things, those

requests asked Stranahan to "[p]roduce all documents concerning Plaintiff appearing on any

website or online video channel ever owned, controlled, or used by you, including any postings

or comments by you or others appearing on those websites or online video channels," *id.* at 6

(RFP No. 11); to "[p]roduce all documents identifying the methods by which you have

investigated the accuracy of claims made by you, or entities in which you have or had ownership

and/or control, concerning Plaintiff," *id.* at 7 (RFP No. 20); and to "[p]roduce all documents

(regardless of creation date) setting forth your editorial standards or guidelines, or the standards

or guidelines of any entity that you own and/or control, from August 11, 2017 through the

present," *id.* (RFP No. 24).

On July 2, 2020, Plaintiff filed a motion to compel discovery responses from Stranahan.

*See* Pl.'s Mot. to Compel Disc., ECF No. 197. Plaintiff's counsel informed the Court that he had

allowed Stranahan additional time to respond and that he had met and conferred with Stranahan

on two occasions. *Id.* at 2. Nonetheless, Stranahan "had not produced any documents responsive

to Plaintiff's [First] Requests for Production." *Id.* Plaintiff also argued that Stranahan's responses

to Plaintiff's First Set of Interrogatories were insufficient because he had simply "copied [them]

nearly verbatim from the responses" produced by other defendants. *Id.* I held a discovery hearing

regarding this dispute, *see* Tr. of July 17, 2020 Disc. Hr'g, ECF No. 205, and on July 17, 2020, I

ordered Stranahan to "provide complete revised responses to Plaintiff's interrogatories and

requests for production of documents" within twenty-one days, *see* Order of July 17, 2020 ¶ 1,

ECF No. 202.

      Stranahan failed to produce any documents to Plaintiff by the Court's deadline. Pl.'s Mot.

for Evid. Sanctions 3. Then, on August 11, he produced "a corrupted file that Plaintiff's counsel

was unable to access." *Id.* Plaintiff's counsel met and conferred with Stranahan regarding this

deficiency, and Stranahan agreed to "submit his complete responses to Plaintiff's RFPs by

August 21." *Id.* Stranahan missed that deadline. *Id.* Plaintiff's counsel contacted Stranahan again

ten days later, and Stranahan said he "expected to finalize" his production of documents by

September 7, 2020. *Id.* That deadline also passed without any additional production. *Id.* at 4.

      On September 9, after a meet-and-confer with Plaintiff's counsel, Stranahan "provided a

list of broken internet links to his articles on the Citizen Journalism School website." *Id.*; *see*

Pl.'s Mot. for Evid. Sanctions Ex. G, Email from L. Stranahan to A. Graves (Sept. 9, 2020, 9:34

AM), ECF No. 268-8, at 3–5. The "article titles contained in the links showed that the articles

were plainly responsive to Plaintiff's RFPs," but Plaintiff's counsel "could not access" them

because the links were broken. Pl.'s Mot. for Evid. Sanctions 4. Plaintiff's counsel then informed

Stranahan that the "Federal [R]ules require that [his productions] be Bates-stamped" and asked

Stranahan to both Bates-stamp and supplement his production by September 23. *Id.* Ex. G, Email

from A. Graves to L. Stranahan (Sept. 17, 2020, 9:48 AM), ECF No. 268-8, at 2. Stranahan

"made a Bates-stamped production of the same nine email chains he had sent previously," but he

failed to produce any other documents, including the CJS posts that appeared to relate to

Plaintiff. Pl.'s Mot. for Evid. Sanctions 4.

At a meet-and-confer on November 6, Stranahan "stated that he would continue his

efforts to produce the remaining responsive material, and that he would provide an update by

November 9." *Id.* On November 9, Stranahan emailed Plaintiff's counsel and reported: "I don't

see any posts on Citizen Journalism School." *Id.*; *see also* Pl.'s Mot. for Evid. Sanctions Ex. J,

Email from L. Stranahan to A. Graves (Nov. 9, 2020, 1:46 PM), ECF No. 268-11, at 2. Plaintiff's

counsel next contacted Stranahan on November 13, and Stranahan again claimed that he "could

not locate the CJS documents." Pl.'s Mot. for Evid. Sanctions 4. Two months later, Stranahan

told Plaintiff's counsel that he "had taken steps to access the CJS documents by contacting

potential custodians of that material" and would provide a "letter outlining his plan to move

forward with discovery" by January 15, 2021. *Id.* at 4–5. Stranahan did not provide a plan for

discovery or produce any of the CJS documents. *Id.* at 5. Nonetheless, he did email Plaintiff's

counsel with an update. *See* Pl.'s Mot. for Evid. Sanctions Ex. L, Email from L. Stranahan to A.

