IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| BRENNAN GILMORE, et al., ) | |
|     Plaintiffs, ) | Civil Action No. 3:18-cv-00017 |
| ) | |
| v. ) | MEMORANDUM OPINION & ORDER |
| ) | |
| ALEXANDER ("ALEX") E. JONES, et al., ) | By:   Joel C. Hoppe |
|     Defendants. ) | United States Magistrate Judge |

This matter is before the Court on Defendants Alex Jones; Infowars, LLC; and Free Speech Systems, LLC's (collectively, "the FSS Defendants") Motion to Compel Discovery from Plaintiff Brennan Gilmore. Defs.' Mot. to Compel, ECF No. 447. The motion has been fully briefed, ECF Nos. 447 to 449, and is ripe for disposition. For the reasons explained below, the Court GRANTS in part and DENIES in part the FSS Defendants' Motion to Compel.

I. Background[1]

This is a defamation case arising out of the "Unite the Right" rally that occurred in Charlottesville, Virginia on August 11–12, 2017. On August 12, "Unite the Right" supporters and counter-protestors filled the streets of downtown Charlottesville. Am. Compl. ¶¶ 25–28. Plaintiff Brennan Gilmore attended the Unite the Right rally as a counter-protestor and captured a video of James Alex Fields, Jr. driving his vehicle through the crowd, killing one woman, and injuring many others. *Id.* ¶¶ 27–30. Gilmore posted the video to his Twitter account and spoke with reporters about what he had seen. *Id.* ¶¶ 31–35. The FSS Defendants later posted two videos about Gilmore wherein they allegedly asserted or implied that he was a "deep state" operative involved in a plot to manufacture violence at the Unite the Right rally to undermine then-President Donald Trump. *See generally id.* ¶¶ 36, 83–124.

---

[1] This section summarizes certain factual allegations in Plaintiff's Amended Complaint, ECF No. 29. It focuses solely on facts relevant to Plaintiff's claims against the FSS Defendants. It does not include facts relevant to Plaintiff's claims against all other defendants to this action.

1

The first video (the "August 15 video"), titled "*Bombshell Connection Between Charlottesville, Soros, CIA*," was published to Defendant Infowars, LLC's website on August 15, 2017. Am. Compl. ¶ 83; *see* Aug. 15 Video Tr. 3, 6, 12, ECF No. 122. It featured Defendants Lee Ann McAdoo and Lee Stranahan discussing Gilmore's "alleged connection to Ukraine and [George] Soros" and a "'Deep State coup underway to oust Trump.'" Am. Compl. ¶ 83 (quoting Aug. 15 Video Tr. 2). They are shown scrolling through Gilmore's Twitter page, noting his classification of Heather Heyer, who was killed during the Unite the Right rally, as a "martyr," and allegedly asserting, via their words and mannerisms, that Gilmore's presence at Unite the Right and filming of Heyer's death were part of a pre-planned "deep state" conspiracy to incite violence in Charlottesville in an effort to disparage Trump. *Id.* ¶¶ 83–85. Stranahan discussed the tiki-torch demonstrations by the Ukrainian neo-Nazi party that were "'exactly like'" those from the Unite the Right rally. *Id.* ¶ 84. During Stranahan's comments, the video plays violent scenes of riots from the Oliver Stone film, "Ukraine on Fire." *Id.* The video's images and Stranahan's and McAdoo's comments allegedly falsely suggest that Gilmore was part of a "Soros-funded and United States government-sponsored coup beginning in Ukraine and further carried out in Charlottesville." *Id.* ¶ 84. Defendant Jones posted the August 15 video to his Twitter account that day. *Id.* ¶ 88.

The next video (the "August 21 video") was posted by Defendant Jones to Defendant Infowars, LLC's website on August 21, 2017, and is titled "*Breaking: State Department/CIA Orchestrated Charlottesville Tragedy.*" *Id.* ¶ 102. On the video, Defendant Jones, purporting to have conducted "deep research" that "confirmed it all," discusses an individual who Jones says is a "known CIA and State Department official[]. . . . on the payroll of [George] Soros" and who "formerly worked for [Barack] Obama, [John] Podesta, Hillary [Clinton], the CIA[.]" *Id.* ¶ 104.