Graves (Jan. 15, 2021, 5:43 AM), ECF No. 268-13, at 2. Stranahan claimed that he had contacted

two potential custodians of the CJS documents, Shane Stranahan (his estranged son) and Katie

McHugh (his former contract-employee), that he had "stressed [to them] the urgency of getting"

the CJS documents, and that he "expect[ed] to have more material on Tuesday, January 19th."

*Id.*. He explained that Ms. McHugh "wrote the [CJS] posts" while under his employ and that

Shane "ha[d] the tech knowledge" to access them. *Id.* Stranahan produced no additional documents on or before January 19, 2021. Pl.'s Mot. for Evid. Sanctions 5.

On February 3, I held a hearing regarding several discovery disputes. *See* Tr. of Feb. 3, 2021 Disc. Hr'g, ECF No. 242. Plaintiff's counsel argued that Stranahan's document production remained deficient. *Id.* at 21. He explained that Plaintiff still could not access the approximately twenty links Stranahan provided to posts on his CJS website and that Stranahan had represented over the course of "several months" that this was because of a "technological issue." *Id.* Plaintiff's counsel also noted that it appeared from the article titles in the links that the links were "directly responsive to this lawsuit" and could include "relevant commentary from Mr. Stranahan." *Id.* at 23 ("Every single one of the links starts with Brennan Gilmore Lawsuit, citizenjournalismschool.com. And so there may just be a whole bunch of news links that are posted inside of those links, but there also may be relevant commentary from Mr. Stranahan."). Stranahan explained that, to "the best of [his] recollection," the links were to his "write-up blog posts about media stories about this case." *Id.* at 22. He did not "believe there was any real original material there," and he said the content of the blog posts was "mostly links to other stuff." *Id.* He also stated that the CJS documents were "gone." *Id.* ("It is gone. Technically, it -- my son transferred my domain about a year ago or something like that. This was on, technically, a sub domain, and apparently it went away."); *see also id.* at 25 ("I don't even understand why -- I believe it has to do with there was a sub domain issued, and I don't understand why that didn't transfer. My son would be in a better position to explain that because he did the transfer of my material."). He explained that he had "spent hours," *id.* at 25, trying to find the CJS documents and had spoken to his son and to Ms. McHugh about them to no avail, *id.* at 22. He claimed that he did not object to producing the documents and agreed that they were relevant. *Id.* at 25. ("I

have no objection to this, and I'm willing to work with Mr. Gilmore's counsel in any way to -- so there's no objection. I'm not -- anything I'm saying about what the material is . . . simply by way of explanation, not by saying that I don't think it's relevant. I would love to give him this material, I just don't -- I don't -- I've really tried and don't see how."). Nonetheless, Stranahan said he was unable to produce the CJS documents because they did "not exist." *Id.* at 24–25.

On February 5, I ordered Stranahan to give Plaintiff's counsel "contact information for the individuals who may have access to the social media content discussed at the hearing" by February 10. *See* Order of Feb. 5, 2021 ¶ 4, ECF No. 231. I also ordered Stranahan to produce "any such content within his possession or control, including email correspondence, on or before February 17, 2021." *Id.* On March 31, Plaintiff informed the Court that the parties were at an "impasse" regarding the CJS documents. Tr. of Mar. 31, 2021 Disc. Hr'g 42, ECF No. 259. Stranahan had not produced them, and Plaintiff's efforts to contact both Shane Stranahan and Katie McHugh had gone unanswered. *See id.* at 41–45; *see also* Pl.'s Mot. for Evid. Sanctions Ex. M, Email from R. Kohli to S. Stranahan (Mar. 8, 2021, 10:51 PM), ECF No. 268-14, at 2; *id.* Ex. N, Email from R. Kohli to K. McHugh (Mar. 8, 2021, 10:52 PM), ECF No. 268-15, at 2. Accordingly, Plaintiff, having exhausted the Court's informal discovery dispute resolution process, sought leave to file a motion for sanctions against Stranahan. Tr. of Mar. 31, 2021 Disc. Hr'g 42. Stranahan did not oppose Plaintiff's request, but he argued that any sanctions should be "proportionate with the actual relevance of anything that's missing to this case." *Id.* at 44. Stranahan explained that all the CJS links at issue were "stories that came out after [Plaintiff's] lawsuit was filed" and that "[n]one of this was from the period in question around [the August 15, 2017] broadcast." *Id.* at 42. Stranahan had "no idea what happened to these posts." *Id.* at 43. He explained that he would have produced them to Plaintiff if he had them, but he contended that