2

Jones's video then displays Gilmore's photograph, identifying Gilmore by name, as a narrator states, "He was presented as an accidental witness, but who is he really?" *Id.* ¶ 105. The narrator also describes Gilmore's purported experience working abroad for the State Department and asks viewers,

> So the first man in the scene whose tweet went viral and who was later interviewed on mainstream news as a witness just happened to be a State Department insider with a long history of involvement in psy-ops? If you think that isn't fishy, how about this? Since the Charlottesville protest, and his appearance in the media, his information was suddenly removed from the State Department websites.

*Id.* Gilmore alleges that the August 21 video falsely "stat[es] and impl[ies] an assertion of fact: that Mr. Gilmore participated in a State Department/CIA operation to stage the violence and Fields'[s] car attack in Charlottesville." *Id.* ¶ 109.

With the backdrop of these factual allegations, the instant discovery dispute concerns several interrogatories and requests for production of documents that the FSS Defendants propounded upon Gilmore covering five broad topics: (1) Gilmore's identification of specific false and defamatory statements contained in the August 15 video and the August 21 video; (2) Gilmore's communications and interactions with media entities; (3) Gilmore's claimed injuries and damages; (4) Gilmore's communications with third parties regarding the central issues to the case; and (5) Gilmore's membership in certain organizations and his applications for certain grants and awards. Defs.' Br. 2, ECF No. 447. Each issue is considered in turn.

## II. The Legal Framework

Broad discovery is generally permitted in civil cases. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). "Relevance is not, on its own, a high bar." *Va. Dep't of Corrs. v. Jordan*, 921 F.3d 180,

188 (4th Cir. 2019). Indeed, "[t]here may be a mountain of documents and emails that are relevant in some way to the parties' dispute, even though much of it is uninteresting or cumulative." *Id.* Moreover, information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). But discovery, "like all matters of procedure, has ultimate and necessary boundaries." *Hickman*, 329 U.S. at 507. Courts must limit the frequency or extent of proposed discovery if it is "outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii), and they may for good cause limit the terms of discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," Fed. R. Civ. P. 26(c).

When a party fails to make requested disclosures or discovery, the requesting party may file a motion to compel. Fed. R. Civ. P. 37(a)(1). On such a motion, the party "resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Eramo v. Rolling Stone LLC*, 314 F.R.D. 205, 209 (W.D. Va. 2016). Thus, once the moving party has made "a prima facie showing of discoverability," the resisting party has the burden of showing either: (1) that the discovery sought is not relevant within the meaning of Rule 26(b)(1); or (2) that the discovery sought "is of such marginal relevance that the potential harm . . . would outweigh the ordinary presumption of broad discovery." *Id.* (internal quotation marks omitted). Moreover, "[d]istrict courts generally have broad discretion in managing discovery, including whether to grant or deny a motion to compel." *Id.* (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va.*, 43 F.3d 922, 929 (4th Cir. 1995)).

### III. Discussion

A.      *Identification of False & Defamatory Statements*[2]

---

[2] The discovery requests at issue on this topic are: Nos. 5–10 of Defendant Free Speech Systems, LLC's First Set of Interrogatories. *See* Defs.' Br. Ex. 1, at 8–16, ECF No. 447-3.