they were "completely non-substantive to any . . . claim that [he] defame[d] Mr. Gilmore." *Id.* at 43–44. I granted Plaintiff's request for leave to move for discovery sanctions, *see* Order of Apr. 1, 2021 ¶ 2(a), ECF No. 255, and this motion, ECF No. 268, followed.

### III. The Legal Framework

Rules 26 through 36 of the Federal Rules of Civil Procedure provide specific devices or procedures for parties to obtain discoverable information from other sources before trial. District courts rely "in large part on the good faith and diligence of counsel and the parties in abiding by these rules and conducting themselves and their judicial business honestly." *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 181 (S.D.N.Y. 2003). When they do not, Rule 37 provides one mechanism for the court to compel compliance, Fed. R. Civ. P. 37(a), or to sanction an unacceptable failure to follow the rules, *see* Fed. R. Civ. P. 37(b)–(f).[2] Plaintiff's motion relies on Rule 37(b)(2)(A) and Rule 37(e)(2)(B).[3] *See generally* Pl.'s Mot. for Evid. Sanctions 6–12.

---

[2] "Federal courts also have inherent power to sanction conduct that offends the legal process, including a party's 'fail[ure] to preserve or produce' discoverable information for another's use in litigation." *Sines v. Kessler*, No. 3:17cv72, 2020 WL 3106318, at *5 n.4 (W.D. Va. June 11, 2020) (quoting *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004)). In this case, Rule 37(b)(2) provides an adequate framework to determine whether Stranahan violated the cited discovery orders and, if so, whether Plaintiff's requested sanction is appropriate. *Id.*; *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than [its] inherent power. But if in the informed discretion of the court, neither [a] statute or the Rules are up to the task, the court may safely rely on its inherent power.")).

[3] Because I find sanctions are warranted under Rule 37(b)(2), I decline to address whether sanctions would also be warranted under Rule 37(e), which applies when relevant ESI is lost because a party failed to take reasonable steps to preserve it and the information cannot be restored or replaced through additional discovery. *See Sines*, 2021 WL 2584807, at *8. Rule 37(e) does not displace the court's ability to impose sanctions under Rule 37(b)(2) when it finds that the party's failure *also* violated an order to provide or permit discovery. *Id.* (collecting cases).

Rule 37(b) authorizes the district court where an action is pending to impose appropriate sanctions when a party "fails to obey an order to provide or permit discovery."[4] Fed. R. Civ. P. 37(b)(2)(A); *see R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 15 (1st Cir. 1991) ("The rule's language clearly requires two things as conditions precedent to engaging the gears of the rule's sanction machinery: a court order must be in effect, and then must be violated, before . . . sanctions can be imposed."). "Once a court makes the threshold determination under Rule 37(b)" that a prior discovery order has been violated, *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 102 (D. Md. 2003), subsection (b)(2)(A) "contains two standards—one general and one specific—that limit [the] court's discretion" in choosing what sanction(s) to impose, *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).[5] "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ir.*, 456 U.S. at 707 (citing

---

[4] The phrase "order to provide or permit discovery" explicitly includes "an order . . . under Rule 37(a)," Fed. R. Civ. P. 37(b)(2)(A), related to motions for an order "compelling an answer . . . production, or inspection" in response to the moving party's written discovery requests, Fed. R. Civ. P. 37(a). Beyond this, "[c]ourts are entitled to interpret broadly what constitutes an order" within the meaning of Rule 37(b)(2). *REP MCR Realty v. Lynch*, 383 F. Supp. 2d 984, 998 (N.D. Ill. 2005); *see Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994) ("[A]n oral directive from the district court provides a sufficient basis for Rule 37(b)(2) sanctions if it unequivocally directs the party to provide the requested discovery."); *cf. Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 324 (4th Cir. 2001) (en banc) (acknowledging "the rule in this circuit that a district court . . . is best able to interpret its own orders").