4

In its First Set of Interrogatories, Defendant Free Speech Systems, LLC, asked Gilmore to "[i]dentify with specificity what statements" in the August 15 video and the August 21 video are "false" or defamatory," and to "[i]dentify with specificity all facts showing that the statements identified . . . are false." Defs.' Br. 3. The FSS Defendants contend that Gilmore gave "vague, unresponsive, and incomplete answers" to those interrogatories *Id.* at 4; *see* Fed. R. Civ. P. 37(a)(4) ("[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."). They assert that Gilmore's response—"the videos are defamatory '*in toto*'"—is insufficient, Defs.' Br. 4, and that Gilmore must identify each statement alleged to be false and defamatory so Defendants can adequately prepare their affirmative defenses, *id.* at 6. *See generally id.* at 3–7. In his opposition, Gilmore argues that he has sufficiently responded to these requests by identifying both specific false and defamatory statements and "provably false factual connotation[s]" that can reasonably be inferred from those statements. Pl.'s Br. 2 (quoting *Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 450 (Va. 2006)), ECF No. 448; *see generally id.* at 2–6. He argues that parsing individual statements to show how they are defamatory is unnecessary in part because "the statements in the video taken as a whole convey a defamatory implication." *Id.* at 4.

The crux of the parties' discovery dispute is their differing interpretation of Virginia's "defamation by implication" theory and the adequacy of Gilmore's identification of allegedly false statements. "Under Virginia law, '[a]n actionable statement is one that is both false and defamatory.'" *Gilmore v. Jones*, 370 F. Supp. 3d 630, 670 (W.D. Va. 2019) (Moon, J.) (quoting *Choi v. Kyu Chul Lee*, 312 F. App'x 551, 552 (4th Cir. 2009)). "False statements are those that 'contain a provably false factual connotation,'" *id.* (quoting *Tronfeld*, 636 S.E.2d at 450), and "[d]efamatory statements are those that tend to 'harm the reputation of another as to lower him in

5

the estimation of the community or to deter third persons from associating or dealing with him," *id.* (quoting *Choi*, 312 F. App'x at 552). "'[A] defamatory charge need not be made in direct terms; it may be made by inference, implication, or insinuation.'" *Id.* (quoting *Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 144 (Va. 1997)); *Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999) (holding that several statements made during a speech "and a fair implication thereof" imputed to Plaintiff criminal acts in a conspiracy that were "capable of defamatory meaning"). Nevertheless, the "defamatory implication must be present in the plain and natural meaning of the words used." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 591–92 (Va. 1954)).

In denying Defendants' motion to dismiss Gilmore's Amended Complaint, Judge Moon determined that Gilmore adequately alleged that specific factual statements in both August 2017 videos were false. *See generally Gilmore*, 370 F. Supp. 3d at 675–77. After citing Defendants' statements in the August 15 video that "there is a 'deep state coup underway to oust Trump,'" that "George Soros and the Obama administration 'sponsored a coup' in Ukraine," and that "the 'white nationalists in Charlottesville' chanted the 'exact same slogan' as 'paid protestors' in the Ukraine and used 'the same tiki torches,'" *id.* at 675 (quoting Aug. 15 Video Tr. 12), Judge Moon noted that Defendant Stranahan described Gilmore as a State Department employee "'who happened to catch that shot' of Fields's attack," *id.* (quoting Am. Compl. ¶ 84). Judge Moon then quoted the following exchange between Defendants Stranahan and McAdoo:

> STRANAHAN: [I]n the Maidan [in Ukraine], they needed martyrs. See, they need someone dead. . . . If you go to Brennan Gilmore's page, his Twitter page, you'll see he has a picture of the young woman who was murdered [in Charlottesville], and you know what it says? 'Martyr.'
>
> McADOO: Wow.

6

> STRANAHAN: Literally it says, 'martyr.' You can't be more explicit than this. . . . I'm a fact-based journalist. The facts are enough. However, the Democrats have investigated Trump for a lot less. . . . I think someone really needs to investigate. Again, I don't like to jump to conclusions, I'd like to ask some questions about who this kid was, where he came from, what do we know, get it all out in the open. . . . [I]f you look at this guy's bio, it says that he was with the State Department. And the fact that he called her a martyr, again, I don't know. . . . This is clearly the way she's being used, is she is a martyr to the cause.
>
> McADOO: Right.