[5] Such sanctions "may include" orders deeming facts established, permitting or requiring an adverse inference, entering default judgment against the disobedient party, or holding the party in civil contempt. *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 533–34 (D. Md. 2010) (quoting Fed. R. Civ. P. 37(b)(2)(A)); *see* Fed. R. Civ. P. 37(b)(2)(A)(i)–(vii); *Thompson*, 219 F.R.D. at 102 ("Rule 37(b)(2) provides a non-exclusive list of possible sanctions[.]"); 8B Charles Wright & Arthur Miller, *Federal Practice & Procedure* § 2289 (3d ed. 2018) (explaining that Rule 37(b)(2) gives courts "broad discretion to make whatever disposition is just" in the particular case and that available sanctions are "not limited to the kinds of orders specified" in subsection (b)(2)(A)(i)–(vii)). "Instead of or in addition to" any orders issued under Rule 37(b)(2)(A), "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to obey], unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

Fed. R. Civ. P. 37(b)(2)(A)). In making this determination, the district court should consider: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would . . . be[] effective." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (citing *Belk*, 269 F.3d at 348); *see Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 123–24 (4th Cir. 2019) (citing Fed. R. Civ. P. 37(b)(2)(A)). Some sanctions, including an adverse inference, require the court to find that the disobedient party acted willfully or in bad faith. *Sampson v. City of Cambridge*, 251 F.R.D. 172, 181 (D. Md. 2008) (citing *Hodge*, 360 F.3d at 450).

## IV. Discussion

Plaintiff asks the Court to give the jury a permissive adverse-inference instruction regarding the content of the CJS documents. *See* Pl.'s Mot. for Evid. Sanctions 8. He explains that by failing to preserve and produce the CJS documents, Stranahan "has deprived Plaintiff of at least 20 different articles that directly addressed Plaintiff and the events at the Charlottesville Unite the Right Rally," which "would have been probative of Mr. Stranahan's state of mind with respect to Plaintiff and to the manner in which Mr. Stranahan's audience received his statements." *Id.* Plaintiff argues, "[g]iven that the [CJS documents] are now irrecoverable, the only remedy for the harm caused by Mr. Stranahan's failure to take any reasonable steps to preserve the CJS Documents is an instruction permitting the jury to make adverse inferences about their content." *Id.* More specifically, he asks that the jury be instructed "that Mr. Stranahan chose to intentionally withhold [these] documents, and that the jury may draw adverse inferences from that fact, including that Mr. Stranahan did so because he was aware that the documents contained evidence of his liability." *Id.* at 2.

*

Stranahan failed to comply with my July 17, 2020 Order directing him to supplement his production in response to Plaintiff's March 2020 discovery requests. The subject matter of the July 17 Order was broad, and it covered the CJS materials. In the eleven months since then, Stranahan has repeatedly delayed production, cited technical issues, and conceded that the CJS documents are now "gone." Tr. of Feb. 3, 2021 Disc. Hr'g 22; *see also* Pl.'s Mot. for Evid. Sanctions 2–5. He did not remedy that deficiency as required by my February 5, 2021 Order directing him to produce any social media content within his custody or control, including useable CJS content, on or before February 17, 2021. Nevertheless, it is not clear that he violated the February 5 Order because by that time, according to Stranahan, the CJS materials had already been lost and, thus, were not in his possession or control. To remedy Stranahan's violation of the July 17 Order, the court "may issue further just orders," Fed. R. Civ. P. 37(b)(2)(A), to sanction Stranahan's failure "both as a matter of justice in [this] . . . case and 'to deter others who might be tempted to similar conduct,'" *Lee v. Max Int'l*, 638 F.3d 1318, 1320 (10th Cir. 2011) (Gorsuch, J.) (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)). Choosing an appropriate sanction requires me to consider whether Stranahan acted in bad faith, the kind and degree of prejudice his failure to comply caused Plaintiff, and whether alternative sanctions would provide an effective remedy and deterrent. *S. States Rack & Fixture*, 318 F.3d at 597.