*Id.* at 675–76 (quoting Am. Compl. ¶ 84) (alterations in original) (footnote omitted). Read in conjunction, these statements "are 'reasonably capable of conveying the defamatory innuendo,'" *id.* at 676 (quoting *Pendleton v. Newsome*, 772 S.E.2d 759, 765 (Va. 2015), "that Gilmore was one of the 'players' involved in a Ukrainian coup now using the Unite the Right rally to frame Heather Heyer as a 'martyr' and 'oust President Trump,'" *id.* (quoting Am. Compl. ¶ 84). Judge Moon explained that Gilmore sufficiently alleged that Stranahan's and McAdoo's statements were defamatory in that they created innuendo that would tend to harm Gilmore's reputation, deter others from dealing with him, and "tend to prejudice him in his profession as a diplomat." *Id.*

Regarding the August 15 video, Gilmore identifies in his discovery responses much of the language of Defendants Stranahan and McAdoo identified by Judge Moon and quoted above. He asserts that those statements imply "that [he] was involved in a plot to sponsor a coup in the United States to overthrow the President," that he "was working with others to execute that coup or otherwise 'settle for impeachment,'" and that he "was working with conspirators to promote that coup by referring to Heather Heyer as a 'martyr.'" Pl.'s Br. 2 (quoting Defs.' Br. Ex. 1, at 9–10). Gilmore has therefore identified the defamatory implication (that he was involved in a deep state conspiracy to undermine then-President Trump) and the statements giving rise to this implication (those quoted in his discovery responses). Thus, Gilmore's responses pertaining to

7

the August 15 video identify the statements and the false implications upon which his defamation claim rests.

Similarly, Judge Moon identified certain allegedly false statements in the August 21 video, including Defendant Jones's claim that Gilmore "participated in a State Department/CIA operation to stage the violence and Fields'[s] car attack in Charlottesville." *Gilmore*, 370 F. Supp. 3d at 677 (quoting Am. Compl. ¶ 109). Judge Moon also quoted the following language from the August 21 video:

> I did research, and I confirmed it all. They had known CIA and State Department officials in Charlottesville, first tweeting, first being out on MSNBC, CNN, NBC. The mayor is involved. Everybody is a cut-out. . . . They got State Department and high-level CIA. One guy is paid $ 320,000 a year on the payroll of [George] Soros. He doesn't just get money from Soros, he personally is paid 320 a year, . . . [A]nd he is on the news. And when people pointed out who he was, they took his name of[f] the State Department website . . . I mean it's like WOW, WOW—CIA? Your senior guys? And you're so stupid on TV, 'oh I saw 'm run over, I saw the racists, I saw the white supremacists attack, oh I'm the guy being interviewed first putting out the talking points'. . . . He worked for Podesta too, John Podesta. I'll give you his name and stuff, we're gonna play a video of him on the news. They had him first on every news cast . . . I'm just [a] witness standing here. . . formerly worked for Obama, Podesta, Hillary, the CIA. . .
>
> * * *
>
> [T]he first man in the scene whose tweet went viral and who was later interviewed on mainstream news as a witness just happened to be a State Department insider with a long history of involvement in psy-ops? If you think that isn't fishy, how about this? Since the Charlottesville protest, and his appearance in the media, his information was suddenly removed from the State Department websites. The elites know we're on to them and are trying to cover their tracks.

*Id.* (quoting Am. Compl. ¶¶ 104–05) (alterations in original). Judge Moon found that Gilmore had plausibly alleged that the August 21 video "conveys the provably false factual connotation," *id.* (internal quotation marks omitted), "that, as [its] title states, 'the State Department/CIA [o]rchestrated' the 'Charlottesville [t]ragedy, and that Gilmore was an 'actor' or 'cut-out' in this 'set-up event,'" *id.* (alterations in original).