**

First, Stranahan acted in bad faith by failing to produce the CJS documents. A finding of bad faith is warranted when a party's actions "demonstrate[] a pattern of indifference and disrespect to the authority of the court," *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs.,*

*Inc.*, 872 F.2d 88, 93 (4th Cir. 1989) ("*Mut. Fed.*"), or evince "'callous disregard' of the party's obligations under the Rules," *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 504 (4th Cir. 1977). Mere "inability" to comply does not constitute bad faith. *Wilson*, 561 F.2d at 503; *see also Bizprolink, LLC v. Am. Online, Inc.*, 140 F. App'x 459, 463 (4th Cir. 2005) (finding no bad faith where, although plaintiff's document production was "meager," plaintiff appeared to have given defendant "all the documentation that it had supporting" its damages calculation, as ordered by the court). Rather, bad faith is the party's knowing disregard for its obligations to comply with court orders and/or the Federal Rules of Civil Procedure. *Rabb v. Amatex Corp.*, 769 F.2d 996, 999–1000 (4th Cir. 1985); *see also Belk*, 269 F.3d at 348 (finding bad faith where party failed to supplement its interrogatories and blamed such failure on an unreasonable interpretation of the district court's order).

Here, Stranahan disregarded the Court's order to produce documents responsive to Plaintiff's requests. He missed the twenty-one-day deadline I set for production in July 2020, and then he repeatedly failed to produce the CJS documents thereafter. Pl.'s Mot. for Evid. Sanctions 3–5. In November, Stranahan told Plaintiff's counsel that he did not "see any posts on Citizen Journalism School." Pl.'s Mot. for Evid. Sanctions Ex. J, Email from L. Stranahan to A. Graves (Nov. 9, 2020, 1:46 PM), ECF No. 268-11, at 2. By February 2021, Stranahan claimed at a hearing before the Court that the documents were "gone," did not "exist," and had been lost when his son, Shane Stranahan, copied Stranahan's files to a new domain. *See* Tr. of Feb. 3, 2021 Disc. Hr'g 22, 25. I again ordered Stranahan to produce the CJS documents that were within his possession or control, *see* Order of Feb. 5, 2021, but he failed to do so, asserting that the documents had already been lost, *see* Tr. of Mar. 31, 2021 Disc. Hr'g 41–45. Thus, from March 2020 through the present, Stranahan has repeatedly delayed compliance with the Court's

orders directing him to produce the CJS documents to Plaintiff. He repeatedly assured Plaintiff's

counsel that he would supplement his productions, *see* Pl.'s Mot. for Evid. Sanctions 3–5, and

now claims that he cannot comply because the documents Plaintiff seeks simply no longer exist.

Tr. of Feb. 3, 2021 Disc. Hr'g 22, 25. This conduct plainly "demonstrates a pattern of

indifference and disrespect to the authority of the court," *Mut. Fed.*, 872 F.2d at 93, and

Stranahan's "callous disregard" for his discovery obligations, *Wilson*, 561 F.2d at 504. Stranahan

has missed repeated deadlines, asked Plaintiff for numerous extensions (all of which went un-

met), and has now stalled for fifteen months in responding to Plaintiff's First Set of RFPs. And

although I am cognizant of Stranahan's pro se status, which entitles him to "some leeway in

litigating a case," it "does not forgive his utter failure to comply with deadlines and to engage

meaningfully in discovery." *Opportunities Dev. Grp., LLC v. Andruss*, No. 1:14cv62, 2015 WL

2089841, at *2 (E.D. Va. Apr. 30, 2015). I cannot find that Stranahan violated the February 5,

2021 Order because clear evidence does not exist that he had possession or control of the CJS

information at the time of the order as it appears the information was already lost. On the other

hand, I find by clear and convincing evidence that Stranahan acted in bad faith by failing to obey

my July 17, 2020 discovery order.[6] *See Barclift v. Sentara Reg'l Med. Ctr.*, No. 2:17cv8, 2018

WL 1721947, at *2 (E.D.N.C. Mar. 20, 2018) ("Courts tend to find bad faith when [a party] has

ignored both the opposing party's requests and the court's requests to cooperate, precisely what