In his discovery responses pertaining to the August 21 video, Gilmore again references the allegedly false statements that Judge Moon's opinion cited from the Amended Complaint. Defs.' Br. Ex. 3, at 11–13. Additionally, his response to Interrogatory 7 states in pertinent part:

> The factual assertions made in the August 21 Video are false. By way of example, Plaintiff has never worked for the campaigns or offices of Barack Obama, Hillary Clinton, or John Podesta. Plaintiff has never been employed by the CIA. Plaintiff was not a "cut-out" for the State Department or CIA in connection with the events of August 12, 2017. Plaintiff's name was not removed from the State Department website because "the elites . . . . [were] trying to cover their tracks." Plaintiff never received a personal payment of $380,000 from George Soros. Beyond these examples, the factual implication of the statements made in the August 21 Video is that Plaintiff was part of a wide-ranging State Department and CIA conspiracy to stage the violence that took place in Charlottesville; that he was falsely presented as an "accidental witness" to that violence; and that "deep research" confirmed that Plaintiff was paid for his participation in the conspiracy.

*See* Defs.' Br. Ex. 1, at 12–13. Here, Gilmore has also identified the alleged defamatory implication and the statements giving rise to that implication, as well as specific false statements within the August 21 video.

In his interrogatory responses for both videos, Gilmore has thus identified particular statements, combined with context from the videos, that he contends are false and defamatory, and he has asserted that the videos "as a whole convey a defamatory implication." Pl.'s Br. 4. Clearly, the parties hold different views about the adequacy of Gilmore's allegations of false and defamatory statements, particularly as they concern the theory of defamation by implication. The FSS Defendants' doubts about Gilmore's defamation by implication claims, however, do not show that his discovery responses are necessarily inadequate. Moreover, a motion to compel is not the appropriate vehicle to litigate whether an entire statement or video may show defamation by implication. That is a decision left to the presiding District Judge, should a party properly present it to him. Nonetheless, if Gilmore has not identified all allegedly false and defamatory statements and instead elected to cite only some examples, then he must supplement his

9

responses to the FSS Defendants' interrogatories. The FSS Defendants are entitled to full and complete discovery responses that identify all the statements Gilmore contends are false and defamatory.

B.      *Media Interactions & Communications*[3]

The FSS Defendants ask that the Court compel Gilmore to answer certain interrogatories and requests for production about his interactions and communications with journalists and media entities concerning the central issues in the case. *See* Defs.' Br. 7–8. In their brief, the FSS Defendants agreed to limit the "the scope of their requests on this matter to non-public interviews or appearances between August 12, 2015 and the present." *Id*. at 8. Gilmore responded that he "ha[d] not been interviewed or made any appearances in that time period in a forum that is not publicly available." Pl.'s Br. 7. Thus, Gilmore contends, "this dispute appears resolved." *Id.* The FSS Defendants do not challenge this contention, and, on its face, Gilmore's response appears sufficient. *See* Fed. R. Civ. P. 33(b)(3) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."). As the dispute on this topic appears to be resolved, the Court will deny as moot the FFS Defendants' motion to compel with respect to discovery requests relating to Gilmore's media interactions and communications after August 12, 2015.

C.      *Injuries & Damages*[4]

---

[3] The discovery requests at issue on this topic are: (i) Nos. 5, 26–28 of Defendant Free Speech Systems, LLC's First Requests for Production of Documents, *see* Defs.' Br. Ex. 2, at 10–11, 28–31, ECF No. 447-4; (ii) No. 2 of Defendant Free Speech Systems, LLC's First Set of Interrogatories, *see* Defs.' Br. Ex. 1, at 5–6; and (iii) Nos. 4, 20 of Defendants Infowars, LLC's First Requests for Production of Documents, *see* Defs.' Br. Ex. 3, at 8, 19–20.