---

[6] The Fourth Circuit has not clearly defined the movant's burden of proof on a Rule 37 motion for sanctions. *Brooks Sports, Inc. v. Anta (China) Co., Ltd.*, No. 1:17cv1458, 2018 WL 7488924, at *11 (E.D. Va. Nov. 30, 2018), *adopted by* 2019 WL 969572, at *1 (E.D. Va. Jan. 11, 2019); *Glynn v. EDO Corp.*, Civ. No. 07-1660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010). "Some courts have applied the preponderance of the evidence standard. Other courts have required clear and convincing proof of misconduct, especially when imposing severe sanctions." *Jenkins v. Woody*, No. 3:15cv355, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017). The result here is the same under either standard because "proving misconduct occurred by 'clear and convincing' evidence, as opposed to by a mere preponderance, certainly suffices." *Glynn*, 2010 WL 3294347, at *2.

happened here."); *Anderson v. Found. for Advancement, Educ. & Emp. of Am. Indians*, 155 F.3d 500, 504–05 (4th Cir. 1998) (affirming district court's finding of bad faith where defendant "stonewalled on discovery from the inception of the lawsuit," gave "inconsistent answers as to why it missed discovery deadlines," and missed "deadlines despite adequate warnings from the court").

Second, Stranahan's failure to produce the CJS documents significantly prejudiced Plaintiff. The text of the broken hyperlinks to the CJS documents reveals that they relate directly to Plaintiff and are responsive to his discovery requests. *See* Pl.'s Mot. for Evid. Sanctions Ex. G, Email from L. Stranahan to A. Graves (Sept. 9, 2020, 9:34 AM) (listing twenty links starting with "http://brennangilmorelawsuit.citizenjournalismschool.com" and referencing various news articles concerning Plaintiff), ECF No. 268-8, at 3–5. Stranahan has acknowledged that the CJS documents are relevant to Plaintiff's claims. *See* Tr. of Feb. 3, 2021 Disc. Hr'g 25 ("I have no objection to this, and I'm willing to work with Mr. Gilmore's counsel in any way to -- so there's no objection. I'm not – "[A]nything I'm saying about what the material is . . . simply by way of explanation, not by saying that I don't think it's relevant. I would love to give him this material, I just don't -- I don't – I've really tried and don't see how."). But he also contends that the CJS documents are of little importance, explaining that they are "completely non-substantive" and that they were "stories that came out after [Plaintiff's] lawsuit was filed" and that none of them were "from the period in question around [the August 15, 2017] broadcast." Tr. of Mar. 31, 2021 Disc. Hr'g 42–44. Plaintiff need not simply take his word for it. *See DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 975 (N.D. Ill. 2021) ("Opposing counsel doesn't get to decide what's important to the other side's case."). Stranahan may disagree with Plaintiff about the importance of the CJS documents, but, as he has acknowledged, the documents are

relevant to Plaintiff's claims within the meaning of Rule 26(b)(1) and the Court has ordered him to produce them. Indeed, the lost materials apparently consisted of links to articles about Plaintiff and this lawsuit and Stranahan's comments about those articles. *See* Pl.'s Mot. for Evid. Sanctions Ex. G, ECF No. 268-8, at 3–4. Thus, they could play a role in proving (or disproving) Plaintiff's claim that Stranahan acted with "actual malice" when he made allegedly defamatory statements about Plaintiff. *See* Mem. Op. of Jan. 8, 2021, at 7 ("[T]o show actual malice, a plaintiff must prove that the defendant acted 'with knowledge of falsity or reckless disregard as to truth or falsity.'" (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991)), ECF No. 219; *see also id.* at 10–11 (finding that although "Plaintiff must prove each Defendant's state of mind at the time of publication," "materials that post-date the publication (including, for example, the publisher's own statements) may be probative of actual malice"). Accordingly, I find that Stranahan's repeated failures to produce the CJS documents have significantly prejudiced Plaintiff's ability to develop his case and prepare for trial, *see Burns v. Buser*, No. JKB-18-3100, 2021 WL 1430722, at *3 (D. Md. Apr. 15, 2021) (finding prejudice where pro se plaintiff failed "to respond to discovery requests" or "submit filings by Court-imposed deadlines," which caused defendants to "experience[] uncertainty and delays in moving this lawsuit along to its resolution"); *Brooks Sports*, 2018 WL 7488924, at *16 (finding prejudice where plaintiff was "unable to adequately evaluate its case and properly prepare for trial" because of defendant's "deliberate non-compliance" in discovery).