[4] The discovery requests at issue on this topic are: (i) Nos. 11–12 and 18 of Defendant Free Speech Systems, LLC's First Requests for Production of Documents, *see* Defs.' Br. Ex. 2, at 15–17, 21–22, ECF No. 447-4; (ii) Nos. 2, 12, and 19 of Defendant Free Speech Systems, LLC's First Set of Interrogatories, *see* Defs.' Br. Ex. 1, at 5–6, 17–18, 23–24; (iii) Nos. 30–37, 126, and 131–132 of Defendant Infowars, LLC's First Requests for Production of Documents, *see* Defs.' Br. Ex. 3, at 28–34, 106, 109–10; and (iv)

The FSS Defendants propounded various discovery requests on Gilmore pertaining to his allegations of reputational damage, lost potential business opportunities, lost potential romantic partners, and mental and emotional distress. Defs.' Br. 8. They view Gilmore's responses as deficient, asserting that he has "refused to provide any specific instances of injury or damage to his reputation," *id.*, has provided "no names, and no specific instances of any actual lost business opportunities," *id.* at 8–9, has refused to respond to RFPs asking him to document the loss of a potential romantic partner, *id.* at 9, and has provided only a billing statement from a clinical psychologist in support of his mental health claims, *id.* Additionally, the FSS Defendants note Gilmore "also pleads that he has developed an optical condition referred to as Central Serous Chorioretinopathy," but has "produced no diagnoses or treatment records" and "no information relating to treatments or prescribed medications." *Id.* at 9–10.

In his opposition, Gilmore contends he "identified documents to Defendants in his meet-and-confer correspondence illustrating, e.g., his leave of absence from the State Department, his performance reviews before he was forced to extend that leave due to Defendants' defamatory statements, and threats that he (and his family) received," and that he "has no additional information to provide." Pl.'s Br. 8. Gilmore agreed to produce his mental health records from July 2017 forward, but requests that the production be limited to an "outside-counsel-eyes-only basis" because of Defendant Jones's alleged misconduct in unrelated litigation. *Id.*

The FSS Defendants' requests for information about Gilmore's claimed injuries and damages are relevant for discovery purposes. Fed. R. Civ. P. 26(b)(1). Gilmore asserts that he has produced all responsive documents—save several medical records—and the FSS Defendants have not shown this assertion is inaccurate. Even so, if Gilmore possesses or has control over

---

Nos. 8–10 of Defendant Infowars, LLC's First Set of Interrogatories, *see* Defs.' Br. Ex. 4, at 10–12, ECF No. 447-6.

documents showing that he lost business or romantic opportunities, he must produce them. In their reply brief, the FSS Defendants also continue to challenge the adequacy of Gilmore's interrogatory responses, contending that his description of lost business ventures lacks specific details. Defs.' Reply 4, ECF No. 449. To the extent Gilmore lost any business opportunity because of the FFS Defendants' actions, he must provide the who, what, when, and where of that lost opportunity.

As to Gilmore's physical and psychological injuries, he must produce any documents relating to the injuries he alleges were caused by the FSS Defendants' actions. Gilmore did not address the FSS Defendants' assertion that he has not produced any documents related to his Central Serous Chorioretinopathy. If Gilmore has such documents and he attributes this condition to Defendants' actions, he must produce them to the FSS Defendants. The FSS Defendants seek Gilmore's mental health records from August 1, 2012, to the present, which they aver are relevant for discerning Gilmore's mental baseline. Defs.' Br. 10. The Court finds that five years of documentation is too broad, even to assess a baseline, and in any event, Gilmore asserts that no such records exist prior to July 2017. *See* Pl.'s Br. 9 ("Mr. Gilmore's records extend only as far back as July 2017."). Gilmore has agreed to produce these records subject to "an outside-counsel-eyes-only basis to the [FSS] Defendants only." *See id*. In their reply, the FSS Defendants offer no substantive opposition to this request. To protect Gilmore against any improper use of such records, such disclosures will be designated "Attorney Eyes Only." *See* Fed. R. Civ. P. 26(c)(1)(B) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . specifying terms . . . for the disclosure or discovery."). The parties shall confer and submit an agreed upon modification of the protective order previously entered in this case, ECF

Nos. 194, 196, reflecting that production of Gilmore's mental health information shall be subject to the "Attorney Eyes Only" designation.