Third, there is a need to deter this sort of non-compliance. "Courts must have the ability to effectively manage their cases, and parties are expected to take the Court's orders, instructions, and timelines seriously." *Certain Underwriters at Lloyd's, London Subscribing to Pol'y No. B0823PP1308460 v. AdvanFort Co.*, No. 1:18cv1421, 2019 WL 3366103, at *9 (E.D.

Va. July 25, 2019). Discovery is a fundamental part of the civil litigation process, which facilitates the orderly and timely exchange of information between the parties. *See generally* 8 Wright & Miller, *Federal Practice & Procedure* § 2001 (3d ed. 2021). Repeated discovery delays and noncompliance with discovery orders slow the pace of litigation, frustrate the parties' abilities to prepare for trial, and waste scarce judicial resources. Accordingly, "[c]ontinued contumacious behavior and abuse of the [c]ourts through non-compliance with its orders cannot be tolerated." *Certain Underwriters*, 2019 WL 3366103, at *9 (quoting *Flame S.A. v. Indus. Carriers, Inc.*, 39 F. Supp. 3d 752, 765 (E.D. Va. 2014)). Plaintiff has waited over a year for the CJS documents and has patiently granted Stranahan extension after extension. *See* Pl.'s Mot. for Evid. Sanctions 2–5. At the eleventh hour, Stranahan now claims the CJS documents are simply "gone." Tr. of Feb. 3, 2021 Disc. Hr'g 22. This significant delay and failure to preserve relevant documents is unacceptable and must be deterred. *See Ferguson v. Prince George's Cnty., Md.*, No. TDC-14-3613, 2018 WL 1169083, at *4 (D. Md. Mar. 6, 2018) ("There is a need for deterrence when a party has brought a case to a significant standstill through the failure to participate in discovery."). And although Stranahan's pro se status warrants some leniency, it simply "does not excuse participation in discovery or compliance with the requirements of the Federal Rules." *Loney v. RMB of N. Carolina, Inc.*, No. 7:13cv228, 2014 WL 2716072, at *2 (E.D.N.C. June 16, 2014).

Fourth, a permissive adverse inference instruction is the appropriate sanction. An adverse inference instruction helps "level the evidentiary playing field," *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995), at trial by allowing the jury to presume missing evidence was unfavorable to a party who, knowing it was relevant to some issue in the case, willfully caused its loss or destruction. *United States v. Johnson*, 996 F.3d 200, 217 (4th Cir.

19

2021) ("'[A]n adverse inference may be drawn against a party who [loses or] destroys relevant evidence' when there is 'a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." (quoting *Vodusek*, 71 F.3d at 156) (alteration in original)). Mere negligence in failing to preserve or produce discovery does not suffice. *Vodusek*, 71 F.3d at 156; *see also Hodge*, 360 F.3d at 450. But to show that a party willfully caused evidence to be lost or destroyed, the moving party need not demonstrate that he acted in bad faith, or with the "purpose of depriving the adversary of the evidence." *Victor Stanley*, 269 F.R.D. at 530 (quoting *Powell v. Town of Sharpsburg*, 591 F. Supp. 2d 814, 820 (E.D.N.C. 2008)); *see also Callahan v. Pacific Cycle, Inc.*, 756 F. App'x 216, 227 (4th Cir. 2018) (per curiam) ("'[W]illful conduct' in this context simply means not accidental."). "At bottom, there simply needs to be a showing that the party's 'intentional conduct contribute[d] to the loss or destruction of [the] evidence.'" *Johnson*, 996 F.3d at 217 (quoting *Vodusek*, 71 F.3d at 156); *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008) (rejecting district court's assumption that "non-bad faith conduct" was equivalent to "negligent conduct" and explaining that an adverse inference could still be appropriate if, "though not conducted in bad faith," a party's loss or destruction of evidence is "intentional, willful, or deliberate") (internal quotation marks omitted); *Vodusek*, 71 F.3d at 156 (affirming adverse inference where, although plaintiff may not have acted "in bad faith," district court "acted within its discretion" in finding that plaintiff "permanently destroyed [relevant evidence] as part of [her expert's] deliberate investigative efforts"). Stranahan has conceded that the CJS documents are relevant to the claims in this case. *See* Tr. of Feb. 3, 2021 Disc. Hr'g 25. He apparently took no efforts to preserve the documents, even though he had a duty to do so at least since this litigation commenced in March 2018, *see Silvestri*, 271 F.3d at 591, and the Court specifically ordered him to produce those