D.     *Communications with Third Parties*[5]

The FSS Defendants also propounded various RFPs pertaining to any communications Gilmore had with third parties regarding the allegations in this case. Defs.' Br. 11. The FSS Defendants aver that "[w]hile Plaintiff has produced some documents which are responsive to these requests, he has refused to produce documents in response to others." *Id.* They "are concerned that the produced communications are not exhaustive of the discoverable communications in Mr. Gilmore's possession." *Id.* at 12. To ensure Gilmore is not withholding responsive documentation, they "request that Plaintiff produce a declaration certifying that fact and describing the methods employed to search for the responsive documents." *Id.* Gilmore responds that despite several attempts to resolve this issue without the Court's intervention, the FSS Defendants have declined to meet and confer. Pl.'s Br. 10. Gilmore agreed to "undertake a re-review of documents in view" of the understanding that these requests were intended as catchalls, as confirmed by the FSS Defendants' counsel. *Id.* at 11.

Considering Gilmore's concession, the Court will order him to perform the agreed upon "re-review" and to produce any additional responsive documents. In light of this concession, however, the Court finds it unnecessary at this time to order him to file a declaration affirming that he has produced all responsive documents and detailing the methods employed in searching for such documents. *See Sorensen v. Lexar Media, Inc.*, No. C 08-0095 JW, 2008 WL 5383513, at *2 (N.D. Cal. Dec. 22, 2008) (concluding that "a written declaration that all responsive

---

[5] The discovery requests at issue on this topic are: (i) Nos. 2–6 and 20 of Defendant Free Speech Systems, LLC's First Requests for Production of Documents, *see* Defs.' Br. Ex. 2, at 6–12, 23; and (ii) Nos. 2, 24–28, 63, and 102 of Defendant Infowars, LLC's First Requests for Production of Documents, Defs.' Br. Ex. 3, at 6–7, 22–27, 55, 85–86.

documents have been produced" was "unnecessary because the responding party has a duty to produce responsive documents and to supplement if further materials are located" and "there [was] no reason to doubt that [the responding party] is attempting, in good faith, to fulfill its discovery obligations").

    E.    *Organizational Memberships & Applications for Awards & Grants*

At a discovery hearing on August 27, 2021, the parties indicated that they had resolved this aspect of their dispute. *See* Aug. 27, 2021 Disc. Hr'g Tr. 39, ECF No. 443. Neither party substantively addressed the issue in briefing. Accordingly, the Court will deny as moot the FSS Defendants' motion to compel with respect to discovery requests pertaining to Gilmore's membership in certain organization and applications for grants and awards.

## IV. Conclusion

For the foregoing reasons, the FSS Defendants' motion to compel Plaintiff's discovery responses, ECF No. 447, is hereby GRANTED IN PART and DENIED IN PART as follows:

1. To the extent that he has not already done so, Plaintiff is **ORDERED** to identify with specificity any statement or statements contained in the August 15 video or the August 21 video that he alleges are false or defamatory within fourteen (14) days from the date of this Order.

2. Plaintiff is **ORDERED** to produce, within fourteen (14) days from the date of this Order, the following documents, to the extent he has not already done so: (a) responsive documentation relating to the diagnosis or treatment of his Central Serous Chorioretinopathy; and (b) responsive documentation relating to lost business and romantic opportunities.

3. The FSS Defendants' request for Plaintiff's mental health records for the five years preceding August 2017 is DENIED. Plaintiff is **ORDERED** to produce, within fourteen (14) days from the date of this Order, any responsive mental-health records created in or after July 2017. Any such disclosures shall be designated "Attorney Eyes Only." The parties are **ORDERED** to confer and submit an agreed upon modification of the protective order entered in this case, ECF Nos. 194, 196, defining the "Attorney Eyes Only" designation within fourteen (14) days from the date of this Order.

4. Plaintiff is **ORDERED** to conduct a "re-review" and produce any documents responsive to the FSS Defendants' requests relating to third party communications on the issues central to this case within fourteen (14) days from the date of this Order.

It is so ORDERED.

The clerk shall send copies of this Memorandum Opinion and Order to the parties.

ENTER: November 22, 2021

Joel C. Hoppe
U.S. Magistrate Judge