20

documents in July 2020 and again February 2021. Stranahan admits that despite knowing they were relevant to this litigation, he did not save a copy of them before allowing his son to conduct a domain transfer that resulted in the loss of the CJS documents. *See* Tr. of Feb. 3, 2021 Disc. Hr'g 22. Stranahan may not have, in bad faith, intended to permanently deprive Plaintiff of the documents he seeks. *See Victor Stanley*, 269 F.R.D. at 530. But he failed to preserve documents relevant to this litigation and intentionally permitted the domain transfer that "contribute[d] to the loss or destruction of [the] evidence." *Johnson*, 996 F.3d at 217 (strongly suggesting that an adverse inference instruction would be appropriate where government investigator knew that a decedent's cell phone was relevant to a criminal investigation, failed to preserve its contents, and then "returned the cell phone to [the decedent's] family," who subsequently "misplaced" it, depriving criminal defendant from using the cell phone's contents to present potentially exculpatory evidence at trial); *Membreno v. Atlanta Rest. Partners, LLC*, 338 F.R.D. 66, 73–74 (D. Md. 2021) (finding that "[e]ven assuming there was a 'huge misunderstanding'" about what documents should have been preserved, defendants still failed to "take[] steps to ensure" that relevant personnel files were preserved for purposes of litigation and then engaged in conduct that caused the destruction of those files, warranting an adverse inference as to their contents); *Callahan*, 756 F. App'x at 227–28 (affirming district court's decision to give an adverse-inference jury instruction about the position of a bike's handlebars where judge reasonably found that appellants had the bike in their exclusive control and altered the orientation of its handlebars to a position that was "more favorable" to their theory of the case, which "require[d] an intentional act, like straddling the wheel and turning the handlebars").

Moreover, less severe sanctions would not be effective here. Stranahan has repeatedly failed to respond to discovery requests and a court order. Although he appears to have recently

worked with Plaintiff to resolve disputes over the Periscope videos and Plaintiff's second and third sets of discovery requests, he did so only after Plaintiff moved to compel and after I admonished him at the June 7, 2021 hearing for failure to comply with my prior Order concerning the Periscope videos. He is also proceeding pro se because of a lack of financial resources to hire counsel. Tr. of Mar. 31, 2021 Disc. Hr'g 46 ("I'm pro se because I have no money. I have no bank account."). And, the parties do not dispute that the CJS documents no longer exist. *See* Pl.'s Mot. for Evid. Sanctions 12 (citing Tr. of Mar. 31, 2021 Disc. Hr'g 44– 45). In light of these factors, I find it unlikely that further court orders or monetary sanctions alone would achieve meaningful compliance.

## V. Conclusion

For the foregoing reasons, Plaintiff's Motion to Compel, ECF No. 319, and Plaintiff's Motion for Relief, ECF No. 276, are DENIED as MOOT. Plaintiff's Motion for Evidentiary Sanctions Against Defendant Lee Stranahan, ECF No. 268, is GRANTED. Specifically:

(1) Plaintiff's request for a permissive adverse-inference instruction against Stranahan is GRANTED subject to the presiding District Judge's final approval. Plaintiff should submit his proposed language to the presiding District Judge in his proposed jury instructions. The language should be tailored to Stranahan's failure to obey the July 17, 2020 Order to minimize any impermissible "spillover" effect on Defendants who have not been found to have disobeyed that Order.

(2) Plaintiff may file a petition setting out his reasonable expenses, including attorneys' fees, caused by Stranahan's failure to obey the Court's July 17, 2020 Order, ECF Nos. 202 & 231, *see* Fed. R. Civ. P. 37(b)(2)(C) within thirty (30) days from the date of this Order.

It is so ORDERED.

The Clerk shall send a copy of this Memorandum Opinion & Order to the parties.

ENTER: November 12, 2021

Joel C. Hoppe
U.S. Magistrate Judge